IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DAVID McCHESNEY,

                              Plaintiff,

                                                    Civil Action No.
              v.                                    9:08-CV-1186 (NAM/DEP)


MICHAEL F. HOGAN, Commissioner,
New York State Office of Mental Health,
and DONALD SAWYER, Executive
Director, C.N.Y.P.C.,

                              Defendants.

_____

APPEARANCES:                                OF COUNSEL:

FOR PLAINTIFF:

DAVID McCHESNEY, *Pro Se*
25527-604
CNY Psychiatric Center
P.O. Box 300
Marcy, NY 13403

FOR DEFENDANTS:

HON. ERIC T. SCNEIDERMAN           ADELE TAYLOR-SCOTT ESQ.
Office of Attorney General         Assistant Attorney General
State of New York
The Capitol
Litigation Bureau
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

Plaintiff David McChesney, a convicted sex offender who has been civilly committed to the Central New York Psychiatric Center ("CNYPC" or "Center") for participation in sex offender treatment, has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint, plaintiff alleges that his forced participation in the Sex Offender Treatment Program ("SOTP") administered at the CNYPC violates his constitutional rights.  Since the action was commenced plaintiff's claims, which originally also included a Fifth Amendment self-incrimination claim and sought a finding of individual liability on the part of the named defendants, have been narrowed as a result of motion practice.  The sole remaining claims before the court are First Amendment Establishment and Free Exercise causes of action against defendants in their official capacities for prospective injunctive relief, in which McChesney asserts that the SOTP is predicated in part upon religious tenets, and he is being forced, contrary to his beliefs as an atheist, to practice religion in violation of his First Amendment rights.

Defendants now move for summary judgment dismissing plaintiff's

2

complaint, asserting that the group treatment modalities at issue do not violate plaintiff's First Amendment rights and that, in any event, they are entitled to summary judgment on McChesney's claims against them due to their lack of personal involvement.  For the reasons set forth below, I recommend that defendants' motion be denied.

I.      BACKGROUND[1]

The CNYPC is a mental health facility located in Marcy, New York and operated under the jurisdiction of the New York State Office of Mental Health ("OMH").  Complaint (Dkt. No. 1) § 2; Sawyer Decl. (Dkt. No. 32-5) ¶ 3.  The SOTP is a "secure treatment facility" located within the CNYPC but separate from the general population of the Center.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 32-2) ¶¶ 5-7.[2]  In December 2007, following a period of incarceration and after being adjudicated a "sex offender requiring civil management",[3] pursuant to Article 10 of the

---

[1]      In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]      Plaintiff is deemed to have admitted the allegations contained within defendants' Local Rule 7.1(a)(3) Statement, based upon his failure to oppose defendants' motion.  *See* pp. 12 - 14, *post*.

[3]      Under New York law a "dangerous sex offender requiring confinement" is a detained sex offender suffering from mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that

New York Mental Hygiene Law, McChesney was involuntarily committed to CNYPC-SOTP for treatment.  *Id.* at ¶¶ 1-4.

Plaintiff's complaint, which is sparse in factual detail, asserts that the treatment programs in which he has been forced to participate at the Center subject him, as an atheist, to various religious rituals and practices.[4]  More specifically, he claims that The Good Lives Model and Boundaries program teach that you must believe in spirituality, the Dialectic Behavior Therapy ("DBT"), Self Care Skills I & II, and relaxation programs adopt or are patterned after the rituals and practices of Zen Buddhism, and the Growing up Male, From Inside Out, Problem Solving, and Anger Management programs are all "Hazeldon" products which incorporate Christian beliefs and practices.  According to plaintiff's complaint, defendants' use of these programs violates the First Amendment's prohibition of establishment of religion as well as its protection of his right to the free exercise of religion.

_____

the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility.  N.Y. Mental Hyg. Law § 10.03(e).

[4]    It appears from the record that plaintiff's religious beliefs have changed over time.  At various points while in the custody of the New York State Department of Correctional Services (now the Department of Corrections and Community Services, or "DOCCS"), he indicated his religious affiliation as Buddhist, and later as a Methodist. *See* Taylor Scott Decl. (Dkt. No. 32-3) Exhs. A and B.

The group therapy protocols at the CNYPC-SOTP are developed by the group leaders at that facility and are reviewed and approved by SOTP Director Terri Maxymillian.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 32-2) ¶ 15.  Defendant Michael Hogan, as Commissioner of the OMH, has supervisory responsibility over the CNYPC.  Hogan Decl. (Dkt. No. 32-6) ¶ 5.  The Executive Director of the Center, defendant Donald Sawyer, participates in approval of the CNYPC-SOTP operating procedures and oversees the staff responsible for implementation of the operating protocols.  Sawyer Decl. (Dkt. No. 32-5) ¶ 12.

The self care and relaxation techniques practiced at the Center are part of the DBT and though associated with some Eastern philosophies, such as Buddhism, those beliefs are not specifically referenced or incorporated into the treatment modalities.  Maxymillian Decl. (Dkt. No. 32-4) ¶ 11.  Self care and relaxation skills are taught as part of a broader menu of relaxation tools of which group participants are made aware so that they may choose the techniques and relaxation tools that work best for them and apply them when needed.  *Id.* at ¶¶ 11-13; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 32-2) ¶ 16.  Under the DBT treatment modality a program participant may consider but is not required to employ

5

these relaxation techniques to facilitate his treatment and progress

through the various phases of his or her treatment program.   Defendant's

Rule 7.1(a)(3) Statement (Dkt. No. 32-2) ¶ 17.

The primary goal of the Living the Good Life modality is to assist

participants to become aware of what makes them vulnerable and how

their difficulties in these areas cause them to act in inappropriate ways.

Maxymillian Decl. (Dkt. No. 32-4) ¶ 15.  This particular treatment protocol

requires group participants to define what their personal needs are and

rank those needs in order of importance in order to develop skills to attain

those needs in appropriate and socially acceptable ways.  *Id.* at ¶¶ 14-17.

In this group treatment modality the participants are requested to examine

and determine for themselves whether spirituality is one of their personal

needs, and they are at liberty to determine that it is not important to

pursuing a socially acceptable lifestyle.  *Id.* at ¶ 17.

Another treatment regimen at issue is the Boundaries program.

That program is aimed at assisting the group participants to become

aware of physical, emotional, psychological, and sexual boundaries, as

well as boundary violations.  Maxymillian Decl. (Dkt. No. 32-4) ¶ 18.

From the Inside Out is designed to teach participants the need for

6

healthy relationships and to take responsibility for their relationships; it is a treatment modality product developed by Hazeldon, which incorporates the twelve step Alcoholics Anonymous ("AA") and "NA methodology" used in substance abuse treatment programs and is based upon Christian principles.[5]  Maxymillian Decl. (Dkt. No. 32-4) ¶¶ 20-21.  The purpose of the From the Inside Out modality is to teach participants the need for healthy relationships and help them take personal responsibility for their relationships without blame shifting.  Growing Up Male, Problem Solving and Anger Management, like From the Inside Out, are all Hazeldon products; none of these programs, according to defendants, require the participants to pray or believe in a higher power.  *Id.* at ¶ 22.  Likewise, defendants state, none of the group treatment modalities advocate any particular religion or involve the use of proselytizing or religious indoctrination.  *Id.* at ¶¶ 22, 23.

II.   <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on November 6, 2008.[6]  A second

---

[5]   Defendants do not define the acronyms "AA" or "NA" utilized in their motion papers.  Since defendants refer to the "12 step AA" methodology, the court assumes that this is a reference to the well known Alcoholics Anonymous treatment program.

[6]   At the time plaintiff also had two other actions pending in this court.  In the first, *McChesney v. Hogan, et al.*, No. 9:08-CV-0163 (FJS), filed Feb. 11, 2008, plaintiff complained of the inadequacy of the law library at the CNYPC; the matter was closed

action, Civil Action No. 9:08-CV-1290 (NAM/DEP), was filed some three weeks later on November 28, 2008.   The two actions were subsequently consolidated by the court, *sua sponte*, but have since been severed.[7]  Dkt. Nos. 4, 13.

Plaintiff's complaint named OMH Commissioner Michael Hogan and CNYPC Executive Director Donald Sawyer as defendants and asserted claims under the First and Fifth Amendments to the United States Constitution.   On April 21, 2009, defendants moved for dismissal of plaintiff's claims in the two consolidated actions.   Dkt. No. 17.   The motion was granted in large part, leaving only plaintiff's First Amendment claims

_____

on September 7, 2010 after the court granted summary judgment dismissing plaintiff's claims.  Also pending was *McChesney v. Hogan, et al.,* No. 9:08-CV-0563 (NAM), filed June 10, 2008, in which McChesney lodged claims against the named defendants for failure to protect him from assaults at the hands of fellow patients at the Center; in September of 2010 that action was also closed after the court granted summary judgment in favor of the defendants.  A fifth action commenced by the plaintiff, *McChesney v. Miller, et al.*, No. 9:08-CV-0195 (TJM) (filed Feb. 21, 2008), was closed in March of 2008 based upon plaintiff's voluntary withdrawal of the claims set forth in his complaint without prejudice.  *See id.*, Dkt. Nos. 4-6.

[7]    The two actions were consolidated by the court, of its own initiative, based upon a report I issued on December 23, 2008 recommending that measure and approval of that recommendation by Chief District Judge Norman A. Mordue on March 9, 2009. The court's consolidation order designated Civil Action No. 9:08-CV-1186 (NAM/DEP) as the lead action.  As a result of the dismissal of plaintiff's claims in Civil Action No. 9:08-CV-1290 (NAM/DEP), on August 24, 2010, the court issued another order, *sua sponte*, severing the two actions so as to allow plaintiff to appeal from that judgment to the United States Court of Appeals for the Second Circuit without awaiting the outcome of this action.  Civil Action No. 9:08-CV-1290 (NAM/DEP) has been closed, and it appears that plaintiff did not file an appeal in that action.

8

against the defendants in this action in their official capacities for
prospective injunctive relief.  Dkt. Nos. 23, 25.

On March 31, 2011, following expiration of the deadline for
completion of discovery, defendants filed the pending motion for summary
judgment.  Dkt. No. 32.  Despite having been served with the requisite
notification of the consequences of failing to respond, *see* Dkt. No. 32-1,
as required under Northern District of New York Local Rule 56.2, plaintiff
has failed to file any opposition to defendants' motion, which is now ripe
for determination and has been referred to me for the issuance of a report
and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern
District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.    Summary Judgement Standard

Summary judgment motions are governed by Rule 56 of the Federal
Rules of Civil Procedure.  Under that provision, summary judgment is
warranted when "the pleadings, the discovery and disclosure materials on
file, and any affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of*

*Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir.

2004).  A fact is "material", for purposes of this inquiry, if it "might affect

the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d

549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in

dispute "if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at

2510.

A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be

decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion.  *Anderson*, 477

U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

the event this initial burden is met, the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed.

R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*,

477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled

to special latitude when defending against summary judgment motions,
they must establish more than mere "metaphysical doubt as to the
material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475
U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith
Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court
to consider whether *pro se* plaintiff understood nature of summary
judgment process).

When deciding a summary judgment motion, a court must resolve
any ambiguities, and draw all inferences from the facts, in a light most
favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.
Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is
warranted only in the event of a finding that no reasonable trier of fact
could rule in favor of the non-moving party.  *See Building Trades
Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)
(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511
(summary judgment is appropriate only when "there can be but one
reasonable conclusion as to the verdict").

B.     Legal Significance of Plaintiff's Failure to Respond

Before turning to the merits of plaintiff's remaining claims, a

11

threshold issue to be addressed is the legal significance of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to dismissal of plaintiff's complaint, based upon their motion.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  Undeniably, *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions.  *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.)).  Despite this measure of deference, the failure of an unrepresented plaintiff to oppose a summary judgment motion does not preclude the court from deciding the motion.  *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.)[8]; *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*,

---

[8]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

12

980 F. Supp. 106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).  As

can be seen by the face of Local Rule 7.1(b)(3), however, before

summary judgment can be granted under such circumstances the court

must review the motion to determine whether it is facially meritorious.  *See*

*Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp. 2d 229, 231-

32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542,

545-46 (N.D.N.Y. 2000) (Kahn, J.).

      While a plaintiff's failure to properly oppose a defendant's motion

does not assure that the motion, however lacking in merit, will be granted,

that failure is not without consequences.  By opting not to submit papers

in opposition to their motion, plaintiff has left the facts set forth in

defendants' Local Rule 7.1(a)(3) Statement unchallenged.  Courts in this

district have routinely invoked Local Rule 7.1(a)(3) and its predecessor,

Local Rule 7.1(f), deeming facts set forth in a statement of material facts

not in dispute to have been admitted based upon an opposing party's

failure to properly respond to that statement.[9]  *See*, *e.g.*, *Elgamil v.*

*Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug.

---

[9]   Local Rule 7.1(a)(3) provides that "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."  *See* N.D.N.Y.L.R. 7.1(a)(3).

22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

I recommend that the court apply Local Rule 7.1(a)(3) and, notwithstanding plaintiff's *pro se* status, accept defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing defendants' motion for facial sufficiency.

C.    Governing First Amendment Principles

The First Amendment, made applicable to the states through the Fourteenth Amendment, provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . .." U.S. CONT. AMEND. I.  "It embraces two fundamental concepts: freedom to believe and freedom to act on one's beliefs." *Hatzfeld v. Eagen*, No. 9:08-CV-283, 2010 WL 5579883, at *6 (N.D.N.Y. Dec. 10, 2010) (Homer , M.J.) (citing *Decker v. Hogan*, No.9:09-cv-0239, 2009 WL 3165830, at * 2 (N.D.N.Y.  Sept. 28, 2009) (McAvoy, S.J.)) (internal citations omitted), *report and recommendation adopted*, 2011 WL 124535 (Jan. 14, 2011) (Strom, S.J.).

14

Both of these basic freedoms are potentially implicated in this action.  Plaintiff asserts that by incorporating religious tenets in a required treatment program for sex offenders, the state has violated the First Amendment's requirement regarding establishment of religions and separation of church and state.  In addition, plaintiff maintains that the defendants have interfered with his right to exercise or, conversely, to be free from, religious beliefs as his conscience dictates.

### 1.    Plaintiff's Establishment Claim

The touchstone for the court's analysis of an Establishment Clause claims is the deeply rooted principle that the " 'First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion.' "  *McCreary Cnty., Kentucky v. American Civil Liberties Union*, 545 U.S. 844, 860, 125 S. Ct. 2722, 2733 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S. Ct. 266 (1968) (other citation omitted).  "[A]t a minimum, the government may not coerce anyone to participate in religion or its exercise."  *Hatzfeld*, 2010 WL 5579883, at *6 (quoting *Lee v. Weisman*, 505 U.S. 577, 587, 112 S. Ct. 2649, 2655 (1992)).    In the Second Circuit, analysis of an alleged Establishment Clause violation is governed by the test enunciated by the

15

Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105

(1971), as modified by *Agostini v. Felton*, 521 U.S. 203, 232, 117 S. Ct.

1997, 2015 (1997).  *DeStefano v. Emergency Housing Group, Inc.*, 247

F.3d 397, 406 (2d Cir. 2001).  The focus of the inquiry is "whether the

government acted with the purpose of advancing or inhibiting religion. . .."

*Id.* (quoting *Mitchell v. Helms*, 530 U.S. 793, 845, 120 S. Ct. 2530, 2560

(2000) (O'Connor, J. concurring)) (internal quotations omitted).  The "three

primary criteria" employed under *Lemon-Agostini* are "whether the action

or program 'result[s] in governmental indoctrination; define[s] its recipients

by reference to religion; or create[s] an excessive entanglement.'"[10]

*DeStefano*, 247 F.3d at 406 (quoting *Agostini*, 521 U.S. at 234, 117 S. Ct.

1997) (alterations in original).  "The ultimate inquiry for the purposes of

[p]laintiffs' § 1983 claim is whether the [SOTP] program requires

participation in religious activity."  *Miner v. Goord*, 354 Fed. App'x 489,

492 (2d Cir. 2009) (citing *Warner v. Orange County Dep't of Prob.*, 115

F.3d 1068, 1074-1075 (2d Cir. 1997)) (cited in accordance with Fed. R.

App. Proc. 32.1 not for precedential effect but to show continuing vitality of

---

[10]   "To 'indoctrinate' means '[t]o instruct in a body of doctrine or principles.... To imbue with a partisan or ideological point of view....' "  *DeStefano*, 247 F.3d at 414 (quoting THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 894 (4th ed. 2000)).

*Warner*).[11]

The First Amendment's Establishment Clause prohibits a government from coercing any person to participate in religion or its exercise. *Alexander v. Schenk*, 118 F. Supp. 2d 298, 301 (N.D.N.Y. 2000) (*citing, inter alia*, *Lee,* 505 U.S at 587, 112 S. Ct. 2649).  Where coercion is not at issue, to assess whether an Establishment Clause violation has occurred the court must consider whether "the practice (1) has a secular purpose; (2) whether it advances or inhibits religion in its principal or primary effect; and (3) whether it fosters excessive entanglement with religion."  *Id.* (citing *Lemon*, 403 U.S. at 612-613, 91 S. Ct. 2105; *Cnty. of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 592, 109 S. Ct. 3086 (1989)).  The threshold question in this instance, then, is whether McChesney was coerced into participating in the SOTP.

There is no dispute that plaintiff's commitment to the CNYPC-SOTP

---

[11]   Defendants suggest that plaintiff's Establishment Clause claim fails because his claimed atheism is not sincere.  The court notes, however, that unlike the inquiry involved in a Free Exercise claim, the sincerity of the plaintiff's belief has no bearing on the question of whether there has been an Establishment Clause violation since this provision was "drafted, as Supreme Court has repeatedly stated, to prevent government from coercing ***anyone*** to support or participate in a religion or its exercise, or otherwise act in a way which establishes a [state] religion or religious faith, or tends to do so."  *Alexander*, 118 F. Supp. 2d at 305 (quoting *Lee v. Weisman*, 505 U.S. 577, 587, 112 S. Ct. 2649 (1992)) (emphasis and alteration in original) (internal quotations omitted).

was involuntary.  The next inquiry is whether the treatment modalities

incorporated into the SOTP are religious in nature and if so, whether

secular alternatives are available to plaintiff.  As other courts in this district

have recognized, and as I have previously observed in this case, "the law

is anything but clear on the question of whether compelled use by officials

at the CNYPC of treatment materials peripherally based upon religious

principles violates the rights of patients involuntarily committed and

subjected to the program."  *McChesney v. Hogan*, Nos. 9:08-CV-1186

NAM/DEP, 908-CV-1290, 2010 WL 1027443, at *11 (N.D.N.Y. Feb. 26,

2010) (citing *Pratt v. Hogan*, 631 F. Supp. 2d 192, 198 (N.D.N.Y. 2009)

(Hurd, J.)), *report and recommendation adopted*, 2010 WL 1037957

(N.D.N.Y. Mar 18, 2010) (Mordue, C.J.); *Carey v. Hogan*, Nos. 9:08-CV-

1251, 9:08-CV-1280, 2010 WL 2519121, at * 6 (N.D.N.Y. Mar. 30, 2010)

(Baxter, M.J.) *report and recommendation adopted*, 2010 WL 2519961

(N.D.N.Y. Jun 15, 2010) (Baldwin, J.).  Unfortunately, on the record

currently before the court this issue remains unresolved.

Defendants acknowledge that the group treatment modalities at

issue incorporate spirituality.  If there were no other evidence implicating a

religious purpose, the court's inquiry would end here since references to

spirituality alone would not draw into play the Establishment Clause. *Hatzfeld*, 2010 WL 5579883, at \*7 (citing *Decker*,  2009 WL 3165830, at \*4 (citing *Boyd v. Coughlin*, 914 F. Supp. 828, 833 (N.D.N.Y. 1996)). More troublesome, however, is the fact that several of the modalities are Hazeldon products, which plaintiff asserts are Christian based, and at least one of which, From the Inside Out, incorporates the twelve step AA methodology.

The law is settled in this circuit that AA programming is considered religious for Establishment Clause purposes.  *DeStefano*, 247 F.3d at 407 (citing, *inter alia*, *Griffin v. Coughlin*, 88 N.Y.2d 674, 683, 649 N.Y.S.2d 903, 908, *cert. denied*, 519 U.S. 1054, 117 S. Ct. 681 (1997) (holding that a review of AA materials "demonstrates beyond peradventure that doctrinally and as actually practiced in the 12-step methodology, adherence to the A.A. fellowship entails engagement in religious activity and religious proselytization"); *see also Miner*, 354 Fed. App'x at 492 (citing *Griffin*) (citing in accordance with Fed. R. App. Pr. 32.1 not for precedential value but to show the continuing vitality of *Griffin*).  While this does not, in and of itself, mandate the conclusion that the treatment programs are nonsecular, *see DeStefano*, 247 F.3d at 417, the extent to

which the AA-related and other Hazeldon program materials, which may

very well be based upon Christian or other religious philosophies,

incorporate or emphasize prayer or belief in a higher power is not

revealed in the record now before the court.

Although the defendants assert that the programs at issue do not

"require" prayer and do not involve proselytizing, the record contains only

evidence of the "protocols" followed for each of the programs.  The

protocols reveal little more than the structure of each treatment modality

and the topic of each weekly session.   Even assuming the truth of

defendants' undisputed assertion, the Second Circuit has recognized that

> the type of coercion that violates the Establishment Clause
> need not involve either the forcible subjection of a person to
> religious exercises or the conditioning of relief from
> punishment on the attendance at church services.  Coercion is
> also impermissible when it takes the form of "subtle coercive
> pressure" and interferes with an individual's "real choice"
> about whether to participate in worship or prayer.

*DeStefano*, 247 F.3d at 412 (citations omitted).  In other words, the fact

that participants are not "required" to engage in prayer or participate in

religion is not necessarily dispositive.  The Supreme Court has cautioned

"that purpose must be taken seriously under the Establishment Clause

and needs to be understood in light of context[.]"  *McCreary County,*

20

*Kentucky*, 545 U.S. at 874, 125 S. Ct. at 2733.  It may well be that the

treatment programs are so infused with religious principles that

participation results in subtle coercion.  None of the program materials

have been submitted to the court, and there is no evidence as to their

actual content, leaving unanswered the question of whether the primary

purpose of the programs is to promote religion.  *See Pratt*, 631 F. Supp.

2d at 198.  On the record before the court, I am unable to resolve this

issue and conclude that the treatment modalities to which plaintiff objects

lack subtle coercive pressure to engage in religious activity.

I note, moreover, that noticeably absent from the defendants'

submission is any evidence as to whether other group treatment program

options are available to McChesney as an SOTP participant.  Though the

record before this court is silent on this point as well, other courts have

observed that "refusing to participate in the [SOTP] program may hinder or

prevent a participant's advancement in the program or his release from

civil confinement."[12]  *Pratt*, 631 F. Supp. 2d at 198.

---

[12]   Defendants have explained that the SOTP is a four phase program leading to outpatient supervision.  Maxymillian Decl. (Dkt. No. 32-4) ¶ 6.  Phase I, which is orientation, requires that residents demonstrate an ability to participate in the group process, understand the treatment plan, admit having committed a sexual offense or offenses, acknowledge a want or desire to change, and acknowledge their personal commitment to participate in the program.  *Id.*  From this the court could infer that the

In the event a secular alternative to these programs is available to program participants the use of the religious-based products may not offend the Establishment Clause.  *Miner*, 354 Fed. App'x at 492 (citing *Griffin*).  Conversely, if there are no other programs offered, given the circumstances of plaintiff's forced commitment to the CNYPC-SOTP, it seems quite possible that the use of these programs may present a First Amendment violation.

Having sought summary judgment, it was defendants' burden to produce evidence establishing the lack of any disputed factual issue surrounding the question of whether McChesney's participation in the SOTP amounts to compelled participation in religion.  Resolving all ambiguities and drawing all reasonable inferences against defendants, I find that defendants have not carried this burden, and that questions of material fact remain as to whether the SOTP treatment modalities at issue in this case violate the Establishment Clause.  I therefore recommend that defendants' motion be denied insofar as it challenges the legal sufficiency of plaintiff's Establishment Clause claim.

2.    <u>Plaintiff's Free Exercise Claim</u>

---

treatment modalities involved in this action relate to Phase I and that plaintiff's failure to participate could likely impede his ability to proceed to the next phase of the SOTP.

Turning to McChesney's second claim, I note that the Free Exercise Clause prohibits "governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion."  *Mozert v. Hawkins*, 827 F.2d 1058, 1066 (2d Cir. 1987), *cert. denied*, 484 U.S. 1066, 108 S. Ct. 1029 (1988).  Courts have consistently recognized that atheism falls within the ambit of the First Amendment's protection.  *Hatzfeld*, 2010 WL 557883, at * 6 (citing cases)*; see also Wallace v. Jaffree*, 472 U.S. 53, 105 S. Ct. 2479, 2487 (1985) ("[T]he  Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all.").  In this instance, plaintiff asserts his right to follow his conscience with regard to religious beliefs and claims that his forced participation in the SOTP requires him to practice religion against his will in order to obtain his release from civil commitment.

In general, in order to avoid a violation of the Free Exercise Clause of the First Amendment a government action that substantially burdens a religious practice must be justified by a compelling government interest. *See Sherbert v. Verner*, 374 U.S. 398, 406, 83 S. Ct. 1790, 1795 (1963).

In a prison setting, due to the unique concerns presented, the governmental burden is substantially lessened.  *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003).

It is recognized what while inmates are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the Free Exercise Clause of that amendment does afford them at least some measure of constitutional protection, including their right to participate in congregate religious services.  *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974) ("In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his [or her] status as a prisoner or with the legitimate penological objectives of the corrections system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services.") (citing cases).  The task of defining the contours of a prison inmate's free exercise rights requires careful balance of the rights of prison inmates against the legitimate interests of prison officials tasked with maintaining prison security.  *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S. Ct. 2400, 2404

(1987); *Ford*, 352 F.3d at 588; *Salahuddin v. Coughlin,* 993 F.2d at 308.

When determining whether an action impinges upon an inmate's First

Amendment free exercise right, the inquiry is "one of reasonableness,

taking into account whether the particular [act] affecting [the] right. . . is

'reasonably related to legitimate penological interests.'" *Benjamin v.*

*Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.

Ct. 372 (1990) (quoting *Turner v. Safely*, 482 U.S. 78, 89, 107 S. Ct.

2254, 2261 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850

F.2d 917, 925 (2d Cir. 1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348,

107 S. Ct. at 2404).

　　　The Second Circuit has yet to decide the appropriate standard to be

applied where, as here, a plaintiff is involuntarily civilly committed in a

secure treatment facility sharing many of the concerns and characteristics

of prison facilities; as was recently noted by one of my colleagues, the

issue appears to be one that has divided courts.  *Kalwasinski v.*

*Maxymillain*, No. 9:09-CV-0214, 2010 WL 5620908, at * 3 (N.D.N.Y. Dec.

23, 2010) (Lowe, M.J.) (citing cases), *report and recommendation*

*adopted*, 2011 WL 195648 (N.D.N.Y. 2011) (Hurd, J.); *compare Carey*,

2010 WL 2519121, at *3 (applying substantial burden/compelling interest

test to CNYPC patient's free exercise claim) and *Pratt*, 631 F. Supp. 2d at

198 (same), *with Lombardo v. Holanchock*, No. 07 Civ. 8674, 2008 WL

2543573, at *6 (S.D.N.Y. June 25, 2008) (applying legitimate penological

purpose test to Mid-Hudson Psychiatric Center patient's free exercise

claim) and *Abdul-Matiyn v. Pataki*, No. 9:06-CV-1503, 2008 WL 974409,

at *12 (N.D.N.Y. Apr. 8, 2008) (applying legitimate penological purpose

test to CNYPC patient's free exercise claim) (Hurd, J.).  Resolution of this

question of law is unnecessary in this case, however, since I have

concluded that even if the less restrictive test is applied, defendants have

failed to demonstrate their entitlement to judgment as a matter of law.

As an initial matter, a plaintiff challenging a prison regulation on

Free Exercise grounds must show that it substantially burdens a sincerely

held religious belief.  *Salahuddin v. Goord*, 467 F.3d at 274-75.  Here,

defendants take issue with plaintiff's assertion that he is an atheist and

question the sincerity of that belief, pointing to the facts that when

previously in the custody of DOCS plaintiff had indicated that he was a

Buddhist, and later a Methodist.  The evidence presented shows that

upon admission to a DOCCS facility in 1977 McChesney declared himself

a Buddhist.  Taylor Scott Decl. (Dkt. No. 32-3) Exh. A.   In 1989, again

upon admission to a DOCCS facility, plaintiff described himself as a Methodist.  *Id.* at Exh. B.  These facts alone, however, do not conclusively establish, as is defendants' burden on this motion, that some nineteen years later at the commencement of this action in 2008 plaintiff's declared atheism was not sincere.  Assuming plaintiff's atheism is sincere, a reasonable factfinder could conclude that his required participation in religion based programs imposes a substantial burden on his beliefs.

Turning to application of the *Turner* factors, in considering whether the governmental action serves a legitimate interest, the Second Circuit has characterized "the first 'factor' [as] more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement."  *Salahuddin v. Goord*, 467 F.3d at 274 (citing and quoting *O'Lone*, 482 U.S. at 350, 107 S.Ct. 2400 ("[A] regulation must have a logical connection to legitimate governmental interests...."))  The evidence before the court shows that the group therapy programs are part of regimen designed to rehabilitate repeat sex offers.   However, defendants have not shown a governmental purpose in utilizing programs that are at least peripherally related to religion, particularly the Hazeldon products, which it can reasonably be inferred are Christian-based.  And,

defendants have presented no evidence of a rational connection between the use of those materials and the rehabilitation of the SOTP program participants.  *Cf. Bush v. Goord*, No. 03-CV-759S, 2009 WL 790358, at *3-4 (W.D.N.Y. Mar. 25, 2009) (finding a rational connection between the sex offender counseling program ("SOCP"), including its requirement that prisoners take responsibility for their crimes or face the loss of good time credits for non-participation, and the DOCS' interest in rehabilitating prisoners, and that the primary purpose of the SOCP, which is to reduce the likelihood that convicted sex offenders and other inmates with histories of sexual offending behavior will reoffend, by helping them to gain control of the chain of behaviors that leads to sexual offending).

In sum, when affording plaintiff the benefit of all favorable inferences, I am constrained to conclude that defendants have come forward with no evidence establishing a legitimate governmental purpose in using religion-oriented SOTP group treatment modalities and the rational relation of that purpose to their use under the circumstances presented.  Having failed to establish these requisite facts, defendants have failed to meet their burden in connection with their motion for summary judgment, and I therefore recommend denial of that motion.

D.    Personal Involvement

As an alternative basis for granting summary judgment, defendants

contend that the claims against them must be dismissed for lack of

personal involvement.  In this regard, defendants argue that since they do

not have direct responsibility for developing and implementing SOTP

treatment modalities, they cannot be held liable for the constitutional

violations alleged.

Personal involvement of defendants in alleged constitutional

deprivations generally is a prerequisite to an award of damages under

section 1983.  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing

*Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and

*McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*,

434 U.S. 1087, 98 S. Ct. 1282 (1978)).   This principle, however, has no

applicability in this case since plaintiff's damage claims against the two

defendants were previously dismissed on the basis of qualified immunity,

leaving only a First Amendment claim against the defendants for

declaratory and injunctive relief in their official capacities.

District courts in this circuit have not required a showing of personal

involvement where a plaintiff seeks only declaratory or injunctive relief

29

against defendants in their official capacity.  *Jones-Soderman v. Executive Sec'y of the State Bd.*, No. 08 CV 4716(SJF), 2010 WL 3800908, at *7 (E.D.N.Y. May 21, 2010) (citing *Hall v. Marshall*, 479 F.Supp.2d 304, 318 (E.D.N.Y.2007)), *report and recommendation adopted*,  2010 WL 3780989 (E.D.N.Y. Sep 20, 2010); *Marinaccio v. Boardman*, No. 02 CV 831, 2005 WL 928631, at *9 (N.D.N.Y Apr. 19, 2005) (McCurn, S.J.) (collecting cases)).  "[A]ctions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action."  *Davidson v. Scully*, 148 F. Supp. 2d 249, 254 (S.D.N.Y.2001) (quotation and citations omitted). Defendants' reliance on case law applicable to damage claims under section 1983 against individual defendants is therefore misplaced.

"In a § 1983 action against a state employee in his official capacity, such as the one against [defendants] here, the relevant standard for liability is whether he [or she] a 'moving force' behind the alleged constitutional violations."  *Marinaccio*, 2005 WL 928631, at * 10 (citing *Shabazz v. Cuomo*, No. 93-CIV-7692, 1996 WL 445363, at *5 (S.D.N.Y. Aug. 7, 1996) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct.

3099, 3105 (1985)).  Moreover, a plaintiff's failure to name the proper

defendant is not fatal to the claim.  *Reynolds v. Blumenthal*, No.

3:04cv218, 2006 WL 2788380, at 8 (D. Conn. Sept. 26, 2006) (citing

*Yakima Indian Nation v. Locke*, 176 F.3d 467, 469-70 (9th Cir. 1999)).

     Here, defendant Hogan, as Commissioner of the OMH, admittedly

bears overall responsibility for overseeing the CNYPC.  Likewise,

defendant Sawyer, as Executive Director of the CNYPC, is responsible for

oversight of the Center and concedes that he participates, along with

other members of the "CNYPC Cabinet", in approving the CNYPC-SOTP

procedures and is responsible for the staff who implement the operating

protocols.  As such, it seems clear that both of the named defendants are

well-positioned to implement any prospective relief that may be granted

the plaintiff in this action.  For these reasons, I recommend denial of

defendants' motion insofar as it is premised upon defendants' lack of

personal involvement.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

     The question raised by defendants' motion, and one that seemingly

has yet to be determined by a court in this circuit, is whether use of the

SOTP materials and modalities, which are at least peripherally related to

religious principles, violates the constitutional rights of plaintiff, a sex offender involuntarily committed for sex offender treatment and who claims to be an atheist.  Based upon the limited record before the court, I am unable to conclude that there are no issues of material fact that must be resolved prior to determining plaintiff's Establishment Clause and Free Exercise claims as a matter of law.

With regard to McChesney's Establishment Clause claim, the record before the court shows that, at least with regard to those programs that are Hazeldon products, to some extent the SOTP incorporates the AA 12-step program as well as religious principles.  It remains unclear, however, whether those programs promote religion such that a participant's choice as to whether to participate in worship or prayer is merely illusory. Additionally, while it seems that it can be fairly assumed that a refusal to participate in group therapy would result in McChesney's inability to progress in the program toward supervised release from his involuntary civil commitment,  the consequences of plaintiff's refusal to participate in these group treatment modalities and alternatives that might be available are not revealed.  In view of the foregoing, questions of material fact remain as to whether plaintiff is being forced to participate in religious

activity.

Material questions also remain regarding plaintiff's Free Exercise claim.  As a threshold matter, it has not been established on this motion that McChesney's atheism is not sincere.  Moreover, the legitimate governmental interest in utilizing the programs to which plaintiff objects and a rational relation between that purpose and the treatment modalities employed have not been shown.

The court does not doubt the sincerity of the defendants' goals in utilizing the disputed materials to treat sex offenders so that they can become law abiding members of society.  Indeed, as the Second Circuit has recognized in discussing the religious nature of AA, "[it] is a worthwhile endeavor; [. . .] it has saved the lives, health or well-being of untold thousands of Americans, at least in part because it requires participants 'to turn [their] will and . . . lives over the care of God as [they] underst[an]d him.' " *DeStefano*, 247 F.3d at 442 (citing and quoting David Cole, *Faith Succeeds Where Prison Fails*, N.Y. Times, Jan. 31, 2001, at A21; Paul J. Steinberg, *Faith-Based Successes*, Wash. Post, Jan. 28, 2001, at B7) (alterations supplied).  This notwithstanding, if  the treatment modalities espouse religion and participation is coerced, whether overtly

or subtly, their use by the defendants violates the Establishment Clause, and may also amount to a Free Exercise violation.

For all of the foregoing reasons, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment, Dkt. No. 32, be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.


Dated:      August 2, 2011
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

34



Page 1

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

*1 Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that they
violated his right to due process in the course of a
disciplinary proceeding and subsequent appeal. On
September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived him of
a liberty interest within the meaning of the Due Process
Clause. Plaintiff did not oppose the summary judgment
motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. Sandin v. Conner, 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
Id. Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

### REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton
Annex; T.J. Howard, Hearing Officer; J. Maggy,
Sergeant; Byron Wind, Officer; Barry Rock, Officer;
and Philip Coombe, Jr., Acting Commissioner,
Defendants.
No. 95-CV-1733 (RSP/DNH).

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional
Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, New York,
Darren O'Connor, Esq., Asst. Attorney General, of
Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

*1 This matter comes to me following a
report-recommendation by Magistrate Judge David N.
Hurd, duly filed on the 29th of August, 1997. Following
ten days from the service thereof, the Clerk has sent me
the entire file, including any and all objections filed by the
parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995,
he and some other inmates were attacked while
incarcerated at Clinton Correctional Facility. Compl., Dkt.
No. 1, ¶ 2. Cotto alleges that as a result of this incident he

was charged with engaging in violent conduct and conduct
which disturbed the order of the facility. *Id.* Although
Cotto was found guilty of these charges and sentenced to
a term of one year in the Special Housing Unit and loss of
six months good time, his sentence was reversed on
administrative appeal. *Id.* Cotto brought this action
pursuant to 42 U.S.C. § 1983, alleging various violations
of his rights under the Eighth and Fourteenth
Amendments. *Id.*

By motion filed March 3, 1997, defendants sought
summary judgment. Dkt. No. 17. Plaintiff filed no papers
in opposition to the motion. In his report-recommendation,
the magistrate judge recommended that I grant defendants'
motion pursuant to Local Rule 7.1(b)(3), which provides
that, absent a showing of good cause, failure to respond to
a motion shall be deemed consent to the relief requested.
Dkt. No. 19, at 2. Cotto has filed no objections to the
report-recommendation.

After careful review of all of the papers herein, including
the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby
approved, and it is further

ORDERED that defendants' motion for summary
judgement is GRANTED and the complaint against them
dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this
order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the
Honorable   Rosemary   S.   Pooler,   for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

**\*2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I);

Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681etseq. ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

*5 The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

## DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' " are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis, 119 S.Ct. at 1671* ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser, 118 S.Ct. at 1999).* The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist., 208 F.3d 736, 740 (9th Cir.2000); Soper v. Hoben, 195 F.3d 845, 855 (6th Cir.1999); Murreel v. School Dist. No. 1, Denver Colo., 186 F.3d 1238, 1246 (10th Cir.1999); Wills v. Brown Univ., 184 F.3d 20, 26-27 (1st Cir.1999).* There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese, 208 F.3d at 740* ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray, 57 F.3d at 251* (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray, 57 F.3d at 251* (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

        FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

        FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
John HATZFELD, Plaintiff,
v.
Thomas G. EAGEN, Director, Inmate Grievance
Program, CORC; John W. Burge, Superintendent,
Auburn Correctional Facility; Nancy Ryerson, Nurse
Administrator, Auburn Correctional Facility; Anthony
Graceffo, Former M.D. Auburn Correctional Facility;
and M.D. Pang Kooi, Auburn Correctional Facility,
Defendants.
No. 9:08-CV-283 (LES/DRH).

Dec. 10, 2010.
John Hatzfeld, Moravia, NY, pro se.

Hon. Andrew M Cuomo, Attorney General for the State of
New York, Aaron M. Baldwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff *pro se* John Hatzfeld ("Hatzfeld"), an
inmate in the custody of the New York State Department
of Correctional Services, brings this action pursuant to 42
U.S.C. § 1983 alleging that defendants, five current and
former DOCS employees, violated his constitutional rights
under the First, Eighth, and Fourteenth Amendments.
Compl. (Dkt. No. 1) [FN2] at 1-2, 9. Presently pending is
defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56. Dkt. No. 45. Hatzfeld opposes the
motion. Dkt. No. 50. For the following reasons, it is
recommended that defendants' motion be granted.

> FN2. All references to docket numbers are to the
> docket of this case unless otherwise noted.

**I. Background**

The facts are related herein in the light most favorable
to Hatzfeld as the nonmoving party. *See* subsection II(A)
*infra.*

In April 2000, while incarcerated at Auburn
Correctional Facility ("Auburn"), Hatzfeld was notified
that he tested positive for the Hepatitis C [FN3] Virus
("HCV"). Compl. at 3. On September 20, 2002, a liver
biopsy was performed on Hatzfeld at University Hospital
in Syracuse by Dr. Holtzapple. *Id.* Dr. Holtzapple
recommended that Hatzfeld receive HCV therapy,
including "(1) Pegylated interferon therapy combined, (2)
Ribavirin 100m g daily, (3) Check hepatitis C viral load in
3 months, and (4) Check genotype ." *Id.,* Ex. A.

> FN3. Hepatitis C is "a chronic viral liver disease
> that can increase the risk of liver cancer and can
> lead to inflammation, scarring, and cirrhosis of
> the liver. Cirrhosis can ultimately lead to liver
> failure and death." Pabon v. Wright, 459 F.3d
> 241, 246 (2d Cir.2006).

On December 26, 2002, Dr. Anthony Graceffo
("Graceffo"), a defendant herein who was then a physician
at Auburn, asked Hatzfeld to sign a waiver to participate
in either the Alcohol and Substance Abuse Treatment
Program or Residential Substance Abuse Treatment
Program (collectively "ASAT/RSAT"). *Id.* at 4. Hatzfeld,
an atheist, refused to participate because the programs
included a religious component and his disciplinary
records did not show any violations for alcohol or
substance abuse. *Id.* Dr. Graceffo refused to provide the
recommended treatment. *Id.* After following and
exhausting DOCS grievance procedures, Hatzfeld filed a
civil rights action regarding the withholding of HCV
treatment. *See Hatzfeld v. Goord* (*Hatzfeld I* ), No.
9:04-cv-0159.[FN4]

> FN4. *Hatzfeld I* was marked ready for trial in

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

2007. *Hatzfeld I* Dkt. No. 76. In an order filed November 25, 2009, *Hatzfeld I* and this action were consolidated for all purposes. *Hatzfeld I* Dkt. No. 98; Dkt. No. 38. The motion at issue herein pertains only to the above-captioned action, the Member Case, and not to *Hatzfeld I,* the Lead Case. *Hatzfeld I* has been stayed pending decision on this motion.

In October 2004, while *Hatzfeld I* was pending, Hatzfeld learned that Jeffrey L. Pelkey ("Pelkey"), another inmate, received treatment for HCV from Dr. Graceffo without being forced to participate in ASAT/RSAT. Compl. at 4. Pelkey was diagnosed with Hepatitis C in December 2003 and requested HCV therapy. *Id.,* Dr. Graceffo saw Pelkey on May 13, 2004, and referred Pelkey to a gastroenterologist who recommended that Pelkey receive Pegylated interferon and Ribavirin for six months. *Id.* On September 14, 2004, Dr. Graceffo told Pelkey that he must participate in ASAT/RSAT prior to receiving HCV treatment. *Id.* Pelkey refused to participate in those programs. *Id.* Despite his refusal, Pelkey began receiving the recommended treatment on September 17, 2004. *Id.* Pelkey's disciplinary records show that he tested positive for marijuana twice during his incarceration and that he has a long history of substance abuse. *Id.* To date, Pelkey has not participated in ASAT/RSAT despite receiving treatment. *Id.*

**\*2** Dr. Pang Kooi ("Kooi"), a defendant herein and a physician at Auburn, saw Hatzfeld on June 30, 2005, and they discussed what Hatzfeld believed to be a change in the requirements for HCV treatment. Compl. at 5. Hatzfeld showed Pelkey's affidavit to Dr. Kooi, but Kooi refused to treat Hatzfeld unless he participated in ASAT/RSAT and referred Hatzfeld to Dr. Graceffo. *Id.* Dr. Graceffo saw Hatzfeld on July 21, 2005, and they discussed Pelkey's affidavit and apparent changes in policy. *Id.* Once again, Dr. Graceffo refused to provide Hatzfeld with treatment unless Hatzfeld either enrolled in or completed ASAT/RSAT, regardless of Dr. Graceffo's actions with Pelkey. *Id.*

Six days later, on July 27, 2005, Hatzfeld filed Grievance No. 45299-05, to request HCV treatment "without participation in RSAT," arguing that the refusals

of Drs. Kooi and Graceffo to provide treatment violated Hatzfeld's constitutional rights. Compl., Ex. C at 20.[FN5] On August 1, Hatzfeld's grievance was denied. *Id.* at 23. An Investigative Report authored by Auburn Nurse Administrator Nancy Ryerson ("Ryerson"), a defendant herein, stated that "RSAT is a requirement to receiving" treatment and that Health Insurance Portability and Accountability Act ("HIPPA") regulations prevented the disclosure of another inmate's medical history. Defs.' Mem. of Law, Ex. A (Dkt. No. 45-3) at 7. The IGRC response restated Ryerson's message. *Id.* at 24. Hatzfeld appealed to Auburn Superintendent John W. Burge ("Burge"), a defendant herein, on August 22. Compl., Ex. C at 24. Burge denied the appeal on August 24, stating that "guidelines state participation in a workbook ASAT program is a requirement" for treatment and that "the completion of a workbook is not considered completion of RSAT." *Id.* at 25. Hatzfeld immediately appealed Burge's decision to CORC. *Id.* at 25-26. CORC upheld Burge's decision, and advised Hatzfeld to follow staff direction, and participate in the ASAT workbook program," stating that DOCS was following Hepatitis C Primary Practice Guidelines. *Id.* at 27. This action followed.

> FN5. "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

## II. Discussion

Hatzfeld asserts three causes of action against each defendant. Hatzfeld alleges that he was (1) denied adequate medical care and potentially life-saving treatment for refusing to participate in religious-based alcohol and substance abuse treatment programs in violation of the First Amendment; (2) subjected to cruel and unusual punishment through the denial of adequate medical care and treatment for a potentially life-threatening illness in violation of the Eighth

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

Amendment; and (3) discriminated against as a specific group or class of people because he was held to a higher standard of approval than others in like circumstances in violation of the Fourteenth Amendment. Compl. at 9. These allegations are premised on Hatzfeld's renewed request for treatment on June 30, 2005. Compl. at 5-9. He seeks compensatory and punitive damages. *Id.* at 10.

**\*3** Defendants contend that (1) defendants Thomas Eagen ("Eagen"), Burge, and Ryerson argue that they were not personally involved in any alleged constitutional violations; (2) the ASAT/RSAT requirements do not violate Hatzfeld's First Amendment rights; (3) the program's requirements did not violate Hatzfeld's rights under the Equal Protection Clause of the Fourteenth Amendment; (4) Hatzfeld did not suffer from a serious medical condition, and even if he did, none of the defendants acted with deliberate indifference with regard to such condition; (5) they are entitled to qualified immunity against all claims for monetary damages; and (6) Hatzfeld has experienced no compensable damages and cannot sustain his burden of proving an entitlement to punitive damages such that only a claim for nominal damages could be warranted. Defs. Mem. of Law (Dkt. No. 45-20.)

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Id.; see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86. The non-moving party must do more than merely show that there is some doubt or speculation as to the true

nature of the facts. *Id.* at 586. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-moving party special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude,"; that a *pro se* litigant's submissions must be construed "liberally,"; and that such submission must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest,"; that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

**\*4** *Id.* (internal citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191-92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se, ...* a court is obliged to construe his pleadings liberally.") (citations omitted).

### B. Eleventh Amendment

The Eleventh Amendment prohibits suits against a state in federal court unless the state consents or waives its immunity. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997). The State has not consented to suit or waived its immunity here. § 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Daisernia v. New York,* 582 F.Supp. 792, 796

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

(S.D.N.Y.1984). Thus, a suit that seeks monetary damages from an official in his or her official capacity is barred even though asserted against the individual. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).

Here, all defendants are named both in their individual and official capacities. Compl. at 7-8. Defendants note that "[a]ny claim against the defendants [in *Hatzfeld I* ] for money damages in their official capacities [was] barred by the Eleventh Amendment." Defs. Mem. of Law at 30 n. 3. In this case, however, the defendants have not moved for summary judgment on Eleventh Amendment sovereign immunity grounds. Further, since two of the defendants in *Hatzfeld I,* Burge and Dr. Graceffo, are named as defendants in this action. To the extent that defendants neglected to move explicitly to dismiss on sovereign immunity grounds, it is recommended that the Court *sua sponte* dismiss any claims against defendants for money damages in their official capacities. *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

## C. Personal Involvement

Defendants Eagen, Burge, and Ryerson argue that they were not personally involved in any alleged constitutional violations. Defs. Mem. of Law at 2-7. Personal involvement is an essential prerequisite for section 1983 liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A section 1983 defendant, however, cannot be liable "merely because he held a supervisory position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved" only if the defendant: (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).[FN6]

> FN6. The Supreme Court's decision in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), arguably casts in doubt the continued viability of some of the categories set forth in *Colon.* See *Sash v. United*

*States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the Colon categories apply.

## 1. Eagen

**\*5** Hatzfeld alleges that Eagen, IGP Director during the time in question, failed to remedy CORC's denial of Hatzfeld's grievance by denying Hatzfeld's appeal and that Eagen was "grossly negligent" in supervising CORC because Eagen had allowed CORC to deny Hatzfeld's grievance. Compl. at 5, 7; Pl. Mem. of Law (Dkt.50) at 3. Eagen argues that as a IGP Director he served as the committee's "custodian of records," that he was not a voting member of CORC, and that he is responsible only for "administrative functions," and that he "would have merely signed the dispositions of CORC indicating that such is the response of the body." Defs. Mem. of Law at 3; *see also* Rule 7.1 Statement ¶¶ 23-24; Bellamy Decl. ¶¶ 4-6.

On these facts, it cannot be shown that Eagen was personally involved in any alleged constitutional violations. Under DOCS regulations, the IGP Director "is not a voting member of the CORC" but is "responsible for the administrative function of the IGP," and "as the commissioner's designee, shall ensure implementation of CORC decisions." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(d) (2)(iii). An IGP Director is not personally involved merely because he or she signed CORC's administrative decisions. *See, e.g., Jones v. Goord,* No. 9:05-cv-1438 (DNH/RFT), 2009 WL 790978, at *3 (N.D.N.Y. Mar. 3, 2009) (Treece, M.J.) (finding Eagen not personally involved just because he signed CORC determinations); *H'Shaka v. Drown,* No. 9:03-cv-937 (LEK/RFT), 2007 WL 1017275, at *11 (N.D.N.Y. Mar. 30, 2007) (same); *see also Persad v. Savage,* No. 02-cv-336S(F), 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004) (Foschio, M.J.) ("mere allegation that [an IGP Director] affirmed the decisions [CORC], as evidenced by her signature on the official record of the CORC decision" is insufficient to defeat a motion for summary judgment").

Other than restating the allegations in the complaint and submitting the definition of "Director" from the American Heritage Dictionary, Hatzfeld has not disputed Eagen's argument. Pl. Mem. of Law at 2-3. Hatzfeld has

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

pointed to no additional evidence that Eagen participated in any alleged unconstitutional act. Eagen's only alleged personal involvement is based upon his signing of CORC's administrative decisions. Conclusory allegations are insufficient to defeat a motion for summary judgment. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As such, Eagen was not personally involved in any alleged constitutional violations, and it is recommended that defendants' motion as to Eagen on this ground be granted.

### 2. Burge

Hatzfeld contends that Burge, Acting Auburn Superintendent at the time in question, violated his constitutional rights by denying the grievance. Compl. at 5, 7; Pl. Mem. of Law at 4. Merely denying a prisoner's grievance "is insufficient to establish personal involvement." *Mercer v. Benson,* No. 08-cv-537 (DNH/DRH), 2009 WL 3111684, at *4 (N.D.N.Y. Aug. 14, 2009) (Homer, M.J.) (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). Here, the claim against Burge is premised on his denial of Hatzfeld's grievance at the superintendent level. Pl. Mem. of Law. at 4. Although Hatzfeld's complaint also alleges grossly negligent supervision, he has not raised any issues of material fact on that issue. As such, defendants' motion as to Burge on this ground should be granted.

### 3. Ryerson

*6 Hatzfeld argues that Ryerson, Acting Nurse Administrator at Auburn's Medical Department, is also liable because the denial of the grievance was "based solely" on an Investigative Report that Ryerson prepared and filed. Compl. at 5, 7; Pl. Mem. of Law at 5. The report stated that "RSAT is a requirement of receiving Hepatitis C Treatment" and that HIPPA regulations prevent discussing another inmate's medical information. Grievance Pack at 7.

There can be no personal involvement when defendants "are not supervisory officials ... in any sense factually or legally." *Brody v. McMahon,* 684 F.Supp. 354, 356 (N.D.N.Y 1988). Supervisory capacity involves "hiring, firing, or disciplinary power over any supervisory staff or personnel of the correctional facilities ... [or] direct power to control or direct the customs and policies of the facilities" and one who acts in an advisory capacity by investigating grievances "cannot be held accountable

for any failure ... to remedy an constitutional violations [she] may have learned about." *Van Pelt v. Finn,* No. 98 Civ. 2977(MBM), 1993 WL 465297, at *7 (S.D.N.Y. Nov. 12, 1993). In preparing the Investigative Report, Ryerson was acting in an advisory capacity and not supervisory capacity. Her report merely informed IGRC's decision to deny Hatzfeld's grievance. *See* Defs. Mem. of Law, Ex. A at 7, 24. Hatzfeld has not raised any issues of material of fact as to whether Ryerson developed the policy or that she directed any subordinates to follow that policy. There are no facts showing that she supervised any of the other defendants. Therefore, Ryerson was not personally involved in the alleged constitutional violations and it is recommended that defendants' motion as to her be granted.

### D. First Amendment

Hatzfeld refused to participate in ASAT/RSAT on First Amendment grounds. Compl. at 6. He is an atheist, and he submits that ASAT/RSAT is "faith-based." *Id.* Because participation in ASAT/RSAT was a prerequisite to receiving HCV treatment,[FN7] Hatzfeld did not receive treatment until October 2005 after this Court issued a preliminary injunction ordering DOCS to provide him with treatment.[FN8] Thus, he argues that conditioning hepatitis treatment on participation in ASAT/RSAT violated his First Amendment rights. *Id.* at 9.

> FN7. On October 13, 2005, DOCS changed the Hepatitis C Primary Guideline by removing the ASAT prerequisite "if treatment is otherwise medically indicated." Pl. Mem. of Law (Dkt.50-1) Ex. 4.

> FN8. *See Hatzfeld I* Dkt. No. 57 at 11.

The First Amendment, made applicable to states by the Fourteenth Amendment, states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. amend. I. It embraces "two fundamental concepts: 'freedom to believe and freedom to act' on one's beliefs." *Decker v. Hogan,* No. 9:09-cv-0239 (TJM/GJD), 2009 U.S. Dist. LEXIS 89048, at *7 (N.D.N.Y. Sept. 28, 2009) (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940)). "[A]t a minimum, the government may not coerce anyone to participate in religion or its exercise." *Lee v.*

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

*Weisman,* 505 U.S. 577, 587 (1992); *see also Alexander v. Schenk,* 118 F.Supp.2d 298, 301 (N.D.N.Y.2000). Atheists are protected by the First Amendment. *Decker,* 2009 U.S. Dist. LEXIS 89048 at *9; *McChesney v. Hogan,* No. 9:08-cv-1186 (NAM/DEP), 2008 U.S. Dist. LEXIS 110140, at *13 (N.D.N.Y. Dec. 23, 2008) (Peebles, M. J.); *see also Wallace v. Jaffree,* 472 U.S. 38, 53 (1985) ("the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all").

**\*7** It has "long been understood" that prisoners "retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). A prisoner's free exercise rights, however, "must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system." *Parks v. Smith,* No. 9:08-cv-0586 (TJM/GHL), 2009 U.S. Dist. LEXIS 87210, at *20-21 (N.D.N.Y. Aug. 17, 2009) (Lowe, M.J.) (citing *Ford,* 352 F.3d at 588). Thus, a "generally applicable policy" does not violate a prisoner's free exercise of religion under the First Amendment "if that policy 'is reasonably related to legitimate penological interests.' " *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)).

The defendants argue that in October 2002, two months before Hatzfeld was first advised to participate in ASAT/RSAT, DOCS had already removed all religious content from those programs. Bradford Decl. (Dkt. No. 45-19) ¶ 8; *see also* ASAT Manual (Dkt. No. 45-11) Ex. H. The ASAT Workbooks contain nothing indicating a preference for a specific religion or any religion at all. *See* ASAT Workbooks (Dkt.Nos.45-12, 45-13, 45-14) Exs. I, J, K. In response, Hatzfeld alleges that the ASAT Workbooks contain "no date and/or revision number to reference when the material became available," leaving to "what or which update these Exhibits represent ... to speculation." Pl. Mem. of Law at 24. Hatzfeld, however, has presented no evidence to show that there is a genuine issue of fact on when the revisions occurred. Although non-movants who are *pro se* litigants are to be given "special solicitude," *Triestman,* 470 F.3d at 477, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

Other than a January 2003 article from a DOCS newsletter, stating that the "ASAT program still embraces the concept of spirituality," Hatzfeld has presented no other evidence that would raise a genuine issue as to whether ASAT still contains religious components. *See* Pl.Ex. H (Dkt. No. 32) at 10. References to spirituality alone, however, does not equate to religion "such that any reference to spirituality ... runs afoul of the First Amendment." *Decker,* 2009 U.S. Dist. LEXIS 89048 at *13-14 (quoting *Boyd v. Coughlin,* 914 F.Supp. 828, 833 (N.D.N.Y.1996)); *see also Pratt v. Hogan,* No. 6:08-cv-1003 (DNH/DEP), 2009 WL 87587, at *2 (N.D.N.Y. Jan. 9, 2009).

Moreover, the Second Circuit has held that "as long as a secular alternative ... is provided, it does not violate the Establishment Clause to 'include a noncoercive use of' " an alcohol or substance abuse treatment program that contains religious components. *See Miner v. Goord,* 354 Fed.App'x 489, 492 (2d Cir. Nov. 25, 2009) (citing *Griffin v. Coughlin,* 88 N.Y.2d 674, 677 (1996)); *see also Sumpter v. Skiff,* No. 05-cv-868, 2008 WL 4518996, at *10 (N.D.N.Y. Sept. 30, 2008) (finding that "there is no basis to conclude that ... required participation in the RSAT program would violate [a plaintiff's] religiously held beliefs" when an alternative secular curriculum were available "to any inmate raising religious objections to the content of other treatment regimens").

**\*8** By the time that Hatzfeld was told that ASAT/RSAT was a prerequisite to receiving HCV treatment, DOCS had already designed a secular alternative to the traditional programs. The Cognitive Behavior Therapy Program ("CBT") (also known as Cognitive ASAT) is available "for those inmates whose religious beliefs conflict with the treatment philosophy" of the regular programs, which has been available since March 2002. [FN9] Pl. Mem. of Law (Dkt. No. 50-1) Ex. 3; *see also* Pl.Ex. H. Thus, Hatzfeld's First Amendment claim fails as a matter of law because there is no basis to conclude that Hatzfeld's required participation in the program would violate his religiously held beliefs.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

FN9. Given that Hatzfeld submitted the CBT article as his own exhibit, he was necessarily aware of a secular alternative. There is no indication anywhere in the record, however, that any of the defendants or anyone else at DOCS told Hatzfeld to petition for CBT or that DOCS had already removed religious content from ASAT/RSAT. The last page of the ASAT Manual includes a notification of CBT, and that this notification is also included as one of Hatzfeld's exhibits. *See* ASAT Manual at 87; Pl. Mem. of Law Ex. 3. However, an explicit and direct notification to Hatzfeld that he could petition for CBT or that ASAT/RSAT had already removed any religious materials could have resolved the matter without the necessity of litigation. Moreover, the failure to provide an explicit and direct notification to hatzfeld that he could petition for CBT or that ASAT/RSAT had already removed any religious materials may demonstrate a deliberate indifference on the part of defendants to Hatzfeld's serious medical needs. *See* Section II-F *infra.*

Accordingly, it is recommended that defendants' motion be granted as to Hatzfeld's First Amendment claim.

### E. Equal Protection

Hatzfeld also alleges that he "is being discriminated against as a specific group or class of people" in violation of the Fourteenth Amendment's Equal Protection Clause because DOCS holds him to a "higher standard of approval [ ] to gain medical care/treatment" than others in similar circumstances. Compl. at 9.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). The level of scrutiny used to "ensure that classifications comply with this guarantee differs according to the nature of the classification." *Travis v. N.Y. State Div. of Parole,* No. 96-cv-0759, 1998 U.S. Dist. LEXIS 23417, at *11 (N.D.N.Y Aug. 26, 1998) (Sharpe, M. J.). Strict scrutiny is used when "the classification drawn 'impermissibly ... operates to the

peculiar disadvantage of a suspect class.' " *Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs,* 962 F.2d 136, 141 (2d Cir.1992) (citing *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307 (1976) (footnotes omitted)). Suspect classes are those based on "race, alienage, or national origin, or those which discriminate against a group saddled political powerlessness as to command extraordinary protection from the majoritarian political process." *Id.* To survive strict scrutiny, the "State must demonstrate a compelling governmental interest and show that the law is the least restrictive means of furthering its interest." *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997). Quasi-suspect classifications, like those based on gender or illegitimacy, receive heightened scrutiny, and such classifications are impermissible unless they are "substantially related to a sufficiently important governmental interest." *City of Cleburne,* 473 U.S. at 441. Any other classifications "need only be rationally related to a legitimate governmental purpose." *Travis,* 1998 U.S. Dist. LEXIS at *11.

Construing his Complaint liberally, it appears that Hatzfeld argues that this discrimination occurred because of his "religion" and "handicap." Compl. at 6 (those words are underlined). As discussed in section II(D) *supra,* there is no merit to Hatzfeld's claim that ASAT/RSAT infringes upon his First Amendment rights as an atheist. Further, Hatzfeld has not stated what his particular handicap might be, let alone alleged any discrimination based on a handicap. Thus, Hatzfeld has not alleged any facts "plausibly suggesting that "[he] was intentionally treated differently from others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class." *O'Neil v. Bebee,* No. 5:09-cv-1133 (GTS/DEP), 2010 U.S. Dist. LEXIS 11639, at *29 (N.D.N.Y. Feb. 10, 2010) (emphasis in original).

**\*9** Hatzfeld also advances a "class of one" claim. Pl. Mem. of Law at 12. Hatzfeld argues that he was treated differently from Pelkey, who received HCV treatment despite Pelkey's refusal to participate in ASAT/RSAT even though Pelkey had a history of substance abuse. *Id.* at 11-12; *see also* Compl. at 4-5. An Equal Protection claim "may be brought by a 'class of one' 'where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Tatta v.*

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

*Wright,* 616 F.Supp.2d 308, 319 (N.D.N.Y 2007) (citing *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564; *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005)).

In Equal Protection claims, prison administrators making classifications " 'need only demonstrate a rational basis for their distinction,' ... or that [the classifications] are 'reasonably related to legitimate penological interests.' " *Doe v. Goord,* No. 04 Civ. 0570, 2005 U.S. Dist. LEXIS 28850(GBD)(AJP), at *61 (S.D.N.Y. Nov. 22, 2005) (Peck, M.J.) (quoting *Isaraphanich v. Coughlin,* 716 F.Supp. 119, 121 (S.D.N.Y.1989)). The "burden is upon the challenging party to negative 'any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Doe,* 2005 U.S. Dist. LEXIS 28850 at *59 (quoting *Bd. of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 367 (2001) (internal citations omitted)).

A considerable portion of defendants' brief discusses the rational basis for different treatments between those with hepatitis and those who have Acquired Immune Deficiency Syndrome ("AIDS"). *See* Defs. Mem. of Law at 20-24. Although that was an issue in *Hatzfeld I,* the allegations here concern the alleged disparate treatment between Hatzfeld and Pelkey and not between those with HCV and AIDS. *See* Compl. at 4-5, 9, Ex. B; *see also* Pl. Mem. of Law at 12. Regardless, the record is devoid of any indication that Hatzfeld was treated differently due to any discriminatory animus on the part of any of the defendants. Because Hatzfeld has failed to plead an "inescapable crux of [an] Equal Protection claim, it is unnecessary to determine whether any rational basis existed for a possible disparity in treatment." *Lighthall v. Vadlamudi,* No. 9:04-CV-0721 (NAM/RFT), 2006 U.S. Dist. LEXIS 74734, at * 52 (N.D.N.Y. Feb. 6, 2006) (Treece, M.J.).

As such, it is recommended that defendants' motion be granted as to Hatzfeld's Fourteenth Amendment claim.

**F. Eighth Amendment**

Hatzfeld also argues that defendants violated his Eighth Amendment rights by denying him hepatitis treatment. Compl. at 9. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."

U.S. Const. amend. VIII. This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a section 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

**1. Serious Medical Need**

*10 " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Although there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). An inmate need not "demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do[es] [this Court] require a showing that his or her condition will degenerate into a life threatening one." *Id.* at 163. This " 'component of an Eight Amendment claim is ... [necessarily] contextual' and fact-specific." *Smith,* 316 F.3d at 185 (quoting *Hudson,* 503 U.S. at 8). Thus, the "serious medical need inquiry must be tailored to the specific circumstances of each case." *Id.*

It is well-established that Hepatitis C is a serious medical condition. *See, e.g., Motta v. Wright,* No. 9:06-cv-1047, 2009 WL 1437589, at *15 (N.D.N.Y.May 20, 2009) ("No one disputes that HCV is a 'serious medical condition.' "); *Scheckells v. Goord,* 423 F.Supp.2d 342, 347 (S.D.N.Y.2006) ( "failure to treat ... HCV clearly satisfies the objective element of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

deliberate indifference standard"); *Pabon v. Wright,* No. 99 Civ. 2196(WHP), 2004 WL 628784, at *5 (S.D.N.Y. Mar. 29, 2004) ("as it is undisputed that plaintiffs each carried Hepatitis C and that this action arises from defendants' treatment of that virus, plaintiffs have demonstrated a sufficiently serious medical need"); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002) (Gorenstein, M.J.) (holding that Hepatitis C constitutes an objectively serious condition).

Defendants argue that this case should be treated as one of "delayed or interrupted treatment," rather than one of "denied treatment." Defs. Mem. of Law at 8. In cases where the "the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the 'seriousness' inquiry focuses on the challenged delay itself, rather than the underlying condition alone." *Motta,* 2009 WL 1437589 at *14.

Relying on *Smith,* defendants argue that the Court's inquiry on Hatzfeld's serious medical need should focus on the alleged three-month delay from June 30 to September 23, 2005 between Hatzfeld's renewed request for treatment and the commencement of treatment. Defs. Mem. of Law at 8. The plaintiff's claim in *Smith* was premised on an interruption in treatment. There, an HIV-positive prisoner challenged the "failure to provide him with prescription HIV medication during a seven-day period in October 1998 and a five-day period in January 2009," which made the case "conceptually different from the ordinary denial of medical care case, because [the *Smith* ] claim is based on short-term interruptions in the otherwise adequate treatment" that the prisoner was receiving.[FN10] *Id.* at 185. Thus, in *Smith,* it was "appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" was sufficiently serious. *Id.* (emphasis in original).

FN10. Other cases cited by defendants to support this proposition are all either delayed treatment or interrupted treatment cases.

**\*11** Defendants' attempt to re-characterize the issue in this case is misguided. Here, Hatzfeld's Eighth Amendment claim arises from the *denial*-and not a delay

or interruption-of his renewed request for treatment in June 2005. *See* Compl. at 9 ("Plaintiff is being subjected to cruel and unusual punishment through the *denial* of adequate medical care/treatment for a potentially life threatening disease.") (emphasis added). Further, unlike the plaintiffs in the delayed or interrupted treatment cases, Hatzfeld was not regularly receiving his treatment for his underlying condition. He was denied treatment in 2002 and once again in 2005. But for the preliminary injunction in September 2005, or the policy change one month later, Hatzfeld might never have received treatment. Therefore, it is inappropriate to treat this case as one of delayed or interrupted treatment.

Even if this case were one of delayed treatment, there remains an issue of fact as to the seriousness of Hatzfeld's medical condition. *See Chambers v. Wright,* No. 05 Civ. 9915(WHP), 2009 U.S. Dist. LEXIS 37424, at *10 (S.D.N.Y. Mar. 17, 2009) (finding a material issue of fact whether a delay in plaintiff's third HCV treatment was "objectively serious"). D. Graceffo states that Hatzfeld "has achieved a 'sustained viral response' and is essentially 'cured.' " Graceffo Decl. (Dkt. No. 45-17) ¶ 25; *see also* Wright Decl. (Dkt. No. 45-18) ¶ 37; Pl. Med. R. (Dkt. No. 45-4.). However, Hatzfeld's last liver biopsy was in 2002. Defs.' Rule 7.1 Statement ¶ 96. That biopsy indicated that Hatzfeld had stage three fibrosis of the liver. Pl.'s Med. R. Stage three indicates bridging fibrosis, which is "a type of scarring that starts to develop into cirrhosis." Pl. Reply to Defs.' Mot. for Summ. J. (Dkt. No. 50-1) Ex. 2 at 5. Since Hatzfeld's last biopsy was over eight years ago, there is a question of fact as to the extent of liver damage.

Accordingly, Hatzfeld has raised a question of fact as to the objective prong of the deliberate indifference standard and defendants' motion on this ground should be denied.

**2. Deliberate Indifference**

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. To be "sufficiently culpable," the defendant must "know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the [defendant] must both be aware of

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

facts from which the interference could be drawn that a substantial risk of harm exists, and he must also draw that reference." *Farmer,* 511 U.S. at 837. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

"Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**\*12** Because defendants "have cited policy as the reason for their actions ..., the question before [the Court] is whether following the policy resulted in deliberate indifference to [Hatzfeld's] medical needs." *Brock,* 315 F.3d at 166. "If so, summary judgment may not be granted ... since unconstitutional acts would ... have occurred as a result of [the] policy." *Id.* As such, the "operative question" here "is not whether the Guideline's substance abuse policy is generally justifiable, but whether a jury could find that the application of the policy in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs." *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005).

The Second Circuit has found that deliberate indifference may lie where prison officials ignore a physician's recommendation to provide hepatitis treatment even where prison officials do so in accordance with policy. *See Johnson,* 412 F.3d at 404. Here, defendants relied on DOCS' Guideline requiring enrollment in ASAT/RSAT before receiving HCV treatment when initially denying Hatzfeld HCV treatment. *See* Defs. Mem. of Law at 11-13; Defs. Rule 7.1 Statement ¶¶ 8, 15, 1668, 72-80; Wright Decl. ¶¶ 23-29; Graceffo Decl. ¶¶ 12-17. The denial of Hatzfeld's renewed request for treatment was also premised on his refusal to enroll in ASAT/RSAT. *See*

Grievance Pack (Dkt.45-3) at 2-3, 7, 22. Dr. Holtzapple recommended pegylated interferon therapy combined with ribavirin on December 18, 2002. Pl. Med. R.; Compl. Ex. A. Thus, a reasonable jury could find that conditioning treatment on participation in ASAT/RSAT were acts of deliberate indifference. *See Chambers,* 2009 U.S. Dist. LEXIS 37424 at \*13-14 (holding that a jury must decide on whether conditioning HCV treatment on participation in RSAT is "reckless" and not "medically justifiable").

Moreover, a legitimate claim of deliberate indifference may also lie where a plaintiff shows that another inmate had received hepatitis treatment without participating in a substance abuse program. *See, e.g., Conti v. Goord,* 59 F. App'x 434, 436 (2d Cir. Mar. 14, 2003) (finding that a plaintiff may establish deliberate indifference where he presented affidavits from inmates who were given hepatitis treatment without being required to participate in ASAT, raising the possibility that defendants "have applied their policy selectively, and adversely" to plaintiff). In this case, Hatzfeld has presented an affidavit from Pelkey, another inmate, stating that despite his history of substance abuse, he received hepatitis treatment even though he did not participate in ASAT/RSAT. *See* Compl. Ex. B. Therefore, a reasonable jury could conclude that adherence to the policy in this case amounted to deliberate indifference.

Finally, defendants' failure explicitly to notify Hatzfeld that all religious materials had been removed from ASAT/RSAT or that a secular alternative was available could be viewed as deliberate indifference to Hatzfeld's serious medical needs. Indeed, Hatzfeld might have participated in the secular alternative had he been given the opportunity to do so. Although Hatzfeld submitted an article discussing the secular alternative as an exhibit (*see* Pl.Ex. H), it is unclear when Hatzfeld first learned of the alternative. As such, a reasonable jury could find that defendants showed deliberate indifference to Hatzfeld's serious medical needs.

**\*13** Accordingly, it is recommended that defendants' motion as to Hatzfeld's Eighth Amendment claims be denied on this ground.

### G. Qualified Immunity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

Even if Hatzfeld's constitutional claims are substantiated, defendants [FN11] claim that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fizgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002), aff'd, 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir.1991) (citing Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir.1990)).

> FN11. It is recommended above that judgment be granted to Eagen, Burge, and Ryerson for lack of personal involvement in any alleged constitutional violations. See subsection II(B) supra. Therefore, this portion of the Report-Recommendation will focus only on Drs. Graceffo and Kooi.

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F.Supp.2d at 230. A prisoner's right to adequate medical treatment is a clearly established constitutional right. See, e.g., Burgess v. Goord, No. 98 Civ.2077(SAS), 1999 U.S. Dist. LEXIS 611, at *17 (S.D.N.Y. Jan. 26, 1999) ("It is clearly established that inadequate medical care can give rise to an Eight Amendment constitutional violation where prison officials are deliberately indifferent to an inmate's serious medical needs.") (internal citations omitted).

As discussed supra, a reasonable jury could find that defendants violated Hatzfeld's Eighth Amendment rights. Nevertheless, defendants may still be entitled to qualified immunity if it was objectively reasonable for them to believe that their acts did not violate Hatzfeld's constitutional rights. See Kaminsky, 929 F.2d at 925 (citing Magnotti, 918 F.2d at 367). Drs. Graceffo and Kooi relied on DOCS' Guideline when they refused to provide treatment to Hatzfeld. See Defs. Mem. of Law at 11-13; Defs. Rule 7.1 Statement ¶¶ 8, 15, 1668, 72-80; Wright Decl. ¶¶ 23-29; Graceffo Decl. ¶¶ 12-17; Grievance Pack at 2-3, 7, 22. The Guideline is constantly developed and revised based upon information from a number of independent medical sources. See Rule. 7.1 Statement ¶ 46. DOCS relied on those independent sources when it established the ASAT/RSAT prerequisite. See Wright Decl. ¶ 24; NIH Consensus Statement (Dkt. No. 45-7); CDC Morbidity and Mortality Weekly Report (Dkt. No. 45-8.) The medical community recognized that alcohol or drug use could prevent the successful completion of hepatitis treatment, and DOCS promulgated rules in accordance with recommendation from the medical community. Thus, although the necessity of the ASAT/RSAT has been called into question, it was objectively reasonable for Drs. Graceffo and Kooi to believe that conditioning Hatzfeld's treatment on his participation those programs did not violate the law. Hatzfeld has not raised any issues of material fact on this question. Rather, he merely restates allegations of constitutional violations. Pl. Mem. of Law at 13-14.

**\*14** Accordingly, it is recommended that defendants' motion as to Drs. Graceffo and Kooi on this ground be granted.[FN12]

> FN12. In light of the recommendations herein, defendants' argument regarding damages need not be addressed.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 45) be **GRANTED** and that judgement be entered in favor of all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

"within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Hatzfeld v. Eagen
Slip Copy, 2010 WL 5579883 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 124535 (N.D.N.Y.)

(Cite as: 2011 WL 124535 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
John HATZFELD, Plaintiff,
v.
Thomas G. EAGEN, Director, Inmate Grievance Program, CORC; John W. Burge, Superintendent, Auburn Correctional Facility; Nancy Ryerson, Nurse Administrator, Auburn Correctional Facility; Anthony Graceffo, Former M.D., Auburn Correctional Facility; and M.D. Pang Kooi, Auburn Correctional Facility, Defendants.
No. 9:08CV283 (LES/DRH).

Jan. 14, 2011.
John Hatzfeld, Moravia, NY, pro se.

Aaron M. Baldwin, New York State Attorney General, Albany, NY, for Defendants.

MEMORANDUM OPINION

LYLE E. STROM, Senior District Judge.

&#42;1 This matter is before the Court on the report-recommendation and order (Filing No. 54) of the magistrate judge. The Court has reviewed the report-recommendation, together with defendants' motion for summary judgment (Filing No. 45), plaintiff's response in opposition to the motion for summary judgment (Filing No. 50), defendants' reply to response (Filing No. 53), objection to the report and recommendation by defendants (Filing No. 55), plaintiff's objection to the report and recommendation (Filing No. 56), and plaintiff's reply to defendants' objections (Filing No. 57). The Court has reviewed all the filings and finds the report and recommendation should be approved and adopted and the objections thereto should be overruled. A separate order will be entered in accordance with this memorandum opinion.
N.D.N.Y.,2011.

Hatzfeld v. Eagen
Slip Copy, 2011 WL 124535 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Michael L. DECKER, Plaintiff,
v.
Michael F. HOGAN, Commissioner, NYS Office of
Mental Health; Donald Sawyer, Executive Director,
Central New York Psychiatric Center, Defendants.
No. 9:09-CV-0239 (TJM/GJD).

Sept. 28, 2009.

Michael L. Decker, pro se.

Office of the Attorney General, Charles J. Quackenbush,
Esq., Assistant Attorney General, of Counsel, State of
New York, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

THOMAS J. McAVOY, Senior District Judge.
**I. Introduction**
     *1 Plaintiff Michael L. Decker commenced this action
*pro se* seeking relief pursuant to 42 U.S.C. § 1983 for the
alleged violation of his constitutional rights. Dkt. No. 1.
Plaintiff is a civil detainee under Article 10 of the New
York Mental Health Law, and has been confined at the
Central New York Psychiatric Center ("CNYPC") since
August, 2008. Plaintiff challenges the constitutionality of
three aspects of the Sexual Offender Treatment Program
("SOTP") administered by the New York State Office of
Mental Health ("OMH") at CNYPC. Plaintiff claims that
the SOTP utilizes treatment programs which are
faith-based, and that the requirement that he participate in
those programs violates his rights under the First
Amendment. *Id.* at 2-3. Plaintiff also claims that
SOTP-required polygraph and penile plethysmography
("PPG") [FN1] examinations are unconstitutional. *Id.* at 3-4.
According to plaintiff, successful completion of the SOTP
is a condition of his release from CNYPC. *Id.* at 3-4.
Named as defendants are Michael Hogan, Commissioner

of OMH, and Donald Sawyer, Executive Director of
CNYPC. Plaintiff seeks monetary damages as well as
declaratory and injunctive relief.[FN2]

     FN1. Penile Plethysmography, as defined by the
     OMH in the Advancement to SOTP Phase II-IV
     Consent to Participate in Treatment, is intended
     to "assess sexual interests and measure treatment
     effectiveness. In this treatment, while wearing a
     sterilized gauge around the penis, a machine
     records any erection response that results from
     listening to and/or viewing depiction of sexual
     and non-sexual materials. This assessment occurs
     within a laboratory setting with complete
     privacy." Dkt. No. 3-3 at 8. For recent
     discussions of the wide range of opinion
     regarding the efficacy of PPG examinations and
     their proper role in sex offender treatment
     programs, see *United States v. Rhodes,* 552 F.3d
     624, 626-29 (7th Cir.2009) (finding that
     challenge to PPG as condition of supervised
     release not ripe where condition would become
     effective only after defendant served more than
     ten years imprisonment and several other
     conditions were met); *United States v. Weber,*
     451 F.3d 552, 561-66 (9th Cir.2006)
     (requirement of PPG testing as part of sex
     offender treatment program imposed as a
     condition of supervised release requires
     heightened procedural protections).

     FN2. Two other CNYPC detainees have filed §
     1983 actions in the Northern District challenging
     these same aspects of the SOTP. See *Pratt v.
     Hogan,* No. 6:08-CV-1003, 2009 WL 1916284
     (N.D.N.Y. Jul. 6, 2009) (Hurd, J.)
     (injunctive/declaratory relief claims dismissed
     pursuant to *Younger* abstention; defendants
     granted qualified immunity from claims for
     money damages); *McChesney v. Hogan,* No.
     9:08-CV-1186, Report-Recommendation that
     motion for injunctive relief be denied, 2009 WL
     607398 (N.D.N.Y. Dec. 23, 2008) (Peebles,
     M.J.), *adopted,* 2009 WL 607398, at *7

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

(N.D.N.Y. Mar. 9, 2009) (Mordue, C. J.). McChesney also claims that the SOTP requirement that he compile an autobiography is unconstitutional. *McChesney,* 2009 WL 607398, at *1.

In addition to his complaint, plaintiff filed a motion seeking a temporary restraining order and preliminary injunction enjoining defendants from mandating participation in faith-based programs and from requiring polygraph or PPG examinations as a part of the SOTP. Dkt. No. 3-2 at 1-2.

By Order of this Court filed March 26, 2009, plaintiff was granted leave to proceed *in forma pauperis* and the U.S. Marshal was directed to effect service of process on the defendants. Dkt. No. 5. Plaintiff's request for the issuance of a temporary restraining order was denied. Defendants were directed to file a response to the preliminary injunction motion. *Id.* at 2-3.

Defendants have responded in opposition to plaintiff's motion for injunctive relief. Dkt. No. 8. Defendants also filed a "cross-motion" seeking dismissal of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[FN3]

> FN3. Plaintiff has not filed a response to defendants' motion to dismiss.

These motions are before the Court for consideration.[FN4]

> FN4. The parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded for purposes of this motion. Any appeal taken from this Memorandum-Decision and Order, if appropriate, will be to the Court of Appeals for the Second Circuit.

## II. Motion to Dismiss Standard

In deciding a Rule 12(b)(6) dismissal motion, "the court must accept the material facts alleged in the complaint as true, and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d

133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994).[FN5] The plaintiff must satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (italics in original). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 563 (2007).

> FN5. The "complaint" includes any written instrument attached to it as an exhibit and any statements or documents incorporated into the complaint by reference. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995); Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")

**\*2** The burden undertaken by the moving party is substantial, as the question presented by the motion to dismiss is not whether the non-moving party is likely ultimately to prevail, "but whether the claimant is entitled to offer evidence to support the claims." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other citations omitted). In order to withstand a motion to dismiss, a complaint must plead enough facts to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) ("The court should freely give leave when justice so requires.").

## III. First Amendment Claims

Plaintiff identifies himself as an atheist.[FN6] Since his placement at CNYPC, plaintiff has been assigned to the SOTP. Participation in the SOTP has "subjected [plaintiff] to religious practices and rituals." Dkt. No. 1 at 2. The "Good Lives Model and Boundaries Programs" teach the participants that they must "believe in something denoted as spirituality." *Id.* at 3. In addition, the SOTP includes Dialectic Behavior Therapy, which teaches "the rituals and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

practices" of Buddhism. *Id.* The SOTP also utilizes several "Hazeldon products which incorporate Christian beliefs and practices." *Id.* These programs include "From the Inside Out," "Growing Up Male," "Problem Solving" and "Anger Management." [FN7]

> FN6. The following facts are drawn from plaintiff's complaint and are accepted as true for purposes of the pending motion to dismiss. *Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007); *Boykin v. KeyCorp,* 521 F.3d 202, 204 (2d Cir.2008).

> FN7. In his memorandum in support of the motion for injunctive relief, plaintiff states that the Hazeldon products are "Christian based and incorporate the 12 steps/12 traditions of A.A. (Alcoholics Anonymous)." Dkt. No. 3 at 3.

The First Amendment, made applicable to states by the Fourteenth Amendment, states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. The First Amendment embraces two fundamental concepts: "freedom to believe and freedom to act" on one's beliefs. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940). The First Amendment's Establishment Clause prohibits government from officially preferring one religious denomination over another. Thus, "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente,* 456 U.S. 228, 244 (1982); *Skoros v. City of New York,* 437 F.3d 1, 16 (2d Cir.2006). The First Amendment also protects individuals against "government compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion." *Mozert v. Hawkins County Bd. of Educ.,* 827 F.2d 1058, 1066 (2d Cir.1987), *cert. denied,* 484 U.S. 1066 (1988).

Defendants urge dismissal of plaintiff's First Amendment claims, arguing that he has failed to state a cognizable claim under either the Establishment Clause or the Free Exercise Clause. Dkt. No. 8-2 at 7-9. Defendants contend that the state law pursuant to which plaintiff is confined "was clearly enacted for secular purposes" and that the purposes of the SOTP "are clearly secular as

well." *Id.* at 7-8. With respect to the particular treatment programs complained of by plaintiff, defendants maintain that dismissal is warranted because there is "no proof" that the programs "either advance or inhibit religion;" there is "no evidence" that the programs "foster any entanglement with religion;" and "no proof" of "governmental compulsion impacting upon his atheistic beliefs or practices." *Id.* at 8-9.

**\*3** The question presented by defendants' motion to dismiss is not whether plaintiff has or can adduce facts sufficient to prove his First Amendment claims. It may become clear, at summary judgment or at some later stage in the litigation, that plaintiff's claims are not adequately supported. But at this early stage, the Court must accept plaintiff's allegations as true and may not dismiss the case unless it is clear that it would be impossible for plaintiff to make out a legally cognizable claim.

Reading plaintiff's complaint liberally and accepting the well-pleaded allegations thereof as true, the Court finds that the First Amendment claim is sufficient to withstand defendants' motion to dismiss. Atheism is subject to the protections of the First Amendment. *Wallace v. Jaffree,* 472 U.S. 38, 52-53 (1985) ("the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all."); *McChesney,* 2009 WL 607398, at \*6 (Peebles, M.J.); *Alexander v. Schenck,* 118 F.Supp.2d 298, 300-02 (N.D.N.Y.2000) (Kahn, J.). Plaintiff identifies himself as an atheist, and alleges that he "has been subjected to religious practices and rituals" in the course of participating in the SOTP. Dkt. No. 1 at 2. Plaintiff claims that portions of the program are based upon Zen Buddhism and Christianity and that the SOTP "teach[es] that you have to believe in something denoted as spirituality." *Id.* at 2-3. Plaintiff alleges that he is compelled to participate in these faith-based programs in order to secure his release from CNYPC, and that this compelled participation violates his "right to believe or not as my conscience dictates." *Id.* at 3, 5. *See, e.g., Warner v. Orange County Dept. of Probation,* 115 F.3d 1068, 1075 (2d Cir.1997) (holding that because the plaintiff was sent to Alcoholics Anonymous as a condition of his probation, without offering a choice of other

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

providers, he was "plainly" coerced in violation of the Establishment Clause); *Alexander,* 118 F.Supp.2d at 301 (prisoner ordered to attend Alcohol and Substance Abuse Treatment Program was "coerced" for purposes of First Amendment).

Defendants' motion to dismiss plaintiff's First Amendment claim is denied. Accordingly, the Court will address plaintiff's motion for preliminary injunctive relief.

The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. As the Second Circuit noted in *Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992), the movant must show: (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *Id.* at 77 (affirming district court's denial of inmate's request for preliminary injunction). Where a movant seeks relief which will alter, rather than maintain, the status quo, or which will provide him with substantially all the relief sought, the requested injunction is properly characterized as mandatory rather than prohibitory. A party seeking a mandatory injunction must make a "clear" or "substantial" showing of the likelihood of success, as well as irreparable harm should the injunction not be granted. *Jolly v. Coughlin,* 76 F.3d 468, 473-74 (2d Cir.1996).

**\*4** Plaintiff asks that this Court issue a preliminary injunction prohibiting defendants from mandating participation in faith-based SOTP programs. Dkt. No. 3-2. The Court treats plaintiff's motion as seeking mandatory rather than prohibitory relief. Accordingly, plaintiff must make a clear or substantial showing of the likelihood of success on the merits of his claims.

Where a deprivation of constitutional rights is alleged, specific proof of irreparable injury is not required. *See e.g., Mitchell v.. Cuomo,* 748, F.2d 804, 806 (2d Cir.1984). For purposes of this motion, defendants do not contest plaintiff's assertion that he will suffer irreparable harm if the requested relief is not granted. *See* Dkt. No. 8-2 at 6. *See McChesney v. Hogan,* No. 9:08-CV-1186, Report-Recommendation, 2009 WL 607398, at \*3

(N.D.N.Y. Dec. 23, 2008), *adopted,* 2009 WL 607398, at \*7 (N.D.N.Y. Mar. 9, 2009) (Mordue, C.J.).

A party seeking injunctive relief must also demonstrate a likelihood of succeeding on the merits of a claim, or evidence that establishes sufficiently serious questions going to the merits of such a claim and a balance of hardships tipping decidedly toward the party seeking such relief. *Covino,* 967 F.2d at 77.

While the Court has found that plaintiff's allegations are sufficient to withstand defendants' Rule 12(b)(6) motion to dismiss, the present record does not contain evidence sufficient to warrant the issuance of injunctive relief. The record before the Court consists only of plaintiff's description of these programs and his claim that defendants are "proselytizing Christianity" and mandating his participation in faith-based programs in contravention of his avowed atheism. Plaintiff has not presented the Court with program materials or other evidence demonstrating a clear or substantial likelihood of success on the merits of his claim that SOTP programs such as Dialectic Behavior Therapy, "The Good Lives Model" and various Hazeldon programs are, in fact, religious in nature in First Amendment terms. *Compare Warner,* 115 F.3d at 1075 (finding a "Twelve Steps" program which "placed a heavy emphasis on spirituality and prayer" and instructed belief in "a Power greater than ourselves" was an intensely religious event) with *Boyd v. Coughlin,* 914 F.Supp. 828, 833 (N.D.N.Y.1996) (McAvoy, J.) ("This court is unaware of a controlling decision that equates spirituality with religion, such that any reference to spirituality in ... [a] treatment program ... runs afoul of the First Amendment."). See *McChesney,* 2009 WL 607398, at \*4. Plaintiff has also failed to support his motion with evidence that he was coerced into participating in the alleged religious exercises or rituals by virtue of his enrollment in the SOTP, and that no secular alternatives were made available to patients raising religious objections to the content of the treatment programs. *See Warner,* 115 F.3d at 1075 (recognizing that consideration of plaintiff's First Amendment claim "would be altogether different" if he had been offered a reasonable choice of therapy providers).

**\*5** Accordingly, plaintiff's motion for preliminary

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

injunctive relief is denied.

**IV. Fifth Amendment Claims**

SOTP participants seeking to advance to Phase II-IV of the program are asked to consent to polygraph and PPG examinations. Dkt. No. 1 at 3.[FN8] The Advancement Contract signed by plaintiff in December, 2008 contains the following general disclaimer: "[t]he court, your attorney, the Attorney General's Office, and other relevant participants in your commitment process have access to the information you reveal regarding your sexual offending behaviors and may use that information during the civil management process." Dkt. No. 3-3 at 7.[FN9] The section of the Advancement Contract specifically describing the required polygraph examinations includes the following statement: "The courts may choose to use any information gathered from these examinations." *Id.* at 8.[FN10] The Advancement Contract advises SOTP participants that a refusal to undergo the requested examinations "may slow or prevent advancement in SOTP phases of treatment." *Id.*

FN8. See note 5 *infra.*

FN9. Plaintiff references these documents as exhibits (C) and (D) to the complaint. Although the complaint as filed does not include these exhibits, the materials (as well as the documents identified as exhibits A and B), were filed as exhibits in support of plaintiff's motion for injunctive relief. Both submissions were filed on the same day.

FN10. A previous version of the Advancement Contract advised that polygraph examinations "are not designed to be incriminating or to be used in court." See Dkt. No. 3-3 at 5.

The Fifth Amendment's privilege against self-incrimination, which applies to the states via the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The privilege

not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also "privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

Minnesota v. Murphy, 465 U.S. 420, 426 (1984) (quoting Lefkowitz v. Turley, 414 U.S. 70, 77 (1973)). The right not to answer potentially incriminating questions however, is not absolute. Rather, "[t]he prohibition against compelling the testimony of a witness in any setting is predicated upon there being a real danger that the testimony might be used against the witness in later criminal proceedings." Andover Data Services, a Div. of Players Computer, Inc. v. Statistical Tabulating Corp. 876 F.2d 1080, 1082 (2d Cir.1989). Thus, "[i]t is ... black-letter law that a witness cannot assert a Fifth Amendment privilege not to testify 'if the testimony sought cannot possibly be used as a basis for, or in aid of, a criminal prosecution against the witness.' " Pillsbury Co. v. Conboy, 459 U.S. 248, 273 (1983) (Blackmun, J., concurring) (quoting Brown v. Walker, 161 U.S. 591, 597 (1896)).

Outside of the prison context, the Supreme Court has "described compulsion in relatively broad terms." Ainsworth v. Risley, 244 F.3d 209, 213 (1st Cir.2001), vacated on other grounds, 536 U.S. 953 (2002). The Court has held that "certain types of penalties are capable of coercing incriminating testimony," including: termination of employment, the loss of a professional license, ineligibility to receive government contracts, and the loss of the right to participate in political associations and to hold public office. McKune v. Lile, 536 U.S. 24, 49-50 (2002) (O'Connor, J., concurring in the judgment) (citing cases). The Supreme Court has defined "compulsion" as anything that makes the exercise of the right "costly." Spevack v. Klein, 385 U.S. 511, 515 (1967). See Lefkowitz v. Cunningham, 431 U.S. 801, 808 (1977) (rejecting "the notion that citizens may be forced to incriminate themselves because it serves a governmental need.").

**\*6** Writing for a plurality of the Court in *McKune,* Justice Kennedy concluded that the setting in which the compulsion arises is an integral part of the constitutional analysis. Id., 536 U.S. at 36 ("The fact that these consequences are imposed on prisoners, rather than

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

ordinary citizens, moreover, is important in weighing respondent's constitutional claim."). Noting that "[a] broad range of choices that might infringe constitutional rights in free society fall within the expected conditions of confinement of those who have suffered a lawful conviction," *id.,* Justice Kennedy concluded that the "atypical and significant hardship" analysis articulated in *Sandin v. Connor,* 515 U.S. 472 (1995) "provides a reasonable means of assessing whether the response of prison administrators to correctional and rehabilitative necessities are so out of the ordinary that one could sensibly say they rise to the level of unconstitutional compulsion." *McKune,* 536 U.S. at 41. Concurring with the judgment reached by the *McKune* plurality, that withholding certain privileges upon an inmate's refusal to participate in a mandatory sex offender treatment program does not constitute a compulsion that encumbers the constitutional right not to incriminate oneself, Justice O'Connor wrote separately to express her opinion that the Fifth Amendment compulsion standard is broader that *Sandin's* "atypical and significant hardship" standard. *Id., 536 U.S. at 48* (O'Connor, J., concurring).[FN11]

> FN11. The inmate plaintiff in *McKune,* complained that he faced transfer to a less-desirable maximum security prison, and that he also faced the loss of his personal television set, less access to prison organizations and the gym area, a reduction in certain pay opportunities and restricted visitation rights. *McKune, 536 U.S. at 39.* Justice Kennedy, writing for a plurality, emphasized that the decision not to participate in the Kansas Sexual Abuse Treatment Program "did not extend [the prisoner's] term of incarceration" nor did it "affect his eligibility for good-time credits or parole." *Id., 536 U.S. at 38.*

In this case, plaintiff, a civil detainee faced with prolonged civil detention if he refuses to submit to polygraph and PPG examinations, has adequately alleged that he faces "compulsion" that is constitutionally significant even under the *Sandin* analysis utilized by the *McKune* plurality.

Notwithstanding the foregoing, however, the Court finds that plaintiff has failed to state a Fifth Amendment claim because neither polygraph nor PPG examinations violate the Fifth Amendment privilege against self-incrimination. The Second Circuit has held that requiring the use of a polygraph examination for a convicted sex offender as a condition of supervised release does not violate the privilege against self-incrimination because polygraph evidence is generally inadmissible, and the individual would be free to challenge that evidence should it be used against him in a future proceeding. *United States v. Johnson,* 446 F.3d 272, 278-80 (2d Cir.2006); *United States v. Santiago,* No. 03 Cr. 664, 2008 WL 1959548, at *1 (S.D.N.Y. May 5, 2008); *see also United States v. Dotson,* 324 F.3d 256, 261 (4th Cir.2003) (polygraph test, "inadmissible in nearly every circumstance at trial," may be required as a condition of supervised release); *United States v. Zinn,* 321 F.3d 1084, 1090-92 (11th Cir.2003) (requiring polygraph testing as a condition of supervised release generally does not violate the Fifth Amendment). *Compare United States v. Weber,* 451 F.3d 552, 568 n. 17 (9th Cir.2006) (defendant subject to polygraph testing as requirement of supervised release retains Fifth Amendment rights "unless granted use-andderivative-use immunity").

**\*7** The Court also find that results of PPG examinations do not implicate plaintiff's Fifth Amendment right against self-incrimination because the procedure itself is not testimonial but, rather, is an assessment of an individual's physical reactions to various stimuli. *See McChesney,* 2009 WL 607398, at *5; *Walrath v. United States,* 830 F.Supp. 444, 446 (N.D.Ill.1993). Moreover, courts asked to consider the admissibility of PPG examinations have uniformly refused to do so, finding that PPG results fail to meet scientific validity prong for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589-90 (1990)); *see Doe ex. rel. Rudy-Glanzer v. Glanzer,* 232 F.3d 1258, 1266 (9th Cir.2000) ("courts are uniform in their assertion that the results of penile plethysmographs are inadmissible as evidence because there are no accepted standards for this test in the scientific community."); *United States v. Powers,* 59 F.3d 1460, 1470-71 n. 13 (4th Cir.1995) (appellant "has not provided, and we have not found, any decisions acknowledging the validity of the use of penile plethysmography other than in the treatment and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

monitoring of sex offenders.").

Based upon the foregoing, the Court finds that the allegations of the complaint, as drafted, do not state a claim upon which relief may be granted for the violation of plaintiff's Fifth Amendment right against self-incrimination stemming from polygraph and/or PPG examinations conducted as part of the SOTP. This aspect of defendants' motion to dismiss is granted.[FN12]

> FN12. In light of this ruling, the Court need not address plaintiff's motion for injunctive relief. Defendants' claim that they are entitled to qualified immunity from damages on this claim is also moot.

**V. Qualified Immunity**

Defendants raise the affirmative defense of qualified immunity. Dkt. No. 8-2 at 11-12. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)).

The Second Circuit has recognized that the availability of qualified immunity may "turn[ ] on factual questions that cannot be resolved at [the motion to dismiss] stage of the proceedings." *Taylor v. Vermont Dept. of Educ.,* 313 F.3d 768, 793 (2d Cir.2002).[FN13] Thus, where the "objective reasonableness" of defendants' actions depends at least in part on what information they had regarding the substance of plaintiff's complaints, an adjudication as to the applicability of the qualified immunity affirmative defense on the basis of the pleadings alone would be premature.

> FN13. In *Stephenson,* the court advised that a "defendant should press a qualified immunity defense during pretrial proceedings so that such a claim can be disposed of by summary judgment where possible, or factual disputes material to the defense can be identified and presented to the jury." *Stephenson,* 332 F.3d at 76.

Although a factual basis for affording qualified immunity to defendants on plaintiff's First Amendment claims may arise during the course of discovery, the Court cannot at this early stage of the proceeding, accepting all of plaintiff's allegations as true, conclude that defendants are entitled to qualified immunity as a matter of law. *See Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 255 (2d Cir.2001); *Bailey v. Pataki,* 08 Civ. 8563, 2009 WL 2001178, at *6 (S.D.N.Y. Jul.10.2009). Accordingly, defendants' motion to dismiss plaintiff's First Amendment claims for money damages based on qualified immunity is denied, without prejudice to renew.

**VI. Conclusion**

**\*8** Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted is granted in part and denied in part. The well-pleaded allegations of the complaint sufficiently allege a violation of plaintiff's First Amendment rights resulting from his required participation in faith-based treatment programs. Plaintiff's motion for preliminary injunctive relief is denied. Defendants' request for dismissal of plaintiff's First Amendment claims for money damages on qualified immunity grounds is denied, without prejudice. Plaintiff's Fifth Amendment claims are dismissed, without prejudice.

WHEREFORE, on the basis of the above, it is hereby

ORDERED, that defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **granted in part and denied in part** as set forth above, and it is further

ORDERED, that plaintiff's motion for preliminary injunctive relief is **denied,** and it is further

ORDERED, that defendants file an answer to complaint **no later than October 31, 2009,** and it is further

ORDERED, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties.

IT IS SO ORDERED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

N.D.N.Y.,2009.

Decker v. Hogan
Slip Copy, 2009 WL 3165830 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
David McCHESNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, New York State
Office of Mental Health, et al., Defendants.
David McCchesney, Plaintiff,
v.
Michael F. Hogan, Commissioner, New York State
Office of Mental Health, et al., Defendants.
Civil Action Nos. 9:08-CV-1186 (NAM/DEP),
6:08-CV-1290 (NAM/DEP).

Feb. 26, 2010.
David McCchesney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General, State of New York, Adele Taylor-Scott Esq., Assistant Attorney General, Dean J. Higgins, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff David McCchesney, a convicted sex offender who has been civilly committed to the Central New York Psychiatric Center ("CNYPC"), for participation in sex offender treatment, has commenced these two actions pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaints, plaintiff alleges that the Sex Offender Treatment Program ("SOTP") administered at the CNYPC is predicated in part upon religious tenets, and he is being forced, contrary to his beliefs as an atheist, to practice religion in violation of his First Amendment rights. In addition, plaintiff alleges that various other aspects of the SOTP, including use of polygraph and penile plethysmograph ("PPG") testing and the requirement that he compose and share an autobiography detailing his sexual history, violate his Fifth Amendment right against self-incrimination.[FN1] As relief, plaintiff seeks both damages and an injunction against the continued use of the problematic religious and self-incriminating elements of the treatment program.

> FN1. A plethysmograph is "[a]n instrument that measures variations in the size of an organ or body part on the basis of the amount of blood passing through or present in the [body] part." American Heritage Dictionary 1338 (4th ed.2000). According to materials regarding the programming at the CNYPC, use of the PPG is intended to "assess sexual interests and measure treatment effectiveness. In this treatment, while wearing a sterilized gauge around the penis, a machine records any erection response resulting from listening to and/or viewing depiction of sexual and non-sexual materials. This assessment occurs within a laboratory setting for complete privacy." *See Decker v. Hogan,* No. 9:09-CV-0239 (TJM/GJD), 2009 WL 3165830 at \*1 n. 1 (N.D.N.Y. Sept.28, 2009).

Defendants have moved for dismissal of the complaints on a variety of grounds, both procedural and substantive, arguing that 1) plaintiff's complaints are legally insufficient because he has failed to separately number paragraphs and include all exhibits referenced in one of the two complaints; 2) plaintiff's damage claims against the defendants in their official capacities are precluded under the Eleventh Amendment; 3) plaintiff's forced self-incrimination claims lack merit; and 4) they are entitled to qualified immunity with respect to plaintiff's First Amendment cause of action in light of the unsettled state of the law governing such a claim. For the reasons set forth below, I recommend that plaintiff's Fifth Amendment self-incrimination claim be dismissed because he has failed to plead that information set forth in his autobiography or derived through polygraph or PPG testing has been used against him in a criminal proceeding, that his damage claims against the defendants as individuals alleging violation of the First Amendment be dismissed based on qualified immunity, and that any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

damage claims against defendants as state officials be dismissed pursuant to the Eleventh Amendment. To the extent that plaintiff's First Amendment claim seeks injunctive relief against defendants in their official capacities only, however, I further recommend that this claim survive defendants' motion, and additionally that defendants' motion to dismiss the complaint for failure to meet the governing pleading requirements be denied.

I. *BACKGROUND*[FN2]

> **FN2.** In light of the procedural posture of this case, my recitation of the relevant facts is drawn principally from plaintiff's complaints, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). Portions of the background description which follows have been derived from the exhibits attached to plaintiff's complaints, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *see also Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

On or about December 6, 2007 the plaintiff, a convicted sex offender, was involuntarily committed to the care and custody of the New York State Office of Mental Health and designated to the CNYPC pursuant to the mandates of New York Mental Hygiene Law Article 10.[FN3] *See generally,* Civil Action No. 9:08-CV-1186 (NAM/DEP) Complaint (Dkt. No. 1) § 4. While there, McChesney is required to participate in the SOTP, an established sex offender treatment regimen that is broken down into four distinct segments. *Id.,* Exh. D; Civil Action No. 9:08-CV-1290 (NAM/DEP) Complaint (Dkt. No. 1) Exhs. B and C. Phase I of the program, entitled "Orientation and Treatment Readiness", is described as

the "readiness phase" and "provides basic information related to the commitment process, goals of the sex offender treatment program, and the treatment plan which documents an individual's progress towards meeting the program goals." *Id.* Phases II through IV of the SOTP are more intensive and are based upon what is described as a "structured treatment protocol." *Id.*

> **FN3.** Enacted in 2007, Article 10 of the Mental Hygiene Law provides for civil commitment and treatment of certain individuals convicted of committing sex crimes, recognizing the danger that recidivistic offenders present when released into the community. *See* N.Y. Mental Hyg. Law § 10.01.

**\*2** In order to participate in the latter three phases of the SOTP, which are conducted in group therapy settings, a patient is required to sign a consent form, described by the plaintiff as a contract. Civil Action No. 9:08-CV-1186 (NAM/DEP) Complaint (Dkt. No. 1) § 4 and Exhs. D and E. Significantly, the consent form discloses the potential use of polygraph and PPG testing during the course of the final three phases and notes that a separate written consent is required for use of each of those types of testing. *Id.* While advised of his or her right to refuse such testing, the patient is also pointedly informed that a refusal "may slow or prevent advancement in SOTP Phases of treatment." *Id.*

Attached to plaintiff's first complaint are two versions of the SOTP Phase II-IV Consent to Participate in Treatment form. Civil Action No. 9:08-CV-1186 (NAM/DEP) Complaint (Dkt. No. 1) Exhs. D and E. According to the plaintiff, the second of those forms "was recently issued by defendant [OMH Commissioner] Hogan." *Id.* § 4. The more recent consent form differs from the earlier version in several critical respects. First, while the original form provided that polygraph examinations "are not designed to be incriminating or to be used in court", the amended version instead states that "[t]he courts may choose to use any information gathered from [polygraph] examinations." *Id.* The more recent iteration also specifically advises that the polygraph examination may be used to explore the patient's sexual history. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

In addition to use of polygraph and PPG testing as treatment tools, the SOTP employs course materials which, plaintiff asserts, incorporate or are predicated upon Buddhist and Christian beliefs and practices, including "The Good Lives Model and Boundaries Programs," which discusses spirituality; "Dialectic Behavior Therapy", "Self Care Skills I and II", and "Relaxation Programs", all teaching the rituals and practices of Buddhism; and "Growing up Male, Problem Solving, Anger Management Programs", described as "Hazleton Products which incorporate Christian beliefs and practices into their programs." Civil Action No. 9:08-CV-1186 (NAM/DEP) Complaint (Dkt. No. 1) § 4. McChesney, who is an atheist, asserts that by requiring him to submit to teaching using those materials defendants have violated his First Amendment rights. *Id* .

In or about August of 2008, as part of the SOTP program, plaintiff was directed by Donald Sawyer, Executive Director of the CNYPC, to author and be prepared to present an autobiography. Civil Action No. 9:08-CV-1290 (NAM/DEP) Complaint (Dkt. No. 1) § 4. Preparation of such an autobiography is a requirement of the Phase II treatment protocol and is described in a handout entitled "Introduction to Autobiographies." Civil Action No. 9:08-CV-1290 (NAM/DEP) Complaint (Dkt. No. 1) Exh. A. Segment four of the questionnaire given to patients for use in complying with this requirement requests information about criminal history and asks specific questions regarding the patient's participation in sex crimes and other unlawful sexual conduct. *Id.,* Exhs. A and C. On or about October 9, 2008, defendant Valerie Colasante, a psychologist at the facility, advised plaintiff that each participant in the program would be questioned regarding his or her autobiography, which was to recount a history of sexual offenses including charged and uncharged crimes. Civil Action No. 9:08-CV-1290 (NAM/DEP) Complaint (Dkt. No. 1) § 4. According to McChesney, Terry Maxymillan, the SOTP Director, issued an order that plaintiff's autobiography be collected, placed in his file, and made available for inspection by the Attorney General. *Id.* On October 30, 2008, plaintiff was directed by defendant Colasante to turn in his autobiography. *Id.* Plaintiff was later removed from the treatment group based upon a refusal to permit his autobiography to be copied. *Id.*

II. *PROCEDURAL HISTORY*

**\*3** The first of these two actions, Civil Action No. 9:08-CV-1196 (NAM/DEP), was commenced by the plaintiff on November 6, 2008. The second, Civil Action No. 9:08-CV-1290 (NAM/DEP), was filed some three weeks later on November 28, 2008. The two actions were subsequently consolidated by the court, on its own initiative, based upon a report issued by me on December 23, 2008 recommending that measure and approval of that recommendation by Chief District Judge Norman A. Mordue on March 9, 2009.[FN4][FN5] Civil Action No. 9:08-CV-1186 (NAM/DEP) Dkt. Nos. 4, 13.

> FN4. Plaintiff currently has two other actions pending in this court, including *McChesney v. Hogan, et al.,* No. 9:08-CV-0163 (FJS) (filed Feb. 11, 2008), in which plaintiff complains of the inadequacy of the law library at the CNYPC, and *McChesney v. Hogan, et al.,* No. 9:08-CV-0563 (NAM) (filed June 10, 2008), in which McChesney has lodged claims against the named defendants for failure to protect him from assaults the hands of fellow patients at the center. A fifth action commenced by the plaintiff, *McChesney v. Miller, et al.,* No. 9:08-CV-0195 (TJM) (filed Feb. 21, 2008), was closed in March of 2008 based upon plaintiff's voluntary withdrawal of the claims set forth in his complaint without prejudice. *See id.,* Dkt. Nos. 4-6.

> FN5. The court's consolidation order designated Civil Action No. 9:08-CV-1186 (NAM/DEP) as the lead action. All references to docket entries in this report, unless indicated otherwise, will refer to the docket sheet in that case.

Plaintiff's complaint in Civil Action No. 9:08-CV-1186 (NAM/DEP) names OMH Commissioner Michael Hogan and CNYPC Executive Director Donald Sawyer as defendants and asserts claims under the First and Fifth Amendments to the United States Constitution. McChesney's complaint in 9:08-CV-1290 (NAM/DEP) names Commissioner Hogan and Executive Director Sawyer as well as three new defendants, including SOTP

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

Director Terri Maxymillian; Psychologist Valerie Colasante; and Registered Nurse Regina Anderson, identified as a Treatment Team Leader at the Center. The complaint in that action focuses on the compelled self-incrimination aspect of the SOTP program, particularly the requirement to complete an autobiography, seemingly asserting a claim under the Fifth Amendment to the United States Constitution. *Id.*

On April 21, 2009 defendants moved pursuant to Rules 10(b) and 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of plaintiff's complaints in these two consolidated actions. Dkt. No. 17. In their motion defendants allege that 1) plaintiff has failed to meet the pleading requirements of Rule 10(b) by not separately numbering the paragraphs and because of his failure to include some of the exhibits that are specifically incorporated by reference into one of the complaints; 2) the Eleventh Amendment bars plaintiff's damage claims against the defendants in their official capacities; 3) plaintiff's Fifth Amendment claim lacks merit; and 4) defendants are entitled to qualified immunity in connection with plaintiff's First Amendment claim.[FN6] Although plaintiff did not respond to defendants' motion within the allotted time, which expired on May 26, 2009, he has since submitted what is denominated as a declaration in further support of his action. Dkt. No. 22. Without providing great detail, plaintiff's submission states that a New York State Supreme Court Justice has made a finding that McChesney suffers from "a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that he is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility"; it appears that plaintiff is suggesting that this determination was based upon the sexual autobiography that he was compelled to prepare as part of his participation in the SOTP.

> FN6. Defendants' motion also requests a protective order precluding plaintiff from engaging in discovery pending determination of their motion. That relief is no longer necessary, however, since by order entered on April 23, 2009, I stayed discovery in the action pending resolution of defendants' motion to dismiss. *See*

Dkt. No. 19.

III. *DISCUSSION*

A. *Failure To Comply With Governing Pleading Requirements*

**\*4** As a threshold matter, in their motion defendants argue that plaintiff's complaints do not conform to applicable pleading requirements in that they do not consist of separately numbered paragraphs and that he has also failed to attach Exhibits A through C despite their incorporation by reference into his complaint in Civil Action No. 9:08-CV-1186 (NAM/DEP). Defendants urge the court to exercise its discretion to dismiss the complaints due to these omissions.

Federal Rule of Civil Procedure 10 imposes a requirement whose intent is largely pragmatic, requiring, among other things, that a pleading consist of separately numbered paragraphs "each of which shall be limited as far as practicable to a statement of a single set of circumstances[.]" Fed.R.Civ.P. 10(b). Rule 10(b) is designed to assist litigants and the court by allowing the interposition of a responsive pleading and the corresponding framing of issues with sufficient clarity to allow an orderly and meaningful presentation of a plaintiff's claims and any corresponding defenses, either on motion or at trial. *See Flores v. Graphtex,* 189 F.R.D. 54, 55 (N.D.N.Y.1999) (Munson, S.J.).

Analysis of plaintiff's amended complaint, in the face of defendants' motion, is informed not only by the salutary purposes to be served by these pleading requirements but additionally by two equally important principles. First, it is a well settled that a complaint prepared by a *pro se* litigant should be liberally construed in his or her favor. *Salahuddin v. Cuomo,* 861 F.2d 30, 42-43 (2d Cir.1988). Second, courts generally favor adjudication of cases on their merits rather than on the basis of a technicality or procedural nicety. *Id.* at 42; *see also Zdziebloski v. Town of East Greenbush,* 101 F.Supp.2d 70, 72 (N.D.N.Y.2000) (Kahn, J.) (citing *Salahuddin* ); *Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

Unlike the situation presented in many instances involving *pro se* litigants, including the case cited by the defendants, *Jochnowitz v. Russell Sage College,* No. 90-CV-1101, 1992 WL 106813 (N.D.N.Y. May 13, 1992), plaintiff's complaints in these two actions are neither rambling nor prolix and instead concisely state the facts upon which relief is sought.[FN7] In this instance the factual allegations recited in both complaints are broken down into separate paragraphs. In the case of plaintiff's complaint in Civil Action No. 9:08-CV-1186 (NAM/DEP) plaintiff has attempted to separately letter some of the paragraphs; in Civil Action No. 9:08-CV-1290 (NAM/DEP), however, the factual recitation includes paragraphs that are wholly unnumbered.

FN7. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

The salutary objective to be served by Rule 10 is to permit the formulation of a proper pleading and response. That end can be served in this instance by assuming that the paragraphs outlined in section four of plaintiff's two complaints are separately numbered, beginning with paragraph number one, with defendants responding accordingly in their answers.

**\*5** Slightly more problematic is the fact that plaintiff's complaint in Civil Action No. 08-CV-1186 (NAM/DEP) fails to attached three exhibits referenced in the complaint. This is a curable defect and presumably the result of an oversight on the plaintiff's part. I therefore recommend against dismissal of plaintiff's complaint on this basis. Instead, I respectfully suggest that plaintiff be directed to submit to the court and defendants' counsel copies of the exhibits referenced in his complaint in Civil Action No. 9:08-CV-1186 (NAM/DEP) before defendants must file an answer so that they may know the full extent of the allegations to which they are responding.

B. *Dismissal Standard*

The second prong of defendants' motion is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss a complaint brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, thedefendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ---U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ----, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570 127 S.Ct. at 1974).

C. *Eleventh Amendment*

Plaintiff's complaints in these consolidated actions seek both monetary and injunctive relief. They do not, however, clearly specify whether monetary damages are sought against the defendants in their official capacities, or instead just as individuals. To the extent that plaintiff's complaints may be construed as seeking damages against the defendants as state officials, they argue that such relief is precluded under the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

enjoy under the Eleventh Amendment extends both to state agencies and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN8] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN9] *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

> FN8. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

> FN9. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

*6 Since plaintiff's damage claim against the named defendants in their official capacities is in reality a claim against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, it is subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted and that plaintiff's damage claim against the defendants in their capacity as state officials be dismissed.[FN10]

> FN10. Dismissal of plaintiff's damage claim against the defendants in their official capacities does not preclude plaintiff from maintaining an action for injunctive relief against those individuals as state officials. *Frew ex. rel. Frew v. Hawkins,* 540 U.S. 431, 437, 124 S.Ct. 899, 903, 157 L.Ed.2d 855 (2007) ("[T]he Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.") (citations omitted).

**D.** *Plaintiff's Fifth Amendment Self Incrimination Claim*

Defendants next seek dismissal of plaintiff's Fifth Amendment claim. In support of this portion of their motion defendants argue that using polygraph and PPG testing and an autobiography potentially containing incriminating information, including that related to past uncharged crimes, in a civil setting to treat the plaintiff as a sex offender does not run afoul of the Fifth Amendment's privilege against self-incrimination.

The Fifth Amendment, which applies to the states through the Fourteenth Amendment, *see Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), insures that no person "shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V. That provision protects persons against being compelled in a criminal case to give self-incriminating testimony. *McKune v. Lile,* 536 U.S. 24, 35-36, 122, 122 S.Ct. 2017, 153 L.Ed.2d 47, S.Ct. 2017, 2026 (2002); *Higazy v. Templeton,* 505 F.3d 161, 171 (2d Cir.2007). As the Supreme Court has noted, "[t]he privilege reflects a complex of our fundamental values and aspirations, and marks an important advance of the development of our liberty." *Kastrigar v. United States,* 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). While speaking in terms of criminal cases, the Fifth Amendment offers a privilege that "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory...." *Id.* at 444-45, 92 S.Ct. at 1656 (footnote omitted).

The first question presented in connection with plaintiff's Fifth Amendment claim is whether by virtue of the SOTP's autobiography requirement he has been compelled by the government to give incriminating

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

information. "The test for whether a statement was improperly obtained by coercion is 'determined by the totality of the circumstances' ". *Higazy,* 505 F.3d at 170 (citing and quoting *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998)).

The element of compulsion, in the context of the Fifth Amendment, was addressed by the Supreme Court in *McKune,* 536 U.S. at 48-49, 122 S.Ct. at 2032-33 (O'Connor, J., concurring). *McKune* involved a Kansas prison inmate who, as a participant in a sex abuse treatment program, was required not only to discuss and accept responsibility for the crime of conviction but also to complete a sexual history form detailing all prior sexual activities. *McKune,* 536 U.S. at 29-32, 122 S.Ct. at 2022-24. The consequences for refusing to participate in the treatment program included curtailment of various privileges and a transfer into a more secure facility with more limited opportunities for movement. *Id.* at 30-31, 122 S.Ct. at 2022-23. A plurality of the Court concluded that the plaintiff in that case had failed to demonstrate a sufficient degree of constitutionally significant compulsion, although no one opinion garnered a majority. Focusing on the compulsion element of the self-incrimination clause Justice Kennedy, who delivered an opinion in which three others joined, concluded that the limitations faced for failing to cooperate were similar to that which other prison inmates could also be exposed and did not rise to a level sufficient to constitute undue compulsion and thus run afoul of the Fifth Amendment.[FN11] *McKune,* 536 U.S. at 41-47, 122 S.Ct. 2017, 153 L.Ed.2d 47.

FN11. In its decision *McKune,* the Supreme Court took notice of the serious threat presented by sex offenders released into the community and the high rate of their recidivism, noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault[,]" adding that "[s]tates thus have a vital interest in rehabilitating convicted sex offenders." *McKune,* 536 U.S. at 33, 122 S.Ct. at 2024 (citations omitted). The Court also observed in *McKune* that "[a]cceptance of responsibility is the beginning of rehabilitation,"

noting that the acceptance of responsibility for past offenses "gives inmates a basis to understand why they are being punished and to identify the traits that cause such a frightening and high risk of recidivism." *Id.,* 536 U.S. at 33-34, 47, 122 S.Ct. 2025, 2032.

**\*7** In *Edwards v. Ladlair* this court went one step further, concluding the requirement that the petitioner in that habeas case disclose prior uncharged sex offenses during the course of a prison sex offender treatment program did not violate his Fifth Amendment right against self-incrimination since the sanction for refusing to participate in the program was the denial of good time credit allowances, a discretionary privilege, and under *McKune* the denial of prison privileges does not suffice to establish the requisite degree of compulsion for purposes of the Fifth Amendment. No. 9:07-CV-0059-JKS, 2008 WL 3156214 at \*6 (N.D.N.Y. Aug.4, 2008), *aff'd,* 2010 WL 292749 (2d Cir. Jan.26, 2010). As acknowledged by Judge Singleton in *Edwards,* the *McKune* Court noted that the decision not to participate in the Kansas sex offender treatment did not affect the respondent's eligibility for good time credits or parole. *Edwards,* 2008 WL 3156214, at \*5 (citing *McKune,* 536 U.S. at 38, 122. S.Ct.2017). *Edwards* therefore extended the reasoning in *McKune,* applying it as well to circumstances in which the sanction for failure to comply included loss of good time credits.

When addressing the compulsion element of a Fifth Amendment claim such as that now presented,

[t]he test, as articulated in *McKune,* depends upon the severity of the consequences of the choice made by the prisoner not to participate and discuss his crimes. 536 U.S. at 44-45 (plurality), 48-50 (O'Connor, J. concurring). Unfortunately, the Supreme Court has not provided a bright-line of demarcation above which the severity of the consequences constitutes compulsion.

*Edwards,* 2008 WL 3156214, at \*5. It is by now fairly well settled that risking the loss of good time credits or jeopardizing the chance for parole, alone, does not qualify as sufficiently compulsive to meet the test. *See Wolfe v. Pennsylvania Dep't of Corrections,* 334 F.Supp.2d 762, 771 (E.D.Pa.2004); *see also Ainsworth v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

*Stankley,* 317 F.3d 1, 5 (1st Cir.2002), *cert. denied,* 538 U.S. 999, 123 S.Ct. 1908, 155 L.Ed.2d 825 (2003); *Searcy v. Simmons,* 299 F.3d 1220, 1226 (10th Cir.2002). Beyond these forms of recrimination, however, the issue becomes less clear.

In this instance, the plaintiff is a civil detainee whose liberty is being withheld beyond the expiration of his prison sentence. McChesney is therefore in a very different circumstance than the inmates involved in *Edwards* and *McKune.* Although this is somewhat unclear from the scant record now before the court, it appears that in all likelihood *McChesney* has served all of the time imposed based upon his criminal sex conviction and is now involuntarily committed for rehabilitation pursuant to the relatively recently enacted provisions of New York Mental Hygiene Law Article 10. The record now before the court does not disclose what sanctions could result from plaintiff's failure to provide the requested information in connection with his SOTP. Plausibly, however, one could imagine that it could well result in an extension of his confinement at the CNYPC. This, then, is a very different situation than presented in *McKune,* 536 U.S. at 38, 122 S.Ct. at 2027 ("in the present case, respondent's decision not to participate in Kansas SOTP did not extend his term of incarceration"), and the potential sanction for plaintiff's refusal to incriminate himself suffices, at least at this early procedural juncture, to establish the requisite degree of compulsion necessary to support a Fifth Amendment claim. *Decker v. Hogan,* No. 9:09-CV-0239 (TJM/GJD), 2009 WL 3165830, at *6 (N.D.N.Y. Sept.28, 2009) (McAvoy, S.J.).

**8** The more difficult question presented is whether, in being compelled by officials at the CNYPC to submit to polygraph and PPG testing and complete an autobiography, plaintiff has been unlawfully forced to incriminate himself in violation of his right under the Fifth Amendment. As unsettled as the controlling legal principles were after the Court's decision in *McKune,* the landscape was further muddied by the Supreme Court's later decision in *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), another case heavily relied upon by the defendants in their motion. That action involved a claim brought by an individual pursuant to 42 U.S.C. § 1983, arguing that his Fifth Amendment right

against self-incrimination was violated when he was interrogated by the petitioner, a police patrol supervisor, even though the statements obtained through the course of that interrogation were never used against him in any criminal prosecution. Under the circumstances presented the Court found no constitutional violation, since the respondent was never forced to be a witness against himself in a criminal proceeding. *Chavez,* 538 U.S. at 767, 123 S.Ct. at 2001.

Admittedly, it is somewhat difficult to reconcile *Chavez* with some of the Court's prior decisions regarding the Fifth Amendment. In *Kastigar,* for example, the Court noted that the privilege

can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory, and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.

406 U.S. at 444-45, 92 S.Ct. at 1656 (footnote omitted). *Chavez,* however, appears to stand for the proposition that while this may be true, and *Kastigar* and other cases permit invocation of the Fifth Amendment privilege in non-criminal settings, a violation of the right of against self-incrimination is inchoate until a person has been actually compelled to be a witness against himself or herself in a criminal proceeding, meaning that his or her testimony or statements have been used in a criminal arena. *Chavez,* 538 U.S. at 770, 123 S.Ct. at 2002-03. Accordingly, since McChesney has not alleged that he completed an autobiography disclosing uncharged sex crimes, permitted it to be copied, and the autobiography was used against him in a criminal in prosecution, or that he consented to and underwent polygraph or PPG testing the results of which were offered against him in a criminal setting, his complaint fails to allege a Fifth Amendment violation [FN12][FN13] *Fifield v. Eaton,* No. 07-CV-6521L, 2009 WL 3429791, at *3 (W.D.N.Y. Oct.20, 2009) (claim by a convicted sex offender that defendants required him to complete forms admitting guilt of a sex offense, leading to expulsion from sex offender treatment upon his denial, held not to give rise to a Fifth Amendment violation since plaintiff failed to allege that the defendant used, sought to

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

use, or could have used any incriminating statement against him at a criminal proceeding"); *see also Krug v. County of Rennselaer,* 559 F.Supp.2d 223, 246 (N.D.N.Y.2008) (statements made to law enforcement officers but never used in a criminal proceeding do not give rise to a Fifth Amendment claim) (citing, *inter alia, Chavez,* 538 U.S. at 766, 123 S.Ct. at 2000).

FN12. Any contention on plaintiff's part that his autobiography may be used in the future in a criminal proceeding against him is not presently ripe for adjudication. *Longway v. Jefferson County Jefferson Bd. of Supervisors,* 24 F.3d 397, 400 (2d Cir.1994) ("An issue is ripe for judicial resolution only if it presents a real and substantial controversy, not a mere hypothetical question.") (internal quotations and citation omitted). This decision therefore does not foreclose plaintiff from challenging the use of his autobiography in a subsequent criminal proceeding, nor does it preclude him from bringing a separate action under for damages 42 U.S.C. § 1983 for violating his Fifth Amendment rights in the event that government officials attempt to use his compulsory autobiography against him in a subsequent criminal proceeding.

FN13. Even if plaintiff could establish a Fifth Amendment violation with regard to the autobiography requirement, fearing that its contents could give rise to and be used in a subsequent criminal proceeding, he could not make a plausible self-incrimination claim with regard to the polygraph and PPG testing. Addressing the use of a polygraph examination under analogous circumstances with regard to a convicted sex offender as a condition of his supervised released, the Second Circuit has concluded that the requirement that a party submit to a polygraph exam does not violate the privilege against self-incrimination since such evidence is generally inadmissible, and the individual would be free to challenge the evidence should it be used against him in a future proceeding. *United States v. Johnson,* 446 F.3d 272, 278-80 (2d Cir.2006); *see also United*

*States v. Zinn,* 321 F.3d 1084, 1090-92 (11th Cir.2003) (holding that requiring polygraph testing as a condition of supervised release generally does not violate the Fifth Amendment), *U.S. v. Santiago,* No. 03 Cr. 66 4, 2008 WL 1959548 at *1 (S.D.N.Y. May 5, 2008) (citing *Johnson,* 446 F.3d at 278-80); and, *Decker,* 2009 WL 3165830 at *6. Similarly, the use of a penile plethysmograph does not implicate plaintiff's Fifth Amendment right against self-incrimination since the test result is not testimonial but a physical test of plaintiff's sexual reactions to various stimuli. *See Walrath v. United States,* 830 F.Supp. 444, 446 (N.D.N.Y.Ill.1993). Moreover, there is little likelihood that testimony involving PPG testing would pass muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1990) and its progeny as being sufficiently reliable to be admitted in evidence at a criminal trial. *Decker,* 2009 WL 3165830, at *7.

**\*9** I therefore recommend dismissal of plaintiff's Fifth Amendment claim in its entirety.

E. *First Amendment*

Another material aspect of plaintiff's claims in these consolidated actions centers upon the program materials utilized for the SOTP which, he contends, are premised upon religious principles contrary to his beliefs as an atheist. Plaintiff argues that by exposing him to those materials and requiring his participation in the SOTP the defendants have violated his First Amendment rights. Defendants seek dismissal of this claim on the basis of qualified immunity, citing the state of flux of the governing legal principles applicable to plaintiff's free exercise claim.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ----, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ----, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN14] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[FN15] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision-makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [FN16] *Pearson,* 555 U.S. at ----, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 555 U.S. at ----, 129 S.Ct. at 821) (emphasis in original).

FN14. In making the threshold inquiry, "[i]f no

constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

FN15. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

FN16. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* --- U.S. at ----, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, ---- (1991) (per curiam)).

**\*10** For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

Turning first to whether plaintiff has established a plausible First Amendment violation, I note at the outset that the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." U.S. Const. amend

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

1. That amendment, which applies to the states through the Fourteenth Amendment, *Decker,* 2009 WL 3165830, at *2, prohibits a governmental entity from favoring one religious denomination over another and additionally protects against "government compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a leave forbidden or required by one's religion. *Id.* (citing and quoting *Mozert v. Hawkins County Bd. of Educ.,* 827 F.2d 1058, 1066 (2d Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988)). As an atheist, plaintiff is subject to the protections of the First Amendment. *Decker,* 2009 WL 3165830, at *3 (citing, *inter alia, Wallace v. Jaffree,* 472 U.S. 38, 52-53, 105 S.Ct. 2479, 2487-88, 86 L.Ed.2d 29 (1985)). Because plaintiff contends that the SOTP subjects him to religious tenets that violate his generally held religious beliefs, he has successfully stated a plausible First Amendment claim sufficient to withstand dismissal at this early stage. *Decker,* 2009 WL 3165830, at *3.

Turning to the second prong of the qualified immunity inquiry, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [government employee in the defendant's position] that his [or her] conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government employees of reasonable competence could disagree as to whether his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433

(quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no [government worker] of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir.1995)).

**\*11** As defendants have argued, the law is anything but clear on the question of whether compelled use by officials at the CNYPC of treatment materials peripherally based upon religious principles violates the rights of patients involuntarily committed and subjected to the program. *Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (Hurd, J). That inquiry turns, in part, upon whether secular alternatives are offered for those who voice a *bona fide* religious objection, *see, e.g. Miner v. Goord,* No. 09-0674-cv, 2009 WL 4072085, at *2 (2d Cir. Nov.25, 2009) (citing, *inter alia, DeStefano v. Emergency Hous. Group, Inc.,* 247 F.3d 397, 408 (2d Cir.2001) (cited in accordance with *Fed. R.App. Proc.* 32.1). In this case, there is no question that persons of reasonable competence in defendants' circumstances could disagree on whether the compelled use of religious based SOTP program materials would violate the First Amendment.

Based upon the lack of clearly established guidance on the specific legal issue presented, I recommend a finding that defendants are entitled to qualified immunity with respect to plaintiff's First Amendment religious claim. *Pratt,* 631 F.Supp.2d at 198; *see also Bush v. Goord,* No. 03-CV-759S, 2009 WL 790358, at *8-9 (W.D.N.Y. Mar.25, 2009).

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaints in these two consolidated actions, though sparse in their allegations, are sufficient to place defendants on notice of his claims and permit them to both frame an answer and engage in discovery to flesh out any remaining causes of action, provided that the missing exhibits in Civil Action No. 9:08-CV-1186 (NAM/DEP) are filed with the court.

Turning to the merits of plaintiff's claims, I conclude that plaintiff has not pleaded a plausible claim that his required participation in the SOTP while involuntarily

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

committed at the CNYPC potentially violates his Fifth Amendment right against self-incrimination. I further find that defendants are entitled to qualified immunity from suit with respect to plaintiff's claim for damages in connection with plaintiff's First Amendment's religious exercise claim, in light of the fact that the legal principles regarding how the First Amendment's right of a free exercise affects the required use of SOTP teaching materials of a religious tenor are distinctly unsettled, but that plaintiff should be permitted to pursue his First Amendment claim against them as officials for purposes of injunctive relief. I further find that all claims against the defendants for damages in their official capacities are subject to dismissal on the basis of their Eleventh Amendment. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 17) be GRANTED, in principal part, and that all of plaintiff's claims, with the exception of his First Amendment cause of action against the defendants in their official capacities seeking injunctive relief, be DISMISSED.

**\*12** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

McChesney v. Hogan
Slip Copy, 2010 WL 1027443 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1037957 (N.D.N.Y.)

(Cite as: 2010 WL 1037957 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
David McCHESNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, New York State
Office of Mental Health, and Donald Sawyer, Executive
Director, Central New York Psychiatric Center,
Defendants.
David McChesney, Plaintiff,
v.
Michael F. Hogan, Commissioner, New York State
Office of Mental Health, Terri Maxymillian,
Director-Sex Offender Treatment Program, Central New
York Psychiatric Center; Valerie Colasante,
Psychologist Central New York Psychiatric Center,
Regina Anderson, R.N., Treatment Team Leader, and
Donald Sawyer, Executive Director, Central New York
Psychiatric Center, Defendants.
Nos. 9:08-CV-1186 (NAM/DEP), 9:08-CV-1290
(NAM/DEP).

March 18, 2010.
David McChesney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Adele Taylor Scott, Assistant Attorney
General, Albany, NY, for Defendants.

### MEMORANDUM-DECISION AND ORDER

Hon. NORMAN A. MORDUE, Chief Judge.
    **\*1** In these consolidated *pro se* actions, plaintiff, an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), seeks monetary and
injunctive relief under 42 U .S.C. § 1983 stemming from
his civil commitment to the Central New York Psychiatric

Center for participation in the Sex Offender Treatment
Program ("SOTP"). Upon referral of defendants' motion
to dismiss (Dkt. No. 17), United States Magistrate Judge
David E. Peebles issued a Report and Recommendation
(Dkt. No. 23) recommending dismissal of all of plaintiff's
claims with the exception of his First Amendment claim
for injunctive relief against defendants in their official
capacities. Defendants do not object. Plaintiff has
submitted an objection (Dkt. No. 24).
    Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court
reviews *de novo* those parts of a report and
recommendation to which a party specifically objects.
Plaintiff objects to most aspects of the Report and
Recommendation, and, accordingly, the Court conducts a
*de novo* review. Upon review, the Court accepts and
adopts the Report and Recommendation in all respects.

    In particular, as to plaintiff's Fifth Amendment claim,
the Court notes that "mere coercion does not violate the
text of the Self-Incrimination Clause absent use of the
compelled statements in a criminal case against the
witness [.]" *Chavez v. Martinez,* 538 U.S. 760, 769-70,
123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (Thomas, J.,
plurality op.); *accord Higazy v. Templeton,* 505 F.3d 161,
171 (2d Cir.2007). Thus, in the instant case, even if the
potential consequences of failure to comply with SOTP
requirements can be said to constitute coercion, plaintiff
states no Fifth Amendment claim because he does not
allege "use or derivative use of a compelled statement at
any criminal proceeding against [him]." *Higazy,* 505 F.3d
at 717 (quoting *Weaver v. Brenner,* 40 F.3d 527, 535 (2d
Cir.1994)). The Court agrees with Magistrate Judge
Peebles that the individual defendants are entitled to
qualified immunity on the First Amendment damages
claim. The Court has reviewed the materials attached to
plaintiff's objection and finds they do not warrant a
different result. Finally, the Court agrees that plaintiff
states a claim for prospective injunctive relief on his First
Amendment claim against defendants in their official
capacities.

    It is therefore

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1037957 (N.D.N.Y.)

(Cite as: 2010 WL 1037957 (N.D.N.Y.))

ORDERED that the Report and Recommendation of United States Magistrate Judge David E. Peebles (Dkt. No. 23) is accepted and adopted; and it is further

ORDERED that defendants' motion to dismiss (Dkt. No. 17) is granted in part and denied in part; and it is further

ORDERED that all claims are dismissed except the First Amendment claim for injunctive relief against defendants in their official capacities.

IT IS SO ORDERED.

N.D.N.Y.,2010.

McChesney v. Hogan
Slip Copy, 2010 WL 1037957 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Donald CARNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, NYS Office of
Mental Health; Donald Sawyer, Executive Director,
CNYPC, Defendants.
Donald Carney, Plaintiff,
v.
Michael F. Hogan, Commissioner, NYS Office of
Mental Health; Donald Sawyer, Executive Director,
CNYPC; Terri Maxymillian, Director, Sex Offender
Treatment Program; Valerie Colasante, Psychologist
Assistant, Defendants.
Nos. 9:08-CV-1251 (DNH/ATB), 9:08-CV-1280
(DNH/ATB).

March 30, 2010.
West KeySummary**Constitutional Law 92** ⚖ **1399**

92 Constitutional Law

92XIII Freedom of Religion and Conscience
92XIII(B) Particular Issues and Applications
92k1394 Health Care
92k1399 k. Mental Health. Most Cited
Cases
**Mental Health 257A** ⚖ **465(3)**

257A Mental Health

257AIV Disabilities and Privileges of Mentally
Disordered Persons
257AIV(E) Crimes
257Ak452 Sex Offenders
257Ak465 Disposition; Commitment
257Ak465(3) k. Treatment. Most Cited
Cases
A *pro se* civilly confined sex offender's allegations

that a treatment program required his participation in
faith-based program were adequate to state a First
Amendment claim. The sex offender claimed that
components of the program subjected him to religious
tenets that were contrary to his general religious beliefs,
and that participation in the faith-based programs were
required as a condition of his release from civil
confinement. Although sex offender did not state a
specific religion in which he believed, he identified
himself as a Native American, and it was assumed that his
status as a Native American encompassed particular
religious beliefs. U.S. Const.Amend. 1; 42 U.S.C.A. §
1983.
Donald Carney, pro se.

Aaron M. Baldwin, Asst. Attorney General, for
Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.
**\*1** This matter was referred to Magistrate Judge
Gustave J. Di Bianco for Report and Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y.
72.3(c). Upon Magistrate Judge Di Bianco's retirement on
January 4, 2010, the case was referred to me by the
Honorable Norman A. Mordue, Chief United States
District Judge. (Dkt. No. 20).
    Plaintiff filed two complaints in separate cases
pursuant to 42 U.S.C. § 1983, challenging the
constitutionality of the Sex Offender Treatment Program
("SOTP") administered at the Central New York
Psychiatric Center ("CNYPC") by the New York State
Office of Mental Health ("OMH"). Magistrate Judge Di
Bianco issued an order on December 10, 2008,
consolidating the cases. (Dkt. No. 5). Plaintiff alleges that
the SOTP violates the United States Constitution in four
ways: (1) the SOTP violates plaintiff's First Amendment
right to abstain from religious practices; (2) the SOTP
violates plaintiff's Fifth Amendment right against
self-incrimination through use of a penile plethysmograph
[FN1] ("PPG") examination; (3) the SOTP violates plaintiff's
Fifth Amendment right against self-incrimination by

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

requiring a polygraph examination; and (4) the SOTP violates plaintiff's Fifth Amendment right against self-incrimination by requiring him to complete an "autobiography" and a "sexual offense history" that includes uncharged crimes or dismissed charges.[FN2] Plaintiff seeks injunctive relief and monetary damages.

> **FN1.** A plethysmograph is an "instrument for measuring variations in the size of an organ or body part on the basis of the amount of blood passing through or present in the part." WEBSTER'S II NEW COLLEGE DICTIONARY 847 (Margery S. Berube et al. eds., 1995.).

> **FN2.** Plaintiff's complaint filed in the lead case (08-CV-1251) ("Lead Complaint") relates to claims (1) through (3) and plaintiff's complaint filed in the member case (08-CV-1280) ("Member Complaint") relates to claim (4).

Defendants move to dismiss plaintiff's claims for failure to state a claim upon which relief can be granted pursuant to FED.R.CIV.P. 12(b)(6). (Dkt. No. 15). Plaintiff responded in opposition to defendants' motion, and defendants filed a reply. (Dkt.Nos.16, 18). For the following reasons, this court will recommend that defendants' motion be granted in part and denied in part.

**DISCUSSION**

**I.** *Facts*

Plaintiff was placed under civil confinement at CNYPC on July 11, 2008. (Lead Compl. at 2).[FN3] As part of his treatment regimen, plaintiff has been enrolled in the SOTP, which he alleges incorporates components that violate his constitutional rights. In particular, plaintiff has been directed to complete an "autobiography" and a "sexual offense history." (Member Compl. at 4, 9). Plaintiff alleges that his autobiography and sexual offense history are to include "uncharged crimes and/or charges that were dismissed." (Member Compl. at 4). Plaintiff further alleges that defendant Colasante issued an order to photocopy plaintiff's autobiography bi-weekly for placement in his file "for the New York State Attorney General's review to be used as evidence" to further civilly confine plaintiff. (Member Compl. at 4). Because plaintiff

refused to have his autobiography photocopied, he was apparently removed from the "autobiography group" and told that he could not progress toward his release until he allowed the photocopying. (Member Compl. at 4).

> **FN3.** Citations to the Lead Complaint (08-CV-1251) will be cited as "Lead Compl." and a page number. Plaintiff did not number his paragraphs or pages, so the court will number the pages beginning with the first page of the Lead Complaint as page 1. Citations to the Member Complaint (08-CV-1280) will be cited as "Member Compl." and paginated in a like manner.

Plaintiff, a Native American, also complains about specific components of "all program phases," which he alleges subject him to religious practices and rituals based on "Zen Buddhism and Christianity." (Lead Compl. at 2-3). Plaintiff claims that the "Good Lives Model and Boundaries Programs" are unconstitutional because they "teach that you have to believe in something devoted [sic] as spirituality ... [and] ... teach the rituals and practices of Buddhism." (Lead Compl. at 3). In addition, plaintiff alleges that "From the Inside [O]ut[:] Growing up Male, problem [s]olving anger management programs are all Hazeldon products which incorporate Christian beliefs and practices," and violate his constitutional rights. (Lead Compl. at 3).

**\*2** Finally, plaintiff alleges that he is being coerced to submit to a PPG and polygraph examination, and a new "contract" has changed the two exams from "therapy tools" to "investigate [sic] tools" to obtain information to keep plaintiff civilly confined. (Lead Compl. at 4). Plaintiff again alleges coercion because his advancement in the program is dependent on his compliance with the two examinations. (Lead Compl. at 4).

**II.** *Motion to Dismiss*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

(2007)). *See also Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (citation omitted). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)). Here, plaintiff attached what appear to be three separate documents to the Member Complaint. The first document, entitled "Sex Offender Treatment Program Model," is a bulleted list of criteria for Phases I-III. (Member Compl. at 8). The second document is entitled "Phase Goals" and describes specific assignments for Phases I and II. (Member Compl. at 9). The Phase Goals document appears to be the first page of a multi-page document, because it does not describe assignments for Phase III. The third document is a collection of materials all related to the autobiography component of the SOTP. (Member Compl. at 10-29).

Plaintiff attached nothing to the Lead Complaint, but names specific components of the SOTP, including Dialectical Behavior Therapy ("DBT") and the "Advancement to SOTP Phase II-IV Consent to Participate in Treatment." Defendants have attached these documents to their motion.[FN4] (Defs.' Mot. to Dismiss, App. B, Exs. B, D and E; *see also* Defs.' Mot. to Dismiss at 3). Because these documents are integral to the complaint and were relied upon by plaintiff in drafting his complaint, the court will consider them in its analysis of

defendants' motion.[FN5]

> **FN4.** The defendants also state that these documents were filed in support of a motion to dismiss an identical section 1983 case, decided in the Northern District of New York. *See Pratt v. Hogan,* 6:08-CV-1003 (DNH/DEP).

> **FN5.** In the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted).

### III. *First Amendment Claim*

***3** The Establishment and Free Exercise Clauses of the First Amendment, made applicable to state action by the Fourteenth Amendment, provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. In order to establish a violation of the Free Exercise Clause, a plaintiff must show "direct government compulsion." *Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). In addition, a court should sustain a Free Exercise claim "only if the 'government has placed a substantial burden on the observation of a central religious belief' " that is not otherwise justified by a compelling state interest. *Skoros v. City of New York,* 437 F.3d 1, 39 (2d Cir.2006) (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 384-85, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990)). The Establishment Clause, by comparison, "prohibits government from officially preferring one religious denomination over another." *Id.* at 38-39.

In this case, plaintiff alleges that the SOTP requires his participation in faith-based programs as a condition of his release from civil confinement. (Lead Compl. at 3). Further, plaintiff claims that this participation violates his "right to believe or not as [his] conscience dictates." *Id.* Defendants argue that plaintiff has failed to state a cognizable claim under the First Amendment because he has failed to set forth any facts concerning the beliefs or practices of his religion and explained why the defendants' program would violate those beliefs. (Defs.' Mem. of Law at 18-19).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

In *Decker v. Hogan,* Senior District Judge McAvoy rejected a similar argument made by defendants in a case in which the plaintiff was challenging the SOTP because he was an atheist. *See Decker v. Hogan,* No. 9:09-CV-0239, 2009 U.S. Dist. LEXIS 89048, at *8-9; 2009 WL 3165830 (N.D.N.Y. Sept.28, 2009) (McAvoy, S.J.). Defendants argued, *inter alia,* that there was no proof of governmental compulsion impacting upon the plaintiff's atheistic beliefs. *Id.* Senior Judge McAvoy found that the court could not make such a determination on a motion to dismiss because plaintiff's factual allegations must be accepted as true, and plaintiff was alleging that the defendants' program was subjecting him to religious practices based upon Zen Buddhism and Christianity, and that this was forcing plaintiff to engage in practices that were contrary to his atheistic beliefs. *Id.* at *9-10.

In this case, plaintiff has identified himself as a "Native American." Although he has not stated a specific "religion," in affording the *pro se* plaintiff the utmost liberality, the court will assume that his status as a Native American encompasses particular religious beliefs. This plaintiff, like the plaintiff in *Decker,* claims that components of the SOTP subject him to religious tenets that are contrary to his general religious beliefs. Based on *Decker,* Plaintiff Carney has successfully stated a plausible First Amendment Claim, sufficient to withstand defendants' motion to dismiss. As Senior Judge McAvoy stated in *Decker,* it may later become clear on a motion for summary judgment, or at some later stage of the proceedings, that plaintiff's claims are not adequately supported. However, at this stage, the court must accept plaintiff's allegations as true. Accordingly, this court recommends that defendants' motion to dismiss plaintiff's First Amendment claim be denied. [FN6]

> FN6. As noted below, this court will recommend that the plaintiff's First Amendment claim for damages be dismissed based on qualified immunity, leaving only the First Amendment cause of action for injunctive relief.

**IV.** *Fifth Amendment Claim*

**\*4** The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U .S. CONST. amend. V. However, a violation of this right "occurs only if one has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez,* 538 U.S. 760, 770, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003); *see also Higazy v. Templeton,* 505 F.3d 161, 171 (2d Cir.2006). Plaintiff is civilly confined, and has made no allegation that the information in his autobiography, sexual history, or information that would be gained from the polygraph and/or PPG examination is currently being used in a criminal case. [FN7] Any claim that this information might be used against him in the future in a criminal proceeding is not now ripe for adjudication. *Longway v. Jefferson County Bd. of Supervisors,* 24 F.3d 397, 500 (2d Cir.1994).

> FN7. If any of this information were used in a future criminal proceeding against him, plaintiff could still challenge the use of the information.

The Second Circuit has held that answering questions during a polygraph examination about past offenses and "with respect to any criminal prosecution unrelated to the conviction" does not waive a defendant's right against self-incrimination under the Fifth Amendment; the defendant can still challenge the polygraph examination results in court on Fifth Amendment grounds if it were to be used in a criminal proceeding. *United States v. Johnson,* 446 F.3d 272, 275, 280 (2d Cir.2006). The court also explained that polygraph examinations are reasonably related to promoting the sentencing goals of balancing supervised release conditions against restraint of individual liberty, and served to further sex offender treatment. *Id.* at 277.

Furthermore, the use of a PPG examination does not implicate plaintiff's right against self-incrimination under the Fifth Amendment because the results of the test are not "testimonial." Rather, the test provides an "assessment of an individual's physical reactions to various stimuli." *Decker v. Hogan,* No. 09-CV-0239, 2009 U.S. Dist. LEXIS 89048, at *21 (citations omitted), 2009 WL 3165830 (N.D.N.Y. Sept.28, 2009). This court also notes that courts often find that PPG examination results

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

inadmissible as evidence. *Id.* (citations omitted).

Use of the polygraph, PPG, autobiography, and/or sexual history as part of the SOTP do not implicate plaintiff's right against self-incrimination and do not violate the Fifth Amendment because they are not being used against him in a criminal case. *See McChesney v. Hogan,* 9:08-CV-1186/6:08-CV-1290, 2010 U.S. Dist. LEXIS 25705, at *27-31, 2010 WL 1027443 (N.D.N.Y. March 18, 2010) (Report Recommendation of Peebles, USMJ), *accepted and adopted by* 2010 U.S. Dist. LEXIS 257171, 2010 WL 1037957 (N.D.N.Y. Mar.18, 2010) (Mordue, CJ).[FN8] Therefore, plaintiff has failed to state a claim upon which relief can be granted, and this court recommends that defendants' motion to dismiss be granted as to his Fifth Amendment claims.

> FN8. *McChesney* granted a motion to dismiss a Fifth Amendment claim relating to the SOTP program that was substantially similar to the one asserted in this case.

## V. *Qualified Immunity*

**\*5** Defendants argue that they are entitled to qualified immunity from plaintiff's claim for money damages. Because the court is recommending denial of the defendants' motion to dismiss plaintiff's First Amendment claim, the court will proceed to discuss defendants' argument.[FN9]

> FN9. Because the court has determined that there is no Fifth Amendment violation, the court need not discuss qualified immunity with respect to plaintiff's Fifth Amendment claims.

Qualified immunity protects government officials performing discretionary functions in the course of their employment where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A government actor is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001) (internal quotation marks omitted).

In *Decker,* Senior Judge McAvoy denied defendants the protection of qualified immunity in the context of a motion to dismiss a First Amendment cause of action very similar to the claim alleged in the instant action. He observed that the "objective reasonableness" of defendants' actions sometimes depends on factual issues about what they knew about plaintiff's complaints, making a determination of qualified immunity on the pleadings alone premature. *Decker,* 2009 U.S. Dist. LEXIS 89048 at *22-23. Judge McAvoy denied the motion to dismiss without prejudice, noting that a factual basis for affording defendants qualified immunity could arise during discovery. *Id.* at *22-24.

In determining whether defendants involved in the SOTP program are entitled to qualified immunity, this court would focus, not on the "objective reasonableness" prong of the analysis as Judge McAvoy appeared to do in *Decker,* but on whether "... plaintiff's constitutional rights were not clearly established at the time he alleges his rights were violated." *Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (Hurd, J.) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396). When deciding if a constitutional right was "clearly established at the relevant time," a court should consider

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

*African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002); *see also Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). This court concludes, as have several other judges in this district, that the law remains unclear as to whether the use of treatment materials and modalities peripherally related to religious principles violates the constitutional rights of those individuals treated in the SOTP. *Pratt v. Hogan,* 631 F.Supp.2d at 198; *McChesney v. Hogan,* U.S. Dist. LEXIS

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

25705, at *37-38.

**\*6** A review of the case law on this issue shows that with respect to treatment programs requiring an inmate to participate in Alcoholics Anonymous methodology, the law was well-settled as early as 1996, that compelled participation could rise to the level of a First Amendment. *See generally Cox v. Miller,* 296 F.3d 89, 108 (2d Cir.2002) (citing *inter alia Griffin v. Coughlin,* 88 N.Y.2d 674, 692, 649 N.Y.S.2d 903, 673 N.E.2d 98 (holding that "a mandatory, exclusive ASAT addiction treatment program ... incorporating the A.A. Twelve Steps methodology, credo, and meeting practices, violates the Establishment Clause") (1996)). The difference between the A.A. programs in the above-cited cases and the program at issue in this case is that the A.A. programs "placed heavy emphasis on spirituality and prayer," requiring participants to pray to God to overcome their alcohol problems. *Pratt,* 631 F.Supp.2d at 198 (citing *Warner v. Orange County Dep't of Prob.,* 115 F.3d 1068, 1075 (2d Cir.1997)).

As Judge Hurd observed in *Pratt,* a case containing claims identical to the case herein, it "remains unclear whether the 'Good Lives Model and Boundaries Program' and DBT have non-secular purposes and if the primary purpose of the programs are to promote or prohibit religions." As Magistrate Judge Peebles concluded in a Report Recommendation adopted by Chief District Judge Mordue, "... the law is anything but clear on the question of whether compelled use by officials at the CNYPC of treatment materials peripherally based upon religious principles violates the rights of patients involuntarily committed and subjected to the program." *McChesney v. Hogan,* U.S. Dist. LEXIS 25705, at *37-38 (citing *Pratt,* 631 F.Supp.2d at 198).* This court agrees that, because the law on this issue is unsettled, it will recommend that defendants be afforded qualified immunity from damages for any First Amendment violation. Plaintiff's claim for injunctive relief against the defendants in their official capacity, however, may proceed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6) (Dkt. No. 15)

be **GRANTED IN PART AND DENIED IN PART,** and it is further

**RECOMMENDED,** and that all plaintiff's claims, with the exception of his First Amendment cause of action seeking injunctive relief against the defendants in their official capacity, be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Carney v. Hogan
Slip Copy, 2010 WL 2519121 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2519961 (N.D.N.Y.)

(Cite as: 2010 WL 2519961 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Donald CARNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, NYS Office of
Mental Health; and Donald Sawyer, Executive Director,
CNYPC, Defendants.
Donald Carney, Plaintiff,
v.
Michael F. Hogan; Terri Maxymillian; Valerie
Colasante; and Donald Sawyer, Defendants.
Action Nos. 9:08-CV-1251, 9:08-CV-1280.

June 15, 2010.
Donald Carney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General,
State of New York, Aaron M. Baldwin, Esq., Assistant
Attorney General, of Counsel, Albany, NY.

### DECISION and ORDER

DAVID N. BALDWIN, District Judge.
**\*1** Plaintiff, Donald Carney, brought these civil rights
actions in November 2008, pursuant to 42 U.S.C. § 1983.
The cases were consolidated in December 2008. By
Report-Recommendation dated March 30, 2010, the
Honorable Andrew T. Baxter, United States Magistrate
Judge, recommended that defendants' motion to dismiss
pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 15) be
granted in part and denied in part as follows: all of
plaintiff's claims with the exception of his First
Amendment cause of action seeking injunctive relief
against the defendants in their official capacity be
dismissed.

The defendants have filed objections to the

Report-Recommendation.

Based upon a de novo review of the
Report-Recommendation and the entire file, including
those portions to which the defendants have objected, the
Report-Recommendation is accepted and adopted in all
respects. See 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that defendants' motion to dismiss is
GRANTED in part and DENIED in part as follows:

(a) All of plaintiff's claims with the exception of his
First Amendment cause of action in the Lead Case
(08-cv-1251) seeking injunctive relief against the
defendants in their official capacity are DISMISSED;

(b) The Member Case (9:09-CV-1280) is
DISMISSED;

(c) The Clerk shall enter judgment dismissing the
Member Case (08-cv-1280); and

(d) The Lead Case (08-CV-1251) shall be returned to
the Magistrate Judge for handling of further proceedings
in the plaintiff's First Amendment cause of action seeking
injunctive relief against defendants Michael F. Hogan and
Donald Sawyer in their official capacities.

IT IS SO ORDERED.

N.D.N.Y.,2010.

Carney v. Hogan
Slip Copy, 2010 WL 2519961 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.







H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Edward KALWASINSKI, Plaintiff,

v.

Terri MAXYMILLIAN, Michael Hogan, Donald Sawyer, Defendants.

No. 9:09-CV-0214 (DNH/GHL).

Dec. 23, 2010.

Edward Kalwasinski, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Dean J. Higgins, Esq., of Counsel, Albany, NY, for Defendants.

***REPORT-RECOMMENDATION and ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Edward Kalwasinski alleges that Defendants violated his right to exercise his religion at the Central New York Psychiatric Center ("CNYPC"). Currently pending before the Court are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. Nos. 33 and 37.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part and that Plaintiff's motion be denied.

## I. FACTUAL AND PROCEDURAL SUMMARY

On June 13, 2007, Plaintiff was civilly committed to CNYPC pursuant to Article 10 of New York's Mental Hygiene Law. (Dkt. No. 1 at 3 ¶¶ 1-2.) Plaintiff informed "administrators" [FN1] that he was a Muslim and needed to participate in all of the activities required by his faith, including prayer, meals, and ceremonies. *Id.* at 3-4 ¶ 3.

FN1. The complaint does not identify these "administrators" by name.

Plaintiff alleges that Defendants Terri Maxymillian (the director of the Sex Offender Treatment Program at CNYPC), Michael Hogan (the commissioner of the New York Office of Mental Health), and Donald Sawyer (the executive director of CNYPC) violated his constitutional rights by (1) not allowing Al-Jumu'ah prayer on Fridays; (2) forcing Plaintiff to eat food from bowls and with plastic silverware contaminated with pork from prior meals eaten by non-Muslims; (3) denying Plaintiff sacred foods during holidays; (4) forcing Plaintiff to eat fish on Fridays "as the church of Catholics require[s]"; and (5) forcing Plaintiff to attend Sex Offender Treatment Program ("SOTP") classes on Fridays. *Id.* at 4-5 ¶¶ 4-7.[FN2]

FN2. Plaintiff's motion for summary judgment focuses entirely on the Al Jumu'ah issue. (Dkt.Nos.33-1, 33-2.) Defendants, too, focus largely on the Al Jumu'ah issue.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

*Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN3. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

### B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

*2 To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F .R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp.*

*v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id. at 1950* (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Religion Claims

*1. Applicable Standard*

Depending on the circumstances, different standards apply to claims that state actors have violated an individual's right to freely exercise religion. Generally, in order to satisfy the Free Exercise Clause of the First Amendment, government actions that substantially burden a religious practice must be justified by a compelling government interest. *Sherbert v. Verner,* 374 U.S. 398 (1963). However, due to the unique concerns of the prison setting, prisoners' First Amendment free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). Thus, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987) (punctuation omitted).

**\*3** The Second Circuit has not decided which standard applies to individuals, like Plaintiff, who are civilly committed to locked psychiatric facilities that share characteristics with penal institutions. District courts in the Second Circuit are split on the issue. *Compare Carney v. Hogan,* No. 9:08-CV-1251 (DNH/ATB), 2010 U.S. Dist. LEXIS 59439, at \*8, 2010 WL 2519121, at \*3 (N.D.N.Y. Mar. 30, 2010) (applying substantial burden/compelling interest test to CNYPC patient's free exercise claim) *and Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (same) (Hurd, J.), *with Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, at \*16-17, 2008 WL 2543573, at \*6 (S.D.N.Y. June 25, 2008) (applying legitimate penological purpose test to Mid-Hudson Psychiatric Center patient's free exercise claim) *and Abdul-Matiyn v. Pataki,* No. 9:06-CV-1503, 2008 U.S. Dist. LEXIS 118430, at \*32, 2008 WL 974409, at \*12 (N.D.N.Y. Apr. 8, 2008) (applying legitimate penological purpose test to CNYPC patient's free exercise claim) (Hurd, J.).[FN4] In an abundance of caution, I will consider Plaintiff's claims in the context of each standard.[FN5]

> **FN4.** The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

> **FN5.** Defendants' position is that the legitimate penological interest test should apply because "Plaintiff has made reference to prisoner litigation in his complaint and has not suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to prisoners' free exercise claims." (Dkt. No. 37-8 at 3, citation to complaint omitted.)

Plaintiff's religious rights are also protected by the Religious Land Use and Institutionalized Persons Act.

("RLUIPA").[FN6] RLUIPA, like the Free Exercise Clause as applied to non-prisoners, applies a compelling governmental interest test. Specifically, RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution[FN7] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." [FN8] 42 U.S.C. § 2000cc-1(a).

> **FN6.** Although Plaintiff's complaint does not explicitly claim that Defendants are liable under RLUIPA, I am required to construe the complaint liberally, interpreting it to raise the strongest possible arguments that it suggests. *Chavis v. Chappius,* 618 F.3d 162 (2d Cir.2010). Moreover, Plaintiff refers to RLUIPA in his motion for summary judgment. (Dkt. No. 33-2 at 5.) Defendants do not address RLUIPA.

> **FN7.** An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

> **FN8.** Although neither the Supreme Court nor the Second Circuit has yet decided the issue, the consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506-09 (S.D.N.Y.2008). That issue is currently pending before the Supreme Court in *Sossamon v. Texas* (No. 08-1438, argued Nov. 2, 2010). That issue does not affect the analysis here because Plaintiff requests both money damages and injunctive relief. (Dkt. No. 1 at 7-9.)

2. *Al Jumu'ah Service*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

Plaintiff alleges that Defendants violated his religious rights by failing to hold proper Al Jumu'ah services. (Dkt. No. 1 at 4 ¶ 4(a).) Defendants move for summary judgment of this claim, arguing that the unavailability of proper Al Jumu'ah services was caused by legitimate penological interests. (Dkt. No. 37-8 at 5.)
a. *Facts*

"Al Jumu'ah is an important service for Muslims. Unlike other Muslim daily prayers, it is not a prayer that can be worshiped individually. It is a congregate prayer performed every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer.... There is no alternative means of attending Jumu'ah. Attendance at the congregational prayer is obligatory on all men in the Muslim religion." (Najeeullah Decl., Dkt. No. 37-5 ¶¶ 10-11.) Plaintiff alleges that CNYPC stopped offering Al Jumu'ah services in August 2008. (Dkt. No. 33-1 ¶ 1.)

At CNYPC, a Muslim prayer service or study class [FN9] is offered on Fridays from 9:30-10:30 a.m. (Defs.' Ex. 1, Dkt. No. 37-4 at 2.) Imam Malik Najeeullah presides. (Dkt. No. 37-5 ¶ 7.) Plaintiff's official schedule at CNYPC includes this event. (Defs.' Ex. 9, Dkt. No. 37-4 at 45.) Defendants state that "CNYPC was under the mistaken belief that the Al Jumu'ah prayer could be worshiped individually and that the regularly scheduled worship time for Muslims at 9:30 a.m. on Fridays was available to satisfy the desire of resident Muslims to worship the prayer." (Dziadyk Decl., Dkt. No. 37-6 ¶ 12.)

> FN9. At various times, CNYPC officials, including Defendants, have referred to this event as a "prayer service." (Dkt. No. 33-2 at 18; Dkt. No. 37-4 at 32, 40.) Imam Najeeullah, who presides over the event, refers to it as a "class." (Dkt. No. 33-2 at 16; Dkt. No. 37-5 ¶ 7.)

**\*4** On January 22, 2009, Plaintiff sent a complaint to Defendant Maxmillian objecting to the lack of Al Jumu'ah services. (Pl.'s Ex. C, Dkt. No. 33-2 at 11 ¶ 1.) Defendant Maxmillian responded, stating that "CNYPC ... offers Muslim prayer services on Friday mornings that are led by Imam Najeeullah. Those services have not been changed nor has [Plaintiff] been denied the ability to attend." (Defs.' Ex. 7, Dkt. No. 37-4 at 40.)

On February 20, 2009, Plaintiff filed this action. (Dkt. No. 1.)

On March 18, 2009, Plaintiff sent a complaint to Defendant Sawyer in which he objected to the lack of Al Jumu'ah services. (Pl.'s Ex. G, Dkt. No. 33-2 at 17.) Defendant Sawyer responded that "Muslim services are offered on Fridays at 9:30 a.m. This time was set to meet both the needs of the residents and the Imam's schedule. The Imam has informed us that formal services do not need to happen at noon as residents can participate individually and from any location at that time." [FN10] *Id.* at 18.

> FN10. In response to interrogatories, Defendant Sawyer identified "the Imam" who had "informed" him on these matters as Imam Abdullah Muhammad. (Pl.'s Ex. G, Dkt. no. 33-2 at 19.) Imam Abdullah Mohammad is the Muslim Chaplain at Mohawk Correctional Facility. (Pl.'s Ex. B, Dkt. No. 33-2 at 8.)

On March 27, 2009, Imam Najeeullah issued a memorandum titled "Jumu'ah Prayer or the Friday Worship Service for Muslim[s]." (Pl.'s Ex. A, Dkt. No. 33-2 at 7.) It is not clear to whom the memorandum was directed, but the document states that Elaine Dziadyk (the supervisor of rehabilitation services) and S. Montrose (a social worker supervisor) received copies. *Id.* Imam Najeeullah explained that Al Jumu'ah should occur at approximately 1:15 p.m. during daylight savings time, that the prayer was "obligatory for all Muslims," and that the Friday morning Muslim study class at CNYPC was "not a Jumu'ah worship service." *Id.* Imam Najeeullah stated that his schedule did not allow him to facilitate a Friday Al Jumu'ah prayer service at CNYPC, but that "[t]here should always be a qualified Imam available to facilitate this service if it is allowed." *Id.*

On May 1, 2009, John Culkin, the Director of the Bureau of Sex Offender Evaluation and Treatment, responded to an April 7, 2009, letter from Plaintiff. (Pl.'s Ex. D, Dkt. No. 33-2 at 15; Defs.' Ex. 8, Dkt. No. 37-4 at 42.) Mr. Culkin stated that "[p]er staff at Central New York Psychiatric Center, the facility offers Muslim prayer services at 9:30 am on Friday mornings. These services

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

have not changed nor have you been denied the right to attend them as currently scheduled. The Imam has additionally informed [CNYPC] staff that formal services do not need to occur at noon as residents can participate individually and from any location at that time." *Id.*

On May 19, 2009, Mental Hygiene Legal Services wrote to Mr. Culkin, enclosing a copy of a letter from Imam Najeeullah. (Pl.'s Ex. E, Dkt. No. 33-2 at 16.) Mental Hygiene Legal Services noted that Imam Najeeullah's letter stated "that the Jumu'ah worship service is 'obligatory for all Muslims,' just as 'Sunday worship service is for all Christians' " and that "the 'study classes' he does host on Thursdays and Fridays are 'not a Jumu'ah worship service.' " *Id.*

**\*5** On October 23, 2009, Defendants Sawyer and Maxymillian responded to Plaintiff's interrogatories. (Dkt. No. 37-4 at 52-66.) In those responses, Defendants reiterated their answers to Plaintiff's grievances and stated that Imam Abdullah Muhammad had informed them that congregate prayer was not necessary for Al Jumu'ah. *Id.*

On January 13, 2010, Imam Abdullah Muhammad wrote to Deputy Attorney General Dean J. Higgins, counsel for Defendants in this action. (Pl.'s Ex. B, Dkt. No. 33-2 at 8.) He stated that he was writing to "clarify a gross misunderstanding" that Al Jumu'ah "can be performed individually." *Id.* He explained that "[a]ttendance at the congregational prayer is obligatory on all men ... So, it is impossible for me to advise anyone that Jumu'ah prayer can be performed individually. What I did say, and it may be the source of the misunderstanding, is that the [five] daily prayers can be performed individually under circumstances such as those found in jails, prisons, and other institutions." *Id.*

At some point, officials at CNYPC came to understand that "Al Jumu'ah is a congregate prayer that can[ ]not be worshiped individually." (Dziadyk Decl., Dkt. No. 37-6 ¶¶ 13.) Thereafter, the facility "commenced a search for a Muslim Imam to conduct the service." *Id.* ¶ 14. CNYPC officials asked Imam Najeeullah to preside at the service. *Id.* ¶ 15. Imam Najeeullah is employed part-time by both the New York Department of Correctional Services ("DOCS") at Marcy Correctional

Facility and the Department of Mental Health at CNYPC. (Najeeullah Decl., Dkt. No. 37-5 ¶¶ 2-3.) Imam Najeeullah attempted to get permission from DOCS to conduct a service at CNYPC, but his request was denied because it would conflict with his schedule of services at Marcy. *Id.* ¶ 12.

Imam Najeeullah has worked with CNYPC officials "to identify an eligible Imam who would be able to conduct services at the Center," but no such individual has been found. (Dkt. No. 37-5 ¶ 13.) At one point, an individual was "identified ..., but it was determined that he was not eligible" because of "issues in his background." *Id.* ¶ 14; Dkt. No. 37-6 ¶ 18. Defendants do not identify what these "issues" were or why they rendered the individual unsuitable. Defendants state that the search is ongoing. (Dkt. No. 37-5 ¶ 16; Dkt. No. 37-6 ¶ 19.)

On February 4, 2010, Stephen C. Clark, the principal attorney for the Mental Hygiene Legal Service for the Fourth Judicial Department, wrote to Plaintiff. (Pl.'s Ex. C, Dkt. No. 33-2 at 9-10.) Mr. Clark reported that he had met with members of the CNYPC staff, including Defendants Sawyer and Maxymillian, to discuss the lack of Al Jumu'ah services at CNYPC. *Id.* at 9. Defendant Sawyer stated that CNYPC was "actively attempting" to find someone and "insured that he would continue to work to bring this matter to a quick resolution." *Id.* Mr. Clark inquired whether Plaintiff would be interested in being trained to lead Al Jumu'ah services because Defendant Sawyer "seemed to indicate that the hospital would be willing to entertain getting appropriate training for someone currently there [ ] to run such services." *Id.*

b. *Analysis*

**\*6** Under the legitimate penological interest test, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN11] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274-75 (citing *Ford,* 352 F.3d at 591). Defendants do not dispute that Plaintiff's religious beliefs are sincerely held or that the lack of Al Jumu'ah services burdened those beliefs. Indeed, for the purposes of the pending motions, Defendants concede that Al Jumu'ah "is a central religious service of the Muslim faith" and that "[t]here is no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

alternative to the Al Jumu'ah worship." (Dkt. No. 37-8 at 5.) Therefore, I find that Plaintiff holds a sincere religious belief that has been substantially burdened. The issue, then, is whether Defendants have established as a matter of law that this burden was caused by a legitimate or compelling governmental interest.

> FN11. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

Under the deferential legitimate penological interest test, once a plaintiff establishes that his or her sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). Although the defendants' burden is "relatively limited," the legitimate penological interest advanced must have been the *actual* reason for the defendants' actions. "Post hoc justifications with no record support will not suffice." *Salahuddin,* 467 F.3d at 276-77.

Here, Defendants rely on a post hoc justification. Defendants state that they

> are not opposed to permitting Plaintiff's participation in the congregate Al Jumu'ah; however ... there is currently no Imam available to conduct the service ... [T]he Imam and the CNYPC staff are addressing this issue and have instituted a search for a person to conduct the service. Once an Imam is identified, the service will be instituted and Plaintiff will be permitted to attend.

(Dkt. No. 37-8 at 5.) This was not the reason that Defendants initially gave for not offering the Al Jumu'ah service. Rather, Defendants initially responded to Plaintiff's complaints by stating that they believed that the Friday morning session offered by Imam Najeeullah was sufficient and that no congregate Al Jumu'ah service was required.[FN12] Defendants admit in their motion papers that this belief was "mistaken." (Dkt. No. 37-6 ¶ 12.) Defendants persisted in this "mistaken belief" for at least seventeen months, from the time that they ceased offering Al Jumu'ah services in approximately August 2008 until January 2010, when Imam Muhammad wrote to defense counsel to correct Defendants' "gross misunderstanding." (Dkt. No. 37-4 at 40; Dkt. No. 33-2 at 8.) Indeed, individuals associated with CNYPC continued to assert their belief that Al Jumu'ah was not required for several months after Plaintiff filed this action. (Dkt. No. 37-4 at 42.) Thus, the initial denial of Al Jumu'ah was due not to the lack of an Imam as Defendants now contend, but rather to a misunderstanding of the religious significance of Al Jumu'ah. It was not until after Imam Muhammad corrected this misunderstanding that Defendants began to search for an Imam who could preside at Al Jumu'ah.

> FN12. I note that such a justification would not, if asserted in the pending motion, be legally sufficient to entitle Defendants to summary judgment. *Ford,* 352 F.3d at 597-98. Even if this justification were legally sufficient, it would not be factually supported here. As Imam Muhammad indicated in his letter to defense counsel, he never intended for Defendants to believe that congregate Al Jumu'ah prayer is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

merely optional for Muslims.

**\*7** Even if Defendants' justification were not post hoc, it would be insufficient to support a finding, as a matter of law, that the denial of Al Jumu'ah was motivated by a legitimate penological interest. As another judge in this District has observed, the legitimate penological interest inquiry "is particularly fact-lad[ ]en and often ill-suited for resolution on [a] motion for summary judgment ..." *Jackson v. Boucaud,* No. 9:08-CV-1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, at *26, 2009 WL 6066799, at *7 (N.D.N.Y. Dec. 31, 2009).[FN13] Here, Defendants simply have not provided the Court with enough information to analyze the issue. Defendants do not provide any details at all about why the search for an Imam has been unsuccessful, other than to state that one potential Imam was not eligible because of unspecified "issues in his background." (Dkt. No. 37-6 ¶ 18.)

> FN13. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Defendants' justification, and the lack of detail they provide about it, is similar to that asserted in a recent case from the District of Connecticut. *Vega v. Lantz,* No. 304CV1215DFM, 2009 U .S. Dist. LEXIS 88550, 2009 WL 3157586 (D.Con. Sept. 25, 2009).[FN14] In *Vega,* a state prisoner claimed that his free exercise and RLUIPA rights were violated because the facility routinely cancelled Al Jumu'ah. *Vega,* 2009 WL 315786, at *1. The defendants conceded that Al Jumu'ah had been frequently cancelled over a four-year period, but argued that cancellation was necessary "when there is no chaplain available or in case of a security lockdown." *Id.* at *11. The court denied the defendants' motion for summary judgment because the defendants "provide[d] no explanation for the frequent cancellation of Jumah, or of the insufficient and unequal staffing that allegedly underlies it." *Id.* Thus, the court found, the defendants had failed "to carry their burden of showing that the frequent cancellation of Jumah is either rationally related to a legitimate penological interest ... or in furtherance of a compelling governmental interest." *Id.*

> FN14. The Court will provide Plaintiff with a

copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the Al Jumu'ah service.

### 3. *Bowls and Utensils*

Plaintiff alleges that Defendants violated his religious rights by "forcing Plaintiff to eat food from bowls contaminated with pork from prior meals eat [en] by non-Muslims." (Dkt. No. 1 at 4 ¶ 4(b).) Defendants move for summary judgment dismissing this claim, arguing that Plaintiff's religious beliefs have not been burdened. (Dkt. No. 37-8 at 6.) Defendants are correct.

Imam Najeeullah declares that there is "no prohibition" on eating from a bowl or using a utensil previously used by a non-Muslim to eat pork "so long as they have been washed and sanitized ..." (Dkt. No. 37-5 ¶¶ 18-19.) Valerie Fasteson, the Director of Nutritional Services for CNYPC, declares that plates, bowls, and utensils are "thoroughly washed and sanitized" before they are reused. (Dkt. No. 37-7 ¶ 6.) CNYPC residents can also request disposable plates and tableware that would be used only once and then discarded. *Id.* ¶ 7. Plaintiff has not made such a request. *Id.*

**\*8** In opposition to Defendants' motion for summary judgment, Plaintiff admits that "all bowls and utensils are washed and sanitized after use and before re-use and such washing is consistent with the tenets of the Muslim faith." (Dkt. No. 37-1 ¶ 20; Dkt. No. 40 ¶ 9.)

Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs have been burdened and I recommend that the Court dismiss Plaintiff's claim regarding the contamination of bowls and utensils.

### 4. *Food Issues*

Plaintiff alleges that his religion requires him to eat Halal foods and that Defendants violated his constitutional rights by forcing him to "eat meals issued for Christian

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

and Catholic religions, e.g.: Friday Muslims must eat fish as the church of Catholics require." (Dkt. No. 1 at 5 ¶ 5.) It is not entirely clear whether Plaintiff objects to the lack of a Halal menu or to the fact that fish is served on Fridays. Defendants argue that serving fish on Fridays does not burden Plaintiff's religious beliefs and that they are not constitutionally required to provide an entirely Halal menu. (Dkt. No. 37-8 at 5-6.)

a. *Fish on Friday*

Imam Najeeullah declares that "[f]ish is an acceptable food for a Muslim diet and the service of fish would violate no tenet of our faith." (Dkt. No. 37-5 ¶ 21.) Plaintiff admits in his reply papers that fish is a permissible food under Islamic law. (Dkt. No. 40 ¶ 8.) Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs were burdened by the fact that fish was served on Fridays at CNYPC and I recommend that the Court grant Defendants' motion for summary judgment with respect to the claim that CNYPC's practice of serving fish on Fridays violated Plaintiff's rights under the Free Exercise Clause or RLUIPA.[FN15]

> [FN15.] Plaintiff may also be asserting an Establishment Clause claim regarding the service of fish on Fridays. Any such claim would be subject to dismissal for failure to state a claim. *See Travillion v. Leon,* 248 Fed. App'x 353, 355-56 (3d Cir.2007) (affirming trial court's 12(b)(6) dismissal of claim that jail's service of vegetarian menu during Lent violated Protestant inmate's rights under the Establishment Clause).

b. *Halal Foods*

Plaintiff may also be claiming that Defendants violated his free exercise and RLUIPA rights because CNYPC does not offer a Halal menu. (Dkt. No. 1 at 5 ¶ 5.) Defendants move for summary judgment of this claim. (Dkt. No. 37-8 at 5-6.)

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his

religion's] dietary laws." *Muhammad v. Warithu-Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000) (citing *Abdul-Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)).[FN16]

> [FN16.] The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Defendants assert that meals at CNYPC "do not violate any tenets of the Muslim faith." (Dkt. No. 37-1 ¶ 19.) For this proposition, Defendants cite the declarations of Valerie Fasteson and Imam Najeeullah. *Id.* Neither of the declarations cited by Defendants show that CNYPC meals do not violate Muslim dietary laws. Ms. Fasteson declares that "[a]lthough the dietary service does not serve a strictly Halal diet, we do serve meals that are not violative of Muslim tenets. We do serve an alternative diet that, upon information and belief and based on the declaration of Imam Najeeullah ..., does accommodate the Muslim faith. This would include an option that would insure a pork free diet." (Dkt. No. 37-7 ¶ 5.) Imam Najeeullah's declaration does not state that CNYPC's alternative diet accommodates the Muslim faith. Rather, Imam Najeeullah merely states that fish in an acceptable food for a Muslim diet and that "the Halal diet is important to a Muslim's faith ... I will work with CNYPC staff to try and find ways to make a Halal diet possible." (Dkt. No. 37-5 ¶¶ 21-22.) These vague declarations stand in stark contrast to the evidence presented in a case cited by Defendants, *Majid v. Fischer,* No. 07 Civ. 4584, 2009 U.S. Dist. LEXIS 71616 (S.D.N.Y. Jul. 31, 2009).[FN17] There, the defendants provided the court with a report from an Imam explicitly stating that the pork-free menu offered by DOCS was "adequate and sufficient for Muslims under Islamic law and does not require Muslims to choose between violating their religious practice or starving." *Majid,* Dkt. No. 37-10 at 8.

> [FN17.] Defendants served a copy of this unpublished decision on Plaintiff with their summary judgment papers. (Dkt. No. 37-10.)

*9 Moreover, Defendants have not provided the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

with enough evidence to establish as a matter of law that CNYPC provides a pork-free diet that is sufficient to sustain Plaintiff's good health. Indeed, the only reference in the record to the nutritional quality of the alternative menu is one sentence in the Inpatient Operations Manual stating that CNYPC's pork-free diet "meets 100 percent of the RDA." (Defs.' Ex. 3, Dkt. No. 37-4 at 24.) Defendants do not note this fact in their memorandum of law or ask the Court to draw any conclusions from it.

Additionally, Defendants have not provided any evidence regarding the legitimate penological or compelling interests supporting the menu at CNYPC. Although Defendants cite cases upholding DOCS' menu in the face of First Amendment and RLUIPA challenges by Muslim inmates, Defendants have not provided the Court with any evidence that CNYPC's menu is similar to DOCS' or that it is driven by similar penological interests. In contrast to the dearth of evidence here, the defendants in *Majid* provided the court with a declaration describing in detail the number of inmates who needed to be fed in the DOCS system, the nutritional and religious factors that DOCS considered in formulating menus, the cost of providing a pork-free (but non-Halal) menu as compared with the regular menu, and the problems associated with obtaining Halal meats. Thus, I find that Defendants have not established, as a matter of law, that CNYPC provided Plaintiff with a diet sufficient to maintain his good health without violating Muslim dietary laws. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing this claim.

5. *Classes on Fridays and Denial of Sacred Foods on Holidays*

Defendant's motion for summary judgment does not address Plaintiff's claims that (1) being required to attend classes on Fridays violates his religious rights; or (2) Defendants violated Plaintiff's religious rights by denying him sacred foods on holidays. Therefore, I find that the claims should survive Defendants' motion for summary judgment.

**B. DUE PROCESS CLAIM**

Plaintiff claims that Defendants violated his Fifth and Fourteenth Amendment rights to due process. (Dkt. No. 1 at 7.) Regarding the due process issue, Plaintiff's

complaint states only that "Plaintiff has not d[one] anything to lose his right[s] afforded by the" First Amendment. *Id.* Defendants argue that the complaint fails to state a due process claim. (Dkt. No. 37-8 at 6-7.) Defendants are correct. Plaintiff's due process claim simply duplicates his free exercise and RLUIPA claims. *See Velez v. Levy, 401 F.3d 75, 94 (2d Cir.2005)* ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). Therefore, I recommend that the Court grant Defendants' motion for summary judgment dismissing Plaintiff's due process claim.

**C. EIGHTH AMENDMENT CLAIM**

**\*10** Plaintiff claims that Defendants violated his Eighth Amendment rights. (Dkt. No. 1 at 8.) Defendants argue that the complaint fails to state an Eighth Amendment claim. (Dkt. No. 37-8 at 6-7.) Defendants are correct.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble, 429 U.S. 97, 102-03 (1976).* Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle, 429 U.S. at 102.* To satisfy the objective component of an Eighth Amendment claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian, 503 U.S. 1, 9 (1992).* To satisfy the subjective component, the defendant's behavior must be "wanton." *Whitley v. Albers, 475 U.S. 312, 320 (1986).* Where a prisoner claims that a defendant provided inadequate conditions of confinement, he must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter, 501 U.S. 294, 302-03 (1991).* A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Here, Plaintiff has not raised a triable issue of fact that Defendants deprived him of the minimal civilized measure of life's necessities or that they knew of and disregarded an excessive risk to Plaintiff's health or safety. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of Plaintiff's Eighth Amendment claim.

## D. PERSONAL INVOLVEMENT BY DEFENDANT HOGAN

Defendants argue that any claims against Defendant Hogan should be dismissed because Plaintiff has failed to allege that Defendant Hogan was personally involved in any constitutional violation. (Dkt. No. 37-8 at 7-8.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a *Bivens* cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing

subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN18] *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

> FN18. In *Iqbal,* 129 S.Ct. at 1949, the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's own purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. See *Sash v. United States,* 674 F.Supp.2d 531, 543-44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that the *Colon* categories remain good law.

*11 Here, the complaint does not mention Defendant Hogan at all other than in the caption and the list of parties. (Dkt. No. 1.) In response to interrogatories from Plaintiff, Defendant Sawyer stated that he could not recall Defendant Hogan making any inquiry about Plaintiff's March 18 complaint. (Dkt. No. 33-2 at 19.) Thus, the complaint fails to plausibly suggest, and the evidence fails to raise a triable issue, that Defendant Hogan was personally involved in any alleged constitutional violation. Therefore, I recommend that the Court dismiss Plaintiff's claims against Defendant Hogan.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's motion for summary judgment (Dkt. No. 33) focuses entirely on the lack of Al Jumu'ah services at CNYPC. I have discussed all of the evidence submitted by Plaintiff regarding this issue above, in Section III(A)(2). In analyzing Plaintiff's motion for summary judgment, I must resolve all ambiguities and draw all reasonable inferences in Defendants' favor. *Major League Baseball Props., Inc.,* 542 F.3d at 309. Although, as discussed above, Defendants have not provided the Court with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

sufficient evidence to support summary judgment in their favor on the Al Jumu'ah issue, they have provided sufficient evidence to raise a triable issue of fact. A reasonable juror could find that Defendants had a legitimate penological or a compelling interest for the decision not to hold Al Jumu'ah services at the proper time. Therefore, I recommend that the Court deny Plaintiff's motion for summary judgment.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be ***GRANTED IN PART AND DENIED IN PART.*** I recommend that the Court grant Defendants' motion and dismiss the following claims: (1) the free exercise and RLUIPA claims regarding the use of bowls and utensils; (2) the free exercise and RLUIPA claims regarding CNYPC's practice of serving fish on Fridays; (3) any Establishment Clause claim regarding CNYPC's practice of serving fish on Fridays; (4) the due process claim; (5) the Eighth Amendment claim; and (6) all claims against Defendant Hogan; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 33) be ***DENIED;*** and it is further

**RECOMMENDED** that the following claims survive the pending motions: (1) the free exercise and RLUIPA claims regarding the lack of Al Jumu'ah services at CNYPC; (2) the free exercise and RLUIPA claims regarding the lack of a Halal menu at CNYPC; (3) the claim regarding CNYPC's requirement that Plaintiff attend classes on Fridays; and (4) the claim that Defendants denied Plaintiff sacred foods on holidays. The parties should be prepared, in further proceedings, to fully brief whether the legitimate Penological interest or the compelling government interest test should be applied to this case; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Carney v. Hogan,* No. 9:08-CV-1251 (DNH/ATB), 2010 U.S. Dist. LEXIS 59439, 2010 WL 2519121 (N.D.N.Y. Mar. 30, 2010); *Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, 2008 WL 2543573 (S.D.N.Y. June 25, 2008);

*Abdul-Matiyn v. Pataki,* No. 9:06-CV-1503, 2008 U.S. Dist. LEXIS 118430, 2008 WL 974409 (N.D.N.Y. Apr. 8, 2008); *Jackson v. Boucaud,* No. 9:08-CV-1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, 2009 WL 6066799 (N.D.N.Y. Dec. 31, 2009); *Vega v. Lantz,* No. 304CV1215DFM, 2009 U.S. Dist. LEXIS 88550, 2009 WL 3157586 (D.Con. Sept. 25, 2009); and *Abdul-Malik v.. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402 (S.D.N.Y. Feb. 27, 1997) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*12** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Kalwasinski v. Maxymillian
Slip Copy, 2010 WL 5620908 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 195648 (N.D.N.Y.)

(Cite as: 2011 WL 195648 (N.D.N.Y.))

H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Edward KALWASINSKI, Plaintiff,
v.
Teri MAXYMILLIAN, Director of Sex Offender Treatment Program for New York State; Michael Hogan, New York State Office of Mental Health Commissioner; and Donald Sawyer, Executive Director of CNYPC, Defendant.
No. 9:09-CV-214.

Jan. 20, 2011.
Edward Kalwsinski, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Dean J. Higgins, Esq., Asst. Attorney General, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.
  **\*1** Plaintiff, Edward Kalwasinski, commenced this civil rights action in February 2009, pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated December 22, 2010, the Honorable George H. Lowe, United States Magistrate Judge, recommended that plaintiff's motion for summary judgment (Dkt. No. 33) be denied. The Magistrate Judge further recommended that defendants' motion for summary judgment (Dkt. No. 37) be granted in part and denied in part, recommending that the court grant defendants' motion and dismiss the following claims: (1) the free exercise and RLUIPA claims regarding the use of bowls and utensils; (2) the free exercise and RLUIPA claims regarding CNYPC's practice of serving fish on Fridays; (3) any Establishment Clause claim regarding CNYPC's practice of serving fish on Fridays; (4) the due

process claim; (5) the Eighth Amendment claim; and (6) all claims against defendant Hogan. The Magistrate Judge further recommended that the following claims survive the pending motions: (1) the free exercise and RLUIPA claims regarding the lack of Al Jumu'ah services at CNYPC; (2) the free exercise and RLUIPA claims regarding the lack of a Halal menu at CNYPC; (3) the claim regarding CNYPC's requirement that plaintiff attend classes on Fridays; and (4) the claim that defendants denied plaintiff sacred foods on holidays. The Magistrate has also advised the parties they should be prepared, in further proceedings, to fully brief whether the legitimate Penological interest or the compelling government interest test should be applied to this case. No objections to the Report-Recommendation have been filed.
  Based upon a careful review of the file, and the recommendations of Magistrate Judge Lowe, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

  Accordingly, it is

  ORDERED that

  1. Plaintiff's motion for summary judgment (Dkt. No. 33) is DENIED;

  2. Defendants' motion for summary judgment (Dkt. No. 37) is GRANTED IN PART and DENIED IN PART;

  3. The defendants' motion for summary judgment is GRANTED with the exception of the following claims which are DISMISSED:

  (a) The free exercise and RLUIPA claims regarding the use of bowls and utensils;

  (b) The free exercise and RLUIPA claims regarding CNYPC's practice of serving fish on Fridays;

  (c) Any Establishment Clause claim regarding CNYPC's practice of serving fish on Fridays;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 195648 (N.D.N.Y.)

(Cite as: 2011 WL 195648 (N.D.N.Y.))

(d) The due process claim; and

(e) The Eighth Amendment claim;

4. All claims against defendant Hogan are DISMISSED;

5. The following claims will survive the pending motions:

(a) The free exercise and RLUIPA claims regarding the lack of Al Jumu'ah services at CNYPC;

(b) The free exercise and RLUIPA claims regarding the lack of a Halal menu at CNYPC;

(c) The claim regarding CNYPC's requirement that plaintiff attend classes on Fridays; and

(d) The claim that defendants denied plaintiff sacred foods on holidays.

**\*2** 6. The parties are advised that in all further proceedings, they should be prepared to fully brief whether the legitimate Penological interest or the compelling government interest test should be applied to this case;

7. This matter is referred back to the Magistrate Judge for scheduling of any further proceedings that are required.

IT IS SO ORDERED.

N.D.N.Y.,2011.

Kalwasinski v. Maxymillian
Slip Copy, 2011 WL 195648 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Scott LOMBARDO, Plaintiff,
v.
Howard HOLANCHOCK, Dr. Chandrasekhara, Frank Brusinski, Dr. Sheyas Baxi, Dr. Sadorra, Lynburgh Burton, Zelma Armstrong, John Doe, Defendants.
No. 07 Civ. 8674(DLC).

June 25, 2008.
Scott Lombardo, New Hampton, NY, pro se.

Joshua Pepper, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, NY, for Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** *Pro se* plaintiff Scott Lombardo brings this action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights by staff members at the Mid-Hudson Psychiatric Center ("Mid-Hudson"), to which Lombardo was civilly committed and where he currently resides. Defendants have moved to dismiss, claiming principally that Lombardo has failed to allege any violation of his constitutionally protected rights. For the following reasons, defendants' motion is granted in part.

BACKGROUND

The following facts are drawn from the complaint and are assumed to be true, as they must be on a motion to dismiss.[FN1] Lombardo is a patient-resident at "Mid-Hudson," a secure New York State facility that provides comprehensive evaluation, treatment, and rehabilitation, pursuant to court order, for offenders who have been found not guilty by reason of mental defect or incompetent to stand trial.[FN2] He was civilly committed to Mid-Hudson after he pleaded insanity "for a crime that he committed."[FN3]

FN1. Certain facts are also drawn from an "Addendum to Complaint," which the plaintiff did not file but did serve on the defendants. The Court became aware of this Addendum through references in defendants' motion to dismiss. Defendants provided the Court with a copy of the Addendum, which includes additional factual allegations as well as the twelfth cause of action. The Addendum has been docketed and filed by order of this Court. This Opinion treats the complaint and the Addendum together as the pleading to which the defendants' motion is addressed.

FN2. This description of Mid-Hudson is not disputed. It is not contained in the complaint, but rather is drawn from the webpage of the New York State Office of Mental Health. *See* http://www.omh.state.ny.us/omhweb/facilities/mhpc/facility.htm.

FN3. This fact is drawn from Lombardo's opposition to defendants' motion to dismiss.

On August 15, 2006, Lombardo attended a Gold Card Bingo game, which is restricted to patients with "Gold Card" status. He sat next to patient Rebecca B. About an hour into the game, Rebecca B. "announced that she was going to the bathroom" and did not return. Later that evening, Lombardo was informed by defendant Dr. Sadorra that Rebecca B. claimed Lombardo "rubbed her leg and made obscene comments to her such as[ ] he wanted to have sex with her."

The following day, Lombardo met with his treatment team, which included defendants Dr. Sheyas Baxi and Dr. Chandrasekhara, to discuss Rebecca B.'s allegations. Lombardo denied any wrongdoing. His treatment team suspended his Gold Card status and prohibited him from attending co-ed activities pending an investigation. On August 17, Lombardo was interviewed by a member of the institution's risk management team, to whom he provided

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

a list of witnesses to testify on his behalf concerning Rebecca B.'s allegations.

On August 18, Lombardo was prohibited from attending Jewish services by Baxi, who explained that the services were co-ed and therefore off limits to Lombardo. Later that afternoon, Lombardo met with members of the Mental Hygiene Legal Services team, who told him that they would work on gaining him access to Jewish services. His Gold Card status was restored on October 31, but the restrictions on his attendance at co-ed activities remained in place. On November 22, Lombardo's treatment team informed him that he would slowly be phased back into co-ed activities. That day, he was permitted to attend a pizza party.

On December 7, Lombardo attended a Behavior Change Group, facilitated by defendant Zelma Armstrong. At that meeting, Lombardo spoke of recent problems he was having with his girlfriend. He also revealed that his girlfriend had been bringing him caffeinated coffee, which is contraband at Mid-Hudson. Armstrong told Lombardo that she was required to report his admission to the treatment team.

**\*2** The following day, Lombardo's treatment team, including defendant Frank Brusinski, informed Lombardo that his girlfriend would no longer be permitted to visit him because she had "introduced contraband to the facility." The team also searched Lombardo's room and found $34.10 in change. Six dollars of this was placed in Lombardo's personal account; the remainder was placed into the patients' general fund.

On December 26, a box of Christmas cookies was delivered to Lombardo's ward. Throughout the morning, Lombardo observed Mid-Hudson staff members eating the cookies. Believing that the cookies were reserved for patients only, Lombardo reported the staff members' behavior to two members of the ward's staff. At 10 p.m. that evening, Lombardo was awakened by Mid-Hudson staff who informed him that his room was to be searched because the staff had received information that Lombardo was in possession of contraband matches. This search-or "shake down"-was approved by Sadorra and supervised by defendant Lynburgh Burton. During the search, which

lasted forty-five minutes, Mid-Hudson staff recovered sugar packets, ziplock bags, shoe laces, and two sexually provocative pictures. No matches were recovered. The following day, Lombardo met with his treatment team. He was placed on inappropriate sexual behavior alert by Baxi, which resulted in his segregation from the general population for approximately one week.

Lombardo was again required to meet with his treatment team on January 25, 2007, after he sent a birthday card to a female patient. Baxi informed Lombardo that he was not permitted to communicate with any female patients, except during religious services. Lombardo asked Baxi whether she "wanted him to be a homosexual." As a result, he was given an "X," which resulted in four weeks' additional suspension of his Gold Card status.

Lombardo regained his Gold Card status on March 2. On March 9, his treatment team informed him that he had been accused by a patient of pinching his buttocks in the shower. As a result, Lombardo was transferred to a different ward, where he was assigned a new treatment team. Only three days after his transfer, the new treatment team informed Lombardo that "there [we]re already rumors that plaintiff made passes at patients in the shower room." Accordingly, Sadorra restricted Lombardo to solitary showers.

On or before March 16, Lombardo attempted to send $600 in paper money through the mail. Paper money is contraband in the hospital, and it is unclear how Lombardo acquired it. Lombardo wrapped the money in a manila envelope and sealed it, and then gave the envelope to the ward social worker, along with money to pay the cost of postage. On March 16, Lombardo was told by a Mid-Hudson staff member that the envelope had been opened. The staff member did not provide any details, however, as to who had opened the envelope or why. It was only later, on August 7, 2007, that Lombardo learned that social worker Mildred Smith had opened the envelope. Chandrasekhara later informed Lombardo that he was to be placed on "mail restriction," meaning that all of his outgoing mail-including his legal mail-would be observed as it was being placed into the envelope. Three days later, Chandrasekhara informed Lombardo that he

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

had also been placed on "phone restriction," meaning that all of his outgoing telephone calls-including his legal calls-would be monitored from his end. Lombardo objected, contending that certain calls should be excluded from surveillance by Mid-Hudson staff because they were "legal calls." He produced a list of such calls and provided it to his treatment team, which approved only part of the list. The team excluded calls to obviously non-legal telephone numbers, such as the New York State Office of Mental Health. The team also honored a request from Mental Hygiene Legal Services not to scrutinize any of Lombardo's legal mail upon receipt.

**\*3** Lombardo met with his treatment team on April 12. Dr. Phelan, the chief of Lombardo's unit, informed Lombardo that he would be taken off telephone restrictions if he divulged the source of the $600 found in his outgoing mail. The complaint provides no account of Lombardo's response to Phelan's request. Nonetheless, Lombardo was taken off telephone restrictions on April 24. He remained on mail restrictions.

On May 1, Lombardo's treatment team told him that the $600 discovered in his outgoing mail would be credited in its entirety to his account if he divulged a legitimate source of the money. If he could not provide a legitimate explanation, the money would be placed into the patients' general fund. It is not clear from the complaint whether Lombardo ever proffered an explanation to the treatment team. Nonetheless, by letter dated June 6, defendant Howard Holanchok informed Lombardo that only ten dollars of the confiscated money had been credited to his account, with the remainder placed in the patients' fund.

Lombardo was observed playing cards with another patient on June 29. Believing that the two patients were gambling, a Mid-Hudson staff member summoned Brusinski, who approved a pat-frisk of Lombardo and a search of his quarters. When Lombardo returned to the ward that night, his quarters were searched upon Brusinski's orders. Twenty-five dollars in coins were confiscated from Lombardo's quarters.

Lombardo filed the complaint in this action on October 9, 2007, bringing eleven causes of action under

42 U.S.C. § 1983 for alleged violations of his constitutional rights and his rights under the New York State Mental Hygiene Law. A twelfth was added through the Addendum. Defendants moved to dismiss on January 25, 2008, arguing primarily that Lombardo failed to state a violation of his constitutional rights or any law of the United States. Further, they contended that they were immune from this action based on absolute or qualified immunity. Lombardo opposed the motion on March 4; defendants submitted their reply on March 28.

DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted). A court must apply a "flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (citation omitted). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). Nonetheless, a *pro se* pleading must be more liberally construed. "A document filed *pro se* is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp,* 521 F.3d 202, 214 (2d Cir.2008) (citation omitted).

**\*4** In their motion to dismiss, defendants helpfully analyze Lombardo's twelve causes of action according to the constitutional provisions and state law upon which they are based. The following analysis will proceed in the same fashion.

I. The Due Process Clause

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

Lombardo alleges the following violations of the Due Process Clause: (1) Baxi, Chandrasekhara, and Brusinski violated the Due Process Clause by restricting Lombardo's access to religious services, segregating him from the ward population, and prohibiting him from writing to female patients, based on allegations by a female patient and without interviewing Lombardo himself (First Cause of Action); (2) Armstrong violated Lombardo's "right to confidentiality" by reporting to her supervisors that Lombardo's girlfriend had brought him contraband caffeinated coffee (Fifth Cause of Action); (3) Brusinski unconstitutionally deprived Lombardo of the money that was found during searches of his quarters by depositing that money into the patients' general fund, rather than Lombardo's personal account (Seventh Cause of Action); (4) Holanchok unconstitutionally attempted to "coerce" Lombardo when he offered to end Lombardo's mail restrictions if he provided the source of the $600 confiscated from his outgoing mail (Tenth Cause of Action); and (5) Holanchok unconstitutionally deprived Lombardo of the money confiscated from his outgoing mail when he placed the $590 into the patients' general fund (Eleventh Cause of Action).

"In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v. McDonald, 280 F.3d 159, 173 (2d Cir.2001)* (citation omitted). The Supreme Court has recognized that patients involuntarily committed to state mental institutions enjoy a constitutionally protected liberty interest in safe conditions and freedom from bodily restraint. *Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982)*. The plaintiff in Romeo was violent, and was shackled while treated in the infirmary for a broken arm. *Id. at 310.* The Court held that such committed inmates also have a constitutionally protected liberty interest in "minimally adequate or reasonable training" to ensure safety and freedom from undue bodily restraint. *Id. at 319.*

In assessing whether rights under the Due Process Clause have been violated, a court weighs "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id. at 320.* Any decision regarding a restraint on these liberty interests that is made by a professional "is presumptively valid." *Id. at 323.* To prevail on a due process claim, a plaintiff must show that the professional's decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

**\*5** When a person is deprived of a liberty or property interest protected by the Constitution, the state must provide notice and an opportunity to be heard. *Mathews v. Eldridge, 424 U.S. 319, 348 (1976)*. "The precise form of notice and hearing depends upon balancing (1) the state's interest; (2) the private interest affected by the state's action; and (3) the risk of erroneous deprivation and the value of additional safeguards." *Perry, 280 F.3d at 174.* "[T]he existence of an adequate state remedy to redress property damage inflicted by state officials avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment." *Parratt v. Taylor, 451 U.S. 527, 542 (1981)* (citation omitted), *overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327, 330-31 (1986); see Doe v. Dep't of Public Safety ex rel. Lee, 271 F.3d 38, 55 (2d Cir.2001)* (citation omitted), *rev'd on other grounds, Conn. Dep't of Public Safety v. Doe, 538 U.S. 1 (2003).*

With the exception of his assertion that his money was seized, Lombardo's due process claims do not recite a deprivation of a constitutionally protected interest. Specifically, the restrictions on his participation in prison activities and correspondence with female patients, the reporting of his violations of the institution's rules, and the requests that he divulge the source of contraband currency do not constitute interference with constitutionally protected interests.

Lombardo complains of three seizures of money. On December 8, 2006, $28.10 of $34.10 found in his room was placed into the patients' general fund. On March 16, 2007, $590 of $600 was also placed in that fund.[FN4] Finally, on June 29, 2007, $25 in coins was seized from his room. These allegations describe a deprivation of property by officers acting under color of state law. *See Parratt,* 527 U.S. at 536-37. Nonetheless, Lombardo's claim for recovery of these moneys is a simple tort claim. As the Second Circuit has observed, "[t]he Supreme Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

has been emphatic that not every tort committed by public officers is actionable under the Constitution, even though every one could be thought to deprive the tort's victim of an interest in the nature of liberty or property." *Dep't of Public Safety ex rel. Lee,* 271 F.3d at 55.

> FN4. As Lombardo's complaint acknowledges, the $600 in paper money was contraband, and in Lombardo's possession in violation of the institution's rules.

Lombardo has an adequate state remedy for the seizures of his money because he can bring an action for conversion of his property. *See Parratt,* 451 U.S. at 543-44; *Hudson v. Palmer,* 468 U.S. 517, 530, 533 (1984). The New York Court of Claims Act provides Lombardo with a cause of action against the State for this tort. *See* N.Y. Ct. of Claims Act § 9; *see Brown v. State,* 674 N.E .2d 1129, 1133-34 (N.Y.1996). Accordingly, he has failed to state a claim under § 1983 for violation of his rights under the Due Process Clause.

## II. First Amendment Right to Religious Freedom

**\*6** Lombardo claims that Baxi, Chandrasekhara, and Brusinski violated his First Amendment right to freedom of religion by prohibiting him from attending religious services (Third Cause of Action). In his complaint, and in the cause of action concerning religious freedom, Lombardo mentions only one Jewish service he was unable to attend.[FN5] In opposition to this motion, Lombardo adds that in lieu of attending the service he asked to see a rabbi but that the rabbi never came.

> FN5. An appendix attached to his complaint, however, lists four services-one Jewish, two Protestant, and one for "Spiritual Development"-that Lombardo was allegedly prohibited from attending. To prevail on a free exercise claim, the plaintiff must "demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir.2002) (citation omitted). As a consequence, the complaint will be construed as asserting that the plaintiff is Jewish and that the defendants

interfered with his practice of his Jewish faith.

In the Second Circuit, to prevail on a free exercise claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006) (citation omitted).[FN6] The First Amendment protects inmates' free exercise rights "even when the infringement results from the imposition of legitimate disciplinary measures." *McEachin v. McGuinnis,* 357 F.3d 197, 204 (2d Cir.2004); *see also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) (observing that "prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible"). Thus, defendants must "justify their restriction of [plaintiff's] free exercise rights" by reference to legitimate penological interests. *McEachin,* 357 F.3d at 204 (citation omitted).

> FN6. No party has suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to prisoners' free exercise claims. Accordingly, the free exercise analysis applied in the prison context will apply here.

Lombardo has pleaded a violation of his First Amendment rights with his allegation that Baxi prohibited him from attending Jewish services on August 18, 2006. Defendants also claim that defendants are entitled to qualified immunity on Lombardo's free exercise claim because they "could not reasonably have thought that barring Plaintiff from a single service could constitute an infringement of his Free Exercise right."

Under the doctrine of qualified immunity, a government official may be shielded from liability "if his conduct did not violate clearly established rights or if it would have been objectively reasonable for the official to believe his conduct did not violate plaintiff's rights." *Reuland v. Hynes,* 460 F.3d 409, 419 (2d Cir.2006) (citation omitted). In determining whether a defendant is entitled to qualified immunity, the relevant inquiry is whether the right that was allegedly violated was "clearly established at the time of the defendant's behavior." *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "The essence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

of the principle is that officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with a criminal offense." *Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005) (citation omitted). In assessing a qualified immunity claim, a court must consider:

> (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*7** *Id.* (citation omitted).

The right of an incarcerated person to observe his religion and to attend congregate religious services was well-established in this Circuit before August 2006. *See Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young,* 866 F.2d at 570.[FN7] It was also well-established as of that time that the right is not abrogated when the incarcerated person is subject to disciplinary constraints, *see McEachin,* 357 F.3d at 204, but that restrictions may be imposed when they are "reasonably related to legitimate penological interests," *Young,* 866 F.2d at 570.

> FN7. Defendants rely on an unpublished Second Circuit summary order, dated March 29, 2004, for their contention that they "could not reasonably have thought that by barring Plaintiff from a single service could constitute an infringement of his Free Exercise right." Pursuant to the rules of the Second Circuit, citation to unpublished summary orders filed before January 1, 2007 is not permitted.2d Cir. R. 32.1. Regardless of what the order says, a summary, unpublished disposition cannot articulate the law of the Circuit with the clarity requisite for a qualified immunity defense.

The defendants are entitled to qualified immunity on Lombardo's free exercise claim. Relying solely on the allegations in the complaint and construing those allegations in the light most favorable to the plaintiff, it was objectively reasonable for the defendants to believe that the restriction on Lombardo's participation in a single co-ed religious service was reasonably related to legitimate penological interests. The service occurred just three days after Rebecca B. complained that Lombardo had touched her and had made obscene comments to her, and during that time Lombardo's treatment team was investigating those allegations. The claim based on the asserted violation of the Free Exercise Clause is dismissed. *See Young v. Goord,* No. 01 Civ. 0626(JG), 2005 WL 562756 (E.D.N.Y. Mar. 10, 2005), *aff'd,* 192 Fed. App'x 31, 33 (2d Cir.2006).

### III. Illegal Searches and Seizures

Lombardo contends in his Sixth and Twelfth Causes of Action that defendants Sadorra, Burton, and Brusinski violated his right to be free from searches and seizures "for harassment purposes" when they ordered or supervised searches of his quarters.[FN8] Lombardo was told that the search at issue in the Sixth Cause of Action was performed because "some unnamed person said that Plaintiff was in possession of matches," but suggests that the search was in retaliation for his complaints that staff members were eating the patients' Christmas cookies. As noted above, the search yielded no matches, but other contraband was discovered. As to the search at issue in the Twelfth Cause of Action, Lombardo observes that it was effected after a pat-frisk, conducted because of suspicions he was gambling, revealed no contraband on his person.

> FN8. Lombardo's Twelfth Cause of Action alleges that Brusinski violated Lombardo's rights "by approving 'shake-down' on Plaintiff after he was pat-frisked, with no contraband found." This cause of action thus challenges the "shake-down" search of Lombardo's quarters, and not the pat-frisk that preceded it.

As the defendants rightly observe, the Second Circuit has not articulated the level of privacy enjoyed by a civilly committed psychiatric patient such as Lombardo. *But see Buthy v. Commissioner of Office of Mental Health of New York State,* 818 F.2d 1046, 1051 (2d Cir.1987) (applying the levels of protection afforded pre-trial detainees under the Due Process Clause to persons confined due to an acquittal by reason of insanity or due to their

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

incompetence to stand trial). *Youngberg v. Romeo* teaches that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Romeo,* 457 U.S. at 321-22. "At the same time, this standard is lower than the compelling or substantial necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety." *Id.* at 322. Moreover, Romeo makes clear that courts must defer to the considered judgment of professionals in institutions to which persons are involuntarily committed. *Id.* at 323.

**8** In the convicted prisoner and pretrial detainee contexts, the Supreme Court has permitted searches of inmates' cells, finding that such a search gives rise to neither a Fourth Amendment nor Fourteenth Amendment claim. *See Block v. Rutherford,* 468 U.S. 576, 590 (1984); *Hudson,* 468 U.S. 517 at 530. The Supreme Court observed that "it would be literally impossible to accomplish the prison objectives" of preventing the introduction of contraband and illicit weapons, detecting escape plots, and maintaining a sanitary environment "if inmates retained a right of privacy in their cells." *Hudson,* 468 U.S. at 527; *see Willis v. Artuz,* 301 F.3d 65, 69 (2d Cir.2002). [FN9]

> FN9. A pretrial detainee may retain a limited Fourth Amendment right when a search is instigated by non-prison officials acting for non-institutional security reasons. *Willis,* 301 F.3d at 68. Since Lombardo does not assert that the searches were instituted at the behest of officials outside Mid-Hudson, this limited right need not be discussed further.

The same rationale obtains in the context of an involuntarily committed person. *Romeo* makes clear that involuntarily committed persons should be free of "conditions of confinement [that] are designed to punish." *Romeo,* 457 U.S. at 322. The *Romeo* rule is thus animated by a concern that individuals who have not been convicted of a crime not be punished as criminals. The *Block/Hudson* rule, on the other hand, is motivated by concerns about institutional security and health. The protections accorded to involuntarily detained individuals

under *Romeo* thus do not serve to undermine the *Block/Hudson* rationale that deprives institutionalized persons of their Fourth Amendment rights. As the Supreme Court has observed, "[i]t is difficult to see how the detainee's interest in privacy is infringed by the room-search rule. No one can rationally doubt that room searches represent an appropriate security measure ...." *Bell v. Wolfish,* 441 U.S. 520, 557 (1979); [FN10] *see also United States v. Willoughby,* 860 F.2d 15, 21 (2d Cir.1988). Accordingly, as an involuntarily detained person, Lombardo has no Fourth Amendment right against searches of his cell, and thus no claim under § 1983 for the alleged violations of his Fourth Amendment rights. His claims to this effect are therefore dismissed.

> FN10. In *Bell,* the Supreme Court assumed that a pretrial detainee had a diminished expectation of privacy after commitment to a custodial facility, and found that searches of these detainees' cells did not violate the Fourth Amendment. *Bell,* 441 U.S. at 557.

To the extent Lombardo argues that the first search was effected in retaliation for his complaint about the staff members, that claim also fails. "While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001); *see also Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). The courts of this district are unanimous in holding that even retaliatory searches of a prisoner's cell do not give rise to a claim under § 1983. *See Salahuddin v. Mead,* 95 Civ. 8581(MBM), 2002 WL 1968329, at *5 (S.D.N.Y. Aug. 26, 2002) (collecting cases). "Cell searches are so fundamental to the effective administration of persons and to the safety of prisoners and staff that the searches should not be second-guessed for motivation." *Id.* at *3. For the reasons discussed above, involuntarily committed persons have no right to privacy in their cells. Accordingly, Lombardo cannot state a retaliation claim for a search of his cell.

IV. Right to Contact with Counsel

**9** Read broadly, Lombardo's Ninth Cause of Action

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

alleges that defendants violated his right "to confidential communications with attorneys" by refusing to allow him private telephone calls and by observing him as he placed his outgoing mail into envelopes. Lombardo's claim fails to the extent it is brought under the First and Fourteenth Amendments.

As the Second Circuit has observed, "[i]nterference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis,* 320 F.3d at 351.[FN11] Presumably the same holds true for legal communication by telephone and for the rights of inmates committed by reason of insanity. "To state a claim for denial of access to the courts-in this case due to interference with legal mail-a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim," *id.* (citation omitted); for instance, actions that led to the dismissal of an otherwise meritorious legal claim, *id.*

> FN11. Lombardo predicates the Ninth Cause of Action in part on the Sixth Amendment, which applies only in criminal cases. Presumably, his Sixth Amendment claim concerns defendants' alleged interference with Lombardo's communication with his attorneys in connection with the underlying criminal case that resulted in his civil commitment. Defendants' treatment of this claim in their motion papers is cursory. In his opposition, Lombardo explains that he was committed to Mid-Hudson pursuant to New York Criminal Procedure Law. Liberally read, this argument suggests that his commitment proceedings and eventual exit proceedings from Mid-Hudson were criminal in nature, and that the Sixth Amendment therefore applies to him. Lombardo is therefore granted leave to replead his Ninth Cause of Action insofar as it raises a Sixth Amendment claim.

This claim fails for a number of reasons. First, Lombardo has failed to allege, as required by *Davis,* that defendants' actions "resulted in actual injury."[FN12] He has not alleged any way in which he was affected by defendants' mere observation of him sending mail, or

surveilling his outgoing telephone calls. Second, Lombardo has not alleged that defendants searched his mail, only that they observed him placing the mail into envelopes. Observation of the mail, standing alone, cannot impinge on Lombardo's access to counsel, "since the mail would not be read." *Wolff v. McDonnell,* 418 U.S. 539, 577 (1974). Third, per his request and the request of Mental Hygiene Legal Services, defendants agreed not to scrutinize any mail to Lombardo from the Mental Hygiene Legal Service or to listen to any legal calls.[FN13] Accordingly, Lombardo's Ninth Cause of Action fails to the extent it is predicated on the First and Fourteenth Amendments.

> FN12. If Lombardo's failure to allege that the defendants hindered his pursuit of a meritorious legal claim were the sole deficiency, then Lombardo would be granted leave to replead, since the defendants did not move to dismiss his Ninth Cause of Action on this ground. As it is, the other grounds for dismissal are sufficient to support dismissal.

> FN13. In an appendix to his complaint, Lombardo lists thirty-two telephone calls, identifying the staff member "who assisted [Lombardo] in making" the calls and the intended recipient. In his opposition to defendants' motion to dismiss, Lombardo identifies these calls for the first time as "legal telephone communications [that] were listened to on 32 occasions by members of Plaintiff's treatment team." Nowhere in his complaint does Lombardo allege that the staff members "listened to" these calls; he only claims that they "assisted [him] in making" them. Further, the calls were made to the Mental Health In-House Complaint Line, the Commission on Quality Care, the Joint Commission of Accreditors of Health Care Organizations, Mental Hygiene Legal Services, and a handful of unidentified individuals. Only Mental Hygiene Legal Services is identified as a legal services provider, and defendants agreed not to listen to any calls from this organization. Lombardo does not dispute this fact. Accordingly, the appendix does not support any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

plausible claim that Lombardo's counsel-related rights were violated by the defendants.

**V. Eighth Amendment**

In his Second Cause of Action, Lombardo alleges that defendants Baxi, Chandrasekhara, and Brusinski violated his Eighth Amendment right to be free from cruel and unusual punishment by preventing him from attending certain activities, segregating him from other patients, preventing written communication with female patients, and denying him visits from his girlfriend. Further, in his Tenth Cause of Action, Lombardo claims that defendant Holanchok violated his Eighth Amendment rights by "attempting to coerce him," when he offered to end Lombardo's mail restrictions if Lombardo identified the source of the $600 confiscated from his outgoing mail. These claims fail as Eighth Amendment claims because that constitutional amendment does not apply to one who has been civilly committed. By its terms, the Eighth Amendment applies only to "punishment," and as "an insanity acquittee ... was not convicted, he may not be punished." *Jones v. United States,* 463 U.S. 354, 369 (1983); *see also Youngberg,* 457 U.S. at 324-25.

***10** Reading the complaint liberally, Lombardo's Second and Tenth Causes of Action fail to state any constitutional claims. For the most part, the injuries of which Lombardo complains have either been discussed and rejected in the preceding discussion or do not implicate any right protected by the Constitution. Only one claim requires further discussion: Lombardo asserts that he was denied visits from his girlfriend. This could be construed as raising a First Amendment claim. Assuming *arguendo* that Lombardo possessed a First Amendment right to freedom of association with his girlfriend, his claim fails. Lombardo acknowledges that his girlfriend brought him contraband caffeine, and that the restrictions on his visits with her were introduced as a result of these infractions. Lombardo does not argue that these restrictions were unreasonable, or that there was any impermissible reason for defendants' restrictions on his visits with his girlfriend. Further, Lombardo was permitted to receive other visitors, and to communicate with his girlfriend through other means, such as mail. *See Smith v. Coughlin,* 748 F.2d 783, 788 (2d Cir.1984).

**VI. State Law Claims**

Lombardo alleges two violations of the New York Mental Hygiene Law. First, in his Fourth Cause of Action, he claims that Baxi, Chandrasekhara, and Brusinski violated his rights under the New York Mental Hygiene Law by denying him access to religious services. Second, the Eighth Cause of Action seeks to hold defendant "John Doe" liable for violating Lombardo's rights under 14 N.Y.C.R.R. § 527.11, which prescribes guidelines governing mental health patients' free communication with others within and outside the facility to which they are committed. In his "Addendum to Complaint," Lombardo identifies "John Doe" as Mildred Smith, a Mid-Hudson social worker. These claims fails. "The Mental Hygiene Law is a regulatory statute." *McWilliams v. Catholic Diocese of Rochester,* 536 N.Y.S.2d 285, 286 (4th Dep't 1988). "No private cause of action is authorized for violations of the Mental Hygiene Law." *Id.* [FN14]

> [FN14]. Lombardo is surely aware of this principle. In a previous lawsuit, his claims under the New York Mental Hygiene Law were dismissed on the same basis. *See Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at *5 (S.D.N.Y. Aug. 20, 2001).

**CONCLUSION**

The Court has considered Lombardo's other arguments and finds them to be without merit. Defendants' January 25, 2008 motion to dismiss is granted in part. Lombardo is granted leave to replead his Ninth Cause of Action under the Sixth Amendment A scheduling order accompanies this Opinion.

SO ORDERED.

S.D.N.Y.,2008.

Lombardo v. Holanchock
Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Faris ABDUL-MATIYN, Plaintiff,
v.
Governor George PATAKI, Governor; Allen,
Correction Officer; Rowe, Correction Officer;
Valezquez, Correction Officer; Benbow, Correction
Officer; Johnson, Sullivan Correctional Facility Senior
Parole Officer; John Doe, 1, Sullivan Correctional
Facility Audiologist; John Doe 2, Sullivan Correctional
Facility Counselor; Walsh, Sullivan Correctional
Facility Superintendent; John Doe 3, Sullivan
Correctional Facility Psychiatrist; John Doe # 4, Cnypc
Psychiatrist; Elizabeth Farnum, Doctor; Debroize,
Doctor; Forshee, Doctor; Pete Hanmer, Cnypc Primary
Therapist; Tom Murphy; Jeff Nowicki; Sharon Barboza,
Director Cnypc Sotp Program; Sawyer, Director, Cnypc;
Cnypc Medical Staff; Michelle Payne, Former Cnypc
Program Rehabilitation Counselor; Steve Capolo; and
Linda Becker, Defendants.
No. 9:06-CV-1503 (DNH)(DRH).

April 8, 2008.
Faris Abdul-Matiyn, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General
State of New York, Gerald J. Rock, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants Johnson, Walsh, Farnum, Debroize, Forshee,
Hanmer, Murphy, Nowicki, Barboza, Sawyer, CNYPC
Medical Staff, Capolo, and Becker.

Kloss, Stenger, Kroll & Lotempio, David W. Kloss, Esq.,
of Counsel, Buffalo, NY, for Defendants Allen, Rowe,
Valezquez, and Benbrow.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Faris Abdul-Matiyn, brought this civil
rights action pursuant to 42 U.S.C. § 1983. By a
voluminous Report-Recommendation dated February 19,
2008, the Honorable David R. Homer, United States
Magistrate Judge, addressed the numerous issues in this
matter with the recommendations that:

1. The motion of Walsh and Johnson to sever be
denied;

2. The motion of Walsh and Johnson to dismiss be
granted as to plaintiff's conspiracy claim against defendant
Johnson for failure to intervene, and denied in all other
respect;

3. The state defendants' motion to dismiss be granted
in all respects as to defendant Sawyer; granted in all
respects as to plaintiff's claim for denial of access to the
courts, and denied in all other respects;

4. The City defendants' motion to dismiss be denied
in all respects;

5. The motion of defendant CNYPC Medical Staff to
dismiss be granted; and

6. The complaint be dismissed without prejudice as to
defendants George Pataki, Michelle Payne, and John Does
I-IV.

No objections to the Report-Recommendation have
been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Homer, the
Report-Recommendation is accepted and adopted in its
entirety. See 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that:

1. Defendant Walsh and Johnson's motion to sever is
DENIED;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

2. Defendant Walsh and Johnson's motion to dismiss is GRANTED with regard to plaintiff's conspiracy claim against defendant Johnson for failure to intervene, and DENIED in all other respects;

3. The state defendants' motion to dismiss is GRANTED in all respects with regard to defendant Sawyer, GRANTED in all respects with regard to plaintiff's claim for denial of access to the courts, and DENIED in all other respects;

4. The City defendants' motion to dismiss is DENIED in all respects;

5. The motion of defendant CNYPC Medical Staff to dismiss is GRANTED; and

6. The complaint is DISMISSED without prejudice with regard to defendants George Pataki, Michelle Payne, and John Does I-IV.

7. The Clerk is directed to enter judgment accordingly, and the remaining defendants are instructed to file and serve answers with regard to the remaining claims on or before April 29, 2008.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Faris Abdul-Matiyn ("Abdul-Matiyn"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] twelve DOCS employees[FN3] ("State defendants"), four New York City Corrections Officers ("City defendants"), and the Central New York Psychiatric Center ("CNYPC") Medical Staff ("CNYPC defendants"), violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments.

Compl. (Docket No. 1). Presently pending are a motion to sever defendants Walsh and Johnson pursuant to Fed.R.Civ.P. 21 or, in the alternative, to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 17) and motions to dismiss from the State defendants (Docket Nos. 44, 47),[FN4] the City defendants (Docket No. 46), and defendant CNYPC Medical Staff defendants (Docket No. 55) pursuant to Fed.R.Civ.P. 12(b)(6). Abdul-Matiyn opposes all motions. Docket Nos. 45, 48, 62. For the following reasons, it is recommended that (1) the motion of Walsh and Johnson to sever be denied and their motion to dismiss be granted in part and denied in part, (2) the State defendants' motion be granted in part and denied in part, (3) the City defendants' motion be denied, and (4) the motion of the CNYPC Medical Staff be granted.

> FN2. Abdul-Matiyn initially named twenty-six defendants. Compl. By an order entered January 26, 2007, the Court *sua sponte* dismissed three of the defendants. Docket No. 8. Defendants Pataki and Payne have not been served or otherwise appeared in this action. Likewise, defendants John Does I-IV have neither been served nor further identified. More than 120 days have elapsed since the complaint was filed. Accordingly, it is recommended that the complaint be dismissed without prejudice as to these six defendants pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

> FN3. Two of the State defendants, Walsh and Johnson, are employed by Sullivan Correctional Facility and, while represented by the same attorney as the other State defendants, have filed separate motions.

> FN4. The State defendants initially moved to dismiss which was later discovered to contain an error in the electronic scanning of the documents. Docket No. 47. By an order dated May 29, 2007 (Docket No. 44, Pt. 1), that motion was stricken from the record and replaced by Docket No. 47. Docket No. 49.

**I. Background**

**\*2** The facts are presented in the light most favorable

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

to Abdul-Matiyn as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Abdul-Matiyn "was released from Woodburn [Correctional Facility], after ... serv[ing] sixteen years and eight months ...." Compl. at 13. Abdul-Matiyn thereafter "attended [and completed] sex therapy, alternative[s] to violence, [and] psychological programs ...." *Id.* However, on May 5, 2005, Abdul-Matiyn was arrested and detained at Rikers Island due to a parole violation. *Id.*

Upon his arrival at Rikers Island, Abdul-Matiyn complained of "arthritis, back problems (pains), a history of heart problems, a history of blackouts ..," and kidney and bladder stones. *Id* . On July 6, 2005, Abdul-Matiyn requested a sick call because he was "having severe back pains, that were making it almost impossible for him to walk ... [and] a tightness in his chest and strong chest pains." *Id.* at 7. Abdul-Matiyn alleges that he was sent back to his cell, and despite his continued complaints, crippling pain, and pleas to go to the hospital, defendants Allen and Benbow ignored his requests. *Id.* at 7-8. Defendant Valezquez replaced Allen and "[Abdul-Matiyn] and the inmates informed [her] that [AbdulMatiyn] was having chest and back pains ... [so she] called the hospital and she was told to send [him] right down." *Id.* at 8. Benbow approached Valezquez to inquire where AbdulMatiyn was going and when Valezquez informed her that he was going to the hospital, Benbow allegedly referred to Abdul-Matiyn by a racial epithet and called the hospital, instructing them to put Abdul-Matiyn "on the burn". *Id.*

Defendant Rowe met Abdul-Matiyn upon his arrival at the hospital. *Id.* She informed him that he was "on the burn" and "[d]espite [Abdul-Matiyn's] persistent complaints of chest and back pains ..," Rowe did not let him see a doctor until over three and one-half hours later. *Id.* at 9. Abdul-Matiyn's chest pains had subsided, but he was still suffering from back pain and was prescribed methocarbamol. *Id.* Abdul-Matiyn contends that the physician informed him that due to the hospital's faulty equipment, the methocarbarnol was the only treatment available and that any persisting pain would have to be managed with Abdul-Matiyn's ability to use his mind to control the discomfort. *Id.*

Additionally, Abdul-Matiyn alleges that on another occasion where he was rushed to the clinic "due to severe pains [in his] chest, back and belly ..," he encountered Rowe, who stated that "they had something special in store for [Abdul-Matiyn]" and refused to provide Abdul-Matiyn with immediate medical treatment. *Id.* at 12. Abdul-Matiyn also contends that some of Rowe's saliva landed on his face and in his mouth while Rowe was speaking to him and attributed this exchange of bodily fluids to his contraction of Hepatitis B. *Id.* at 15.

**\*3** Abdul-Matiyn was supposed to be released from Rikers Island on May 5, 2006. *Id.* at 14. However, at the beginning of April, Abdul-Matiyn was summoned to meetings with the Sullivan Correctional Facility's mental health department. *Id.* at 16.[FN5] The mental health workers "stated that Albany told them to interview [Abdul-Matiyn] and to send Albany an evaluation;" however, despite Abdul-Matiyn's repeated requests, they would not tell him why Albany required an evaluation. *Id.* During the interview, Abdul-Matiyn was asked questions concerning his religion and alleged involvement with terrorists and terrorist organizations. *Id.* Additionally, Abdul-Matiyn contends that the mental health department was misconstruing prior conversations he had with them [FN6] about his religious beliefs, "distort[ing] and misinterpret[ing his statements] to have it appear that [he] was seeing and hearing things that were not there." *Id.*

> FN5. At some point Abdul-Matiyn was transferred to Sullivan Correctional Facility for housing, but the exact date is not reflected in the record.

> FN6. Abdul-Matiyn states that he sporadically suffered from depression which caused trouble sleeping. Compl. at 16. When this occurred, he would "go to mental health and speak with someone and [ ] get something to help him sleep." *Id.*

After the evaluation interview, Abdul-Matiyn was seen by defendant Johnson. *Id.* at 17. Johnson asked Abdul-Matiyn to complete additional paperwork, allegedly because AbdulMatiyn's initial paperwork had been "messed up." *Id.* Abdul-Matiyn "asked if anything came

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

up that would interfere with his release ...." and Johnson responded "no unless something else comes up unexpectedly ...." *Id.* Abdul-Matiyn continually asked correctional facility staff if there were new developments occurring in his case that would preclude his release; however, "[e]ach defendant expressed ... that they had no knowledge of anything that would prevent [him] from going home." *Id.*

On May 5, 2005, Abdul-Matiyn was met by Johnson and informed that he was "suppose[d] to have been examined by mental health the last two weeks before he was to be released [and] ... he had to be transferred to Marcy Psychiatric [Correctional Facility] to be evaluated." *Id.* at 18. Abdul-Matiyn alleges that he was told that his evaluation would be "three days to a week and no more than two weeks ...." *Id.* Abdul-Matiyn was then strip-searched, shackled, and transported to CNYPC. *Id.* Abdul-Matiyn later alleged that Walsh authored and signed an application for involuntary commitment and that this information was readily known by other defendants. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶¶ 11, 13-14.

Upon arrival at CNYPC, defendant Murphy allegedly told Abdul-Matiyn that he would "be [t]here a lot longer than [two weeks because he was] one of the filthy animals [defendants] have to clean off our streets." Compl. at 19. "All of [Abdul-Matiyn's] property was taken from him," including religious texts and other items. *Id.* Additionally, Murphy informed Abdul-Matiyn that he would "be [t]here for the rest of [his] life." *Id.* Abdul-Matiyn continually asked what authority granted defendants the ability to keep him confined against his will, but defendants did not give him an answer. *Id.*

**\*4** Additionally, Abdul-Matiyn underwent a psychological evaluation upon arrival. *Id.* According to the psychologist, "she didn't see anything mentally wrong with [Abdul-Matiyn] ... and that she could not give [him] any answers to his legal questions except that Governor Pataki instructed them to lock up everyone convicted of a sexual offense by any means possible, and keep them locked up forever." *Id.*

While Abdul-Matiyn resided at CNYPC, the CNYPC defendants, "especially ... Hanmer, .. Murphy, .. Nowicki

and ... Payne told [him] he had no constitutional rights ... to be allowed to practice his religion, have access to the courts or be told why he was [t]here at CNYPC." *Id.* at 20. Additionally, defendant Capolo allegedly refused Abdul-Matiyn's requests to pray, "tell[ing Abdul-Matiyn] that he was too busy to allow [Abdul-Matiyn] the opportunity to pray and [that he] would have to find another time after Capolo got off work to pray." *Id.* at 27. Abdul-Matiyn also contends that Payne "would taunt [him] everyday by making sarcastic statements about [Abdul-Matiyn] and his religion to groups of people whenever he was present." *Id.* Furthermore, although CNYPC provided kosher meals to Jewish residents and defendant Becker "told [Abdul-Matiyn] that they would consider obtaining a contract for halal meals [FN7] ...," none were purchased and Abdul-Matiyn was denied his special religious diet. *Id.* at 20.

> [FN7]. "Halal" foods are those prepared in accordance with Islamic religious law. *See, e.g.,* Cyril Glasse, *The Concise Encyclopedia of Islam* 133, 144, 148 (1989).

Abdul-Matiyn also contends that while he was at CNYPC, he was "forcefully strip searched, on a few occasions and threatened with the threat of being injected with drugs if he refused to be striped [sic] searched or ... participate in the programs [t]here at CNYPC, even if his refusal [wa]s due to his religion or if he w[as] physically ill." *Id.* at 23. AbdulMatiyn also alleges that Payne threatened him with the punishment of the "side room", where patients were allegedly "unmercifully beat, kick[ed] and stomp[ed] ...." *Id.* at 28. Moreover, Abdul-Matiyn contends that his "room ha[d] not been clean in over six months and the times [he] ha[d] tried to clean his room with a wet towel; he was threatened with punishment ...." *Id.* at 23. Abdul-Matiyn also complains that his confinement was discriminatory because "defendants ... came to the determination that they would imprison males convicted of sexual offenses ... [since] defendants are targeting only males convicted of sexual offenses and not females who commit the same or similar offenses." *Id.* at 25. This action followed.

**II. Discussion**

In his complaint, Abdul-Matiyn alleges that his First

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

Amendment rights were violated because the CNYPC defendants failed to provide him with halal meals, did not allow him to pray, and impeded his access to the courts. Abdul-Matiyn also claims that he was unlawfully strip-searched and shackled on multiple occasions. Additionally, Abdul-Matiyn asserts Eighth Amendment violations for deliberate indifference to a serious medical need [FN8] and, liberally construing Abdul-Matiyn's complaint, failure to protect. Moreover, AbdulMatiyn contends that his due process rights were violated by his civil confinement and the conspiracy between Walsh and Johnson to have him civilly confined, as well as claiming that his equal protection rights were violated by CNYPC's discriminatory procedures confining only male sex offenders. Walsh and Johnson move to sever and, in the alternative, dismiss based upon the failure to (1) abide by the pleading requirements, (2) allege the personal involvement of Walsh, and (3) state a claim with respect to Johnson. The State defendants move to dismiss based upon (1) Abdul-Matiyn's failure to comply with pleading requirements, (2) failure to allege the personal involvement of Sawyer, (3) the submission of a conclusory complaint with respect to the First and Fourteenth Amendment claims, and (4) the fact that verbal harassment alleged on the part of Capolo is not actionable under § 1983. The City defendants move to dismiss based upon the failure to (1) comply with pleading requirements, (2) allege personal involvement, (3) exhaust administrative remedies,[FN9] and (4) allege a serious medical need. The CNYPC defendants move to dismiss based upon Eleventh Amendment immunity.

FN8. Abdul-Matiyn asserts multiple claims of serious medical conditions including *inter alia* back and chest pain, hearing loss, bladder and kidney stones, Hepatitis B, and arthritis. Compl. at 5,11, 12-13, 14. Because only the City defendants asserted an argument controverting Abdul-Matiyn's serious medical need, only the ailments directly pertaining to their involvement with his treatment will be discussed. Docket No. 46. These claims primarily concern the complaints of Abdul-Matiyn's chest and back pain. Compl. at 7-9.

FN9. "[F]ailure to exhaust is an affirmative defense ...." *Jones v. Block,* 127 S.Ct. 910, 921

(2007); *see also Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006). Thus, the City defendants' assertion of this affirmative defense in a motion to dismiss is premature but may be revisited at the summary judgment stage. *See Jones,* 127 S.Ct. at 921-22 (holding that an inmate is not required to plead exhaustion in the complaint). Accordingly, the City defendants' motion on this ground should be denied.

**A. Legal Standard**

**\*5** Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the nonmovant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at *3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.,* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest..... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

*se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted).

### B. Failure to Comply with Pleading Requirements

"Under the Federal Rules, a 'short and plain' complaint is sufficient as long as it puts the defendant on notice of the claims against it." *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (*quoting* Fed.R.Civ.P. 8(a)). Additionally, the Federal Rules state that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances...." Fed.R.Civ.P. 10(b). However, "[a]t base, the Rules command us never to exalt form over substance." *Phillips,* 408 F.3d at 128 (*citing* Fed.R.Civ.P. 8(f)).

The majority of defendants cite Abdul-Matiyn's failure to number his complaint in paragraphs as a basis for dismissal. However, the Court has been "willing to overlook harmless violations of Rule 10(b) ..." where the spirit of the rule, "to facilitate [ ] the clear presentations of the matters set forth, so that allegations might easily be referenced in subsequent pleadings," is not offended. *Id.* (citations and internal quotations omitted). Thus, "where the absence of numbering or succinct paragraphs does not interfere with one's ability to understand the claims or otherwise prejudice the adverse party, the pleading should be accepted." *Id.* (citations omitted).

**\*6** In this case, it is clear that all defendants were able to reference easily the allegations in the complaint as each set forth multiple reasons to dismiss the complaint other than the failure to comply with Rule 10(b). Moreover, defendants were not clearly prejudiced as each motion and memorandum of law is extensively researched, cogently written, and, when viewed together, refute most of the bases upon which Abdul-Matiyn asserts constitutional violations.

Therefore, the motions of Walsh and Johnson, the State defendants, and the City defendants on this ground should be denied.

### C. Personal Involvement

Certain defendants contend that Abdul-Matiyn has failed to establish their personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1)[T]he defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

### 1. Walsh

Walsh contends that "[o]ther than being named in the caption and identified as a party, [he] is never referred to in the complaint." Docket No. 17, Pt. 2 at 4. However, construing all of Abdul-Matiyn's submissions liberally, he alleges that "Walsh ... without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment .... " Docket No. 48 at ¶ 11. As discussed *infra* in subsection II(E)(2)(I), Abdul-Matiyn's involuntary civil confinement may constitute a due process violation. Thus, Walsh's alleged actions of authoring and signing the allegedly false report which served as the basis of Abdul-Matiyn's confinement may constitute direct participation in an alleged constitutional violation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

Accordingly, Walsh's motion to dismiss on this ground should be denied.

### 2. Benbow, Allen, Rowe, and Valezquez

The City defendants contend that there are no allegations that they were personally involved in the alleged deliberate indifference to Abdul-Matiyn's medical treatment because they were not personally involved with providing his medical care. However, defendants need not physically administer the care to be subject to Eighth Amendment liability.

**\*7** As discussed *infra* in subsection II(E)(1), construing all facts in the light most favorable to Abdul-Matiyn, the City defendants exhibited deliberate indifference to his medical treatment. Although the City defendants were not responsible for the actual medical care, they were responsible for seeing that Abdul-Matiyn received adequate treatment once they were aware of his serious medical need. Crediting Abdul-Matiyn's allegations, each City defendant ignored this responsibility by denying Abdul-Matiyn with medical treatment or severely delaying it. Therefore, the complaint suffices to allege that each was directly involved in the alleged deliberate indifference.

Thus, City the City defendants' motion on this ground should be denied.

### 3. Sawyer

The State defendants argue that "[o]ther than being named in the caption and identified as a party, Sawyer is never referred to in the complaint." Docket No. 47, Pt. 2 at 4. Reading all of Abdul-Matiyn's submissions together, he alleges that "superiors [are] liable for their [employees'] actions ... and Sawyer is responsible for the training for those employed at CNYPC and liable for their actions and inactions." Docket No. 48 at ¶ 22. Abdul-Matiyn continues by alleging negligent hiring and retention and vicarious liability. *Id.* at ¶¶ 23-26.

Sawyer cannot be held liable solely because he held a supervisory position over other defendants. Abdul-Matiyn does not specifically contend that Sawyer was directly involved or had knowledge of the alleged constitutional violations; however, even when reading the complaint in the light most favorable to Abdul-Matiyn, any liberally construed allegations of direct involvement

and knowledge would still lack any factual basis. Additionally, although Abdul-Matiyn contends that there was negligent supervision, there is no fact asserted beyond his conclusory allegations that Sawyer created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing the other named defendants.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### D. Severance

In the event of misjoinder of parties, "[a]ny claim against a party may be severed and proceed separately." Fed.R.Civ.P. 21. "While the decision whether to grant a severance motion is committed to the sound discretion of the trial court, the federal courts view severance as a procedural device to be employed only in exceptional circumstances." *Baergas v. City of New York,* No. 04-CV-2944 (BSJ/HBP), 2005 WL 2105550 at \*3 (S.D.N.Y. Sept. 01, 2005) (citations and internal quotations omitted). The factors considered "when determining whether severance is appropriate [are]:

(1) whether the claims arise out of the same transaction or occurrence, whether the claims present common questions of fact or law, (3) whether severance would serve judicial economy, (4) prejudice to the parties caused by severance, and (5) whether the claims involve different witnesses and evidence."

**\*8** *Id.* at \*3-4 (citations omitted).

In this case, it is clear that severance is not warranted. The actions of Walsh and Johnson are the basis of Abdul-Matiyn's due process claim. Liberally reading all submissions, Abdul-Matiyn alleges that Walsh, "without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment" and signed it, leading to Abdul-Matiyn's involuntary civil confinement, potentially in violation of the Fourteenth Amendment. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶ 11. Additionally, Abdul-Matiyn contends that Johnson participated in the conspiracy to involuntarily confine him "by concealing what was taking place, and giving [him]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

misleading information concerning the situation." *Id.* at ¶ 13. Thus, the subsequent claims of involuntary confinement asserted against the CNYPC defendants directly relate to, and intertwine with, the allegations against Walsh and Johnson. Additionally, the same set of facts relating to who signed the papers and ordered that he be confined would be determined in both cases. Among other things, this would result in defendants calling duplicate witnesses. Thus, severing the litigation would not serve the interests of judicial economy and may lead to inconsistent findings in liability and damages which would prejudice all defendants.

Therefore, Walsh and Johnson's motion to sever should be denied.

### E. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

#### 1. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually

knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*9** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1,9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, 16 and (3) the existence of chronic and substantial pain ." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id .* at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV1089 (GLS/RFT), 2006 WL 681223, at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at \*14 (S.D.N.Y. Sept. 17, 2002). Courts have

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

also failed to recognize chest pains as a serious medical condition. See *McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) (holding that keeping plaintiff "waiting for twenty-five minutes and then sen[ding] him back to his cell without treating his chest pains does not amount to a constitutional deprivation.").

However, considering Abdul-Matiyn's claims together and reading all allegations in a light most favorable to him, it appears that he has alleged a serious medical condition. Abdul-Matiyn contends he had a history of back pain and that the back pain he was experiencing on July 6, 2005 was so severe that it was "making it almost impossible to walk ...." Compl. at 7. This pain began at 11:30 a.m. and was not addressed until after 3 p.m. *Id.* at 7-9. Additionally, the back pain was accompanied by severe chest pain. *Id.* at 7. This pain lasted far longer than that addressed in *McCoy.* Additionally, the combination "had [Abdul-Matiyn] twisted over in a bending position ... [causing him to] cry[ ]." *Id.* Crediting Abdul-Matiun's allegations, this combination of factors present a condition which a reasonable person or physician would deem worthy of treatment. Additionally, the pain appears to have been of sufficient severity. Thus, Abdul-Matiyn's chest and back pain constituted a serious medical condition.

***10** Construing the allegations in the light most favorable to Abdul-Matiyn also leads to the conclusion that the City defendants were deliberately indifferent to his need for medical treatment. Abdul-Matiyn alleges that Allen and Benbow refused to respond to his repeated requests to go to the clinic for his severe and crippling chest pains. Compl. at 7. Additionally, even though Valezquez called the clinic on Abdul-Matiyn's behalf, it is alleged that Valezquez stood idly by while Benbow told the clinic that Abdul-Matiyn was to be placed "on the burn." *Id.* at 8. Additionally, upon arrival at the clinic, Rowe refused to let Abdul-Matiyn see a physician for an extended period of time. Compl. at 9. If proven, these actions could constituted intentional delay and denial of medical services during a serious medical need.

Therefore, the City defendants' motion to dismiss on this ground should be denied.

**2. Fourteenth Amendment**

**I. Due Process**

Abdul-Matiyn contends that the State defendants violated his due process rights when he was involuntarily, civilly confined at CNYPC without being given any justification from the State defendants. The State defendants contend that Abdul-Matiyn's claims are conclusory.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. See *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting." *Malik v. Tanner,* 697 F. Supp 1294, 1301 (S.D.N.Y.1988) (citing *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974)). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." *Fisk v. Letterman,* 401 F.Supp.2d 159, 173, 374 (S.D.N.Y.2005) (citing *Addington v. Texas,* 441 U.S. 418, 425 (1979)). However, the Supreme Court has "permitt[ed] involuntary confinement based upon a determination that the person currently both suffers from a 'mental abnormality' or 'personality disorder' and is likely to pose a future danger to the public." *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997). "In the case of civil confinement, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for ... commit[ment] ... [and is in]tolera[nt of] the involuntary confinement of a nondangerous individual." *Mental Hygiene Legal Serv. v. Spitzer,* No. 07-CV-2935 (GEL), 2007 WL 4115936, at *6 (S.D.N.Y. Nov. 16, 2007) (citations and internal quotations omitted).

In this case, viewing all facts in the light most favorable to Abdul-Matiyn, it appears that his due process rights were violated. Abdul-Matiyn continually inquired why he was being interviewed, if the results of those discussions would interfere with his release date, and, upon his arrival at CNYPC, under what authority and with what proof he was being detained. All of these unanswered inquiries directly reflect upon the due process, or lack thereof, afforded to Abdul-Matiyn.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

**\*11** Additionally, construing the allegations in the light most favorable to Abdul-Matiyn, he was not a danger to the community as he had undergone multiple courses during his release and devoted his time and energy to his religion and assisting those less fortunate in the community. Compl. at 13-14. Moreover, Abdul-Matiyn had no suicidal ideations or mental illness but was merely a devout and spiritual Muslim. *Id.* at 16. Therefore, AbdulMatiyn has alleged adequate facts to present a basis for recovery.

Thus, the State defendants' motion to dismiss on this ground should be denied.

### ii. Equal Protection[FN10]

FN10. Liberally construing Abdul-Matiyn's complaint, there is a second allegation of discrimination. Abdul-Matiyn claims that defendants did not target those convicted of homicide, a crime specifically mentioned in the Mental Hygiene laws, for confinement while they did target sex offenders, a crime allegedly "never considered by the framers ... as a mental illness ...." Compl. at 25. However, Abdul-Matiyn's conclusory allegations do not compare similarly situated individuals; thus, any such contention does not implicate Fourteenth Amendment protection.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. 95-CV-1534, 1997 WL 151770, at \*3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.). "To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197 (1976).

In this case, Abdul-Matiyn alleges that male sex offenders were civilly confined in CNYPC while similarly situated female sex offenders were not. Compl. at 25. Construing all allegations in the light most favorable to Abdul-Matiyn, it appears that he has asserted a sex-based, discriminatory policy. The State defendants merely claim that Abdul-Matiyn has stated a conclusory allegation; however, at this stage these facts, without any proffer of substantial relation to an important government objective, are suffice to allege a potential basis for relief.

Therefore, the State defendants' motion to dismiss on this ground should be denied.

### 3. First Amendment
### I. Free Exercise of Religion

Abdul-Matiyn alleges that his First Amendment rights were violated when the State defendants failed to provide him with his religious meals and refused to let him pray. The State defendants contend that Abdul-Matiyn's claims are conclusory.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04-CV-57 (DNH), 2007 WL 3046703, at \*4 (N.D.N.Y. Oct. 17, 2007) (*citing Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (*citing Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ...." *Johnson,* 2007 WL 3046703, at \* 4.

### a. Failure to Provide Halal Meals

**\*12** The Free Exercise Clause extends "into other aspects of prison life including, pertinently, that of an inmate's diet ...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden [s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under ... *Turner* ....

*Johnson,* 2007 WL 3046703 at * 4-5 (citations omitted).

In this case, Abdul-Matiyn has articulated a First Amendment violation as the State defendants did not provide him with his halal meals during his confinement in CNYPC. There is no dispute at this stage that Abdul-Matiyn held genuine religious beliefs. The State defendants at this stage assert only that Abdul-Matiyn's claim was conclusory. Therefore, the State defendants' motion must be denied because the allegations of the complaint suffice to state a claim.

Therefore, the State defendants' motion on this ground should be denied.

**b. Refusal to Allow Prayer**

"A determination of whether the refusal to permit attendance at a religious service [vioolates the First Amendment] hinges upon the balancing of an inmate's First Amendment free exercise right[ ] against institutional needs of ... operating prison facilities ...." *Johnson,* 2007 WL 3046703, at *4. "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (citations omitted).

In this case, Abdul-Matiyn appears to have asserted a First Amendment violation when the State defendants removed his religious texts and refused to permit him to pray. Compl. at 19. Abdul-Matiyn specifically references defendant Capolo, alleging that "he refuse[d] to allow [Abdul-Matiyn] to go and perform his prayers ...." *Id.* at 27. The State defendants contend that Capolo's oral refusals constituted nothing more than verbal harassment, which "alone, unaccompanied by an injury no natter how

inappropriate, unprofessional, or reprehensible .., does not constitute the violation of any federally protected right and therefore is not actionable under 42 U. S.C. § 1983." *Murray,* 2007 WL 956941, at *8.

However, the State defendants are incorrect in asserting that Capolo's alleged oral denials amounted only to verbal harassment and were insufficient to state a First Amendment violation. Capolo's alleged continuous refusals to provide Abdul-Matiyn with his religious texts or permit him time and space to pray were at least arguably unreasonable in light of the fact that at this stage, the State defendants have not proffered a legitimate penological interest which justified denial of the provision of a book and time for prayer. Thus, Abdul-Matiyn has alleged here a violation with a potential basis for relief.

**\*13** Therefore, the State defendants motion on this ground should be denied.

**ii. Access to Courts**

Abdul-Matiyn contends that while confined, he was denied access to a law library and was thus denied his First Amendment right of access to the courts. The State defendants assert that Abdul-Matiyn alleges only a conclusory claim here.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries ...." *Bounds v. Smith,* 430 U.S. 817, 828 (1977); *see also* *Lewis v. Casey,* 518 U.S. 343, 351 (1996). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis,* 518 U.S. at 531. "[I]n order to fulfill the actual injury requirement ... on a law library claim where there is a lack of access to the courts, the inmate must be pursuing [*inter alia* ] ... a civil rights claim pursuant to § 1983 to vindicate basic constitutional rights." *Linares v. Mahunik,* No. 05-CV-625 (GLS/RFT), 2006 WL 2595200, at *7 (N.D.N.Y. Sept. 11, 2006) (citations and internal quotations omitted). Thus, "to prove an actual injury, a plaintiff must show that a non-frivolous legal claim was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

frustrated or impeded due to the actions of prison officials." *Id.* (citations omitted).

In this case, Abdul-Matiyn enjoyed the right to a law library. Construing his allegations in the light most favorable to Abdul-Matiyn, this right was violated when the State defendants denied him access to one. Compl. at 20. However, Abdul-Matiyn does not allege that he suffered any injury due to this alleged deprivation. even when viewing all of Abdul-Matiyn's submissions together, he makes only that his lack of access to a law library precluded him from "drafting papers for court." Docket No. 48 at § 47. Additionally, Abdul-Matiyn claims that this preclusion from drafting papers provided defendants with their grounds for dismissal based on non-compliance with pleading requirements. *Id.*

However, this conclusory allegation is insufficient to provide a basis for relief. AbdulMatiyn alleges no case then pending which was adversely affected in any way. In this case, defendants' motions to dismiss based on the failure to comply with the pleading requirements were rejected. Moreover, Abdul-Matiyn gives no other indication of what drafts he intended to submit to the Court.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### 4. Conspiracy

Johnson assert that Abdul-Matiyn has failed to state a cause of action against him. Abdul-Matiyn contends that Johnson participated in the conspiracy to have him civilly detained and that he has a right "to be free from conspiracies to deprive him of his constitutional rights." Docket No. 48 at ¶¶ 13-14.

**\*14** "Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4)

whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Abdul-Matiyn alleges that Johnson joined with others to deprive Abdul-Matiyn of his rights. Liberally construing those allegations, the concert of actions by Johnson and others could support a claim of agreement among Johnson and other defendants and acts in furtherance of the conspiracy. This suffices to support a claim for conspiracy against Johnson and Johnson's motion on this ground should be denied.

However, liberally construing Abdul-Matiyn's claims, he has asserted an action for negligent failure to prevent the deprivation of his rights. If Johnson "ha[d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ... [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994).

Therefore, Johnson's motion to dismiss on this ground should be granted in part and denied in part.

### F. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100.

"[T]he Central New York Psychiatric Center[,] ... [as an institution, is an] arm[ ] of the state for Eleventh Amendment purposes and ... therefore, [is] absolutely immune from [P]laintiff's claims for monetary damages in this lawsuit." *Murray v. Pataki,* No. 03-CV-1263 (LEK/RFT), 2007 WL 956941, at *12 (N.D.N.Y. Mar. 29, 2007) (citations omitted). Therefore, the motion of defendant CNYPC Medical Staff on this ground should be granted.

### III. Conclusion

**\*15** For the reasons stated above, it is hereby **RECOMMENDED** that:

A. The motion of Walsh and Johnson to sever (Docket No. 17) be **DENIED;**

B. The motion of Walsh and Johnson to dismiss (Docket No. 17) be:

1. **GRANTED** as to Abdul-Matiyan's conspiracy claim against defendant Johnson for failure to intervene; and

2. **DENIED** in all other respects;

C. The State defendants' motion to dismiss (Docket Nos. 44, 47) be:

1. **GRANTED** in all respects as to defendant Sawyer;

2. **GRANTED** in all respects as to Abdul-Matiyan's claim for denial of access to the courts; and

3. **DENIED** in all other respects;

D. The City defendants motion to dismiss (Docket No. 46) be **DENIED** in all respects;

E. The motion of defendant CNYPC Medical Staff to dismiss (Docket No. 55) be **GRANTED;** and

F. The complaint be **DISMISSED** without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.

Abdul-Matiyn v. Pataki
Slip Copy, 2008 WL 974409 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Keith BUSH and Anthony Bennett, Plaintiffs,
v.
D.O.C. Commissioner Glen GOORD, Michael
Giambruno, Gerald Elmore, Tom Brunette, and Jeff
Weber, Defendants.
No. 03-CV-759S.

March 25, 2009.
West KeySummary **Constitutional Law 92** ⚖ 1426

92 Constitutional Law

92XIII Freedom of Religion and Conscience
92XIII(B) Particular Issues and Applications
92k1421 Prisons and Pretrial Detention
92k1426 k. Rehabilitation and Treatment
Programs. Most Cited Cases
**Mental Health 257A** ⚖ 465(3)

257A Mental Health

257AIV Disabilities and Privileges of Mentally
Disordered Persons
257AIV(E) Crimes
257Ak452 Sex Offenders
257Ak465 Disposition; Commitment
257Ak465(3) k. Treatment. Most Cited
Cases

A sex offender counseling and treatment program that
required a sex offender to admit responsibility for his
actions did not violate the sex offender's right to the free
exercise of religion. Although the sex offender's Wiccan
faith prevented him from admitting to guilt for his actions,
the program's acknowledgement of guilt requirement was
reasonably related to the department of correction's
legitimate penological interests. The program's goal was
to rehabilitate sex offenders, and without the sex offender

admitting to his guilt, officials would be unable to assist
the sex offender in the development of tools necessary to
self-regulate and to avoid future offensive behavior. Thus,
even though the sex offender would not gain certain
good-time-credits for failing to complete the program, the
offender's participation in the program was not mandatory
and did not violate his First Amendment rights. U.S.C.A.
Const.Amend. 1; 42 U.S.C.A. § 1983.
Scott Michael Lupiani, Scott M. Lupiani, Attorney at Law,
Buffalo, NY, for Plaintiffs.

David Joseph State, Peter B. Sullivan, New York State
Attorney General, Buffalo, NY, for Defendants.

**ORDER**

WILLIAM M. SKRETNY, District Judge.
*1 1. On October 9, 2003, Plaintiffs commenced this
civil rights action against Defendants under 42 U.S.C. §
1983. On October 9 and December 30, 2003, Plaintiffs
moved to proceed *in forma pauperis.* (Docket Nos. 2, 8.)
On May 27, 2004, this Court referred this matter to the
Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B).
(Docket No. 27.) On April 27, 2007, Defendants filed a
Motion for Summary Judgment. (Docket No. 119.)

2. On January 7, 2008, the Honorable Jeremiah J.
McCarthy, United States Magistrate Judge, filed a Report
and Recommendation, in which he recommended (1) that
Plaintiffs' Motions for Leave to Proceed *In Forma
Pauperis* be granted *nunc pro tunc,* and (2) that
Defendants' Motion for Summary Judgment be granted.
(Docket No. 135 .)

3. On April 29, 2008, this Court accepted in part and
recommitted in part Judge McCarthy's Report and
Recommendation. (Docket No. 139 .) This Court accepted
Judge McCarthy's recommendation to grant Plaintiffs'
Motions to Proceed *In Forma Pauperis,* but recommitted
Defendants' Motion for Summary Judgment for "further
factual development and discussion." (Docket No. 139, ¶
5.)

4. After additional discovery and receiving

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

supplemental briefing and oral argument, Judge McCarthy filed a Supplemental Report and Recommendation on February 23, 2009, in which he again recommends that Defendants' Motion for Summary Judgment be granted, and also recommends that Plaintiff Bush be terminated as a plaintiff because he is no longer incarcerated, which Plaintiffs do not oppose. (Docket No. 164.)

5. No objections to Judge McCarthy's Supplemental Report and Recommendation were received from either party within ten days of the date of its service, in accordance with 28 U.S.C. § 636(b)(1)(C) and Local Rule 72.3(a)(3). This Court has carefully reviewed the Supplemental Report and Recommendation and is now satisfied that the record is complete and fully supports Judge McCarthy's recommendation that Defendants' motion be granted. Accordingly, this Court will accept that recommendation and grant Defendants' motion.

IT HEREBY IS ORDERED, that this Court accepts Judge McCarthy's Supplemental Report and Recommendation (Docket No. 164) in its entirety, including the authorities cited and the reasons given therein.

FURTHER, that upon consent of Plaintiffs' counsel, the Clerk of the Court is directed to TERMINATE Plaintiff Keith Bush as a Plaintiff in this action.

FURTHER, that Defendants' Motion for Summary Judgment (Docket No. 119) is GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

### SUPPLEMENTAL REPORT AND RECOMMENDATION

JEREMIAH J. McCARTHY, United States Magistrate Judge.

This case was referred to me by Hon. William M. Skretny to hear and report in accordance with 28 U.S.C. 636(b)(1) (Dkt.# 118). Before me is defendants' motion for summary judgment (Dkt.# 119). Following oral argument and supplemental briefing, on January 7, 2008

I issued a Report and Recommendation in which I recommended that defendants' motion be granted (Dkt.# 135).

*2 Defendants filed objections to my Report and Recommendation (Dkt.# 136). By Decision and Order dated April 29, 2008 (Dkt.# 139), Judge Skretny accepted my recommendation that plaintiffs' *in forma pauperis* applications be granted (Dkt.# 139, ¶ 7), but stated that with respect to the summary judgment motion, "further factual development and discussion is necessary to appropriately weigh the relevant [*Turner* ] factors and reach a supportable legal conclusion." *Id.* at ¶ 5. Therefore, he returned the case to me for further proceedings and the issuance of a Supplemental Report and Recommendation. *Id.* at ¶ 7.

The parties thereafter conducted further discovery [FN1] and filed supplemental submissions. Oral argument was again held before me on February 13, 2009. Following oral argument, I requested defendants to clarify whether or not plaintiff Bennett lost previously earned good-time credits as a result of his failure to participate in the SOCP, and they did so (Dkt.162 and 163). For the following reasons, I again recommend that defendant's motion for summary judgment (Dkt.# 119) be GRANTED.

> FN1. The parties have conducted the depositions of plaintiff Bennett and defendants Tom Brunette and Jeffrey Weber. "Th[ese] depositions were the extent of the additional factual discovery conducted by the parties." Plaintiffs' Response (Dkt.# 154), p. 4.

### DISCUSSION AND ANALYSIS

**A. Status of Plaintiff Bush**

During oral argument on February 13, 2009, I inquired as to the status of plaintiff Bush. Plaintiffs' attorney stated that he would not oppose a motion to dismiss the complaint as to plaintiff Bush, as he is no longer incarcerated. Defendants then orally moved to dismiss the complaint, with prejudice, as to plaintiff Bush, and the motion was unopposed. Accordingly, I recommend that the complaint be dismissed as to plaintiff Bush.

**B. Does The SOCP's Acknowledgment of Responsibility Requirement Violate Plaintiffs' First**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

**Amendment Rights to Free Exercise of Religion?**[FN2]

> **FN2.** Because Judge Skretny remanded the case to me for a more complete factual discussion of the *Turner* factors, I have not expanded upon the other aspects of my initial Report and Recommendation, including whether plaintiffs' claims are subsumed by the class certified in *Donhauser v. Goord,* 01-CV-1535 (N.D.N.Y.) (settled October 2008). January 7, 2008 Report and Recommendation (Dkt.# 135), pp. 5-6.

"Prisoners retain their right to religious freedom even when incarcerated." *Ochoa v. Connell,* 2007 WL 3049889, *6 (N.D.N.Y.2007).* However, this right must be "balanced against the 'interests of prison officials charged with complex duties arising from administration of the penal system.' " *Id.* Therefore, a prison inmate retains only " 'those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system' ". *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004). "The governing standard is one of reasonableness.' " *Id.*

The parties agree that I "must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (*citing Turner v. Safley.* 482 U.S. 78, 90-91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

**\*3** Plaintiff Bennett "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin. supra.* 467 F.3d at 274-75.[FN3] Plaintiff Bennett has given conflicting accounts for why he did not participate in the SOCP. For example, in a June 6, 2003 Time Allowance Form he indicated that he "previously refused SOP ... due to concern over information regarding crime being disseminated to employees-security and other inmates." Declaration of

David State, Esq. (Dkt.# 149), Ex. B. He also explained during his deposition that "if I give a statement of guilt then this automatically destroys my chances of being exonerated of the case ... I asked her: what's more important? Me getting the treatment or me giving you a guilty plea?" August 29, 2008 Deposition Transcript of Anthony Bennett (Dkt. # 149), Ex. A, p. 17.

> **FN3.** This point was not addressed in my initial Report and Recommendation because it was not raised by defendants. Based upon the newly conducted discovery, defendants now raise this argument (Defendants' Memorandum of Law (Dkt.# 151), Point II), and plaintiffs do not challenge defendants' ability to raise this argument at this stage of the case. Plaintiffs' Response (Dkt.# 154), pp. 8-11. Therefore, I will address it.

However, at other points in his deposition, he indicated that his refusal to participate in the SOCP was because of the admission of guilt requirement, which would require him to violate his Wiccan faith: "When I presented myself before the court ... and I took an oath that my word is my bond and my bond is my life according to Wiccan.... [I]f you violate that, then you forfeit your life in this world and the next." *Id.* at pp. 29-30; *see also* p. 28.

Based upon the record before me, I cannot conclude, as a matter of law, that the SOCP's admission of guilt requirement does not substantially burden plaintiff Bennett's sincerely held religious beliefs. Therefore, I will consider each of the four *Turner* factors:

**1. "Whether the challenged regulation has a valid, rational connection to a legitimate governmental objective"**[FN4]

> **FN4.** Although plaintiff Bennett does not challenge the first and second *Turner* factors, I have analyzed them in light of the newly presented evidence, since Judge Skretny remanded the case to me for further factual development and analysis of all of the factors. Judge Skretny's April 25, 2008 Decision and Order (Dkt.# 139), ¶¶ 5-6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

"The first *Turner* 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin, supra,* 467 F.3d at 274 (*citing O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Because "a court need not weigh each factor equally", this factor has been called the "controlling factor". *Mayfield v. Texas Department of Criminal Justice,* 529 F.3d 599, 607 (5th Cir.2008).

According to Edwin H. Elfeldt, the Guidance and Counseling Coordinator for DOCS, "the primary purpose of the [DOCS'] sex offender counseling program is to reduce the likelihood that convicted sex offenders and other inmates with histories of sexual offending behavior will reoffend, by helping them to gain control of the chain of behaviors that leads to sexual offending." Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 3. "The SOCTP is fully consistent with the standards, guidelines, and best practices in the field, which require participants in counseling to openly and honestly discuss the behavior that resulted in their incarceration and referral to SOCTP, demonstrate acceptance of responsibility for their conduct, and demonstrate an understanding of his or her sexual offending behavior and cycle of abuse. If an inmate lies or is untruthful, he will not benefit from the treatment." [FN5] *Id.* at ¶ 7.

> FN5. The SOCP was superseded by the Sex Offender Counseling and Treatment Program ("SOCTP") in November 2007. Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 1. However, at oral argument on February 13 the parties confirmed that the SOCTP also contains an admission of guilt requirement.

**\*4** Based upon Mr. Elfeldt's uncontested representations, I conclude that there is a rational connection between the SOCP, including its requirement that prisoners take responsibility for their crimes or face the loss of good time credits for non-participation, and DOCS' interest in rehabilitating prisoners. *See Donhauser v. Goord,* 314 F.Supp.2d, 119, 135 (N.D.N.Y.2004) ("there does exist a valid, rational connection between the SOCP, along with its requirements, including the threat

faced for non-participation, and the State's interest in requiring program participants to divulge their sexual histories as part of the larger interest in rehabilitating prisoners for safe return to society"). *See also Searcy v. Simmons,* 299 F.3d 1220, 1228 (10th Cir.2002) ( "Even were we to assume the admission of responsibility impinges upon Mr. Searcy's right to freely exercise his religious beliefs, we would agree with the district court that the requirement is 'reasonably related' to the [the government's] penological interests.").

**2. "Whether prisoners have alternative means of exercising the burdened right"**

Plaintiff Bennett is currently serving a sentence as a result of a conviction for a sexual offense in 1984. At his trial he denied, under oath, that he committed the crime. Plaintiff Bennett's August 29, 2008 Deposition Transcript (Dkt.# 149-2), pp. 28-30. He has been a practicing Wiccan since 1984, and according to him, "my word is my bond and my bond is my life according to Wiccan.... If you violate that, then you forfeit your life in this world and the next." *Id.* at p. 30.

Therefore, it is evident that plaintiff Bennett could not maintain his tenet against recanting his sworn testimony and, at the same time, abide by the SOCP's admission of guilt requirement. "Though it would not be conclusive, it would be some evidence that the regulations were unreasonable." *Overton v. Bazzetta,* 539 U.S. 126, 135, 123 S.Ct. 2162, 156 L.Ed.2d 162(2003).

**3. "The impact on guards, inmates, and prison resources of accommodating the right"**

**and**

**4. "The existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests"**

"The third factor and fourth factors are related: whether an accommodation would have a 'significant ripple effect' on the guards, other inmates, and prison resources and whether there is an alternative that fully accommodates the prisoner at *de minimis* cost to valid penological interests. 'This is not a 'least restrictive alternative' test, prison officials do not have to set up and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.' ... But if the inmate can point to an alternative that fully accommodates his rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship test." *Schnitzler v. Reisch,* 518 F.Supp.2d 1098, 1118 (D.S.D.2007).

**\*5** In remanding the case back to me of further proceedings, Judge Skretny noted that "it is unclear whether Plaintiffs voluntarily want to participate in the SOCP but believe that they cannot do so because of their religious convictions, or whether DOCS requires that the Plaintiffs participate in this particular program or face the loss of good-time credits. This distinction is important on at least the third and fourth Turner factors, particularly because it appears that programs similar to the SOCP exist that do not include the admission of guilt requirement (Plaintiffs, in fact, completed one)." Judge Skretny's April 25, 2008 Decision and Order (Dkt.# 139), ¶ 6.

According to Mr. Elfeldt, "allowing an inmate to complete the SOCTP without accepting responsibility for his behavior would wreak havoc with DOCS's rehabilitation goals. In other words, allowing Bennett to participate in the SOCTP without accepting responsibility for his behavior would give him credit for completion of a program where staff were prevented from exploring his assessed dynamic risks. If treatment staff cannot discuss with a participant his individual risks, they cannot assist that participant in the development of tools necessary to self-regulate and to avoid future offending behavior." Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 14. Moreover, DOCS' "treatment staff are not trained to treat an offender who will not discuss his or her offending behavior." *Id* . Based upon this undisputed testimony, I conclude that accommodating plaintiff Bennett "would undermine the precept of the entire [program], that admission of responsibility and overcoming denial are integral to the rehabilitation of sex offenders." *Searcy, supra,* 299 F.3d at 1228.

"The court in *Turner* ... expressed concern for situations where an accommodation would have a 'ripple effect' throughout the prison, thereby possibly straining

the facility's ability to cope with change." *Donhauser, supra,* 314 F.Supp.2d at 136. "Allowing one participant in the program to avoid discussion of his behavior could result in all other inmates doing the same which would prevent the entire group from receiving the benefits of program participation." Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 15; *see also* ¶ 12 ("if the Department were to permit an offender to attend the SOCTP without engaging in such discussion, it would likely impair the ability of other inmates in the group to benefit from the program. I would expect that other inmates in the group would believe that they were being treated unfairly and this would make it much more difficult for those participants to engage in the very difficult process of discussing their behavior cycle").

Plaintiff Bennett argues that "the existence of other means of rehabilitating inmates was present prior to the current SOCP and those programs did not require an admission of guilt." Plaintiffs' Response (Dkt.154), p. 14. By "allowing ... previously acceptable religious based programs [such as this] as alternatives to the secular SOCP would accommodate those inmates with sincerely held religious beliefs that prevent those inmates from violating their sworn oath and relieving them of the threat of eternal punishment." *Id.* In 1989 plaintiff Bennett completed an Innovative Therapeutic Program ("ITP").[FN6] *See* Plaintiff Bennett's Deposition Transcript (Dkt.# 154-2), p. 12; Plaintiffs' Response (Dkt.# 126), Ex. A, ITP Manual. Other than the ITP, plaintiff Bennett concedes that he completed no sex offense counseling program. Plaintiff Bennett's Deposition Transcript (Dkt.# 154-2), pp. 14-15.

> [FN6.](#) It also appears to be referred as the "Islamic Therapeutic Program". Deposition of Thomas Brunette (Dkt.# 154-2), p. 77.

**\*6** However, the ITP is a religious based program, which is not sanctioned by DOCS. *See* Deposition of Thomas Brunette (Dkt.# 154-2), p. 78.[FN7] Although plaintiff Bennett received a certificate from DOCS for completing the ITP, DOCS "stopped giving out certificates at least 18 years ago.... We stopped doing that because the Department started developing their programs that were more staff run, more ... patented, consistent ... the sex offender program we now have is the result of

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

years of research". Deposition of Thomas Brunette (Dkt.# 154-2), p. 87.

> FN7. In fact, plaintiff Bennett made a similar argument regarding his referral to a DOCS' sanctioned substance abuse treatment and was advised by DOCS that the ITP did not satisfy his substance abuse treatment requirement. Declaration of David State, Esq. (Dkt.# 149), Ex. D.

It remains DOCS' responsibility to "assign[ ] each inmate to a program of treatment that is most likely to be useful in assisting the inmate to refrain from future violations of the law." Affidavit of Edwin H. Elfeldt (Dkt.# 150), 116. "The individual inmate's assigned Correction Counselor, evaluates each inmate to identify his or her assessed program needs." *Id.*

In this case, plaintiff Bennett was assigned to the SOCP. While he may have completed other non-sanctioned programs, these do not function as substitutes for the SOCP. The goal of the SOCP "is habilitative, and not punitive". *Id.* at ¶ 3. "The ultimate benefit of [SOCP] participation is enhancing the likelihood that the inmate will be able to lead a postsocial, law abiding life upon release from custody." *Id.* at ¶ 17.

While plaintiff Bennett may not agree with the necessity to complete the SOCP, "it is not the function of this court to micromanage the New York prison system or to second guess officials, including those regarding programming." *Sumpter v. Skiff,* 2008 WL 4518996, *12 (N.D.N.Y.2008).

Alternatively, plaintiff Bennett argues that "the lost of earned good-time-credits and the inability to earn good-time-credits acts as a *de facto* compulsion towards participation." Plaintiffs' Response (Dkt.# 154), p. 5. Therefore, "if inmates could refuse to enter the program by making a voluntary and informed decision, and not one based on the fear that they may lose years of good-time-credits thereby extending their term of incarceration substantially, then there would be very little impact on guards, inmates, and prison resources." *Id.* at p. 14. In response, defendants argue that the SOCP is not

mandatory. Defendants' Memorandum of Law (Dkt.# 151), Point I; Defendants' Reply Memorandum of Law (Dkt.# 155), Point IV.

Although plaintiff Bennett's maximum sentence expires on July 14, 2013, by 2003 he had earned 9 years, 10 months and zero days of good-time credits, which gave him a conditional release date of September 14, 2003. Declaration of David State, Esq. (Dkt.# 163), ¶¶ 3 and 4, Ex. A. Based upon his impending conditional release date, the Time Allowance Committee began reviewing plaintiff Bennett's case in or about June 2003. *Id.* at ¶ 4. After reviewing the matter, the Time Allowance Committee recommended that all of plaintiff Bennett's previously earned good-time credits be withheld because he "needs to successfully complete S/O program and reapply to the committee" and "has a very poor disciplinary [*sic* ], with improvements noted, recently. Mr. Bennett should continue to work on this aspect of his incarceration." *Id.* at Ex. A. This recommendation was adopted by DOCS' Commissioner on July 1, 2003. *Id.*

**\*7** In addition to all of plaintiff Bennett's previously earned good-time credits being withheld, the parties agreed at the February 13, 2009 oral argument that he also lost the right to earn good-time credits going forward as a result of his failure to successfully complete the SOCP.

The SOCP Policy and Procedure Manual, effective October 2001 ("SOCP Manual"), provides that "an offender may chose to refuse participation in the.... Program." Affidavit of Edwin H. Elfeldt (Dkt.# 150), Ex. A, p. 15. "As a result, participation in the SOCP is voluntary." Affidavit of Edwin H. Elfeldt (Dkt.# 150), Ex. A, p. ¶¶ 4 and 16 ("The Department's sex offender programming is and has been a voluntary program").

According to the SOCP Manual, "an offender who refuses the Program should be made aware of the negative impact his/her decision may have on the Earned Eligibility process, NYS Board of Parole decisions, Time Allowance Committee decisions, the Board of Examiners of Sex Offenders assessment, and other DOCS programs he/she may wish to participate in, such as the Family Reunion Program.... An offender who refuses the ... Program may be given one second and final opportunity to participate,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

after one year from his/her initial refusal but not within one year of his/her Conditional Release Date or thereafter, unless specified by a Time Allowance Committee that *may withhold the earning of 'good time' until the offender successfully completes the ... Program." Id* . (emphasis added).

Good behavior allowances "may be granted for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program, and *may be withheld, forfeited or canceled* in whole or in part for bad behavior, violation of institutional rules or *failure to perform properly in the duties or program assigned."* N.Y. Correction Law § 803(1)(a) (emphasis added). "Good behavior allowances *are in the nature of a privilege* to be earned by the inmate and no inmate has the right to demand or to require that any good behavior allowance be granted to him." 7 N.Y.C.R.R. § 260.2 (emphasis added). *See also* N.Y. Correction Law § 804(3) ("No person shall have the right to demand or require the allowances authorized by this section ."); N.Y. Correction Law § 803(4) (same).

An inmate does not receive the good-time allowance until there is a final order of the commissioner. *See* 7 N.Y.C.R.R. § 262.1(d). However, "the grant of the good behavior allowance *shall be contingent* on the inmate's continued good behavior, efficient and willing performance of duties assigned, and progress and achievement in an assigned treatment program." *Id.* (emphasis added).

Although there is some contrary authority as to whether the loss of good time credits makes the SOCP a compulsory program,[FN8] I. believe that it does not. The "granting or withholding of good time is a discretionary matter subject to the prisoner meeting and maintaining the requirements for eligibility. Thus, the inescapable conclusion is that ... the wholly discretionary good time allowance scheme does not 'create a legitimate expectancy' of obtaining an earlier release". *Edwards v. Ladlair,* 2008 WL 3156214, *4 (N.D.N.Y.2008) (habeas petition). Thus, "the right to a good time allowance is a discretionary privilege". *Id.* at *6; *see also* *Brooks v. DiFasi,* 1997 WL 436750, *4 (W.D.N.Y.1997) (Elfvin, J.) ("Under New York law and its prison regulations, there is

no right to good behavior allowances.... 'Good behavior allowances are in the nature of a privilege to be earned by the inmate' and there is no entitlement to them.").

> FN8. *See* Donhauser, supra, 314 F.Supp.2d at 134. ("In light of the severe nature of the loss of good time credits, the automatic imposition of such loss, and the casual connection between the imposition of such loss and plaintiff's invocation of his Fifth Amendment right, the fact that participation in the SOCP was labeled 'recommended' or 'voluntary' is not dispositive of the issue of whether plaintiff truly had a choice in the matter. Such facts precipitate a finding that plaintiff was 'ordered,' not recommended, to participate in the program.").

**\*8** "It is beyond doubt, of course, that respondent would prefer not to choose between losing prison privileges and accepting responsibility for his past crimes. It is a choice, nonetheless, that does not amount to compulsion, and therefore one [the state] may require respondent to make." *McKune v. Lile,* 536 U.S. 24, 45, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002).[FN9] Therefore, I conclude that participation in the SOCP is voluntary, not mandatory.

> FN9. In my initial Report and Recommendation I did not reach the question of whether the SOCP infringed on plaintiffs' First Amendment rights because this was not argued by defendants who instead concentrated their arguments on whether the admission of guilt requirement was reasonably related to the DOCS' penological interests. However, because I have now found that the SOCP is not a compulsory program, I also find that plaintiffs' First Amendment claim fails on this basis alone without reaching the *Turner* factors: "Mr. Searcy is free to adhere to his religious proscription against lying. In doing so, however, he losses certain privileges he would have received had he complied fully with the requirements for the SATP. This does not present an infringement of Mr. Searcy's constitutional right to free exercise of religion. This is especially so because the requirement of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

admission of responsibility is generally applicable to all inmates in the SATP and is not pointed at any particular religion or religious belief." *Searcy, supra,* 299 F.3d at 1228.

However, even if participation in the SOCP *could be* considered mandatory, based upon my consideration of all of the *Turner* factors, including the first and "controlling" factor ( *Mayfield, supra,* 529 F.3d at 607), which weighs heavily in favor of defendants, I would find that the admission of guilt requirement is reasonably related to DOCS' penological interests.

Once defendants satisfy "the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct[,] 'the burden remains with the prisoner to show that these articulated concerns were irrational.' " *Salahuddin, supra,* 467 F.3d at 275. I conclude that defendants have satisfied their burden, whereas plaintiff Bennett has failed to meet his.

Accordingly, I conclude that the SOCP's "acknowledgment of guilt" requirement is reasonably related DOCS' legitimate penological interests, and recommend that plaintiff Bennett's First Amendment claim be dismissed. *See Schnitzler, supra,* 518 F.Supp.2d at 1104-1107 (holding that a sex offender treatment program, the completion of which was necessary to be eligible for non-discretionary parole, which required inmates to participate in sexually explicit group discussions did not violate the right to the free exercise of religion under the First Amendment).

**B. Are Defendants Entitled to Qualified Immunity?**

Even if the SOCP's acknowledgment of responsibility requirement violates plaintiffs' First Amendment rights to free exercise of religion, defendants argue that they are entitled to qualified immunity. Defendants' Memorandum of Law (Dkt.# 151), Point VI. Plaintiffs argue that this argument should be disregarded as it is not consistent with my order or the order of Judge Skretny, which limited the supplemental briefing to the applicability of the *Turner* factors. Plaintiffs' Response (Dkt.# 154), Point III.

Qualified immunity was argued by defendants in their initial motion for summary judgment. *See* Defendants' Memorandum of Law (Dkt.# 122), Point VI. However,

because I found that the SOCP did not violate plaintiffs' First Amendment rights, I concluded in my initial Report and Recommendation that "I need not reach defendants' qualified immunity arguments (Dkt. # 122, Point VI)." Report and Recommendation (Dkt.# 135), 9 n. 7. Although it was not addressed in my initial Report and Recommendation, I see no reason not to address it now as an alternative basis to recommend granting defendants' motion for summary judgment.[FN10]

> [FN10.] Because plaintiffs are not barred from raising objections to the Supplemental Report and Recommendation, I find that they are not prejudiced by my analysis of this issue herein. *See* Judge Skretny's April 25, 2008 Decision and Order (Dkt.# 139), p. 4.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565, 2009 WL 128768, *6 (2009). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow v. Fitzgerald.* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**\*9** As evidenced by the absence of case law on the issue, it is not "clearly" established, either in the Second Circuit or elsewhere, that the admission of guilt requirement of the SOCP violates plaintiffs' rights to free exercise of religion. Other circuits have granted defendants summary judgment on the basis of qualified immunity for similar First Amendment challenges to inmate sexual offender treatment programs. *See Hydrick v. Hunter.* 500 F.3d 978, 992 (9th Cir.2007), *petition for certiorari filed,* 76 USLW 3410 (Jan 17, 2008) ("To the extent that the claim relies on a First Amendment right not to participate in treatment sessions, the Defendants have qualified immunity, because the law on this point is not clearly established."); *Aruanno v. Spagnuolo,* 292 Fed.Appx. 184, 187, 2008 WL 2746229, *2 (3d Cir.2008)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

("even if we were to conclude that Aruanno had a right to refrain from disclosing his past sexual history and we have not so concluded, we could not hold that the right is clearly established under the First Amendment [right to refrain from speaking], and that it was one of which defendants should have been aware.").

Plaintiff Bennett concedes that *"this issue currently presented may be of first impression"*. Plaintiffs' Memorandum of Law (Dkt.# 126), p. 13 (emphasis added). However, he argues that it is well established that prison conditions do not give rise to a due process violation unless those conditions constitute a "atypical and significant hardship" as set forth in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). *Id.* While the plurality in *McKune, supra,* 536 U.S. at 37-38, applied the atypical and hardship standard to the plaintiff's Fifth Amendment challenge to an inmate sex offender treatment program, plaintiff Bennett is not asserting a due process or self-incrimination challenge to the SOCP's admission of guilt requirement.[FN11]

> **FN11.** Moreover, it is questionable whether the plurality's finding that compulsion under the Fifth Amendment should be measured by reference to *Sandin's* atypical and significant hardship standard (which Justice O'Connor disagreed with in her concurrence) can be considered the holding of the Supreme Court in *McKune, supra:* "Because Justice O'Connor based her conclusion on the narrower ground that KDOC's policy was not compulsion under the Fifth Amendment, we view her concurrence as the holding of the Court in *McKune,"* *Searcy, supra,* 299 F.3d at 1225.

Therefore, even if defendants *had* violated plaintiff Bennett's First Amendment rights, I would recommend that defendants' motion for summary judgment be granted to the extent that he seeks an award of damages, based on their entitlement to qualified immunity.[FN12]

> **FN12.** However, the qualified immunity defense would not bar plaintiff Bennett's claim for injunctive relief, since "qualified immunity is not a defense when such relief is sought". *African*

*Trade & Information Center. Inc. v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002).

**C. Defendants' Newly Raised Arguments**

Defendants raise additional arguments not previously raised before me, including that plaintiffs' claim is barred by the favorable termination rule of *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and application of *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See* Defendants' Memorandum of Law, Points IV and V. Plaintiffs object to my consideration of these arguments. Plaintiffs' Response (Dkt.# 154), Point III. Because these arguments were not previously raised by defendants in their initial motion or based on the newly conducted discovery, I will disregard them.

**CONCLUSION**

For these reasons, I again recommend that defendants' motion (Dkt.# 119) be GRANTED. Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**\*10** ORDERED, that this Supplemental Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Supplemental Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Supplemental Report and Recommendation in accordance with the above statute, Rule 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3). or with similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judges refusal to consider the objection.*

   **SO ORDERED.**

W.D.N.Y.,2009.

Bush v. Goord
Slip Copy, 2009 WL 790358 (W.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Jill JONES-SODERMAN, Plaintiff,
v.
EXECUTIVE SECRETARY OF THE STATE BOARD
FOR PSYCHOLOGY OF THE STATE EDUCATION
DEPARTMENT OF THE UNIVERSITY OF THE
STATE OF NEW YORK; Morris Schrager, State Board
of Social Work; George Ding, Director of Prosecutions;
Wayne Keyes, Esq., Prosecuting Attorney; Louis J.
Catone, Professional Conduct Officer; Commissioner of
Education of the State of New York; Assistant
Commissioner for the State Education Department of
the State of New York, Defendants.
No. 08 CV 4716(SJF)(LB).

May 21, 2010.
Jill Jones-Soderman, Nyack, NY, pro se.

Ralph Pernick, New York State Attorney General,
Mineola, NY, for Defendants.

### REPORT AND RECOMMENDATION

BLOOM, United States Magistrate Judge.

**\*1** Plaintiff, Jill Jones-Soderman, brings this *pro se*
action pursuant to 42 U.S.C. § 1983 (" § 1983") alleging
that defendants violated her constitutional rights under the
Fourteenth Amendment during the course of a licensing
proceeding that is still pending against her in the State of
New York. Plaintiff seeks declaratory and injunctive
relief. Defendants move to dismiss the complaint pursuant
to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of
Civil Procedure. The Honorable Sandra J. Feuerstein
referred defendants' motion to me for a Report and
Recommendation in accordance with 28 U.S.C. § 626(b).
It is respectfully recommended that defendants' motion
should be granted, and plaintiff's complaint should be
dismissed.

### BACKGROUND

Plaintiff commenced her lawsuit in this Court by
filing a *pro se* civil rights complaint on November 24,
2008. She filed an amended complaint on January 26,
2009. According to the Amended Complaint, plaintiff was
licensed to practice social work in both New Jersey and
New York. On March 15, 2002, the New Jersey State
Licensing Board ("New Jersey Board") commenced a
proceeding against her as a result of a telephone
communication plaintiff made to a trial judge about a case.
(Amend.Compl.¶ 10.) The New Jersey Board levied a
$30,000 fine and suspended plaintiff's license to practice
social work in the state of New Jersey for five years. (*Id.*
¶ 11.) Plaintiff informed the State Board of Social Work
of the University of the State of New York ("New York
Board") of her New Jersey suspension and retained her
New York license and continued to practice in New York.
(*Id.* ¶ 12.) Plaintiff was subsequently accused of practicing
social work in New Jersey without a license, and, on
January 7, 2004, the New Jersey Board held a second
hearing, at which plaintiff's New Jersey license was
revoked. (*Id.* ¶ 15.) In that proceeding, plaintiff entered
into a consent agreement in which she agreed to pay a
$45,000 fine and to tender her late book date. Moreover, she
was required to inform all of her clients that her New
Jersey license had been revoked. (*Id.* ¶ 16.) Plaintiff
continued to inform the New York Board of the New
Jersey proceedings. (*Id.* ¶¶ 17-21.)

In 2003, plaintiff made an error on her renewal form
for her New York license, in which she incorrectly
checked a box indicating no previous disciplinary action.
(*Id.* ¶¶ 22, 26.) Plaintiff entered into a settlement with
Walter Ramos, an official in the Office of Professional
Discipline, in which she agreed to pay a $500 fine and
accept a six-month suspension of her New York license,
which was stayed. (*Id.* ¶ 22.) Defendant Wayne Keyes
subsequently replaced Walter Ramos and requested a
meeting with plaintiff to discuss the 2003 renewal form.
(*Id.* ¶ 25.) On September 19, 2008, plaintiff met with
Keyes. During this conference, "Keyes had a social
worker named 'Schrager' [FN1] informally assess Plaintiff as
to her mental status without her permission and without

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

her knowledge." (*Id.* ¶ 27.) Thereafter, "Keyes offered Plaintiff the choice of either accepting a psychological evaluation now or face a full board hearing to revoke her license." (*Id.* ¶ 28.) The Amended Complaint does not describe any further actions or proceedings.

>  **FN1.** Defendants' Motion to Dismiss identifies this defendant as "Morris Schrajer." Assistant Attorney General Ralph Pernick undertook representation of all defendants, including Schrager/Schrajer. *See* Docket Entry 9.

**\*2** Plaintiff filed a prior federal lawsuit in this Court, alleging that various New Jersey officials violated her constitutional rights in connection with the New Jersey licensing proceedings. That case was transferred to the United States District Court for the District of New Jersey. Plaintiff's claims were dismissed against all but one of the defendants in that case. *Jones-Soderman v. McVeigh, et al.,* Civil Action No. 08-1887(PGS), slip op. (D.N.J. June 17, 2009.)[FN2]

>  **FN2.** The case against one defendant is still pending. On May 18, 2010, the court directed plaintiff to file a submission by June 4, 2010, or else the case would be dismissed for failure to prosecute. *See* https:// ecf.njd.usc ourts.gov/cgi-bin/DktRpt.pl?6913842057265-L _942_0-1 (viewed May 21, 2010).

In the instant action, plaintiff alleges that defendants Schrager and Keyes violated her due process rights when they "lured Plaintiff into a conference and without her knowledge and permission conducted an informal assessment of her mental status." (Amended Compl. ¶ 30.) "Plaintiff's injuries may include, but are not limited, to the following: loss of her ability to earn a living, be free from investigations and administrative proceedings." (*Id.* ¶ 38.) Plaintiff seeks a declaratory judgment that defendants violated her constitutional rights and an injunction "suspending any further prosecution of the New York licensing action." (*Id.* ¶ 39.)

In lieu of an answer, defendants move to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that (1)

the claims against the state agencies and state defendants named in their official capacities are barred by the Eleventh Amendment; (2) the state agencies may not be sued under 42 U.S.C. § 1983, because they are not "persons" within the meaning of the statute; (3) this Court must abstain from hearing the action, under *Younger v. Harris,* because the state disciplinary proceedings are still ongoing; (4) some of the individual defendants are entitled to absolute judicial or prosecutorial immunity; (5) plaintiff fails to allege the supervisory defendants' personal involvement; and (6) plaintiff fails to allege any acts by defendants Ding and Catone.

Defendants attach to their motion a copy of the December 16, 2008 Statement of Charges In the Matter of the Disciplinary Proceeding against Jill G. Jones-Soderman.[FN3] This statement charged plaintiff with committing unprofessional conduct by willfully filing a false report and having been found guilty of improper professional practice or professional misconduct by the state of Arizona, with the result that her Arizona license was revoked, conduct which would constitute professional misconduct if committed in New York State. (Def's. Mot. Dismiss, Exhibit 1.) The charge recommended an unspecified disciplinary penalty and was signed by Wayne Keyes, Prosecuting Attorney, on behalf of Louis J. Catone, Professional Conduct Officer, and George M. Ding, Director of Prosecutions for the Office of Professional Discipline with the New York State Education Department. (*Id.* at 14.)

>  **FN3.** Defendants gave the required Notice to a Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings, by filing a copy of Local Rule 12.1 along with their Notice of Motion to Dismiss. Plaintiff has also submitted materials outside of the pleadings. The Court need not reach these matters, except to take judicial notice of the decisions of the state administrative bodies. Accordingly, the Court need not convert the motion to one for summary judgment pursuant to Rule 56.

Plaintiff opposes defendants' motion on the grounds that (1) *Younger v. Harris* should not apply, because defendants brought the state proceeding in "bad faith;" (2)

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

the State waived Sovereign Immunity by accepting federal funding for education; and (3) the defendants are not entitled to absolute immunity because they acted in their administrative, rather than prosecutorial capacity. Plaintiff's lengthy Affidavit describes the ongoing proceedings before the New York Board, including a March 25, 2009 hearing.[FN4] Plaintiff attaches a transcript of that proceeding as Exhibit 8. Plaintiff's counsel moved at the March 2009 hearing to dismiss the disciplinary proceeding, and the hearing officer reserved decision. (Pl.'s Aff., Exhibit 8.) Defendants reply to plaintiff's opposition.

> FN4. Although plaintiff's opposition to the motion details the initiation of the disciplinary proceeding and license revocation proceeding in New Jersey, these materials were not presented in the Amended Complaint, and thus are not properly before the Court. In considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), "a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits and documents incorporated by reference in the complaint." *Field Day, LLC v. County of Suffolk,* 463 F.3d 167, 192 (2d Cir.2006) (quotations and citations omitted). The Court may also take judicial notice of records of state administrative bodies without converting a motion to dismiss to one for summary judgment. *Johnson v. County of Nassau,* 411 F.Supp.2d 171, 178 (E.D.N.Y.2006).

**\*3** Thereafter, and without leave of Court, plaintiff filed a further Response to Defendants' Reply. The Court has since received several additional submissions from the parties. By letter dated June 18, 2009, Defense Counsel informed the Court that the Office of Professional Discipline had withdrawn its initial Specification of Charges and moved to submit an Amended Statement of Charges, attaching a copy. The Amended Statement withdraws one of the allegations of professional misconduct against plaintiff, the charge that she willfully filed a false statement on her license renewal; but adds a further specification of professional misconduct, that she continued to practice social work in New Jersey after her

license to practice was suspended. Neither party has informed the Court of any further developments in the state licensing proceeding since June, 2009.

## DISCUSSION

## I. LEGAL STANDARDS
### A. Motion to Dismiss

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citing *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)); *Koppel v. 4987 Corp.,* 167 F.3d 125, 130 (2d Cir.1999). To survive a motion to dismiss, however, a plaintiff's complaint must allege sufficient facts "to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 569. If a plaintiff does not "nudge [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

### B. Pro Se Litigants

"A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' " *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). *See also Bertin v. U.S.,* 478 F.3d 489, 491 (2d Cir.2007) ("We liberally construe pleadings and briefs submitted by *pro se* litigants, reading such submissions 'to raise the strongest arguments they suggest.' ") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)) (other citations omitted).

### II. *YOUNGER V. HARRIS* ABSTENTION

Defendants argue that the Court must abstain from hearing plaintiff's claims on the basis of the *Younger* abstention doctrine. In *Younger v. Harris,* 401 U.S. 37

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

(1971), the Supreme Court held that, absent extraordinary circumstances, a federal court may not enjoin an ongoing state criminal proceeding. *"Younger generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings.... This doctrine of federal abstention rests foursquare on the notion that, in the ordinary course, a state proceeding provides an adequate forum for the vindication of federal constitutional rights."* Diamond *"D" Constr. Corp. v. McGowan,* 282 F.3d 191, 198 (2d Cir.2002) (internal quotations marks and citations omitted). The doctrine also applies to state administrative proceedings. *Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986) . It likewise applies to demands for injunctive and declaratory relief. *Kirschner v. Klemons,* 225 F.3d 227, 235 (2d Cir.2000) (citing *Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971)).

**\*4** "'*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims. *Diamond "D" Constr. Corp.,* 282 F.3d at 198. The only exceptions to the abstention requirement are where a plaintiff can demonstrate "bad faith, harassment or any other unusual circumstance that would call for equitable relief." *Id.,* 282 F.3d at 198 (quoting *Younger,* 401 U.S. at 54). A plaintiff challenging the application of *Younger* abstention bears the burden of showing one of these exceptions. *Id.*

Defendants argue that the Court must abstain from hearing this case under *Younger,* as the state licensing revocation proceeding is pending.[FN5] New York State has an important state interest in licensing and regulating the practice of social work in the state. Plaintiff is free to raise her constitutional claims during the administrative proceeding before the New York Board and, should she be unhappy with the outcome of the proceeding, through the avenues for review.

FN5. The state licensing proceeding was pending as of June 18, 2009, the date of defendants' last communication with the Court. Plaintiff does not

allege that the New York Board proceeding has concluded, or if it has and she was not vindicated, that she has exhausted all available avenues of appeal.

In her Opposition to the Motion to Dismiss, plaintiff does not challenge the three conditions requiring abstention. Instead, she argues that an exception to *Younger* abstention applies in this case, because the proceedings were brought in "bad faith." (Pl.'s Opp'n Mot. at 11.) "Mere conclusory allegations of bias are insufficient to overcome *Younger*-a plaintiff seeking to avoid *Younger* must affirmatively demonstrate the justification for application of an exception." *Kirschner,* 225 F.3d at 236. In order to invoke the bad faith exception, a litigant must show that "the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome," or that the proceeding was brought with the purpose of retaliation or harassment. *Cullen v. Fleigner,* 18 F.3d 96, 103 (2d Cir.1994). "A state proceeding that is legitimate in its purposes, but unconstitutional in its execution-even when the violations of constitutional rights are egregious-will not warrant the application of the bad faith exception." *Diamond " "D" Const. Corp.,* 282 F.3d at 199.

Plaintiff fails to meet her burden to demonstrate bias or bad faith. Plaintiff's Opposition states that the prosecuting attorney, Wayne Keyes, "was on a personal vendetta against Plaintiff," and suggests that the New York Board initiated the review out of "a malicious and vexatious intent." (Opp'n at 11.) However, these conclusory statements are not supported by factual allegations demonstrating defendants' bias or bad faith. Plaintiff also argues that the proceeding was brought in bad faith "because documentary evidence was presented to prove Plaintiff was innocent and that the State had brought the action out of time, and admitted it destroyed key documents for the defense." (Opp'n at 11). Whatever documentary evidence plaintiff presented to prove her innocence, her Amended Complaint fails to demonstrate that defendants initiated the licensing proceeding in bad faith.[FN6]

FN6. Plaintiff apparently submitted evidence at the March 25, 2009 hearing which prompted the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

Office of Professional Discipline to revise its Statement of Charges. Those new charges are still pending before the New York Board.

**\*5** As plaintiff fails to demonstrate a basis for the bad faith or bias exception to the application of the *Younger* abstention doctrine, the Court should abstain from hearing plaintiff's instant claims.

## III. 42 U.S.C. § 1983

Even if the Court did not abstain from hearing plaintiff's claims on the basis of *Younger v. Harris,* plaintiff's claims would be dismissed for failure to state a claim pursuant to Rule 12(b)(6). In order to maintain an action pursuant to § 1983, a plaintiff must allege two essential elements. First, "the conduct complained of must have been committed by a person acting under color of state law." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994) (citing *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds* by *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). Second, "the conduct complained of must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Id.* "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citing *City of Oklahoma City v. Turtle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

Plaintiff asserts that defendants Keyes and Schrager deprived her of her "due process rights" by giving her "an informal psychological diagnostic interpretation on the pretense of talking with Plaintiff to work out an agreement on a licensing complaint." (Amend.Compl.¶ 5.) She alleges that defendant Schrager acted "with the purpose of not only suspending Plaintiff's license but also putting a psychological cloud over Plaintiff which she could never get out of." (*Id.* ¶ 34.) She further alleges that "Plaintiff's injuries may include, but are not limited, to the following: Loss of her ability to earn a living, be free from investigations and administrative proceedings." (*Id.* ¶¶ 38.)

In order to prevail on a due process claim under the

Fourteenth Amendment, a plaintiff must identify a constitutionally protected liberty or property interest and then show that she was deprived of that interest without due process of law. *See Narumanchi v. Board of Trustees,* 850 F.2d 70, 72 (2d Cir.1988) (describing the two-step process of first identifying the property or liberty interest at stake and then asking what process was due to the plaintiff and whether that constitutional minimum was provided). Plaintiff fails to identify any protected liberty or property interest that defendants deprived her of without due process. "[The Supreme] Court has indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation." *Conn v. Gabbert.* 526 U.S. 286,291-92(1999).

[T]he question of whether an applicant has a legitimate claim of entitlement to the issuance of a license or certificate should depend on whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted. Otherwise the application would amount to a mere unilateral expectancy not rising to the level of a property right guaranteed against deprivation by the Fourteenth Amendment. To create an entitlement out of the mere existence of procedural due process created by the state would put the federal cart before the state horse and open a Pandora's Box of unnecessary federal-state conflict.

**\*6** *Yale Auto Parts. Inc. v. Johnson,* 758 F.2d 54, 59 (2d Cir.1985).

A person may have a stronger property interest in retaining, rather than obtaining, a state license that has already been granted. "[O]nce the government has granted a business license to an individual, the government cannot deprive the individual of such an interest without ... appropriate procedural safeguards." *Spinelli v. City of New York,* 579 F.3d 160, 169 (2d Cir.2009) (quoting *Arnett v. Kennedy,* 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring in part)). Where state-issued licenses are subject to renewal according to state regulations and are subject to revocation only for a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

showing of misconduct, the licensee may have a property interest in the license that requires the protections of the Due Process Clause. *Id,* 579 F.3d at 169 (quoting *Barry v. Barchi,* 443 U.S. 55, 64, 99 S.Ct. 2642, 61 L.Ed.2d 365 (1979), and citing *Richardson v. Town of Eastover,* 922 F.2d 1152, 1157 (4th Cir.1991) ("[A] state-issued license for the continued pursuit of the licensee's livelihood, renewable periodically on the payment of a fee and revocable only for cause, creates a property interest in the licensee.")).

However, plaintiff fails to state a claim that she has been deprived of a protected liberty or property right in her social work license or the opportunity to practice her profession, because she has not shown that her license has been revoked; indeed, her license is the subject of the current administrative proceedings. Moreover, she has not alleged that defendants' actions that she challenges herein, the "informal psychological diagnostic interpretation," (Amend.Compl.¶ 5) deprived her of any liberty or property right.

Nor does plaintiff state a substantive due process claim, which requires a plaintiff to demonstrate "governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Brown v. Baldwin Union Free School Dist.,* 603 F.Supp.2d 509, 515 (E.D.N.Y.2009) (quoting *Velez v. Levy,* 401 F.3d 75, 93 (2d Cir.2005). Plaintiff's allegation that she "walked away with a mental status exam" (Amend.Compl.¶ 31) does not rise to the level of egregious conduct that shocks the conscience. Even if plaintiff could show that defendants Keyes and Schrager surreptitiously assessed her mental status under the guise of investigating the error in her renewal form, plaintiff's allegations fail to state a claim that defendants violated her constitutional rights.

As plaintiff fails to allege sufficient facts to state a claim to relief that is plausible, defendants' motion to dismiss plaintiff's claims under § 1983 should be granted.

## IV. DEFENDANTS' ADDITIONAL CLAIMS

If the Court abstains from hearing this case on the basis of *Younger v. Harris* or for failure to state a claim

under 42 U.S.C. § 1983, the Court need not reach the following additional bases for dismissal urged by defendants.

### A. Claims against Ding and Catone

**\*7** Plaintiff's claims against defendants George Ding and Louis Catone should be dismissed, as plaintiff only names these individuals in the caption; she makes no mention of them in the body of the Amended Complaint. The only reference to these individuals appears in the December 16, 2008 Statement of Charges that is attached to defendants' Motion to Dismiss. As plaintiff fails to allege any act or omission by these individuals, plaintiff's claims against Ding and Catone should be dismissed.

### B. Supervisory Liability

Defendants seek dismissal of the Amended Complaint on the additional ground that there is no *respondeat superior* liability under § 1983. Indeed, generally a plaintiff seeking to recover under § 1983 must establish that the named defendants were personally involved in the deprivation of her constitutional rights. However, district courts in this Circuit have not required **personal involvement** where a plaintiff seeks only declaratory or injunctive relief against defendants in their official capacity. *Hall v. Marshall,* 479 F.Supp.2d 304, 318 (E.D.N.Y.2007); *Marinaccio v. Boardman,* No. 02 CV 831, 2005 WL 928631, at \*9 (N.D.N.Y Apr. 19, 2005) (collecting cases). "[A]ctions involving claims for **prospective** declaratory or injunctive **relief** are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Davidson v. Scully,* 148 F.Supp.2d 249, 254 (S.D.N.Y.2001) (quotation and citations omitted).

Had plaintiff established that defendants had violated her constitutional rights, she would only need to establish the supervisory officials' "direct connection to, or responsibility for" the alleged violation. However, since plaintiff's Amended Complaint fails to state a claim that defendants violated her constitutional rights, the Court should not consider her claim for prospective declaratory or injunctive relief.

### C. Sovereign Immunity

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

Defendants argue that plaintiff's claims are precluded by the Eleventh Amendment, which bars suits for damages against states, state agencies, and state officials acting in their official capacity, absent the state's consent to suit or an express or statutory waiver of immunity. *Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) ("[I]n the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (citations omitted)). However, again, since plaintiff seeks injunctive and declaratory relief only, the Eleventh Amendment's proscription would not apply.

**\*8** In *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court identified an exception to state sovereign immunity where plaintiff "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Dairy Mart Convenience Stores, Inc. v. Nickel,* 411 F.3d 367, 372 (2d Cir.2005). This exception applies when a plaintiff sues a state official in his or her official capacity for prospective injunctive or declaratory relief. *In re Deposit Ins. Agency,* 482 F.3d 612, 617 (2d Cir.2007). Moreover, a state official in his or her official capacity, when sued for injunctive relief, would be a person under **§ 1983** because "official-capacity actions for prospective relief are not treated as actions against the State." *Will,* 491 U.S. at 71 n. 10 (citations omitted).

Plaintiff names six individual defendants, four of them by name and two by their offices. All six are state officials.[FN7] Plaintiff does not seek damages, but limits her request to declaratory and injunctive relief. Accordingly, if abstention did not preclude the instant action, the named defendants would be considered persons for **§ 1983** analysis and sovereign immunity would not apply. Had plaintiff alleged an ongoing constitutional violation that was not otherwise precluded by the *Younger* abstention doctrine, her request for prospective relief would fall within the *Ex parte Young* exception to sovereign immunity.[FN8]

FN7. Plaintiff does not specify whether she is suing defendants in their individual or official capacities. However, as plaintiff is proceeding *pro se,* the Court should liberally construe her complaint against defendants to allege both individual and official capacity claims. *See McCloud v. Kane,* 491 F.Supp.2d 312, 316 (E.D.N.Y.2007).

FN8. Contrary to plaintiff's arguments, the state has not waived sovereign immunity by accepting federal funding for various educational purposes. "Although Congress may, pursuant to its spending power, extract a constructive waiver of Eleventh Amendment immunity by placing conditions on the grant of funds to states, waiver based on participation in a federal program will be found only if stated in express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction. That is to say, mere participation by a state in a federal program providing financial assistance does not establish the state's consent to be sued in federal court." *McGinty v. New York,* 251 F.3d 84, 95 (2d Cir.2001) (citations and quotations omitted).

**D. Absolute Immunity**

Defendants also argue that any claims for damages must be dismissed because the prosecutorial defendants are protected by absolute immunity from suits for damages. "Absolute immunity is accorded to judges and prosecutors functioning in their official capacities, and under certain circumstances, is also extended to officials of government agencies performing certain functions analogous to those of a prosecutor or a judge." *DiBlasio v. Novello,* 344 F.3d 292, 297-98 (2d Cir.2003). To the extent that defendant Keyes and others performed functions analogous to a prosecutor's when initiating the New York Board proceedings against plaintiff, these defendants would likely be entitled to absolute immunity to any suit for damages. *See Butz v. Economou,* 438 U.S. 478, 516, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) ("We believe that agency officials must make the decision to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3800908 (E.D.N.Y.)

(Cite as: 2010 WL 3800908 (E.D.N.Y.))

move forward with an administrative proceeding free from intimidation or harassment.... [W]e hold that those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision.); *White v. Martin.* 26 F.Supp.2d 385, 388 (D.Conn.1998) ("Officials who carry out special functions, principally judges and prosecutors, are generally protected against personal liability under **section 1983** by absolute immunity. Officials who carry out administrative and executive functions are protected by qualified immunity.") However, as previously stated, plaintiff seeks only injunctive relief. "An official's entitlement to absolute immunity from a claim for damages ... does not bar the granting of injunctive relief, or of other equitable relief." *Shmueli v. City of New York,* 424 F.3d 231, 239 (2d Cir.2005) (quotations and citations omitted).[FN9] While sovereign immunity would not bar plaintiff's claims here, the Court would grant defendants motion to dismiss plaintiff's Amended Complaint on the other grounds, as set forth above.

> FN9. Although the Federal Courts Improvement Act of 1996 extends judicial immunity to most actions seeking prospective injunctive relief, it has not been extended to prosecutorial officials. *See* Federal Courts Improvement Act of 1996, § 309(c), Pub.L. No. 104-317, 110 Stat. 3847, 3853 (1996) (amending 42 U.S.C. **§ 1983**); *see e.g., Huminski v. Corsones,* 396 F.3d 53, 74 (2d Cir.2005).

### CONCLUSION

**\*9** Accordingly, defendants' motion should be granted and plaintiff's action should be dismissed, without leave to replead, as amendment would be futile. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ( "[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.")

### FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written

objections. See also Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of Court. Any request for an extension of time to file objections must be made within the ten-day period. Failure to file a timely objection to this Report generally waives any further judicial review. *Marcella v. Capital Dist. Physicians' Health Plan, Inc.,* 293 F.3d 42, 46 (2d Cir.2002); *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *see Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

SO ORDERED.

E.D.N.Y.,2010.

Jones-Soderman v. Executive Secretary of the State Board for Psychology of the State Educ. Dept. of the University of the State of N.Y.
Slip Copy, 2010 WL 3800908 (E.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3780989 (E.D.N.Y.)

(Cite as: 2010 WL 3780989 (E.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

E.D. New York.
Jill JONES-SODERMAN, Plaintiff,
v.
EXECUTIVE SECRETARY OF THE STATE BOARD
FOR PSYCHOLOGY OF THE STATE EDUCATION
DEPARTMENT OF THE UNIVERSITY OF THE
STATE OF NEW YORK; Morris Schrager, State Board
of Social Work; George Ding, Director of Prosecutions;
Wayne Keyes, Esq., Prosecuting Attorney; Louis J.
Catone, Professional Conduct Officer; Commissioner of
Education of the State of New York; Assistant
Commissioner for the State Education Department of
the State of New York, Defendants.
No. 08 CV 4716(SJF)(LB).

Sept. 20, 2010.
Jill Jones-Soderman, Nyack, NY, pro se.

Ralph Pernick, New York State Attorney General,
Mineola, NY, for Defendants.

**ORDER**

FEUERSTEIN, District Judge.
    *1 On November 11, 2008, *pro se* plaintiff Jill
Jones-Soderman ("Plaintiff") commenced this action
against defendants Executive Secretary of the State Board
for Psychology of the State Education Department of the
University of the State of New York; Morris Schrager,
State Board of Social Work; George Ding, Director of
Prosecutions; Wayne Keyes, Esq., Prosecuting Attorney;
Louis J. Catone, Professional Conduct Officer;
Commissioner of Education of the State of New York; and
Assistant Commissioner for the State Education
Department of the State of New York, (collectively,

"Defendants") asserting violations of 42 U.S.C. § 1983
("Section 1983"). On April 23, 2009, Defendants moved
to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(1)
and 12(b)(6) of the Federal Rules of Civil Procedure.
Pursuant to a Referral dated May 18, 2009, a Report and
Recommendation (the "Report") of United States
Magistrate Lois Bloom, dated May 21, 2010,
recommended that Defendants' motion to dismiss be
granted and that Plaintiff's Complaint be dismissed with
prejudice. (Report, at 16.) Upon review of the Report and
consideration of Plaintiff's objections, the objections are
overruled and the Report is accepted in its entirety.
I. Discussion

A. Standard of Review

    Rule 72 of the Federal Rules of Civil Procedure
permits magistrate judges to conduct proceedings on
dispositive pretrial matters without the consent of the
parties. Fed.R.Civ.P. 72(b). Any portion of a report and
recommendation on dispositive matters, to which a timely
objection has been made, is reviewed *de novo.* 28 U.S.C.
§ 636(b)(1); Fed.R.Civ.P. 72(b). However, "general or
conclusory objections, or objections which merely recite
the same arguments presented to the magistrate judge, are
reviewed for clear error." *Johnson v. Connolly,* No.
9:07-CV-1237, 2010 WL 2628747, at *1 (N.D.N.Y.
Jun.25, 2010). *See also Vega v. Artuz,* No. 97 Civ. 3775,
2002 WL 31174466, at *1 (S.D.N.Y. Sept.30, 2002)
(noting that "objections that are merely perfunctory
responses argued in an attempt to engage the district court
in a rehashing of the same arguments set forth in the
original [papers] will not suffice to invoke de novo
review"). The court is not required to review the factual
findings or legal conclusions of the magistrate judge as to
which no proper objections are interposed. *See Thomas v.
Arn,* 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435
(1985). Whether or not proper objections have been filed,
the district judge may, after review, accept, reject, or
modify any of the magistrate judge's findings or
recommendations. 28 U.S.C. § 636(b) (1); Fed.R.Civ.P.
72(b).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3780989 (E.D.N.Y.)

(Cite as: 2010 WL 3780989 (E.D.N.Y.))

B. Plaintiff's Objections

Plaintiff objects to the Report on the grounds that: (1) "as a *pro se* party, [she] should be held to a less stringent standard;" and (2) abstention pursuant to *Younger v. Harris,* 401 U.S. 37 (1971), is inappropriate pursuant to the District of Connecticut's Opinion in *Sica v. Connecticut,* 331 F.Supp.2d 82 (D.Conn.2004), because "there has been no discovery in this case." (Pl. Obj., at 3-4).

**\*2** Insofar as Plaintiff contends that Judge Bloom should have held Plaintiff to a less stringent standard, it is evident from the Report that Judge Bloom liberally construed Plaintiff's pleadings (*See* Report, at 6), and *pro se* plaintiffs must nevertheless follow the rules of procedure governing pleading and dismissal. See *Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983). Moreover, insofar as Plaintiff relies on *Sica* to assert that she was entitled to discovery and a hearing on the abstention issue, her reliance is misplaced as *Sica* emphasizes that an evidentiary hearing is not always required when a party asserts *Younger* abstention. *Sica,* 331 F.Supp.2d at 87 (noting that although questions of fact are "often difficult to resolve without an evidentiary hearing [but][t]hat does not mean that an evidentiary hearing is always required when *Younger* issues are raised"). Whereas the court in *Sica* required a hearing because that plaintiff was seeking "a preliminary injunction, which usually requires an evidentiary hearing when factual issues are in dispute," in the instant action, Plaintiff does not seek the same relief. *Id.* Accordingly, Plaintiff's objections are overruled.

II. Conclusion

For the foregoing reasons, the Report is accepted in its entirety, and (1) Defendants' motion to dismiss is granted; and (2) Plaintiff's Complaint is dismissed with prejudice. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

E.D.N.Y.,2010.

Jones-Soderman v. Executive Secretary of the State Board for Psychology of the State Educ. Dept. of the University of the State of New York

Slip Copy, 2010 WL 3780989 (E.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Paul MARINACCIO, Sr., Accadia Site Contracting,
Inc., and Midway Enterprises, Inc., Plaintiffs,
v.
Joseph H. BOARDMAN, in his official capacity; James
B. Cantwell, Steven F. Lewis, James F. Tynan and
Robert E. O'Connor, in their official and individual
capacities, as employees of the State of New York, by
and through, The New York State Department of
Transportation, Defendants.
No. 1:02 CV 00831 NPM.

April 19, 2005.

Gresens & Gillen, LLP, Buffalo, New York, for Plaintiffs,
Joseph J. Manna, James W. Gresens, of counsel.

Office of the New York State Attorney General, The
Capitol, Albany, New York, for Defendants, Michael G.
McCartin, of counsel.

*MEMORANDUM-DECISION and ORDER*

MCCURN, Senior J.

I. Introduction

**\*1** Plaintiff Paul Marinaccio, Sr. ("Marinaccio") is a
contractor and the president and sole owner of Plaintiffs
Midway Enterprises, Inc. ("Midway") and Accadia Site
Contracting, Inc. ("Accadia Site"), both highway and
bridge construction companies (hereinafter referred to
collectively as "Plaintiffs"). Marinaccio is also the
president and sole owner of Accadia Enterprises, Inc.
("Accadia"), another highway and bridge construction
company, which is not a party to this action. Marinaccio
originally filed this civil rights action in October 2001
against defendants, Joseph H. Boardman ("Boardman"),
Commissioner of the New York State Department of
Transportation ("DOT"), Robert E. O'Connor, Regional
Construction Engineer for DOT Region 5, James B.

Cantwell, Chairperson of DOT's Contract Review Unit
("CRU"), and CRU members Steven F. Lewis and James
F. Tynan (hereinafter referred to collectively as
"Defendants"). In March 2004, an amended complaint was
filed, with leave of the court, wherein Midway and Acadia
Site were named as additional plaintiffs.

Presently before the court are a motion for summary
judgment by Defendants and a cross motion for partial
summary judgment by Plaintiffs. Oral argument was heard
regarding the pending motions on January 11, 2005 in
Syracuse, New York. Decision was reserved.

II. Factual Background

A. The Mateer Incident

On September 14, 1999, Marinaccio and DOT
inspector, Dwight Mateer ("Mateer") were involved in an
automobile collision at a DOT work site (DOT contract #
D257706). Thereafter, Mateer claimed that Marinaccio
intentionally slammed the front of his truck into Mateer's
truck. Mateer advised DOT Regional Engineer, Robert
O'Connor ("O'Connor") of same. Marinaccio was charged
with a felony-third degree criminal mischief-regarding the
collision. He eventually pleaded guilty to disorderly
conduct, a violation.

One week after the collision, O'Connor banned
Marinaccio from being present at all DOT project sites
"until further notice", which included the project sites of
four contracts previously awarded to Accadia (DOT
Contract Nos. D257706, D257298, D252811 and
D257521). *See* Decl. of Janice A McLachlan, Nov. 10,
2004, Ex. D, Dkt. No.84. On October 19, 1999, after
notice was given to Marinaccio, a meeting was held to
allow him an opportunity to address the reasons for this
ban and determine if it should continue. Marinaccio
appeared at the meeting with his counsel and was given an
opportunity to be heard. Thereafter, Marinaccio's counsel
submitted documents in support of Marinaccio's position.
On January 21, 2000, CRU member James Tynan
("Tynan") issued a letter sustaining the ban on all four
contracts. The letter stated,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Marinaccio will be banned from all current [DOT] contracts with Accadia Enterprises, Inc.... This ban shall expire with the acceptance of Contracts D257298, D257521, D257706, and D252811. However, should Accadia Enterprises, Inc. be the apparent low bidder on future [DOT] construction contracts, then Mr. Marinaccio will be requested to appear in front of the [CRU] for a determination as to whether Accadia is a responsible contractor. Should an award be made, Mr. Marinaccio's conduct on subsequent projects will be monitored and reviewed.

**\*2** McLachlan Decl. at Ex. H. The ban was to extend over the duration of said contracts and applied to Marinaccio personally, not Accadia. Accadia was paid in full on each of those contracts.

B. The Williams Road Contract

In March 2001, Midway was the low bidder on a DOT project involving Williams Road in the City of Niagara Falls (Contract No. D258702). On May 14, 2001, DOT Attorney Marie Corrado ("Corrado") issued a letter to Paul Marinaccio, Jr., then president of Midway, informing him that a meeting was scheduled for May 21, 2001 to address the following issues that CRU had with Midway's bid: Midway's lack of experience with DOT work, the size and nature of the contract, Midway's connection with Accadia, and the past performance of Accadia and Paul Marinaccio, Sr. *See* Decl. of Marie A. Corrado, Nov. 11, 2004, Ex. D, Dkt. No. 84.

The CRU meeting was held on May 21, 2001 as scheduled. Corrado was present, as well as, among others, O'Connor, CRU Chairperson James Cantwell ("Cantwell"), and CRU members Tynan and Steven Lewis ("Lewis"). *See* id. at Ex. E. Although at the time of the meeting, Marinaccio was not yet the owner of Midway, he was also present at the meeting along with his attorney, James Gresens. Marinaccio admits that Plaintiffs were given notice of the concerns to be addressed at the May 21, 2001 meeting and that he and his counsel were given an opportunity to address DOT's concerns about Midway at said meeting. Gresens assured the CRU that Marinaccio would be acting only as an advisor or consultant on the project. Marinaccio explained that he spent most of his

time taking car of his wife, who sustained a brain injury in a bad car accident three years prior, and further stated that "I have no intention of going back into the construction business." Then, after an extended discussion between Marinaccio and O'Connor about Marinaccio's history and his behavior on DOT sites, Gresens stated, "If you want something in writing that Paul will not go on the job or talk to an inspector, we'll give that to you." Further, as for the ban in effect for the four previous contracts, Gresens stated, "If you want to continue that, that's not a problem, for this job. He does want to make a livelihood someday. He's not interested in going into business at the moment. So if you want him off this job, I don't think that would be a problem." Id. At this same meeting, Marinaccio claimed that he had a briefcase full of documents that could prove that certain DOT officials were involved in some kind of improper or possibly illegal activity. Defendants thereafter encouraged Marinaccio to cooperate with the DOT Inspector General to expose any type of DOT wrongdoing. Although Defendants claim that Marinaccio refused to cooperate, Marinaccio argues that he offered to show the contents of the briefcase to the CRU members at the meeting but they declined to review same. *See* id.

On June 5, 2001, the DOT, through the CRU, denied Midway the Williams Road contract (No. D258702) citing the owners' lack of experience. The CRU acknowledged Marinaccio's assurances that he, with his 35 years of experience, would be available as an advisor to the owners. However, the CRU noted its concern that Marinaccio's wife's illness was taking a great deal of his time, and that, nonetheless, even if he were available, Marinaccio's prior history of unprofessional behavior concerned them.

**\*3** On June 22, 2001, John S. Samaniuk, Director of the Officer of Internal Audit and Investigations for the DOT sent Marinaccio a letter requesting copies of documents or other information which Marinaccio believed supported the claims he made at the May 21, 2001 CRU meeting. *See* id., Ex. R. Marinaccio issued a letter to Samaniuk on July 3, 2001 explaining that because he was seriously considering a lawsuit against the DOT and O'Connor, the documents and information referred to in Samaniuk's June 22 letter would not be released. *See* id., Ex. S.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Midway unsuccessfully challenged the decision denying them the Williams Road Contract in New York State Supreme Court in Albany County via an Article 78 petition on July 10, 2001. Marinaccio submitted an affidavit in support of the petition. That Court found that DOT had a rational basis for denying the contract, citing the owners' lack of experience and/or availability, and DOT records which indicate that Marinaccio "has been uncooperative, aggressive, verbally abusive and violent and was actually banned from his company's active [DOT] work sites due to such conduct." Id. at Ex. H. Plaintiffs did not bring a due process challenge to the Article 78 proceeding in State Court, nor did they appeal the Supreme Court's decision.

C. The Military Road Contract

In August 2001, the DOT terminated its contract with another construction company for a project at Military Road in Niagara Falls. The surety company for the project, Kemper Surety ("Kemper"), was left with the obligation of finishing the work for the Military Road contract (No. D258333). Midway submitted the low bid to Kemper for completion of the work. Kemper gave DOT an ultimatum by telling it that Midway would be the completing contractor, or Kemper would go to its next lowest bidder, and DOT would pay the difference. See Dep. of Nancy E. Jones, July 16, 2004, 31:14-18, at Ex. T. to Aff. of Joseph J. Manna (hereinafter "Manna Aff. II"), Dec. 23, 2004, Dkt. No. 92.

On September 14, 2001, O'Connor issued an email to Tynan, and Corrado, among others, to notify them of Marinaccio's intent to hold a public meeting to let the Town of Niagara know how Midway will complete the Military Road Project. See Dep. of Robert E. O'Connor, July 14, 2004, 167 at Ex. E to Aff. of Joseph J. Manna (hereinafter "Manna Aff. I"), Nov. 15, 2004, Dkt. No. 85. See also Ex. H to Manna Aff. I, Dkt. No. 85. The remaining text of O'Connor's email message is as follows:

This is outrageous and typical for Mr. Marinaccio. I called Midway's project engineer and informed him that Midway HAS NOT been approved as a subcontractor for Military Road. I further explained that contractors do not call public meetings. That is our job. In years

past, Mr. Marinaccio would meet with local officials and propose his own project phasing. We put a stop to that practice. He clearly has learned nothing. I am again reminded of why we here in Region 5 don't want to work with this thug.

**\*4** Id.

On September 17, 2001, a CRU meeting was held in order to, according to Defendants, determine whether Midway was a responsible bidder. See Corrado Decl. at ¶ 28. However, Lisa Bevilacqua, the DOT Engineer-in-Charge of the Military Road Contract, testified that a meeting was held prior to the CRU meeting, wherein she and O'Connor were present, as well as others, and where it was decided that Midway would be awarded the contract on the condition that Marinaccio be banned from the site. See Dep. of Lisa Bevilacqua, Aug. 31, 2004, 24-30 at Ex. L to Manna Aff. II, Dkt. No. 91.

Marinaccio, who by this time had replaced his son as the President of Midway, was present at the CRU meeting along with his and Midway's attorney, James Manna. Also present at the meeting were DOT attorney Marie Corrado as well as Defendants O'Connor, Tynan and Lewis, among others. See Corrado Decl. at Exs. K & L. The meeting commenced with a discussion of the manner in which the job would be completed, including confirmation that Marinaccio proposed to serve as superintendent.

Earlier in the meeting, Manna stated that Midway did some preliminary planning and spoke with residents concerning the Military Road project. See id. at 5. In response to Cantwell's inquiry regarding same, Marinaccio stated that he has always met with residents on previous jobs, and that he met with Ms. Bevilacqua when he was at the Military Road site and mentioned his intent to hold a meeting with residents "if nobody has any problem." Id. at 19-20. Marinaccio went on to state that "we weren't trying to do anything behind anybody (sic)" and that he "wasn't trying to ... step on anybody's toes." Id. at 21. Marinaccio also stated " if that is okay with everybody in this room, I still intend to have a meeting." Id. at 22. In response to Cantwell's invitation for comment regarding such a meeting, O'Connor stated that "contractors don't set up meetings, we do," id. at 23, and "[t]here is no other

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

contractor, at least in my experience, has (sic) ever on his own set in motion a public meeting" id. at 24. In reference to the comments from Marinaccio and O'Connor, Corrado noted the DOT's concern that some confusion may exist as to who is in charge and it should be clear to Marinaccio that the Engineer in Charge, in other words, the DOT, is in charge of the project. *See id.* Addressing this concern, Manna stated,

> We understand the point you are making. We agree with it. If you decide that that's a meeting that you want to have, we'll be happy to organize it. Or not organize it, to be there. However you folks want to do it, if you want to do it. We understand you are in charge and we understand you're calling the shots and if you want us there, great. If you don't, hey, that's okay too. The point that you are trying to make is well taken. We understand that you are in control.

Id. at 25.

Although DOT notified Kemper and Marinaccio's son that the meeting was to be held and that DOT had certain concerns about Midway, Marinaccio did not have notice that Defendants objected to his holding public meetings. *See* Corrado Decl. at Ex. J. Marinaccio did testify, however, that he had an opportunity to speak at the meeting and present his side of the story uninterrupted. *See* Dep. of Paul Marinaccio, Sr., 237, at Ex. A to Decl. of Michael McCartin, Nov. 12, 2004, Dkt. No. 84.

**\*5** On September 25, 2001, an attachment to the completion contract between Kemper and Midway, referred to as "Attachment A", was executed by Corrado for the DOT, Kimberly Steele ("Steele"), attorney for Kemper, and Richard Reinhold ("Reinhold"), Vice President of Midway. Reinhold signed the attachment, with Marinaccio's consent, above the words "signed under protest and with a full reservation of all rights." Am. Compl., Ex. A. The attachment provides, in relevant part, that DOT consents to Kemper contracting with Midway for completion of the Military Road Contract with certain conditions, as follows: First, Reinhold is the sole superintendent of the project. Second, "Midway, its employees and officers will not conduct any public forums concerning this project." Id. Third, Midway agrees to restrict the actions of Marinaccio for the duration of the project, and agrees that Marinaccio will refrain from visiting the job site, contacting DOT employees, contacting DOT consultants or inspectors working on the project, or making any threats, gestures, trespasses or other verbal or non-verbal communication with, or menacing or following any DOT employee, contractor or inspector. *See id.*

According to Tynan, the CRU members agreed to allow Kemper to contract with Midway as long as Marinaccio was kept away from the site due to his past behavior. *See* Tynan Decl. at ¶ 36. Tynan also testified that the CRU discussed some of the conditions in Attachment A, including Reinhold's appointment as superintendent and the restriction against public forums. *See* Dep. of James F. Tynan, July 13, 2004, 80, at Ex. O to Manna Aff. II, Dkt. No. 92. However, DOT attorney Corrado stated that the terms of Attachment A were negotiated by herself as well as the attorneys for Kemper and Midway, and that none of the defendants to this action were involved in same. *See* Corrado Decl. at ¶ 38. Plaintiffs deny that there was any negotiation, citing Gresens' testimony that Corrado told him the conditions were inflexible and there would be no negotiating regarding same. *See* Dep. of James W. Gresens, July 29, 2004, 40-49, at Ex. E to McCartin Decl., Dkt. No. 84. Plaintiffs admit that during negotiation of the terms of Attachment A, neither Marinaccio, his attorneys nor any representative of Midway told any DOT representative that Marinaccio's First Amendment rights would be infringed by execution of same. *See* Ex. F to McCartin Aff. at ¶ 55.

On October 9, 2001, Marinaccio commenced the present suit in the United States District Court for the Western District of New York. Ten days later, Marinaccio moved for a preliminary injunction to enjoin Defendants from continuing restrictions upon him and seeking an order requiring Defendants to provide him with due process. Within one week of Marinaccio's motion, Defendants moved for change of venue to this court. Before deciding the motion to change venue, the District Court in the Western District of New York denied Marinaccio's motion for a preliminary injunction for failure to make the necessary showing of irreparable harm.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

**\*6** On January 11, 2002, Midway filed an Article 78 petition in New York State Supreme Court, Ulster County, seeking declaration that DOT's restrictions upon plaintiff were in violation of state law and enjoining DOT from continuing said restrictions. The DOT filed a motion to dismiss said petition, which was denied based on the State court's finding that, among other things, (1) pursuant to N.Y. Highway Law § 38, the DOT cannot impose restrictions on a corporate officer or debar him from working on DOT projects where, as here, the corporate entity has been found to be a responsible bidder, and (2) the DOT acted arbitrarily and capriciously by concluding simultaneously that Midway was a responsible bidder but its most significant employee was unfit to work on the project at issue. The DPT thereafter appealed to the Appellate Division, Third Department.

In May 2002, Marinaccio went to work on the Military Road project. Later that month, Defendants' motion to transfer venue to this court was granted. On March 13, 2003, the New York Appellate Division, Third Department dismissed DOT's appeal as moot because both the Military Road and Quay Street projects had been completed in full and because the Supreme Court's decision did not hold that DOT had instituted an improper de facto *prospective* debarment. That court also granted DOT's motion to vacate the Supreme Court's judgment below "in light of the fact that [it] ruled on the petition without affording [DOT] an opportunity to file an answer when it was not clear that there were neither factual disputes nor prejudice to respondents in charting such a procedural course [.]" *Marinaccio v. Boardman,* 303 A.D.2d 896, 897, 755 N.Y.S.2d 346 (App. Div. 3rd Dep't 2003).

D. Master's Edge Subcontract-Quay Street Contract

On October 10, 2001, O'Connor informed DOT attorney Nancy Jones that Marinaccio had contacted several people in Region 5, alleging that Master's Edge, a contractor on DOT's Quay Street project (Contract No. D258267), wanted to use Midway as its subcontractor on said project. *See* Jones Dep., 71-72, at Ex. T. to Manna Aff. II, Dkt. No. 92. On October 12, 2001, Steele, counsel for Kemper, and Gresens, counsel for Midway, notified

Jones that Midway wanted to be the subcontractor on the Quay Street project. *See* Decl. of Nancy E. Jones, Nov. 11, 2004, ¶ 8, Dkt. No. 84. On this same day, Jones issued a letter to Gresens inquiring as to why it was necessary to have Marinaccio on the site as a supervisor. *See id.* at ¶ 11; Ex. A. The letter, which asked for an immediate response, was sent to Gresens by facsimile at 3:30 p.m. that day. *See* Ex. I to Manna Aff. II., Dkt. No. 91. Jones states that she sent the letter because she believed that Marinaccio's presence on the site would require approval by the CRU since the same issue had been addressed less than one month earlier regarding the Military Road project. *See* Jones Decl. at ¶ 10. Although Gresens sent Marinaccio's reply to Jones by facsimile at 5:10 p.m. on October 12, 2001, a Friday, Jones had already left for the day and did not receive same until the following Monday morning. The letter stated Marinaccio's intent to move equipment into place over the weekend in order to begin work on Monday morning, October 15, 2001. Jones received word from DOT officials that Midway employees, including Marinaccio and his son, had arrived at the Quay Street site but, instead of working for Midway as a subcontractor, they were working directly for Master's Edge. *See* Jones Decl. at ¶ 13. Marinaccio testified that only four or five individuals who were directly associated with Midway prior to working for Master's Edge were working at the site that morning. *See* Marinaccio Dep., 228, at Ex. A to McCartin Decl. However, Marinaccio's son testified that there were at least seven of them, all receiving the going union rate for their work. *See* Dep. of Paul Marinaccio, Jr., July 27, 2004, 56-57, at Ex. B to McCartin Decl. Midway also received about $30,000 in rental fees from Master's Edge for the use of its paving equipment. However, according to Marinaccio, Midway also lost about $70,000 because it was not awarded the contract. *See* Marinaccio Dep., 233, at Ex. A to McCartin Decl.

**\*7** Ostensibly because Midway's employees were already on the site working directly for the contractor, (a practice which Jones describes as an "end run" around DOT's lawful procedures and section 112 of the State Finance Law), and because Gresens told Jones on October 12, 2001 that the project needed to be completed by October, 20, 2001, Jones considered Midway's request to be the subcontractor for the project moot, and therefore, no CRU meeting was scheduled regarding same. *See* Jones

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Decl. at ¶¶ 16-18, Dkt. No. 84. Moreover, DOT never received any further requests from Midway to be the subcontractor for Master's Edge, *see id.* at ¶ 17, nor did Midway ever seek any further relief in an Article 78 proceeding, although it could have done so, *see id.* at ¶ 18. However, Plaintiffs deny making an "end run" around DOT's lawful procedures or State law and submit that because they responded to Jones' inquiry immediately as she requested, and were waiting for a response to same, they had no reason to make any further inquiries or file an Article 78 petition, although same would have been moot as the project completion deadline was October 20, 2001. *See* Jones Decl., Ex. A.

E. Route 33 Contract

On March 27, 2003, Plaintiff, Accadia Site, was the low bidder on a DOT road construction project involving Route 33 in the Buffalo region (Contract No. D259306). On May 15, 2003, DOT issued a letter to Marinaccio giving him notice of its concerns regarding Accadia Site working on this project, including its lack of experience with DOT projects or with large projects, as well as DOT's concern regarding Marinaccio's ability to conduct himself in a professional manner, specifically due to the Mateer incident. *See* Corrado Decl., Ex. N. Dkt. No. 84. The letter also notified Marinaccio that a CRU meeting would be held to address these concerns on May 28, 2003. The CRU meeting was held as scheduled, and present were Marinaccio, his attorney, Gresens, and, among others, Defendants Lewis and Tynan. One issue raised at the meeting regarding Marinaccio's behavior dealt with an apparent altercation between Marinaccio and his nephew-in-law, which occurred across the street from the project limits of the Military Road site, after which the nephew-in-law reported to the police that he was afraid and that Marinaccio had guns in his possession. *See* Corrado Decl., Ex. O, 7-9. According to Marinaccio, his nephew-in-law, who is a drug addict, was fired after Marinaccio discovered that he stole several pieces of equipment for sale to another contractor. *See id.* Although Reinhold, Midway's Vice President, testified that Marinaccio threatened to kill his nephew-in-law during this altercation near the Military Road site, *see* Dep. of Richard C. Reinhold, July 27, 2004, 23-24, at Ex. C to McCartin Decl., Marinaccio claims he never threatened to

kill anyone, *see* Aff. of Paul Marinaccio, Sr., Dec. 22, 2004, ¶ 3, Dkt. No. 93. Marinaccio also states that his nephew-in-law is now in jail for other crimes. *See* Marinaccio Aff. at ¶ 10.

**\*8** Also addressed at the CRU meeting was Marinaccio's recent conviction on a gun related charge. *See* Corrado Decl. at Ex. O, 6, 8-9, Dkt. No. 84. In response, Marinaccio claims that someone else admitted to owning the gun, his conviction is currently on appeal, and the judge in that case issued him a "certificate of relief from disabilities" which ensures that he is eligible for all types of employment without exception. *See* Marinaccio Aff. at ¶ 6, Dkt. No. 93. A copy of the certificate is part of the record here and reflects that New York State Supreme Court Judge Mario Rossetti issued same to Marinaccio on February 26, 2004. *See* Manna Aff. II, Ex. W, Dkt. No. 92.

On March 3, 2004, Plaintiffs filed an Amended Complaint in this court, alleging as a basis for their claims, among other things, the refusal by Defendants to award Accadia Site the Route 33 Contract. On April 8, 2004, almost one year after the CRU meeting was held on the Route 33 contract, CRU members Tynan and Lewis, as well as one member who is not a party to this action, issued a letter denying Accadia Site this contract based on, among other things, the aforementioned issues regarding Marinaccio's prior behavior on work sites and his criminal conviction. *See* Corrado Decl., Ex. Q, Dkt. No. 84. The letter indicates that because Marinaccio stated that he would be on that project 95% of the time, the CRU members found that Accadia Site was not a responsible bidder pursuant to Highway Law § 38, and therefore rejected the contract bid. *See id.* Plaintiffs challenge the fairness of said determination, noting Tynan's testimony that he did not know whether it was fair that he was a member of the CRU, which denied a contract to Accadia Site, while he was simultaneously being sued for his failure to award said contract. *See* Tynan Dep., 128, at Manna Aff. II, Ex. O, Dkt. No. 92.

Plaintiffs never instituted an Article 78 mandamus proceeding in State court to attempt to force the DOT to issue a decision on the Route 33 Contract, although they could have done so. Pursuant to State Finance Law § 140, Plaintiffs could have withdrawn their bid within 45 days

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

and had their bid bond returned. However, if Plaintiffs wished to have their contract bid approved, they could not have withdrawn same. On May 25, 2004, Plaintiffs made their first request for return of their bid bond in accordance with State Finance Law § 140.

### III. Procedural Background

The Amended Complaint sets forth six causes of action as predicates to a civil rights claim pursuant to 42 U.S.C. § 1983, as well as pursuant to the New York State Constitution, and five causes of action pursuant to New York State tort law. In Count I, Plaintiffs allege that Defendants violated their procedural due process rights under the United States Constitution and the New York State Constitution by unlawfully debarring them for working on DOT Contracts, numbered D257706, D257298, D252811, D257521, D258702, D258333, D2582677 and D259306, without affording them a hearing. *See* Am. Compl. ¶¶ 46-51, Dkt. No. 59. In Count II, Plaintiffs allege that Defendants' defacto debarment was intentional and malicious and interfered with their freedom of speech and association rights and their right to work and/or earn a living in violation of their substantive due process rights pursuant to the United States Constitution and the New York State Constitution. *See* Am. Compl. ¶¶ 52-56. In Count III, Plaintiffs set forth a "stigma plus" claim, alleging that Defendants violated their procedural due process rights under the United States Constitution and the New York State Constitution, when Defendants published false statements about Plaintiffs, thereby stigmatizing them and foreclosing their liberty interests. *See* Am. Compl. at ¶¶ 57-63. In Count IV, Plaintiffs allege that Defendants violated their right to equal protection pursuant to the United States Constitution and the New York State Constitution by intentionally treating them differently from those similarly situated in retaliation for Plaintiffs' exercise of their First Amendment rights. *See* Am. Compl. ¶¶ 64-68. In Count V, Plaintiffs "as independent [ ]DOT contractors" allege that Defendants debarred Plaintiffs from publicly speaking about the Military Road project in violation of Plaintiffs' First Amendment rights to free speech under the United States Constitution and the New York State Constitution. *See* Am. Com pl. ¶¶ 69-79. In Count VI, Plaintiffs "as private citizens" allege that Defendants unlawfully

conditioned the award of a government contract on Plaintiffs' silence about matters of public concern in violation of their First Amendment rights to free speech under the United States Constitution and the New York State Constitution. *See* Am. Compl. ¶¶ 80-85.

**\*9** In Count VII, Plaintiffs Marinaccio and Midway allege a claim against all Defendants for tortious interference with business relations pursuant to New York law. *See* Am. Compl. ¶¶ 86-90. Marinaccio and Midway also allege a claim against all Defendants for tortious interference with prospective advantage pursuant to New York law, in Count VIII of the Amended Complaint. *See* Am. Compl. ¶¶ 91-96. In Count IX, Plaintiffs Marinaccio and Accadia Site allege a claim against all Defendants for tortious interference with prospective advantage pursuant to New York law. *See* Am. Compl. ¶¶ 97-102. In Count X all Plaintiffs allege a claim against all Defendants for prima facie tort pursuant to New York law. *See* Am. Compl. ¶¶ 103-107. Finally, in Count XI, Marinaccio alleges a claim against all Defendants for defamation pursuant to New York Law. *See* Am. Compl. ¶¶ 108-113.

Defendants now move for summary judgment on the entire Amended Complaint. Plaintiffs move for partial summary judgment on Count V of the Amended Complaint, as well as dismissal of Defendants' waiver and accord and satisfaction defenses to that claim. At oral argument, Defendants consented to a dismissal of the accord and satisfaction defense.

### IV. Discussion

#### A. Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Peck v. Public Serv. Mut. Ins. Co.,* 326 F.3d 330, 337 (2d Cir.2003), *cert. denied,* 124 S.Ct. 540 (2003). When deciding whether to grant a motion for summary judgment, "a court must construe the facts in the light most favorable to the non-moving party and must resolve

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

all ambiguities and draw all reasonable inferences against the movant." *See Baisch v. Gallina,* 346 F.3d 366, 372 (2d Cir.2003), *citing Anderson V. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505 (1986). While the initial burden of demonstrating the absence of a genuine issue of material fact falls upon the moving party, once that burden is met, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," *see Koch v. Town of Brattleboro, Vermont,* 287 F.3d 162, 165 (2d Cir.2002), *citing* Fed.R.Civ.P. 56(c), by a showing sufficient to establish the existence of every element essential to the party's case, and on which that party will bear the burden of proof at trial. *See Peck,* 326 F.3d at 337.

**B. Dismissal of Claims Against Boardman**

Defendants argue that Boardman should be dismissed from this action because he lacks the requisite level of involvement for liability on claims pursuant to 42 U.S.C. § 1983. Boardman is named as a defendant to this action solely in his official capacity as DOT Commissioner. As such, only injunctive, not monetary, relief may be awarded to Plaintiffs on their § 1983 claims against him. *See Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358 (1991); *Quern v. Jordan,* 440 U.S. 332, 341, 99 S.Ct. 1139, 1145 (1979); *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441 (1908). In their moving papers, Defendants cite well known precedent of the Court of Appeals for the Second Circuit which holds that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of *damages* under § 1983." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (internal citations omitted) (emphasis added). District courts in the Second Circuit have interpreted said language to mean that the personal involvement requirement does *not* apply to bar actions such as the one here, pursuant to § 1983 for injunctive relief against a state official. *See, e.g., Shabazz v. Cuomo,* No. 93-CIV-7692, 1996 WL 445363, at *1 (S.D.N.Y. Aug. 7, 1996); *Ramirez v. Coughlin,* 919 F.Supp. 617, 623 (N.D.N.Y.1996); *Marshall v. Switzer,* 900 F.Supp. 604, 615 (N.D.N.Y.1995); *Tarafa v. Manigo,* 897 F.Supp. 172, 173, n. 4 (S.D.N.Y.1995); *DeBerry v. Griefinger,* No. 94-Civ.-6898, 1995 WL 514765, at *2 (S.D.N.Y.1995); *Santiago v. Miles,* 774 F.Supp. 775, 792 (W.D.N.Y.1991); *Brooks v. Taylor,* No. 90-Civ.-2312, 1991 WL 67166, at *2 (S.D.N.Y. Apr. 18, 1991).

**\*10** In a § 1983 action against a state employee in his official capacity, such as the one against Boardman here, the relevant standard for liability is whether he was a "moving force" behind the alleged constitutional violations. *See Shabazz,* 1996 WL 445363, at *5, *citing Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, the entity's policy or custom, must have played a part in the violation of federal law." *Hafer,* 502 U.S. at 25, 112 S.Ct. at 361-362, *quoting Graham,* 473 U.S. at 166, 105 S .Ct. at 3105. Therefore, the personal involvement standard cited by Defendants is not applicable here in deciding their summary judgment motion on behalf of Boardman. The court must determine instead whether there is any evidence in the record before it which would create a question of fact as to whether the alleged constitutional violations here occurred due to an official policy or custom of the DOT.

Notably absent from Plaintiffs' opposition papers is any mention of Defendants' motion as it relates to Boardman. In fact, Plaintiffs refer to Boardman in their papers only insofar as they allege that he was aware of Plaintiffs' objection to the public forums language in Attachment A by virtue of its inclusion in the pleadings. At oral argument, counsel for Plaintiffs expanded on this statement, contending that based on the allegations in the Complaint and Amended Complaint in this action, Boardman was aware that a policy or custom existed in the DOT which amounted to a constitutional violation against Plaintiffs, but nonetheless allowed the policy or custom to continue, and failed to act on the information in said pleadings which indicated that an unconstitutional act was occurring. Plaintiffs' allegations alone are not enough to create a question of fact regarding the existence of a DOT policy or custom pursuant to which constitutional violations occurred, much less Boardman's role as a "moving force" behind such violations. For this reason, Plaintiffs' § 1983 claims against defendant Boardman must fail.

Further, Plaintiffs' State law claims must also fail insofar as they purport to allege causes of action against defendant Boardman, or any of the other Defendants in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

their official capacities. "Whereas a federal court may award injunctive relief against a state official in an official capacity action based on the Ex Parte Young 'exception,' the Eleventh Amendment bars even prospective injunctive relief based on violations of state law." *Chinn v. City Univ. of New York Sch. of Law at Queens Coll., 963 F.Supp. 218, 227 (E.D.N.Y.1997), citing Penhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 911 (1984).*

For the aforementioned reasons, the motion for summary judgment is granted as to all claims against defendant Boardman, and as to all state law claims against the remaining Defendants in their official capacities.

C. Collateral Estoppel-Marinaccio's Criminal Conviction

**\*11** Defendants contend that Plaintiffs are collaterally estopped from relitigating the issue of whether Marinaccio intentionally collided his vehicle into Mateer's truck because said issue was conclusively determined in a criminal proceeding. This affirmative defense was set forth by Defendants in Paragraph 31 of the Answer to the Amended Complaint.

In order to determine whether to give preclusive effect to a state court judgment, a federal court must apply the preclusion law of said state. *See Lennon v. Seaman, No. 99-Civ.-2664, 2002 WL 109525, at \*2 (S.D.N.Y.Jan. 28, 2002).* In New York, "[c]ollateral estoppel occurs if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Simpson v. New York State Dept. of Civil Service, No. 02-CV-1216, 2005 WL 545349, at \*7 (N.D.N.Y. Mar. 1, 2005), citing Vargas v. City of New York, 377 F.3d 200, 205-206 (2d Cir.2004)* (internal quotation marks and emphasis omitted). Also in New York, "a guilty plea precludes relitigation in a subsequent civil action of all issues necessarily determined by the conviction." *Lennon, 2002 WL 109525, at \*3, quoting Merchants Mut. Inc. Co. v. Arzillo, 98 A.D.2d 495, 504 (1984).* Thus, for collateral estoppel purposes, "a guilty plea is equivalent to a conviction after trial[.]" *Lennon, 2002 WL 109525, at \*3.*

Here, Plaintiffs contend that Marinaccio never

admitted to intentionally causing the automobile collision with Mateer, and therefore they are not estopped from arguing that the collision was an accident. It is undisputed that Marinaccio pleaded guilty to disorderly conduct regarding the Mateer incident. According to the New York Penal Law,

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

1. He engages in fighting or in violent, tumultuous or threatening behavior; or

2. He makes unreasonable noise; or

3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or

4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or

5. He obstructs vehicular or pedestrian traffic; or

6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

N.Y. Penal Law § 240.20 (McKinney 2004). By the very terms of the statute defining disorderly conduct, said conduct is intentional, or at the very least, reckless. Therefore, the state court judgment of conviction based on Marinaccio's plea of guilty to such a violation actually and necessarily decided that his actions during the Mateer incident were intentional or reckless.

**\*12** As the party against whom preclusion is sought, Plaintiffs have the burden of establishing that Marinaccio did not have a full and fair opportunity to litigate the issue of whether he acted intentionally in state court. *See Simpson,* WL 545349, at \*8. Because Plaintiffs make no argument regarding this second element, the court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

concludes that Marinaccio did have a full and fair opportunity to litigate the present issue in state court.[FN1] Therefore, the state court judgment of conviction against Marinaccio on the charge of disorderly conduct precludes any further litigation regarding whether he acted intentionally or recklessly during the Mateer incident, necessarily precluding Marinaccio from claiming that said collision was an accident.

> FN1. Plaintiffs only argument against preclusion is that because the parties to this action are not identical with the parties to the state court judgment, the collateral estoppel doctrine does not apply. See *Leather v. Eyck,* 180 F.3d 420, 424 (2d Cir.1999) ("[c]ollateral estoppel ... means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."). However, Plaintiffs misconstrue the caselaw on this topic. It is clear that the important requirement is that the party against whom preclusion is sought had a full and fair opportunity to litigate the issue in the prior action, and that whether the party seeking preclusion was a party in the prior action is not relevant. See *Carino v. Town of Deerfield (Oneida County, N.Y.),* 750 F.Supp. 1156, 1170 (N.D.N.Y.1990), citing *Blonder-Tongue Labs., Inc. v. University of Illinois Found.,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788, 799-800 (1971). ("A requirement of complete identity of parties serves no purpose as long as the person against whom the findings are asserted or his privity has had a full and fair opportunity to litigate the identical issue in the prior action.")

**D. First Amendment Claims-Counts V and VI**

Counts V and VI of the Amended Complaint set forth § 1983 claims as predicates to claims for the violation of Plaintiffs' First Amendment rights under the United States Constitution as well as the New York State Constitution.[FN2] Count V is set forth on behalf of Plaintiffs "as independent [ ]DOT contractors" and Count VI is set

forth on behalf of Plaintiffs "as private citizens". Although Defendants purport to seek summary judgment on the entire Amended Complaint, at oral argument, counsel for Plaintiffs conceded that they seek summary judgment only as to Count V, and that Count V is alleged only on behalf of plaintiffs Marinaccio and Midway.

> FN2. Free speech claims pursuant to Art. I § 8 of the New York State Constitution are subject to the same standard as their counterpart in the First Amendment to the United States Constitution. See *Sanchez v. Turner,* No. 00-cv-1674, 2002 WL 1343754, at *4, n. 4 (S.D.N.Y. June 19, 2002). The right to freedom of assembly guaranteed under the New York State Constitution, see Art. I § 9, is broader than that right under the First Amendment, but only insofar as the New York Constitution also protects the rights of political parties. See *Golden v. Clark,* 76 N.Y.2d 618, 634, 564 N.E.2d 611, 621, 563 N.Y.S.2d 1, 11 (N.Y.1990). Therefore, Plaintiffs claims here will be analyzed under the First Amendment.

Under Count V of the Amended Complaint, Plaintiffs contend that Defendants violated their First Amendment rights to free speech, association and assembly when, as of September 25, 2001, they barred Marinaccio and Midway from conducting any public forums concerning the Military Road project. Under Count VI, Plaintiffs set forth another First Amendment claim, and allege that *"[i]f no ongoing or commercial relationship existed between Marinaccio, Midway and/or Accadia Site and NYSDOT,* defendants unlawfully conditioned the awarding of public and/or government contracts to plaintiffs on plaintiffs' public silence concerning matters of public concern and by interfering with plaintiffs' right to free assembly and association." Amended Compl. ¶ 81 (emphasis added). It appears, therefore, that Count VI is asserted in the alternative, such that if the court is to determine that no commercial relationship existed between Plaintiffs and the DOT, Plaintiffs allege they are still entitled to relief for violation of their First Amendment rights as private citizens.

Defendants' sole argument in support of their motion for summary judgment as to Count V, and in opposition to

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Plaintiffs' cross motion for summary judgment, is that they are entitled to qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982). In deciding whether Defendants here should be granted qualified immunity, the court must consider whether the facts alleged, when taken in the light most favorable to Plaintiffs, show that the Defendants' conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156 (2001). If that question is answered in the affirmative, the next step is to determine whether the right was clearly established, in other words, "whether it would be clear to a reasonable [government official] that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. at 2156. A court may, in cases where it determines that a right was not clearly established at the relevant time, decline to address whether such a right exists. *See African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002), *citing Horne v. Coughlin,* 178 F.3d 603, 606-607 (2d Cir.1999).

**\*13** In determining whether a right was clearly established at the time a § 1983 defendant acted, three factors are to be considered:

(1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*African Trade,* 294 F.3d at 360, *citing Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996) (internal citations and quotations omitted).

Plaintiffs contend that by executing Attachment A, which by its terms conditioned the award of the Military Road subcontract to Midway on, among other things, an agreement that Midway, its employees and officers would not conduct any public forums relating to said subcontract,

Defendants violated Plaintiffs First Amendment rights. According to Defendants, the execution of Attachment A did not violate Plaintiffs' First Amendment rights for several reasons. First, Defendants argue, the agreement did not create an adverse employment action against Plaintiffs, as by its very terms Midway was awarded the Military Road subcontract. Second, Defendants claim that it was Kemper who contracted with Midway, not DOT.[FN3] Third, Defendants contend, Midway was a mere bidder for a DOT contract, and as such can not claim that an adverse employment action took place. Finally, according to Defendants, Plaintiffs waived any First Amendment rights they may have had.

> FN3. The court need not devote much time to this argument, as it is clear that a representative of DOT executed Attachment A along with representatives of Midway and Kemper.

In order to establish a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and that the alleged violation was committed by a person acting under color of state law. *See West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988). To establish a First Amendment retaliation claim under § 1983, a plaintiff

> must initially demonstrate by a preponderance of the evidence that: (1) his speech was constitutionally protected, (2) he suffered an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination.

*Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999), *citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283-87, 97 S.Ct. 568 (1977). Once such a showing is made, in order to determine "the extent to which a state may regulate the speech of its employees, [the court] must balance 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " *Morris,* 196 F.3d at 109 -110, *quoting Pickering v. Board of Educ.,* 391 U.S. 563, 568,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

88 S.Ct. 1731 (1968). Finally, a defendant will have a valid defense if it can show, by a preponderance of the evidence, that it would have taken the action it did regardless of plaintiff's speech, *see Mt. Healthy City,* 429 U.S. at 287, 97 S.Ct. 568, or if it can persuade the court that its legitimate interests outweigh the free speech interests at stake, *see Pickering,* 391 U.S. at 568, 88 S.Ct. 1731.

**\*14** Here, Plaintiffs argue, and Defendants do not appear to dispute, that the speech at issue-by Midway and Marinaccio regarding the Military Road subcontract-touched upon a matter of public concern, and is therefore, protected speech. *See Connick v. Myers,* 461 U.S. 138, 147-148, 103 S.Ct. 1684, 1690-91 (1981).

Regarding the third element set forth in *Mount Healthy City,* Plaintiffs note that the terms of Attachment A are clear proof of Defendants' motivation to suppress speech. Plaintiffs further argue that, although they were not terminated in retaliation for their speech, an adverse employment action nonetheless occurred, satisfying the second element of their First Amendment claim. In support of this argument, Plaintiffs cite caselaw which describes this Circuit's broad definition of an adverse employment action to include a refusal to hire as well as discharge from employment. *See, e.g., Morris,* 196 F.3d at 110. Nonetheless, Defendants argue, Plaintiffs were not DOT employees, but were instead applicants or bidders for a DOT contract, and as such, were not entitled to First Amendment protection.

The Supreme Court, in *Board of County Commissioners v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342 (1996), extended its analysis in First Amendment retaliation cases involving government employees to hold that independent contractors who have a pre-existing commercial relationship with a government entity enjoy First Amendment protection from termination by that entity in retaliation for the exercise of free speech. *See id.* at 685, 116 S.Ct. at 2352. The Court specifically left undecided the issue of whether independent contractors who are mere bidders or applicants for government contracts enjoy the same protection. *Id.* It is clear that on September 25, 2001, the date Attachment A was executed, a contractual relationship was created between Midway,

including Marinaccio as the President of Midway, and DOT. The character of the parties' relationship to one another prior to the execution of Attachment A, however, is not clear. Prior to September 2001, Marinaccio was awarded other DOT contracts, unrelated to the Military Road project. *See* Pls.' Statement of Material Fact in Supp. of Cross Mot. at ¶ 4 (admitted). On the other hand, the Military Road subcontract was the first DOT contract awarded to Midway. *See* Marinaccio Dep., 23, at Ex. A to McCartin Decl.

In order to determine whether Plaintiffs' First Amendment rights were clearly established as of the date Attachment A was executed, the court must determine whether, at that time, Plaintiffs may have been characterized as applicants or bidders for the Military Road subcontract, or as independent contractors with a pre-existing commercial relationship with DOT. Such an inquiry must be conducted based solely the decisional law of Supreme Court and the Court of Appeals for the Second Circuit as of September 25, 2001. *See African Trade,* 294 F.3d at 360. By that time, *Umbehr* had been decided but the only Court of Appeals to address the issue left open after *Umbehr* was the Third Circuit, who declined to extend First Amendment protection to applicants for new contracts. *See McClintock v. Eichelberger,* 169 F.3d 812, 817 (3d Cir.1999).

**\*15** Following *Umbehr* alone, as it must, Defendants would have this court conclude, as did the Second Circuit in *African Trade,* that qualified immunity is appropriate here because, as of the date Attachment A was executed, the law did not provide for extension of First Amendment protection to mere bidders for government contracts. *See African Trade,* 294 F.3d at 360-362. In *African Trade,* however, unlike here, the question of whether the plaintiffs there could be characterized as having a prior commercial relationship with the defendant was not before that court. *See id.,* 294 F.3d at 358-359. The court here must decide whether, based on the relevant decisional law as of September 25, 2001, it was clearly established that Plaintiffs were independent contractors that had a preexisting commercial relationship with DOT.

The *Umbehr* Court, in deciding that a preexisting commercial relationship existed, considered the length of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

the relationship as well as the number and quality of agreements between the parties. In *Umbehr,* a preexisting commercial relationship was deemed to exist where the respondent had a six-year contract with petitioner County for the provision of trash removal services, which continued uninterrupted and exclusive for the entire six years before the County elected not to renew same in accordance with the terms of the contract. *See Umbehr, 518 U.S. at 671, 116 S.Ct. 2342.* In *McClintock,* however, no preexisting commercial relationship was found to have existed where plaintiff and defendants entered into three separate, distinct and unrelated agreements prior to the denial of the contract at issue there. *See McClintock, 169 F .3d at 816.* In so finding, the court in McClintock distinguished the ongoing nature of the contract involved in *Umbehr. See id.* At least one district court in the Second Circuit has held, contrary to the Third Circuit Court of Appeals in *McClintock,* that an independent contractor who is denied a government contract bid in retaliation for its exercise of free speech may state a viable First Amendment claim based on same, *see A.F.C. Enterprises, Inc. v. New York City Sch. Constr. Auth.,* No. 98CV4534, 2001 WL 1335010, at *17 (E.D.N.Y. Sept. 6, 2001). However, that decision was issued only 19 days prior to the execution of Attachment A, and in any event, does not represent the clearly established decisional law of the Court of Appeals for the Second Circuit.

Here, although neither party delineates each and every DOT contract awarded to Marinaccio prior to September 2001, it is clear that those most temporally related to the Military Road contract were not at all substantively related. Unlike in *Umbehr,* where the contract at issue involved the provision of a particular type of service to a governmental entity for a long period of time, i.e., trash hauling, here Marinaccio and his companies contracted with the DOT to complete separate and distinct road construction projects, which were wholly unrelated to one another. The facts of this case are more similar to those in *McClintock* where the contracts at issue were awarded sporadically, and dealt with separate and distinct projects. The court is mindful that, as the decisional law of another Circuit Court of Appeal, *McClintock* may not be considered in determining whether Plaintiffs had a clearly established right at the time Attachment A was executed. Nonetheless, that case illustrates just how obscure the law

was at that time regarding the distinction between a mere applicant or bidder for a government contract and a contractor with a preexisting commercial relationship with a particular government entity.

**\*16** The court finds that no clearly established First Amendment right existed for Plaintiffs at the time that Attachment A was executed. Accordingly, Defendants are entitled to qualified immunity on Count V of the Amended Complaint. Defendants' motion for summary judgment as to Count V is granted and Plaintiffs' motion for partial summary judgment is denied.

Regarding Count VI, the court acknowledges the absence of argument on Defendants' behalf as to the merits of said claim. Defendants do contend, however, that Plaintiffs waived their First Amendment rights. Because this defense may be considered in the context of either Count V or Count VI, the court will address it now.

The Supreme Court has held that constitutional rights way be waived in a civil context. *See D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 187, 92 S.Ct. 775, 783 (1972); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983 (1972). However, after analyzing *Overmyer* and *Fuentes,* the Court of Appeals for the Third Circuit held that constitutional rights

may be contractually waived where the facts and circumstances surrounding the waiver make it clear that the party foregoing its rights has done so of its own volition, with full understanding of the consequences of its waiver. Such volition and understanding are deemed to be, and indeed have been held to be, present, where parties to the contract have bargaining equality and have negotiated the terms of the contract, and where the waiving party is advised by competent counsel and engaged in other contract negotiations.

*Erie Telecommunications, Inc. v. City of Erie, Pennsylvania,* 853 F.2d 1084, 1096 (3d Cir.1988). More recently, a district court in this Circuit has decided an issue regarding contractual waivers of constitutional rights in accordance with *Overmyer, Fuentes* and *Erie. See Legal Aid Society v. City of New York,* 114 F.Supp.2d 204 (S.D.N.Y.2004). There the court noted that any such

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

waiver must be made voluntarily, knowingly and intelligently and must be established by clear and convincing evidence. *Id.* at 226-227. Moreover, a waiver of a fundamental right, as here, cannot be presumed or lightly inferred, and courts must indulge every reasonable presumption against waiver. *Id.* at 227. Finally, the court concluded, waiver of constitutional rights is disfavored and must be at the very least be clear. *Id.*

Here, Plaintiffs cite evidence that their attorney objected to the language in Attachment A before it was executed, and note that their representative signed Attachment A under protest and with reservation of all rights. Defendants argue that the deferential statements made by Marinaccio and his attorney at the September 2001 CRU meeting support a finding that Plaintiffs waived their First Amendment rights. Further, Defendants contend that any objections made by Marinaccio's attorney to DOT attorney Corrado are irrelevant because she is not a defendant to this action.

**\*17** Clearly, statements made to a DOT attorney who represents and can legally bind Defendants must be considered in deciding whether Plaintiffs waived their free speech rights here. In any event, considering the policy that waiver of a fundamental right is disfavored, cannot lightly be inferred, and must be very clear, the fact that Attachment A was signed by Plaintiffs' representative under protest and with a reservation of all rights weighs against a finding of waiver here. Accordingly, Defendants' waiver defense must be dismissed.

Defendants have failed to meet their burden of proving that there is no question of fact to be decided at trial regarding Count VI. Moreover, because Defendants consent to dismissal of their accord and satisfaction defense, and because their waiver defense is dismissed regarding the First Amendment claims, Defendants' motion for summary judgment as to Count VI of the Amended Complaint must be denied.

E. Counts I, II & III-Due Process Claims

Counts I, II and III of the Amended Complaint set forth § 1983 claims as predicates to claims for the violation of Plaintiffs' Fourteenth Amendment due process

rights: procedural due process, substantive due process, and "stigma plus" claims, respectively. *See* Am. Compl. ¶¶ 46-63. Plaintiffs also allege violations of the New York State Constitution. *See* id.[FN4] The Due Process Clause of the Fourteenth Amendment essentially provides that no state shall "deprive any person of life, liberty, or property, without due process of law". U.S. Const. amend. XIV, § 1. Thus, in order to prevail on each due process cause of action, Plaintiffs must establish that they were deprived of some tangible property or liberty interest. *See* Patterson v. City of Utica, 370 F.3d 322, 329-30 (2d Cir.2004) ("stigma plus" claim requires a showing of the loss of one's reputation coupled with a more tangible liberty or property interest); DeMuria v. Hawkes, 328 F.3d 704, 705 (2d Cir.2003) (substantive due process claim requires plaintiff to identify the deprivation of a protected liberty or property interest, in addition to the requisite conscious-shocking behavior on the part of the government); McMenemy v. City of Rochester, 241 F.3d 279, 285 -286 (2d Cir.2001) (to establish a procedural due process claim, plaintiff must show that he possessed a protected liberty or property interest, of which he was deprived without due process).

FN4. Because the due process rights afforded under the New York State Constitution are broader than those under the Fourteenth Amendment to the United States Constitution, only insofar as the definition of state action is implicated, and because there is no question before the court regarding same, Plaintiffs' due process claims will be analyzed under the federal constitutional standards. *See* McGovern v. Local 456, Int'l Bhd. of Teamsters, Chauffeurs & Warehousemen & Helpers of Am., AFL-CIO, 107 F.Supp.2d 311, 317-318 (S.D.N.Y.2000); Rohan v. Am. Bar Ass'n, No. 93-CV-1338, 1995 WL 347035, at *9 (E.D.N.Y. May 31, 1995).

1. Property Interest

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Terminate Control Corp. v.. Horowitz, 28 F.3d 1335, 1351 (2d Cir.1994), *quoting* Bd. of Regents of State Colls.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

*v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972). Such an entitlement is not created by the Constitution, but may exist pursuant to a contract or state statute. *See Velez v. Levy,* 401 F.3d 75, 85 (2d Cir.2005), *citing Roth,* 408 U.S. at 577, 92 S.Ct. 2701.

**\*18** In the Amended Complaint and in their papers, Plaintiffs identify several DOT contracts regarding which they purport to have suffered the deprivation of a protected property or liberty interest. As an initial matter, the court declines to conclude that a deprivation of a property interest may be found regarding the four DOT contracts which were already awarded to Marinaccio and/or his company, Accadia Enterprises, Inc., when Marinaccio was barred from those worksites in relation to the Mateer incident. The record does not reflect any evidence that Plaintiffs suffered a deprivation in relation thereto, as said contracts were already awarded to Accadia Enterprises, Inc., and were paid in full by DOT. The same analysis pertains to the Military Road subcontract, which was actually awarded to Midway, and regarding which Plaintiffs claim no monetary loss.

Moreover, Plaintiffs cannot establish that they suffered the deprivation of a property interest regarding either the Williams Road or Route 33 contracts, or the Master's Edge subcontract. It is clear that New York law does not recognize a vested property interest in the low bid on a public contract. *See A.F.C. Enterprises,* 2001 WL 1335010, at \*13, *citing Terminate Control,* 28 F.3d at 1343; *Stride Contracting Corp. v. Bd. of Contract and Supply,* 181 A.D.2d 876, 879, 581 N.Y.S.2d 446, 448 (App. Div.2d Dep't 1992). Here, it is undisputed that although Plaintiffs were the low bidders on the Williams Road and Route 33 contracts, their bids were rejected by DOT on the grounds that they were not "responsible bidders" pursuant to New York Highway Law § 38. Regarding the Master's Edge subcontract, Defendants admit that no decision was ever made in response to Midway's request that it be awarded same. Therefore, Plaintiffs cannot prevail on a claim for the deprivation of a property interest relating to either the Williams Road or Route 33 contract or the Master's Edge subcontract.

2. Liberty Interest

Plaintiffs contend that a liberty interest was implicated when they were denied DOT contracts and when Marinaccio was debarred from work on DOT contract sites because Marinaccio's reputation was injured as a result of same. Specifically, Plaintiffs contend that due to defamatory statements made by O'Connor, Marinaccio was debarred from the Military Road contract site, Midway was not awarded the Master's Edge subcontract, and Accadia Site's bid for the Route 33 contract was rejected.

Injury to one's reputation, without more, does not amount to the deprivation of a protectible liberty interest under the Fourteenth Amendment. *See Walentas v. Lipper,* 862 F.2d 414, 420 (2d Dir.1988), *citing Paul v. Davis,* 424 U.S. 693, 701-702, 96 S.Ct. 1155, 1160-61 (1976). However, where the damage to one's reputation accompanies the deprivation of a "legal right or status", a liberty interest may be implicated. *See Sadallah v. City of Utica,* 383 F.3d 34, 38 (2d Cir.2004), quoting *Abramson v. Pataki,* 278 F.3d 93, 103 (2d Cir.2002). Therefore, in order to establish a § 1983 liberty interest claim, also known as a "stigma plus" claim, a plaintiff must bring forth evidence of

**\*19** (1) the utterance of a statement about [him] that is injurious to [his] reputation, "that is capable of being proved false, and that he or she claims is false," and (2) "some tangible and material state-imposed burden ... in addition to the stigmatizing statement."

*Velez,* 401 F.3d at 87, quoting *Doe v. Dep't of Pub. Safety ex rel. Lee,* 271 F.3d 38, 47 (2d Cir.2001), *rev'd on other grounds, Connecticut Dept. of Public Safety v. Doe,* 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003).

Additionally, the alleged utterance must have been made public. *See Brandt v. Bd. of Coop. Educ. Servs.,* 820 F.2d 41, 44 (2d Cir.1987), *citing Roth,* 408 U.S. at 575, 92 S.Ct. at 2708. The Second Circuit has said that the purpose of this "public disclosure" requirement

is to limit a constitutional claim to those instances where the stigmatizing charges made in the course of discharge have been or are likely to be disseminated widely enough to damage the discharged employee's standing in the community or foreclose future job opportunities. In determining the degree of dissemination that satisfies

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

the "public disclosure" requirement, we must look to the potential effect of dissemination on the employee's standing in the community and the foreclosure of job opportunities. As a result, what is sufficient to constitute "public disclosure" will vary with the circumstances of each case.

*Brandt,* 820 F.2d at 44. Thus, in *Brandt,* where there were questions of fact as to whether statements included in plaintiff's personnel file were likely to be disclosed to prospective employers, the lower court's ruling of summary judgment on plaintiff's stigma plus claim was reversed. *Id.* at 46. Likewise, where plaintiff's presence on a list of child abusers would necessarily be viewed by her prospective child care employers, as was required by law, the stigma element of her liberty interest claim was deemed to have been satisfied. *See Valmonte v. Bane,* 18 F.3d 992, 100 (2d Cir.1994). However, where there was no evidence that an allegedly stigmatizing remark was communicated to anyone other than plaintiff's administrator, the court, albeit under a qualified immunity analysis, declined to find that plaintiff's rights were violated. *See Vega v. Miller,* 273 F.3d 460, 461 (2d Cir.2001).

Regarding the stigma element of this claim, Plaintiffs allege that O'Connor made false statements about Marinaccio to members of the CRU. *See* Pls.' Resp. to Defs.' Second Set of Interrogs., at 5-6, Ex. G. to McCartin Decl., Dkt. No. 84. First, Plaintiffs claim that at the May 21, 2001 CRU meeting, O'Connor told those present that Marinaccio threatened to shoot and kill DOT employee, Terrence Bender. The transcript of that meeting reflects that O'Connor first stated that he was reading "notes from engineers' diaries which are official documents[ ]" before making the following statement: "Terry Bender was threatened. Mr. Marinaccio has said, 'I'll go to my gun and I'll get my truck, and I'll shoot you (sic).' I documented that." *See* Ex. E to Corrado Decl., at 23, Dkt. No. 84. By affidavit, Marinaccio stated, "I deny that I ... threaten to shoot or kill people. Those allegations are not true." Aff. of Paul Marinaccio, Sr., Dec. 22, 2004, at ¶ 3, Dkt. No. 93. Plaintiffs also allege that on May 28, 2003, just prior to the CRU meeting regarding Accadia Site's bid for the Route 33 contract, O'Connor told members of the CRU and others that Marinaccio engaged in "sex harassment"

of an owner. *See* Ex. G to McCartin Aff. at Response 1, Dkt. No. 84. Although no documentation of same is part of the record now before the court, the transcript of the referenced CRU meeting reveals that O'Connor stated, in response to an inquiry from Marinaccio regarding the number of concerned citizen letters he received, "What comes to mind is the woman you sexually harassed in Fredonia who called the police. That one comes to mind." *See* Ex. O to Corrado Decl., at 25, Dkt. No. 84. Plaintiffs also claim this statement is false. *See* Pls.' Resp. to Defs.' Second Set of Interrogs., at 5-6, Ex. G. to McCartin Decl., Dkt. No. 84. While both of these statements may call into question Marinaccio's "good name, reputation, honor, or integrity", *see Roth,* 408 U.S. at 573, 92 S.Ct. at 2707, and while Marinaccio denies the truth of each statement, it is doubtful that these communications may be deemed public within the bounds set forth by *Brandt* because there is no evidence that they were communicated to anyone outside of those who were present at each meeting. Nor do Plaintiffs allege, or cite to any evidence in the record which would suggest, as did the plaintiff in *Brandt,* that there is a likelihood of public disclosure in order to warrant a denial of summary judgment on this point. *See Brandt,* 820 F.2d at 44, 45-46.

**\*20** Plaintiffs also contend that O'Connor made stigmatizing utterances regarding Marinaccio to CRU members via email. In the first email, dated May 24, 2001, which was addressed to Tynan and Brian Browback, DOT Regional Director, O'Connor referred to Marinaccio as "an incorrigible liar" and "a bully." *See* Ex. B to Manna Aff. II, Dkt. No. 91. In the second email, dated September 14, 2001, which was addressed to Tynan and Corrado, among others, O'Connor stated, regarding Marinaccio, "I am again reminded of why we here in Region 5 don't want to work with this thug." *See* Ex. H to Manna Aff. I, Dkt. No. 85. Again, Plaintiffs have alleged the falsity of these statements. While no evidence of public disclosure exists regarding the May 24, 2001 email, it is not ascertainable from the record whether the September 14, 2001 email message was communicated to anyone other than those involved in the CRU decision making process, as neither party has identified the relationship of the other recipients of said message to Plaintiffs or the CRU.[FN5] Therefore, questions of fact exist as to whether the latter email was publicly disclosed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

FN5. In addition to Tynan and Corrado, Lisa Sakalian, Richard Springer, and Charlie Stone are listed as recipients of this message, along with Brian Rowback, who appears to have been sent a copy of same. The record does not identify the relationship of these additional recipients to Plaintiffs or DOT.

Finally, Plaintiffs ostensibly contend that certain statements regarding Marinaccio, which were included in a letter addressed by Corrado to the attorney for Kemper Surety, were also stigmatizing. The contents of said letter, dated September 14, 2001, referred to DOT's concerns relating to the possible award of the Military Road subcontract to Midway. See Ex. J to Corrado Decl., Dkt. No. 84. In one paragraph, Corrado wrote, "According to our records, Mr. Marinaccio, Sr. was uncooperative, aggressive, verbally abusive and violent at times. His behavior was completely unacceptable and highly unusual, culminating in a decision to ban him from all NYSDOT work sites in January 2000." Id. To the extent Plaintiffs claim the language regarding Marinaccio's ban is stigmatizing, same cannot be the basis for their liberty interest claim because its truth is not disputed. Also, to the extent Plaintiffs claim the statement that Marinaccio is "uncooperative, aggressive, verbally abusive and violent at times" is sufficiently stigmatizing, they nonetheless fail to cite any evidence in the record that same was published to anyone other than Kemper. Because it is undisputed that Midway was actually awarded the Military Road subcontract, Plaintiffs cannot base their liberty interest claim on the aforementioned statement.

Regarding the second element of Plaintiffs' "stigma plus" claim, it is unclear what exactly constitutes the "plus," other than termination from government employment or deprivation of property. See Giovanniello v. Goord, No. 04-CV-6129, 2004 WL 2315090, at *3 (W.D.N.Y. Oct. 14, 2004), citing Patterson v. City of Utica, 370 F.3d 322, 330 (2d Cir.2004); Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir.1989). However, it is clear that the typical consequences of a bad reputation, including the negative impact of same on one's job prospects, does not rise to the level of deprivation of a "legal right or status" required for a "stigma plus" claim. See Giovanniello, 2004

WL 2315090, at *3, citing Valmonte, 18 F.3d at 1001. Where, as in Valmonte, a plaintiff was added to a government generated list of child abusers, which all child care agencies were required to review prior to hiring employees, the court found the "plus" element to have been satisfied, "not merely because of the defamatory aspect of [said list] but because that defamation occur[ed] in conjunction with a statutory impediment to employment." Valmonte, 18 F.3d at 1002. On the other hand, where, as in Sadallah, plaintiffs complained that defamatory comments by a government official about the condition of plaintiffs' business caused harm to the good will in their business, the court held that the "plus" element had not been satisfied as such harm did not occur "in addition to" the defamation, but instead was a "deleterious effect[ ]" of same. See Sadallah, 383 F.3d at 38-39, citing Doe, 271 F.3d at 47; Valmonte, 18 F.3d at 1001.

*21 Initially, it is clear that Marinaccio's debarment from contract sites, unaccompanied by any property deprivation, cannot sustain the "plus" element of his liberty interest claim. The relevant question, therefore, is whether DOT's rejection of Plaintiffs' bids for either the Williams Road or Rte 33 contracts, or the failure to award Midway the Master's Edge subcontract may satisfy the second element of Plaintiffs' stigma plus claim. The court has already determined that Plaintiffs did not have a protectible property interest in either of the aforementioned contracts or subcontract. Moreover, there is evidence in the record that Plaintiffs did not suffer any business loss as a result of not being awarded the contracts and subcontract at issue. In a signed affidavit, Marinaccio admitted that as of December 2004, his companies "continue to perform millions of dollars in work for public owners throughout Western New York." See Marinaccio Aff., ¶ 7, Dkt. No. 93. Clearly, therefore, Plaintiffs have not suffered the requisite harm to their reputation as is required for success on a liberty interest claim.

Because it is clear that Plaintiffs have not suffered the deprivation of a protectible property or liberty interest in order to prevail on any of their § 1983 due process claims, the court need not address the issue of adequacy of process. Accordingly, Defendants are entitled to summary judgment on Counts I, II and III of the Amended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

Complaint.

F. Count IV-Equal Protection

Count IV of the Amended Complaint sets forth a § 1983 claim as a predicate to a claim for the violation of Plaintiffs' right to equal protection under the Fourteenth Amendment to the United States Constitution as well as pursuant to the New York State Constitution.[FN6] In the Amended Complaint, Plaintiffs allege that Defendants selectively and intentionally treated them differently as compared to other similarly situated independent contractors, their owners and employees in contravention of their right to equal protection under the Fourteenth Amendment, and did so with intent to injure Plaintiffs and to punish them for the exercise of their First Amendment rights. *See* Am. Compl. ¶¶ 65-66. Pursuant to the Equal Protection Clause of the Fourteenth Amendment, no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Essentially, the Equal Protection Clause directs "that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Cent.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985).

> FN6. Because an equal protection claim under § 1983 mirrors that of its counterpart in the New York State Constitution, *see* N.Y. Const. art. I § 11, the court will analyze Plaintiffs' equal protection claim under the federal constitutional standards. *See Hayut v. State Univ. of New York,* 352 F.3d 733, 754 (2d Cir.2003).

In order to prevail on a § 1983 claim for violation of his right to equal protection of the laws, a plaintiff must establish that the defendant treated him differently compared with others similarly situated. *See Bizzarro v. Miranda,* 394 F.3d 82, 86 (2d Cir.2005). In addition, a plaintiff must also establish that there was no rational basis for the selective treatment. *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073 (2000). Such a claim is commonly known as a "class of one" equal protection claim. *See id.* Alternatively, a plaintiff prevail on his equal protection claim by showing that "[the] selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or

bad faith intent to injure a person." *Bizzarro,* 394 F.3d at 86, *quoting LeClair v. Saunders,* 627 F.2d 606, 609-610 (2d Cir.1980).

**\*22** Defendants argue, ostensibly because they would have the court analyze Plaintiffs' equal protection claim under *Olech,* that no jury could reasonably find that they lacked a rational basis for their treatment of Plaintiffs, citing Marinaccio's criminal conviction relating to the Mateer incident. Plaintiffs, on the other hand, cite evidence of the bitter relationship between Marinaccio and O'Connor, and Defendants awareness of same, ostensibly in support of an equal protection claim based on "malicious or bad faith intent to injure" under *LeClair. See* 627 F.2d at 609-610. However, before the court addresses the second prong of the equal protection analysis, Defendants must first establish a lack of evidence in the record, which would support a finding that they treated Plaintiffs differently than others similarly situated.

The Second Circuit has held that in order to establish treatment different from others similarly situated, a "plaintiff must show [he] was 'similarly situated in all material respects' to the individuals with whom [he] seeks to compare [himself]." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000), *quoting Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir.1997).[FN7] This standard will be met where a plaintiff can show that "his comparators were subject to the same evaluation and discipline standards and that these comparators who went undisciplined engaged in comparable conduct." *Rossi v. West Haven Bd. of Educ.,*-F.Supp.2d-, No. 3:03CV1247, 2005 WL 578615 (D.Conn. Mar. 7, 2005), *citing Graham,* 230 F.3d at 40.

> FN7. To be sure, *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) and *Shumway v. United Parcel Service, Inc.,* 118 F.3d 60, 64 (2d Cir.1997) are both cases involving Title VII claims. However, "[t]he elements of an Equal Protection claim and a Title VII claim "are generally the same[ ]", *see Simpson v. New York State Dept. of Civil Service,* No. 02-CV-1216, 2005 WL 545349, at \*22 (N.D.N.Y. Mar. 1, 2005), *citing Feingold v. New York,* 366 F.3d 138, 159 (2d Cir.2004) (citations omitted). As

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

other district courts have followed the Second Circuit's "others similarly situated" analysis in Title VII cases when deciding a § 1983 equal protection claim, this court will as well. *See, e.g., Rossi v. West Haven Bd. of Educ.,* -F.Supp.2d-, No. 3:03CV1247, 2005 WL 578655 (D.Conn. Mar. 7, 2005); *Payne v. Huntington Union Free Sch. Dist.,* 219 F.Supp.2d 273, 279 (E.D.N.Y.2002).

Here, Plaintiffs argue that DOT treated them differently than other independent contractors, citing evidence that it never imposed conditions on other contractors seeking DOT contracts similar to those it imposed upon Marinaccio and Midway in Attachment A to the Military Road subcontract. *See* Tynan Dep., 80:11-81:2, at Manna Aff. II, Ex. O, Dkt. No. 92; Dep. of Steven F. Lewis, July 15, 2004, 42:9-43:3, at Ex. S. to Manna Aff. II, Dkt. No. 92. Defendants contend that this argument fails because of Marinaccio's criminal conviction related to the Mateer incident, and therefore, Defendants apparently argue, Plaintiffs are more properly compared to other independent contractors with documented criminal convictions, who sought DOT contracts. In support of their argument, Defendants cite a case from the Second Circuit, where the court rejected a Title VII plaintiff's pretext argument because she erroneously compared herself to other employees who were not disciplined by the defendant but had only engaged in verbally offensive behavior, while the plaintiff engaged in a physical fight. *See Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 568 (2d Cir.2000). This argument might carry weight if the Plaintiffs' equal protection claim were based on Defendants' rejection of Plaintiffs' bids for DOT contracts. In such a case, Marinaccio's criminal conviction relating to events which occurred on a DOT contract site would be material to the CRU's determination regarding Plaintiffs' bids for future DOT contracts. *See* Ex. B to Corrado Decl., Dkt. No. 84. In fact, consideration of a bidder's relevant criminal history is required under DOT's policy for determining whether a contractor is the lowest responsible bidder within the bounds of New York Highway Law § 38. *See* 9 N.Y.C.R.R. § 4.170 (2004). Defendants fail to explain, much less identify evidence which would support a conclusion that, Marinaccio's conviction is material to a decision regarding whether to

ban him from speaking publicly about a DOT contract, as provided in Attachment A to the Military Road subcontract. To be sure, Marinaccio's conviction might properly be deemed material to a decision regarding whether he should be banned from the Military Road site, a provision which also exists in Attachment A. However, at the very least, Plaintiffs have identified a question of fact regarding whether they were similarly situated to others who were not subject to a ban on holding public forums. The Second Circuit has noted that "[a]s a general rule, whether items are similarly situated is a factual issue that should be submitted to a jury." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499, n. 2 (2d Cir.2001), *citing Graham,* 230 F.3d at 39. While the court also noted that "[t]his rule is not absolute, [ ], and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met[ ]", such is not the case here as a reasonable jury could find, based on the evidence cited by Plaintiffs, that Defendants never treated another independent contractor similar to Marinaccio when it banned him from speaking publicly about a DOT contract, and that Marinaccio's prior criminal conviction is not relevant to same.

**\*23** Returning to the second prong of the equal protection analysis, the court notes that questions of fact remain on either the showing required by *LeClair* or *Olech.* Questions remain as to whether Defendants had a rational basis for their treatment of Plaintiffs, for the same reasons as outlined under the similarly situated analysis. While Defendants contend there is no question that Marinaccio's conviction provided a rational basis for their actions, they do not explain the relevance of said conviction to Marinaccio's ability to speak publicly about the Military Road contract. Notably, it is unclear whether the rational basis issue here is one of fact for a jury to decide or a legal issue for the court to decide. *See Bizzarro v. Miranda,* 394 F.3d 82, 89 (2d Cir2005) (finding that an equal protection claim would lie "[i]f a jury could reasonably find that there was no rational basis" for the defendants' action). *But see NYC C.L.A.S.H., Inc. v. City of New York,* 315 F.Supp.2d 461, 471 (S.D.N.Y.2004), *citing Myers v. County of Orange,* 157 F.3d 66, 75, n. 3 (2d Cir.1998) (issue of whether, under the Equal Protection Clause, defendants had a rational basis for their different treatment of plaintiffs is one of law for the court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

to decide, and is not a fact issue for a jury). However, because the grounds for Defendants' rational basis argument is so closely related to the remaining fact issues regarding Plaintiffs' similarly situated argument, the court concludes that the rational basis issue here should also be decided by a jury.

As for the *LeClair* standard under the second prong of the equal protection analysis, Plaintiffs have also identified questions of fact. Pursuant to *LeClair*, Plaintiffs can establish an equal protection claim where "[the] selective treatment was based on ... [among other things, a] malicious or bad faith intent to injure a person." *Bizzarro,* 394 F.3d at 86, *quoting LeClair,* 627 F.2d at 609-610. Here, Plaintiffs cite evidence in the record which shows that Defendants were aware of a bitter relationship between Marinaccio and O'Connor, *see* Tynan Dep., 101:11-24, at Manna Aff. II, Ex. O, Dkt. No. 92; Dep. of James B. Cantwell, July 15, 2004, 67:2-68:11, at Ex. R to Manna Aff. II, Dkt. No. 92, that they were also aware that O'Connor had bitter feelings toward Marinaccio, *see* Tynan Dep., 102:1-10, at Manna Aff. II, Ex. O, Dkt. No. 92, and that the relationship between the two had deteriorated, *see* Cantwell Dep., 65:24-66:23, at Manna Aff. II, Ex. R, Dkt. No. 92. Also, Plaintiffs note Marinaccio's allegation that he complained to O'Connor after the engineer in charge at a project site called Marinaccio a "little dago" but O'Connor never took any steps to investigate same. *See* Corrado Decl., Ex. E, at 26, Dkt. No. 84. Moreover, Plaintiffs again note that O'Connor referred to Marinaccio as a "thug" in his September 14, 2001 email to Tynan and Corrado. *See* Ex. H to Manna Aff. I, Dkt. No. 85. Based on this evidence, Plaintiffs have identified a question of fact regarding whether they were treated differently due to a malicious or bad faith intent to injure. *Cf. Harlen Assocs.,* 273 F.3d at 502.

**\*24** Material questions of fact remain regarding each element of Plaintiffs' § 1983 equal protection claim. Therefore Defendants' motion for summary judgment is denied regarding said claim, set forth in Count IV of the Amended Complaint.

**G. New York State Tort Claims-Counts VII through XI**

**1. Counts VII, VIII and IX-Tortious Interference With Business Relations**

The first three of Plaintiffs state law claims are as follows: tortious interference with business relations by Marinaccio and Midway (Count VII), tortious interference with prospective advantage by Marinaccio and Midway (Count VIII), and tortious interference with prospective advantage by Marinaccio and Accadia Site (Count IX). *See* Am. Compl. ¶¶ 86-102. Because in New York, claims for tortious interference with business relations and prospective advantage are identical, the court will conduct its analysis of Counts VII, VIII and IX together. *See Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir.2002); *Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108 -109 (2d Cir.1997). *See also El Greco Leather Prods. Co. v. Shoe World, Inc.,* 623 F.Supp. 1038, 1044 (E.D.N.Y.1985). The elements for this cause of action are "(i) the plaintiff had business relations with a third party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Lombard,* 280 F.3d at 214. See also *Goldhirsh Group,* 107 F.3d at 108 -109; *El Greco Leather Prods.,* 623 F.Supp. at 1044.

In Count VII of the Amended Complaint, Plaintiffs allege that Defendants interfered with Marinaccio's and Midway's business relationships with Kemper and the DOT. In Count VIII, Plaintiffs allege that Defendants interfered with Marinaccio's and Midway's business relationship with Master's Edge, insofar as they prevented the award of the Master's Edge subcontract to Midway, resulting in damage to said relationship and a $70,000 loss to Midway. At oral argument, counsel for Plaintiffs further argued that, insofar as the claim for tortious interference with business relations is maintained by Marinaccio, Defendants interfered with his business relations with Midway, and insofar as the claim is maintained by Midway, Defendants interfered with its business relations with Marinaccio. In Count IX of the Amended Complaint, Plaintiffs argue that Defendants interfered with Marinaccio's and Accadia Site's relationship with the DOT by not awarding them the Route 33 contract. Finally, Plaintiffs argue in their memorandum of law, ostensibly as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

to Counts VII and IX, that Defendants interfered with their business relationship with the DOT, based on Marinaccio's history of performing $85 million in road construction for DOT.

Defendants argue that the only third parties involved in this action are Kemper Surety and Master's Edge, and neither suffered an injury to their respective relationships with Plaintiffs. Moreover, Defendants argue that it had a reasonable and legitimate purpose for its actions based on Marinaccio's prior behavior, and therefore, Plaintiffs cannot establish that Defendants acted improperly.

**\*25** Initially, the court notes that neither Marinaccio, Midway, nor, to the extent Plaintiffs argue same, Accadia Site, may be considered a third party under Plaintiffs' tortious interference claims as Marinaccio is the owner and/or president of each. Because each entity has identity of interests with Marinaccio, he therefore cannot claim that either is a third-party to prospective contracts or business relations with others. The DOT, however, may be considered a third party for purposes of Plaintiffs' tortious interference claims because Plaintiffs' state law claims are only properly brought against Defendants in their individual capacities. As such, Defendants are necessarily only liable on said claims if they acted outside the authority of the DOT, and therefore, were capable of interfering with Plaintiffs' relationship with the DOT.

Regarding Count VII, there is no evidence in the record that Marinaccio's or Midway's relationship with Kemper or the DOT was injured as a result of Defendants' actions relating to the Military Road subcontract. Defendants are correct that Plaintiffs' award of said subcontract contradicts Plaintiffs' claims that their relationship with Kemper or the DOT was damaged. Therefore, Defendants are entitled to summary judgment on Count VII of the Amended Complaint.

The court concludes, nonetheless, that questions of fact exist regarding the claims set forth in Counts VIII and IX of the Amended Complaint. Plaintiffs have submitted evidence that their relationship with Master's Edge was harmed as a result of Defendants' failure to award them the subcontract at issue, in that Plaintiffs suffered a monetary loss in relation thereto. *See* Marinaccio Dep.,

232:22-233:19, at Ex. A to McCartin Decl., Dkt. No. 84. Moreover, Plaintiffs have also submitted evidence that their relationship with the DOT has suffered as a result of Defendants' actions, insofar as its bids for DOT contracts have been rejected. Regarding the propriety of Defendants actions regarding the Master's Edge subcontract and the Route 33 contract, questions of fact remain for the same reasons as previously outlined in the discussion of Plaintiffs' equal protection claim. Therefore, Defendants' motion for summary judgment as to Counts VIII and IX of the Amended Complaint is denied.

Accordingly, the court grants Defendants' motion for summary judgment as to Count VII of the Amended Complaint and denies the motion as to Counts VIII and IX.

**2. Count X-Prima Facie Tort**

As their tenth cause of action, Plaintiffs claim that Defendants intentionally and maliciously, with the sole purpose of causing them harm, interfered with their business relationships and/or contracts with DOT, Kemper, and Master's Edge, thereby resulting in "special damages" to Plaintiffs in the form of "loss of income, loss of profits, loss of productivity, loss of future earnings and loss of goodwill in the business community." Am. Compl. ¶¶ 103-107.

In New York, the elements of a claim for prima facie tort are "(1) intentional infliction of harm, (2) causing special damages (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *Discover Group, Inc. v. Lexmark Int'l, Inc.,* 333 F.Supp.2d 78, 87 (E.D.N.Y.2004) (citation and quotation omitted). A key feature of a prima facie tort claim is "disinterested malevolence, meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990) (citation and quotation omitted). "Motives other than disinterested malevolence, such as profit, self-interest, or business advantage will defeat a prima facie tort claim." *Id.* Also, in order to prevail on a claim for prima facie tort in New York, a plaintiff must establish special damages "with sufficient particularity to identify actual losses" and "round sums without any attempt at

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

itemization are insufficient." *Discover Group, 333 F.Supp.2d at 87.*

**\*26** Here, to the extent Plaintiffs' claim is based upon the rejection of their bids for either the Williams Road or Route 33 contracts, Defendants have submitted evidence that their actions regarding same were motivated by workplace and public safety in accordance with DOT regulations, and that their decisions were based upon Marinaccio's criminal conviction relating to the Mateer incident as well as Midway's and Accadia Site's lack of experience. Because Defendants have supplied evidence of a motive other than "disinterested malevolence," their rejections of Plaintiffs' bids for the Williams Road and Route 33 contracts cannot be the basis of Plaintiffs' prima facie tort claim. Also, to the extent Plaintiffs base their claim upon Defendants' actions regarding the Military Road subcontract, the claim must fail because said subcontract was, in fact, actually awarded to Midway, and therefore, no damages may be found. Finally, although Plaintiffs submit evidence that they "probably lost somewhere in the neighborhood of sixty, seventy thousand dollars" due to their not being awarded the Master's Edge subcontract, Marinaccio Dep., 233:10-11, Ex. A to McCartin Decl., Dkt. No. 84, such rounded estimates are not enough to meet the standard required to establish "special damages." For these reasons, Plaintiffs cannot establish a claim for prima facie tort, and accordingly, Defendants' motion for summary judgment as to Count X of the Amended Complaint is granted.

### 3. Count XI-Defamation

Plaintiffs' final cause of action is a claim for defamation under New York law. Although the Amended Complaint purports to set forth a defamation claim by Marinaccio against all Defendants, at oral argument Plaintiffs conceded that O'Connor is the sole defendant against whom this claim is alleged. Therefore, initially the court notes that Count XI of the Amended Complaint is dismissed against all defendants except O'Connor.

In New York, in order to prevail on a claim for defamation, a plaintiff must establish the following elements: "(1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by the defendant; and (4) resulting in injury to the plaintiff."

*Mills v. Unisource Worldwide, Inc.,* No. 04-CV-6324, 2005 WL 578167, at \*5 (W.D.N.Y. Mar. 9, 2005) (citation and quotation omitted). During discovery, Plaintiffs identified four separate instances of statements made by O'Connor about Marinaccio, which they allege form the basis of his claim for defamation. *See* Pls.' Resp. to Defs.' Second Set of Interrogs., at 5-6, Ex. G. to McCartin Decl., Dkt. No. 84. These statements include O'Connor's references to Marinaccio as "an incorrigible liar," "a bully" and a "thug" in his email messages of May 24, 2001 and September 14, 2001, respectively. *See* Ex. B to Manna Aff. II, Dkt. No. 91.; *See* Ex. H to Manna Aff. I, Dkt. No. 85. Also included are the statements made by O'Connor at the CRU meetings held on May 21, 2001 (regarding the engineer's notes which alleged that Marinaccio threatened to shoot a DOT employee) and May 28, 2003 (regarding Marinaccio having sexually harassed a woman in Fredonia who called the police). *See* Ex. E to Corrado Decl., at 23, Dkt. No. 84; Ex. O to Corrado Decl., at 25, Dkt. No. 84.

**\*27** Defendants argue that Marinaccio cannot establish his defamation claim against O'Connor because the proffered statements are not false and defamatory, and because Marinaccio was not injured by them. First, Defendants argue that Plaintiffs cannot establish the falsity of O'Connor's statement that Marinaccio is a "thug" and "a bully," because said statements were made after the Mateer incident, and Marinaccio was convicted of criminal conduct based on same. Even if the court were to credit this argument, there are clearly questions of fact regarding the truth of the remaining statements, as Marinaccio has asserted they are false.

Regarding the element of damages, in New York, in order to prevail on a claim for defamation, a plaintiff must prove "special damages," which consist of "the loss of something having economic or pecuniary value which must flow directly from the injury to the reputation by defamation; not from the effects of defamation." *Idema v. Wager,* 120 F.Supp.2d 361, 368 (S.D.N.Y.2000), *quoting Matheson v. Marchello,* 100 A.D.2d 233, 234, 473 N.Y.S.2d 998, 1001 (App. Div. 2nd Dep't 1984). Defendants contend that Marinaccio cannot establish that he was injured by the May 2001 email and CRU statements because Defendants have submitted evidence that Midway

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

was denied the Williams Road contract based on its inexperience, not Marinaccio's behavior. Defendants make a similar argument regarding O'Connor's statements at the May 2003 CRU, noting that there is evidence that Accadia Site was denied the Route 33 contract due to its inexperience. Finally, regarding the September 2001 email, Defendants contend that no injury may be shown because Midway was awarded the Military Road subcontract. However, the court need not address these arguments as Marinaccio's defamation claim fails on separate grounds. The "special damages" requirement in New York demands that a plaintiff fully and accurately define his damages "with sufficient particularity to identify actual losses." *Idema,* 120 F.Supp.2d at 368. As with the "special damages" element of a prima facie tort claim, in order to prove special damages for a defamation claim, the submission of estimates or round figures will not suffice. *See* id.; *Discover Group,* 333 F.Supp.2d at 87. Because Marinaccio has failed to submit specific evidence of his alleged losses relating to O'Connor's statements, he cannot establish defamation claim, and therefore, Defendants' motion for summary judgment as to Count XI of the Amended Complaint is granted.

V. Conclusion

In accordance with the above, it is hereby ORDERED that:

the motion for summary judgment on behalf of defendant, Joseph H. Boardman, as to all claims against him is GRANTED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Counts I, II and III of the Amended Complaint is GRANTED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Count IV of the Amended Complaint is hereby DENIED;

**\*28** defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, are entitled to qualified immunity as to Count V of the Amended Complaint, and therefore, said defendants' motion for

summary judgment as to said claim is accordingly GRANTED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Count VI of the Amended Complaint is hereby DENIED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, as to Counts VII, X and XI of the Amended Complaint is hereby GRANTED;

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their official capacities, as to Counts VIII and IX of the Amended Complaint is hereby GRANTED; and

the motion for summary judgment on behalf of defendants, James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their individual capacities, as to Counts VIII and IX of the Amended Complaint is hereby DENIED.

Accordingly, the following claims remain for consideration at trial:

Plaintiffs' claims against defendants James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their official and individual capacities, pursuant to 42 U.S.C. § 1983 as predicates to claims for the violation of Plaintiffs' right to equal protection under the Fourteenth Amendment (Count IV of the Amended Complaint) and their rights to free speech and assembly under the First Amendment (Count VI of the Amended Complaint); and

claims for tortious interference with prospective advantage, pursuant to New York law, against defendants James B. Cantwell, Steven F. Lewis, James F. Tynan and Robert E. O'Connor, in their individual capacities, by plaintiffs, Paul Marinaccio, Sr. and Midway Enterprises, Inc. (Count VIII of the Amended Complaint), and by plaintiffs, Paul Marinaccio, Sr. and Accadia Site Contracting, Inc. (Count IX of the Amended Complaint).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)

(Cite as: 2005 WL 928631 (N.D.N.Y.))

IT IS SO ORDERED.

N.D.N.Y.,2005.

Marinaccio v. Boardman
Not Reported in F.Supp.2d, 2005 WL 928631 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1996 WL 445363 (S.D.N.Y.)

(Cite as: 1996 WL 445363 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael Aziz Zarif SHABAZZ, a/k/a Michael Hurley,
Plaintiff,
v.
Mario M. CUOMO, Governor of the State of New
York, Thomas A. Coughlin, III, Commissioner of the
Department of Correctional Services, et al., Defendants.
No. 93 CIV. 7692 DLC.

Aug. 7, 1996.
Michael Aziz Zarif Shabazz, Dannemora, NY, pro se.

Dennis C. Vacco, Attorney General of the State of New
York, New York City, Moshe Benjamin, Assistant
Attorney General, for Defendants.

*OPINION*

COTE, District Judge:

**\*1** Michael Aziz Zarif Shabazz, an inmate in the
custody of the New York State Department of
Correctional Services ("DOCS"), filed this action pursuant
to 42 U.S.C. § 1983. Before the Court is a motion by
Mario Cuomo, former Governor of the State of New York,
and Thomas Coughlin, former Commissioner of DOCS, to
dismiss the complaint. For the reasons stated below,
defendants' motion is granted in part and denied in part.

*PROCEDURAL HISTORY*

On November 9, 1993, Shabazz brought an action *pro
se* for monetary damages and declaratory and injunctive
relief. He alleged, *inter alia,* that the defendants conspired
to violate his constitutional rights and those of fellow
prisoners when DOCS ceased providing inmates with a
weekly allotment of five free postage stamps for personal
mail. The District Court dismissed Shabazz's claim *sua
sponte* under 12(b)(6), Fed.R.Civ.P., for failure to state a
claim.

Shabazz filed an appeal. On March 31, 1994, the

Second Circuit Court of Appeals vacated the dismissal and
remanded the matter for further proceedings. The order of
remand stated that Shabazz had alleged specific facts
regarding the deprivation of stamps which may state a
Section 1983 claim and referred the District Court to
*Morgan v. LaVallee,* 526 F.2d 221 (2d Cir.1975) (prison
inmate's rights to communicate with family and friends are
First Amendment rights subject to Section 1983
protection). The case was subsequently transferred to this
Court. Defendants now bring a motion to dismiss for
failure to state a claim.

*PERSONAL CAPACITY VERSUS OFFICIAL
CAPACITY*

Although the plaintiff appears to bring an action
against defendants Cuomo and Coughlin in their
individual capacity, it is not entirely clear whether he also
intends to sue the defendants in their official capacity.[FN1]
A plaintiff who has not clearly identified in his complaint
the capacity in which a defendant is sued should not have
the complaint automatically construed as focusing on one
capacity to the exclusion of another. *See Frank v. Relin,* 1
F.3d 1317, 1326 (2nd Cir.1993), *cert. denied,* 510 U.S.
1012 (1993). Typically, the course of proceedings will
indicate the nature of the liability sought. *See id.* (citing
*Kentucky v. Graham,* 473 U.S. 159, 167 n. 14 (1985)). In
a Motion in Opposition, Shabazz states that he had
previously forwarded a letter to the clerk's office
requesting that the caption of his complaint be amended to
include "individually and in their official capacity." It
appears, nonetheless, that there remains some confusion as
to the capacity in which the defendants are being sued.
Neither plaintiff nor defendants directly address the legal
distinctions between personal-capacity actions and
official-capacity actions in their motion papers. Nor do
they differentiate between the relief sought for each type
of action. To introduce clarity to the proceedings, I will
review the record as a whole.

> FN1. Shabazz names Cuomo and Coughlin as
> defendants in his complaint, however, neither
> Cuomo nor Coughlin were served. Instead,
> service has been effected only upon their

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 445363 (S.D.N.Y.)

(Cite as: 1996 WL 445363 (S.D.N.Y.))

successors in office, Governor George E. Pataki and Commissioner Philip Coombe. Counsel for Cuomo and Coughlin have not filed a notice of appearance before the Court. Instead, the Attorney General filed a notice of appearance as counsel for both Pataki and Coombe in their official capacity. The Attorney General then filed this motion to dismiss on behalf of Cuomo and Coughlin in their individual capacity, though explicitly not at the request of Cuomo and Coughlin.

Shabazz has undoubtedly filed a claim against Cuomo and Coughlin in their personal capacity. First, Shabazz seeks monetary and punitive damages, which are unavailable in an official capacity action.[FN2] *See Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 89 (2d Cir.1991); *Shabazz v. Coughlin,* 852 F.2d 697, 700 (2d Cir.1988). Second, Shabazz alleges Cuomo and Coughlin's personal involvement in the alleged constitutional deprivation, an issue which is relevant only to personal capacity claims. Third, Cuomo and Coughlin acknowledge the existence of a personal capacity claim by arguing for lack of personal involvement and qualified immunity in their motion to dismiss. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993).

FN2. To the extent that a state official is sued for damages in his or her official capacity, such a suit is deemed to be a suit against the State. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993). Unless a State has waived its Eleventh Amendment immunity or Congress has overridden it, a State cannot be sued directly in its own name regardless of the relief sought. *See Kentucky v. Graham,* 473 U.S. at 167 n. 14 (citing *Alabama v. Pugh,* 438 U.S. 781 (1978) (suit against State and its Board of Corrections is barred by Eleventh Amendment where no consent has been given)). Here, there is no showing that the State of New York has consented to be a party to the suit.

**\*2** In construing the complaint favorably to the plaintiff, it appears that Shabazz has also sued Cuomo and Coughlin in their official capacity. The Eleventh Amendment does not bar an action for injunctive relief against state officials charged with alleged violations of the Constitution. *See Lowrance v. Coughlin,* 862 F.Supp. 1090, 1097 (S.D.N.Y.1994) (citing *Ex parte Young,* 209 U.S. 123). In the context of injunctive actions, official capacity actions are not treated as actions against the state. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10 (1989) (citing *Kentucky v. Graham,* 473 U.S. 159, 167 n. 10). To the extent that the named defendants no longer hold their official positions, their successors automatically assume the role in the suit. *See Lowrance,* 862 F.Supp. at 1097 n. 3.

Thus, the Complaint will be construed as seeking damages against Cuomo and Coughlin, who are sued in their personal capacity, and as seeking injunctive and declaratory relief from Pataki and Coombe, who as successors to Cuomo and Coughlin, are sued in their official capacity.

*STANDARD*

The Court may dismiss an action pursuant to Rule 12(b)(6), Fed.R.Civ.P., only if "it appears that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). In considering the motion, the Court must take "as true the facts alleged in the complaint and draw[ ] all reasonable inferences in the plaintiff's favor." *Jackson National Life Insurance Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 699-700 (2d Cir.1994). The Court can dismiss the claim only if, assuming all facts alleged to be true, plaintiff still fails to plead the basic elements of the cause of action. Additionally, although a court considering a motion to dismiss for failure to state a claim is limited to the facts stated in the complaint, the complaint includes any written instrument attached to it as an exhibit and any statements or documents incorporated into it by reference. *Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). Because the plaintiff appears in this action *pro se,* the Court must "liberally construe" his pleadings. *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2nd Cir.1995). "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." *Harsco Corp. v. Segui,* 1996 WL

Not Reported in F.Supp., 1996 WL 445363 (S.D.N.Y.)

(Cite as: 1996 WL 445363 (S.D.N.Y.))

428911, *4 (2nd Cir.1996).

### BACKGROUND

Shabazz claims that DOCS ceased providing five free stamps per week for inmates to send personal mail as of April 13, 1992. Read liberally, Shabazz appears to allege that this change in policy substantially interferes with all inmates' ability to communicate with family and friends, but is particularly a problem for inmates like Shabazz who are in restrictive confinement and therefore unable to participate in prison programs where they can earn money. Shabazz hypothesizes that some such inmates may not receive any money from the outside, and therefore will be unable to repay any amount advanced by DOCS for stamps for personal mail.

**\*3** Shabazz alleges that Cuomo caused the alleged deprivation as supervisor of the state's prison system. He also alleges that Coughlin caused the alleged deprivation by setting regulations and policy for the prison system. Moreover, Shabazz alleges that he mailed a letter of protest to Cuomo in which he notified Cuomo of the constitutional violation. The letter, dated May 15, 1992, is attached to the Complaint.

### PERSONAL CAPACITY CLAIMS

Section 1983 provides a cause of action against any person who, acting under the color of state law, infringes on a person's rights secured by the Constitution or the laws of the United States. The allegation of a defendant's personal involvement in any alleged constitutional deprivation is a prerequisite to a damage award for personal liability under Section 1983. [FN3] See Wright v. Smith, 21 F.3d 496, 501 (2d.Cir.1994). A supervisory official may be found personally involved in the deprivation of a plaintiff's constitutionally protected interest if the defendant: (1) participated directly in the alleged constitutional violation; (2) failed to remedy the violation after being informed of it through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference to the rights of the inmates by failing to act on information indicating that unconstitutional acts were occurring. See Colon v.

Coughlin, 58 F.3d 865, 873 (2d Cir.1995).

FN3. Defendants contend that they were not individually served within the time specified under Rule 4(m), Fed.R.Civ.P., and therefore, the case should be dismissed. Because failure to serve may be cured, I will address the motion to dismiss on the merits.

That Shabazz mailed a single letter to the Governor's office describing the deprivation of stamps does not, by itself, establish that Cuomo had notice of the constitutional violation. See Zamakshari v. Dvoskin, 899 F.Supp. 1097, 1110 (S.D.N.Y.1995) (collecting cases). Shabazz alleges no further basis for Cuomo's personal involvement and, therefore, the claims against Cuomo must be dismissed.

As to Coughlin, Shabazz alleges that the defendant was personally involved in promulgating a policy of denying prisoners a weekly allotment of five free stamps for personal mail. Coughlin contends that the policy in question, Directive 4422, was promulgated by Susan Butler, the Deputy Commissioner of DOCS, and not by the Commissioner. He argues, therefore, that he was not personally involved. Even if Coughlin played no role in promulgating the Directive and was uninformed of the policy, he can be still be held liable as a supervisory official. By statute, the Commissioner was charged with developing policies governing the operation of DOCS and the conduct of its employees at the time of alleged constitutional deprivation. N.Y.Correctional Law § 112 (McKinney 1996). Moreover, the Commissioner was charged with annually reviewing all DOCS rules and regulations pertaining to inmates, whether promulgated by the Commissioner or by his subordinates. N.Y.Correctional Law § 138 (McKinney 1996). To the extent that Coughlin delegated his authority to others whom he failed to supervise, or allowed a Directive promulgated by his subordinate to bypass his review, he remains personally involved. Coughlin has, as a further defense, invoked the doctrine of qualified immunity.

### QUALIFIED IMMUNITY

**\*4** The doctrine of qualified immunity shields government officials in personal capacity actions under Section 1983 "from liability for civil damages insofar as

Not Reported in F.Supp., 1996 WL 445363 (S.D.N.Y.)

(Cite as: 1996 WL 445363 (S.D.N.Y.))

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (citations omitted). *See also Kentucky v. Graham,* 473 U.S. 159, 166-67 (1985). In order to determine whether a right is "clearly established," this Court should consider: (1) whether the right was defined with reasonable specificity, (2) whether the Supreme Court and this Circuit's cases have clearly established the right, and (3) whether a reasonable defendant would have reasonably understood that his or her actions were unlawful in light of preexisting law. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.), *cert. denied,* 503 U.S. 962 (1992). *See also Allen v. Coughlin,* 64 F.3d 77, 81 (2d Cir.1995). In making this determination, only the case law of the Second Circuit and the Supreme Court is relevant. *Richardson v. Selsky,* 5 F.3d 616, 623 (2d Cir.1993) ("district court decision does not 'clearly establish' the law, even in its own circuit"); *Russel v. Scully,* 15 F.3d 219, 223 (2d Cir.1993) (looking only to case law of the Supreme Court and Second Circuit).

Shabazz contends that an inmate's right to communicate with the outside world has been long established under the First Amendment. In *Thornburgh v. Abbott,* the Supreme Court found that prison walls do not form a barrier separating prison inmates from the protection of the Constitution. 490 U.S. 401, 407 (1989). The Supreme Court, however, has also acknowledged that "[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment...." *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 125 (1977).

While the Second Circuit has rendered decisions on prison officials' obligation to provide free postage to inmates for legal mail, it has not ruled on whether prison officials must provide free postage to inmates to send personal mail to friends and family. In *Gittens v. Sullivan,* 848 F.2d 389 (2nd Cir.1988), the Second Circuit reviewed prior case law [FN4] and held that in light of budgetary considerations, an inmate was not deprived of meaningful access to courts where prison officials provided him with $1.10 per week for postage stamps and an additional advance of at least $36 for postage for legal mail. In *Morgan v. LaVallee,* 526 F.2d 221 (2d Cir.1975), the

Second Circuit found a constitutional right of inmates to communicate with the outside world, but did not address whether the correctional facility was required to provide inmates with free postage for personal mail. In *Morgan,* the Court found that the plaintiff had stated a claim through his allegation that the prison had issued a directive to him that he tell his correspondents not to send him stamps. In light of the fact that the prison only provided inmates at that time with one stamp per week, the Court held that such a directive, should it be found to exist, could materially interfere with First Amendment rights.

> FN4. In *Jones v. Smith,* 784 F.2d 149 (2d Cir.1986), two consolidated cases were remanded by the Court of Appeals on the issue of whether the $1.10 was sufficient to allow access to the courts. In *Chandler v. Coughlin,* 763 F. 110 (2d Cir.1985), the Court of Appeals also remanded an action for further proceedings as to whether the state policy of discretionary advancements for legal mail comports with the requirements of due process.

**\*5** Neither *Gittens* nor *Morgan* clearly establish an inmate's constitutional right to free postage for personal mail, much less to five stamps per week. Consequently, Cuomo and Coughlin are entitled to qualified immunity and the motion to dismiss the claims against them in their personal capacity is granted.

## OFFICIAL CAPACITY CLAIMS

In an official capacity action, a government entity is liable under Section 1983 only when the entity itself is a "moving force" behind the constitutional deprivation. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985) (citation omitted). In the present case, there is no question that DOCS promulgated the policy which led to the alleged constitutional violation. There is, in contrast, no allegation that the Governor's Office played any role in creating or approving the regulations regarding inmate mail. Therefore, the motion to dismiss the official capacity action against Pataki is granted.

I now turn to the official capacity action against Coombe as successor to Coughlin. As noted above, an inmate's right to communicate with family and friends is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 445363 (S.D.N.Y.)

(Cite as: 1996 WL 445363 (S.D.N.Y.))

protected by the First Amendment. To find a violation of this right, the Court must find that a directive or policy of DOCS materially impedes an inmate's ability to communicate with the outside world. *Morgan,* 526 F.2d at 225. At the same time, the Court must exercise judicial restraint in reviewing prison policy because courts are not well suited to deal with the urgent problems of prison administration and because they must respect the doctrines of separation of powers and federalism. *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2nd Cir.1995) (citing *Turner v. Safley,* 482 U.S. 78, 84-85 (1987)).

In assessing whether a prison regulation that impinges on an inmates' constitutional rights is nonetheless valid, a court must analyze whether it is reasonably related to a legitimate penological interest. *Id.* To determine reasonableness, the Court must look to four issues: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it and whether the governmental interest is legitimate and neutral; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) whether and how an accommodation of the asserted constitutional right will impact on guards and other inmates, and on the allocation of prison resources generally; and (4) whether easy alternatives to the policy in question exist. *Id.* The plaintiff bears the burden of proving that the disputed regulation is unreasonable. *Id.* at 1054 (internal citation omitted).

Viewing the complaint as a whole, I find that the Shabazz's *pro se* complaint, "which we hold to less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner,* 404 U.S. 519 (1972), states a cognizable claim for an alleged constitutional deprivation under Section 1983. The heart of Shabazz's complaint consists of allegations that his denial of five free postage stamps per week for personal mail materially impedes his ability to communicate with the outside world because he lacks the resources to purchase stamps or to pay back advances for stamps which he might receive. Because Shabazz presses legitimate questions as to the reasonableness of DOCS' postage policy and the efficacy of the alternatives available to him, he should be given the opportunity to address the substance of his claim against the defendant.

**\*6** Coombe, as successor to Coughlin, urges that plaintiff's claim is baseless. He argues that the defendants have a legitimate budgetary interest in promulgating the postage policy and that DOCS has more than adequately provided the plaintiff with numerous alternatives to communicate with the outside world. In support of this argument, he cites several Directives promulgated by DOCS which provide inmates various means to contact family and friends, either by advancing postage to inmates under certain circumstances, [FN5] allowing inmates to receive money from family and friends to pay for stamp purchases,[FN6] or allowing inmates to pay for telephone usage. [FN7] On a motion to dismiss, however, only the plaintiff's facts are taken as true and accepted for consideration.

> FN5. According to Directive 4422 III(D)(4), an inmate *may* be advanced one first class postage stamp per month if the inmate has been confined to Special Housing Unit and has a zero or negative account balance, been confined to keeplock status and has zero or negative account balance, or has lost his phone privileges and has not refused to accept available program assignments.

> FN6. Directive 4422 III(G)(2) states that cash, checks and money orders mailed to prisoners from identifiable persons outside the correctional facility shall be deposited into an inmate's personal account.

> FN7. 7 N.Y.C.R.R. § 723.

At the Court's discretion under Rule 12(c), Fed.R.Civ.P., it may consider matters outside the complaint in ruling on a motion to dismiss for failure to state a claim, which in essence means that it will treat the motion as one for summary judgment pursuant to Rule 56, Fed.R.Civ.P., and give the non-moving party an opportunity to present evidence in opposition to the motion. The inquiry, when determining if a conversion to a motion for summary judgement is appropriate, is whether the non-movant,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1996 WL 445363 (S.D.N.Y.)

(Cite as: 1996 WL 445363 (S.D.N.Y.))

should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleading.

*National Ass'n of Pharmaceutical Mfrs. v. Ayerst Lab,* 850 F.2d 904, 911 (2d Cir.1988) (quoting *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985), *cert. denied sub nom., M.J.M. Exhibitor, Inc. v. Stern,* 475 U.S. 1015 (1986)). *See also Krijn v. Pogue Simone Real Estate Co.,* 896 F.2d 687, 689 (2d Cir.1990).

In this case, few matters outside the pleadings were presented by either party. The defendant attached to his motion a certified copy of the amended Directive 4422. The defendant also refers to other DOCS Directives, but did not attach copies to the motion. The plaintiff in turn attached an affidavit of a fellow inmate who describes his own experience regarding the alleged constitutional deprivation. Shabazz also requested discovery on the matter at issue here. Given the few exhibits attached to the motion papers, and the plaintiff's lack of opportunity to meet facts introduced by the defendant outside of the pleadings, it is inappropriate for this Court to convert this motion to one for summary judgment.

Although none of the parties have referred to it, a court in the Northern District of New York considered and dismissed on summary judgment a similar challenge to the precise regulation at issue here. *Dawes v. Carpenter,* 899 F.Supp. 892 (1995) (Kaplan, J., sitting by designation). The court in *Dawes* held that "the Constitution does not require the State to subsidize inmates" who wish to send personal mail. The plaintiff in *Dawes,* like Shabazz, argued that he was entitled to free stamps since he was confined in Special Housing Unit and a lien on his account prevented him from buying stamps or using the telephone. The *Dawes* court, rejecting this argument, stated "[t]hese incidental restrictions on First Amendment freedoms are justified if the [sic] they are necessary to serve a legitimate government interest such as that in order, security or rehabilitation." *Id.* at 899.

**\*7** While the reasoning in *Dawes* is persuasive, that Court did not weigh the *Turner* factors cited by the Second Circuit in *Giano* and listed above. Moreover, in

the instant action, where a civil rights violation is at issue and the plaintiff is *pro se,* the Court must be vigilant in applying the standard for a motion to dismiss. *See Hernandez v. Coughlin,* 18 F.3d 133, 136 (2nd Cir.1994), *cert. denied,* 115 S.Ct. 117 (1994). Consequently, in order to permit the parties to develop a record from which they may analyze Shabazz's claim in light of the *Turner* factors, I will permit discovery to proceed. Should the plaintiff request appointment of counsel, and should he submit adequate proof that he is entitled to appointed counsel, the Court will enter such an order. Any such application should be made by September 16, 1996.

*CONCLUSION*

The motion to dismiss is granted as to the claims against Cuomo and Coughlin in their personal capacity. The motion to dismiss is granted as to the claim against Pataki, as successor to Cuomo, in his official capacity.

The motion to dismiss is denied as to the claim against Coombe, as successor to Coughlin, for injunctive and declaratory relief.

SO ORDERED:

S.D.N.Y.,1996.

Shabazz v. Cuomo
Not Reported in F.Supp., 1996 WL 445363 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

D. Connecticut.
Clarence O. REYNOLDS, Plaintiff,
v.
Richard S. BLUMENTHAL, Attorney General of the
State of Connecticut; Mark F. Kohler, Assistant
Attorney General of the State of Connecticut;
Connecticut Department of Public Utility Control;
Northeast Nuclear Energy Company; Northeast Utilities
Service Company; Connecticut Light & Power
Company; Day Berry & Howard, LLP; Allan B. Taylor,
Defendants.
No. 3:04cv218 (PCD).

Sept. 26, 2006.
Clarence O. Reynolds, Oakdale, CT, pro se.

Clare E. Kindall, Jane R. Rosenberg, Attorney General's
Office, Duncan Ross Mackay, Northeast Utilities Service
Co., John B. Nolan, Allan B. Taylor, Day, Berry &
Howard, Hartford, CT, for Defendants.

### *RULING ON MOTION TO DISMISS*

PETER C. DORSEY, District Judge.
   **\*1** Plaintiff, Clarence Reynolds, brings this action
pursuant to 42 U .S.C. §§ 1983 and 1985 alleging, *inter
alia,* that Defendants violated his constitutional, statutory,
and common law rights when he was terminated in
retaliation for filing whistleblower complaints .[FN1]
Defendants Attorney General Richard Blumenthal
("Blumenthal"), Assistant Attorney General Mark Kohler
("Kohler"), and the Connecticut Department of Public
Utility Control ("DPUC") (together, the "State
Defendants") move, pursuant to Rules 12(b)(1) and
12(b)(6) of the Federal Rules of Civil Procedure, to
dismiss Plaintiff's Complaint as to them on the grounds
that Plaintiff's claims are (1) barred by the Eleventh
Amendment; (2) barred by res judicata; (3) barred by the

applicable statute of limitations; (4) barred by sovereign
immunity; (5) barred by the *Rooker-Feldman* doctrine;
and (6) fail to state a claim on which relief can be granted.
For the reasons that follow, the State Defendants' Motion
to Dismiss [Doc. No. 11] is **granted.**

   FN1.    Although Plaintiff was originally
   represented by an attorney, he is now proceeding
   *pro se.* On March 4, 2004, defendant Allan
   Taylor moved to strike the Plaintiff's Complaint
   pursuant to Local Rule 16(g)(2) on the ground
   that Plaintiff's counsel, Nancy Burton, had
   outstanding unpaid sanctions against her. On
   May 3, 2004, this Court granted Taylor's motion
   to strike and ordered Nancy Burton not to
   function, in any capacity, as an attorney in
   connection with the case. (*See* Ruling on Mot.
   Strike 1, May 3, 2004, Doc. No. 26 ("In the
   absence of payment of sanctions ordered by
   Judge Nevas, ... Attorney Burton is foreclosed
   from filing any pleadings in this Court," and is
   ordered "to not function, in any capacity, as an
   attorney with respect to this case.").) Plaintiff
   appealed that ruling to the Second Circuit,
   however, his appeal was dismissed on the ground
   that "a final order has not been issued by the
   district court as contemplated by 28 U.S.C. §
   1291." (Mandate, Jan. 13, 2005, Doc. No. 34.)

### I. BACKGROUND[FN2]

   FN2. A court considering a motion to dismiss for
   failure to state a claim must accept the facts
   alleged in the complaint as true. *Scheuer v.
   Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40
   L.Ed.2d 90 (1974). Accordingly, the statement of
   facts that follows is derived in large part from
   Plaintiff's Complaint. Because this ruling also
   involves a motion to dismiss pursuant to Rule
   12(b)(1), however, the statement of facts also
   refers to evidence outside the pleadings. *See
   Makarova v. United States,* 201 F.3d 110, 113
   (2d Cir.2000).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

Plaintiff was employed as a skilled mechanic at the Millstone Nuclear Power Station ("Millstone") by defendant Northeast Nuclear Energy Company ("NNECO") from 1980 until June 27, 1994, when his employment was terminated. (Compl.¶¶ 4, 12.) On September 24, 1993, nine months before NNECO terminated his employment, Plaintiff filed a formal complaint, pursuant to Conn. Gen.Stat. § 16-8a (the "Nuclear Whistleblower Act"), with the DPUC. (*Id.* ¶ 13.) In his complaint, Plaintiff alleged that he was harassed and intimidated for filing health and safety complaints with NNECO and various regulatory agencies. (*Id.*) Following his termination, Plaintiff sought an order from the DPUC, pursuant to Conn. Gen.Stat. § 16-8a(c)(4), reinstating his employment. (*Id.* ¶ 14.)

After his employment was terminated, Plaintiff also filed a complaint against NNECO with the United States Department of Labor ("DOL"), alleging retaliatory discharge and discipline under the Energy Reorganization Act, 42 U.S.C. § 5 851. *See Reynolds v. Northeast Nuclear Energy Co.,* No. CV 940541440, 20 Conn. L. Rptr. 683, 1997 Conn.Super. LEXIS 2839, at *2 (Super.Ct. Oct. 14, 1997).[FN3] After a ten-day hearing, an Administrative Law Judge ("ALJ") issued a recommended decision and order in which the ALJ found that Plaintiff "had a poor attendance record," "an uncooperative attitude," was "missing from work on a number of occasions," "was caught sleeping on the job on several occasions," and that his "performance in 1991 was deplorable." *Id.* at *4. The ALJ also found that Plaintiff committed perjury during the proceedings before the DOL, was untruthful, and, "provided a series of false and misleading statements" to a DOL Investigator. *Id.* Finally, the ALJ concluded that Plaintiff "failed to provide any evidence, circumstantial or direct, linking his raising of safety concerns with his discipline and termination." *Id.* at *5. That decision was adopted by the Administrative Review Board as "factually and legally sound," and Plaintiff's complaint was dismissed with prejudice on March 31, 1997. *Id.* at *5 and *9.

FN3. Plaintiff also filed a civil suit against NNECO in Connecticut Superior Court alleging retaliatory discharge and discipline in violation of Conn. Gen.Stat. § 31-51q. *Reynolds v.*

*Northeast Nuclear Energy Co.,* 1997 Conn.Super. LEXIS 2839. On October 14, 1997, the Superior Court granted summary judgment for NNECO, finding that Plaintiff's claims had been fully litigated by the same parties in the DOL proceeding and thus were barred by the doctrines of res judicata and collateral estoppel. *Id.*

**\*2** On September 10, 1997, after an investigation, the DPUC issued a preliminary ruling ordering Plaintiff reinstated to his employment. (Compl. ¶ 15.) Specifically, the DPUC found that Plaintiff (1) had complained of misfeasance, malfeasance, or nonfeasance; (2) was fired; and (3) had not knowingly made a false report. Accordingly, the DPUC concluded that there was a presumption that NNECO had retaliated against Plaintiff and issued the preliminary ruling ordering NNECO to immediately reinstate Plaintiff.[FN4] The DPUC, however, did not effectuate the reinstatement order, which explicitly provided that the order would be stayed pending NNECO's appeal of previous department decisions issued pursuant to the Whistleblower Act. (*Id.* ¶ 16; DPUC Decision 7, Sept. 7, 1997, Ex. 4 to Defs.' Mot. Dismiss.) The appeal, which was filed in United States District Court, District of Connecticut, by NNECO, Northeast Utilities Service Company ("NUSCO"), Connecticut Light & Power ("CL & P") and related entities against the DPUC, challenged 1997 Conn. Pub. Acts No. 97-60 as unconstitutional and sought a preliminary injunction prohibiting the DPUC from applying the amended Act. (Compl.¶¶ 16-17); *see also Connecticut Light & Power Company et al. v. State of Connecticut Department of Public Utility Control,* 3:97cv1258 (RNC) ("*CL & P v. DPUC*"). Plaintiff was not a party to this action. (Compl.¶ 17.)

FN4. At the time when Plaintiff filed his complaint with the DPUC, the Connecticut Nuclear Whistleblower Act, Conn. Gen.Stat. § 16-8a, had been recently amended by 1997 Conn. Pub. Act No. 97-60, which prohibited public service companies and other regulated entities from taking or threatening to take any retaliatory action against an employee for disclosing any mater involving "substantial

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

misfeasance, malfeasance or nonfeasance" in the management of the company. 1997 Conn. Pub. Acts No. 97-60 § 1(a), Ex. 2 to Defs.' Mot. Dismiss. If an employee complained of such retaliatory action, the amendment required the DPUC to make a preliminary finding regarding the alleged retaliation based on sworn affidavits and verified documents, without holding a public hearing. 1997 Conn. Pub. Acts No. 97-60 § 1(c)(1). The employer was notified of the complaint and provided an opportunity to respond, however, in making the preliminary finding, the DPUC was required to adopt a presumption that the employee had been retaliated against in violation of the Act if it found that: "(A) the employee had reported substantial misfeasance, malfeasance or nonfeasance in the management of the public service company, holding company or licensee; (B) the employee was subsequently discharged, suspended, demoted or otherwise penalized by having his status of employment changed by his employer; and (C) the employee's report was not knowingly false." 1997 Conn. Pub. Acts No. 97-60 § 1(c)(2)-(3). If the DPUC made this finding, it was required to "issue an order requiring the employer to immediately return the employee to the employee's previous position of employment or an equivalent position." 1997 Conn. Pub. Acts No. 97-60 § 1(c)(4). It was only *after* making this finding that the DPUC was required to "conduct a full investigatory proceeding ... at which time the employer shall have the opportunity to rebut the presumption." 1997 Conn. Pub. Acts No. 97-60 § 1(d). This is no longer the law, as discussed below. *See* Conn. Gen.Stat. § 16-8a, as amended by 1999 Conn. Pub. Acts No. 99-46.

According to Plaintiff's Complaint, on October 9, 1997, in proceedings before the United States District Court, defendants Taylor and Blumenthal, acting by and through defendant Kohler, agreed that the DPUC would not enforce its order to reinstate Plaintiff to his employment at Millstone. (Compl.¶ 21.) Plaintiff was not reinstated to his employment, and was not notified by any

of the defendants as to their agreement not to effectuate his reinstatement. (*Id.* ¶ 22.) The State Defendants assert that no secret agreement existed. (*See* Defs.' Reply 2-4.) To prove this, they submit the transcript of the October 9, 1997 oral argument before Judge Chatigny.[FN5] The transcript reveals that the only exchange mentioning Reynolds occurred when counsel for the plaintiffs in that suit, Allan Taylor, in determining whether to make a federal preemption argument, briefly clarified that it was the DPUC's position that the amended Act would not require the plaintiffs to reinstate Reynolds to the same or equivalent position. (*CL & P v. DPUC* Transcript at 4:13-22, Oct. 9, 1997, Ex. A to Defs .' Reply.) Attorney Kohler, representing the DPUC, confirmed this was the DPUC's position. (*Id.* at 4:24-25.) [FN6]

> FN5. In ruling on a motion to dismiss, courts may consider documents that have been incorporated by reference in the plaintiff's complaint-i.e., a document may be considered if the complaint "relies heavily upon its terms and effect," such that the document may be considered "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir.2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995) (per curiam)). The *Chambers* Court cautioned, however, that "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.* at 153. In the instant case, the transcript of the October 9, 1997 oral argument is integral to Plaintiff's claims and thus is incorporated by reference in his Complaint. (*See* Com pl. ¶¶ 17-18, 21.) The Second Circuit has also stated that a court ruling on a motion to dismiss may consider "matters of which judicial notice may be taken," *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993), and it is has been held that courts may take judicial notice of transcripts from judicial proceedings in related cases. *See Browdy v. Karpe*, No. 3:00cv1866 (CFD), 2004 U.S. Dist. LEXIS 19299, at *5 n. 3 (D.Conn. Sept. 20,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

2004) *(citing Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (noting that "courts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings")); *see also* Fed.R.Evid. 201(b) (authorizing a court to take judicial notice of an adjudicative fact if that fact is "not subject to reasonable dispute" or if it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). It should be emphasized, however, that a court may take judicial notice of a document filed in another court "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer,* 937 F.2d at 774.

FN6. Specifically, the transcript indicates that Attorney Taylor stated that "[i]f it is not the position of the State that as a matter of law we are required to reinstate [Reynolds] to a position at the nuclear plant, then we're not asking for a judgment that there is no other position, no non-nuclear position. So [the plaintiffs'] view is that the statute is preempted as applied to the extent that it requires us to reinstate him to a nuclear plant, and we're not seeking any further judgment other than that." *(CL & P v.. DPUC* Transcript at 4:13-22.) Attorney Kohler indicated that he was satisfied with that statement. The only other times that Reynolds was mentioned during oral argument were: (1) on pages 6 and 7 of the transcript, where the attorneys used the "Reynolds facts" as an illustration of "the fundamental substantive due process problem with [the amended Whistleblower Act]," (*id.* at 6:6-7:8), and (2) at the end of the oral argument, when Attorney Taylor noted that "it is the State's position that we are not compelled to return Mr. Reynolds to a nuclear plant position makes [the preemption] issue at this point not requiring any further decision," and Attorney Kohler agreed that the "Reynolds issue" was moot, (*id.* at 32:14-24).

While this suit was pending, the General Assembly adopted 1999 Conn. Pub. Acts No. 99-46, which amended Conn. Gen.Stat. § 16-8a, effective May 27, 1999. The amendment changed the process that had been adopted in Public Act 97-60, discussed in *supra* note 3, and that was being challenged by NNECO, NUSCO and CL & P. Specifically, the amendment gave the employer an opportunity to respond to an employee's complaint and to have its response considered by the DPUC *prior* to the DPUC's issuance of a preliminary ruling:

> **\*3** The employer may submit a written response and both the employer and the employee may present rebuttal statements in the form of affidavits from witnesses and supporting documents and may meet with the department informally to respond verbally about the nature of the employee's charges. The department shall consider in making its preliminary finding as provided in subdivision (3) of this subsection any such written and verbal responses, including affidavits and supporting documents, received by the department not more than twenty business days after the employer receives such notice.

1999 Conn. Pub. Acts No. 99-46 § 1(c)(2). The amendment eliminated the presumption of retaliation if the employer could show, "by clear and convincing evidence that the adverse employment action was taken for a reason unconnected with the employee's report of substantial misfeasance, malfeasance or nonfeasance." 1999 Conn. Pub. Acts No. 99-46 § 1(c)(3).

*CL & P v. DPUC* was resolved by a confidential out-of-court settlement and the case was closed on November 22, 1999. (Compl.¶ 18.) Following the close of that action, the DPUC did not effectuate its reinstatement order, notwithstanding Plaintiff's efforts in pressing the DPUC to effectuate his reinstatement. (*Id* . ¶¶ 18-19.) However, by letter dated October 26, 1999, the DPUC notified NNECO and Plaintiff that it would continue processing Plaintiff's complaint pursuant to Conn. Gen.Stat. § 16-8a, as amended by Public Act No. 99-46. A final decision was issued on May 2, 2001. (*See* DPUC Decision 3, May 2, 2001, Ex. 5 to Defs.' Mot. Dismiss.[FN7]) Pursuant to Public Act No. 99-46, the DPUC accepted a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

response from NNECO and concluded, "by clear and convincing evidence, that the adverse employment action taken against [Plaintiff] was for reasons other than as retaliation for reasons connected to his report of substantial misfeasance, malfeasance or nonfeasance." (*Id.* at 7-8.) In particular, the DPUC found that Plaintiff's "actual employment history [was] marked by a long period of deterioration beginning shortly after his employment in 1980," Plaintiff "routinely engaged in confrontational behavior with his management and his peers," and the "vast majority" of his safety concerns were not valid. (*Id.* at 6.) Although the DPUC noted that Plaintiff's "termination was coincidental to the imposition of a fine on [him]," it was determined that "the record in this case supports the finding that [NNECO] was justified in its termination of Mr. Reynolds as an employee." (*Id.* at 8.) Accordingly, the DPUC dismissed Plaintiff's complaint. (Compl.¶ 20 .)

> FN7. As stated in *supra* note 6, a court ruling on a motion to dismiss may consider matters of which judicial notice may be taken. *Brass, 987 F.2d at 150.* Among the matters of which courts may take judicial notice are decisions of an administrative agency, such as the DPUC decision discussed herein. *See Funari v. Warden, 218 F.3d 250, 255 (3d Cir.2000)* ("it is proper for this Court to take judicial notice of decisions of an administrative agency"); *Opoka v. INS, 94 F.3d 392, 394 (7th Cir.1996)* ( "it is a well-settled principle that the decision of another court or agency, including the decision of an administrative law judge, is a proper subject of judicial notice") *(citing, among others, Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388 (2d Cir.1992)*).

Plaintiff contends that the DPUC's May 2, 2001 decision was issued without further investigation, and only after he testified, on March 12, 2001, during court proceedings on the proposed sale of the Millstone Nuclear Power Station to Dominion Nuclear Connecticut, Inc., about criminal conduct at Millstone. (*Id.*)

*4 On June 15, 2001, Plaintiff brought suit in Connecticut Superior Court, challenging the DPUC's decision. *See Reynolds v. Dep't of Pub. Util. Control, 48 Conn. Supp. 188, 835 A.2d 134 (Super.Ct.2001).* The Connecticut Superior Court dismissed the suit, concluding that the DPUC's decision was not a contested case subject to appeal under the Uniform Administrative Procedure Act, and that the Nuclear Whistleblower Statute, Conn. Gen.Stat. § 16-8a, did not create a right of action against the DPUC. *Id.* Plaintiff appealed, however, the Connecticut Supreme Court affirmed the Superior Court's decision on November 18, 2003. *See Reynolds v. Dep't of Pub. Util. Control, 266 Conn. 606, 834 A.2d 58 (2003).*

Subsequently, on February 9, 2004, Plaintiff filed the present suit in United States District Court. Seeking reinstatement to his position at Millstone, as well as compensatory and punitive damages, attorneys' fees and costs, Plaintiff's Complaint sets out five counts against Defendants: (1) deprivation of his right to due process of law pursuant to the Fourteenth Amendment to the United States Constitution and Article First, Sections 8 and 10 of the Connecticut Constitution, in violation of 42 U.S.C. § 1983; (2) conspiracy to deprive Plaintiff of his federal and state constitutional rights in violation of 42 U.S.C. § 1985; (3) violation of the Nuclear Whistleblower Act, Conn. Gen.Stat. § 16-8a; (4) intentional infliction of emotional distress; and (5) negligent infliction of emotional distress. (Compl.¶¶ 25-33.)

## II. STANDARD OF REVIEW

### A. Rule 12(b)(1)

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. *See* Fed.R.Civ.P. 12(b)(1). Plaintiff, as the party asserting subject matter jurisdiction, has the burden of establishing by a preponderance of the evidence that it exists, *Malik v. Meissner, 82 F.3d 560, 562 (2d Cir.1996),* and the court should not draw argumentative inferences in his favor. *Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l, 968 F.2d 196, 198 (2d Cir.1992).* Unlike with a Rule 12(b)(6) motion, a court resolving a Rule 12(b)(1) motion for lack of subject matter jurisdiction may refer to evidence outside the pleadings. *Makarova v. United States, 201 F.3d 110, 113 (2d Cir.2000) (citing Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir.1986)); see*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

also *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi,* 215 F.3d 247, 253 (2d Cir.2000) (in resolving a Rule 12(b)(1) motion, district courts may "resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing"). A court must "look to the substance of the allegations to determine jurisdiction." *Cargill Int'l S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1019 (2d Cir.1993).

Defendant is moving to dismiss Plaintiff's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. When a party moves to dismiss pursuant to Rule 12(b)(1) in addition to other bases, "the court should consider the Rule (12)(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Rhulen Agency, Inc. V. Alabama Ins. Guaranty Ass'n.,* 896 F.2d 674, 678 (2d Cir.1990).

**B. Rule 12(b)(6)**

**\*5** The function of a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 776 (2d Cir.1984) (citation omitted). Therefore, when considering such a motion, the court must accept the facts alleged in the complaint as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). Dismissal of a complaint under Rule 12(b)(6) is inappropriate unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *I. Meyer Pincus & Associates v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991); *see also Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (Courts should not grant a Rule 12(b)(6) motion to dismiss merely because recovery seems unlikely or remote, as "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").

**III. DISCUSSION**[FN8]

FN8. Plaintiff is granted extra deference here in light of his *pro se* status. *See Haines v. Kerner,*

404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (holding the allegations of a *pro se* complaint to "less stringent standards than formal pleadings drafted by lawyers"); *see also Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996) (noting that "district courts should be especially hesitant to dismiss for procedural deficiencies where ... the failure is by a pro se litigant").

**A. The Eleventh Amendment**

1. *Federal Claims Against State Agencies*

The Eleventh Amendment provides that: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Supreme Court has consistently held that this amendment prohibits a private party from suing a state in federal court unless Congress unequivocally expresses its intent to abrogate that immunity or a state waives its immunity. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *In re Charter Oak Assocs.,* 361 F.3d 760, 765 (2d Cir.2004). This jurisdictional bar applies "whether the relief sought is legal or equitable," *Papasan v. Allain,* 478 U.S. 265, 276, 92 S.Ct. 209, 106 S.Ct. 2932 (1986), and encompasses actions against the state itself and certain actions against a state's agencies, agents or instrumentalities. *Regents of the Univ. of California v. Doe,* 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); *see also Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 89 L.Ed. 389, 65 S.Ct. 347 (1945) ("when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants"). "It is clear ... that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citing *Florida Dep't of Health and Rehabilitative Servs. v. Florida Nursing Home Ass'n,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

57 L.Ed.2d 1114 (1978) (per curiam)).

**\*6** The fact that Plaintiff has sued the State Defendants pursuant to 42 U.S.C. §§ 1983 and 1985 does not change the analysis. The Supreme Court has established that Congress, in enacting § 1983, did not abrogate the states' sovereign immunity. *See Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979); *Edelman,* 415 U.S. 651. Moreover, state agencies are not considered "persons" subject to liability under § 1983. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

The DPUC is "a state agency authorized pursuant to title 16 of the General Statutes to regulate and supervise the operation of public service companies." *New England Cable Television Ass'n v. Dep't of Pub. Util. Control,* 247 Conn. 95, 98, 717 A.2d 1276 (1998); *see also* Conn. Gen.Stat. § 16-1 *et seq.* As such, the Eleventh Amendment bars Plaintiff's federal law claims for both monetary and injunctive relief against the DPUC, and deprives this Court of subject matter jurisdiction over those claims.

Plaintiff asserts, in his Opposition to the Motion to Dismiss, that his claims against the DPUC will not be barred if he is allowed to amend his Complaint in order to sue individual members of the DPUC, and requests permission to do so. (Pl.'s Opp. Mot. Dismiss ¶ 1.)

2. *Federal Claims for Money Damages Against State Officials in their Official Capacities*

It is well-established that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," which "is no different from a suit against the State itself." *Will,* 491 U.S. at 71. Because a suit against a state official in his or her official capacity is the equivalent of a suit against the State itself, suits for money damages are barred by the Eleventh Amendment. *Hafer v. Melo,* 502 U.S. 21, 27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991) ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them."); *Edelman,* 415 U.S. at 677; *Berman Enterprises,*

*Inc.* Thus, although private parties may not seek a "retroactive award which requires the payment of funds from the state treasury," a federal court may, under *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), "enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury." *Quern,* 440 U.S. at 337 (*citing Edelman,* 415 U.S. at 667-68); *Pennhurst,* 465 U.S. at 121. The exception created for claims against state officers for prospective injunctive relief based on allegations of a federal constitutional violation does not extend to claims for money damages or any other form of retroactive relief. *See Pennhurst,* 465 U.S. at 105 ("we declined to extend the fiction of Young to encompass retroactive relief, for to do so would effectively eliminate the constitutional immunity of the States").

**\*7** Accordingly, the Eleventh Amendment bars Plaintiff's federal law claims against Defendants Blumenthal and Kohler, insofar as Plaintiff seeks money damages or any other form of retroactive relief. Because this Court lacks subject matter jurisdiction over Plaintiff's federal law claims for money damages against Defendants Blumenthal and Kohler, those claims are dismissed.

The Supreme Court has also noted, however, that "the Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983," nor "are state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." *Hafer,* 502 U.S. at 30-31 (holding that "state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983"). As such, Plaintiff requests leave to amend his complaint to sue Defendants Blumenthal and Kohler in their personal capacities. (Pl.'s Opp. Mot. Dismiss ¶ 2.)

3. *Federal Claims Against State Officials for Prospective Injunctive Relief*

In addition to his claims for money damages, Plaintiff asserts claims for prospective injunctive relief against Defendants Blumenthal and Kohler. Plaintiff seeks reinstatement to his position or an equivalent position at Millstone, and asserts that these defendants "wrongfully acted to preclude the plaintiff's reinstatement to his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

employment at Millstone and they should be barred from doing so in the future." (Pl.'s Opp. Mot. Dismiss ¶ 2 .) Defendants Blumenthal and Kohler argue that they have no authority to provide the relief sought by Plaintiff. (Defs.' Mem. Supp. Mot. Dismiss 11.)

As noted above, the Supreme Court, in *Ex parte Young,* recognized an exception to Eleventh Amendment immunity in cases in which a state official is sued in his or her official capacity for prospective injunctive relief based on a federal constitutional violation. *Quern,* 440 U.S. at 337 (citing *Ex parte Young,* 209 U.S. 123). Therefore, under this doctrine, federal courts may "enjoin state officials to conform future conduct to the requirements of federal law." *Rosie D. v. Swift,* 310 F.3d 230, 234 (1st Cir.2002). To determine whether *Ex parte Young* avoids an Eleventh Amendment bar to suit, the inquiry is a straightforward one: the court need only ask "whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n,* 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). These elements are not in question here.

For the *Ex parte Young* exception to apply, however, a plaintiff seeking prospective injunctive relief must be seeking such relief from a state official who has a direct connection to, or responsibility for, the alleged illegal action:

In making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act, or else it is making him a party as a representative of the State, and thereby attempting to make the State a party.

**\*8** *Ex parte Young,* 209 U.S. at 157; *see also Yakama Indian Nation v. Locke,* 176 F.3d 467, 469-70 (9th Cir.1999). So long as the state officer has "some connection with the enforcement of the act" that is in continued violation of federal law, "it is not necessary that the officer's enforcement duties be noted in the act." *In re Dairy Mart Convenience Stores, Inc.,* 411 F.3d 367, 372-373 (2d Cir.2005); *see also Prairie Band Potawatomi Nation v. Wagnon,* 402 F.3d 1015, 1027 (10th Cir.2005) (holding that state officials "are not required to have a

'special connection' to the unconstitutional act or conduct;" they need only "have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty"). Moreover, personal action or involvement on the part of the named official is not required. *Marshall v. Switzer,* 900 F.Supp. 604, 615 (N.D.N .Y.1995) (although the state official in question was not personally involved in the alleged wrongful conduct, he was "the official responsible for the allegedly wrongful denial of benefits," and therefore, the plaintiff's claims against that state official in his official capacity for prospective injunctive relief were not barred) (*citing Luckey v. Harris,* 860 F.2d 1012, 1015-16 (11th Cir.1988), *cert. denied,* 495 U.S. 957, 109 L.Ed.2d 744, 110 S.Ct. 2562 (1990) ("Personal action is not a necessary condition of injunctive relief against state officers in their official capacity")). Failure to name the proper defendant is fatal to the claim. *Yakama Indian Nation,* 176 F.3d at 469.

In *Yakama Indian Nation,* the Yakama Indian Tribe sued the State of Washington and its governor, claiming that the State's operation of a lottery on the tribe's reservation violated the Indian Gaming Regulatory Act, and seeking monetary damages and injunctive relief against the governor. The Ninth Circuit found that all claims, including the claim for injunctive relief against the governor, was barred by the Eleventh Amendment. *Yakama Indian Nation,* 176 F.3d at 470. The court reasoned that "[t]he complaint contains no allegations that the governor is charged with operating the state lottery," and "[n]owhere in [the state] statutes is there any indication that the governor has the responsibility of operating the state lottery or determining where its tickets will be sold." *Id.* at 469-70. As such, the court held that the governor "lacks the requisite connection to the activity sought to be enjoined," and therefore "share[s] the State's Eleventh Amendment immunity from unconsented suit in federal court." *Id.* at 470.

Defendants Blumenthal and Kohler argue that they, in their positions as Attorney General and Assistant Attorney General, have no authority to provide the relief requested. They contend that "[n]o provision of the Connecticut General Statutes grants these defendants any authority to hire or fire NNECO employees or, specifically, to

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

reinstate the plaintiff, and nothing in the Complaint alleges otherwise." (Defs.' Mem. Supp. Mot. Dismiss 12-13.) Plaintiff, alternatively, claims that Defendants Blumenthal and Kohler's connection to the illegal action is established by the "secret litigation," i.e., *CL & P v. DPUC,* that "resulted in a secret termination of Plaintiff's rights without notice to him nor an opportunity to participate in the litigation." (Pl.'s Reply 4.) Plaintiff claims that it was only in this litigation that the DPUC, through Defendants Blumenthal and Kohler, agreed to vacate its prior order reinstating Plaintiff to his former or equivalent position at Millstone. (*Id.*)

**\*9** The transcript of the October 9, 1997 oral argument in *CL & P v. DPUC,* however, raises serious questions about the viability of Plaintiff's claim. Importantly, the transcript suggests no "secret" agreement, but only a clarification of the DPUC's position-i.e., that the amended Act did not require Plaintiff's reinstatement. There is no evidence that the DPUC "agreed" to vacate its prior order reinstating Plaintiff to his former or equivalent position in the *CL & P v. DPUC* litigation. First, the order initially issued by the DPUC expressly provided that the DPUC "will stay implementation of the orders in this Decision, pending the outcome" of the *CL & P v. DPUC* litigation. (DPUC Decision 7, Sept. 7, 1997, Ex. 4 to Defs.' Mot. Dismiss.) The fact that the stay was a condition of the initial order establishes that the DPUC's failure to immediately reinstate Plaintiff to his position was not the result of any secret agreement made after the order was issued. Moreover, while *CL & P v. DPUC* was pending, the Whistleblower Act-pursuant to which the initial order was issued-was amended, thus vitiating the DPUC's initial order. *See* 1999 Conn. Pub. Acts No. 99-46, effective May 27, 1999. On October 26, 1999, before *CL & P v. DPUC* was resolved, the DPUC notified NNECO and Plaintiff, via letter, that it would continue processing Plaintiff's complaint pursuant to Conn. Gen.Stat. § 16-8a, as amended by Public Act No. 99-46. It was not until November 22, 1999 that *CL & P v. DPUC* was settled, however, at that point, the DPUC had re-opened Plaintiff's complaint and began a de novo review of the complaint under the amended act and pursuant to the procedures that the amendment established. There is no evidence that the DPUC's final decision dismissing Plaintiff's complaint, issued on May 2,

2001, was the product of a "secret agreement," or that Defendants Blumenthal and/or Kohler had any connection to that decision.

The Attorney General and Assistant Attorney General are not named in the Whistleblower Act, Conn. Gen.Stat. § 16-8a, however, as attorneys for the State of Connecticut, they represent the DPUC in all judicial and other legal proceedings. Moreover, Conn. Gen.Stat. § 16-10 provides that "[t]he Superior Court, *on application of* the Department of Public Utility Control or of *the Attorney General,* may enforce, by appropriate decree or process, any provision of this chapter or any order of the department rendered in pursuance of any statutory provision." Conn. Gen.Stat. § 16-10 (emphasis added). These factors, however, are not sufficient to establish subject-matter jurisdiction over Defendants Blumenthal and Kohler. The Complaint contains no allegation, and there is no indication in the Connecticut statutes, that Defendants Blumenthal and Kohler have the authority to provide the relief requested-namely, to reinstate Plaintiff to his former or equivalent position with NNECO. Because these defendants "lack[ ] the requisite connection to the activity sought to be enjoined," they "share the State's Eleventh Amendment immunity from unconsented suit in federal court." *Yakama Indian Nation,* 176 F .3d at 470. As such, the federal law claims against Defendants Blumenthal and Kohler for prospective injunctive relief are dismissed for lack of subject matter jurisdiction.

4. *Plaintiff's Requests for Leave to Amend Complaint*

**\*10** As noted above, Plaintiff includes in his Opposition brief a request for leave to amend his complaint to assert claims against individual members of the DPUC and Attorney General Richard Blumenthal and Assistant Attorney General Mark Kohler in their individual capacities. *(See* Pl.'s Opp. Mot. Dismiss ¶¶ 1, 2 .) Defendants object to this request on the ground that any such amendment would be futile. Specifically, they argue that such an amendment would do nothing to cure the fact that Plaintiff has failed to state a claim upon which relief can be granted and would be barred by the same jurisdictional bars that apply to the present Complaint. (Defs.' Reply 9.)

When a plaintiff moves to amend a complaint, leave

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

to file an amended complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). The district court has discretion as to whether leave to amend should be granted, *Foman v.. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), however, "that discretion must be exercised in terms of a justifying reason or reasons consonant with the liberalizing spirit of the Federal Rules." *United States v. Continental Illinois Nat'l Bank & Trust,* 889 F.2d 1248, 1254 (2d Cir.1989) (*citing* Fed. R. Civ P. 1, which states that the rules are to be construed "to secure the just, speedy, and inexpensive determination of every action.").

Leave should be "freely given" in the absence of a stated or apparent reason to the contrary, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman,* 371 U.S. at 182. A denial of leave to amend on the ground that the proposed amendment would be futile is permissible only "where there is no possible merit to the claims." *National Union Fire Ins. Co. v. Gordon,* Nos. 87 Civ. 7695(LLS), 87 Civ. 7696(LLS), 89 Civ. 3235(LLS), 1991 U.S. Dist. LEXIS 309, at *16, 1991 WL 4753 (S.D.N.Y. Jan. 11, 1991) (*citing* *Slavin v. Benson,* 493 F.Supp. 32, 33 (S.D.N.Y.1980)); *accord* *Glassman v. Computer Vision,* 90 F.3d 617, 622 (1st Cir.1996); *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991).

To the extent that Plaintiff seeks to sue individual members of the DPUC in their official capacity for money damages, leave to amend is denied. As discussed above, a "suit against a state official in his or her official capacity is ... no different from a suit against the State itself," and therefore is barred by the Eleventh Amendment. *Will,* 491 U.S. at 71. Moreover, to the extent that Plaintiff seeks to sue Defendants Blumenthal and Kohler in their individual capacities for injunctive relief, leave to amend is denied. Claims against a state officer for prospective relief must be asserted only against the officer in his or her official capacity. *Poe v. Massey,* 3 F.Supp.2d 176, 178 (D.Conn.1998) (*citing* *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 87 L.Ed.2d 114, 105 S.Ct. 3099 (1985); *Hill v. Shelander,* 924 F.2d 1370, 1374 (7th Cir.1991)).

**\*11** Finally, to the extent that Plaintiff seeks to sue individual members of the DPUC and Defendants Blumenthal and Kohler in their individual capacities for money damages, leave to amend is also denied on the ground that such an amendment would be futile. Any claims for money damages against the officials in their individual capacities would be barred by qualified immunity if Plaintiff is unable to show that (1) the officials' conduct violated a constitutional right and (2) the constitutional right alleged to have been violated was clearly established at the time, such that it would be clear to a reasonable official that his or her conduct was unlawful in the situation he or she confronted. *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Plaintiff has not shown that any constitutional right was violated. Any right that Plaintiff may have to his former job is subject to his former employer's right to be heard, and is, at best, a conditional constitutional right. Plaintiff was accorded due process, such that the DPUC adjudicated his claim after he was afforded an opportunity to be heard. Plaintiff has also not shown that any right of his was violated in the *CL & P v. DPUC* litigation. To the extent that Plaintiff wanted to protect any constitutional rights, he could have sought to intervene in that litigation, however, he failed to do so. Because any claims against the officials in their individual capacities would be barred by the doctrine of qualified immunity, there is no possible merit to Plaintiff's claims. Accordingly, leave to amend is denied on the ground that the proposed amendment would be futile.

**B. Whether Plaintiff's State Law Claims against the State Defendants for Money Damages are Barred by Sovereign Immunity**

The Connecticut Supreme Court has long recognized that the common law doctrine of sovereign immunity bars suit against the State except where, by appropriate legislation, consents to be sued. *Canning v. Lensink,* 221 Conn. 346, 349, 603 A.2d 1155 (1992) (recognizing the common-law principle that "the state cannot be sued without its consent"); *Horton v. Meskill,* 172 Conn. 615, 623, 376 A.2d 359 (1977); *State v. Kilburn,* 81 Conn. 9, 11, 69 A. 1028 (1908). This broad immunity applies not only to suits against the State, but also to suits against state officers in their official

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)

(Cite as: 2006 WL 2788380 (D.Conn.))

capacities. *Canning,* 221 Conn. at 349 ("Because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state.").

The Connecticut Supreme Court has recognized an exception to sovereign immunity in actions for injunctive or declaratory relief in which the officer is alleged to have acted in excess of statutory authority or pursuant to an unconstitutional statute, however, "[t]his exception does not apply ... to claims against the state for monetary damages." *Miller v. Egan,* 265 Conn. 301, 314-15, 828 A.2d 549 (2003) (citations omitted). With respect to claims against state officials for monetary damages, "[w]hen sovereign immunity has not been waived, the claims commissioner is authorized by statute to hear monetary claims against the state and determine whether the claimant has a cognizable claim." *Krozser v. New Haven,* 212 Conn. 415, 421, 562 A.2d 1080 (1989) (*citing* Conn. Gen.Stat. §§ 4-141 through 4-165b), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990); *see also Miller,* 265 Conn. at 317. Pursuant to Conn. Gen.Stat. § 4-148(b), sovereign immunity bars any claims against the state for monetary damages except those sanctioned or authorized by the claims commissioner. *Krozser,* 212 Conn. at 421; *Miller,* 265 Conn. at 317-18. Plaintiff does not claim to have obtained authorization of the Claims Commissioner, and accordingly, all of his state law claims seeking money damages from the State Defendants are barred by sovereign immunity.

**\*12** The only other remaining claim is a claim against Defendants Blumenthal and Kohler for prospective injunctive relief pursuant to the Nuclear Whistleblower Statute, Conn. Gen.Stat. § 16-8a. The exception to sovereign immunity for claims against state officials for injunctive or declaratory relief only applies when the officer in question is alleged to have acted in excess of statutory authority or pursuant to an unconstitutional statute. *Miller,* 265 Conn. at 314 (*citing, among others,* *Horton v. Meskill,* 172 Conn. 615, 624, 376 A.2d 359 (1977); *Pamela B. v. Ment,* 244 Conn. 296, 328, 709 A.2d 1089 (1998); *Doe v. Heintz,* 204 Conn. 17, 32, 526 A.2d 1318 (1987)). Plaintiff does not allege here that either defendant acted in excess of his statutory authority or pursuant to an unconstitutional statute. As discussed in section III.A.3, *supra,* Defendants Blumenthal and Kohler

have no authority to provide the relief requested-i.e., to reinstate Plaintiff to his former or equivalent position. They are not responsible for the DPUC's decision to dismiss Plaintiff's complaint and do not have the power or authority to alter that result. As such, all of Plaintiff's state law claims against the State Defendants are barred by sovereign immunity.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss [Doc. No. 11] is **granted.** Moreover, Plaintiff's Motion for Leave to Amend the Complaint is denied on the ground that the proposed amendment would be futile. Because all claims against the State Defendants are dismissed on the grounds that they are barred by the Eleventh Amendment and the doctrine of Sovereign Immunity, the Court need not address the State Defendants' other, alternative arguments for dismissal. All claims against Defendants Blumenthal, Kohler, and the DPUC are hereby dismissed.

SO ORDERED.

D.Conn.,2006.

Reynolds v. Blumenthal
Not Reported in F.Supp.2d, 2006 WL 2788380 (D.Conn.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.