IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

DAVID McCHESNEY,

                Plaintiff,

                                    Civil Action No.
      v.                         9:08-CV-1186 (NAM/DEP)

MICHAEL F. HOGAN, Commissioner,
New York State Office of Mental Health,
*et al.*,

                Defendants.

---

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

DAVID McCHESNEY, *Pro Se*
25527-604
CNY Psychiatric Center
P.O. Box 300
Marcy, NY 13403

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN     ADELE TAYLOR-SCOTT ESQ.
Office of Attorney General           Assistant Attorney General
State of New York
The Capitol
Litigation Bureau
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT, RECOMMENDATION AND ORDER

Plaintiff David McChesney, a convicted sex offender who has been

civilly committed to the Central New York Psychiatric Center ("CNYPC")

for participation in sex offender treatment, has commenced this action

pursuant to 42 U.S.C. § 1983 claiming deprivation of his civil rights.  In his

complaint, plaintiff alleges that his forced participation in the Sex Offender

Treatment Program ("SOTP") administered at the CNYPC violates his

constitutional rights.[1]  The sole remaining claim in this action, following

---

[1]    Plaintiff has commenced seven separate actions in this court related to his
involuntary civil confinement.  In *McChesney v. Hogan,et al.*, No. 9:08-CV-0163 (filed
Feb. 11, 2008), plaintiff complained of various policies at the CNYPC ranging from
those addressing receipt of food packages and telephone access to mail censorship
and the use of short chain restraints, and maintained that the adoption and
implementation of those policies by the various defendants named in his complaint
resulted in violation of his rights under the First, Fourth, Eighth, and Fourteenth
Amendments.  That action resulted in the entry of summary judgment dismissing
plaintiff's claims.  *See id.* at Dkt. Nos. 49 and 50.  In *McChesney v. Miller, et al.*, No.
9:08-CV-0195 (filed Feb. 21, 2008), plaintiff asserted a medical indifference claim
under the Eighth Amendment.  McChesney voluntarily dismissed that action, and
judgment was entered in favor of the defendants.  *See id.* at Dkt. Nos. 5 and 6.  In
*McChesney v. Hogan, et al.*, No. 9:08-CV-0563 (filed June 10, 2008), plaintiff alleged
three instances on which he was assaulted by fellow patients on two separate days,
and argued that the attacks resulted from defendants' failure to properly protect him
from harm in violation of his constitutional rights.  The complaint in that action was
dismissed upon defendants' motion for summary judgment, and judgment was entered
in favor of defendants.  *See id.* at Dkt. Nos. 36 and 37.  In *McChesney v. Hogan, et al.*,
No. 9:08-CV-1290 (filed Nov. 28, 2008), plaintiff made claims similar to those made in
this lawsuit alleging, *inter alia*, that the SOTP administered at the CNYPC is predicated
in part upon religious tenets, and he is being forced, contrary to his beliefs as an
atheist, to practice religion in violation of his First Amendment rights.  That action was
dismissed and judgment entered in favor of the defendants.  *See McChesney v.
Hogan, et al.*, No. 9:08-CV-1290, at Dkt. No. 9.  In *McChesney v. Bastien*, No. 9:10-
CV-0047 (filed Jan. 13, 2010), plaintiff alleged a single cause of action for deprivation

earlier motion practice, is McChesney's assertion that the SOTP is predicated in part upon religious tenets, and he is being forced, contrary to his beliefs as an atheist, to practice religion in violation of his First Amendment rights.  The matter is now before the court on defendants' second motion for summary judgment seeking dismissal of the remaining causes of action alleged under the Establishment and Free Exercise Clauses against defendants in their official capacities for prospective injunctive relief.

Having now provided the court with the SOTP treatment materials and modalities at issue, defendants argue, once again, that the use of these programs in the SOTP does not violate plaintiff's First Amendment rights and that they are, therefore, entitled to summary judgment. Additionally, proposed intervenor Jeremy Zielinski, has sought leave to intervene for the sole purpose of moving to vacate the court's order

---

of liberty without due process of law based upon his alleged involuntary detention at another psychiatric facility operated by the New York State Office of Mental Health ("OMH") for a period of sixty days, from October 5, 2007 until December 4, 2007.  After the defendant moved to dismiss, the action was dismissed without prejudice at plaintiff's request.  *See id.* at Dkt. No. 11.  In *McChesney v. Bastien*, No. 9:10-CV-1409 (filed Nov. 22, 2010), plaintiff made the same claims as in the earlier filed lawsuit against Bastien; on July 5, 2012, finding the existence of material issues of fact as to whether plaintiff was deprived of his liberty without due process of law, I issued a report recommending that defendant's motion for summary judgment in that action be denied.  *See id.* at Dkt. No. 14.

allowing defendants to file the SOTP program materials under seal.  For

the reasons set forth below, I will deny the proposed intervenor's motion

and recommend that defendants' motion be granted.

I.    <u>BACKGROUND</u>[2]

The CNYPC is a mental health facility located in Marcy, New York

and operated under the jurisdiction of the New York State Office of Mental

Health ("OMH").  Complaint (Dkt. No. 1) § 2; Defendants' Rule 7.1(a)(3)

Statement (Dkt. No. 38-3) ¶ 2.[3]  The SOTP is a "secure treatment facility"

created for the purpose of providing care and treatment to dangerous sex

offenders who are civilly confined after serving their prison sentences

pursuant to New York Mental Hygiene Law ("MHL") Article 10.

Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 38-3) ¶ 2.[4]

---

[2]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[3]    Plaintiff is deemed to have admitted the allegations contained within defendants' Local Rule 7.1(a)(3) Statement, based upon his failure to oppose defendants' motion.  *See* pp. 17-20, *post.*

[4]    Under New York law a "dangerous sex offender requiring confinement" is a detained sex offender suffering from mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that the person is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility.  N.Y. Mental Hyg. Law § 10.03(e).  The MHL does not allow for indefinite confinement of a detained sex offender.  Instead, the Commissioner of the OMH is required to provide a civilly committed sex offender and his or her counsel with annual notice of the right to petition the court for discharge, and must

Plaintiff's complaint, which is sparse in factual detail, asserts that the treatment programs in which he has been forced to participate at the CNYPC subject him, as an atheist, to various religious rituals and practices.[5]  More specifically, he claims that The Good Lives Model and Boundaries programs teach that you must believe in spirituality, the Dialectic Behavior Therapy ("DBT"), Self Care Skills I & II, and Relaxation programs adopt or are patterned after the rituals and practices of Zen Buddhism, and the Growing up Male, From the Inside Out, Problem Solving, and Anger Management programs are all "Hazelden" products which incorporate Christian beliefs and practices.  According to plaintiff's complaint, defendants' use of these programs violates the First Amendment's prohibition of establishment of religion as well as its protection of his right to the free exercise of religion.

_____

assure that each civilly confined person receives an examination for evaluation of his or her mental condition at least once a year, calculated from the date on which the court last ordered or confirmed the need for civil confinement.  See N.Y. Mental Hyg. Law § 10.09(a) and (b).  The law also includes a provision for annual court review in the form of an evidentiary hearing to determine the necessity of continued retention. See id. at § 10.09(d).

[5]    It appears from the record that plaintiff's religious beliefs have fluctuated over time.  At various points while in the custody of the New York State Department of Correctional Services (now the Department of Corrections and Community Services, or "DOCCS"), he indicated his religious affiliation as Buddhist, and later as Methodist. See Taylor Scott Decl. (Dkt. No. 32-3) Exhs. A and B.  Most recently, in his religious designation of May 2011, plaintiff advised personnel at the CNYPC that he is now a Buddhist.  Maxmillian Decl. (Dkt. No. 38-2) ¶ 55.

The sex offender treatment services provided at CNYPC through the SOTP are "evidence-based" methods; as new research emerges and best practices evolve, the SOTP adapts its services accordingly, including creation of new groups, modification of existing groups or discontinuation of groups which no longer reflect effective treatment modalities.[6] Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 38-3) ¶ 3; Maxymillian Decl. (Dkt. No. 38-2) ¶¶ 7-8.  The treatment programs at the CNYPC-SOTP are designed to address specific risks and criminogenic and

_____

[6]    Defendants' first motion for summary judgment was denied based upon the court's finding that defendants had failed to carry their burden in demonstrating their entitlement to summary judgment, "primarily because they had not submitted the SOTP material so as to enable the court to determine whether or not their content supports plaintiff's First Amendment claims."  *McChesney v. Hogan*, No. 9:08-CV-1186, 2011 WL 4592360, at * 3 (N.D.N.Y. Sep. 30, 2011) (Mordue, C.J.); Memorandum Decision and Order, dated Sep. 30, 2011 (Dkt. No. 35); *see also* Report and Recommendation, dated Aug. 2, 2011 (Dkt. 33).  When filing their second summary judgment motion defendants requested permission to file the SOTP materials by traditional means for the court's *in camera* review in association with that motion, asserting that a public filing allowing CNYPC-SOTP residents to access the materials would run counter to their therapies.  Dkt. No. 36.  Upon review of the defendants' request, as well as the materials submitted, and having received no objection to the request from plaintiff, the court granted defendants' request to file the SOTP materials under seal, denied the request that the court consider the materials *ex parte*, and directed that defendants provide plaintiff an opportunity to review the materials by providing a complete set of the materials to plaintiff's SOTP counselor and a reasonable opportunity for plaintiff to review them in association with his preparation of a response to defendants' motion.  *See* Decision and Order, dated Dec. 6, 2011 (Dkt. No. 41).  Defendants have provided the court with all of the SOTP written materials challenged by plaintiff in this action, as well as two DVDs containing additional From the Inside Out program materials.  SOTP Director Maxymillian has also advised the court that she personally oversaw plaintiff's review of the program materials, which took plaintiff a period of two to three days.  Maxymillian Decl. (Dkt. No. 45) ¶ 3.

responsivity needs of participants, and are targeted at reducing the person's risk of recidivism, enhancing his or her treatment engagement, developing self regulation skills, managing sexual deviancy, and assisting him or her in developing pro-social attitudes and behaviors. Defendants' Local Rule 7.1 Statement (Dkt. No. 38-3) ¶¶ 4 and 5; Maxmillian Decl. (Dkt. No. 10) ¶¶ 9-10.  The programs may also provide educational and vocational training, didactic and psycho-educational training, pro-social development, and behavioral therapy, as well as process-oriented treatment.  *Id.*

The group therapy protocols at the CNYPC-SOTP are developed by the group leaders at that facility and are reviewed and approved by SOTP Director Terri Maxmillian. Maxmillian Decl. (Dkt. No. 38-2) ¶ 11.  The content and format for each program is drafted in such a manner that any SOTP clinical staff may lead the group.  *Id.* at ¶ 12.  Individuals committed to the SOTP are required to participate in the therapeutic programming, and if they choose not to do so, a court reviewing whether civil commitment remains necessary may continue to require in-patient treatment until the individual has appropriately addressed his or her risk to re-offend.  *See id.* at ¶¶ 6, 50.  Nonetheless, the SOTP does not rigidly

7

require a civilly committed sex offender to attend and participate in every single session of a group in order to "pass" a class.  *Id.* at ¶¶ 47-48. Instead, the expectation is that the residents will make an effort to engage and participate in the treatment modalities offered in a meaningful manner, yet allowing for participants to miss or opt out of a small portion of the therapy offered.  *Id.* at ¶ 48.

Nine group therapies are at issue in this case; four of those are Hazelden products, including From the Inside Out, Growing Up Male, Problem Solving, and Anger Management.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 13.  Plaintiff claims that the Hazelden products are Christian-based, and use of these programs violates his First Amendment freedoms.  According to its website, www.hazelden.org, Hazelden which was founded in 1949, is one of the world's largest and most respected private not-for-profit alcohol and drug addiction treatment centers. Maxymillian Decl. (Dkt. No. 38-2) ¶ 18.  Though originating as a care treatment center for alcoholic priests, it has since evolved into an entity assisting individuals, families, and communities struggling with abuse and addiction by providing treatment and recovery services as well as an array of resources, and its programs have grown to address a broader patient

base.  *See id.*

From the Inside Out is group therapy program designed to teach participants the need for healthy relationships and to take responsibility for their lives and their relationships without blame shifting.  *See* Maxymillian Decl. (Dkt. No. 38-2) Exh. A.  Growing Up Male, another group therapy modality used in the SOTP, is aimed at assisting CNYPC residents in developing the ability to identify current attitudes and beliefs that perpetuate the cycle of violence in society, to understand its costs, and to identify the different ways it is manifested.  *See id.* at Exh. B.  Problem Solving, yet another Hazelden product included within plaintiff's challenge, is intended to assist the participants in developing group problem solving techniques and appropriate participation and social interaction.  *See id.* at Exh. C.  Anger Management, the last of the Hazelden products at issue in this case, is designed to help CNYPC- SOTP residents recognize anger, aggression, and assertiveness, to understand the impact personal anger has had on their lives, and to develop skills to regulate anger and interrupt the aggression cycle in the future.  *See id.* at Exh. D.

DBT, another group therapy program used in the SOTP, has been found to be an effective therapeutic tool for persons with personality

disorders, teaching them to learn to regulate their emotions, tolerate

stress, and ultimately, to avoid offending behaviors.  Maxymillian Decl.

(Dkt. No. 38-2) ¶ 35; *see also id.* at Exh. E.  Self Care Skills I and II are

group programs designed to teach CNYPC residents to understand and

identify what causes their stress and how to develop appropriate coping

mechanisms.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 36, Exh. F.  Self Care II

builds on the basic concepts taught in the first segment, and asks the

participants to apply those concepts to explore their family systems by

analyzing each family member's role in the family unit as well as what

separates healthy families from dysfunctional families.  *See id.*  The self

care and relaxation techniques practiced at the CNYPC are part of the

DBT and are taught as part of a broader menu of relaxation tools of which

group participants are made aware so that they may choose the

techniques and relaxation tools that work best for them and apply them

when needed.  Maxymillian Decl. (Dkt. No. 38-2) ¶¶ 32; *see also id.* at

Exhs. E, F, and G; Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 38-3) ¶

18.  Under the DBT treatment modality a program participant may

consider, but is not required to, employ these relaxation techniques to

facilitate his or her treatment and progress through the various phases of

10

the treatment program.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 33;

Defendant's Rule 7.1(a)(3) Statement (Dkt. No. 38-3) ¶ 20.

 The primary goal of the Living the Good Life (the "Good Lives

Model" or "GLM") group program is to assist participants in understanding

their identities as they relate to the needs they have in life.  *See*

Maxymillian Decl. (Dkt. No. 38-2) Exh. H.  This modality is intended to help

the participants to develop skills to attain those needs in appropriate and

socially acceptable ways.  *See id.*

Another treatment regimen at issue is the Boundaries program.  *See*

Maxymillian Decl. (Dkt. No. 38-2) Exh. I.  That program is aimed at

assisting the group participants to become aware of interpersonal

boundaries, including physical, emotional, psychological, and sexual

boundaries, as well as boundary violations.  *See id.*

Use of all of the above referenced modalities in the SOTP is in

furtherance of the overarching purposes of the entire treatment program,

which are to rehabilitate sex offenders and protect the safety of

communities by reducing the risk that persons civilly committed to the

CNYPC for sex offender treatment will sexually re-offend upon release.

Maxymillian Decl. (Dkt. No. 38-2) ¶ 58.

II.    PROCEDURAL HISTORY

Plaintiff commenced this action on November 6, 2008.  A second related action, Civil Action No. 9:08-CV-1290 (NAM/DEP), was initiated by McChesney some three weeks later, on November 28, 2008.   The two actions were subsequently consolidated by the court, *sua sponte*, but have since been severed.[7]  Dkt. Nos. 4, 13.

Plaintiff's complaint in this action named OMH Commissioner Michael Hogan and CNYPC Executive Director Donald Sawyer as defendants, and asserted claims under the First and Fifth Amendments to the United States Constitution.  On April 21, 2009, defendants moved for dismissal of plaintiff's claims in the two consolidated actions.  Dkt. No. 17. The motion was granted in large part, leaving only plaintiff's First Amendment claims against the defendants in this action in their official capacities for prospective injunctive relief.  Dkt. Nos. 23, 25.

_____

[7]    The two actions were consolidated by the court, of its own initiative, based upon a report I issued on December 23, 2008 recommending that measure and approval of that recommendation by Chief District Judge Norman A. Mordue on March 9, 2009. The court's consolidation order designated Civil Action No. 9:08-CV-1186 (NAM/DEP) as the lead action.  As a result of the dismissal of plaintiff's claims in Civil Action No. 9:08-CV-1290 (NAM/DEP), on August 24, 2010, the court issued another order, *sua sponte*, severing the two actions in order to allow the plaintiff to appeal the dismissal to the United States Court of Appeals for the Second Circuit without awaiting the outcome of this action.  Civil Action No. 9:08-CV-1290 (NAM/DEP) has been closed, and it appears that plaintiff did not file an appeal in that action.

On March 31, 2011, following expiration of the deadline for

completion of discovery, defendants filed their first motion for summary

judgment.  Dkt. No. 32.  That motion was referred to me for the issuance

of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and

Northern District of New York Local Rule 72.3(c).  In a report dated August

2, 2011, finding that defendants had failed to meet their burden of

demonstrating the lack of triable issues of material fact, I recommended

denial of defendants' motion.  Dkt. No.33.  That conclusion was based

primarily upon the defendants' failure to provide the court with anything

more than the SOTP protocols in support of their motion.  On September

30, 2011, then Chief District Judge Norman A. Mordue, accepted my

report and recommendation, except as to my factual finding that From the

Inside Out is a treatment modality product developed by Hazelden, which

incorporates the twelve step Alcoholics Anonymous and "NA

methodology" used in treatment programs, and is based upon Christian

principles.[8]  Dkt. No. 35 at p. 5.  In doing so, the court declined

_____

[8]    In rejecting that factual finding, Judge Mordue found instead that this was
defendants' characterization of plaintiff's contention, which defendants dispute, and
noted that "[t]he statement on page 18 [of the report and recommendation] that
defendants 'acknowledge that the group treatment modalities at issue incorporate
spirituality' differs somewhat from defendants' position."  Dkt. No. 35 at p. 5.  Judge
Mordue agreed with my ultimate conclusion, however, that defendants had not met

defendants' request to permit supplementation of the record on the motion

before it, but expressly stated that it would entertain a second motion for

summary judgment if filed within sixty days.  Dkt. No. 35 at pp. 5-6.

Plaintiff timely filed the pending renewed motion on November 29,

2011.  Dkt. No. 38.  Despite having been served with the requisite

notification of the consequences of failing to respond to the motion, as

required under Northern District of New York Local Rule 56.2, and having

reviewed the SOTP program materials in the presence of SOTP Director

Maxymillian, *see* Dkt. No. 38, plaintiff has failed to file any opposition to

defendants' motion, which is now ripe for determination and has been

referred to me for the issuance of a report and recommendation, pursuant

to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

A.   Summary Judgement Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

---

their burden on the summary judgment motion since they had not filed SOTP materials
with the court so as to enable the court to determine whether or not their content
supports plaintiff's First Amendment claims.  *See id.*

14

warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B.    Legal Significance of Plaintiff's Failure to Properly
Respond to Defendant's Local Rule 7.1(a)(3) Statement

Plaintiff has neither opposed defendants' motion, nor responded to Defendants' Statement of Undisputed Material facts, as required by Local Rule 7.1(a)(3).  Before turning to the merits of plaintiff's claims, the court will therefore address as a threshold matter the legal significance of his failure to properly respond to that statement.

The consequences of this failure are potentially significant.  By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y.L.R. 7.1(a)(3).  Courts in this district have routinely enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond.  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases);[9] *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275,

---

[9]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

17

292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[10]

Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions.  *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.).  The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with a failure to comply with the court's local rules.  *See Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997).  Thus, "a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins*, No. 9:09-CV-308, 2011 WL 11003045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, C.J.) (citing *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 583 (S.D.N.Y. 2008) and *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).  Where

---

[10]   As to any facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I will assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998).

a plaintiff has been specifically notified of the consequences of failing to respond to a movant's Local Rule 7.1(a)(3) Statement but has failed to do so, and the facts contained within that statement are supported by the evidence in the record, the court will accept such facts as true.  *Id.* (citing *Littman v. Senkowski*, 2008 WL 420011, at *2 (N.D.N.Y. 2008) (citing *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir.1996)).

With their motion, defendants served a court-authorized notice specifically warning plaintiff of the consequences of his failure to properly respond to defendants' Local Rule 7.1(a)(3) Statement.[11]  That form advised the plaintiff as follows:

> Pursuant to Local Rule 7.1 of the Northern District, you are required to submit the following papers in opposition to this motion (1) a **memorandum of law** (containing relevant factual and legal argument); (ii) **one or more affidavits** in opposition to the motion and (iii) **a short and concise statement of material facts** as to which you claim there are genuine issues in dispute. **These papers must be filed and served in accordance with the time set by Local Rule 7.1.**

Notification of Consequences of Failing to Respond to a Summary

---

[11]   Northern District of New York Local Rule 56.2 mandates that when summary judgment is sought against a *pro se* litigant the moving party must notify that *pro se* litigant of the consequences of failing to respond to the motion.  *See* N.D.N.Y.L.R. 56.2.  The local rule also advises that a sample notice can be obtained through the court.

Judgment Motion (Dkt. No. 12-1) (emphasis in original).[12]  The notification

continued, warning the plaintiff as follows:

> If you do not submit a short and concise statement
> of material facts as to which you claim there are
> general issues in dispute, all material facts set
> forth in the statement filed and served by
> defendant(s) shall be deemed admitted.

*Id*.

As the foregoing reflects, the plaintiff was squarely put on notice of

the consequences of his failure to respond to defendants' motion.  In view

of the foregoing, despite plaintiff's *pro se* status, I recommend that the

court accept defendants' assertions of facts as set forth in his Local Rule

7.1(a)(3) Statement as uncontroverted when considering the pending

motion.

C.    Summary of Governing First Amendment Principles

The First Amendment, made applicable to the states through the

Fourteenth Amendment, provides in relevant part that "Congress shall

make no law respecting an establishment of religion, or prohibiting the

---

[12]   The court notes that although the form utilized by the defendants tracks the language of a previous court-approved iteration, the court has revised the form, and the form sent to the plaintiff is therefore not the current court-approved notification. The changes made, however, are not so material as to provide a basis to relieve the plaintiff from the consequences of his failure to respond to Defendant's Local Rule 7.1(a)(3) Statement.

free exercise thereof . . .."  U.S. CONST. AMEND. I.  "It embraces two

fundamental concepts: freedom to believe and freedom to act on one's

beliefs."  *Hatzfeld v. Eagen*, No. 9:08-CV-283, 2010 WL 5579883, at *6

(N.D.N.Y. Dec. 10, 2010) (Homer , M.J.) (citing *Decker v. Hogan*, No.9:09-

cv-0239, 2009 WL 3165830, at * 2 (N.D.N.Y.  Sept. 28, 2009) (McAvoy,

S.J.)) (internal citations omitted), *report and recommendation adopted*,

2011 WL 124535 (Jan. 14, 2011) (Strom, S.J.).

Both of these basic freedoms are potentially implicated in this action.

Plaintiff asserts that by incorporating religious tenets in a required

treatment program for sex offenders, the state has violated the First

Amendment's requirement regarding establishment of religion and

separation of church and state.  In addition, plaintiff maintains that the

defendants have interfered with his right to exercise or, conversely, to be

free from, religious beliefs as his conscience dictates.

> D.   Plaintiff's Establishment Clause Claim

The touchstone for the court's analysis of an Establishment Clause

claim is the deeply rooted principle that the " 'First Amendment mandates

governmental neutrality between religion and religion, and between

religion and nonreligion.' "  *McCreary Cnty., Kentucky v. American Civil*

*Liberties Union*, 545 U.S. 844, 860, 125 S. Ct. 2722, 2733 (2005) (quoting

*Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S. Ct. 266 (1968) (other

citation omitted).   "[A]t a minimum, the government may not coerce

anyone to participate in religion or its exercise."  *Hatzfeld*, 2010 WL

5579883, at *6 (quoting *Lee v. Weisman*, 505 U.S. 577, 587, 112 S. Ct.

2649, 2655 (1992)).  In the Second Circuit, analysis of an alleged

Establishment Clause violation is governed by the test enunciated by the

Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105

(1971), as modified by *Agostini v. Felton*, 521 U.S. 203, 232, 117 S. Ct.

1997, 2015 (1997).  *Skoros v. City of New York*, 437 F.3d 1, 17 (2d Cir.

2006); *DeStefano v. Emergency Housing Group, Inc.*, 247 F.3d 397, 406

(2d Cir. 2001).  The focus of the inquiry is "whether the government acted

with the purpose of advancing or inhibiting religion. . .."  *DeStefano*, 247

F.3d at 406 (quoting *Mitchell v. Helms*, 530 U.S. 793, 845, 120 S. Ct.

2530, 2560 (2000) (O'Connor, J. concurring)) (internal quotations

omitted).  The "three primary criteria" employed under *Lemon-Agostini* are

"whether the action or program 'result[s] in governmental indoctrination;

define[s] its recipients by reference to religion; or create[s] an excessive

entanglement.'"  *DeStefano*, 247 F.3d at 406 (quoting *Agostini*, 521 U.S.

22

at 234, 117 S. Ct. 1997) (alterations in original).  "The ultimate inquiry for

the purposes of [p]laintiffs' § 1983 claim is whether the [SOTP] program

requires participation in religious activity."  *Miner v. Goord*, 354 Fed. App'x

489, 492 (2d Cir. 2009) (citing *Warner v. Orange Cnty. Dep't of Prob.*, 115

F.3d 1068, 1074-1075 (2d Cir. 1997)) (cited in accordance with Fed. R.

App. Proc. 32.1 not for precedential effect but to show continuing vitality of

*Warner*).[13]

    The First Amendment's Establishment Clause prohibits a

government from coercing any person to participate in religion or its

exercise.[14]  *Alexander v. Schenk*, 118 F. Supp. 2d at 301 (citing, *inter alia*,

---

[13]   The court notes that unlike the inquiry involved in a Free Exercise claim, the sincerity of the plaintiff's belief has no bearing on the question of whether there has been an Establishment Clause violation since this provision was "drafted, as Supreme Court has repeatedly stated, to prevent government from coercing **anyone** to support or participate in a religion or its exercise, or otherwise act in a way which establishes a [state] religion or religious faith, or tends to do so."  *Alexander v. Schenk*, 118 F. Supp. 2d 298, 305 (N.D.N.Y. 2000) (quoting *Lee*, 505 U.S. at 587, 112 S. Ct. 2649) (emphasis and alteration in original) (internal quotations omitted).  Thus, insofar as plaintiff has changed his religious designation, over time, potentially raising questions as to the sincerity of his beliefs, any such questions have no bearing on the court's determination of his Establishment Clause claim.

[14]   Where coercion is not at issue, to assess whether an Establishment Clause violation has occurred the court must consider whether "the practice (1) has a secular purpose; (2) whether it advances or inhibits religion in its principal or primary effect; and (3) whether it fosters excessive entanglement with religion."  *Alexander*, 118 F. Supp. 2d at 301 (citing *Lemon*, 403 U.S. at 612-613, 91 S. Ct. 2105; *Allegheny Cnty. v. Am. Civil Liberties Union*, 492 U.S. 573, 592, 109 S. Ct. 3086 (1989)); *Skoros*, 437 F.3d at 17.

*Lee,* 505 U.S at 587, 112 S. Ct. 2649).  The threshold question, then, is

whether McChesney was coerced into participating in the SOTP.  In this

instance there is no dispute that plaintiff's commitment to the CNYPC-

SOTP was involuntary.

 The next inquiry for the court is whether the treatment modalities

incorporated into the SOTP are religious in nature and, if so, whether

secular alternatives are available to the plaintiff.  As I have previously

observed in this case, and other courts in the district have recognized,

"the law is anything but clear on the question of whether compelled use by

officials at the CNYPC of treatment materials peripherally based upon

religious principles violates the rights of patients involuntarily committed

and subjected to the program."  *McChesney v. Hogan*, Nos.

9:08-CV-1186, 9:08-CV-1290, 2010 WL 1027443, at *11 (N.D.N.Y. Feb.

26, 2010) (citing *Pratt v. Hogan*, 631 F. Supp. 2d 192, 198 (N.D.N.Y.

2009) (Hurd, J.)), *report and recommendation adopted*, 2010 WL 1037957

(N.D.N.Y. Mar 18, 2010) (Mordue, C.J.); *Carey v. Hogan*, Nos. 9:08-CV-

1251, 9:08-CV-1280, 2010 WL 2519121, at * 6 (N.D.N.Y. Mar. 30, 2010)

(Baxter, M.J.) *report and recommendation adopted*, 2010 WL 2519961

(N.D.N.Y. Jun 15, 2010) (Baldwin, J.).  Significantly, however, those

decisions were made at the pleading stage upon Federal Rule of Civil

Procedure 12(b)(6) motions to dismiss, where the plaintiffs alleged, and

the court was bound to accept as true, that the SOTP programs at issue

incorporated religious beliefs and/or practices.  The court's research has

not revealed a reported decision in this circuit addressing the merits of

such a claim based upon a fully developed evidentiary record.[15]

E.      The SOTP Programs At Issue

_____

[15]    *But see Pratt v. Hogan*, 79 A.D.3d 1669, 914 N.Y.S.2d 540 (4th Dep't 2010),
which affirmed the dismissal of the plaintiff's Article 78 petition, brought pursuant to
New York Civil Practice Law and Rules ("CPLR"), seeking a judgment "vacating the
SOTP" and "directing respondents to cease and desist all programming with any
religious foundation, belief, ritualism, connotation or suggestion of religious affiliation"
on the grounds that such programming violates his constitutional right to freedom of
religion,"  *id.* at 1670, 914 N.Y.S.2d at 541, based upon a finding that "a government
facility does not violate the constitutional right to freedom of religion merely by offering
religion-based sex offender treatment but only when an individual is coerced into
participating in such programming.  *Id.* (citing *Mtr. of Griffin v. Coughlin*, 88 N.Y.2d 674,
677, 649 N.Y.S.2d 903, 673 N.E. 2d 98, *cert. denied* 519 U.S. 1054, 117 S.Ct. 681;
*Alexander*, 118 F. Supp. 2d at 302; *Warner*, 115 F.3d at 1074–1075).   The court
found further that,

> Petitioner, who is an atheist, failed to establish that he was
> required to participate in any religion-based treatment
> programs offered by CNYPC and, indeed, the documents
> submitted by petitioner demonstrate that most of the
> programs cited by petitioner as being religion-based provide
> nothing more than relaxation, meditation or introspection
> techniques. The record further establishes that petitioner
> was free to choose the programs in which he would
> participate and that there were several secular programs
> from which he could choose to satisfy his sex offender
> treatment requirement

*Id.*, 914 N.Y.S.2d at 542-42 (citing *Griffin*, 88 N.Y.2d at 677, 649 N.Y.S.2d 903, 673
N.E.2d 98; *Warner,* 115 F.3d at 1075).

At issue in this case are nine group therapy programs employed in the SOTP, four of which are Hazelden products, including from the Inside Out (Hazelden), Growing Up Male (Hazelden), Problem Solving (Hazelden), Anger Management (Hazelden), DBT, Self Care Skills I and II, Relaxation, Good Lives Model,[16] and Boundaries.  Defendants have now submitted to the court a complete copy of these SOTP treatment modalities, including the protocols for each, and the formatted content of the programs, including the lesson plans, and the related worksheets.[17] Among the materials provided are also two DVDs that are used in association with the From the Inside Out group program.  The protocols reveal the structure of each treatment modality and the topic of each weekly session.  The program materials, DVDs, and worksheets show the actual content of each treatment modality.

---

[16]   SOTP Director Terri Maxymillian states that Group Problem Solving is no longer offered at the CNYPC and has not been utilized for more than two years.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 21.  A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir.1983).  Since plaintiff's only remaining claims seek prospective injunctive relief and the Group Problem Solving program is no longer in use in the SOTP, it would appear that his challenge to that program is now moot.

[17]   As was previously mentioned, the content and format for each program is drafted in such a manner that any SOTP clinical staff may lead the group, which gives the SOTP flexibility in the assignment of instructors each semester.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 12.  It thus appears that while the material presented each semester is comparable, it may not be identical.  *See id.*

1.    The Growing Up Male, Problem Solving, and Anger
<u>Management Group Therapy Modalities</u>

Plaintiff alleges that the Growing Up Male, Problem Solving, and

Anger Management group therapy programs are all Hazelden products,

which incorporate Christian beliefs and practices.  Complaint (Dkt. No. 1)

¶ 3.  Upon careful review of these program materials it is evident that they

contain no reference to God, a Higher Power, or religion, nor do they

appear to incorporate any religious rituals or practices.[18]  Furthermore,

there is nothing within those Hazelden group therapy programs supporting

plaintiff's allegations that the programs are based in Christianity and

include Christian practices.  To the contrary, there is simply no evidence in

the record before the court suggesting that the Growing Up Male, Problem

Solving, and Anger Management group therapy modalities incorporate any

religious beliefs or practices.  As result, based upon the evidence before

the court I have determined that no reasonable juror could find that these

programs are offensive to the Establishment Clause.

---

[18]   At week nine the Anger Management lesson includes a sample "Anger Control Plan" that identifies stress relief strategies.  *See* Maxymillian Decl. (Dkt. No. 38-2) Exh. D.  Among the potential strategies are exercise, relaxation, journal, and mediation.  To the extent that plaintiff may take issue with the reference to meditation, the court notes that its review of the program material reveals no connection in the program materials between the suggested meditation and any religious practice or philosophy.  To the extent that plaintiff alleges that meditation is a Buddhist practice, as defendants point out, there is no basis for a finding that only Buddhists meditate.

2.    From the Inside Out

Plaintiff similarly alleges that From the Inside Out, another Hazelden product, incorporates Christianity.  Once again, however, the program materials associated with that group therapy modality do not support plaintiff's claim.  The From the Inside Out group therapy materials reveal that the goal of that program is to teach SOTP participants that relationships are critical to living a responsible and productive life, and to take personal responsibility for the relationships in their lives.  *See* Maxymillian Decl. (Dkt. No. 38-2) Exh. A.  During the first week of that program the residents are taught, *inter alia*, that the course is about relationships and that relapse is most often "traced back to not knowing how to participate in healthy relationships – with ourselves, with others, and with our Higher Power."  *Id.*  Residents are asked to complete a worksheet intended to help the participant realize why relationships are important.  The introductory paragraph to the worksheet notes, "There are many kinds of relationships.  This exercise provides the names of different types of relationships you might have with different people[,]" and proceeds to list and identify six types of relationships, including the relationship with self, a significant other, children, relatives, support

people, and a "Higher Power."  *See id.*  One's relationship with a higher

power is labeled "faith."  *See id.*  The participant is then asked to chose

one of the relationships listed, and to write the name of a person he or she

would like to reestablish or continue a relationship with, and also to write

in the type of relationship that is desired.  *See id.*  During the fifth session

of the From the Inside Out group therapy, "trust" is discussed, and the

resident is asked to complete a worksheet addressing that topic.

Reference is once again made to "your Higher Power"; the worksheet

instructs, "What you most owe yourself and your Higher Power is to

change what you bring to your relationship that is not fair."  *Id.*

        In my view, especially when considered in context of the goal of the

From the Inside Out group therapy and the particular exercises in which

they appear, it seems clear that these mere references to a higher power

within that group modality do not advance or inhibit any particular religion.

*See Skoros*, 437 F.3d at 13.  It is equally obvious that the mention of a

potential relationship with a higher power in these lessons and activities

does not require or coerce the participant into believing in the existence of

a higher power.  Rather, these references simply supply an example of a

kind of personal relationship an individual may have and may wish to

29

pursue, one that is identified as "faith", in order to advance their healing.

At week ten of the From the Inside Out Program the lesson is focused on trust in communication.  *See* Maxymillian Decl. (Dkt. No. 38-2) Exh. A.  Within the context of that discussion, to emphasize the point that words have different meanings to different people, the instructor may use the word "Christmas" as an example, explaining that "[t]o one it might mean the best time of year, presents, religion, family, love, and so on.  But to other people it might mean disappointment, pain and abandonment."  *Id.* at ¶ 27 and Exh. A.  At week 12, a Chinese parable, entitled "The Difference Between Heaven and Hell", is used in association with the lesson about making and keeping healthy relationships.[19]  *See id.*  It is

---

[19]   That parable teaches as follows:

A very old man knew that he was going to die soon.  Before he died, he wanted to know what heaven and hell were like, so he visited the wise man in his village.  "Can you tell me what heaven and hell are like?" he asked the wise man.  "Come with me and I will show you," the wise man replied.  The two men walked down a long path until they came to a large house.  The wise man took the old man inside, and there they found a large dining room with an enormous table covered with every kind of food imaginable.  Around the table were many people, all thin and hungry, who were holding twelve-foot chopsticks.  Every time they tried to feed themselves, the food fell off the chopsticks.  The old man said to the wise man, "Surely this must be hell. Will you now show me heaven?"  The wise man said, "Yes, come with me."  The two men left the house and walked farther down the path until they reached another large house.  Again they found a large dining room and in it a table filled with all kinds of food.  The people there were happy and appeared well fed, but they also held twelve-foot chopsticks.  "How can this be?" asked the old man.

intended to help make the point that in healthy relationships with others, everyone survives, but when you attempt to rely on yourself, you often fail. Maxymillian Decl. (Dkt. No. 38-2) ¶ 28.  Again, there is nothing in the material before the court that suggests that these lessons foster, promote, or coerce any religious belief or practice.

The DVDs used with the From the Inside Out program feature Ernie Larsen as an instructor/moderator, along with several former prison inmates who, at the beginning of the DVD set, discuss their respective backgrounds and their willingness to participate in creating the DVD due to a desire to give back and demonstrate to others that people are capable of changing their own lives.  The DVDs include some instruction from Larsen, as well as discussion and role playing by the former inmates which coincides with the topics discussed each week in the program materials.  The DVD was filmed at a halfway house.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 23.  Occasionally in the DVD there are banners visible in the background that make reference to "God."[20]  The men appearing in the

---

"These people have twelve-foot chopsticks and yet they are happy and well fed.  The wise man replied, "In heaven the people feed each other."

Maxymillian Decl. (Dkt. No. 38-2) Exh. A.

[20]   The two banners that the court observed read as follows: "Live in God's Grace", and "All things Bright and Beautiful Come From God."

DVD do not, however, discuss or promote their religion, and there are no lessons, interviews, or role playing that obviously relate to any religion or religious practices.  In my view, these few fleeting and inconspicuous appearances of religious banners in the DVDs, or the mention of Christmas, or reciting of a Chinese parable, alone are insufficient to support plaintiff's claim that the From the Inside Out program is based in Christianity.  *See Skoros*, 437 F.3d at 13.

### 3.    GLM, DBT, Self Care Skills I and II, and Relaxation

According to plaintiff's complaint, the GLM, DBT, Self-Care Skills I and II, and Relaxation group treatment modalities teach the rituals and practices of Buddhism.  The purpose of the GLM modality is to assist participants in understanding a part of their identity as it relates to what they want to approach in life, which are identified as "primary needs." Maxymillian Decl. (Dkt. No. 38-2) Exh. H.  There are fourteen basic human primary needs identified.[21]  *See id.*  At the start of that group therapy, participants are asked to rank in order of personal importance their primary needs, including spirituality and inner peace.  *See id.*  Residents

---

[21]    Those fourteen primary needs are identified as autonomy, self-esteem, intimacy, health, sex, creativity, spirituality, financial security, excellence in work, recreation/leisure time, inner peace, intellectual stimulation, friendships and socialization, and family.  Maxymillian Decl. (Dkt. No. 38-2) Exh. H.

are free to discount any of the primary human needs, including spirituality, if that need has no significance to the path they wish to pursue in furtherance of a socially acceptable lifestyle.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 44.  In the following weeks, each class is devoted to discussing one or more of the primary needs.  *Id.* at ¶ 42.  There is no evidence of Buddhist practices or teachings contained within the GLM group therapy program materials.

DBT is designed to teach SOTP participants to regulate their emotions, manage stress and interpersonal relationships, and become aware of potential vulnerabilities they may have.  *See* Maxymillian Decl. (Dkt. No. 38-2) Exh. E.  For weeks three and four, the lesson is described in the lesson plan as "Distract-Wise Mind ACCEPTS".  *See id.*  The lessons utilize acronyms to assist in teaching "Crisis Survival Strategies"; in four boxes the handout for weeks three and four lists "[s]kills for tolerating painful events and emotions when you cannot make things better right away."  *Id.*  As indicated in the first box in that handout, "ACCEPTS" denotes "Activities, Contributing, Comparisons, Emotions, Pushing away, Thoughts, Sensations."  *See id.*  That handout also refers to "Self-Soothe the Five Senses" as another apparent destressing

33

strategy, as well as "IMPROVE THE MOMENT", with "IMPROVE"

referencing "Imagery, Meaning, Prayer, Relaxation, One thing at a time,

Vacation, Encouragement", and finally "PROS AND CONS" in the last box,

referring to developing a list of pros and cons of "tolerating the distress"

and another list of pros and cons resulting from "not tolerating the

distress".  *See id.*  The materials further explain the various strategies

signified by IMPROVE, describing the seven skills the word symbolizes,

including imagery, meaning, prayer, relaxation, and "one thing in the

moment," specifically stating with regard to prayer and relaxation,

> With **Prayer**:
>
> Open your heart to a supreme being, greater wisdom, God, your own wise mind.  Ask for strength to bear the pain in this moment.  Turn things over to God or a higher being.
>
> With **Relaxation**:
>
> Try muscle relaxing by tensing and relaxing each large muscle group, starting with your hands and arms, going to the top of your head, and then working down; listen to a relaxation tape; exercise hard; take a hot bath or sit in a hot tub; drink hot milk; massage your neck and scalp, your calves and feet.  Get in a tub filled with very cold or hot water and stay in it until the water is tepid.  Breathe deeply; half-smile; change facial expression.

Maxymillian Decl. (Dkt. No. 38-2) Exh. E (emphasis in original).

34

According to SOTP Director Maxymillian, DBT is an effective therapeutic tool for persons with personality orders; for some, learning to relax or pray, as referenced in the lesson formats for weeks three and four, helps them to manage or avoid stressful situations.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 35.  Other than the two generic references to prayer and relaxation as potential skills that participants can employ as tools to aid in diffusing stressful situations, there are no references to any religion or religious practices or rituals found in the DBT program materials and, contrary to plaintiff's allegations in this action, they do not mention Buddha or incorporate Buddhism.[22]

The Self Care Skills I and II group treatment programs are intended to teach residents the causes of stress and enable them to develop appropriate coping skills.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 36 and Exh. F.  The second segment of that program builds on the concepts taught in the first and asks the participants to apply those concepts to explore their

---

[22] "Buddha" is an "Indian mystic and founder of Buddhism.  He began preaching after achieving supreme enlightenment at the age of 35."  AMERICAN HERITAGE DICTIONARY 241 (4th ed. 2000).  Buddhism is defined by the same source as "[t]he teaching of Buddha that life is permeated with suffering caused by desire, that suffering ceases when desire ceases, and that enlightenment obtained through right conduct, wisdom, and meditation releases one from desire, suffering, and rebirth."  *Id.*  Nothing in the content of the DBT, Self Care Skills I and II, and Relaxation program materials refers to or discusses these concepts.

family systems by analyzing each family member's role in the family unit, as well as what separates healthy families from dysfunctional families. *See id.* In Self Care Skills II, in the lesson plan for week two, which is described as understanding family belief patterns, participants are instructed how each is shaped by his or her past and are asked to brainstorm about their own belief patterns. *See id.* Two categories are identified for the brainstorming exercise: "family" and "individual." The subcategories under family include family configuration, ethnic origin, cultural values, economics, and religion. *See id.* These concepts are introduced as part of the discussion pertaining to understanding family belief patterns and are continued into weeks three of Self Care Skills II, when the discussion is focused on the function of families. Maxymillian Decl. (Dkt. No. 38-2) ¶ 37. The handout associated with that lesson describes how healthy families function and what needs they fulfill for their members, including maintenance, nurturance, inclusion, privacy, esteem, understanding, recreation, and spirituality. *See id.* at Exh. F. These are the only references to religion or spirituality that are found in the Self Care Skills I and II program materials. As with DBT, based upon a review of the materials before me, I find no evidence to support plaintiff's allegation that

the Self Care Skills I and II group therapies are Buddhist-based.

I next turn to the Relaxation group therapy.  *See* Maxymillian Decl. (Dkt. No. 38-2) Exh. G.  Defendants concede that this program includes relaxation techniques, such as self awareness and deep breathing, which may be associated with some Eastern philosophies such as Buddhism. *Id.* at ¶ 31.  The court's review of the program materials associated with this modality, however, confirms that there is no reference to any of those philosophies, any other religion, or to the concepts of religion, a higher power, or even spirituality for that matter.

### 4.    Boundaries Group Therapy

The only remaining program to be addressed is the Boundaries program, the purpose of which is to teach SOTP residents the concept of interpersonal boundaries and to understand boundary violations.  In that group treatment modality, I have found a single reference to religion in the program materials.  At week seven, the resident is asked to identify how much he or she is threatened by others whose religious views differ from his or hers.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 46 and Exh. I.  Once again, this single general reference to religion is insufficient to support an Establishment Clause violation.  *See Skoros*, 437 F.3d at 13.

37

In sum, a careful review of the record before the court, reveals that, at worst, six of the nine group treatment modalities utilized in the SOTP include some acknowledgment that religion and/or spirituality plays an important role in our society and can contribute to healing and provide a potential tool for managing difficult situations in one's life.  Of the nearly 600 pages of program materials submitted to the court, I have found only twelve general references to the concept of religion or spirituality.  The Establishment Clause, however, has never been interpreted to require government "'to purge from the public sphere all that in any way partakes of the religious'", *Skoros*, 437 F.3d at 13 (quoting *Van Orden v. Perry*, 545 U.S. 677, 699, 125 S. Ct. 2854, 2868 (2005) (Breyer, J., concurring)), nor does that clause  demand that courts "'sweep away all government recognition and acknowledgment of the role of religion in the lives of our citizens,'" *id.* at 30 (quoting *Allegheny Cnty.*, 492 U.S. at 623, 109 S. Ct. 3086).  Similarly, references to spirituality alone do not draw into play the Establishment Clause.  *Hatzfeld*, 2010 WL 5579883, at *7 (citing *Decker v. Hogan*, No. 9:09–CV–0239, 2009 WL 3165830, at *4 (N.D.N.Y. Sep. 28, 2009) (in turn citing *Boyd v. Coughlin*, 914 F. Supp. 828, 833 (N.D.N.Y. 1996) and *Pratt v. Hogan*, No. 6:08–cv–1003, 2009 WL 87587,

at *2 (N.D.N.Y. Jan. 9, 2009)).

To be sure, as the Second Circuit has recognized,

the type of coercion that violates the Establishment Clause
need not involve either the forcible subjection of a person to
religious exercises or the conditioning of relief from
punishment on the attendance at church services.  Coercion is
also impermissible when it takes the form of "subtle coercive
pressure" and interferes with an individual's "real choice" about
whether to participate in worship or prayer.

*DeStefano*, 247 F.3d at 412 (citations omitted).  In other words, the fact

that participants are not "required" to engage in prayer or participate in

religion is not necessarily dispositive.  The Supreme Court has cautioned

"that purpose must be taken seriously under the Establishment Clause

and needs to be understood in light of context[.]"  *McCreary Cnty.,*

*Kentucky*, 545 U.S. at 874, 125 S. Ct. at 2733.

The unrefuted goals of the SOTP, as well as the treatment

modalities contained within the record, are secular – that is, to rehabilitate

dangerous sex offenders and thereby further the state's interest in

protecting the safety of its communities by reducing the risk of recidivism

of sex offenders who are released into society.  Each of the group therapy

modalities at issue has its own goal intended to further this secular

purpose; none of these goals is intended to promote religion or spirituality.

Moreover, the record is devoid of any evidence even remotely suggesting that the treatment modalities at issue employ subtle coercion to inculcate the notion that participants are required to participate in a religion or exercise spirituality.  To the contrary, the references to religion and spirituality appear on limited occasions throughout the materials as examples of types of personal relationships or skills that may be used to promote mental health and achieve a socially acceptable lifestyle. Additionally, defendants have established that SOTP participants are afforded the option of not participating in activities they perceive as spiritual or offensive to their religious beliefs; an SOTP resident's decision not to participate in these relatively few exercises or discussions would in no way impede his or her progress in the program.  Indeed, it seems clear that on the record before this court that the concepts of religion and spirituality are not coercively employed in the SOTP program, but instead merely introduced as an effort to provide SOTP participants with options and/or skills for improving their lives.

In view of the foregoing, based upon the evidence before the court, I have determined that no reasonable factfinder could conclude that the SOTP group therapy programs at issue in this case violate the

40

Establishment Clause, and I therefore recommend that defendants'

motion for summary judgment as to this claim be granted.

     F.     <u>Plaintiff's Free Exercise Claim</u>

     In addition to a violation of the Establishment Clause, plaintiff also

complaints of interference with his rights under the Free Exercise Clause

of the First Amendment.  That provision prohibits "governmental

compulsion either to do or refrain from doing an act forbidden or required

by one's religion, or to affirm or disavow a belief forbidden or required by

one's religion."  *Mozert v. Hawkins Cnty. Bd. of Educ.*, 827 F.2d 1058,

1066 (2d Cir. 1987), *cert. denied*, 484 U.S. 1066, 108 S. Ct. 1029

(1988).[23]  In general, in order to avoid a violation of the Free Exercise

Clause of the First Amendment a government action that substantially

burdens a religious practice must be justified by a compelling government

interest.  *See Sherbert v. Verner*, 374 U.S. 398, 406, 83 S. Ct. 1790, 1795

(1963).  In a prison setting, due to the unique concerns presented, the

---

    [23]  Courts have consistently recognized that atheism falls within the ambit of the First Amendment's protection.  *Hatzfeld*, 2010 WL 557883, at * 6 (citing cases)*; see also Wallace v. Jaffree*, 472 U.S. 53, 105 S. Ct. 2479, 2487 (1985) ("[T]he Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all.").  At the time of commencement of this action plaintiff asserted that he was an atheist. However, it appears that he is now claiming to be Buddhist.

governmental burden in this regard is substantially lessened.  *See Ford v.*
*McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003).

It is recognized that while inmates are by no means entitled to the
full panoply of rights guaranteed under the United States Constitution,
including its First Amendment, the Free Exercise Clause of that
amendment does afford them at least some measure of constitutional
protection, including their right to participate in congregate religious
services.  *See Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804
(1974) ("In the First Amendment context . . . a prison inmate retains those
First Amendment rights that are not inconsistent with his [or her] status as
a prisoner or with the legitimate penological objectives of the corrections
system."); *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.
1993) ("It is well established that prisoners have a constitutional right to
participate in congregate religious services.") (citing cases).  The task of
defining the contours of a prison inmate's free exercise rights requires
careful balance of the rights of prison inmates against the legitimate
interests of prison officials tasked with maintaining prison security.
*O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S. Ct. 2400, 2404
(1987); *Ford*, 352 F.3d at 588; *Salahuddin v. Coughlin,* 993 F.2d at 308.

42

When determining whether an action impinges upon an inmate's First

Amendment free exercise right, the inquiry is "one of reasonableness,

taking into account whether the particular [act] affecting [the] right. . . is

'reasonably related to legitimate penological interests.'" *Benjamin v.*

*Coughlin,* 905 F.2d 571, 574, *cert. denied,* 498 U.S. 951, 111 S. Ct. 372

(2d Cir. 1990) (quoting *Turner v. Safely*, 482 U.S. 78, 89, 107 S. Ct. 2254,

2261 (1987)); *Ford,* 352 F.3d at 588; *see also Farid v. Smith,* 850 F.2d

917, 925 (2d Cir. 1988) (citing, *inter alia, O'Lone,* 482 U.S. at 348, 107 S.

Ct. at 2404).

The Second Circuit has yet to decide the appropriate standard to be

applied where, as here, a plaintiff is involuntarily civilly committed in a

secure treatment facility sharing many of the concerns and characteristics

of prison facilities; as was recently noted by one of my colleagues, the

issue appears to be one that has divided courts.  *Kalwasinski v.*

*Maxymillain*, No. 9:09-CV-0214, 2010 WL 5620908, at * 3 (N.D.N.Y. Dec.

23, 2010) (Lowe, M.J.) (citing cases), *report and recommendation*

*adopted*, 2011 WL 195648 (N.D.N.Y. 2011) (Hurd, J.); *compare Carey*,

2010 WL 2519121, at *3 (applying substantial burden/compelling interest

test to CNYPC patient's free exercise claim) and *Pratt*, 631 F. Supp. 2d at

43

198 (same), *with Lombardo v. Holanchock*, No. 07 Civ. 8674, 2008 WL 2543573, at *6 (S.D.N.Y. June 25, 2008) (applying legitimate penological purpose test to Mid-Hudson Psychiatric Center patient's free exercise claim) and *Abdul-Matiyn v. Pataki*, No. 9:06-CV-1503, 2008 WL 974409, at *12 (N.D.N.Y. Apr. 8, 2008) (applying legitimate penological purpose test to CNYPC patient's free exercise claim) (Hurd, J.).  Resolution of this question of law is unnecessary in this case, however, since I have concluded that under even the more rigorous test, plaintiff's Free Exercise claim would fail.

As an initial matter, a plaintiff challenging a prison regulation on Free Exercise grounds must show that it substantially burdens a sincerely held religious belief.[24]  *Salahuddin v. Goord*, 467 F.3d at 274-75.  Defendants have now shown that the program materials at issue would not impose a substantial burden on plaintiff's beliefs, whether they be grounded in

_____

[24]   Here, defendants seem to take issue with plaintiff's ability to make this required showing with respect to those programs that he challenges as incorporating Buddhism since he is now a practicing Buddhist.  According to a recent statement made by plaintiff, he meditates and performs yoga daily and also follows a regimen of "mindfulness", apparently stemming from his current Buddhist beliefs.  Maxymillian Decl. (Dkt. No. 38-2) ¶ 56.  As a result, at least with respect to those group therapy modalities that he claims incorporate Buddhism, it seems clear that given his current religious practices plaintiff cannot now claim that those programs impose a substantial burden on his beliefs.

atheism or Buddhism, since there is nothing in the SOTP that requires a participant to engage in the practice of religion, or perform any exercises that demand a belief in spirituality, and there is no evidence in the record that plaintiff is otherwise required or forbidden to perform any activity that is offensive to his own religious beliefs.  To the contrary, defendants have shown that with respect to those activities that mention religion and/or spirituality, plaintiff may freely choose not to participate.

Even if that were not the case, however, plaintiff's Free Exercise claim would fail as application of the *Turner* factors favors the defendants in this action.  In considering whether the governmental action serves a legitimate interest, the Second Circuit has characterized "the first 'factor' [as] more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin v. Goord*, 467 F.3d at 274 (citing and quoting *O'Lone*, 482 U.S. at 350, 107 S. Ct. 2400 ("[A] regulation must have a logical connection to legitimate governmental interests....")).

In its decision in *McKune v. Lile*, 536 U.S. 24, 35-36, 122, S. Ct. 2017, 2026 (2002), the Supreme Court recognized the serious threat presented by sex offenders released into the community and the high rate

45

of recidivism, attributable to that segment, noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sexual assault[,]" adding that "[s]tates thus have a vital interest in rehabilitating convicted sex offenders.  *McKune,* 536 U.S. at 33, 122 S. Ct. at 2024 (citations omitted); *see also Hobbs v. Westchester Cnty.*, 397 F.3d 133, 150 (2d Cir.) (finding protection of physical and social well being of minors a compelling interest when evaluating a First Amendment challenge to the ban on the issuance of permits for solicitation, performance or similar activity on county property to persons known to have been convicted of sex offenses against minors, where the presentation would entice children to congregate), *cert. denied*, 546 U.S. 815, 126 S. Ct. 340 (2005); *Stevenson v. State and Local Police Agencies*, 42 F. Supp. 2d 229, 223 (W.D.N.Y. 1999) (finding that with respect to sex offender registration legislation that "[o]bviously the state has a strong interest in ensuring the safety and well-being of its citizens").

The evidence now before the court shows that the group therapy programs are part of a regimen designed to rehabilitate repeat sex offenders in order to reduce recidivism and protect the community upon

46

their release; these are governmental interests that the court finds to be indisputably compelling.  Defendants have likewise established a rational connection between the use of the materials at issue and the rehabilitation of the SOTP program participants.  Defendants have produced uncontroverted evidence that the treatment services are designed to enhance an individual's treatment engagement and develop the skills necessary to avoid future anti-social behavior.  They have shown that the materials they use are based upon methods that are consistent with best known practices in the field of sex offender treatment, and that as new research evolves the SOTP adapts its programs accordingly, incorporating new groups and eliminating others as appropriate.  In addition, defendants have come forward with evidence that religion and spirituality may play a role in some people's recovery, and that relaxation and spirituality have proven to be effective therapeutic tools for persons with personality disorders, such as sex offenders, by teaching them coping skills and how to regulate their emotions, and ultimately to avoid offending behaviors. *See* Maxymillian Decl. (Dkt. No. 38-2) ¶¶ 35, 53.

In sum, after careful review of the record before the court, I have found no evidence that anything encompassed within the SOTP group

therapy modalities that plaintiff challenges in this action imposes a substantial burden upon his religious beliefs, whether that is as an atheist or a Buddhist.  Moreover, the evidence presented establishes that the occasional identification of religion and/or spirituality as a potential tool for achieving a socially acceptable lifestyle is reasonably related to the compelling governmental interests of reducing recidivism and protecting society from repeat sex offenders.  *See Bush v. Goord*, No. 03-CV-759S, 2009 WL 790358, at *3-4 (W.D.N.Y. Mar. 25, 2009) (finding a rational connection between the sex offender counseling program ("SOCP"), including its requirement that prisoners take responsibility for their crimes or face the loss of good time credits for non-participation, and the DOCS' interest in rehabilitating prisoners, and that the primary purpose of the SOCP, which is to reduce the likelihood that convicted sex offenders and other inmates with histories of sexual offending behavior will reoffend, by helping them to gain control of the chain of behaviors that leads to sexual offending).

For all of the foregoing reasons, I have concluded that based upon the record before the court no reasonable juror could find in favor of plaintiff on his Free Exercise claim, and therefore recommend that

48

defendants' motion be granted as to that cause of action as well.

      G.    <u>The Intervenor's Motion</u>

      Jeremy Zielinski, who identifies himself as a member and supporter of the New York chapter of Reform Sex Offender Laws ("RSOL"), an organization devoted to reforming sexual offense laws and ending biases and stereotypes against those labeled as sex offenders, has moved to intervene in this action for the limited purpose of seeking access to the documents filed under seal, and to vacate the court's order granting defendants leave to file the SOTP program materials under seal, asserting his own as well as the public's First Amendment right to access judicial proceedings. *See* Dkt. Nos. 43. Defendants' have opposed that motion. Dkt. No. 45.

      As was recognized by the Second Circuit in *Lugosch v. Pyramid Co. of Onondaga,* 435 F.3d 110 (2d Cir. 2006), the right of public access to the federal courts, including judicial records, is firmly rooted in our nation's history and gives rise to a presumption of openness in judicial proceedings. *Id.* at 119; *see also Gambale v. Deutsche Bank*, 377 F.3d 133, 140 (2d Cir. 2004). This presumption of public access serves twin purposes, promoting accountability of the courts and fostering public

confidence in the administration of justice.  *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)).  In deciding whether to seal presumptively public judicial documents a court should weigh the importance of the presumption of public access, depending upon the type of judicial function at issue, against the interests sought to be protected by sealing.  *Securities and Exchange Comm'n v. Oakford Corp.*, No. 00 Civ. 2426, 2001 WL 266996, at* 1 (S.D.N.Y. Mar. 16, 2001) (citing, *inter alia*, *Amodeo*, 71 F.3d at 1047-51.  Additionally,

> [t]he motives of the party invoking the presumption of public access, and those of the party opposing such access, may be considered insofar as they bear on the veracity of the parties' asserted positions.  In all events, "a judge must carefully and skeptically review sealing requests to insure that there really is an extraordinary circumstance or compelling need."

*Encyclopedia Brown Prods., Ltd. v. Home Box Office, Inc.*, 26 F. Supp. 2d 606, 610–11 (S.D.N.Y.1998) (citing *Amodeo* and quoting *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir.1994)).[25]  By its very nature, the

---

[25]   Rule 83.13 of this court's local rules of practice, which outlines the procedures to be filed when some or all of a case is sealed, provides, in relevant part,

> [a] party seeking to have a document . . . or entire case sealed shall submit an application, under seal, setting forth the reason(s) why the document, party or entire case should be sealed, together with a proposed order for the assigned judge's approval.

sealing of some or all of the court's records in a case "impose[s] a

substantial burden on the court[ ] and the judge[ ] to whom [it] is

assigned." *Standard Chartered Bank Int's (Americas) Ltd. v. Calvo*, 757

F. Supp. 2d 258, 260 (S.D.N.Y. Jun. 16, 2010).

Although not mentioned in proposed intervenor Zielinski's

submission on the pending motion, he is familiar to this court, having

recently appeared on a petition brought by a United States Probation

Officer to modify the conditions of Zielinski's supervised release.[26, 27]

*United States v. Zielinski*, No. 1:11-cr-0533 (N.D.N.Y. filed Nov. 14, 2011).

It appears from court records that on June 28, 2006 Zielinski pleaded

guilty to federal charges of conspiracy to commit access fraud in violation

of 18 U.S.C. § 1028(a)(7).  *See id.* at Dkt. No. 1.  Subsequently, on or

---

N.D.N.Y.L.R. 83.13.

[26]   The judicial documents and official court records associated with those proceedings, as publically available documents, are properly considered by the court and entitled to judicial notice in connection with this proceeding. *See* Federal Rules of Evidence 201 and 1005; *see also*, *Wilson v. Limited Brands, Inc.,* No. 08 CV 3431, 2009 WL 1069165 at *1 n. 1 (S.D.N.Y. April 17, 2009).

[27]   Zielinski, who was formerly a New York State prison inmate, has also previously filed at least four civil rights actions in this court relating to, among other things, the conditions of his confinement.  *See Zielinski v. Fischer, et al.*, No. 9:09-CV-1444 (N.D.N.Y. filed Dec. 29, 2009); *Zielinski v Rabsatt, et al.*, No. 9:10-CV-0246 (N.D.N.Y. filed Mar. 3, 2010); *Zielinski v. Fischer, et al.*, No. 9:10-CV-1014 (N.D.N.Y. filed Aug. 23, 2010); *Zielinski v. Defreest, et al.*, No. 6:11-CV01359 (N.D.N.Y. filed Nov. 16, 2011).  All of these matters are now closed.

about August 30, 2006, Zielinski was convicted of charges contained in a

56-count indictment in Warren County, New York, including charges of

promoting a sexual performance of a child, possessing a sexual

performance by a child, and attempted dissemination of indecent material

to a minor.  *See id.* at Dkt. No. 3.  As a result of that conviction, Zielinski

was classified by New York State as a Level 2 Sex Offender.  After

conducting a hearing on the petition, the court sentenced Zielinski to six

(6) months of home confinement for his violation of the terms of his

pre-existing supervised release. *See id.* at Dkt. No. 39, p. 2.  The court

also modified the terms and conditions of Zielinski's supervised release by

1) extending the supervised release term for a period of 24 months

following his sentence on the violation, and 2) by imposing special

conditions of supervised release related to his state court convictions.

*See id.* at Dkt. No. 39, p. 2.  Those special conditions included a

requirement that Zielinski participate in a mental health program, including

participation in a treatment program for sexual disorders.  *See id.* at Dkt.

No. 39. n. 6.

Zielinski appealed that decision, and on February 24, 2012 filed a

motion to stay his sentence pending appeal; that application was denied.

On March 28, 2012, just seven days before filing his current motion to intervene, Zielinski filed a second motion to stay his sentence pending appeal, arguing, among other things, that the mental health program counseling he is required to attend is imposing a religious viewpoint upon him in violation of his First Amendment rights.  *See United States v. Zielinski*, No. 1:11-cr-0533, Dkt. No. 33.  In his decision and order, dated May 8, 2012, denying Zielinski's second motion to stay his sentence, District Judge McAvoy noted that "[Zielinski's] constitutional challenge to the specific mental health treatment program he has been assigned might be the basis for a modification petition (and which would require a separate hearing exploring the nature of the mental health treatment program), but it does not present a 'close call' or an issue that could have been decided the other way on whether the Court had the authority to modify the terms of his supervised release requiring that he attend mental health counseling."  *Id.* at Dkt. No. 39, pp. 6-7.  The record does not reveal whether the sex offender treatment program in which Zielinski is required to participate utilizes the SOTP group therapy materials at issue in this case.

In opposing Zielinski's motion, defendants have submitted the

declarations of SOTP Director Terry Maxymillian, Psy.D., and of Naomi

Freeman, Ph.D., the Director of the OMH Bureau of Sex Offender

Evaluation and Treatment.  Dkt. Nos. 45 and 45-1.  In these submissions,

defendants reiterate the dual purpose of the CNYPC-SOTP, and assert

that disclosure of the SOTP materials to residents of that program would

undermine its critical therapeutic objectives.  *See id.*  More specifically, Dr.

Freeman, who is responsible for oversight and management of the

personnel and facilities engaged in the civil management of sex offenders

as mandated by MHL Article 10, states that "[t]o maximize the potential

effectiveness of [the SOTP group therapy], it is of paramount importance

that precautions are taken to minimize the likelihood that the program

content. . . come into possession of SOTP residents in advance of their

actual participation in the programs."  Freeman Decl. (Dkt. No. 45-1) ¶ 10.

Dr. Freeman explains that the group therapy protocols are not intended to

be self-study, and that attempts by residents to "treat themselves" by

working on the materials outside of the program, before they are clinically

ready to do so, would undermine efforts of staff to engage residents in

clinical work that is more suited to their current abilities and treatment

needs, and interfere with the therapeutic relationship and treatment

process.  *Id.* at ¶¶ 11, 13, 15.  Dr. Freeman states further that providing

access to these group therapy program materials to SOTP residents

before clinically appropriate would not only weaken the therapeutic

benefits, but place the public at greater risk for sexually reoffending

behavior.  *Id.* at ¶ 18.

According to SOTP Director Maxymillian, many SOTP residents

have long histories of manipulating people and systems, and, at least

initially, have very little motivation to change their views on sexually

offending behaviors.  Maxymillian Decl. (Dkt. No. 45) ¶ 16.  Maxymillian

further explains that if these materials were made available to SOTP

participants it would open the door to the manipulation of the therapy

groups and other participants in the groups.  *Id.* at ¶¶ 13, 16.  There is

also a risk that the evaluative process of these individuals would have to

be extended to compensate for potential false positives created by

advance access to program materials, and thus prolong the time it takes

for residents to successfully complete programs, or for staff to evaluate

whether they have done so.  *Id.* at ¶ 18.  Additionally, because the

possession of program materials by SOTP residents is considered

contraband, disclosure would also require the CNYPC to become "hyper-

vigilant" in policing its possession.  *Id.* at ¶ 14.   These detrimental effects

would extend beyond CNYPC-SOTP to other sex offender treatment

programs throughout New York State, and could very well undermine the

purposes underlying MHL Article 10.  *Id.* at ¶ 20.

In the face of the evidence offered from these doctors, who are

experienced OMH executives, Zielinski has offered nothing but conjecture

to suggest that their concerns and the anticipated risks of disclosure are

unfounded.  I have considered proposed intervenor Zielinski's personal

interest in the program materials at issue, and it appears that his current

motion may be for the purpose of obtaining discovery related to the

criminal matter that he has pending in this District, a practice the court

cannot condone.  Indeed, it seems clear that the disclosure of the program

materials at issue in this case to Zielinski, a convicted sex offender who is

required to participate in sex offender treatment, would directly implicate

the very concerns that justified the court's decision to allow defendants to

file them under seal in the first place.

Having weighed the competing considerations, I have determined

that sealing of the SOTP program materials in this case remains

warranted due to the potential detrimental effect that disclosure of the

materials to convicted sex offenders may have on the SOTP program goal

to  rehabilitate them.  Balancing the public's right of access to court

proceedings, I have narrowly tailored the order so as to allow the filing of

only the complete set of SOTP program materials under seal, and I note

that the public otherwise retains full access to this matter, including SOTP

Director Maxymillian's declarations and all other submissions filed by

defendants in support of their motion for summary judgment, as well as

this court's report and recommendation, which explains in detail the basis

for the conclusion that the record before the court does not support

plaintiff's First Amendment claims.

For these reasons, I will deny the proposed intervenor's motion.

IV.     <u>SUMMARY AND RECOMMENDATION</u>

Though raising potentially significant First Amendment challenges to

the use of certain group therapy programs in the SOTP, having now had

the opportunity to review the entirety of the program materials, it seems

clear that plaintiff's claims cannot be sustained based upon the record

before the court.  While some of the group therapy modalities at issue at

times make mention of religion or spirituality, there is nothing in those

materials that either overtly or subtly coerces SOTP participants to engage

in religious or spiritual practices, thus dispelling plaintiff's Establishment Clause claim. With regard to plaintiff's Free Exercise claim, the record is lacking any evidence demonstrating that anything included in the SOTP program materials substantially burdens plaintiff's sincere religious beliefs. Moreover, defendants have shown that the references to religion and spirituality as potential tools to assist SOTP participants in developing a socially acceptable lifestyle is reasonably related to the State's compelling interest in rehabilitating sex offenders in order to reduce recidivism and protect the community from repeat offenses. Considering the undisputed evidence before the court, I have thus concluded that the defendants have now met their burden to establish the lack of material issues of fact for trial, and therefore recommend that their motion be granted.

With respect to proposed intervenor Zielinski's motion to intervene for the purposes of unsealing the SOTP program materials, I have found that the State's interests in maintaining these records under seal in order to ensure the integrity of the program outweighs Zielinski's interest in disclosure, and have carefully crafted my sealing order to protect the public's First Amendment right to access to judicial proceedings. Accordingly, Zielinski's motion will be denied.

For all of the foregoing reasons, it is hereby respectfully

RECOMMENDED, that defendants' motion for summary judgment,

Dkt. No. 38, be GRANTED, and that judgment be entered in favor of the

defendants in this action dismissing all remaining claims in the action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby further

ORDERED that proposed intervenor's motion, Dkt. No. 43, is

DENIED; and it is further

ORDERED that the clerk of the court serve a copy of this report,

recommendation and order upon the parties and the proposed intervenor

in accordance with this court's local rules.


Dated:      July 30, 2012
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge
59



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C**  Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph
Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for
Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse
University ("University") pursuant to 20 U.S.C. §
1681 *etseq.* ("Title IX") claiming hostile educational
environment, and retaliation for complaints of same.
Presently before the court is the University's motion for
summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are
affected by plaintiff's failure to file a Statement of Material
Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This
Rule requires a motion for summary judgment to contain
a Statement of Material Facts with specific citations to the
record where those facts are established. A similar
obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of
Material Facts. The non-movant's response shall mirror the
movant's Statement of Material Facts by admitting and/or
denying each of the movant's assertions in matching
numbered paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue arises.... *Any
facts set forth in the [movant's] Statement of material
Facts shall be deemed admitted unless specifically
controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an
eleven page, twenty-nine paragraph Statement of Material
Facts, replete with citations to the record in every
paragraph. Plaintiff, in opposition, filed a two page, nine
paragraph statement appended to her memorandum of law
which failed to admit or deny the specific assertions set
forth by defendant, and which failed to contain a single
citation to the record. Plaintiff has thus failed to comply
with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules
are not suggestions, but impose procedural requirements
upon parties litigating in this District." *Osier v. Broome
County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a
consequence, courts in this district have not hesitated to
enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1]
by deeming the facts asserted in a movant's proper
Statement of Material Facts as admitted, when, as here, the
opposing party has failed to comply with the Rule.
*See,e.g., Phipps v. New York State Dep't of Labor,* 53
F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v.
Car-Freshner Corp.,* 49 F.Supp.2d 84, 86
(N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson
v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. FN2 The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.](#) Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. FN4 Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U.S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *SeeOsier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

*8 Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *SeeMeiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *SeeDavis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did she ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.FN9

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

*1 Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that they
violated his right to due process in the course of a
disciplinary proceeding and subsequent appeal. On
September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived him of
a liberty interest within the meaning of the Due Process
Clause. Plaintiff did not oppose the summary judgment
motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. Sandin v. Conner, 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
Id. Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

### REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

**\*2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Valery LATOUCHE, Plaintiff,
v.
Michael C. TOMPKINS, C.O., Clinton Correctional
Facility; Dean E. Laclair, C.O., Clinton Correctional
Facility; Jeffrey R. Ludwig, C.O ., Clinton Correctional
Facility; Michael B. King, Sgt., Clinton Correctional
Facility; D. Mason, C.O., Clinton Correctional Facility;
B. Malark, C.O., Clinton Correctional Facility; John
Reyell, C.O., Clinton Correctional Facility; Bob
Fitzgerald, R.N., Clinton Correctional Facility; John
Doe, C.O. (C.O. Gallery Officer Company Upper F–6);
John Doe, C.O. (Mess Hall Supervising C.O.),
Defendants.
No. 9:09–CV–308 (NAM/RFT).

March 23, 2011.
Valery LaTouche, Ossining, NY, pro se.

Eric T. Schneiderman, Attorney General for the State of
New York, Krista A. Rock, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

**INTRODUCTION**

**\*1** In this *pro se* action under 42 U.S.C. § 1983,
plaintiff, an inmate in the custody of the New York State
Department of Correctional Services ("DOCS"), claims
that defendants violated his Eighth Amendment rights as
a result of a physical altercation. Defendants moved for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure (Dkt. No. 46) and plaintiff
opposed the motion. (Dkt. No. 53). The motions were
referred to United States Magistrate Judge Randolph F.
Treece for a Report and Recommendation pursuant to 28
U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

Magistrate Judge Treece issued a Report and
Recommendation (Dkt. No. 60) recommending that
defendants' motion be granted in part and denied in part.
Specifically, Magistrate Judge Treece recommended
awarding summary judgment dismissing the following: (1)
plaintiff's claims for monetary relief against all defendants
in their official capacity; (2) plaintiff's claims of medical
indifference against defendant Fitzgerald; and (3)
plaintiff's allegations of verbal harassment by defendant
Mason. Magistrate Judge Treece also recommended
denying defendants' motion for summary judgment on
plaintiff's excessive force claims against defendants
Tompkins, LaClair, Mason, Malark and Reyell and
plaintiff's failure to protect claims against defendants
Ludwig and King.

Defendants filed specific objections to portions of the
Report and Recommendation arguing: (1) that the
Magistrate Judge erred in "overlooking" plaintiff's failure
to comply with Local Rule 7.1(a) (3); (2) that the
Magistrate Judge erred when he failed to apply the
*Jeffreys* exception as plaintiff's testimony was incredible
as a matter of law; and (3) plaintiff's excessive force
claims against defendant Reyell are subject to dismissal
for lack of personal involvement. (Dkt. No. 61). Plaintiff
does not object to the Report and Recommendation. (Dkt.
No. 62).

In view of defendants' objections, pursuant to 28
U.S.C. § 636(b) (1)(c), this Court conducts a *de novo*
review of these issues. The Court reviews the remaining
portions of the Report–Recommendation for clear error or
manifest injustice. *See Brown v. Peters,* 1997 WL 599355,
*2–3 (N.D.N.Y.), af'd without op., 175 F.3d 1007 (2d
Cir.1999); see also Batista v. Walker,* 1995 WL 453299,
at *1 (S.D.N.Y.1995) (when a party makes no objection
to a portion of the report-recommendation, the Court reviews
that portion for clear error or manifest injustice). Failure
to object to any portion of a report and recommendation
waives further judicial review of the matters therein. *See
Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

**DISCUSSION**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

## I. Local Rule 7.1(a)(3)

The submissions of *pro se* litigants are to be liberally construed. *Nealy v. U.S. Surgical Corp.,* 587 F.Supp.2d 579, 583 (S.D.N.Y.2008). However, a *pro se* litigant is not relieved of the duty to meet the requirements necessary to defeat a motion for summary judgment. *Id.* (citing *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003)). Where a plaintiff has failed to respond to a defendant's statement of material facts, the facts as set forth in defendant's Rule 7.1 statement will be accepted as true to the extent that (1) those facts are supported by the evidence in the record, and (2) the non-moving party, if is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment. *Littman v. Senkowski,* 2008 WL 420011, at *2 (N.D.N.Y.2008) (citing *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996)). FN1

FN1. Local Rule 7.1(a)(3) provides:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits. *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*

The moving party shall also advise *pro se* litigants about the consequences of their failure to respond to a motion for summary judgment. See also L.R. 56.2.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert.*

Local Rule 7.1(a)(3) (emphasis in original).

**\*2** The record herein contains few undisputed facts. Plaintiff and defendants disagree on many of the events that transpired and provide conflicting accounts of the circumstances surrounding the incident. In support of the motion, defendants properly filed a Statement of Material Facts pursuant to Local Rule 7.1 and notified plaintiff about the consequences of his failure to respond to the motion for summary judgment. Plaintiff does not dispute that he received such notification from defendants. Plaintiff responded with a handwritten "Statement of Facts", without citations to the record, and failed to specifically admit or deny defendants' factual statements as required by Local Rule 7.1. However, plaintiff also annexed a copy of his deposition transcript. In the deposition, upon questioning from defense counsel, plaintiff testified as follows:

Q. ... Have you read the complaint?

A. Yes, ma'am.

Q. So, you are aware of its contents?

A. Yes, ma'am.

Q. Did anyone help you prepare the complaint?

A. No, ma'am.

Q. Are there any statements contained in the complaint that you now wish to change or modify?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

A. I'm not sure.

Q. Well, let me ask you this: So, do you adopt this document under oath as true to the best of your knowledge?

A. Yes, ma'am.

Transcript of Plaintiff's Deposition at 13.

A verified complaint may be treated as an affidavit for the purposes of a summary judgment motion and may be considered in determining whether a genuine issue of material fact exists. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (the plaintiff verified his complaint by attesting under penalty of perjury that the statements in the complaint were true to the best of his knowledge). Based upon the aforementioned colloquy, the Court deems plaintiff's complaint to be "verified" and as such, will treat the complaint as an affidavit. *See Torres v. Caron,* 2009 WL 5216956, at *3 (N.D.N.Y.2009). While plaintiff has not formally and technically complied with the requirements of Local Rule 7.1(a)(3), his opposition to defendants' motion contains sworn testimony. In light of his *pro se* status and the preference to resolve disputes on the merits rather than "procedural shortcomings", to the extent that plaintiff's "Statement of Facts" and assertions in the complaint do not contradict his deposition testimony, the Court will consider those facts in the context of the within motion. *See Mack v. U.S.,* 814 F.2d 120, 124 (2d Cir.1987); *see also Liggins v. Parker,* 2007 WL 2815630, at *8 (N.D.N.Y.2007) (citing *Lucas v. Miles,* 84 F.3d 532, 535 (2d Cir.1996)). The Court has reviewed plaintiff's complaint and compared the allegations with the testimony presented at his deposition and adopts Magistrate Judge Treece's summary of the "facts" as presented by both parties.[FN2]

FN2. While the Court adopts Magistrate Judge Treece's recitation of defendants' and plaintiff's versions of the facts, the Court does not adopt the reasoning set forth in the Footnote 2 of the Report and Recommendation.

**II. *Jeffreys* Exception**

Defendants argue that the Court should apply *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) and award summary judgment dismissing all claims of excessive force based upon plaintiff's implausible and contradictory claims.

**\*3** "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment' ". *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (citing *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (unfavorable assessments of a plaintiff's credibility are not "within the province of the court on a motion for summary judgment")). A narrow exception to this general rule was created by the Second Circuit in *Jeffreys:*

> While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether "the jury could reasonably find for the plaintiff," and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account. Under these circumstances, the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor.

> *Id.* at 554 (internal citations and citations omitted).

Here, while plaintiff relies exclusively on his own testimony, for *Jeffreys* to apply, the testimony must also be "contradictory and incomplete". In this regard, defendants argue that plaintiff's allegations are contradicted by his prior accounts of the incident. Defendants cite to the record and argue that plaintiff told Fitzgerald that, "I hit the officer first" and that "I was hurt when I was subdued". Moreover, defendants point out that these statements were documented in an Inmate Injury Report executed by plaintiff.

Plaintiff does not deny making the aforementioned statements. However, in his deposition, plaintiff explained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

those discrepancies and testified:

Q. —did Nurse Fitzgerald ask you any questions while he was examining you?

A. I think he asked me how am I feeling, how did this happen?

Q. And what did you say?

A. I told him I was nervous and that [sic] whatever officer D. Mason told me to tell him.

Q. What did you say?

A. I told him I was nervous and whatever officer D. Mason told me to tell him, which was that I got hurt being subdued—

Q. Which was—

A. —and that I started this.

Q. And is that the truth?

A. No.

Q. Why did you tell the nurse that?

A. Because I was being forced to.

Q. Forced to how?

A. By the officers that [sic] was there.

Q. Did you sign a form admitting that you hit the officer first and you were hurt when you were subdued?

A. Yes, ma'am.

Q. Why did you do that?

A. Because the [sic] officer D. Mason kept smacking me for me to do that.

Transcript of Plaintiff's Deposition at 53–54.

*4 In the Report and Recommendation, Magistrate Judge Treece concluded that plaintiff's "fear of retribution" was a plausible explanation for the discrepancies in his testimony. This Court agrees and adopts the Magistrate Judge's conclusions. See *Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (2d Cir.1998); *see also Cruz v. Church,* 2008 WL 4891165, at *5 (N.D.N.Y.2008) ("[t]he Court notes that ... it would be have difficulty concluding that [the][p]laintiff's statement of June 5, 2005, and his statement of June 16, 2005, are wholly irreconcilable, given his proffered explanation that he made the statement of June 5, 2005, out of fear of retribution by [the] [d]efendants).

Defendants also argue that plaintiff cannot identify which individuals participated in the attack; that plaintiff's injuries are consistent with the brief use of force as described by defendants to subdue plaintiff; and that plaintiff's version is contradicted by defendants' affidavits. Magistrate Judge Treece found that plaintiff was able to identify some individuals involved in the assault which, "stands in stark contrast to the plaintiff in *Jeffreys* who was unable to identify any of the officers involved in the alleged assault". Upon review of the record, as it presently exists, the Court agrees and finds that plaintiff's testimony is not wholly conclusory or entirely inconsistent to warrant application of the *Jeffreys* exception. *See Percinthe v. Julien,* 2009 WL 2223070, at *7 (S.D.N.Y.2009) (the court rejected the defendants' argument that the plaintiff's claims were subject to dismissal for implausibility as his injuries did not reflect the attack that he described and his description of the incident changed over time holding that the plaintiff's testimony, "[did] not reach the level of inconsistency and lack of substantiation that would permit the Court to dismiss on these grounds").

Magistrate Judge Treece provided an extensive summary of the record and applicable law and found that the evidence did not support deviating from the established rule that issues of credibility are not resolved on summary judgment. On review, the Court agrees with the Magistrate's recommendations and concludes that the *Jeffreys* exception does not apply. Accordingly, the Court accepts and adopts the Report and Recommendation on this issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

### III. Reyell's Personal Involvement

Defendants argue that the Magistrate Judge erred when he failed to dismiss the complaint against Reyell on the grounds that he was not personally involved in the attack. Defendants claim that the "RRO erroneously cites plaintiff's declaration as stating that 'it was defendant Reyell and another officer who removed the shirt' ". Defendants claim that the declaration and complaint clearly state that, "Officer Rock orchestrated the removal of plaintiff's shirt". [FN3] Defendants argue that the assertions in plaintiff's declaration (submitted in response to the motion for summary judgment) and complaint are contradicted by plaintiff's deposition testimony. Defendants claim that plaintiff testified that Reyell tried to cover up the incident by removing the shirt he was wearing.

> FN3. Officer Rock is not a defendant herein.

**\*5** The Court has reviewed plaintiff's complaint, declaration and deposition transcript and finds defendants' summary of plaintiff's assertions to be inaccurate. In plaintiff's complaint, on page 8, plaintiff alleges:

> Feeling extremely weak the claimant responded with a shake of his head. Once this performance was over with Correctional Officer R. Rock, the individual who held on to the photograph camera and who is responsible for capturing the claimant's injuries [sic] photos pointed to the claimant's bloodly [sic] stain kitchen white colored uniform [ ] as co-workers....

> Correctional Officer D. Mason then roughly removed the article of clothing and with the help of on[e] other they discarded the item of clothings [sic].

In Paragraph 22 of plaintiff's declaration, he states:

> Officer Rock, the individual who held the photograph camera and was responsible for capturing LaTouche injuries [sic] bloody kitchen white colored uniform to his coworker asking them to remove the article of clothing before he take [sic] any pictures. Mason then roughly removed the clothing and with the help of an other [sic] officer they discarded the items of

clothing.

In his deposition, plaintiff testified:

Q. What about Defendant Reyell, why are you suing Reyell?

A. Because defendant Reyell, that's the officer that was holding the camera and he tried to cover up the incident.

Q. How so?

A. That's when him and the other officer that was there, when they was searching me, strip searching me they took my shirt and they kept screaming something about let's remove this bloodstained shirt, let's remove this bloodstained shirt, we can't have this for the camera.

* * *

Q. Reyell and another officer took your shirt off?

A. Yes, ma'am.

Q. Do you remember the other officer's name?

A. No, ma'am.

Transcript of Plaintiff's Deposition at 63–64.

Here, the Magistrate Judge stated that any inconsistency or discrepancy [in plaintiff's testimony], "go[es] to the weight ... accorded to plaintiff's testimony". The Court agrees. Any discrepancies or inconsistencies in plaintiff's testimony are for a jury to assess. In the Second Circuit case of *Fischl v. Armitage,* the plaintiff/inmate alleged that he was assaulted in his cell by other inmates. *Fischl,* 128 F.3d at 54. The district court dismissed the plaintiff's complaint as against one defendant based upon "inconsistent statements". *Id.* The Second Circuit vacated the judgment of the district court holding:

> [T]he district court apparently questioned whether there had been an attack on Fischl at all, principally because of inconsistencies in his accounts of the event, his failure to report such an attack to prison workers in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)

(Cite as: 2011 WL 1103045 (N.D.N.Y.))

area on that morning, and the failure of those workers to notice any indications that he had been beaten. That skepticism, however, rests on both a negative assessment of Fischl's credibility and the drawing of inferences adverse to Fischl.

**\*6** Likewise, inconsistent statements by Fischl as to, for example, whether it was five, six, or seven inmates who attacked him, and as to what he observed or overheard just prior to the attack, go to Fischl's credibility. While inconsistencies of this sort provide ammunition for cross-examination, and they may ultimately lead a jury to reject his testimony, they are not a proper basis for dismissal of his claim as a matter of law. The jury might well infer, for example, that while Fischl was under siege he was understandably unable to take an accurate census of the number of inmates holding him and kicking him in the face.

*Fischl,* 128 F.3d at 56.

In this matter, without a credibility assessment of plaintiff, the record does not warrant an award of summary judgment. Accordingly, the Court adopts the Magistrate's recommendation and denies summary judgment on this issue.

### CONCLUSION

It is therefore

**ORDERED** that the Report and Recommendation of United States Magistrate Judge Randolph F. Treece (Dkt. No. 60) is adopted; and it is further

**ORDERED** that for the reasons set forth in the Memorandum–Decision and Order herein, defendants' motion for summary judgment is granted in part and denied in part; and it is further

**ORDERED** that the Clerk provide copies of this Order to all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2011.

Latouche v. Tompkins
Not Reported in F.Supp.2d, 2011 WL 1103045 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Idris LITTMAN, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent, Clinton Correctional Facility; D. Meier, Inmate Records Coordinator, Clinton Correctional Facility; John Doe # 1, Superintendent, Downstate Correctional Facility; and John Doe # 2, Inmate Records Coordinator, Downstate Correctional Facility, Defendants.
No. 9:05-CV-1104 (LEK/GHL).

Feb. 11, 2008.
Idris Littman, Dannemora, NY.[FN1]

> FN1. Although this is the address of record for Plaintiff on this action's docket, DOCS' online "Inmate Lookup" Service indicates (as of the date of this Report-Recommendation) that Plaintiff is currently incarcerated at Upstate Correctional Facility, P.O. Box 2000, 309 Bare Hill Road, Malone, N.Y. 12953.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Jeffrey M. Dvorin, Esq., Assistant Attorney General, of Counsel, Albany, NY.

*DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.
**\*1** This matter comes before the Court following a Report-Recommendation filed on December 31, 2007, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 22).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Lowe's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 22) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 18) is **GRANTED** and Plaintiff's claims against Senkowski and Meier are **DISMISSED with prejudice;** and it is further

**ORDERED,** that Plaintiff's claims against John Doe # 1 and John Doe # 2 be **DISMISSED** with prejudice due to the applicable statute of limitations (for the reasons set forth in Part III. A of the Report-Recommendation), or in the alternative, due to Plaintiff's failure to serve or even name those individuals, in violation of Fed. R. Civ. P 4(m), 16(f), and/or 41(b); and it is further

**ORDERED,** that any appeal taken from the Court's final judgment in this action would not be taken in good faith pursuant to 28 U.S.C.1915(a)(3); and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.
This action has been referred to me for a Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Plaintiff Idris Littman ("Plaintiff"), while an inmate at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

Clinton Correctional Facility ("Clinton C.F."), commenced this *pro se* civil rights action pursuant to 42 U.S.C. § 1983.

Liberally construed, Plaintiff's Complaint alleges that four employees of the New York State Department of Correctional Services ("DOCS")-Clinton C.F. Superintendent Daniel Senkowski, Clinton C.F. Inmate Records Coordinator D. Meier, Downstate Correctional Facility Superintendent John Doe # 1, and Downstate C.F. Inmate Records Coordinator John Doe # 2-violated Plaintiff's rights under the Fourth, Eighth and Fourteenth Amendments when, between February of 2002 and September of 2002, they (1) negligently or perhaps recklessly miscalculated the "parole jail-time credits" to which he was entitled, resulting in his being incarcerated in DOCS two hundred and eighteen (218) days past his "maximum release date," and (2) negligently or perhaps recklessly refused to promptly correct the error once they were notified of it through the filing of Plaintiff's state habeas corpus proceeding on August 7, 2002, challenging the miscalculation. (*See generally* Dkt. No. 1 [Plf.'s Am. Compl.].)

**\*2** Currently pending before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 18.) FN2 Despite having been advised of the potential consequences of failing to respond to Defendants' motion, and having been given three extensions of the time by which to so respond, Plaintiff has not responded. For the reasons that follow, I recommend that Defendants' motion be granted. In addition, I recommend that the Court dismiss Plaintiff's claims against John Doe # 1 and John Doe # 2 for failure to serve.

FN2. Defendants' motion for summary judgment is brought by Defendants Senkowski and Meier only. No indication exists on the docket that either John Doe # 1 or John Doe # 2 was ever named or served.

**I. LEGAL STANDARD GOVERNING UNOPPOSED MOTIONS**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material FN3 fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. FN4

FN3. A fact is "material" only if it would have some

effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN4. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN5 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN6 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN7

FN5. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN6. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN7. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

What this burden-shifting standard means when a plaintiff has failed to respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." [FN8] Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the defendant.[FN9] However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

FN8. *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

FN9. *See Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiffs claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed"* and *"the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

More specifically, where a plaintiff has failed to respond to a defendant's statement of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true [FN10] to the extent that (1) those facts are supported by the evidence in the record,[FN11] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the

potential consequences of failing to respond to the movant's motion for summary judgment.[FN12] Here, I note that Plaintiff was so advised by Defendants on or about July 14, 2007. (Dkt. No. 18, Part 1, at 1-2 [Defendants' Notice of Motion].) Clearly, Plaintiff was aware of these potential consequences since he requested (and was granted) *three* extensions of the response-filing-deadline. (Dkt.Nos.19-21.)

FN10. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

FN11. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3, 2002 WL 449757 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and* supported" as provided in this rule") [emphasis added].

FN12. *See* Champion v. Artuz, 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

**\*3** Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [FN13] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law are *facially meritorious.* [FN14] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [FN15]

FN13. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a

memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment has been made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response ...* must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g.,* Beers v. GMC, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31, 1999 WL 325378 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

FN14. *Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious*" ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2, 2007 WL 894375 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40, 2007 WL 951447 (N .D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by*

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

FN15. *See Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett, Ml* U.S. 317, 323-324 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*FN16 However, in the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.FN17 Here, I note that Plaintiff's Complaint contains a verification pursuant to 28 U.S.C. § 1746. (Dkt. No. 1.) That having been said, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must,

among other things, not be conclusory. FN18 An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.FN19 Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." FN20

FN16. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN17. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN18. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN19. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN20. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of

summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

**II. STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants' Rule 7.1 Statement contains eleven paragraphs of factual assertions, each of which is supported by an accurate citation to the record. (*See generally* Dkt. No. 18, Part 2.) Plaintiff has failed to file a response to this Rule 7.1 Statement, despite having been specifically advised of the potential consequences of failing to file such a response. (Dkt. No. 18, Part 1, at 1-2 [Defendants' Notice of Motion].) FN21 As a result, I accept each of the factual assertions as true. *See* N.D.N.Y. L.R. 7.1(a)(3) ( *"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ) [emphasis in original].

FN21. As explained above in Part I of this Report-Recommendation, I note that, clearly, Plaintiff was aware of these potential consequences since he

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

requested (and was granted) *three* extensions of the response-filing-deadline. (Dkt.Nos.19-21.)

With a few modifications, I summarize these factual assertions below in a "chronology of material events." These modifications are mainly due to an effort to summarize each of the material facts in one comprehensive chronology, and an effort to omit certain facts that I do not find to be material to Defendants' motion. Among the facts that I do not find to be material is any reference to Exhibit B to Defendants' motion, which is a "Certificate of Credited Jail Time" issued by the Albany County Sheriff's Department at some point in 1996. (Dkt. No. 18, Part 3, at 8 [Ex. B to Simone Affirm.] .) I find this document to be of no real relevance to Defendants' motion since the document regards a credit of pre-trial and post-trial jail time Plaintiff earned (with regard to his original conviction of burglary) in 1996, while Plaintiff's Complaint and Defendants' motion regard a credit of parole jail time Plaintiff earned (with regard to another violation) in 2000 and 2001. Moreover, this document is potentially confusing since it regards an amount of jail time credit that, coincidentally, equals the exact same amount of jail time credit at issue in this action, namely 253 days. As a result, I find that the following "chronology of material events" accurately summarizes the material facts established by the record on Defendants' motion:

### *Chronology of Material Events*

| | |
|---|---|
| **11/01/96** | Received by DOCS for service of sentence of 3-to-6 years for burglary. |
| **02/17/00** | Conditionally released from incarceration for burglary conviction. |
| **09/14/00** | Arrested on charges of grand larceny and criminal mischief. Charged (on 09/20/00) with violating terms of conditional release. Convicted (on 01/08/01) of parole violation, which was deemed to occur on 09/14/00. |

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

**09/14/00-05/24/01** (253-Day Period)          Served jail time. (At the time, this period of incarceration was deemed to be due to charges of grand larceny and criminal mischief.)

**05/24/01**          Released on pending charges of grand larceny and criminal mischief.

**05/25/01-08/02/01** (70-Day Period)          Served jail time due to parole violation.

**08/03/01**          Returned to DOCS custody as parole violator, in order to serve remainder of sentence for burglary. Received (on 08/06/01) Certificate from Division of Parole, crediting him with having already served **70 days** of "parole jail-time" based on incarceration between 05/25/01 and 08/02/01.

**03/26/02**          Pled guilty to crime of harassment. Though crime carried maximum of 15-days imprisonment, Plaintiff was sentenced to "time served."

**08/07/02**          Filed habeas corpus proceeding in state court, seeking additional "parole jail-time credit" of **253 days** with regard to remaining sentence for burglary, based on incarceration between 09/14/00 and 5/25/01, since his ultimate conviction of harassment carried only 15-day sentence.

**09/12/02**          Received decision by state court holding that he is entitled to additional "parole-time credit" of having already served 253 days based on incarceration between 09/14/00 and 5/25/01.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

| | |
|---|---|
| **09/13/02** | Received amended Certificate from Division of Parole, increasing "parole jail time credit" from 70 days to 323 days (i.e ., based on addition of 253 days of "parole jail-time credit"). |
| **09/16/02** | Discharged from DOCS because maximum release date had been 02/13/04 (216 days earlier) under new calculation. |
| **08/28/05** | Signed Complaint in the current action. |

## III. ANALYSIS

### A. Statute of Limitations

*4 Defendants argue that (1) the statute of limitations for claims arising under Section 1983 is three years, (2) here, Plaintiff's Section 1983 claims accrued more than three years before August 28, 2002, when Plaintiff mailed his Complaint to the Clerk of Court, and (3) therefore, Plaintiff's Section 1983 claims are time barred. (Dkt. No. 18, Part 4, at 4 [Defs.' Mem. of Law].)

Because Plaintiff does not respond to Defendants' statute-of-limitations argument in their properly filed motion for summary judgment, the sole issue before the Court is whether that argument has, at the very least, facial merit. *See, supra,* Part I of this Report-Recommendation (describing the legal standard governing unopposed motions for summary judgment). After reviewing Defendants' memorandum of law, Rule 7.1 Statement, and the governing law, I answer that question in the affirmative. Even if I were to subject Defendants' statute-of-limitations argument to more rigorous scrutiny, I would accept that argument as persuasive.

"The applicable statute of limitations for § 1983 actions arising in New York requires claims to be brought within three years ." *Pinaud v. County of Suffolk,* 52 F.3d 1138, 1156 (2d Cir.1995) [citations omitted]; *see also Connolly v. McCall,* 254 F.3d 36, 40-41 (2d Cir.2001) ("[Plaintiff's] federal constitutional claims, brought pursuant to 42 U.S.C. § 1983, are governed by New York's three-year statute of limitations for personal injury actions ....") [citations omitted]. Moreover, a claim arising under Section 1983 accrues "when the plaintiff

knows or has reason to know of the harm that he seeks to redress." *Connolly v. McCall,* 254 F.3d 36, 41 (2d Cir.2001) [internal quotation marks and citation omitted], *accord, Pearl v. City of Long Beach,* 296 F.3d 76, 80 (2d Cir.2002) [internal quotation marks and citations omitted].

Here, on August 6, 2001, the New York State Division of Parole issued a "Parole Jail Time Certificate" that did not credit Plaintiff with the 253 days of "parole jail time" for the period of September 14, 2000, to May 24, 2001. FN22 I have trouble finding that Plaintiff had "reason to know" of the omission of the 253-day credit when the Certificate was issued, since at that time the omission appears to have been entirely proper in that the 253-day period of incarceration was due to the pending charges of grand larceny and criminal mischief, which Plaintiff was facing.

> FN22. (Dkt. No. 18, Part 3, at 10 [Ex. C to Simone Affirm.].)

However, I do find that Plaintiff had "reason to know" of the omission (of the 253-day credit from the Certificate) by March 26, 2002, when he pled guilty to the crime of harassment, which carried a maximum penalty of 15-days' imprisonment. This is because the 15-day maximum penalty effectively *changed* the 253-day period in question from a period of incarceration due to the charges of grand larceny and criminal mischief to a period of incarceration due to a parole violation, warranting his immediate release on the parole violation. FN23 (I note that Plaintiff has also alleged that, during this time period, he started to experience injuries as a result of his continued incarceration, including the denial of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

opportunity to attend the funeral of a relative, giving him added reason to scrutinize the Certificate.) [FN24] In any event, he certainly had *actual knowledge* of the omission (of the 253-day credit from the Certificate) by August 7, 2002, when he filed a habeas corpus proceeding in state court, seeking the 253-day credit at issue.[FN25] Under either of these two scenarios, the three-year limitations period had expired by the time Plaintiff signed the Complaint in this action, on August 28, 2005.

> FN23. *See Littman v. Senkowski,* Index No. 02-940, Decision, at 3 (N.Y. Sup.Ct., Clinton County, filed Sept. 12, 2002) (Felstein, J.S .C.) ("This Court ... must ... attempt to understand the *implication* of [Plaintiff's] sentence [upon his conviction for the crime of harassment] in the present context [of parole jail-time credits].") [emphasis added] (attached as Ex. E to Simone Affirm., *see* Dkt. No. 18, Part 3, at 16).

> FN24. (Dkt. No. 1, ¶ III.)

> FN25. (Dkt. No. 18, Part 3, at 14 [Ex. E to Simone Affirm.].)

**\*5** I note that I am specifically persuaded by Defendants' argument that the three-year limitations period did *not* begin to run on September 12, 2002, when the state court issued its decision granting Plaintiffs habeas corpus petition. "The reference to 'knowledge of injury' [in the above-described standard] does not suggest that the statute [of limitations] does not begin to run until the claimant has received judicial verification that the defendants' acts were wrongful." *Veal v. Geraci,* 23 F.3d 722, 724 (2d Cir.1995) [citations omitted], *accord, Shannon v. Selsky,* 04-CV-1939, 2005 U.S. Dist. LEXIS 3823, \*13, 2005 WL 578943 (S.D.N.Y. March 10, 2005); *see also Abbas v. Dixon,* 480 F.3d 636, 641 (2d Cir.2007) ("We have held ... that a plaintiff's pursuit of a state remedy, such as an Article 78 proceeding, does not toll the statute of limitations for filing a claim pursuant to section 1983.") [citations omitted], *accord, LeBron v. Swaitek,* 05-CV-0172, 2007 U.S. Dist. LEXIS 81587, at \*7, n. 5, 2007 WL 3254373 (N.D.N.Y. Nov. 2, 2007) (Sharpe, J.).

As a result, I recommend that the Court dismiss Plaintiff's claims against all four Defendants as time barred.

**B. Failure to State a Claim**

Defendants Senkowski and Meier argue that they had no discretion or control over (1) the Department of Parole's decision to credit only 70 days parole jail time in Plaintiff's original Division of Parole "Parole Jail Time Certificate," issued on August 6, 2002,[FN26] and (2) any "failure" by the Department of Parole to issue an Amended Certificate before September 13, 2002.[FN27] (Dkt. No. 18, Part 4, at 4-5 [Defs.' Mem. of Law].) Again, because Plaintiff does not respond to this argument, the sole issue before the Court is whether the argument has, at the very least, facial merit. After reviewing Defendants' memorandum of law, Rule 7.1 Statement, and the governing law, I answer that question in the affirmative.

> FN26. (Dkt. No. 18, Part 3, at 10 [Ex. C to Simone Affirm.].)

> FN27. (Dkt. No. 18, Part 3, at 12 [Ex. D to Simone Affirm.].)

After carefully considering Defendants' lack-of-discretion argument, I have concluded that it is, at its core, an attack on the pleading sufficiency of Plaintiff's Complaint. (*See, e.g.,* Dkt. No. 18, Part 4, at 5 [Defs.' Mem. of Law, arguing, "Plaintiff merely offers conclusory allegations ..." and "[s]uch allegations hardly provide an adequate basis ..."].) As stated above, I liberally construe Plaintiff's Complaint as alleging (in a conclusory fashion) that Defendants Senkowski and Meier acted with negligence or perhaps recklessness when they assisted in miscalculation of, or failed to correct, Plaintiff's "parole jail-time credits." The problem is that Plaintiff has alleged no facts plausibly suggesting that, during the relevant time period, Defendants Senkowski and Meier acted with the sort of recklessness (or intent) necessary to state a constitutional claim.[FN28]

> FN28. *See, e.g., Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment.") *Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ("There must be allegations of deliberate falsehood or of reckless disregard for the truth [to state a claim under

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

the Fourth Amendment].”); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (“The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.”) [internal quotation marks and citations omitted]; *Madiwale v. Savaiko,* 117 F.3d 1321, 1326-27 (11th Cir.1997) ( “[A] warrant affidavit violates the Fourth Amendment when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit.”) [internal quotation marks and citation omitted].

At most, Plaintiff has alleged facts plausibly suggesting that Defendant Meier may have exhibited a hint of negligence by *not somehow* persuading the Division of Parole to issue an Amended Certificate between March 26, 2002 (when Plaintiff pled guilty to the crime of harassment, which carried a maximum penalty of 15-days imprisonment), and September 12, 2002 (when the state court issued its decision requiring such an Amended Certificate).[FN29] I hasten to add that Plaintiff has alleged no facts plausibly suggesting precisely *how* Defendant Meier could have so persuaded the Division of Parole, especially given the legal issue created by the sentence of “time served” that Plaintiff received on March 26, 2002. In any event, even if Plaintiff had alleged such facts, such an allegation of negligence would not be actionable under 42 U.S.C. § 1983.[FN30]

FN29. I note that Plaintiff has alleged no facts plausibly suggesting that the individual who signed the original Parole Jail Time Certificate on August 6, 2001 (apparently “Kathleen Jack”) made any sort of mistake whatsoever. This is because it was only after Plaintiff pled guilty to harassment, which carried a maximum penalty of 15-days imprisonment, on March 26, 2002, that the 253-day period in question effectively changed from a period of incarceration due to the charges of grand larceny and criminal mischief to a period of incarceration due to a parole violation.

FN30. *See, e.g., Farmer,* 511 U.S. at 835 (“[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence.”); *Daniels v. Williams,* 474 U.S. 327, 331-33, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (stating that “injuries inflicted by governmental negligence are not addressed by the United States Constitution” and rejecting § 1983 claim based on alleged due process violation under Fourteenth Amendment); *Hudson v. Palmer,* 486 U.S. 517, 531, 108 S.Ct. 1945, 100 L.Ed.2d 517 (1984) (“[T]he Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property ....”); *Franks,* 438 U.S. at 171 (“Allegations of negligence or innocent mistake are insufficient [to state a claim under the Fourth Amendment].”); *Riddick v. Modeny,* No. 07-1645, 2007 WL 2980186, at *2 (3d Cir. Oct.9, 2007) (“The protections afforded prisoners by the Due Process Clause of the Fourteenth Amendment are not triggered by the mere negligence of prison officials.”); *Billington v. Smith,* 292 F.3d 1177, 1190 (9th Cir.2002); (“The Fourth Amendment's ‘reasonableness’ standard is not the same as the standard of ‘reasonable care’ under tort law, and negligent acts do not incur constitutional liability.”); *Myers v. Okla. County Bd. of County Com'rs,* 151 F.3d 1313, 1320 (6th Cir.1998) (“[A]ctions leading to a confrontation, such as the decision to enter the apartment, must be more than merely negligent to be “unreasonable” for purposes of the Fourth Amendment inquiry.”); *Madiwale,* 117 F.3d at 1326 (“Negligent or innocent mistakes do not violate the Fourth Amendment.”); *Sevier v. City of Lawrence, Kan.,* 60 F.3d 695, 699, n. 7 (10th Cir.1995) (“Mere negligent actions precipitating a confrontation [that was the subject of plaintiff's Fourth Amendment claim] would not, of course, be actionable under § 1983.”).

**\*6** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendants Senkowski and Meier based upon Plaintiff's failure to state a claim against them.

**C. Lack of Personal Involvement of Defendant Senkowski**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendants argue that, in the alternative, Plaintiff's claims against Defendant Senkowski should be dismissed because Plaintiff has neither alleged facts plausibly suggesting, nor adduced any evidence establishing, the personal involvement of Defendant Senkowski in any of the constitutional violations alleged. (*See* Dkt. No. 18, Part 4, at 5-6 [Defs.' Mem. of Law].) Again, because Plaintiff does not respond to this argument, the sole issue before the Court is whether the argument has, at the very least, facial merit. After reviewing Defendants' memorandum of law, Rule 7.1 Statement, and the governing law, I answer that question in the affirmative.

For the sake of argument, I will set aside the issue of whether the allegations in Plaintiff's Complaint give Defendant Senkowski "fair notice" of Plaintiff's claim against him, sufficient to state such a claim, under Fed.R.Civ.P. 8 and 12. Even if this were so, no rational fact finder could find, based merely on the sworn assertions in Plaintiff's Complaint, that Defendant Senkowski was personally involved in any constitutional violation.

Specifically, in his Complaint, Plaintiff offers sworn assertions that (1) Defendant Senkowski, *solely by virtue of his position as Superintendent of Clinton C.F. during the relevant time period,* was "fully aware and informed about the facts that form the basis of this complaint," (2) "[a]ll defendants [,] despite full awareness of the erroneous refusal/failure to give me credit for parole jail time herein[,] refused and failed to properly calculate and give me credit for parole jail time to which I was entitled," and (3) "[e]ach defendant was well aware of my illegal detention and refused to correct the erroneous time computation." (Dkt. No. 1, ¶¶ II.D.3., II.D.6., II.D.12.)

However, the simple fact that allegations are sworn does not convert them into admissible evidence sufficient to create a factual issue for purposes of a motion for summary judgment. As explained above in Part I of this Report-Recommendation, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory. An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.

Here, there are no facts asserted in Plaintiff's Complaint specifying *why* Defendant Senkowski was personally involved in the miscalculation of, or failure to correct, Plaintiff's parole time credits, other than his role as the supervisor of the prison. For example, Plaintiff does not assert that he ever wrote or spoke to Defendant Senkowski about his claim to the 253-day credit at issue, nor does Plaintiff attach to his Complaint any relevant parole documents bearing Senkowski's signature (nor are any such documents attached to Defendants' motion papers).

***7** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's claims against Defendant Senkowski based on his lack of personal involvement in the constitutional violations alleged.

**D. Qualified Immunity**

Because I have already concluded that adequate grounds exist upon which to base a recommendation of dismissal of Plaintiffs claims against Defendants Senkowski and Meier, I need not, and do not, reach the merits of Defendants' alternative argument in favor of dismissal, namely, their qualified immunity argument (*see* Dkt. No. 18, Part 4, at 6-7 [Defs.' Mem. of Law] ) other than to note that (1) their argument appears to have facial merit and (2) Plaintiff has failed to respond to that argument.

**E. Failure to Serve or Even Name "John Doe # 1" and "John Doe # 2"**

On September 1, 2005, Plaintiff filed his Complaint in this action, which asserted claims against, *inter alia,* "John Doe # 1" (i.e., the Superintendent of Downstate C.F. during the relevant time period) and "John Doe # 2" (i.e., the Inmate Records Coordinator of Downstate C.F. during the relevant time period). (Dkt. No. 1.)

On December 14, 2005, Judge Kahn ordered, *inter alia,* that (1) "the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshall for service on the remaining defendants," and (2) "Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action." (Dkt. No. 6, at 3-4.) That same day, the Clerk's Office wrote Plaintiff a letter requesting him to complete USM 285 Forms for each of the remaining Defendants. (Dkt. No. 7.)

However, Plaintiff never returned a USM 285 Form for either John Doe # 1 (i.e., the Superintendent of Downstate C.F.) or John Doe # 2 (i.e., the Inmate Records Coordinator of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

Downstate C.F.). (*See generally* Docket [reflecting no "Acknowledgment of Service" or "Summons Returned Unexecuted" for either of these two Defendants].) Nor did Plaintiff ever file, or even attempt to file, an Amended Complaint naming either of these two individuals. (*See generally* Docket.)

Because Plaintiff has not offered "good cause" for his failure to enable the Marshals Service to effect service on either John Doe # 1 (i.e., the Superintendent of Downstate C.F.) or John Doe # 2 (i.e., the Inmate Records Coordinator of Downstate C.F.), I find that Plaintiff has violated Fed.R.Civ.P. 4(m). Alternatively, I find that Plaintiff has violated Fed.R.Civ.P. 16(f) due to the fact that he violated Judge Kahn's Order of December 14, 2005, directing him to "comply with any requests to the Clerk's Office for any documents that are necessary to maintain this action." (Dkt. No. 6, at 4.) Alternatively, I find that Plaintiff has violated Fed.R.Civ.P. 41(b) by failing to diligently prosecute his claims against John Doe # 1 and John Doe # 2.

As a result, should the Court decide for some reason not dismiss Plaintiff's claims against John Doe # 1 and John Doe # 2 based on the applicable statute of limitations (for the reasons described above in Part III.A. of this Report Recommendation), I recommend that, in the alternative, the Court dismiss Plaintiff's claims against John Doe # 1 and John Doe # 2 based on Plaintiff's failure to serve or even name them.

**\*8** I note that, under Fed.R.Civ.P. 4(m) and 16(f), the Court need not issue such an order only upon motion of defense counsel but may do so *sua sponte. See* Fed. R. Civ. 4(m) ("[T]he Court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time."); Fed. R. Civ. 16(f) ("[T]he judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just ...."). [FN31] Furthermore, with regard to Fed.R.Civ.P. 41(b), which speaks only of a *motion* to dismiss on the referenced grounds, courts retain the "inherent power" to *sua sponte* "clear their calendars of cases that have remained dormant because of the inaction or dilatoriness of the parties seeking relief." *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962); *see also Saylor v. Bastedo,* 623 F.2d 230, 238 (2d Cir.1980); *Theilmann v. Rutland Hospital, Inc.,* 455 F.2d 853, 855 (2d Cir.1972).

Indeed, Local Rule 41.2(a) recognizes this authority. *See* N.D.N.Y. L.R. 41.2(a) ("Whenever it appears that the plaintiff has failed to prosecute an action or proceeding diligently, the assigned judge *shall* order it dismissed.") [emphasis added].

> FN31. In the event the Court were to base its dismissal of Plaintiff's claims against the John Doe Defendants on Fed.R.Civ.P. 4(m), this Report-Recommendation would serve as the requisite notice to Plaintiff.

**F. Failure to Notify Court of Change in Address**

On December 14, 2005, Judge Kahn ordered Plaintiff, *inter alia,* to keep the Clerk's Office apprised of his current address. (Dkt. No. 6, at 6.) Specifically, Judge Kahn advised Plaintiff that he ***"is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to do so will result in the dismissal of this action."*** (*Id.*)

Moreover, Local Rule 10.1 imposes on a plaintiff a duty to promptly notify the Court of any change in his address. *See* N.D .N.Y. L.R. 10.1(b)(2) (imposing on plaintiffs a duty to **"immediately notify the Court of any change of address"**) [emphasis in original]. This duty has been found to also be imposed by Fed.R.Civ.P. 41(b).[FN32]

> FN32. *See, e.g., Robinson v. Middaugh,* 95-CV-0836, 1997 U.S. Dist. LEXIS 13929, at *2-3, 1997 WL 567961 (N.D.N.Y. Sept. 11, 1997) (Pooler, J.) (dismissing action under Fed.R.Civ.P. 41(b) where plaintiff failed to inform the Clerk of his change of address despite having been previously ordered by Court to keep the Clerk advised of such a change); *see also* N.D.N.Y. L.R. 41.2(b) ("Failure to notify the Court of a change of address in accordance with [Local Rule] 10.1(b) may result in the dismissal of any pending action.").

Here, Plaintiff's current address of record in this action is "Clinton Correctional Facility, PO Box 2001, Dannemora, N.Y. 12929." (*See* Docket.) However, based on my review of the DOCS' online "Inmate Lookup" Service, it appears that Plaintiff's current address is Upstate Correctional Facility, P.O. Box 2000, 309 Bare Hill Road, Malone, N.Y. 12953.[FN33] While I cannot determine when Plaintiff was apparently transferred

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)

(Cite as: 2008 WL 420011 (N.D.N.Y.))

from Clinton C.F. to Upstate C.F., I note that Plaintiff's last filing in this action was dated September 11, 2007. (Dkt. No. 21.) I note also that in Plaintiff's filing dated July 3, 2007, his return address was not Clinton C.F. but was *Great Meadow C.F.* Thus, Plaintiff's failure to notify the Court of his current address appears to have persisted for some three to six months now. *Pro se* actions have been dismissed for failure to comply with a court order even where the failure was for four months. *See, e.g., Georgiadis v. First Boston Corp.,* 167 F.R.D. 24, 25 (S.D.N.Y.1996) (plaintiff had failed to comply with order directing him to answer interrogatories for more than four months).

> FN33. *See* New York DOCS' "Inmate Lookup Service" http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130 (last visited Dec. 31, 2007).

**\*9** As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's Complaint for failure to notify the Court of his current address.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 18) be ***GRANTED*** for the reasons set forth above, and that Plaintiff's claims against Defendants Senkowski and Meier be ***DISMISSED* with prejudice;** and it is further

**RECOMMENDED** that Plaintiff's claims against John Doe # 1 and John Doe # 2 be ***DISMISSED* with prejudice** due to the applicable statute of limitations (for the reasons set forth above in Part III.A. of this Report-Recommendation), or, in the alternative, due to Plaintiff's failure to serve or even name those individuals, in violation of Fed.R.Civ.P. 4(m), 16(f), and/or 41(b); and it is further

**RECOMMENDED** that the Court certify in writing that any appeal taken from the Court's final judgment in this action would not be taken in good faith, for purposes of 28 U.S.C. § 1915(a)(3); and it is further

**ORDERED** that the Clerk's Office shall send a copy of this Report-Recommendation to Plaintiff at both (1) his address of record on the docket in this action and (2) Upstate Correctional Facility, P.O. Box 2000, 309 Bare Hill Road,

Malone, N.Y. 12953.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.

Littman v. Senkowski
Not Reported in F.Supp.2d, 2008 WL 420011 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
John HATZFELD, Plaintiff,
v.
Thomas G. EAGEN, Director, Inmate Grievance
Program, CORC; John W. Burge, Superintendent,
Auburn Correctional Facility; Nancy Ryerson, Nurse
Administrator, Auburn Correctional Facility; Anthony
Graceffo, Former M.D. Auburn Correctional Facility;
and M.D. Pang Kooi, Auburn Correctional Facility,
Defendants.
No. 9:08-CV-283 (LES/DRH).

Dec. 10, 2010.
John Hatzfeld, Moravia, NY, pro se.

Hon. Andrew M Cuomo, Attorney General for the State of
New York, Aaron M. Baldwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

**\*1** Plaintiff *pro se* John Hatzfeld ("Hatzfeld"), an
inmate in the custody of the New York State Department
of Correctional Services, brings this action pursuant to 42
U.S.C. § 1983 alleging that defendants, five current and
former DOCS employees, violated his constitutional rights
under the First, Eighth, and Fourteenth Amendments.
Compl. (Dkt. No. 1) [FN2] at 1-2, 9. Presently pending is
defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56. Dkt. No. 45. Hatzfeld opposes the
motion. Dkt. No. 50. For the following reasons, it is
recommended that defendants' motion be granted.

> FN2. All references to docket numbers are to the
> docket of this case unless otherwise noted.

**I. Background**

The facts are related herein in the light most favorable
to Hatzfeld as the nonmoving party. *See* subsection II(A)
*infra.*

In April 2000, while incarcerated at Auburn
Correctional Facility ("Auburn"), Hatzfeld was notified
that he tested positive for the Hepatitis C [FN3] Virus
("HCV"). Compl. at 3. On September 20, 2002, a liver
biopsy was performed on Hatzfeld at University Hospital
in Syracuse by Dr. Holtzapple. *Id.* Dr. Holtzapple
recommended that Hatzfeld receive HCV therapy,
including "(1) Pegylated interferon therapy combined, (2)
Ribavirin 100m g daily, (3) Check hepatitis C viral load in
3 months, and (4) Check genotype ." *Id.,* Ex. A.

> FN3. Hepatitis C is "a chronic viral liver disease
> that can increase the risk of liver cancer and can
> lead to inflammation, scarring, and cirrhosis of
> the liver. Cirrhosis can ultimately lead to liver
> failure and death." *Pabon v. Wright,* 459 F.3d
> 241, 246 (2d Cir.2006).

On December 26, 2002, Dr. Anthony Graceffo
("Graceffo"), a defendant herein who was then a physician
at Auburn, asked Hatzfeld to sign a waiver to participate
in either the Alcohol and Substance Abuse Treatment
Program or Residential Substance Abuse Treatment
Program (collectively "ASAT/RSAT"). *Id.* at 4. Hatzfeld,
an atheist, refused to participate because the programs
included a religious component and his disciplinary
records did not show any violations for alcohol or
substance abuse. *Id.* Dr. Graceffo refused to provide the
recommended treatment. *Id.* After following and
exhausting DOCS grievance procedures, Hatzfeld filed a
civil rights action regarding the withholding of HCV
treatment. *See Hatzfeld v. Goord* (*Hatzfeld I* ), No.
9:04-cv-0159.[FN4]

> FN4. *Hatzfeld I* was marked ready for trial in

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

2007. *Hatzfeld I* Dkt. No. 76. In an order filed November 25, 2009, *Hatzfeld I* and this action were consolidated for all purposes. *Hatzfeld I* Dkt. No. 98; Dkt. No. 38. The motion at issue herein pertains only to the above-captioned action, the Member Case, and not to *Hatzfeld I,* the Lead Case. *Hatzfeld I* has been stayed pending decision on this motion.

In October 2004, while *Hatzfeld I* was pending, Hatzfeld learned that Jeffrey L. Pelkey ("Pelkey"), another inmate, received treatment for HCV from Dr. Graceffo without being forced to participate in ASAT/RSAT. Compl. at 4. Pelkey was diagnosed with Hepatitis C in December 2003 and requested HCV therapy. *Id.,* Dr. Graceffo saw Pelkey on May 13, 2004, and referred Pelkey to a gastroenterologist who recommended that Pelkey receive Pegylated interferon and Ribavirin for six months. *Id.* On September 14, 2004, Dr. Graceffo told Pelkey that he must participate in ASAT/RSAT prior to receiving HCV treatment. *Id.* Pelkey refused to participate in those programs. *Id.* Despite his refusal, Pelkey began receiving the recommended treatment on September 17, 2004. *Id.* Pelkey's disciplinary records show that he tested positive for marijuana twice during his incarceration and that he has a long history of substance abuse. *Id.* To date, Pelkey has not participated in ASAT/RSAT despite receiving treatment. *Id.*

**\*2** Dr. Pang Kooi ("Kooi"), a defendant herein and a physician at Auburn, saw Hatzfeld on June 30, 2005, and they discussed what Hatzfeld believed to be a change in the requirements for HCV treatment. Compl. at 5. Hatzfeld showed Pelkey's affidavit to Dr. Kooi, but Kooi refused to treat Hatzfeld unless he participated in ASAT/RSAT and referred Hatzfeld to Dr. Graceffo. *Id.* Dr. Graceffo saw Hatzfeld on July 21, 2005, and they discussed Pelkey's affidavit and apparent changes in policy. *Id.* Once again, Dr. Graceffo refused to provide Hatzfeld with treatment unless Hatzfeld either enrolled in or completed ASAT/RSAT, regardless of Dr. Graceffo's actions with Pelkey. *Id.*

Six days later, on July 27, 2005, Hatzfeld filed Grievance No. 45299-05, to request HCV treatment "without participation in RSAT," arguing that the refusals

of Drs. Kooi and Graceffo to provide treatment violated Hatzfeld's constitutional rights. Compl., Ex. C at 20.[FN5] On August 1, Hatzfeld's grievance was denied. *Id.* at 23. An Investigative Report authored by Auburn Nurse Administrator Nancy Ryerson ("Ryerson"), a defendant herein, stated that "RSAT is a requirement to receiving" treatment and that Health Insurance Portability and Accountability Act ("HIPPA") regulations prevented the disclosure of another inmate's medical history. Defs.' Mem. of Law, Ex. A (Dkt. No. 45-3) at 7. The IGRC response restated Ryerson's message. *Id.* at 24. Hatzfeld appealed to Auburn Superintendent John W. Burge ("Burge"), a defendant herein, on August 22. Compl., Ex. C at 24. Burge denied the appeal on August 24, stating that "guidelines state participation in a workbook ASAT program is a requirement" for treatment and that "the completion of a workbook is not considered completion of RSAT." *Id.* at 25. Hatzfeld immediately appealed Burge's decision to CORC. *Id.* at 25-26. CORC upheld Burge's decision, and advised Hatzfeld to follow staff direction, and participate in the ASAT workbook program," stating that DOCS was following Hepatitis C Primary Practice Guidelines. *Id.* at 27. This action followed.

> FN5. "The IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

## II. Discussion

Hatzfeld asserts three causes of action against each defendant. Hatzfeld alleges that he was (1) denied adequate medical care and potentially life-saving treatment for refusing to participate in religious-based alcohol and substance abuse treatment programs in violation of the First Amendment; (2) subjected to cruel and unusual punishment through the denial of adequate medical care and treatment for a potentially life-threatening illness in violation of the Eighth

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

Amendment; and (3) discriminated against as a specific group or class of people because he was held to a higher standard of approval than others in like circumstances in violation of the Fourteenth Amendment. Compl. at 9. These allegations are premised on Hatzfeld's renewed request for treatment on June 30, 2005. Compl. at 5-9. He seeks compensatory and punitive damages. *Id.* at 10.

**\*3** Defendants contend that (1) defendants Thomas Eagen ("Eagen"), Burge, and Ryerson argue that they were not personally involved in any alleged constitutional violations; (2) the ASAT/RSAT requirements do not violate Hatzfeld's First Amendment rights; (3) the program's requirements did not violate Hatzfeld's rights under the Equal Protection Clause of the Fourteenth Amendment; (4) Hatzfeld did not suffer from a serious medical condition, and even if he did, none of the defendants acted with deliberate indifference with regard to such condition; (5) they are entitled to qualified immunity against all claims for monetary damages; and (6) Hatzfeld has experienced no compensable damages and cannot sustain his burden of proving an entitlement to punitive damages such that only a claim for nominal damages could be warranted. Defs. Mem. of Law (Dkt. No. 45-20.)

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Id.; see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86. The non-moving party must do more than merely show that there is some doubt or speculation as to the true

nature of the facts. *Id.* at 586. It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks judgment against a *pro se* litigant, a court must afford the non-moving party special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude,"; that a *pro se* litigant's submissions must be construed "liberally,"; and that such submission must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest,"; that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law."

**\*4** *Id.* (internal citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191-92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.") (citations omitted).

### B. Eleventh Amendment

The Eleventh Amendment prohibits suits against a state in federal court unless the state consents or waives its immunity. *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 (1984). A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997). The State has not consented to suit or waived its immunity here. § 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Daisernia v. New York,* 582 F.Supp. 792, 796

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

(S.D.N.Y.1984). Thus, a suit that seeks monetary damages from an official in his or her official capacity is barred even though asserted against the individual. *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).

Here, all defendants are named both in their individual and official capacities. Compl. at 7-8. Defendants note that "[a]ny claim against the defendants [in *Hatzfeld I* ] for money damages in their official capacities [was] barred by the Eleventh Amendment." Defs. Mem. of Law at 30 n. 3. In this case, however, the defendants have not moved for summary judgment on Eleventh Amendment sovereign immunity grounds. Further, only two of the defendants in *Hatzfeld I,* Burge and Dr. Graceffo, are named as defendants in this action. To the extent that defendants neglected to move explicitly to dismiss on sovereign immunity grounds, it is recommended that the Court *sua sponte* dismiss any claims against defendants for money damages in their official capacities. *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

**C. Personal Involvement**

Defendants Eagen, Burge, and Ryerson argue that they were not personally involved in any alleged constitutional violations. Defs. Mem. of Law at 2-7. Personal involvement is an essential prerequisite for section 1983 liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A section 1983 defendant, however, cannot be liable "merely because he held a supervisory position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Supervisory personnel may be considered "personally involved" only if the defendant: (1) directly participated in the alleged constitutional violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).[FN6]

> FN6. The Supreme Court's decision in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), arguably casts in doubt the continued viability of some of the categories set forth in *Colon.* See *Sash v. United*

*States,* 674 F.Supp.2d 531 (S.D.N.Y.2009). Here, the Court will assume *arguendo* that all of the Colon categories apply.

**1. Eagen**

***5** Hatzfeld alleges that Eagen, IGP Director during the time in question, failed to remedy CORC's denial of Hatzfeld's grievance by denying Hatzfeld's appeal and that Eagen was "grossly negligent" in supervising CORC because Eagen had allowed CORC to deny Hatzfeld's grievance. Compl. at 5, 7; Pl. Mem. of Law (Dkt.50) at 3. Eagen argues that as a IGP Director he served as the committee's "custodian of records," that he was not a voting member of CORC, and that he is responsible only for "administrative functions," and that he "would have merely signed the dispositions of CORC indicating that such is the response of the body." Defs. Mem. of Law at 3; *see also* Rule 7.1 Statement ¶¶ 23-24; Bellamy Decl. ¶¶ 4-6.

On these facts, it cannot be shown that Eagen was personally involved in any alleged constitutional violations. Under DOCS regulations, the IGP Director "is not a voting member of the CORC" but is "responsible for the administrative function of the IGP," and "as the commissioner's designee, shall ensure implementation of CORC decisions." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(d) (2)(iii). An IGP Director is not personally involved merely because he or she signed CORC's administrative decisions. *See, e.g., Jones v. Goord,* No. 9:05-cv-1438 (DNH/RFT), 2009 WL 790978, at *3 (N.D.N.Y. Mar. 3, 2009) (Treece, M.J.) (finding Eagen not personally involved just because he signed CORC determinations); *H'Shaka v. Drown,* No. 9:03-cv-937 (LEK/RFT), 2007 WL 1017275, at *11 (N.D.N.Y. Mar. 30, 2007) (same); *see also Persad v. Savage,* No. 02-cv-336S(F), 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004) (Foschio, M.J.) ("mere allegation that [an IGP Director] affirmed the decisions [CORC], as evidenced by her signature on the official record of the CORC decision" is insufficient to defeat a motion for summary judgment").

Other than restating the allegations in the complaint and submitting the definition of "Director" from the American Heritage Dictionary, Hatzfeld has not disputed Eagen's argument. Pl. Mem. of Law at 2-3. Hatzfeld has

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

pointed to no additional evidence that Eagen participated in any alleged unconstitutional act. Eagen's only alleged personal involvement is based upon his signing of CORC's administrative decisions. Conclusory allegations are insufficient to defeat a motion for summary judgment. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As such, Eagen was not personally involved in any alleged constitutional violations, and it is recommended that defendants' motion as to Eagen on this ground be granted.

### 2. Burge

Hatzfeld contends that Burge, Acting Auburn Superintendent at the time in question, violated his constitutional rights by denying the grievance. Compl. at 5, 7; Pl. Mem. of Law at 4. Merely denying a prisoner's grievance "is insufficient to establish personal involvement." *Mercer v. Benson,* No. 08-cv-537 (DNH/DRH), 2009 WL 3111684, at *4 (N.D.N.Y. Aug. 14, 2009) (Homer, M.J.) (citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002). Here, the claim against Burge is premised on his denial of Hatzfeld's grievance at the superintendent level. Pl. Mem. of Law. at 4. Although Hatzfeld's complaint also alleges grossly negligent supervision, he has not raised any issues of material fact on that issue. As such, defendants' motion as to Burge on this ground should be granted.

### 3. Ryerson

*6 Hatzfeld argues that Ryerson, Acting Nurse Administrator at Auburn's Medical Department, is also liable because the denial of the grievance was "based solely" on an Investigative Report that Ryerson prepared and filed. Compl. at 5, 7; Pl. Mem. of Law at 5. The report stated that "RSAT is a requirement of receiving Hepatitis C Treatment" and that HIPPA regulations prevent discussing another inmate's medical information. Grievance Pack at 7.

There can be no personal involvement when defendants "are not supervisory officials ... in any sense factually or legally." *Brody v. McMahon,* 684 F.Supp. 354, 356 (N.D.N.Y 1988). Supervisory capacity involves "hiring, firing, or disciplinary power over any supervisory staff or personnel of the correctional facilities ... [or] direct power to control or direct the customs and policies of the facilities" and one who acts in an advisory capacity by investigating grievances "cannot be held accountable

for any failure ... to remedy an constitutional violations [she] may have learned about." *Van Pelt v. Finn,* No. 89 Civ. 2977(MBM), 1993 WL 465297, at *7 (S.D.N.Y. Nov. 12, 1993). In preparing the Investigative Report, Ryerson was acting in an advisory capacity and not supervisory capacity. Her report merely informed IGRC's decision to deny Hatzfeld's grievance. *See* Defs. Mem. of Law, Ex. A at 7, 24. Hatzfeld has not raised any issues of material of fact as to whether Ryerson developed the policy or that she directed any subordinates to follow that policy. There are no facts showing that she supervised any of the other defendants. Therefore, Ryerson was not personally involved in the alleged constitutional violations and it is recommended that defendants' motion as to her be granted.

### D. First Amendment

Hatzfeld refused to participate in ASAT/RSAT on First Amendment grounds. Compl. at 6. He is an atheist, and he submits that ASAT/RSAT is "faith-based." *Id.* Because participation in ASAT/RSAT was a prerequisite to receiving HCV treatment,[FN7] Hatzfeld did not receive treatment until October 2005 after this Court issued a preliminary injunction ordering DOCS to provide him with treatment.[FN8] Thus, he argues that conditioning hepatitis treatment on participation in ASAT/RSAT violated his First Amendment rights. *Id.* at 9.

> FN7. On October 13, 2005, DOCS changed the Hepatitis C Primary Guideline by removing the ASAT prerequisite "if treatment is otherwise medically indicated." Pl. Mem. of Law (Dkt.50-1) Ex. 4.

> FN8. *See Hatzfeld I* Dkt. No. 57 at 11.

The First Amendment, made applicable to states by the Fourteenth Amendment, states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...." U.S. Const. amend. I. It embraces "two fundamental concepts: 'freedom to believe and freedom to act' on one's beliefs." *Decker v. Hogan,* No. 9:09-cv-0239 (TJM/GJD), 2009 U.S. Dist. LEXIS 89048, at *7 (N.D.N.Y. Sept. 28, 2009) (quoting *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940)). "[A]t a minimum, the government may not coerce anyone to participate in religion or its exercise." *Lee v.*

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

*Weisman,* 505 U.S. 577, 587 (1992); *see also Alexander v. Schenk,* 118 F.Supp.2d 298, 301 (N.D.N.Y.2000). Atheists are protected by the First Amendment. *Decker,* 2009 U.S. Dist. LEXIS 89048 at \*9; *McChesney v. Hogan,* No. 9:08-cv-1186 (NAM/DEP), 2008 U.S. Dist. LEXIS 110140, at \*13 (N.D.N.Y. Dec. 23, 2008) (Peebles, M. J.); *see also Wallace v. Jaffree,* 472 U.S. 38, 53 (1985) ("the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all").

**\*7** It has "long been understood" that prisoners "retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). A prisoner's free exercise rights, however, "must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system." *Parks v. Smith,* No. 9:08-cv-0586 (TJM/GHL), 2009 U.S. Dist. LEXIS 87210, at \*20-21 (N.D.N.Y. Aug. 17, 2009) (Lowe, M.J.) (citing *Ford,* 352 F.3d at 588). Thus, a "generally applicable policy" does not violate a prisoner's free exercise of religion under the First Amendment "if that policy 'is reasonably related to legitimate penological interests.' " *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)).

The defendants argue that in October 2002, two months before Hatzfeld was first advised to participate in ASAT/RSAT, DOCS had already removed all religious content from those programs. Bradford Decl. (Dkt. No. 45-19) ¶ 8; *see also* ASAT Manual (Dkt. No. 45-11) Ex. H. The ASAT Workbooks contain nothing indicating a preference for a specific religion or any religion at all. *See* ASAT Workbooks (Dkt.Nos.45-12, 45-13, 45-14) Exs. I, J, K. In response, Hatzfeld alleges that the ASAT Workbooks contain "no date and/or revision number to reference when the material became available," leaving to "what or which update these Exhibits represent ... to speculation." Pl. Mem. of Law at 24. Hatzfeld, however, has presented no evidence to show that there is a genuine issue of fact on when the revisions occurred. Although non-movants who are *pro se* litigants are to be given "special solicitude," *Triestman,* 470 F.3d at 477, the mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247-48.

Other than a January 2003 article from a DOCS newsletter, stating that the "ASAT program still embraces the concept of spirituality," Hatzfeld has presented no other evidence that would raise a genuine issue as to whether ASAT still contains religious components. *See* Pl.Ex. H (Dkt. No. 32) at 10. References to spirituality alone, however, does not equate to religion "such that any reference to spirituality ... runs afoul of the First Amendment." *Decker,* 2009 U.S. Dist. LEXIS 89048 at \*13-14 (quoting *Boyd v. Coughlin,* 914 F.Supp. 828, 833 (N.D.N.Y.1996)); *see also Pratt v. Hogan,* No. 6:08-cv-1003 (DNH/DEP), 2009 WL 87587, at \*2 (N.D.N.Y. Jan. 9, 2009).

Moreover, the Second Circuit has held that "as long as a secular alternative ... is provided, it does not violate the Establishment Clause to 'include a noncoercive use of' " an alcohol or substance abuse treatment program that contains religious components. *See Miner v. Goord,* 354 Fed.App'x 489, 492 (2d Cir. Nov. 25, 2009) (citing *Griffin v. Coughlin,* 88 N.Y.2d 674, 677 (1996)); *see also Sumpter v. Skiff,* No. 05-cv-868, 2008 WL 4518996, at \*10 (N.D.N.Y. Sept. 30, 2008) (finding that "there is no basis to conclude that ... required participation in the RSAT program would violate [a plaintiff's] religiously held beliefs" when an alternative secular curriculum were available "to any inmate raising religious objections to the content of other treatment regimens").

**\*8** By the time that Hatzfeld was told that ASAT/RSAT was a prerequisite to receiving HCV treatment, DOCS had already designed a secular alternative to the traditional programs. The Cognitive Behavior Therapy Program ("CBT") (also known as Cognitive ASAT) is available "for those inmates whose religious beliefs conflict with the treatment philosophy" of the regular programs, which has been available since March 2002. [FN9] Pl. Mem. of Law (Dkt. No. 50-1) Ex. 3; *see also* Pl.Ex. H. Thus, Hatzfeld's First Amendment claim fails as a matter of law because there is no basis to conclude that Hatzfeld's required participation in the program would violate his religiously held beliefs.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

FN9. Given that Hatzfeld submitted the CBT article as his own exhibit, he was necessarily aware of a secular alternative. There is no indication anywhere in the record, however, that any of the defendants or anyone else at DOCS told Hatzfeld to petition for CBT or that DOCS had already removed religious content from ASAT/RSAT. The last page of the ASAT Manual includes a notification of CBT, and that this notification is also included as one of Hatzfeld's exhibits. *See* ASAT Manual at 87; Pl. Mem. of Law Ex. 3. However, an explicit and direct notification to Hatzfeld that he could petition for CBT or that ASAT/RSAT had already removed any religious materials could have resolved the matter without the necessity of litigation. Moreover, the failure to provide an explicit and direct notification to hatzfeld that he could petition for CBT or that ASAT/RSAT had already removed any religious materials may demonstrate a deliberate indifference on the part of defendants to Hatzfeld's serious medical needs. *See* Section II-F *infra.*

Accordingly, it is recommended that defendants' motion be granted as to Hatzfeld's First Amendment claim.

### E. Equal Protection

Hatzfeld also alleges that he "is being discriminated against as a specific group or class of people" in violation of the Fourteenth Amendment's Equal Protection Clause because DOCS holds him to a "higher standard of approval [ ] to gain medical care/treatment" than others in similar circumstances. Compl. at 9.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). The level of scrutiny used to "ensure that classifications comply with this guarantee differs according to the nature of the classification." *Travis v. N.Y. State Div. of Parole,* No. 96-cv-0759, 1998 U.S. Dist. LEXIS 23417, at *11 (N.D.N.Y Aug. 26, 1998) (Sharpe, M. J.). Strict scrutiny is used when "the classification drawn 'impermissibly ... operates to the

peculiar disadvantage of a suspect class.' " *Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs,* 962 F.2d 136, 141 (2d Cir.1992) (citing *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307 (1976) (footnotes omitted)). Suspect classes are those based on "race, alienage, or national origin, or those which discriminate against a group saddled political powerlessness as to command extraordinary protection from the majoritarian political process." *Id.* To survive strict scrutiny, the "State must demonstrate a compelling governmental interest and show that the law is the least restrictive means of furthering its interest." *City of Boerne v. Flores,* 521 U.S. 507, 534 (1997). Quasi-suspect classifications, like those based on gender or illegitimacy, receive heightened scrutiny, and such classifications are impermissible unless they are "substantially related to a sufficiently important governmental interest." *City of Cleburne,* 473 U.S. at 441. Any other classifications "need only be rationally related to a legitimate governmental purpose." *Travis,* 1998 U.S. Dist. LEXIS at *11.

Construing his Complaint liberally, it appears that Hatzfeld argues that this discrimination occurred because of his "religion" and "handicap." Compl. at 6 (those words are underlined). As discussed in section II(D) *supra,* there is no merit to Hatzfeld's claim that ASAT/RSAT infringes upon his First Amendment rights as an atheist. Further, Hatzfeld has not stated what his particular handicap might be, let alone alleged any discrimination based on a handicap. Thus, Hatzfeld has not alleged any facts "plausibly suggesting that "[he] was intentionally treated differently from others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class." *O'Neil v. Bebee,* No. 5:09-cv-1133 (GTS/DEP), 2010 U.S. Dist. LEXIS 11639, at *29 (N.D.N.Y. Feb. 10, 2010) (emphasis in original).

*9 Hatzfeld also advances a "class of one" claim. Pl. Mem. of Law at 12. Hatzfeld argues that he was treated differently from Pelkey, who received HCV treatment despite Pelkey's refusal to participate in ASAT/RSAT even though Pelkey had a history of substance abuse. *Id.* at 11-12; *see also* Compl. at 4-5. An Equal Protection claim "may be brought by a 'class of one' 'where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Tatta v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

*Wright,* 616 F.Supp.2d 308, 319 (N.D.N.Y 2007) (citing *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564; *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005)).

In Equal Protection claims, prison administrators making classifications " 'need only demonstrate a rational basis for their distinction,' ... or that [the classifications] are 'reasonably related to legitimate penological interests.' " *Doe v. Goord,* No. 04 Civ. 0570, 2005 U.S. Dist. LEXIS 28850(GBD)(AJP), at *61 (S.D.N.Y. Nov. 22, 2005) (Peck, M.J.) (quoting *Isaraphanich v. Coughlin,* 716 F.Supp. 119, 121 (S.D.N.Y.1989)). The "burden is upon the challenging party to negative 'any reasonably conceivable state of facts that could provide a rational basis for the classification.' " *Doe,* 2005 U.S. Dist. LEXIS 28850 at *59 (quoting *Bd. of Trustees of the Univ. of Ala. v. Garrett,* 531 U.S. 356, 367 (2001) (internal citations omitted)).

A considerable portion of defendants' brief discusses the rational basis for different treatments between those with hepatitis and those who have Acquired Immune Deficiency Syndrome ("AIDS"). *See* Defs. Mem. of Law at 20-24. Although that was an issue in *Hatzfeld I,* the allegations here concern the alleged disparate treatment between Hatzfeld and Pelkey and not between those with HCV and AIDS. *See* Compl. at 4-5, 9, Ex. B; *see also* Pl. Mem. of Law at 12. Regardless, the record is devoid of any indication that Hatzfeld was treated differently due to any discriminatory animus on the part of any of the defendants. Because Hatzfeld has failed to plead an "inescapable crux of [an] Equal Protection claim, it is unnecessary to determine whether any rational basis existed for a possible disparity in treatment." *Lighthall v. Vadlamudi,* No. 9:04-CV-0721 (NAM/RFT), 2006 U.S. Dist. LEXIS 74734, at * 52 (N.D.N.Y. Feb. 6, 2006) (Treece, M.J.).

As such, it is recommended that defendants' motion be granted as to Hatzfeld's Fourteenth Amendment claim.

### F. Eighth Amendment

Hatzfeld also argues that defendants violated his Eighth Amendment rights by denying him hepatitis treatment. Compl. at 9. The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."

U.S. Const. amend. VIII. This prohibition extends to the provision of medical care. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). The test for a section 1983 claim is twofold. First, the prisoner must show that the condition to which he was exposed was sufficiently serious. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

### 1. Serious Medical Need

*10 " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Although there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). An inmate need not "demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do[es] [this Court] require a showing that his or her condition will degenerate into a life threatening one." *Id.* at 163. This " 'component of an Eight Amendment claim is ... [necessarily] contextual' and fact-specific." *Smith,* 316 F.3d at 185 (quoting *Hudson,* 503 U.S. at 8). Thus, the "serious medical need inquiry must be tailored to the specific circumstances of each case." *Id.*

It is well-established that Hepatitis C is a serious medical condition. *See, e.g., Motta v. Wright,* No. 9:06-cv-1047, 2009 WL 1437589, at *15 (N.D.N.Y May 20, 2009) ("No one disputes that HCV is a 'serious medical condition.' "); *Scheckells v. Goord,* 423 F.Supp.2d 342, 347 (S.D.N.Y.2006) ( "failure to treat ... HCV clearly satisfies the objective element of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

deliberate indifference standard"); *Pabon v. Wright,* No. 99 Civ. 2196(WHP), 2004 WL 628784, at *5 (S.D.N.Y. Mar. 29, 2004) ("as it is undisputed that plaintiffs each carried Hepatitis C and that this action arises from defendants' treatment of that virus, plaintiffs have demonstrated a sufficiently serious medical need"); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002) (Gorenstein, M.J.) (holding that Hepatitis C constitutes an objectively serious condition).

Defendants argue that this case should be treated as one of "delayed or interrupted treatment," rather than one of "denied treatment." Defs. Mem. of Law at 8. In cases where the "the plaintiff is receiving ongoing treatment, and the issue is an unreasonable delay or interruption of the treatment, then the 'seriousness' inquiry focuses on the challenged delay itself, rather than the underlying condition alone." *Motta,* 2009 WL 1437589 at *14.

Relying on *Smith,* defendants argue that the Court's inquiry on Hatzfeld's serious medical need should focus on the alleged three-month delay from June 30 to September 23, 2005 between Hatzfeld's renewed request for treatment and the commencement of treatment. Defs. Mem. of Law at 8. The plaintiff's claim in *Smith* was premised on an interruption in treatment. There, an HIV-positive prisoner challenged the "failure to provide him with prescription HIV medication during a seven-day period in October 1998 and a five-day period in January 2009," which made the case "conceptually different from the ordinary denial of medical care case, because [the *Smith*] claim is based on short-term interruptions in the otherwise adequate treatment" that the prisoner was receiving.[FN10] *Id.* at 185. Thus, in *Smith,* it was "appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" was sufficiently serious. *Id.* (emphasis in original).

FN10. Other cases cited by defendants to support this proposition are all either delayed treatment or interrupted treatment cases.

**\*11** Defendants' attempt to re-characterize the issue in this case is misguided. Here, Hatzfeld's Eighth Amendment claim arises from the *denial*-and not a delay

or interruption-of his renewed request for treatment in June 2005. *See* Compl. at 9 ("Plaintiff is being subjected to cruel and unusual punishment through the *denial* of adequate medical care/treatment for a potentially life threatening disease.") (emphasis added). Further, unlike the plaintiffs in the delayed or interrupted treatment cases, Hatzfeld was not regularly receiving his treatment for his underlying condition. He was denied treatment in 2002 and once again in 2005. But for the preliminary injunction in September 2005, or the policy change one month later, Hatzfeld might never have received treatment. Therefore, it is inappropriate to treat this case as one of delayed or interrupted treatment.

Even if this case were one of delayed treatment, there remains an issue of fact as to the seriousness of Hatzfeld's medical condition. *See Chambers v. Wright,* No. 05 Civ. 9915(WHP), 2009 U.S. Dist. LEXIS 37424, at *10 (S.D.N.Y. Mar. 17, 2009) (finding a material issue of fact whether a delay in plaintiff's third HCV treatment was "objectively serious"). D. Graceffo states that Hatzfeld "has achieved a 'sustained viral response' and is essentially 'cured.' " Graceffo Decl. (Dkt. No. 45-17) ¶ 25; *see also* Wright Decl. (Dkt. No. 45-18) ¶ 37; Pl. Med. R. (Dkt. No. 45-4.). However, Hatzfeld's last liver biopsy was in 2002. Defs.' Rule 7.1 Statement ¶ 96. That biopsy indicated that Hatzfeld had stage three fibrosis of the liver. Pl.'s Med. R. Stage three indicates bridging fibrosis, which is "a type of scarring that starts to develop into cirrhosis." Pl. Reply to Defs.' Mot. for Summ. J. (Dkt. No. 50-1) Ex. 2 at 5. Since Hatzfeld's last biopsy was over eight years ago, there is a question of fact as to the extent of liver damage.

Accordingly, Hatzfeld has raised a question of fact as to the objective prong of the deliberate indifference standard and defendants' motion on this ground should be denied.

**2. Deliberate Indifference**

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. To be "sufficiently culpable," the defendant must "know[ ] of and disregard[ ] an excessive risk to inmate health and safety; the [defendant] must both be aware of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

facts from which the interference could be drawn that a substantial risk of harm exists, and he must also draw that reference." *Farmer,* 511 U.S. at 837. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

"Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. *Chance,* 143 F.3d at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

**\*12** Because defendants "have cited policy as the reason for their actions ..., the question before [the Court] is whether following the policy resulted in deliberate indifference to [Hatzfeld's] medical needs." *Brock,* 315 F.3d at 166. "If so, summary judgment may not be granted ... since unconstitutional acts would ... have occurred as a result of [the] policy." *Id.* As such, the "operative question" here "is not whether the Guideline's substance abuse policy is generally justifiable, but whether a jury could find that the application of the policy in plaintiff's case could have amounted to deliberate indifference to plaintiff's medical needs." *Johnson v. Wright,* 412 F.3d 398, 404 (2d Cir.2005).

The Second Circuit has found that deliberate indifference may lie where prison officials ignore a physician's recommendation to provide hepatitis treatment even where prison officials do so in accordance with policy. *See Johnson,* 412 F.3d at 404. Here, defendants relied on DOCS' Guideline requiring enrollment in ASAT/RSAT before receiving HCV treatment when initially denying Hatzfeld HCV treatment. *See* Defs. Mem. of Law at 11-13; Defs. Rule 7.1 Statement ¶¶ 8, 15, 1668, 72-80; Wright Decl. ¶¶ 23-29; Graceffo Decl. ¶¶ 12-17. The denial of Hatzfeld's renewed request for treatment was also premised on his refusal to enroll in ASAT/RSAT. *See*

Grievance Pack (Dkt.45-3) at 2-3, 7, 22. Dr. Holtzapple recommended pegylated interferon therapy combined with ribavirin on December 18, 2002. Pl. Med. R.; Compl. Ex. A. Thus, a reasonable jury could find that conditioning treatment on participation in ASAT/RSAT were acts of deliberate indifference. *See Chambers,* 2009 U.S. Dist. LEXIS 37424 at \*13-14 (holding that a jury must decide on whether conditioning HCV treatment on participation in RSAT is "reckless" and not "medically justifiable").

Moreover, a legitimate claim of deliberate indifference may also lie where a plaintiff shows that another inmate had received hepatitis treatment without participating in a substance abuse program. *See, e.g., Conti v. Goord,* 59 F. App'x 434, 436 (2d Cir. Mar. 14, 2003) (finding that a plaintiff may establish deliberate indifference where he presented affidavits from inmates who were given hepatitis treatment without being required to participate in ASAT, raising the possibility that defendants "have applied their policy selectively, and adversely" to plaintiff). In this case, Hatzfeld has presented an affidavit from Pelkey, another inmate, stating that despite his history of substance abuse, he received hepatitis treatment even though he did not participate in ASAT/RSAT. *See* Compl. Ex. B. Therefore, a reasonable jury could conclude that adherence to the policy in this case amounted to deliberate indifference.

Finally, defendants' failure explicitly to notify Hatzfeld that all religious materials had been removed from ASAT/RSAT or that a secular alternative was available could be viewed as deliberate indifference to Hatzfeld's serious medical needs. Indeed, Hatzfeld might have participated in the secular alternative had he been given the opportunity to do so. Although Hatzfeld submitted an article discussing the secular alternative as an exhibit (*see* Pl.Ex. H), it is unclear when Hatzfeld first learned of the alternative. As such, a reasonable jury could find that defendants showed deliberate indifference to Hatzfeld's serious medical needs.

**\*13** Accordingly, it is recommended that defendants' motion as to Hatzfeld's Eighth Amendment claims be denied on this ground.

### G. Qualified Immunity

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

Even if Hatzfeld's constitutional claims are substantiated, defendants [FN11] claim that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fizgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002), *aff'd,* 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)).

> FN11. It is recommended above that judgment be granted to Eagen, Burge, and Ryerson for lack of personal involvement in any alleged constitutional violations. *See* subsection II(B) *supra.* Therefore, this portion of the Report-Recommendation will focus only on Drs. Graceffo and Kooi.

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. A prisoner's right to adequate medical treatment is a clearly established constitutional right. *See, e.g., Burgess v. Goord,* No. 98 Civ.2077(SAS), 1999 U.S. Dist. LEXIS 611, at *17 (S.D.N.Y. Jan. 26, 1999) ("It is clearly established that inadequate medical care can give rise to an Eight Amendment constitutional violation where prison officials are deliberately indifferent to an inmate's serious medical needs.") (internal citations omitted).

As discussed *supra,* a reasonable jury could find that defendants violated Hatzfeld's Eighth Amendment rights. Nevertheless, defendants may still be entitled to qualified

immunity if it was objectively reasonable for them to believe that their acts did not violate Hatzfeld's constitutional rights. *See Kaminsky,* 929 F.2d at 925 (citing *Magnotti,* 918 F.2d at 367). Drs. Graceffo and Kooi relied on DOCS' Guideline when they refused to provide treatment to Hatzfeld. *See* Defs. Mem. of Law at 11-13; Defs. Rule 7.1 Statement ¶¶ 8, 15, 1668, 72-80; Wright Decl. ¶¶ 23-29; Graceffo Decl. ¶¶ 12-17; Grievance Pack at 2-3, 7, 22. The Guideline is constantly developed and revised based upon information from a number of independent medical sources. *See* Rule. 7.1 Statement ¶ 46. DOCS relied on those independent sources when it established the ASAT/RSAT prerequisite. *See* Wright Decl. ¶ 24; NIH Consensus Statement (Dkt. No. 45-7); CDC Morbidity and Mortality Weekly Report (Dkt. No. 45-8.) The medical community recognized that alcohol or drug use could prevent the successful completion of hepatitis treatment, and DOCS promulgated rules in accordance with recommendation from the medical community. Thus, although the necessity of the ASAT/RSAT has been called into question, it was objectively reasonable for Drs. Graceffo and Kooi to believe that conditioning Hatzfeld's treatment on his participation those programs did not violate the law. Hatzfeld has not raised any issues of material fact on this question. Rather, he merely restates allegations of constitutional violations. Pl. Mem. of Law at 13-14.

**\*14** Accordingly, it is recommended that defendants' motion as to Drs. Graceffo and Kooi on this ground be granted.[FN12]

> FN12. In light of the recommendations herein, defendants' argument regarding damages need not be addressed.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 45) be **GRANTED** and that judgement be entered in favor of all defendants on all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5579883 (N.D.N.Y.)

(Cite as: 2010 WL 5579883 (N.D.N.Y.))

"within fourteen (14) days after being served with a copy of the ... recommendation." N.Y.N.D.L.R. 72.1(c) (citing 28 U.S.C. § 636(b)(1)(B)-(C)). **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Hatzfeld v. Eagen
Slip Copy, 2010 WL 5579883 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 124535 (N.D.N.Y.)

(Cite as: 2011 WL 124535 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
John HATZFELD, Plaintiff,
v.
Thomas G. EAGEN, Director, Inmate Grievance Program, CORC; John W. Burge, Superintendent, Auburn Correctional Facility; Nancy Ryerson, Nurse Administrator, Auburn Correctional Facility; Anthony Graceffo, Former M.D., Auburn Correctional Facility; and M.D. Pang Kooi, Auburn Correctional Facility, Defendants.
No. 9:08CV283 (LES/DRH).

Jan. 14, 2011.
John Hatzfeld, Moravia, NY, pro se.

Aaron M. Baldwin, New York State Attorney General, Albany, NY, for Defendants.

MEMORANDUM OPINION

LYLE E. STROM, Senior District Judge.
   **\*1** This matter is before the Court on the report-recommendation and order (Filing No. 54) of the magistrate judge. The Court has reviewed the report-recommendation, together with defendants' motion for summary judgment (Filing No. 45), plaintiff's response in opposition to the motion for summary judgment (Filing No. 50), defendants' reply to response (Filing No. 53), objection to the report and recommendation by defendants (Filing No. 55), plaintiff's objection to the report and recommendation (Filing No. 56), and plaintiff's reply to defendants' objections (Filing No. 57). The Court has reviewed all the filings and finds the report and recommendation should be approved and adopted and the objections thereto should be overruled. A separate order

will be entered in accordance with this memorandum opinion.
N.D.N.Y.,2011.

Hatzfeld v. Eagen
Slip Copy, 2011 WL 124535 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Michael L. DECKER, Plaintiff,
v.
Michael F. HOGAN, Commissioner, NYS Office of
Mental Health; Donald Sawyer, Executive Director,
Central New York Psychiatric Center, Defendants.
No. 9:09-CV-0239 (TJM/GJD).

Sept. 28, 2009.

Michael L. Decker, pro se.

Office of the Attorney General, Charles J. Quackenbush,
Esq., Assistant Attorney General, of Counsel, State of
New York, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

THOMAS J. McAVOY, Senior District Judge.
**I. Introduction**
    **\*1** Plaintiff Michael L. Decker commenced this action
*pro se* seeking relief pursuant to 42 U.S.C. § 1983 for the
alleged violation of his constitutional rights. Dkt. No. 1.
Plaintiff is a civil detainee under Article 10 of the New
York Mental Health Law, and has been confined at the
Central New York Psychiatric Center ("CNYPC") since
August, 2008. Plaintiff challenges the constitutionality of
three aspects of the Sexual Offender Treatment Program
("SOTP") administered by the New York State Office of
Mental Health ("OMH") at CNYPC. Plaintiff claims that
the SOTP utilizes treatment programs which are
faith-based, and that the requirement that he participate in
those programs violates his rights under the First
Amendment. *Id.* at 2-3. Plaintiff also claims that
SOTP-required polygraph and penile plethysmography
("PPG")[FN1] examinations are unconstitutional. *Id.* at 3-4.
According to plaintiff, successful completion of the SOTP
is a condition of his release from CNYPC. *Id.* at 3-4.
Named as defendants are Michael Hogan, Commissioner

of OMH, and Donald Sawyer, Executive Director of
CNYPC. Plaintiff seeks monetary damages as well as
declaratory and injunctive relief.[FN2]

    FN1. Penile Plethysmography, as defined by the
    OMH in the Advancement to SOTP Phase II-IV
    Consent to Participate in Treatment, is intended
    to "assess sexual interests and measure treatment
    effectiveness. In this treatment, while wearing a
    sterilized gauge around the penis, a machine
    records any erection response that results from
    listening to and/or viewing depiction of sexual
    and non-sexual materials. This assessment occurs
    within a laboratory setting with complete
    privacy." Dkt. No. 3-3 at 8. For recent
    discussions of the wide range of opinion
    regarding the efficacy of PPG examinations and
    their proper role in sex offender treatment
    programs, see *United States v. Rhodes,* 552 F.3d
    624, 626-29 (7th Cir.2009) (finding that
    challenge to PPG as condition of supervised
    release not ripe where condition would become
    effective only after defendant served more than
    ten years imprisonment and several other
    conditions were met); *United States v. Weber,*
    451 F.3d 552, 561-66 (9th Cir.2006)
    (requirement of PPG testing as part of sex
    offender treatment program imposed as a
    condition of supervised release requires
    heightened procedural protections).

    FN2. Two other CNYPC detainees have filed §
    1983 actions in the Northern District challenging
    these same aspects of the SOTP. See *Pratt v.*
    *Hogan,* No. 6:08-CV-1003, 2009 WL 1916284
    (N.D.N.Y. Jul. 6, 2009) (Hurd, J.)
    (injunctive/declaratory relief claims dismissed
    pursuant to *Younger* abstention; defendants
    granted qualified immunity from claims for
    money damages); *McChesney v. Hogan,* No.
    9:08-CV-1186, Report-Recommendation that
    motion for injunctive relief be denied, 2009 WL
    607398 (N.D.N.Y. Dec. 23, 2008) (Peebles,
    M.J.), *adopted,* 2009 WL 607398, at *7*

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

(N.D.N.Y. Mar. 9, 2009) (Mordue, C. J.). McChesney also claims that the SOTP requirement that he compile an autobiography is unconstitutional. *McChesney,* 2009 WL 607398, at *1.

In addition to his complaint, plaintiff filed a motion seeking a temporary restraining order and preliminary injunction enjoining defendants from mandating participation in faith-based programs and from requiring polygraph or PPG examinations as a part of the SOTP. Dkt. No. 3-2 at 1-2.

By Order of this Court filed March 26, 2009, plaintiff was granted leave to proceed *in forma pauperis* and the U.S. Marshal was directed to effect service of process on the defendants. Dkt. No. 5. Plaintiff's request for the issuance of a temporary restraining order was denied. Defendants were directed to file a response to the preliminary injunction motion. *Id.* at 2-3.

Defendants have responded in opposition to plaintiff's motion for injunctive relief. Dkt. No. 8. Defendants also filed a "cross-motion" seeking dismissal of the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[FN3]

> FN3. Plaintiff has not filed a response to defendants' motion to dismiss.

These motions are before the Court for consideration.[FN4]

> FN4. The parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded for purposes of this motion. Any appeal taken from this Memorandum-Decision and Order, if appropriate, will be to the Court of Appeals for the Second Circuit.

## II. Motion to Dismiss Standard

In deciding a Rule 12(b)(6) dismissal motion, "the court must accept the material facts alleged in the complaint as true, and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994).[FN5] The plaintiff must satisfy "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible." Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (italics in original). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 563 (2007).

> FN5. The "complaint" includes any written instrument attached to it as an exhibit and any statements or documents incorporated into the complaint by reference. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995); Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")

**\*2** The burden undertaken by the moving party is substantial, as the question presented by the motion to dismiss is not whether the non-moving party is likely ultimately to prevail, "but whether the claimant is entitled to offer evidence to support the claims." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other citations omitted). In order to withstand a motion to dismiss, a complaint must plead enough facts to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) ("The court should freely give leave when justice so requires.").

## III. First Amendment Claims

Plaintiff identifies himself as an atheist.[FN6] Since his placement at CNYPC, plaintiff has been assigned to the SOTP. Participation in the SOTP has "subjected [plaintiff] to religious practices and rituals." Dkt. No. 1 at 2. The "Good Lives Model and Boundaries Programs" teach the participants that they must "believe in something denoted as spirituality." *Id.* at 3. In addition, the SOTP includes Dialectic Behavior Therapy, which teaches "the rituals and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

practices" of Buddhism. *Id.* The SOTP also utilizes several "Hazeldon products which incorporate Christian beliefs and practices." *Id.* These programs include "From the Inside Out," "Growing Up Male," "Problem Solving" and "Anger Management." [FN7]

> FN6. The following facts are drawn from plaintiff's complaint and are accepted as true for purposes of the pending motion to dismiss. *Erickson v. Pardus,* 551 U.S. 89, 93-94 (2007); *Boykin v. KeyCorp,* 521 F.3d 202, 204 (2d Cir.2008).

> FN7. In his memorandum in support of the motion for injunctive relief, plaintiff states that the Hazeldon products are "Christian based and incorporate the 12 steps/12 traditions of A.A. (Alcoholics Anonymous)." Dkt. No. 3 at 3.

The First Amendment, made applicable to states by the Fourteenth Amendment, states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. The First Amendment embraces two fundamental concepts: "freedom to believe and freedom to act" on one's beliefs. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940). The First Amendment's Establishment Clause prohibits government from officially preferring one religious denomination over another. Thus, "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente,* 456 U.S. 228, 244 (1982); *Skoros v. City of New York,* 437 F.3d 1, 16 (2d Cir.2006). The First Amendment also protects individuals against "government compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion." *Mozert v. Hawkins County Bd. of Educ.,* 827 F.2d 1058, 1066 (2d Cir.1987), *cert. denied,* 484 U.S. 1066 (1988).

Defendants urge dismissal of plaintiff's First Amendment claims, arguing that he has failed to state a cognizable claim under either the Establishment Clause or the Free Exercise Clause. Dkt. No. 8-2 at 7-9. Defendants contend that the state law pursuant to which plaintiff is confined "was clearly enacted for secular purposes" and that the purposes of the SOTP "are clearly secular as

well." *Id.* at 7-8. With respect to the particular treatment programs complained of by plaintiff, defendants maintain that dismissal is warranted because there is "no proof" that the programs "either advance or inhibit religion;" there is "no evidence" that the programs "foster any entanglement with religion;" and "no proof" of "governmental compulsion impacting upon his atheistic beliefs or practices." *Id.* at 8-9.

**\*3** The question presented by defendants' motion to dismiss is not whether plaintiff has or can adduce facts sufficient to prove his First Amendment claims. It may become clear, at summary judgment or at some later stage in the litigation, that plaintiff's claims are not adequately supported. But at this early stage, the Court must accept plaintiff's allegations as true and may not dismiss the case unless it is clear that it would be impossible for plaintiff to make out a legally cognizable claim.

Reading plaintiff's complaint liberally and accepting the well-pleaded allegations thereof as true, the Court finds that the First Amendment claim is sufficient to withstand defendants' motion to dismiss. Atheism is subject to the protections of the First Amendment. *Wallace v. Jaffree,* 472 U.S. 38, 52-53 (1985) ("the Court has unambiguously concluded that the individual freedom of conscience protected by the First Amendment embraces the right to select any religious faith or none at all."); *McChesney,* 2009 WL 607398, at \*6 (Peebles, M.J.); *Alexander v. Schenck,* 118 F.Supp.2d 298, 300-02 (N.D.N.Y.2000) (Kahn, J.). Plaintiff identifies himself as an atheist, and alleges that he "has been subjected to religious practices and rituals" in the course of participating in the SOTP. Dkt. No. 1 at 2. Plaintiff claims that portions of the program are based upon Zen Buddhism and Christianity and that the SOTP "teach[es] that you have to believe in something denoted as spirituality." *Id.* at 2-3. Plaintiff alleges that he is compelled to participate in these faith-based programs in order to secure his release from CNYPC, and that this compelled participation violates his "right to believe or not as my conscience dictates." *Id.* at 3, 5. *See, e.g., Warner v. Orange County Dept. of Probation,* 115 F.3d 1068, 1075 (2d Cir.1997) (holding that because the plaintiff was sent to Alcoholics Anonymous as a condition of his probation, without offering a choice of other

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

providers, he was "plainly" coerced in violation of the Establishment Clause); *Alexander,* 118 F.Supp.2d at 301 (prisoner ordered to attend Alcohol and Substance Abuse Treatment Program was "coerced" for purposes of First Amendment).

Defendants' motion to dismiss plaintiff's First Amendment claim is denied. Accordingly, the Court will address plaintiff's motion for preliminary injunctive relief.

The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this Circuit. As the Second Circuit noted in *Covino v. Patrissi,* 967 F.2d 73 (2d Cir.1992), the movant must show: (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *Id.* at 77 (affirming district court's denial of inmate's request for preliminary injunction). Where a movant seeks relief which will alter, rather than maintain, the status quo, or which will provide him with substantially all the relief sought, the requested injunction is properly characterized as mandatory rather than prohibitory. A party seeking a mandatory injunction must make a "clear" or "substantial" showing of the likelihood of success, as well as irreparable harm should the injunction not be granted. *Jolly v. Coughlin,* 76 F.3d 468, 473-74 (2d Cir.1996).

**\*4** Plaintiff asks that this Court issue a preliminary injunction prohibiting defendants from mandating participation in faith-based SOTP programs. Dkt. No. 3-2. The Court treats plaintiff's motion as seeking mandatory rather than prohibitory relief. Accordingly, plaintiff must make a clear or substantial showing of the likelihood of success on the merits of his claims.

Where a deprivation of constitutional rights is alleged, specific proof of irreparable injury is not required. *See e.g., Mitchell v.. Cuomo,* 748, F.2d 804, 806 (2d Cir.1984). For purposes of this motion, defendants do not contest plaintiff's assertion that he will suffer irreparable harm if the requested relief is not granted. *See* Dkt. No. 8-2 at 6. *See McChesney v. Hogan,* No. 9:08-CV-1186, Report-Recommendation, 2009 WL 607398, at \*3

(N.D.N.Y. Dec. 23, 2008), *adopted,* 2009 WL 607398, at \*7 (N.D.N.Y. Mar. 9, 2009) (Mordue, C.J.).

A party seeking injunctive relief must also demonstrate a likelihood of succeeding on the merits of a claim, or evidence that establishes sufficiently serious questions going to the merits of such a claim and a balance of hardships tipping decidedly toward the party seeking such relief. *Covino,* 967 F.2d at 77.

While the Court has found that plaintiff's allegations are sufficient to withstand defendants' Rule 12(b)(6) motion to dismiss, the present record does not contain evidence sufficient to warrant the issuance of injunctive relief. The record before the Court consists only of plaintiff's description of these programs and his claim that defendants are "proselytizing Christianity" and mandating his participation in faith-based programs in contravention of his avowed atheism. Plaintiff has not presented the Court with program materials or other evidence demonstrating a clear or substantial likelihood of success on the merits of his claim that SOTP programs such as Dialectic Behavior Therapy, "The Good Lives Model" and various Hazeldon programs are, in fact, religious in nature in First Amendment terms. *Compare Warner,* 115 F.3d at 1075 (finding a "Twelve Steps" program which "placed a heavy emphasis on spirituality and prayer" and instructed belief in "a Power greater than ourselves" was an intensely religious event) with *Boyd v. Coughlin,* 914 F.Supp. 828, 833 (N.D.N.Y.1996) (McAvoy, J.) ("This court is unaware of a controlling decision that equates spirituality with religion, such that any reference to spirituality in ... [a] treatment program ... runs afoul of the First Amendment."). See *McChesney,* 2009 WL 607398, at \*4. Plaintiff has also failed to support his motion with evidence that he was coerced into participating in the alleged religious exercises or rituals by virtue of his enrollment in the SOTP, and that no secular alternatives were made available to patients raising religious objections to the content of the treatment programs. *See Warner,* 115 F.3d at 1075 (recognizing that consideration of plaintiff's First Amendment claim "would be altogether different" if he had been offered a reasonable choice of therapy providers).

**\*5** Accordingly, plaintiff's motion for preliminary

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

injunctive relief is denied.

**IV. Fifth Amendment Claims**

SOTP participants seeking to advance to Phase II-IV of the program are asked to consent to polygraph and PPG examinations. Dkt. No. 1 at 3.[FN8] The Advancement Contract signed by plaintiff in December, 2008 contains the following general disclaimer: "[t]he court, your attorney, the Attorney General's Office, and other relevant participants in your commitment process have access to the information you reveal regarding your sexual offending behaviors and may use that information during the civil management process." Dkt. No. 3-3 at 7.[FN9] The section of the Advancement Contract specifically describing the required polygraph examinations includes the following statement: "The courts may choose to use any information gathered from these examinations." *Id.* at 8.[FN10] The Advancement Contract advises SOTP participants that a refusal to undergo the requested examinations "may slow or prevent advancement in SOTP phases of treatment." *Id.*

FN8. See note 5 *infra.*

FN9. Plaintiff references these documents as exhibits (C) and (D) to the complaint. Although the complaint as filed does not include these exhibits, the materials (as well as the documents identified as exhibits A and B), were filed as exhibits in support of plaintiff's motion for injunctive relief. Both submissions were filed on the same day.

FN10. A previous version of the Advancement Contract advised that polygraph examinations "are not designed to be incriminating or to be used in court." See Dkt. No. 3-3 at 5.

The Fifth Amendment's privilege against self-incrimination, which applies to the states via the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The privilege

not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also "privileges him not to answer official questions put

to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

*Minnesota v. Murphy,* 465 U.S. 420, 426 (1984) (quoting *Lefkowitz v. Turley,* 414 U.S. 70, 77 (1973)). The right not to answer potentially incriminating questions however, is not absolute. Rather, "[t]he prohibition against compelling the testimony of a witness in any setting is predicated upon there being a real danger that the testimony might be used against the witness in later criminal proceedings." *Andover Data Services, a Div. of Players Computer, Inc. v. Statistical Tabulating Corp.* 876 F.2d 1080, 1082 (2d Cir.1989). Thus, "[i]t is ... black-letter law that a witness cannot assert a Fifth Amendment privilege not to testify 'if the testimony sought cannot possibly be used as a basis for, or in aid of, a criminal prosecution against the witness.' " *Pillsbury Co. v. Conboy,* 459 U.S. 248, 273 (1983) (Blackmun, J., concurring) (quoting *Brown v. Walker,* 161 U.S. 591, 597 (1896)).

Outside of the prison context, the Supreme Court has "described compulsion in relatively broad terms." *Ainsworth v. Risley,* 244 F.3d 209, 213 (1st Cir.2001), *vacated on other grounds,* 536 U.S. 953 (2002). The Court has held that "certain types of penalties are capable of coercing incriminating testimony," including: termination of employment, the loss of a professional license, ineligibility to receive government contracts, and the loss of the right to participate in political associations and to hold public office. *McKune v. Lile,* 536 U.S. 24, 49-50 (2002) (O'Connor, J., concurring in the judgment) (citing cases). The Supreme Court has defined "compulsion" as anything that makes the exercise of the right "costly." *Spevack v. Klein,* 385 U.S. 511, 515 (1967). See *Lefkowitz v. Cunningham,* 431 U.S. 801, 808 (1977) (rejecting "the notion that citizens may be forced to incriminate themselves because it serves a governmental need.").

*\*6* Writing for a plurality of the Court in *McKune,* Justice Kennedy concluded that the setting in which the compulsion arises is an integral part of the constitutional analysis. *Id.,* 536 U.S. at 36 ("The fact that these consequences are imposed on prisoners, rather than

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

ordinary citizens, moreover, is important in weighing respondent's constitutional claim."). Noting that "[a] broad range of choices that might infringe constitutional rights in free society fall within the expected conditions of confinement of those who have suffered a lawful conviction," *id.,* Justice Kennedy concluded that the "atypical and significant hardship" analysis articulated in *Sandin v. Connor,* 515 U.S. 472 (1995) "provides a reasonable means of assessing whether the response of prison administrators to correctional and rehabilitative necessities are so out of the ordinary that one could sensibly say they rise to the level of unconstitutional compulsion." *McKune,* 536 U.S. at 41. Concurring with the judgment reached by the *McKune* plurality, that withholding certain privileges upon an inmate's refusal to participate in a mandatory sex offender treatment program does not constitute a compulsion that encumbers the constitutional right not to incriminate oneself, Justice O'Connor wrote separately to express her opinion that the Fifth Amendment compulsion standard is broader that *Sandin*'s "atypical and significant hardship" standard. *Id.,* 536 U.S. at 48 (O'Connor, J., concurring).[FN11]

> FN11. The inmate plaintiff in *McKune,* complained that he faced transfer to a less-desirable maximum security prison, and that he also faced the loss of his personal television set, less access to prison organizations and the gym area, a reduction in certain pay opportunities and restricted visitation rights. *McKune,* 536 U.S. at 39. Justice Kennedy, writing for a plurality, emphasized that the decision not to participate in the Kansas Sexual Abuse Treatment Program "did not extend [the prisoner's] term of incarceration" nor did it "affect his eligibility for good-time credits or parole." *Id.,* 536 U.S. at 38.

In this case, plaintiff, a civil detainee faced with prolonged civil detention if he refuses to submit to polygraph and PPG examinations, has adequately alleged that he faces "compulsion" that is constitutionally significant even under the *Sandin* analysis utilized by the *McKune* plurality.

Notwithstanding the foregoing, however, the Court

finds that plaintiff has failed to state a Fifth Amendment claim because neither polygraph nor PPG examinations violate the Fifth Amendment privilege against self-incrimination. The Second Circuit has held that requiring the use of a polygraph examination for a convicted sex offender as a condition of supervised release does not violate the privilege against self-incrimination because polygraph evidence is generally inadmissible, and the individual would be free to challenge that evidence should it be used against him in a future proceeding. *United States v. Johnson,* 446 F.3d 272, 278-80 (2d Cir.2006); *United States v. Santiago,* No. 03 Cr. 664, 2008 WL 1959548, at *1 (S.D.N.Y. May 5, 2008); *see also United States v. Dotson,* 324 F.3d 256, 261 (4th Cir.2003) (polygraph test, "inadmissible in nearly every circumstance at trial," may be required as a condition of supervised release); *United States v. Zinn,* 321 F.3d 1084, 1090-92 (11th Cir.2003) (requiring polygraph testing as a condition of supervised release generally does not violate the Fifth Amendment). *Compare United States v. Weber,* 451 F.3d 552, 568 n. 17 (9th Cir.2006) (defendant subject to polygraph testing as requirement of supervised release retains Fifth Amendment rights "unless granted use-andderivative-use immunity").

**\*7** The Court also find that results of PPG examinations do not implicate plaintiff's Fifth Amendment right against self-incrimination because the procedure itself is not testimonial but, rather, is an assessment of an individual's physical reactions to various stimuli. *See McChesney,* 2009 WL 607398, at *5; *Walrath v. United States,* 830 F.Supp. 444, 446 (N.D.Ill.1993). Moreover, courts asked to consider the admissibility of PPG examinations have uniformly refused to do so, finding that PPG results fail to meet scientific validity prong for admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589-90 (1990)). *See Doe ex. rel. Rudy-Glanzer v. Glanzer,* 232 F.3d 1258, 1266 (9th Cir.2000) ("courts are uniform in their assertion that the results of penile plethysmographs are inadmissible as evidence because there are no accepted standards for this test in the scientific community."); *United States v. Powers,* 59 F.3d 1460, 1470-71 n. 13 (4th Cir.1995) (appellant "has not provided, and we have not found, any decisions acknowledging the validity of the use of penile plethysmography other than in the treatment and

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

monitoring of sex offenders.").

Based upon the foregoing, the Court finds that the allegations of the complaint, as drafted, do not state a claim upon which relief may be granted for the violation of plaintiff's Fifth Amendment right against self-incrimination stemming from polygraph and/or PPG examinations conducted as part of the SOTP. This aspect of defendants' motion to dismiss is granted.[FN12]

> FN12. In light of this ruling, the Court need not address plaintiff's motion for injunctive relief. Defendants' claim that they are entitled to qualified immunity from damages on this claim is also moot.

**V. Qualified Immunity**

Defendants raise the affirmative defense of qualified immunity. Dkt. No. 8-2 at 11-12. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997)).

The Second Circuit has recognized that the availability of qualified immunity may "turn[ ] on factual questions that cannot be resolved at [the motion to dismiss] stage of the proceedings." *Taylor v. Vermont Dept. of Educ.,* 313 F.3d 768, 793 (2d Cir.2002).[FN13] Thus, where the "objective reasonableness" of defendants' actions depends at least in part on what information they had regarding the substance of plaintiff's complaints, an adjudication as to the applicability of the qualified immunity affirmative defense on the basis of the pleadings alone would be premature.

> FN13. In *Stephenson,* the court advised that a "defendant should press a qualified immunity defense during pretrial proceedings so that such a claim can be disposed of by summary judgment where possible, or factual disputes material to the defense can be identified and presented to the jury." *Stephenson,* 332 F.3d at 76.

Although a factual basis for affording qualified immunity to defendants on plaintiff's First Amendment claims may arise during the course of discovery, the Court cannot at this early stage of the proceeding, accepting all of plaintiff's allegations as true, conclude that defendants are entitled to qualified immunity as a matter of law. *See Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 255 (2d Cir.2001); *Bailey v. Pataki,* 08 Civ. 8563, 2009 WL 2001178, at *6 (S.D.N.Y. Jul. 10.2009). Accordingly, defendants' motion to dismiss plaintiff's First Amendment claims for money damages based on qualified immunity is denied, without prejudice to renew.

**VI. Conclusion**

**\*8** Defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted is granted in part and denied in part. The well-pleaded allegations of the complaint sufficiently allege a violation of plaintiff's First Amendment rights resulting from his required participation in faith-based treatment programs. Plaintiff's motion for preliminary injunctive relief is denied. Defendants' request for dismissal of plaintiff's First Amendment claims for money damages on qualified immunity grounds is denied, without prejudice. Plaintiff's Fifth Amendment claims are dismissed, without prejudice.

WHEREFORE, on the basis of the above, it is hereby

ORDERED, that defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **granted in part and denied in part** as set forth above, and it is further

ORDERED, that plaintiff's motion for preliminary injunctive relief is **denied,** and it is further

ORDERED, that defendants file an answer to complaint **no later than October 31, 2009,** and it is further

ORDERED, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties.

IT IS SO ORDERED.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3165830 (N.D.N.Y.)

(Cite as: 2009 WL 3165830 (N.D.N.Y.))

N.D.N.Y.,2009.

Decker v. Hogan
Slip Copy, 2009 WL 3165830 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
David McCHESNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, New York State
Office of Mental Health, et al., Defendants.
David McChesney, Plaintiff,
v.
Michael F. Hogan, Commissioner, New York State
Office of Mental Health, et al., Defendants.
Civil Action Nos. 9:08-CV-1186 (NAM/DEP),
6:08-CV-1290 (NAM/DEP).

Feb. 26, 2010.
David McChesney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General,
State of New York, Adele Taylor-Scott Esq., Assistant
Attorney General, Dean J. Higgins, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.
   **\*1** Plaintiff David McChesney, a convicted sex
offender who has been civilly committed to the Central
New York Psychiatric Center ("CNYPC"), for
participation in sex offender treatment, has commenced
these two actions pursuant to 42 U.S.C. § 1983, claiming
deprivation of his civil rights. In his complaints, plaintiff
alleges that the Sex Offender Treatment Program
("SOTP") administered at the CNYPC is predicated in
part upon religious tenets, and he is being forced, contrary
to his beliefs as an atheist, to practice religion in violation
of his First Amendment rights. In addition, plaintiff alleges
that various other aspects of the SOTP, including use of
polygraph and penile plethysmograph ("PPG") testing and
the requirement that he compose and share an

autobiography detailing his sexual history, violate his Fifth
Amendment right against self-incrimination.[FN1] As relief,
plaintiff seeks both damages and an injunction against the
continued use of the problematic religious and
self-incriminating elements of the treatment program.

   FN1. A plethysmograph is "[a]n instrument that
   measures variations in the size of an organ or
   body part on the basis of the amount of blood
   passing through or present in the [body] part."
   American Heritage Dictionary 1338 (4th
   ed.2000). According to materials regarding the
   programming at the CNYPC, use of the PPG is
   intended to "assess sexual interests and measure
   treatment effectiveness. In this treatment, while
   wearing a sterilized gauge around the penis, a
   machine records any erection response resulting
   from listening to and/or viewing depiction of
   sexual and non-sexual materials. This assessment
   occurs within a laboratory setting for complete
   privacy." *See Decker v. Hogan,* No.
   9:09-CV-0239 (TJM/GJD), 2009 WL 3165830
   at \*1 n. 1 (N.D.N.Y. Sept.28, 2009).

   Defendants have moved for dismissal of the
complaints on a variety of grounds, both procedural and
substantive, arguing that 1) plaintiff's complaints are
legally insufficient because he has failed to separately
number paragraphs and include all exhibits referenced in
one of the two complaints; 2) plaintiff's damage claims
against the defendants in their official capacities are
precluded under the Eleventh Amendment; 3) plaintiff's
forced self-incrimination claims lack merit; and 4) they are
entitled to qualified immunity with respect to plaintiff's
First Amendment cause of action in light of the unsettled
state of the law governing such a claim. For the reasons set
forth below, I recommend that plaintiff's Fifth Amendment
self-incrimination claim be dismissed because he has
failed to plead that information set forth in his
autobiography or derived through polygraph or PPG
testing has been used against him in a criminal proceeding,
that his damage claims against the defendants as
individuals alleging violation of the First Amendment be
dismissed based on qualified immunity, and that any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

damage claims against defendants as state officials be dismissed pursuant to the Eleventh Amendment. To the extent that plaintiff's First Amendment claim seeks injunctive relief against defendants in their official capacities only, however, I further recommend that this claim survive defendants' motion, and additionally that defendants' motion to dismiss the complaint for failure to meet the governing pleading requirements be denied.

I. *BACKGROUND*[FN2]

> **FN2.** In light of the procedural posture of this case, my recitation of the relevant facts is drawn principally from plaintiff's complaints, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964). Portions of the background description which follows have been derived from the exhibits attached to plaintiff's complaints, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47-48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *see also Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

On or about December 6, 2007 the plaintiff, a convicted sex offender, was involuntarily committed to the care and custody of the New York State Office of Mental Health and designated to the CNYPC pursuant to the mandates of New York Mental Hygiene Law Article 10.[FN3] *See generally,* Civil Action No. 9:08-CV-1186 (NAM/DEP) Complaint (Dkt. No. 1) § 4. While there, McChesney is required to participate in the SOTP, an established sex offender treatment regimen that is broken down into four distinct segments. *Id.,* Exh. D; Civil Action No. 9:08-CV-1290 (NAM/DEP) Complaint (Dkt. No. 1) Exhs. B and C. Phase I of the program, entitled "Orientation and Treatment Readiness", is described as

the "readiness phase" and "provides basic information related to the commitment process, goals of the sex offender treatment program, and the treatment plan which documents an individual's progress towards meeting the program goals." *Id.* Phases II through IV of the SOTP are more intensive and are based upon what is described as a "structured treatment protocol." *Id.*

> **FN3.** Enacted in 2007, Article 10 of the Mental Hygiene Law provides for civil commitment and treatment of certain individuals convicted of committing sex crimes, recognizing the danger that recidivistic offenders present when released into the community. *See* N.Y. Mental Hyg. Law § 10.01.

**\*2** In order to participate in the latter three phases of the SOTP, which are conducted in group therapy settings, a patient is required to sign a consent form, described by the plaintiff as a contract. Civil Action No. 9:08-CV-1186 (NAM/DEP) Complaint (Dkt. No. 1) § 4 and Exhs. D and E. Significantly, the consent form discloses the potential use of polygraph and PPG testing during the course of the final three phases and notes that a separate written consent is required for use of each of those types of testing. *Id.* While advised of his or her right to refuse such testing, the patient is also pointedly informed that a refusal "may slow or prevent advancement in SOTP Phases of treatment." *Id.*

Attached to plaintiff's first complaint are two versions of the SOTP Phase II-IV Consent to Participate in Treatment form. Civil Action No. 9:08-CV-1186 (NAM/DEP) Complaint (Dkt. No. 1) Exhs. D and E. According to the plaintiff, the second of those forms "was recently issued by defendant [OMH Commissioner] Hogan." *Id.* § 4. The more recent consent form differs from the earlier version in several critical respects. First, while the original form provided that polygraph examinations "are not designed to be incriminating or to be used in court", the amended version instead states that "[t]he courts may choose to use any information gathered from [polygraph] examinations." *Id.* The more recent iteration also specifically advises that the polygraph examination may be used to explore the patient's sexual history. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

In addition to use of polygraph and PPG testing as treatment tools, the SOTP employs course materials which, plaintiff asserts, incorporate or are predicated upon Buddhist and Christian beliefs and practices, including "The Good Lives Model and Boundaries Programs," which discusses spirituality; "Dialectic Behavior Therapy", "Self Care Skills I and II", and "Relaxation Programs", all teaching the rituals and practices of Buddhism; and "Growing up Male, Problem Solving, Anger Management Programs", described as "Hazleton Products which incorporate Christian beliefs and practices into their programs." Civil Action No. 9:08-CV-1186 (NAM/DEP) Complaint (Dkt. No. 1) § 4. McChesney, who is an atheist, asserts that by requiring him to submit to teaching using those materials defendants have violated his First Amendment rights. *Id* .

In or about August of 2008, as part of the SOTP program, plaintiff was directed by Donald Sawyer, Executive Director of the CNYPC, to author and be prepared to present an autobiography. Civil Action No. 9:08-CV-1290 (NAM/DEP) Complaint (Dkt. No. 1) § 4. Preparation of such an autobiography is a requirement of the Phase II treatment protocol and is described in a handout entitled "Introduction to Autobiographies." Civil Action No. 9:08-CV-1290 (NAM/DEP) Complaint (Dkt. No. 1) Exh. A. Segment four of the questionnaire given to patients for use in complying with this requirement requests information about criminal history and asks specific questions regarding the patient's participation in sex crimes and other unlawful sexual conduct. *Id.,* Exhs. A and C. On or about October 9, 2008, defendant Valerie Colasante, a psychologist at the facility, advised plaintiff that each participant in the program would be questioned regarding his or her autobiography, which was to recount a history of sexual offenses including charged and uncharged crimes. Civil Action No. 9:08-CV-1290 (NAM/DEP) Complaint (Dkt. No. 1) § 4. According to McChesney, Terry Maxymillan, the SOTP Director, issued an order that plaintiff's autobiography be collected, placed in his file, and made available for inspection by the Attorney General. *Id.* On October 30, 2008, plaintiff was directed by defendant Colasante to turn in his autobiography. *Id.* Plaintiff was later removed from the treatment group based upon a refusal to permit his autobiography to be copied. *Id.*

II. *PROCEDURAL HISTORY*

*3 The first of these two actions, Civil Action No. 9:08-CV-1196 (NAM/DEP), was commenced by the plaintiff on November 6, 2008. The second, Civil Action No. 9:08-CV-1290 (NAM/DEP), was filed some three weeks later on November 28, 2008. The two actions were subsequently consolidated by the court, on its own initiative, based upon a report issued by me on December 23, 2008 recommending that measure and approval of that recommendation by Chief District Judge Norman A. Mordue on March 9, 2009.[FN4][FN5] Civil Action No. 9:08-CV-1186 (NAM/DEP) Dkt. Nos. 4, 13.

FN4. Plaintiff currently has two other actions pending in this court, including *McChesney v. Hogan, et al.,* No. 9:08-CV-0163 (FJS) (filed Feb. 11, 2008), in which plaintiff complains of the inadequacy of the law library at the CNYPC, and *McChesney v. Hogan, et al.,* No. 9:08-CV-0563 (NAM) (filed June 10, 2008), in which McChesney has lodged claims against the named defendants for failure to protect him from assaults the hands of fellow patients at the center. A fifth action commenced by the plaintiff, *McChesney v. Miller, et al.,* No. 9:08-CV-0195 (TJM) (filed Feb. 21, 2008), was closed in March of 2008 based upon plaintiff's voluntary withdrawal of the claims set forth in his complaint without prejudice. *See id.,* Dkt. Nos. 4-6.

FN5. The court's consolidation order designated Civil Action No. 9:08-CV-1186 (NAM/DEP) as the lead action. All references to docket entries in this report, unless indicated otherwise, will refer to the docket sheet in that case.

Plaintiff's complaint in Civil Action No. 9:08-CV-1186 (NAM/DEP) names OMH Commissioner Michael Hogan and CNYPC Executive Director Donald Sawyer as defendants and asserts claims under the First and Fifth Amendments to the United States Constitution. McChesney's complaint in 9:08-CV-1290 (NAM/DEP) names Commissioner Hogan and Executive Director Sawyer as well as three new defendants, including SOTP

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

Director Terri Maxymillian; Psychologist Valerie Colasante; and Registered Nurse Regina Anderson, identified as a Treatment Team Leader at the Center. The complaint in that action focuses on the compelled self-incrimination aspect of the SOTP program, particularly the requirement to complete an autobiography, seemingly asserting a claim under the Fifth Amendment to the United States Constitution. *Id.*

On April 21, 2009 defendants moved pursuant to Rules 10(b) and 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of plaintiff's complaints in these two consolidated actions. Dkt. No. 17. In their motion defendants allege that 1) plaintiff has failed to meet the pleading requirements of Rule 10(b) by not separately numbering the paragraphs and because of his failure to include some of the exhibits that are specifically incorporated by reference into one of the complaints; 2) the Eleventh Amendment bars plaintiff's damage claims against the defendants in their official capacities; 3) plaintiff's Fifth Amendment claim lacks merit; and 4) defendants are entitled to qualified immunity in connection with plaintiff's First Amendment claim.[FN6] Although plaintiff did not respond to defendants' motion within the allotted time, which expired on May 26, 2009, he has since submitted what is denominated as a declaration in further support of his action. Dkt. No. 22. Without providing great detail, plaintiff's submission states that a New York State Supreme Court Justice has made a finding that McChesney suffers from "a mental abnormality involving such a strong predisposition to commit sex offenses, and such an inability to control behavior, that he is likely to be a danger to others and to commit sex offenses if not confined to a secure treatment facility"; it appears that plaintiff is suggesting that this determination was based upon the sexual autobiography that he was compelled to prepare as part of his participation in the SOTP.

> FN6. Defendants' motion also requests a protective order precluding plaintiff from engaging in discovery pending determination of their motion. That relief is no longer necessary, however, since by order entered on April 23, 2009, I stayed discovery in the action pending resolution of defendants' motion to dismiss. *See*

Dkt. No. 19.

III. *DISCUSSION*

A. *Failure To Comply With Governing Pleading Requirements*

**\*4** As a threshold matter, in their motion defendants argue that plaintiff's complaints do not conform to applicable pleading requirements in that they do not consist of separately numbered paragraphs and that he has also failed to attach Exhibits A through C despite their incorporation by reference into Civil Action No. 9:08-CV-1186 (NAM/DEP). Defendants urge the court to exercise its discretion to dismiss the complaints due to these omissions.

Federal Rule of Civil Procedure 10 imposes a requirement whose intent is largely pragmatic, requiring, among other things, that a pleading consist of separately numbered paragraphs "each of which shall be limited as far as practicable to a statement of a single set of circumstances[.]" Fed.R.Civ.P. 10(b). Rule 10(b) is designed to assist litigants and the court by allowing the interposition of a responsive pleading and the corresponding framing of issues with sufficient clarity to allow an orderly and meaningful presentation of a plaintiff's claims and any corresponding defenses, either on motion or at trial. *See Flores v. Graphtex,* 189 F.R.D. 54, 55 (N.D.N.Y.1999) (Munson, S.J.).

Analysis of plaintiff's amended complaint, in the face of defendants' motion, is informed not only by the salutary purposes to be served by these pleading requirements but additionally by two equally important principles. First, it is a well settled that a complaint prepared by a *pro se* litigant should be liberally construed in his or her favor. *Salahuddin v. Cuomo,* 861 F.2d 30, 42-43 (2d Cir.1988). Second, courts generally favor adjudication of cases on their merits rather than on the basis of a technicality or procedural nicety. *Id.* at 42; *see also Zdziebloski v. Town of East Greenbush,* 101 F.Supp.2d 70, 72 (N.D.N.Y.2000) (Kahn, J.) (citing *Salahuddin* ); *Upper Hudson Planned Parenthood, Inc. v. Doe,* 836 F.Supp. 939, 943 n. 9 (N.D.N.Y.1993) (McCurn, S.J.).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

Unlike the situation presented in many instances involving *pro se* litigants, including the case cited by the defendants, *Jochnowitz v. Russell Sage College,* No. 90-CV-1101, 1992 WL 106813 (N.D.N.Y. May 13, 1992), plaintiff's complaints in these two actions are neither rambling nor prolix and instead concisely state the facts upon which relief is sought.[FN7] In this instance the factual allegations recited in both complaints are broken down into separate paragraphs. In the case of plaintiff's complaint in Civil Action No. 9:08-CV-1186 (NAM/DEP) plaintiff has attempted to separately letter some of the paragraphs; in Civil Action No. 9:08-CV-1290 (NAM/DEP), however, the factual recitation includes paragraphs that are wholly unnumbered.

> FN7. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

The salutatory objective to be served by Rule 10 is to permit the formulation of a proper pleading and response. That end can be served in this instance by assuming that the paragraphs outlined in section four of plaintiff's two complaints are separately numbered, beginning with paragraph number one, with defendants responding accordingly in their answers.

**\*5** Slightly more problematic is the fact that plaintiff's complaint in Civil Action No. 08-CV-1186 (NAM/DEP) fails to attached three exhibits referenced in the complaint. This is a curable defect and presumably the result of an oversight on the plaintiff's part. I therefore recommend against dismissal of plaintiff's complaint on this basis. Instead, I respectfully suggest that plaintiff be directed to submit to the court and defendants' counsel copies of the exhibits referenced in his complaint in Civil Action No. 9:08-CV-1186 (NAM/DEP) before defendants must file an answer so that they may know the full extent of the allegations to which they are responding.

B. *Dismissal Standard*

The second prong of defendants' motion is brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss a complaint brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, thedefendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ---U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ----, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570 127 S.Ct. at 1974).

C. *Eleventh Amendment*

Plaintiff's complaints in these consolidated actions seek both monetary and injunctive relief. They do not, however, clearly specify whether monetary damages are sought against the defendants in their official capacities, or instead just as individuals. To the extent that plaintiff's complaints may be construed as seeking damages against the defendants as state officials, they argue that such relief is precluded under the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

enjoy under the Eleventh Amendment extends both to state agencies and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN8] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN9] *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

> FN8. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367 (2006).

> FN9. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

*6 Since plaintiff's damage claim against the named defendants in their official capacities is in reality a claim against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, it is subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted and that plaintiff's damage claim against the defendants in their capacity as state officials be dismissed.[FN10]

> FN10. Dismissal of plaintiff's damage claim against the defendants in their official capacities does not preclude plaintiff from maintaining an action for injunctive relief against those individuals as state officials. *Frew ex. rel. Frew v. Hawkins,* 540 U.S. 431, 437, 124 S.Ct. 899, 903, 157 L.Ed.2d 855 (2007) ("[T]he Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law.") (citations omitted).

D. *Plaintiff's Fifth Amendment Self Incrimination Claim*

Defendants next seek dismissal of plaintiff's Fifth Amendment claim. In support of this portion of their motion defendants argue that using polygraph and PPG testing and an autobiography potentially containing incriminating information, including that related to past uncharged crimes, in a civil setting to treat the plaintiff as a sex offender does not run afoul of the Fifth Amendment's privilege against self-incrimination.

The Fifth Amendment, which applies to the states through the Fourteenth Amendment, *see Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), insures that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. That provision protects persons against being compelled in a criminal case to give self-incriminating testimony. *McKune v. Lile,* 536 U.S. 24, 35-36, 122, 122 S.Ct. 2017, 153 L.Ed.2d 47, S.Ct. 2017, 2026 (2002); *Higazy v. Templeton,* 505 F.3d 161, 171 (2d Cir.2007). As the Supreme Court has noted, "[t]he privilege reflects a complex of our fundamental values and aspirations, and marks an important advance of the development of our liberty." *Kastrigar v. United States,* 406 U.S. 441, 444, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). While speaking in terms of criminal cases, the Fifth Amendment offers a privilege that "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory...." *Id.* at 444-45, 92 S.Ct. at 1656 (footnote omitted).

The first question presented in connection with plaintiff's Fifth Amendment claim is whether by virtue of the SOTP's autobiography requirement he has been compelled by the government to give incriminating

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

information. "The test for whether a statement was improperly obtained by coercion is 'determined by the totality of the circumstances' ". *Higazy,* 505 F.3d at 170 (citing and quoting *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998)).

The element of compulsion, in the context of the Fifth Amendment, was addressed by the Supreme Court in *McKune,* 536 U.S. at 48-49, 122 S.Ct. at 2032-33 (O'Connor, J., concurring). *McKune* involved a Kansas prison inmate who, as a participant in a sex abuse treatment program, was required not only to discuss and accept responsibility for the crime of conviction but also to complete a sexual history form detailing all prior sexual activities. *McKune,* 536 U.S. at 29-32, 122 S.Ct. at 2022-24. The consequences for refusing to participate in the treatment program included curtailment of various privileges and a transfer into a more secure facility with more limited opportunities for movement. *Id.* at 30-31, 122 S.Ct. at 2022-23. A plurality of the Court concluded that the plaintiff in that case had failed to demonstrate a sufficient degree of constitutionally significant compulsion, although no one opinion garnered a majority. Focusing on the compulsion element of the self-incrimination clause Justice Kennedy, who delivered an opinion in which three others joined, concluded that the limitations faced for failing to cooperate were similar to that which other prison inmates could also be exposed and did not rise to a level sufficient to constitute undue compulsion and thus run afoul of the Fifth Amendment.[FN11] *McKune,* 536 U.S. at 41-47, 122 S.Ct. 2017, 153 L.Ed.2d 47.

FN11. In its decision *McKune,* the Supreme Court took notice of the serious threat presented by sex offenders released into the community and the high rate of their recidivism, noting that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault[,]" adding that "[s]tates thus have a vital interest in rehabilitating convicted sex offenders." *McKune,* 536 U.S. at 33, 122 S.Ct. at 2024 (citations omitted). The Court also observed in *McKune* that "[a]cceptance of responsibility is the beginning of rehabilitation,"

noting that the acceptance of responsibility for past offenses "gives inmates a basis to understand why they are being punished and to identify the traits that cause such a frightening and high risk of recidivism." *Id.,* 536 U.S. at 33-34, 47, 122 S.Ct. 2025, 2032.

**\*7** In *Edwards v. Ladlair* this court went one step further, concluding the requirement that the petitioner in that habeas case disclose prior uncharged sex offenses during the course of a prison sex offender treatment program did not violate his Fifth Amendment right against self-incrimination since the sanction for refusing to participate in the program was the denial of good time credit allowances, a discretionary privilege, and under *McKune* the denial of prison privileges does not suffice to establish the requisite degree of compulsion for purposes of the Fifth Amendment. No. 9:07-CV-0059-JKS, 2008 WL 3156214 at *6 (N.D.N.Y. Aug.4, 2008), aff'd, 2010 WL 292749 (2d Cir. Jan.26, 2010). As acknowledged by Judge Singleton in *Edwards,* the *McKune* Court noted that the decision not to participate in the Kansas sex offender treatment did not affect the respondent's eligibility for good time credits or parole. *Edwards,* 2008 WL 3156214, at *5 (citing *McKune,* 536 U.S. at 38, 122. S.Ct.2017). *Edwards* therefore extended the reasoning in *McKune,* applying it as well to circumstances in which the sanction for failure to comply included loss of good time credits.

When addressing the compulsion element of a Fifth Amendment claim such as that now presented,

[t]he test, as articulated in *McKune,* depends upon the severity of the consequences of the choice made by the prisoner not to participate and discuss his crimes. 536 U.S. at 44-45 (plurality), 48-50 (O'Connor, J. concurring). Unfortunately, the Supreme Court has not provided a bright-line of demarcation above which the severity of the consequences constitutes compulsion.

*Edwards,* 2008 WL 3156214, at *5. It is by now fairly well settled that risking the loss of good time credits or jeopardizing the chance for parole, alone, does not qualify as sufficiently compulsive to meet the test. *See Wolfe v. Pennsylvania Dep't of Corrections,* 334 F.Supp.2d 762, 771 (E.D.Pa.2004); *see also Ainsworth v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

*Stankley,* 317 F.3d 1, 5 (1st Cir.2002), *cert. denied,* 538 U.S. 999, 123 S.Ct. 1908, 155 L.Ed.2d 825 (2003); *Searcy v. Simmons,* 299 F.3d 1220, 1226 (10th Cir.2002). Beyond these forms of recrimination, however, the issue becomes less clear.

In this instance, the plaintiff is a civil detainee whose liberty is being withheld beyond the expiration of his prison sentence. McChesney is therefore in a very different circumstance than the inmates involved in *Edwards* and *McKune.* Although this is somewhat unclear from the scant record now before the court, it appears that in all likelihood *McChesney* has served all of the time imposed based upon his criminal sex conviction and is now involuntarily committed for rehabilitation pursuant to the relatively recently enacted provisions of New York Mental Hygiene Law Article 10. The record now before the court does not disclose what sanctions could result from plaintiff's failure to provide the requested information in connection with his SOTP. Plausibly, however, one could imagine that it could well result in an extension of his confinement at the CNYPC. This, then, is a very different situation than presented in *McKune,* 536 U.S. at 38, 122 S.Ct. at 2027 ("in the present case, respondent's decision to not participate in Kansas SOTP did not extend his term of incarceration"), and the potential sanction for plaintiff's refusal to incriminate himself suffices, at least at this early procedural juncture, to establish the requisite degree of compulsion necessary to support a Fifth Amendment claim. *Decker v. Hogan,* No. 9:09-CV-0239 (TJM/GJD), 2009 WL 3165830, at *6 (N.D.N.Y. Sept.28, 2009) (McAvoy, S.J.).

*8 The more difficult question presented is whether, in being compelled by officials at the CNYPC to submit to polygraph and PPG testing and complete an autobiography, plaintiff has been unlawfully forced to incriminate himself in violation of his right under the Fifth Amendment. As unsettled as the controlling legal principles were after the Court's decision in *McKune,* the landscape was further muddied by the Supreme Court's later decision in *Chavez v. Martinez,* 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003), another case heavily relied upon by the defendants in their motion. That action involved a claim brought by an individual pursuant to 42 U.S.C. § 1983, arguing that his Fifth Amendment right

against self-incrimination was violated when he was interrogated by the petitioner, a police patrol supervisor, even though the statements obtained through the course of that interrogation were never used against him in any criminal prosecution. Under the circumstances presented the Court found no constitutional violation, since the respondent was never forced to be a witness against himself in a criminal proceeding. *Chavez,* 538 U.S. at 767, 123 S.Ct. at 2001.

Admittedly, it is somewhat difficult to reconcile *Chavez* with some of the Court's prior decisions regarding the Fifth Amendment. In *Kastigar,* for example, the Court noted that the privilege

can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory, and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.

406 U.S. at 444-45, 92 S.Ct. at 1656 (footnote omitted). *Chavez,* however, appears to stand for the proposition that while this may be true, and *Kastigar* and other cases permit invocation of the Fifth Amendment privilege in non-criminal settings, a violation of the right of against self-incrimination is inchoate until a person has been actually compelled to be a witness against himself or herself in a criminal proceeding, meaning that his or her testimony or statements have been used in a criminal arena. *Chavez,* 538 U.S. at 770, 123 S.Ct. at 2002-03. Accordingly, since McChesney has not alleged that he completed an autobiography disclosing uncharged sex crimes, permitted it to be copied, and the autobiography was used against him in a criminal in prosecution, or that he consented to and underwent polygraph or PPG testing the results of which were offered against him in a criminal setting, his complaint fails to allege a Fifth Amendment violation [FN12][FN13] *Fifield v. Eaton,* No. 07-CV-6521L, 2009 WL 3429791, at *3 (W.D.N.Y. Oct.20, 2009) (claim by a convicted sex offender that defendants required him to complete forms admitting guilt of a sex offense, leading to expulsion from sex offender treatment upon his denial, held not to give rise to a Fifth Amendment violation since plaintiff failed to allege that the defendant used, sought to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

use, or could have used any incriminating statement against him at a criminal proceeding"); *see also Krug v. County of Rennselaer,* 559 F.Supp.2d 223, 246 (N.D.N.Y.2008) (statements made to law enforcement officers but never used in a criminal proceeding do not give rise to a Fifth Amendment claim) (citing, *inter alia, Chavez,* 538 U.S. at 766, 123 S.Ct. at 2000).

FN12. Any contention on plaintiff's part that his autobiography may be used in the future in a criminal proceeding against him is not presently ripe for adjudication. *Longway v. Jefferson County Bd. of Supervisors,* 24 F.3d 397, 400 (2d Cir.1994) ("An issue is ripe for judicial resolution only if it presents a real and substantial controversy, not a mere hypothetical question.") (internal quotations and citation omitted). This decision therefore does not foreclose plaintiff from challenging the use of his autobiography in a subsequent criminal proceeding, nor does it preclude him from bringing a separate action under for damages 42 U.S.C. § 1983 for violating his Fifth Amendment rights in the event that government officials attempt to use his compulsory autobiography against him in a subsequent criminal proceeding.

FN13. Even if plaintiff could establish a Fifth Amendment violation with regard to the autobiography requirement, fearing that its contents could give rise to and be used in a subsequent criminal proceeding, he could not make a plausible self-incrimination claim with regard to the polygraph and PPG testing. Addressing the use of a polygraph examination under analogous circumstances with regard to a convicted sex offender as a condition of his supervised released, the Second Circuit has concluded that the requirement that a party submit to a polygraph exam does not violate the privilege against self-incrimination since such evidence is generally inadmissible, and the individual would be free to challenge the evidence should it be used against him in a future proceeding. *United States v. Johnson,* 446 F.3d 272, 278-80 (2d Cir.2006); *see also United*

*States v. Zinn,* 321 F.3d 1084, 1090-92 (11th Cir.2003) (holding that requiring polygraph testing as a condition of supervised release generally does not violate the Fifth Amendment), *U.S. v. Santiago,* No. 03 Cr. 66 4, 2008 WL 1959548 at *1 (S.D.N.Y. May 5, 2008) (citing *Johnson,* 446 F.3d at 278-80); and, *Decker,* 2009 WL 3165830 at *6. Similarly, the use of a penile plethysmograph does not implicate plaintiff's Fifth Amendment right against self-incrimination since the test result is not testimonial but a physical test of plaintiff's sexual reactions to various stimuli. *See Walrath v. United States,* 830 F.Supp. 444, 446 (N.D.N.Y.Ill.1993). Moreover, there is little likelihood that testimony involving PPG testing would pass muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1990) and its progeny as being sufficiently reliable to be admitted in evidence at a criminal trial. *Decker,* 2009 WL 3165830, at *7.

**\*9** I therefore recommend dismissal of plaintiff's Fifth Amendment claim in its entirety.

E. *First Amendment*

Another material aspect of plaintiff's claims in these consolidated actions centers upon the program materials utilized for the SOTP which, he contends, are premised upon religious principles contrary to his beliefs as an atheist. Plaintiff argues that by exposing him to those materials and requiring his participation in the SOTP the defendants have violated his First Amendment rights. Defendants seek dismissal of this claim on the basis of qualified immunity, citing the state of flux of the governing legal principles applicable to plaintiff's free exercise claim.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

is the objective inquiry whether a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ----, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. at ----, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN14] *Kelsey,* 567 F.3d at 61, with "the second step being whether the right is clearly established", *Okin v. Village of Cornwall-On-Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[FN15] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently retreated from the prior *Saucier* two-step mandate, concluding in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision-makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[FN16] *Pearson,* 555 U.S. at ----, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 555 U.S. at ----, 129 S.Ct. at 821) (emphasis in original).

FN14. In making the threshold inquiry, "[i]f no

constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272.

FN15. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433, n. 11 (citation omitted).

FN16. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* --- U.S. at ----, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524, 116 L.Ed.2d 589, ---- (1991) (per curiam)).

**\*10** For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

Turning first to whether plaintiff has established a plausible First Amendment violation, I note at the outset that the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..." U.S. Const. amend

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

1. That amendment, which applies to the states through the Fourteenth Amendment, *Decker,* 2009 WL 3165830, at *2, prohibits a governmental entity from favoring one religious denomination over another and additionally protects against "government compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a leave forbidden or required by one's religion. *Id.* (citing and quoting *Mozert v. Hawkins County Bd. of Educ.,* 827 F.2d 1058, 1066 (2d Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988)). As an atheist, plaintiff is subject to the protections of the First Amendment. *Decker,* 2009 WL 3165830, at *3 (citing, *inter alia, Wallace v. Jaffree,* 472 U.S. 38, 52-53, 105 S.Ct. 2479, 2487-88, 86 L.Ed.2d 29 (1985)). Because plaintiff contends that the SOTP subjects him to religious tenets that violate his generally held religious beliefs, he has successfully stated a plausible First Amendment claim sufficient to withstand dismissal at this early stage. *Decker,* 2009 WL 3165830, at *3.

Turning to the second prong of the qualified immunity inquiry, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [government employee in the defendant's position] that his [or her] conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government employees of reasonable competence could disagree as to whether his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433

(quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). "If, on the other hand, no [government worker] of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v. Miller,* 66 F.3d 416, 420-21 (2d Cir.1995)).

**\*11** As defendants have argued, the law is anything but clear on the question of whether compelled use by officials at the CNYPC of treatment materials peripherally based upon religious principles violates the rights of patients involuntarily committed and subjected to the program. *Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (Hurd, J). That inquiry turns, in part, upon whether secular alternatives are offered for those who voice a *bona fide* religious objection, *see, e.g. Miner v. Goord,* No. 09-0674-cv, 2009 WL 4072085, at *2 (2d Cir. Nov.25, 2009) (citing, *inter alia, DeStefano v. Emergency Hous. Group, Inc.,* 247 F.3d 397, 408 (2d Cir.2001) (cited in accordance with *Fed. R.App. Proc.* 32.1). In this case, there is no question that persons of reasonable competence in defendants' circumstances could disagree on whether the compelled use of religious based SOTP program materials would violate the First Amendment.

Based upon the lack of clearly established guidance on the specific legal issue presented, I recommend a finding that defendants are entitled to qualified immunity with respect to plaintiff's First Amendment religious claim. *Pratt,* 631 F.Supp.2d at 198; *see also Bush v. Goord,* No. 03-CV-759S, 2009 WL 790358, at *8-9 (W.D.N.Y. Mar.25, 2009).

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaints in these two consolidated actions, though sparse in their allegations, are sufficient to place defendants on notice of his claims and permit them to both frame an answer and engage in discovery to flesh out any remaining causes of action, provided that the missing exhibits in Civil Action No. 9:08-CV-1186 (NAM/DEP) are filed with the court.

Turning to the merits of plaintiff's claims, I conclude that plaintiff has not pleaded a plausible claim that his required participation in the SOTP while involuntarily

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1027443 (N.D.N.Y.)

(Cite as: 2010 WL 1027443 (N.D.N.Y.))

committed at the CNYPC potentially violates his Fifth Amendment right against self-incrimination. I further find that defendants are entitled to qualified immunity from suit with respect to plaintiff's claim for damages in connection with plaintiff's First Amendment's religious exercise claim, in light of the fact that the legal principles regarding how the First Amendment's right of a free exercise affects the required use of SOTP teaching materials of a religious tenor are distinctly unsettled, but that plaintiff should be permitted to pursue his First Amendment claim against them as officials for purposes of injunctive relief. I further find that all claims against the defendants for damages in their official capacities are subject to dismissal on the basis of their Eleventh Amendment. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 17) be GRANTED, in principal part, and that all of plaintiff's claims, with the exception of his First Amendment cause of action against the defendants in their official capacities seeking injunctive relief, be DISMISSED.

**\*12** NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

McChesney v. Hogan
Slip Copy, 2010 WL 1027443 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1037957 (N.D.N.Y.)

(Cite as: 2010 WL 1037957 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
David McCHESNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, New York State
Office of Mental Health, and Donald Sawyer, Executive
Director, Central New York Psychiatric Center,
Defendants.
David McChesney, Plaintiff,
v.
Michael F. Hogan, Commissioner, New York State
Office of Mental Health, Terri Maxymillian,
Director-Sex Offender Treatment Program, Central New
York Psychiatric Center; Valerie Colasante,
Psychologist Central New York Psychiatric Center,
Regina Anderson, R.N., Treatment Team Leader, and
Donald Sawyer, Executive Director, Central New York
Psychiatric Center, Defendants.
Nos. 9:08-CV-1186 (NAM/DEP), 9:08-CV-1290
(NAM/DEP).

March 18, 2010.
David McChesney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Adele Taylor Scott, Assistant Attorney
General, Albany, NY, for Defendants.

### MEMORANDUM-DECISION AND ORDER

Hon. NORMAN A. MORDUE, Chief Judge.

**\*1** In these consolidated *pro se* actions, plaintiff, an
inmate in the custody of the New York State Department
of Correctional Services ("DOCS"), seeks monetary and
injunctive relief under 42 U .S.C. § 1983 stemming from
his civil commitment to the Central New York Psychiatric

Center for participation in the Sex Offender Treatment
Program ("SOTP"). Upon referral of defendants' motion
to dismiss (Dkt. No. 17), United States Magistrate Judge
David E. Peebles issued a Report and Recommendation
(Dkt. No. 23) recommending dismissal of all of plaintiff's
claims with the exception of his First Amendment claim
for injunctive relief against defendants in their official
capacities. Defendants do not object. Plaintiff has
submitted an objection (Dkt. No. 24).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court
reviews *de novo* those parts of a report and
recommendation to which a party specifically objects.
Plaintiff objects to most aspects of the Report and
Recommendation, and, accordingly, the Court conducts a
*de novo* review. Upon review, the Court accepts and
adopts the Report and Recommendation in all respects.

In particular, as to plaintiff's Fifth Amendment claim,
the Court notes that "mere coercion does not violate the
text of the Self-Incrimination Clause absent use of the
compelled statements in a criminal case against the
witness [.]" *Chavez v. Martinez,* 538 U.S. 760, 769-70,
123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (Thomas, J.,
plurality op.); *accord Higazy v. Templeton,* 505 F.3d 161,
171 (2d Cir.2007). Thus, in the instant case, even if the
potential consequences of failure to comply with SOTP
requirements can be said to constitute coercion, plaintiff
states no Fifth Amendment claim because he does not
allege "use or derivative use of a compelled statement at
any criminal proceeding against [him]." *Higazy,* 505 F.3d
at 717 (quoting *Weaver v. Brenner,* 40 F.3d 527, 535 (2d
Cir.1994)). The Court agrees with Magistrate Judge
Peebles that the individual defendants are entitled to
qualified immunity on the First Amendment damages
claim. The Court has reviewed the materials attached to
plaintiff's objection and finds they do not warrant a
different result. Finally, the Court agrees that plaintiff
states a claim for prospective injunctive relief on his First
Amendment claim against defendants in their official
capacities.

It is therefore

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1037957 (N.D.N.Y.)

(Cite as: 2010 WL 1037957 (N.D.N.Y.))


ORDERED that the Report and Recommendation of United States Magistrate Judge David E. Peebles (Dkt. No. 23) is accepted and adopted; and it is further

ORDERED that defendants' motion to dismiss (Dkt. No. 17) is granted in part and denied in part; and it is further

ORDERED that all claims are dismissed except the First Amendment claim for injunctive relief against defendants in their official capacities.

IT IS SO ORDERED.

N.D.N.Y.,2010.

McChesney v. Hogan
Slip Copy, 2010 WL 1037957 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Donald CARNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, NYS Office of
Mental Health; Donald Sawyer, Executive Director,
CNYPC, Defendants.
Donald Carney, Plaintiff,
v.
Michael F. Hogan, Commissioner, NYS Office of
Mental Health; Donald Sawyer, Executive Director,
CNYPC; Terri Maxymillian, Director, Sex Offender
Treatment Program; Valerie Colasante, Psychologist
Assistant, Defendants.
Nos. 9:08-CV-1251 (DNH/ATB), 9:08-CV-1280
(DNH/ATB).

March 30, 2010.
West KeySummary**Constitutional Law 92** 🔑 **1399**

92 Constitutional Law

92XIII Freedom of Religion and Conscience
92XIII(B) Particular Issues and Applications
92k1394 Health Care
92k1399 k. Mental Health. Most Cited
Cases
**Mental Health 257A** 🔑 **465(3)**

257A Mental Health

257AIV Disabilities and Privileges of Mentally
Disordered Persons
257AIV(E) Crimes
257Ak452 Sex Offenders
257Ak465 Disposition; Commitment
257Ak465(3) k. Treatment. Most Cited
Cases
A *pro se* civilly confined sex offender's allegations

that a treatment program required his participation in
faith-based program were adequate to state a First
Amendment claim. The sex offender claimed that
components of the program subjected him to religious
tenets that were contrary to his general religious beliefs,
and that participation in the faith-based programs were
required as a condition of his release from civil
confinement. Although sex offender did not state a
specific religion in which he believed, he identified
himself as a Native American, and it was assumed that his
status as a Native American encompassed particular
religious beliefs. U.S. Const.Amend. 1; 42 U.S.C.A. §
1983.
Donald Carney, pro se.

Aaron M. Baldwin, Asst. Attorney General, for
Defendants.

**REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.
**\*1** This matter was referred to Magistrate Judge
Gustave J. Di Bianco for Report and Recommendation
pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y.
72.3(c). Upon Magistrate Judge Di Bianco's retirement on
January 4, 2010, the case was referred to me by the
Honorable Norman A. Mordue, Chief United States
District Judge. (Dkt. No. 20).
Plaintiff filed two complaints in separate cases
pursuant to 42 U.S.C. § 1983, challenging the
constitutionality of the Sex Offender Treatment Program
("SOTP") administered at the Central New York
Psychiatric Center ("CNYPC") by the New York State
Office of Mental Health ("OMH"). Magistrate Judge Di
Bianco issued an order on December 10, 2008,
consolidating the cases. (Dkt. No. 5). Plaintiff alleges that
the SOTP violates the United States Constitution in four
ways: (1) the SOTP violates plaintiff's First Amendment
right to abstain from religious practices; (2) the SOTP
violates plaintiff's Fifth Amendment right against
self-incrimination through use of a penile plethysmograph
[FN1] ("PPG") examination; (3) the SOTP violates plaintiff's
Fifth Amendment right against self-incrimination by

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

requiring a polygraph examination; and (4) the SOTP violates plaintiff's Fifth Amendment right against self-incrimination by requiring him to complete an "autobiography" and a "sexual offense history" that includes uncharged crimes or dismissed charges.[FN2] Plaintiff seeks injunctive relief and monetary damages.

> FN1. A plethysmograph is an "instrument for measuring variations in the size of an organ or body part on the basis of the amount of blood passing through or present in the part." WEBSTER'S II NEW COLLEGE DICTIONARY 847 (Margery S. Berube et al. eds., 1995.).

> FN2. Plaintiff's complaint filed in the lead case (08-CV-1251) ("Lead Complaint") relates to claims (1) through (3) and plaintiff's complaint filed in the member case (08-CV-1280) ("Member Complaint") relates to claim (4).

Defendants move to dismiss plaintiff's claims for failure to state a claim upon which relief can be granted pursuant to FED.R.CIV.P. 12(b)(6). (Dkt. No. 15). Plaintiff responded in opposition to defendants' motion, and defendants filed a reply. (Dkt.Nos.16, 18). For the following reasons, this court will recommend that defendants' motion be granted in part and denied in part.

### DISCUSSION

**I.** *Facts*

Plaintiff was placed under civil confinement at CNYPC on July 11, 2008. (Lead Compl. at 2).[FN3] As part of his treatment regimen, plaintiff has been enrolled in the SOTP, which he alleges incorporates components that violate his constitutional rights. In particular, plaintiff has been directed to complete an "autobiography" and a "sexual offense history." (Member Compl. at 4, 9). Plaintiff alleges that his autobiography and sexual offense history are to include "uncharged crimes and/or charges that were dismissed." (Member Compl. at 4). Plaintiff further alleges that defendant Colasante issued an order to photocopy plaintiff's autobiography bi-weekly for placement in his file "for the New York State Attorney General's review to be used as evidence" to further civilly confine plaintiff. (Member Compl. at 4). Because plaintiff

refused to have his autobiography photocopied, he was apparently removed from the "autobiography group" and told that he could not progress toward his release until he allowed the photocopying. (Member Compl. at 4).

> FN3. Citations to the Lead Complaint (08-CV-1251) will be cited as "Lead Compl." and a page number. Plaintiff did not number his paragraphs or pages, so the court will number the pages beginning with the first page of the Lead Complaint as page 1. Citations to the Member Complaint (08-CV-1280) will be cited as "Member Compl." and paginated in a like manner.

Plaintiff, a Native American, also complains about specific components of "all program phases," which he alleges subject him to religious practices and rituals based on "Zen Buddhism and Christianity." (Lead Compl. at 2-3). Plaintiff claims that the "Good Lives Model and Boundaries Programs" are unconstitutional because they "teach that you have to believe in something devoted [sic] as spirituality ... [and] ... teach the rituals and practices of Buddhism." (Lead Compl. at 3). In addition, plaintiff alleges that "From the Inside [O]ut[:] Growing up Male, problem [s]olving anger management programs are all Hazeldon products which incorporate Christian beliefs and practices," and violate his constitutional rights. (Lead Compl. at 3).

**\*2** Finally, plaintiff alleges that he is being coerced to submit to a PPG and polygraph examination, and a new "contract" has changed the two exams from "therapy tools" to "investigate [sic] tools" to obtain information to keep plaintiff civilly confined. (Lead Compl. at 4). Plaintiff again alleges coercion because his advancement in the program is dependent on his compliance with the two examinations. (Lead Compl. at 4).

### II. *Motion to Dismiss*

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

(2007)). *See also Camarillo v. Carrols Corp.,* 518 F.3d 153, 156 (2d Cir.2008) (the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' ") (citation omitted). Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted). When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations omitted). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia-Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989)). Here, plaintiff attached what appear to be three separate documents to the Member Complaint. The first document, entitled "Sex Offender Treatment Program Model," is a bulleted list of criteria for Phases I-III. (Member Compl. at 8). The second document is entitled "Phase Goals" and describes specific assignments for Phases I and II. (Member Compl. at 9). The Phase Goals document appears to be the first page of a multi-page document, because it does not describe assignments for Phase III. The third document is a collection of materials all related to the autobiography component of the SOTP. (Member Compl. at 10-29).

Plaintiff attached nothing to the Lead Complaint, but names specific components of the SOTP, including Dialectical Behavior Therapy ("DBT") and the "Advancement to SOTP Phase II-IV Consent to Participate in Treatment." Defendants have attached these documents to their motion.[FN4] (Defs.' Mot. to Dismiss, App. B, Exs. B, D and E; *see also* Defs.' Mot. to Dismiss at 3). Because these documents are integral to the complaint and were relied upon by plaintiff in drafting his complaint, the court will consider them in its analysis of

defendants' motion.[FN5]

FN4. The defendants also state that these documents were filed in support of a motion to dismiss an identical section 1983 case, decided in the Northern District of New York. *See Pratt v. Hogan,* 6:08-CV-1003 (DNH/DEP).

FN5. In the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted).

### III. *First Amendment Claim*

**\*3** The Establishment and Free Exercise Clauses of the First Amendment, made applicable to state action by the Fourteenth Amendment, provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. CONST. amend. I. In order to establish a violation of the Free Exercise Clause, a plaintiff must show "direct government compulsion." *Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). In addition, a court should sustain a Free Exercise claim "only if the 'government has placed a substantial burden on the observation of a central religious belief' " that is not otherwise justified by a compelling state interest. *Skoros v. City of New York,* 437 F.3d 1, 39 (2d Cir.2006) (quoting *Jimmy Swaggart Ministries v. Bd. of Equalization,* 493 U.S. 378, 384-85, 110 S.Ct. 688, 107 L.Ed.2d 796 (1990)). The Establishment Clause, by comparison, "prohibits government from officially preferring one religious denomination over another." *Id.* at 38-39.

In this case, plaintiff alleges that the SOTP requires his participation in faith-based programs as a condition of his release from civil confinement. (Lead Compl. at 3). Further, plaintiff claims that this participation violates his "right to believe or not as [his] conscience dictates." *Id.* Defendants argue that plaintiff has failed to state a cognizable claim under the First Amendment because he has failed to set forth any facts concerning the beliefs or practices of his religion and explained why the defendants' program would violate those beliefs. (Defs.' Mem. of Law at 18-19).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

In *Decker v. Hogan,* Senior District Judge McAvoy rejected a similar argument made by defendants in a case in which the plaintiff was challenging the SOTP because he was an atheist. *See Decker v. Hogan,* No. 9:09-CV-0239, 2009 U.S. Dist. LEXIS 89048, at *8-9; 2009 WL 3165830 (N.D.N.Y. Sept.28, 2009) (McAvoy, S.J.). Defendants argued, *inter alia,* that there was no proof of governmental compulsion impacting upon the plaintiff's atheistic beliefs. *Id.* Senior Judge McAvoy found that the court could not make such a determination on a motion to dismiss because plaintiff's factual allegations must be accepted as true, and plaintiff was alleging that the defendants' program was subjecting him to religious practices based upon Zen Buddhism and Christianity, and that this was forcing plaintiff to engage in practices that were contrary to his atheistic beliefs. *Id.* at *9-10.

In this case, plaintiff has identified himself as a "Native American." Although he has not stated a specific "religion," in affording the *pro se* plaintiff the utmost liberality, the court will assume that his status as a Native American encompasses particular religious beliefs. This plaintiff, like the plaintiff in *Decker,* claims that components of the SOTP subject him to religious tenets that are contrary to his general religious beliefs. Based on *Decker,* Plaintiff Carney has successfully stated a plausible First Amendment Claim, sufficient to withstand defendants' motion to dismiss. As Senior Judge McAvoy stated in *Decker,* it may later become clear on a motion for summary judgment, or at some later stage of the proceedings, that plaintiff's claims are not adequately supported. However, at this stage, the court must accept plaintiff's allegations as true. Accordingly, this court recommends that defendants' motion to dismiss plaintiff's First Amendment claim be denied. [FN6]

> FN6. As noted below, this court will recommend that the plaintiff's First Amendment claim for damages be dismissed based on qualified immunity, leaving only the First Amendment cause of action for injunctive relief.

**IV.** *Fifth Amendment Claim*

**\*4** The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U .S. CONST. amend. V. However, a violation of this right "occurs only if one has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez,* 538 U.S. 760, 770, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003); *see also Higazy v. Templeton,* 505 F.3d 161, 171 (2d Cir.2006). Plaintiff is civilly confined, and has made no allegation that the information in his autobiography, sexual history, or information that would be gained from the polygraph and/or PPG examination is currently being used in a criminal case. [FN7] Any claim that this information might be used against him in the future in a criminal proceeding is not now ripe for adjudication. *Longway v. Jefferson County Bd. of Supervisors,* 24 F.3d 397, 500 (2d Cir.1994).

> FN7. If any of this information were used in a future criminal proceeding against him, plaintiff could still challenge the use of the information.

The Second Circuit has held that answering questions during a polygraph examination about past offenses and "with respect to any criminal prosecution unrelated to the conviction" does not waive a defendant's right against self-incrimination under the Fifth Amendment; the defendant can still challenge the polygraph examination results in court on Fifth Amendment grounds if it were to be used in a criminal proceeding. *United States v. Johnson,* 446 F.3d 272, 275, 280 (2d Cir.2006). The court also explained that polygraph examinations are reasonably related to promoting the sentencing goals of balancing supervised release conditions against restraint of individual liberty, and served to further sex offender treatment. *Id.* at 277.

Furthermore, the use of a PPG examination does not implicate plaintiff's right against self-incrimination under the Fifth Amendment because the results of the test are not "testimonial." Rather, the test provides an "assessment of an individual's physical reactions to various stimuli." *Decker v. Hogan,* No. 09-CV-0239, 2009 U.S. Dist. LEXIS 89048, at *21 (citations omitted), 2009 WL 3165830 (N.D.N.Y. Sept.28, 2009). This court also notes that courts often find that PPG examination results

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

inadmissible as evidence. *Id.* (citations omitted).

Use of the polygraph, PPG, autobiography, and/or sexual history as part of the SOTP do not implicate plaintiff's right against self-incrimination and do not violate the Fifth Amendment because they are not being used against him in a criminal case. *See McChesney v. Hogan,* 9:08-CV-1186/6:08-CV-1290, 2010 U.S. Dist. LEXIS 25705, at *27-31, 2010 WL 1027443 (N.D.N.Y. March 18, 2010) (Report Recommendation of Peebles, USMJ), *accepted and adopted by* 2010 U.S. Dist. LEXIS 257171, 2010 WL 1037957 (N.D.N.Y. Mar.18, 2010) (Mordue, CJ).[FN8] Therefore, plaintiff has failed to state a claim upon which relief can be granted, and this court recommends that defendants' motion to dismiss be granted as to his Fifth Amendment claims.

> FN8. *McChesney* granted a motion to dismiss a Fifth Amendment claim relating to the SOTP program that was substantially similar to the one asserted in this case.

## V. *Qualified Immunity*

*5 Defendants argue that they are entitled to qualified immunity from plaintiffs' claim for money damages. Because the court is recommending denial of the defendants' motion to dismiss plaintiff's First Amendment claim, the court will proceed to discuss defendants' argument.[FN9]

> FN9. Because the court has determined that there is no Fifth Amendment violation, the court need not discuss qualified immunity with respect to plaintiff's Fifth Amendment claims.

Qualified immunity protects government officials performing discretionary functions in the course of their employment where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A government actor is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged*

*Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001) (internal quotation marks omitted).

In *Decker,* Senior Judge McAvoy denied defendants the protection of qualified immunity in the context of a motion to dismiss a First Amendment cause of action very similar to the claim alleged in the instant action. He observed that the "objective reasonableness" of defendants' actions sometimes depends on factual issues about what they knew about plaintiff's complaints, making a determination of qualified immunity on the pleadings alone premature. *Decker,* 2009 U.S. Dist. LEXIS 89048 at *22-23. Judge McAvoy denied the motion to dismiss without prejudice, noting that a factual basis for affording defendants qualified immunity could arise during discovery. *Id.* at *22-24.

In determining whether defendants involved in the SOTP program are entitled to qualified immunity, this court would focus, not on the "objective reasonableness" prong of the analysis as Judge McAvoy appeared to do in *Decker,* but on whether "... plaintiff's constitutional rights were not clearly established at the time he alleges his rights were violated." *Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (Hurd, J.) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396). When deciding if a constitutional right was "clearly established at the relevant time," a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful.

*African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002); *see also Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). This court concludes, as have several other judges in this district, that the law remains unclear as to whether the use of treatment materials and modalities peripherally related to religious principles violates the constitutional rights of those individuals treated in the SOTP. *Pratt v. Hogan,* 631 F.Supp.2d at 198; *McChesney v. Hogan,* U.S. Dist. LEXIS

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2519121 (N.D.N.Y.)

(Cite as: 2010 WL 2519121 (N.D.N.Y.))

25705, at *37-38.

**\*6** A review of the case law on this issue shows that with respect to treatment programs requiring an inmate to participate in Alcoholics Anonymous methodology, the law was well-settled as early as 1996, that compelled participation could rise to the level of a First Amendment. *See generally* Cox v. Miller, 296 F.3d 89, 108 (2d Cir.2002) (citing *inter alia* Griffin v. Coughlin, 88 N.Y.2d 674, 692, 649 N.Y.S.2d 903, 673 N.E.2d 98 (holding that "a mandatory, exclusive ASAT addiction treatment program ... incorporating the A.A. Twelve Steps methodology, credo, and meeting practices, violates the Establishment Clause") (1996)). The difference between the A.A. programs in the above-cited cases and the program at issue in this case is that the A.A. programs "placed heavy emphasis on spirituality and prayer," requiring participants to pray to God to overcome their alcohol problems. *Pratt, 631 F.Supp.2d at 198* (citing Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1075 (2d Cir.1997)).

As Judge Hurd observed in *Pratt,* a case containing claims identical to the case herein, it "remains unclear whether the 'Good Lives Model and Boundaries Program' and DBT have non-secular purposes and if the primary purpose of the programs are to promote or prohibit religions." As Magistrate Judge Peebles concluded in a Report Recommendation adopted by Chief District Judge Mordue, "... the law is anything but clear on the question of whether compelled use by officials at the CNYPC of treatment materials peripherally based upon religious principles violates the rights of patients involuntarily committed and subjected to the program." *McChesney v. Hogan,* U.S. Dist. LEXIS 25705, at *37-38 (citing *Pratt, 631 F.Supp.2d at 198).* This court agrees that, because the law on this issue is unsettled, it will recommend that defendants be afforded qualified immunity from damages for any First Amendment violation. Plaintiff's claim for injunctive relief against the defendants in their official capacity, however, may proceed.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6) (Dkt. No. 15)

be **GRANTED IN PART AND DENIED IN PART,** and it is further

**RECOMMENDED,** and that all plaintiff's claims, with the exception of his First Amendment cause of action seeking injunctive relief against the defendants in their official capacity, be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2010.

Carney v. Hogan
Slip Copy, 2010 WL 2519121 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2519961 (N.D.N.Y.)

(Cite as: 2010 WL 2519961 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Donald CARNEY, Plaintiff,
v.
Michael F. HOGAN, Commissioner, NYS Office of
Mental Health; and Donald Sawyer, Executive Director,
CNYPC, Defendants.
Donald Carney, Plaintiff,
v.
Michael F. Hogan; Terri Maxymillian; Valerie
Colasante; and Donald Sawyer, Defendants.
Action Nos. 9:08-CV-1251, 9:08-CV-1280.

June 15, 2010.
Donald Carney, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Office of Attorney General,
State of New York, Aaron M. Baldwin, Esq., Assistant
Attorney General, of Counsel, Albany, NY.

### DECISION and ORDER

DAVID N. BALDWIN, District Judge.
**\*1** Plaintiff, Donald Carney, brought these civil rights
actions in November 2008, pursuant to 42 U.S.C. § 1983.
The cases were consolidated in December 2008. By
Report-Recommendation dated March 30, 2010, the
Honorable Andrew T. Baxter, United States Magistrate
Judge, recommended that defendants' motion to dismiss
pursuant to Fed.R.Civ.P. 12(b)(6) (Dkt. No. 15) be
granted in part and denied in part as follows: all of
plaintiff's claims with the exception of his First
Amendment cause of action seeking injunctive relief
against the defendants in their official capacity be
dismissed.
    The defendants have filed objections to the

Report-Recommendation.

    Based upon a de novo review of the
Report-Recommendation and the entire file, including
those portions to which the defendants have objected, the
Report-Recommendation is accepted and adopted in all
respects. See 28 U.S.C. 636(b)(1).

    Accordingly, it is

    ORDERED that defendants' motion to dismiss is
GRANTED in part and DENIED in part as follows:

    (a) All of plaintiff's claims with the exception of his
First Amendment cause of action in the Lead Case
(08-cv-1251) seeking injunctive relief against the
defendants in their official capacity are DISMISSED;

    (b) The Member Case (9:09-CV-1280) is
DISMISSED;

    (c) The Clerk shall enter judgment dismissing the
Member Case (08-cv-1280); and

    (d) The Lead Case (08-CV-1251) shall be returned to
the Magistrate Judge for handling of further proceedings
in the plaintiff's First Amendment cause of action seeking
injunctive relief against defendants Michael F. Hogan and
Donald Sawyer in their official capacities.

    IT IS SO ORDERED.

N.D.N.Y.,2010.

Carney v. Hogan
Slip Copy, 2010 WL 2519961 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 87587 (N.D.N.Y.)

(Cite as: 2009 WL 87587 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Andrew PRATT, Plaintiff,
v.
Michael F. HOGAN, Commissioner, NYS Office of
Mental Health, et al ., Defendants.
Civil Action No. 6:08-CV-1003 (DNH/DEP).

Jan. 9, 2009.
Andrew Pratt, Marcy, NY, pro se.

### DECISION and ORDER

DAVID N. HURD, District Judge.

*4 Plaintiff, Andrew Pratt, brought this civil rights action pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated November 14, 2008, the Honorable David E. Peebles, United States Magistrate Judge, ordered that plaintiff's in forma pauperis application be granted, and recommended that plaintiff's motion for injunctive relief be denied. The plaintiff has filed timely objections to the report-recommendation.

Based upon a careful review of the entire file and the recommendations of Magistrate Judge Peebles, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that plaintiff's motion for injunctive relief is DENIED.

IT IS SO ORDERED.

### REPORT, RECOMMENDATION AND ORDER

DAVID E. PEEBLES, United States Magistrate Judge.

*1 The clerk has forwarded to the court a civil rights complaint, an application for leave to proceed *in forma*

*pauperis* ("IFP"), and a motion for preliminary injunctive relief, all of which have been filed in connection with this action by plaintiff Andrew Pratt, who is currently a patient at the Central New York Psychiatric Center ("CNYPC"), located in Marcy, New York, and within this district. *See* Dkt. Nos. 1, 2, and 3. In his *pro se* complaint the plaintiff, an individual subject to involuntary civil confinement at CNYPC since November 9, 2007 under N.Y. Mental Hygiene Law Art. 10, alleges that he is an atheist and has been subject to various religious rituals and practices since his placement in the Sex Offender Treatment Program ("SOTP") at CNYPC, in violation of his rights under the First Amendment of the United States Constitution. Pratt also claims that defendants Hogan and Sawyer are coercing him to submit to polygraph and penile plethysmograph [FN1] exams in an effort to obtain evidence to keep him confined at CNYPC, in violation of his right against self-incrimination under the Fifth Amendment.

> FN1. A plethysmograph is "[a]n instrument that measures variations in the size of an organ or body part on the basis of the amount of blood passing through or present in the [body] part." AMERICAN HERITAGE DICTIONARY 1338 (4th ed.2000).

Currently pending before the court, in addition to plaintiff's application to proceed *IFP,* is his motion for preliminary injunctive relief, precluding defendants during the pendency of the suit from using all religious-based treatment programs and from administering the polygraph and penile plethysmograph exams. Because I find that plaintiff is unable to establish a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping markedly in his favor, I recommend that plaintiff's motion for preliminary injunctive relief be denied.

### I. COMPLAINT AND IFP APPLICATION

After reviewing the entire file, the court finds that the plaintiff may properly proceed with this matter IFP, since he has set forth facts establishing sufficient economic need. [FN2] See Dkt. No. 2. Additionally, the court finds that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 87587 (N.D.N.Y.)

(Cite as: 2009 WL 87587 (N.D.N.Y.))

the plaintiff's complaint does not meet the criteria for *sua sponte* dismissal under 28 U.S.C. § 1915(e), which governs IFP proceedings, and directs, in pertinent part, that "the court shall dismiss the case at any time if the court determines that-... (B) the action ...-(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

> FN2. The Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915(b), requires an inmate who seeks IFP status to pay, over a period of time, the full amount of the filing fee provided for in 28 U.S.C. § 1914(a), which is currently $350.00 for most civil actions. In addition, this district requires all inmates to submit an inmate authorization form issued by the clerk's office. *See* Northern District of New York Local Rule 5.4(b). As a civil detainee, however, plaintiff is not considered a "prisoner" under the PLRA. *See Makas v. Miraglia,* No. 05 CIV 7180, 2007 WL 724603, at *12 n. 6 (S.D.N.Y. March 5, 2007); *Gibson v. Comm'r of Mental Health,* No. 04 Civ. 4350, 2006 WL 1234971, at *3 (S.D.N.Y. May 8, 2006) (the definition of "prisoner" in the PLRA does not include a civil detainee). *See also Michau v. Charleston County,* S.C., 434 F.3d 725, 727-28 (4th Cir.2006) (civil detainee is not a "prisoner" under the PLRA); *Perkins v. Hedricks,* 340 F.3d 582, 583 (8th Cir.2003) (same); *Page v. Torrey,* 201 F.3d 1136, 1139-40 (9th Cir.2000) (person civilly detained following completion of criminal sentence is not a "prisoner" within the meaning of the PLRA). Accordingly, plaintiff is not required to submit an inmate authorization form in order to be eligible for IFP status and avoid *sua sponte* dismissal by the court.

## II. *INJUNCTIVE RELIEF*

In his motion for injunctive relief, Pratt asks the court to issue an order preventing defendants from 1) using polygraph and penile plethysmograph exams on the plaintiff and 2) giving or teaching any program containing religious connotations, references, rituals, or practices. *See*

Dkt. No. 3.

The standard a court must utilize in considering whether to grant a request for injunctive relief is well-settled in this circuit. To warrant the issuance of a preliminary injunction, a movant must show: (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006); *see also Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992) (affirming a district court's denial of an inmate's request for preliminary injunction); *Roucchio v. LeFevre,* 850 F.Supp. 143, 144 (N.D.N.Y.1994) (McAvoy, C.J.) (adopting a report and recommendation of a magistrate judge that denied inmate's request for injunctive relief). An injunction is an extraordinary remedy, to be awarded only upon careful consideration of the competing interests of the parties presented in connection with an application for such relief. *Winter v. Natural Res. Def. Council,* No. 07-1239, 2008 WL 4862464, at *10 (U.S. Nov.12, 2008) (citation omitted).

### 1. *Irreparable Harm*

**\*2** As to this first factor, where an alleged deprivation of constitutional rights is involved, courts generally do not require a further showing of irreparable harm by the party seeking injunctive relief. *Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984). In this case, Pratt alleges that he is being denied the right to freely practice according to his religious beliefs (or, more accurately, absence of religious beliefs). The Second Circuit has suggested that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Paulsen v. County of Nassau,* 925 F.2d 65, 68 (2d Cir.1991) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)). Plaintiff further alleges he is being forced to incriminate himself in violation of his Fifth Amendment rights, and that inculpatory evidence derived from the constitutional deprivation could serve to extend the length of his civil confinement. Accordingly, the court will assume, for purposes of this motion only, that Pratt may suffer irreparable harm if the requested relief is not granted.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 87587 (N.D.N.Y.)

(Cite as: 2009 WL 87587 (N.D.N.Y.))

2. *Likelihood of Success on Merits*

Despite the fact that he or she has established irreparable harm, a party is not entitled to injunctive relief unless there is also proof of a likelihood of succeeding on the merits of a claim, or evidence that establishes the existence of sufficiently serious questions going to the merits of a claim and a balance of hardships tipping decidedly toward the party seeking such relief. *See Covino,* 967 F.2d at 77. In the present case, plaintiff has only submitted his own application for injunctive relief, containing the reasons why he believes his request should be granted. *See* Dkt. No. 3. Pratt has failed to submit proof or evidence, in either the form of affidavits or a verified complaint, which meet this standard. *See* Fed.R.Civ.P. 65(b); *see also Warner Bros., Inc. v. Dae Rim Trading, Inc.,* 677 F.Supp. 740, 748-49 (S.D.N.Y.1988). While this deficiency alone would justify denial of the plaintiff's motion, I will nonetheless proceed to examine the merits of his legal claims.

The Free Exercise Clause prohibits "governmental compulsion either to do or refrain from doing an act forbidden or required by one's religion, or to affirm or disavow a belief forbidden or required by one's religion." *Mozert v. Hawkins,* 827 F.2d 1058, 1066 (2d Cir.1987), *cert. denied,* 484 U.S. 1066, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988).[FN3] While atheism falls within the realm of protection of the First Amendment, *see Alexander v. Schenk,* 118 F.Supp.2d 298 (N.D.N.Y.2000) (Kahn, J.), plaintiff has not set forth any beliefs or practices forbidden or required by his religion, and similarly has failed to establish any governmental compulsion regarding those beliefs or practices. *See Boyd,* 914 F.Supp. at 834. Particularly, plaintiff has failed to prove that he was coerced into participating in the alleged religious exercises by virtue of his SOTP enrollment, and that no secular alternatives were made available to patients raising religious objections to the content of the treatment programs. *See Warner v. Orange County Dept. of Probation,* 115 F.3d 1068, 1075 (2d Cir.1997). Moreover, plaintiff has not presented the court with sufficient evidence to establish that the various treatment programs used in the SOTP, including Dialectic Behavior Therapy and "The Good Lives Model"-which, plaintiff claims, are based upon Zen Buddhism and Spirituality-are in fact religious in nature in First Amendment terms. *Compare*

*Warner,* 115 F.3d at 1075 (finding a "Twelve Steps" program which "placed a heavy emphasis on spirituality and prayer" and instructed belief in "a Power greater than ourselves" was an intensely religious event) *with Boyd,* 914 F.Supp. at 833 ("This court is unaware of a controlling decision that equates spirituality with religion, such that any reference to spirituality in ... [a] treatment program ... runs afoul of the First Amendment.") *and Moore v. Trippe,* 743 F.Supp. 201, 203 n. 1 (S.D.N.Y.1990) ("This court does not understand Zen Buddhism to be a religion in the traditional sense.").

FN3. Plaintiff appears to be making a Free Exercise claim in his complaint (Dkt. No. 1), but then references the Establishment Clause in his motion for preliminary injunction (Dkt. No. 3). To the extent plaintiff may be claiming the SOTP violates the Establishment Clause, the court finds that argument similarly unavailing, particularly in light of the plaintiff's failure to offer proof that the program has a non-secular purpose and that the principle or primary effect of the program is to promote or inhibit religion. *See Boyd v. Coughlin,* 914 F.Supp. 828, 831-33 (N.D.N.Y.1996) (McAvoy, C.J.).

**\*3** Plaintiff has similarly failed to put forth any proof or evidence regarding his self-incrimination claims. Specifically, plaintiff has failed to submit evidence to show that the SOTP constitutes unconstitutional compulsion under the Fifth Amendment. *See Edwards v. Ladlair,* No. 9:07-CV-00059, 2008 WL 315 6214, at \*5 (N.D.N.Y. Aug. 4, 2008) (Singleton, Jr., J.) (citing *McKune v. Lile,* 536 U.S. 24, 44-45, 122 S.Ct. 2017, 2030-31, 153 L.Ed.2d 47 (2002)) ("The test, as articulated in *McKune,*" for whether sex offender treatment programs requiring discussion of criminal history "constitute compulsory self-incrimination within the scope of the Fifth Amendment's ... proscription .... depends upon the severity of the consequences [resulting from] the choice made by the prisoner not to participate and discuss his crimes."); *see also United States v. Jones,* 299 F.3d 103, 111 (2d Cir.2002) (quoting *McKune,* 536 U.S. at 49, 122 S.Ct. at 2033 (O'Connor, J., concurring)) ("Not all pressure necessarily 'compels' incriminating statements"). I note, moreover, that the Second Circuit has held that requiring

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2009 WL 87587 (N.D.N.Y.)

(Cite as: 2009 WL 87587 (N.D.N.Y.))

the use of a polygraph examination for a convicted sex offender as a condition of supervised release does not violate the privilege against self-incrimination because polygraph evidence is generally inadmissible, and the individual would be free to challenge the evidence should it be used against him in a future proceeding. *United States v. Johnson,* 446 F.3d 272, 278-80 (2d Cir.2006); *United States v. Santiago,* No. 03 Cr. 664, 2008 WL 1959548, at *1 (S.D.N.Y. May 5, 2008) (citing *Johnson,* 446 F.3d at 278-80); *see also United States v. Zinn,* 321 F.3d 1084, 1090-92 (11th Cir.2003) (requiring polygraph testing as a condition of supervised release generally does not violate the Fifth Amendment). Moreover, a penile plethysmograph does not implicate plaintiff's Fifth Amendment right against self-incrimination because the procedure is not testimonial, but rather a physical test of plaintiff's sexual reactions to various stimuli. *See Walrath v. United States,* 830 F.Supp. 444, 446 (N.D.Ill.1993). Additionally, there is no indication that the results of a plethysmograph could be used to criminally prosecute plaintiff; instead the results are more likely used to assess Pratt's progress in the treatment program. *Id.*

Finally, to the extent plaintiff is claiming that, as a result of any potentially incriminating statements, the term of his civil confinement may be lengthened, as opposed to a claim of subsequent criminal prosecution, I note that such claims are not cognizable under the Fifth Amendment, which only protects an individual from being forced to make incriminating statements that might reasonably be used against him or her in a later criminal proceeding. *See Pillsbury Co. v. Conboy,* 459 U.S. 248, 273, 103 S.Ct. 608, 622, 74 L.Ed.2d 430 (1983) (Blackmun, J. concurring) (quoting *Brown v. Walker,* 161 U.S. 591, 597, 16 S.Ct. 644, 647, 40 L.Ed. 819 (1896)) ("It is, of course, black-letter law that a witness cannot assert a Fifth Amendment privilege not to testify 'if the testimony sought cannot possibly be used as a basis for, or in aid of, criminal prosecution against the witness.' "); *See also Andover Data Serv. v. Statistical Tabulating Corp.,* 876 F.2d 1080, 1082 (2d Cir.1989) ( "The prohibition against compelling the testimony of a witness in any setting is predicated upon there being a real danger that the testimony might be used against the witness in later criminal proceedings.").

Plaintiff has failed to demonstrate to the satisfaction of this court that he has either a likelihood of succeeding on the merits of his alleged claims or sufficiently serious questions going to the merits of such claims and a balance of hardships tipping decidedly toward him. For the reasons stated above, I recommend that plaintiff's request for injunctive relief be denied.

III. *SUMMARY*

Based on the above, it is hereby

ORDERED, that plaintiff's *in forma pauperis* application (Dkt. No. 2) is GRANTED.[FN4] The clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service upon the named defendants. The Clerk shall forward a copy of the summons and complaint by mail to the Office of the Attorney General for the State of New York, together with a copy of this Order; and it is further

> FN4. Plaintiff should note that although the application to proceed *in forma pauperis* has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

RECOMMENDED, that plaintiff's motion for injunctive relief (Dkt. No. 3) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2009.

Pratt v. Hogan
Not Reported in F.Supp.2d, 2009 WL 87587 (N.D.N.Y.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 87587 (N.D.N.Y.)

(Cite as: 2009 WL 87587 (N.D.N.Y.))


END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Edward KALWASINSKI, Plaintiff,
v.
Terri MAXYMILLIAN, Michael Hogan, Donald
Sawyer, Defendants.
No. 9:09-CV-0214 (DNH/GHL).

Dec. 23, 2010.
Edward Kalwasinski, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Dean J. Higgins, Esq., of Counsel, Albany,
NY, for Defendants.

### *REPORT-RECOMMENDATION and ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action,
commenced pursuant to 42 U.S.C. § 1983, has been
referred to me for Report and Recommendation by the
Honorable David N. Hurd, United States District Judge,
pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).
Plaintiff Edward Kalwasinski alleges that Defendants
violated his right to exercise his religion at the Central
New York Psychiatric Center ("CNYPC"). Currently
pending before the Court are cross-motions for summary
judgment pursuant to Federal Rule of Civil Procedure 56.
(Dkt. Nos. 33 and 37.) For the reasons that follow, I
recommend that Defendants' motion be granted in part and
denied in part and that Plaintiff's motion be denied.

### I. FACTUAL AND PROCEDURAL SUMMARY

On June 13, 2007, Plaintiff was civilly committed to
CNYPC pursuant to Article 10 of New York's Mental
Hygiene Law. (Dkt. No. 1 at 3 ¶¶ 1-2.) Plaintiff informed
"administrators" [FN1] that he was a Muslim and needed to
participate in all of the activities required by his faith,
including prayer, meals, and ceremonies. *Id.* at 3-4 ¶ 3.

FN1. The complaint does not identify these
"administrators" by name.

Plaintiff alleges that Defendants Terri Maxymillian
(the director of the Sex Offender Treatment Program at
CNYPC), Michael Hogan (the commissioner of the New
York Office of Mental Health), and Donald Sawyer (the
executive director of CNYPC) violated his constitutional
rights by (1) not allowing Al-Jumu'ah prayer on Fridays;
(2) forcing Plaintiff to eat food from bowls and with
plastic silverware contaminated with pork from prior
meals eaten by non-Muslims; (3) denying Plaintiff sacred
foods during holidays; (4) forcing Plaintiff to eat fish on
Fridays "as the church of Catholics require[s]"; and (5)
forcing Plaintiff to attend Sex Offender Treatment
Program ("SOTP") classes on Fridays. *Id.* at 4-5 ¶¶ 4-7.[FN2]

FN2. Plaintiff's motion for summary judgment
focuses entirely on the Al Jumu'ah issue.
(Dkt.Nos.33-1, 33-2.) Defendants, too, focus
largely on the Al Jumu'ah issue.

### II. APPLICABLE LEGAL STANDARDS

#### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary
judgment is warranted if "the pleadings, the discovery and
disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and that
the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(c)(2). The party moving for summary
judgment bears the initial burden of showing, through the
production of admissible evidence, that no genuine issue
of material fact exists. Only after the moving party has met
this burden is the nonmoving party required to produce
evidence demonstrating that genuine issues of material
fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d
Cir.2006). The nonmoving party must do more than "rest
upon the mere allegations ... of the [plaintiff's] pleading"
or "simply show that there is some metaphysical doubt as
to the material facts." *Matsushita Elec. Indus. Co. v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

*Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN3. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

*2 To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F .R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp.*

*v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**A. Religion Claims**

*1. Applicable Standard*

Depending on the circumstances, different standards apply to claims that state actors have violated an individual's right to freely exercise religion. Generally, in order to satisfy the Free Exercise Clause of the First Amendment, government actions that substantially burden a religious practice must be justified by a compelling government interest. *Sherbert v. Verner,* 374 U.S. 398 (1963). However, due to the unique concerns of the prison setting, prisoners' First Amendment free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003). Thus, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)) (punctuation omitted).

**\*3** The Second Circuit has not decided which standard applies to individuals, like Plaintiff, who are civilly committed to locked psychiatric facilities that share characteristics with penal institutions. District courts in the Second Circuit are split on the issue. *Compare Carney v. Hogan,* No. 9:08-CV-1251 (DNH/ATB), 2010 U.S. Dist. LEXIS 59439, at \*8, 2010 WL 2519121, at \*3 (N.D.N.Y. Mar. 30, 2010) (applying substantial burden/compelling interest test to CNYPC patient's free exercise claim) *and Pratt v. Hogan,* 631 F.Supp.2d 192, 198 (N.D.N.Y.2009) (same) (Hurd, J.), *with Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, at \*16–17, 2008 WL 2543573, at \*6 (S.D.N.Y. June 25, 2008) (applying legitimate penological purpose test to Mid-Hudson Psychiatric Center patient's free exercise claim) *and Abdul-Matiyn v. Pataki,* No. 9:06-CV-1503, 2008 U.S. Dist. LEXIS 118430, at \*32, 2008 WL 974409, at \*12 (N.D.N.Y. Apr. 8, 2008) (applying legitimate penological purpose test to CNYPC patient's free exercise claim) (Hurd, J.).[FN4] In an abundance of caution, I will consider Plaintiff's claims in the context of each standard.[FN5]

> **FN4.** The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

> **FN5.** Defendants' position is that the legitimate penological interest test should apply because "Plaintiff has made reference to prisoner litigation in his complaint and has not suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to prisoners' free exercise claims." (Dkt. No. 37-8 at 3, citation to complaint omitted.)

Plaintiff's religious rights are also protected by the Religious Land Use and Institutionalized Persons Act.

("RLUIPA").[FN6] RLUIPA, like the Free Exercise Clause as applied to non-prisoners, applies a compelling governmental interest test. Specifically, RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [FN7] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." [FN8] 42 U.S.C. § 2000cc-1(a).

> **FN6.** Although Plaintiff's complaint does not explicitly claim that Defendants are liable under RLUIPA, I am required to construe the complaint liberally, interpreting it to raise the strongest possible arguments that it suggests. *Chavis v. Chappius,* 618 F.3d 162 (2d Cir.2010). Moreover, Plaintiff refers to RLUIPA in his motion for summary judgment. (Dkt. No. 33-2 at 5.) Defendants do not address RLUIPA.

> **FN7.** An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia,* "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

> **FN8.** Although neither the Supreme Court nor the Second Circuit has yet decided the issue, the consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506–09 (S.D.N.Y.2008). That issue is currently pending before the Supreme Court in *Sossamon v. Texas* (No. 08-1438, argued Nov. 2, 2010). That issue does not affect the analysis here because Plaintiff requests both money damages and injunctive relief. (Dkt. No. 1 at 7-9.)

2. *Al Jumu'ah Service*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

Plaintiff alleges that Defendants violated his religious rights by failing to hold proper Al Jumu'ah services. (Dkt. No. 1 at 4 ¶ 4(a).) Defendants move for summary judgment of this claim, arguing that the unavailability of proper Al Jumu'ah services was caused by legitimate penological interests. (Dkt. No. 37-8 at 5.)
a. *Facts*

"Al Jumu'ah is an important service for Muslims. Unlike other Muslim daily prayers, it is not a prayer that can be worshiped individually. It is a congregate prayer performed every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer.... There is no alternative means of attending Jumu'ah. Attendance at the congregational prayer is obligatory on all men in the Muslim religion." (Najeeullah Decl., Dkt. No. 37-5 ¶¶ 10-11.) Plaintiff alleges that CNYPC stopped offering Al Jumu'ah services in August 2008. (Dkt. No. 33-1 ¶ 1.)

At CNYPC, a Muslim prayer service or study class[FN9] is offered on Fridays from 9:30-10:30 a.m. (Defs.' Ex. 1, Dkt. No. 37-4 at 2.) Imam Malik Najeeullah presides. (Dkt. No. 37-5 ¶ 7.) Plaintiff's official schedule at CNYPC includes this event. (Defs.' Ex. 9, Dkt. No. 37-4 at 45.) Defendants state that "CNYPC was under the mistaken belief that the Al Jumu'ah prayer could be worshiped individually and that the regularly scheduled worship time for Muslims at 9:30 a.m. on Fridays was available to satisfy the desire of resident Muslims to worship the prayer." (Dziadyk Decl., Dkt. No. 37-6 ¶ 12.)

FN9. At various times, CNYPC officials, including Defendants, have referred to this event as a "prayer service." (Dkt. No. 33-2 at 18; Dkt. No. 37-4 at 32, 40.) Imam Najeeullah, who presides over the event, refers to it as a "class." (Dkt. No. 33-2 at 16; Dkt. No. 37-5 ¶ 7.)

*4 On January 22, 2009, Plaintiff sent a complaint to Defendant Maxmillian objecting to the lack of Al Jumu'ah services. (Pl.'s Ex. C, Dkt. No. 33-2 at 11 ¶ 1.) Defendant Maxmillian responded, stating that "CNYPC ... offers Muslim prayer services on Friday mornings that are led by Imam Najeeullah. Those services have not been changed nor has [Plaintiff] been denied the ability to attend." (Defs.' Ex. 7, Dkt. No. 37-4 at 40.)

On February 20, 2009, Plaintiff filed this action. (Dkt. No. 1.)

On March 18, 2009, Plaintiff sent a complaint to Defendant Sawyer in which he objected to the lack of Al Jumu'ah services. (Pl.'s Ex. G, Dkt. No. 33-2 at 17.) Defendant Sawyer responded that "Muslim services are offered on Fridays at 9:30 a.m. This time was set to meet both the needs of the residents and the Imam's schedule. The Imam has informed us that formal services do not need to happen at noon as residents can participate individually and from any location at that time." [FN10] *Id.* at 18.

FN10. In response to interrogatories, Defendant Sawyer identified "the Imam" who had "informed" him on these matters as Imam Abdullah Muhammad. (Pl.'s Ex. G, Dkt. no. 33-2 at 19.) Imam Abdullah Mohammad is the Muslim Chaplain at Mohawk Correctional Facility. (Pl.'s Ex. B, Dkt. No. 33-2 at 8.)

On March 27, 2009, Imam Najeeullah issued a memorandum titled "Jumu'ah Prayer or the Friday Worship Service for Muslim[s]." (Pl.'s Ex. A, Dkt. No. 33-2 at 7.) It is not clear to whom the memorandum was directed, but the document states that Elaine Dziadyk (the supervisor of rehabilitation services) and S. Montrose (a social worker supervisor) received copies. *Id.* Imam Najeeullah explained that Al Jumu'ah should occur at approximately 1:15 p.m. during daylight savings time, that the prayer was "obligatory for all Muslims," and that the Friday morning Muslim study class at CNYPC was "not a Jumu'ah worship service." *Id.* Imam Najeeullah stated that his schedule did not allow him to facilitate a Friday Al Jumu'ah prayer service at CNYPC, but that "[t]here should always be a qualified Imam available to facilitate this service if it is allowed." *Id.*

On May 1, 2009, John Culkin, the Director of the Bureau of Sex Offender Evaluation and Treatment, responded to an April 7, 2009, letter from Plaintiff. (Pl.'s Ex. D, Dkt. No. 33-2 at 15; Defs.' Ex. 8, Dkt. No. 37-4 at 42.) Mr. Culkin stated that "[p]er staff at Central New York Psychiatric Center, the facility offers Muslim prayer services at 9:30 am on Friday mornings. These services

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

have not changed nor have you been denied the right to attend them as currently scheduled. The Imam has additionally informed [CNYPC] staff that formal services do not need to occur at noon as residents can participate individually and from any location at that time." *Id.*

On May 19, 2009, Mental Hygiene Legal Services wrote to Mr. Culkin, enclosing a copy of a letter from Imam Najeeullah. (Pl.'s Ex. E, Dkt. No. 33-2 at 16.) Mental Hygiene Legal Services noted that Imam Najeeullah's letter stated "that the Jumu'ah worship service is 'obligatory for all Muslims,' just as 'Sunday worship service is for all Christians' " and that "the 'study classes' he does host on Thursdays and Fridays are 'not a Jumu'ah worship service.' " *Id.*

**\*5** On October 23, 2009, Defendants Sawyer and Maxymillian responded to Plaintiff's interrogatories. (Dkt. No. 37-4 at 52-66.) In those responses, Defendants reiterated their answers to Plaintiff's grievances and stated that Imam Abdullah Muhammad had informed them that congregate prayer was not necessary for Al Jumu'ah. *Id.*

On January 13, 2010, Imam Abdullah Muhammad wrote to Deputy Attorney General Dean J. Higgins, counsel for Defendants in this action. (Pl.'s Ex. B, Dkt. No. 33-2 at 8.) He stated that he was writing to "clarify a gross misunderstanding" that Al Jumu'ah "can be performed individually." *Id.* He explained that "[a]ttendance at the congregational prayer is obligatory on all men ... So, it is impossible for me to advise anyone that Jumu'ah prayer can be performed individually. What I did say, and it may be the source of the misunderstanding, is that the [five] daily prayers can be performed individually under circumstances such as those found in jails, prisons, and other institutions." *Id.*

At some point, officials at CNYPC came to understand that "Al Jumu'ah is a congregate prayer that can[ ]not be worshiped individually." (Dziadyk Decl., Dkt. No. 37-6 ¶¶ 13.) Thereafter, the facility "commenced a search for a Muslim Imam to conduct the service." *Id.* ¶ 14. CNYPC officials asked Imam Najeeullah to preside at the service. *Id.* ¶ 15. Imam Najeeullah is employed part-time by both the New York Department of Correctional Services ("DOCS") at Marcy Correctional

Facility and the Department of Mental Health at CNYPC. (Najeeullah Decl., Dkt. No. 37-5 ¶¶ 2-3.) Imam Najeeullah attempted to get permission from DOCS to conduct a service at CNYPC, but his request was denied because it would conflict with his schedule of services at Marcy. *Id.* ¶ 12.

Imam Najeeullah has worked with CNYPC officials "to identify an eligible Imam who would be able to conduct services at the Center," but no such individual has been found. (Dkt. No. 37-5 ¶ 13.) At one point, an individual was "identified ..., but it was determined that he was not eligible" because of "issues in his background." *Id.* ¶ 14; Dkt. No. 37-6 ¶ 18. Defendants do not identify what these "issues" were or why they rendered the individual unsuitable. Defendants state that the search is ongoing. (Dkt. No. 37-5 ¶ 16; Dkt. No. 37-6 ¶ 19.)

On February 4, 2010, Stephen C. Clark, the principal attorney for the Mental Hygiene Legal Service for the Fourth Judicial Department, wrote to Plaintiff. (Pl.'s Ex. C, Dkt. No. 33-2 at 9-10.) Mr. Clark reported that he met with members of the CNYPC staff, including Defendants Sawyer and Maxymillian, to discuss the lack of Al Jumu'ah services at CNYPC. *Id.* at 9. Defendant Sawyer stated that CNYPC was "actively attempting" to find someone and "insured that he would continue to work to bring this matter to a quick resolution." *Id.* Mr. Clark inquired whether Plaintiff would be interested in being trained to lead Al Jumu'ah services because Defendant Sawyer "seemed to indicate that the hospital would be willing to entertain getting appropriate training for someone currently there [ ] to run such services." *Id.*

b. *Analysis*

**\*6** Under the legitimate penological interest test, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN11] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274-75 (citing *Ford,* 352 F.3d at 591). Defendants do not dispute that Plaintiff's religious beliefs are sincerely held or that the lack of Al Jumu'ah services burdened those beliefs. Indeed, for the purposes of the pending motions, Defendants concede that Al Jumu'ah "is a central religious service of the Muslim faith" and that "[t]here is no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

alternative to the Al Jumu'ah worship." (Dkt. No. 37-8 at 5.) Therefore, I find that Plaintiff holds a sincere religious belief that has been substantially burdened. The issue, then, is whether Defendants have established as a matter of law that this burden was caused by a legitimate or compelling governmental interest.

> FN11. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

Under the deferential legitimate penological interest test, once a plaintiff establishes that his or her sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). Although the defendants' burden is "relatively limited," the legitimate penological interest advanced must have been the *actual* reason for the defendants' actions. "Post hoc justifications with no record support will not suffice." *Salahuddin,* 467 F.3d at 276-77.

Here, Defendants rely on a post hoc justification. Defendants state that they

> are not opposed to permitting Plaintiff's participation in the congregate Al Jumu'ah; however ... there is currently no Imam available to conduct the service ... [T]he Imam and the CNYPC staff are addressing this issue and have instituted a search for a person to conduct the service. Once an Imam is identified, the service will be instituted and Plaintiff will be permitted to attend.

(Dkt. No. 37-8 at 5.) This was not the reason that Defendants initially gave for not offering the Al Jumu'ah service. Rather, Defendants initially responded to Plaintiff's complaints by stating that they believed that the Friday morning session offered by Imam Najeeullah was sufficient and that no congregate Al Jumu'ah service was required.[FN12] Defendants admit in their motion papers that this belief was "mistaken." (Dkt. No. 37-6 ¶ 12.) Defendants persisted in this "mistaken belief" for at least seventeen months, from the time that they ceased offering Al Jumu'ah services in approximately August 2008 until January 2010, when Imam Muhammad wrote to defense counsel to correct Defendants' "gross misunderstanding." (Dkt. No. 37-4 at 40; Dkt. No. 33-2 at 8.) Indeed, individuals associated with CNYPC continued to assert their belief that Al Jumu'ah was not required for several months after Plaintiff filed this action. (Dkt. No. 37-4 at 42.) Thus, the initial denial of Al Jumu'ah was due not to the lack of an Imam as Defendants now contend, but rather to a misunderstanding of the religious significance of Al Jumu'ah. It was not until after Imam Muhammad corrected this misunderstanding that Defendants began to search for an Imam who could preside at Al Jumu'ah.

> FN12. I note that such a justification would not, if asserted in the pending motion, be legally sufficient to entitle Defendants to summary judgment. *Ford,* 352 F.3d at 597-98. Even if this justification were legally sufficient, it would not be factually supported here. As Imam Muhammad indicated in his letter to defense counsel, he never intended for Defendants to believe that congregate Al Jumu'ah prayer is

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

merely optional for Muslims.

**\*7** Even if Defendants' justification were not post hoc, it would be insufficient to support a finding, as a matter of law, that the denial of Al Jumu'ah was motivated by a legitimate penological interest. As another judge in this District has observed, the legitimate penological interest inquiry "is particularly fact-lad[ ]en and often ill-suited for resolution on [a] motion for summary judgment ..." *Jackson v. Boucaud,* No. 9:08-CV-1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, at *26, 2009 WL 6066799, at *7 (N.D.N.Y. Dec. 31, 2009).[FN13] Here, Defendants simply have not provided the Court with enough information to analyze the issue. Defendants do not provide any details at all about why the search for an Imam has been unsuccessful, other than to state that one potential Imam was not eligible because of unspecified "issues in his background." (Dkt. No. 37-6 ¶ 18.)

> **FN13.** The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Defendants' justification, and the lack of detail they provide about it, is similar to that asserted in a recent case from the District of Connecticut. *Vega v. Lantz,* No. 304CV1215DFM, 2009 U .S. Dist. LEXIS 88550, 2009 WL 3157586 (D.Con. Sept. 25, 2009).[FN14] In *Vega,* a state prisoner claimed that his free exercise and RLUIPA rights were violated because the facility routinely cancelled Al Jumu'ah. *Vega,* 2009 WL 315786, at *1. The defendants conceded that Al Jumu'ah had been frequently cancelled over a four-year period, but argued that cancellation was necessary "when there is no chaplain available or in case of a security lockdown." *Id.* at *11. The court denied the defendants' motion for summary judgment because the defendants "provide[d] no explanation for the frequent cancellation of Jumah, or of the insufficient and unequal staffing that allegedly underlies it." *Id.* Thus, the court found, the defendants had failed "to carry their burden of showing that the frequent cancellation of Jumah is either rationally related to a legitimate penological interest ... or in furtherance of a compelling governmental interest." *Id.*

> **FN14.** The Court will provide Plaintiff with a

copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the Al Jumu'ah service.

**3.** *Bowls and Utensils*

Plaintiff alleges that Defendants violated his religious rights by "forcing Plaintiff to eat food from bowls contaminated with pork from prior meals eat [en] by non-Muslims." (Dkt. No. 1 at 4 ¶ 4(b).) Defendants move for summary judgment dismissing this claim, arguing that Plaintiff's religious beliefs have not been burdened. (Dkt. No. 37-8 at 6.) Defendants are correct.

Imam Najeeullah declares that there is "no prohibition" on eating from a bowl or using a utensil previously used by a non-Muslim to eat pork "so long as they have been washed and sanitized ..." (Dkt. No. 37-5 ¶¶ 18-19.) Valerie Fasteson, the Director of Nutritional Services for CNYPC, declares that plates, bowls, and utensils are "thoroughly washed and sanitized" before they are reused. (Dkt. No. 37-7 ¶ 6.) CNYPC residents can also request disposable plates and tableware that would be used only once and then discarded. *Id.* ¶ 7. Plaintiff has not made such a request. *Id.*

**\*8** In opposition to Defendants' motion for summary judgment, Plaintiff admits that "all bowls and utensils are washed and sanitized after use and before re-use and such washing is consistent with the tenets of the Muslim faith." (Dkt. No. 37-1 ¶ 20; Dkt. No. 40 ¶ 9.)

Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs have been burdened and I recommend that the Court dismiss Plaintiff's claim regarding the contamination of bowls and utensils.

**4.** *Food Issues*

Plaintiff alleges that his religion requires him to eat Halal foods and that Defendants violated his constitutional rights by forcing him "to eat meals issued for Christian

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

and Catholic religions, e.g.: Friday Muslims must eat fish as the church of Catholics require." (Dkt. No. 1 at 5 ¶ 5.) It is not entirely clear whether Plaintiff objects to the lack of a Halal menu or to the fact that fish is served on Fridays. Defendants argue that serving fish on Fridays does not burden Plaintiff's religious beliefs and that they are not constitutionally required to provide an entirely Halal menu. (Dkt. No. 37-8 at 5-6.)

a. *Fish on Friday*

Imam Najeeullah declares that "[f]ish is an acceptable food for a Muslim diet and the service of fish would violate no tenet of our faith." (Dkt. No. 37-5 ¶ 21.) Plaintiff admits in his reply papers that fish is a permissible food under Islamic law. (Dkt. No. 40 ¶ 8.) Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs were burdened by the fact that fish was served on Fridays at CNYPC and I recommend that the Court grant Defendants' motion for summary judgment with respect to the claim that CNYPC's practice of serving fish on Fridays violated Plaintiff's rights under the Free Exercise Clause or RLUIPA.[FN15]

> [FN15.] Plaintiff may also be asserting an Establishment Clause claim regarding the service of fish on Fridays. Any such claim would be subject to dismissal for failure to state a claim. *See Travillion v. Leon,* 248 Fed. App'x 353, 355-56 (3d Cir.2007) (affirming trial court's 12(b)(6) dismissal of claim that jail's service of vegetarian menu during Lent violated Protestant inmate's rights under the Establishment Clause).

b. *Halal Foods*

Plaintiff may also be claiming that Defendants violated his free exercise and RLUIPA rights because CNYPC does not offer a Halal menu. (Dkt. No. 1 at 5 ¶ 5.) Defendants move for summary judgment of this claim. (Dkt. No. 37-8 at 5-6.)

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597. However, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his

religion's] dietary laws." *Muhammad v. Warithu-Deen Umar,* 98 F.Supp.2d 337, 344 (W.D.N.Y.2000) (citing *Abdul-Malik v. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)).[FN16]

> [FN16.] The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Defendants assert that meals at CNYPC "do not violate any tenets of the Muslim faith." (Dkt. No. 37-1 ¶ 19.) For this proposition, Defendants cite the declarations of Valerie Fasteson and Imam Najeeullah. *Id.* Neither of the declarations cited by Defendants show that CNYPC meals do not violate Muslim dietary laws. Ms. Fasteson declares that "[a]lthough the dietary service does not serve a strictly Halal diet, we do serve meals that are not violative of Muslim tenets. We do serve an alternative diet that, upon information and belief and based on the declaration of Imam Najeeullah ..., does accommodate the Muslim faith. This would include an option that would insure a pork free diet." (Dkt. No. 37-7 ¶ 5.) Imam Najeeullah's declaration does not state that CNYPC's alternative diet accommodates the Muslim faith. Rather, Imam Najeeullah merely states that fish in an acceptable food for a Muslim diet and that "the Halal diet is important to a Muslim's faith ... I will work with CNYPC staff to try and find ways to make a Halal diet possible." (Dkt. No. 37-5 ¶¶ 21-22.) These vague declarations stand in stark contrast to the evidence presented in a case cited by Defendants, *Majid v. Fischer,* No. 07 Civ. 4584, 2009 U.S. Dist. LEXIS 71616 (S.D.N.Y. Jul. 31, 2009).[FN17] There, the defendants provided the court with a report from an Imam explicitly stating that the pork-free menu offered by DOCS was "adequate and sufficient for Muslims under Islamic law and does not require Muslims to choose between violating their religious practice or starving." *Majid,* Dkt. No. 37-10 at 8.

> [FN17.] Defendants served a copy of this unpublished decision on Plaintiff with their summary judgment papers. (Dkt. No. 37-10.)

*9 Moreover, Defendants have not provided the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

with enough evidence to establish as a matter of law that CNYPC provides a pork-free diet that is sufficient to sustain Plaintiff's good health. Indeed, the only reference in the record to the nutritional quality of the alternative menu is one sentence in the Inpatient Operations Manual stating that CNYPC's pork-free diet "meets 100 percent of the RDA." (Defs.' Ex. 3, Dkt. No. 37-4 at 24.) Defendants do not note this fact in their memorandum of law or ask the Court to draw any conclusions from it.

Additionally, Defendants have not provided any evidence regarding the legitimate penological or compelling interests supporting the menu at CNYPC. Although Defendants cite cases upholding DOCS' menu in the face of First Amendment and RLUIPA challenges by Muslim inmates, Defendants have not provided the Court with any evidence that CNYPC's menu is similar to DOCS' or that it is driven by similar penological interests. In contrast to the dearth of evidence here, the defendants in *Majid* provided the court with a declaration describing in detail the number of inmates who needed to be fed in the DOCS system, the nutritional and religious factors that DOCS considered in formulating menus, the cost of providing a pork-free (but non-Halal) menu as compared with the regular menu, and the problems associated with obtaining Halal meats. Thus, I find that Defendants have not established, as a matter of law, that CNYPC provided Plaintiff with a diet sufficient to maintain his good health without violating Muslim dietary laws. Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing this claim.

5. *Classes on Fridays and Denial of Sacred Foods on Holidays*

Defendant's motion for summary judgment does not address Plaintiff's claims that (1) being required to attend classes on Fridays violates his religious rights; or (2) Defendants violated Plaintiff's religious rights by denying him sacred foods on holidays. Therefore, I find that the claims should survive Defendants' motion for summary judgment.

**B. DUE PROCESS CLAIM**

Plaintiff claims that Defendants violated his Fifth and Fourteenth Amendment rights to due process. (Dkt. No. 1 at 7.) Regarding the due process issue, Plaintiff's

complaint states only that "Plaintiff has not d[one] anything to lose his right[s] afforded by the" First Amendment. *Id.* Defendants argue that the complaint fails to state a due process claim. (Dkt. No. 37-8 at 6-7.) Defendants are correct. Plaintiff's due process claim simply duplicates his free exercise and RLUIPA claims. *See Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). Therefore, I recommend that the Court grant Defendants' motion for summary judgment dismissing Plaintiff's due process claim.

**C. EIGHTH AMENDMENT CLAIM**

**\*10** Plaintiff claims that Defendants violated his Eighth Amendment rights. (Dkt. No. 1 at 8.) Defendants argue that the complaint fails to state an Eighth Amendment claim. (Dkt. No. 37-8 at 6-7.) Defendants are correct.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102-03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. To satisfy the objective component of an Eighth Amendment claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). To satisfy the subjective component, the defendant's behavior must be "wanton." *Whitley v. Albers,* 475 U.S. 312, 320 (1986). Where a prisoner claims that a defendant provided inadequate conditions of confinement, he must show that the defendant acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302-03 (1991). A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

Here, Plaintiff has not raised a triable issue of fact that Defendants deprived him of the minimal civilized measure of life's necessities or that they knew of and disregarded an excessive risk to Plaintiff's health or safety. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of Plaintiff's Eighth Amendment claim.

**D. PERSONAL INVOLVEMENT BY DEFENDANT HOGAN**

Defendants argue that any claims against Defendant Hogan should be dismissed because Plaintiff has failed to allege that Defendant Hogan was personally involved in any constitutional violation. (Dkt. No. 37-8 at 7-8.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a *Bivens* cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing

subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN18] *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

> FN18. In *Iqbal,* 129 S.Ct. at 1949, the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's own purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. See *Sash v. United States,* 674 F.Supp.2d 531, 543-44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that the *Colon* categories remain good law.

**\*11** Here, the complaint does not mention Defendant Hogan at all other than in the caption and the list of parties. (Dkt. No. 1.) In response to interrogatories from Plaintiff, Defendant Sawyer stated that he could not recall Defendant Hogan making any inquiry about Plaintiff's March 18 complaint. (Dkt. No. 33-2 at 19.) Thus, the complaint fails to plausibly suggest, and the evidence fails to raise a triable issue, that Defendant Hogan was personally involved in any alleged constitutional violation. Therefore, I recommend that the Court dismiss Plaintiff's claims against Defendant Hogan.

**IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff's motion for summary judgment (Dkt. No. 33) focuses entirely on the lack of Al Jumu'ah services at CNYPC. I have discussed all of the evidence submitted by Plaintiff regarding this issue above, in Section III(A)(2). In analyzing Plaintiff's motion for summary judgment, I must resolve all ambiguities and draw all reasonable inferences in Defendants' favor. *Major League Baseball Props., Inc.,* 542 F.3d at 309. Although, as discussed above, Defendants have not provided the Court with

Slip Copy, 2010 WL 5620908 (N.D.N.Y.)

(Cite as: 2010 WL 5620908 (N.D.N.Y.))

sufficient evidence to support summary judgment in their favor on the Al Jumu'ah issue, they have provided sufficient evidence to raise a triable issue of fact. A reasonable juror could find that Defendants had a legitimate penological or a compelling interest for the decision not to hold Al Jumu'ah services at the proper time. Therefore, I recommend that the Court deny Plaintiff's motion for summary judgment.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be ***GRANTED IN PART AND DENIED IN PART.*** I recommend that the Court grant Defendants' motion and dismiss the following claims: (1) the free exercise and RLUIPA claims regarding the use of bowls and utensils; (2) the free exercise and RLUIPA claims regarding CNYPC's practice of serving fish on Fridays; (3) any Establishment Clause claim regarding CNYPC's practice of serving fish on Fridays; (4) the due process claim; (5) the Eighth Amendment claim; and (6) all claims against Defendant Hogan; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 33) be ***DENIED;*** and it is further

**RECOMMENDED** that the following claims survive the pending motions: (1) the free exercise and RLUIPA claims regarding the lack of Al Jumu'ah services at CNYPC; (2) the free exercise and RLUIPA claims regarding the lack of a Halal menu at CNYPC; (3) the claim regarding CNYPC's requirement that Plaintiff attend classes on Fridays; and (4) the claim that Defendants denied Plaintiff sacred foods on holidays. The parties should be prepared, in further proceedings, to fully brief whether the legitimate Penological interest or the compelling government interest test should be applied to this case; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Carney v. Hogan,* No. 9:08-CV-1251 (DNH/ATB), 2010 U.S. Dist. LEXIS 59439, 2010 WL 2519121 (N.D.N.Y. Mar. 30, 2010); *Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, 2008 WL 2543573 (S.D.N.Y. June 25, 2008);

*Abdul-Matiyn v. Pataki,* No. 9:06-CV-1503, 2008 U.S. Dist. LEXIS 118430, 2008 WL 974409 (N.D.N.Y. Apr. 8, 2008); *Jackson v. Boucaud,* No. 9:08-CV-1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, 2009 WL 6066799 (N.D.N.Y. Dec. 31, 2009); *Vega v. Lantz,* No. 304CV1215DFM, 2009 U.S. Dist. LEXIS 88550, 2009 WL 3157586 (D.Con. Sept. 25, 2009); and *Abdul-Malik v.. Goord,* No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402 (S.D.N.Y. Feb. 27, 1997) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*12** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Kalwasinski v. Maxymillian
Slip Copy, 2010 WL 5620908 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 195648 (N.D.N.Y.)

(Cite as: 2011 WL 195648 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Edward KALWASINSKI, Plaintiff,
v.
Teri MAXYMILLIAN, Director of Sex Offender Treatment Program for New York State; Michael Hogan, New York State Office of Mental Health Commissioner; and Donald Sawyer, Executive Director of CNYPC, Defendant.
No. 9:09-CV-214.

Jan. 20, 2011.
Edward Kalwsinski, Marcy, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Dean J. Higgins, Esq., Asst. Attorney General, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.
   **\*1** Plaintiff, Edward Kalwasinski, commenced this civil rights action in February 2009, pursuant to 42 U.S.C. § 1983. By Report-Recommendation dated December 22, 2010, the Honorable George H. Lowe, United States Magistrate Judge, recommended that plaintiff's motion for summary judgment (Dkt. No. 33) be denied. The Magistrate Judge further recommended that defendants' motion for summary judgment (Dkt. No. 37) be granted in part and denied in part, recommending that the court grant defendants' motion and dismiss the following claims: (1) the free exercise and RLUIPA claims regarding the use of bowls and utensils; (2) the free exercise and RLUIPA claims regarding CNYPC's practice of serving fish on Fridays; (3) any Establishment Clause claim regarding CNYPC's practice of serving fish on Fridays; (4) the due

process claim; (5) the Eighth Amendment claim; and (6) all claims against defendant Hogan. The Magistrate Judge further recommended that the following claims survive the pending motions: (1) the free exercise and RLUIPA claims regarding the lack of Al Jumu'ah services at CNYPC; (2) the free exercise and RLUIPA claims regarding the lack of a Halal menu at CNYPC; (3) the claim regarding CNYPC's requirement that plaintiff attend classes on Fridays; and (4) the claim that defendants denied plaintiff sacred foods on holidays. The Magistrate has also advised the parties they should be prepared, in further proceedings, to fully brief whether the legitimate Penological interest or the compelling government interest test should be applied to this case. No objections to the Report-Recommendation have been filed.
   Based upon a careful review of the file, and the recommendations of Magistrate Judge Lowe, the Report-Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

   Accordingly, it is

   ORDERED that

   1. Plaintiff's motion for summary judgment (Dkt. No. 33) is DENIED;

   2. Defendants' motion for summary judgment (Dkt. No. 37) is GRANTED IN PART and DENIED IN PART;

   3. The defendants' motion for summary judgment is GRANTED with the exception of the following claims which are DISMISSED:

   (a) The free exercise and RLUIPA claims regarding the use of bowls and utensils;

   (b) The free exercise and RLUIPA claims regarding CNYPC's practice of serving fish on Fridays;

   (c) Any Establishment Clause claim regarding CNYPC's practice of serving fish on Fridays;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 195648 (N.D.N.Y.)

(Cite as: 2011 WL 195648 (N.D.N.Y.))

(d) The due process claim; and

(e) The Eighth Amendment claim;

4. All claims against defendant Hogan are DISMISSED;

5. The following claims will survive the pending motions:

(a) The free exercise and RLUIPA claims regarding the lack of Al Jumu'ah services at CNYPC;

(b) The free exercise and RLUIPA claims regarding the lack of a Halal menu at CNYPC;

(c) The claim regarding CNYPC's requirement that plaintiff attend classes on Fridays; and

(d) The claim that defendants denied plaintiff sacred foods on holidays.

*2 6. The parties are advised that in all further proceedings, they should be prepared to fully brief whether the legitimate Penological interest or the compelling government interest test should be applied to this case;

7. This matter is referred back to the Magistrate Judge for scheduling of any further proceedings that are required.

IT IS SO ORDERED.

N.D.N.Y.,2011.

Kalwasinski v. Maxymillian
Slip Copy, 2011 WL 195648 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Scott LOMBARDO, Plaintiff,
v.
Howard HOLANCHOCK, Dr. Chandrasekhara, Frank
Brusinski, Dr. Sheyas Baxi, Dr. Sadorra, Lynburgh
Burton, Zelma Armstrong, John Doe, Defendants.
No. 07 Civ. 8674(DLC).

June 25, 2008.
Scott Lombardo, New Hampton, NY, pro se.

Joshua Pepper, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
NY, for Defendants.

*OPINION & ORDER*

DENISE COTE, District Judge.

**\*1** *Pro se* plaintiff Scott Lombardo brings this action
pursuant to 42 U.S.C. § 1983, alleging violations of his
constitutional rights by staff members at the Mid-Hudson
Psychiatric Center ("Mid-Hudson"), to which Lombardo
was civilly committed and where he currently resides.
Defendants have moved to dismiss, claiming principally
that Lombardo has failed to allege any violation of his
constitutionally protected rights. For the following
reasons, defendants' motion is granted in part.
BACKGROUND

The following facts are drawn from the complaint and
are assumed to be true, as they must be on a motion to
dismiss.FN1 Lombardo is a patient-resident at
"Mid-Hudson," a secure New York State facility that
provides comprehensive evaluation, treatment, and
rehabilitation, pursuant to court order, for offenders who
have been found not guilty by reason of mental defect or
incompetent to stand trial.FN2 He was civilly committed to
Mid-Hudson after he pleaded insanity "for a crime that he

committed." FN3

> FN1. Certain facts are also drawn from an
> "Addendum to Complaint," which the plaintiff
> did not file but did serve on the defendants. The
> Court became aware of this Addendum through
> references in defendants' motion to dismiss.
> Defendants provided the Court with a copy of the
> Addendum, which includes additional factual
> allegations as well as the twelfth cause of action.
> The Addendum has been docketed and filed by
> order of this Court. This Opinion treats the
> complaint and the Addendum together as the
> pleading to which the defendants' motion is
> addressed.

> FN2. This description of Mid-Hudson is not
> disputed. It is not contained in the complaint, but
> rather is drawn from the webpage of the New
> York State Office of Mental Health. *See* http://
> www.omh.state.ny.us/omhweb/facilities/mhpc/f
> acility.htm.

> FN3. This fact is drawn from Lombardo's
> opposition to defendants' motion to dismiss.

On August 15, 2006, Lombardo attended a Gold Card
Bingo game, which is restricted to patients with "Gold
Card" status. He sat next to patient Rebecca B. About an
hour into the game, Rebecca B. "announced that she was
going to the bathroom" and did not return. Later that
evening, Lombardo was informed by defendant Dr.
Sadorra that Rebecca B. claimed Lombardo "rubbed her
leg and made obscene comments to her such as[ ] he
wanted to have sex with her."

The following day, Lombardo met with his treatment
team, which included defendants Dr. Sheyas Baxi and Dr.
Chandrasekhara, to discuss Rebecca B.'s allegations.
Lombardo denied any wrongdoing. His treatment team
suspended his Gold Card status and prohibited him from
attending co-ed activities pending an investigation. On
August 17, Lombardo was interviewed by a member of the
institution's risk management team, to whom he provided

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

a list of witnesses to testify on his behalf concerning Rebecca B.'s allegations.

On August 18, Lombardo was prohibited from attending Jewish services by Baxi, who explained that the services were co-ed and therefore off limits to Lombardo. Later that afternoon, Lombardo met with members of the Mental Hygiene Legal Services team, who told him that they would work on gaining him access to Jewish services. His Gold Card status was restored on October 31, but the restrictions on his attendance at co-ed activities remained in place. On November 22, Lombardo's treatment team informed him that he would slowly be phased back into co-ed activities. That day, he was permitted to attend a pizza party.

On December 7, Lombardo attended a Behavior Change Group, facilitated by defendant Zelma Armstrong. At that meeting, Lombardo spoke of recent problems he was having with his girlfriend. He also revealed that his girlfriend had been bringing him caffeinated coffee, which is contraband at Mid-Hudson. Armstrong told Lombardo that she was required to report his admission to the treatment team.

**\*2** The following day, Lombardo's treatment team, including defendant Frank Brusinski, informed Lombardo that his girlfriend would no longer be permitted to visit him because she had "introduced contraband to the facility." The team also searched Lombardo's room and found $34.10 in change. Six dollars of this was placed in Lombardo's personal account; the remainder was placed into the patients' general fund.

On December 26, a box of Christmas cookies was delivered to Lombardo's ward. Throughout the morning, Lombardo observed Mid-Hudson staff members eating the cookies. Believing that the cookies were reserved for patients only, Lombardo reported the staff members' behavior to two members of the ward's staff. At 10 p.m. that evening, Lombardo was awakened by Mid-Hudson staff who informed him that his room was to be searched because the staff had received information that Lombardo was in possession of contraband matches. This search-or "shake down"-was approved by Sadorra and supervised by defendant Lynburgh Burton. During the search, which

lasted forty-five minutes, Mid-Hudson staff recovered sugar packets, ziplock bags, shoe laces, and two sexually provocative pictures. No matches were recovered. The following day, Lombardo met with his treatment team. He was placed on inappropriate sexual behavior alert by Baxi, which resulted in his segregation from the general population for approximately one week.

Lombardo was again required to meet with his treatment team on January 25, 2007, after he sent a birthday card to a female patient. Baxi informed Lombardo that he was not permitted to communicate with any female patients, except during religious services. Lombardo asked Baxi whether she "wanted him to be a homosexual." As a result, he was given an "X," which resulted in four weeks' additional suspension of his Gold Card status.

Lombardo regained his Gold Card status on March 2. On March 9, his treatment team informed him that he had been accused by a patient of pinching his buttocks in the shower. As a result, Lombardo was transferred to a different ward, where he was assigned a new treatment team. Only three days after his transfer, the new treatment team informed Lombardo that "there [we]re already rumors that plaintiff made passes at patients in the shower room." Accordingly, Sadorra restricted Lombardo to solitary showers.

On or before March 16, Lombardo attempted to send $600 in paper money through the mail. Paper money is contraband in the hospital, and it is unclear how Lombardo acquired it. Lombardo wrapped the money in a manila envelope and sealed it, and then gave the envelope to the ward social worker, along with money to pay the cost of postage. On March 16, Lombardo was told by a Mid-Hudson staff member that the envelope had been opened. The staff member did not provide any details, however, as to who had opened the envelope or why. It was only later, on August 7, 2007, that Lombardo learned that social worker Mildred Smith had opened the envelope. Chandrasekhara later informed Lombardo that he was to be placed on "mail restriction," meaning that all of his outgoing mail-including his legal mail-would be observed as it was being placed into the envelope. Three days later, Chandrasekhara informed Lombardo that he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

had also been placed on "phone restriction," meaning that all of his outgoing telephone calls–including his legal calls–would be monitored from his end. Lombardo objected, contending that certain calls should be excluded from surveillance by Mid-Hudson staff because they were "legal calls." He produced a list of such calls and provided it to his treatment team, which approved only part of the list. The team excluded calls to obviously non-legal telephone numbers, such as the New York State Office of Mental Health. The team also honored a request from Mental Hygiene Legal Services not to scrutinize any of Lombardo's legal mail upon receipt.

**\*3** Lombardo met with his treatment team on April 12. Dr. Phelan, the chief of Lombardo's unit, informed Lombardo that he would be taken off telephone restrictions if he divulged the source of the $600 found in his outgoing mail. The complaint provides no account of Lombardo's response to Phelan's request. Nonetheless, Lombardo was taken off telephone restrictions on April 24. He remained on mail restrictions.

On May 1, Lombardo's treatment team told him that the $600 discovered in his outgoing mail would be credited in its entirety to his account if he divulged a legitimate source of the money. If he could not provide a legitimate explanation, the money would be placed into the patients' general fund. It is not clear from the complaint whether Lombardo ever proffered an explanation to the treatment team. Nonetheless, by letter dated June 6, defendant Howard Holanchok informed Lombardo that only ten dollars of the confiscated money had been credited to his account, with the remainder placed in the patients' fund.

Lombardo was observed playing cards with another patient on June 29. Believing that the two patients were gambling, a Mid-Hudson staff member summoned Brusinski, who approved a pat-frisk of Lombardo and a search of his quarters. When Lombardo returned to the ward that night, his quarters were searched upon Brusinski's orders. Twenty-five dollars in coins were confiscated from Lombardo's quarters.

Lombardo filed the complaint in this action on October 9, 2007, bringing eleven causes of action under

42 U.S.C. § 1983 for alleged violations of his constitutional rights and his rights under the New York State Mental Hygiene Law. A twelfth was added through the Addendum. Defendants moved to dismiss on January 25, 2008, arguing primarily that Lombardo failed to state a violation of his constitutional rights or any law of the United States. Further, they contended that they were immune from this action based on absolute or qualified immunity. Lombardo opposed the motion on March 4; defendants submitted their reply on March 28.

DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007) (citation omitted). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted). A court must apply a "flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (citation omitted). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). Nonetheless, a *pro se* pleading must be more liberally construed. "A document filed *pro se* is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp,* 521 F.3d 202, 214 (2d Cir.2008) (citation omitted).

**\*4** In their motion to dismiss, defendants helpfully analyze Lombardo's twelve causes of action according to the constitutional provisions and state law upon which they are based. The following analysis will proceed in the same fashion.

I. The Due Process Clause

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

Lombardo alleges the following violations of the Due Process Clause: (1) Baxi, Chandrasekhara, and Brusinski violated the Due Process Clause by restricting Lombardo's access to religious services, segregating him from the ward population, and prohibiting him from writing to female patients, based on allegations by a female patient and without interviewing Lombardo himself (First Cause of Action); (2) Armstrong violated Lombardo's "right to confidentiality" by reporting to her supervisors that Lombardo's girlfriend had brought him contraband caffeinated coffee (Fifth Cause of Action); (3) Brusinski unconstitutionally deprived Lombardo of the money that was found during searches of his quarters by depositing that money into the patients' general fund, rather than Lombardo's personal account (Seventh Cause of Action); (4) Holanchok unconstitutionally attempted to "coerce" Lombardo when he offered to end Lombardo's mail restrictions if he provided the source of the $600 confiscated from his outgoing mail (Tenth Cause of Action); and (5) Holanchok unconstitutionally deprived Lombardo of the money confiscated from his outgoing mail when he placed the $590 into the patients' general fund (Eleventh Cause of Action).

"In evaluating due process claims, the threshold issue is always whether the plaintiff has a property or liberty interest protected by the Constitution." *Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001) (citation omitted). The Supreme Court has recognized that patients involuntarily committed to state mental institutions enjoy a constitutionally protected liberty interest in safe conditions and freedom from bodily restraint. *Youngberg v. Romeo,* 457 U.S. 307, 315-16 (1982). The plaintiff in Romeo was violent, and was shackled while treated in the infirmary for a broken arm. *Id.,* at 310. The Court held that such committed inmates also have a constitutionally protected liberty interest in "minimally adequate or reasonable training" to ensure safety and freedom from undue bodily restraint. *Id.,* at 319.

In assessing whether rights under the Due Process Clause have been violated, a court weighs "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id.,* at 320. Any decision regarding a restraint on these liberty interests that is made by a professional "is presumptively valid." *Id.,* at 323. To

prevail on a due process claim, a plaintiff must show that the professional's decision "is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

**\*5** When a person is deprived of a liberty or property interest protected by the Constitution, the state must provide notice and an opportunity to be heard. *Mathews v. Eldridge,* 424 U.S. 319, 348 (1976). "The precise form of notice and hearing depends upon balancing (1) the state's interest; (2) the private interest affected by the state's action; and (3) the risk of erroneous deprivation and the value of additional safeguards." *Perry,* 280 F.3d at 174. "[T]he existence of an adequate state remedy to redress property damage inflicted by state officials avoids the conclusion that there has been any constitutional deprivation of property without due process of law within the meaning of the Fourteenth Amendment." *Parratt v. Taylor,* 451 U.S. 527, 542 (1981) (citation omitted), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 330-31 (1986); *see Doe v. Dep't of Public Safety ex rel. Lee,* 271 F.3d 38, 55 (2d Cir.2001) (citation omitted), *rev'd on other grounds, Conn. Dep't of Public Safety v. Doe,* 538 U.S. 1 (2003).

With the exception of his assertion that his money was seized, Lombardo's due process claims do not recite a deprivation of a constitutionally protected interest. Specifically, the restrictions on his participation in prison activities and correspondence with female patients, the reporting of his violations of the institution's rules, and the requests that he divulge the source of contraband currency do not constitute interference with constitutionally protected interests.

Lombardo complains of three seizures of money. On December 8, 2006, $28.10 of $34.10 found in his room was placed into the patients' general fund. On March 16, 2007, $590 of $600 was also placed in that fund.[FN4] Finally, on June 29, 2007, $25 in coins was seized from his room. These allegations describe a deprivation of property by officers acting under color of state law. *See Parratt,* 527 U.S. at 536-37. Nonetheless, Lombardo's claim for recovery of these moneys is a simple tort claim. As the Second Circuit has observed, "[t]he Supreme Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

has been emphatic that not every tort committed by public officers is actionable under the Constitution, even though every one could be thought to deprive the tort's victim of an interest in the nature of liberty or property." *Dep't of Public Safety ex rel. Lee,* 271 F.3d at 55.

> FN4. As Lombardo's complaint acknowledges, the $600 in paper money was contraband, and in Lombardo's possession in violation of the institution's rules.

Lombardo has an adequate state remedy for the seizures of his money because he can bring an action for conversion of his property. *See Parratt,* 451 U.S. at 543-44; *Hudson v. Palmer,* 468 U.S. 517, 530, 533 (1984). The New York Court of Claims Act provides Lombardo with a cause of action against the State for this tort. *See* N.Y. Ct. of Claims Act § 9; *see Brown v. State,* 674 N.E .2d 1129, 1133-34 (N.Y.1996). Accordingly, he has failed to state a claim under § 1983 for violation of his rights under the Due Process Clause.

II. First Amendment Right to Religious Freedom

**\*6** Lombardo claims that Baxi, Chandrasekhara, and Brusinski violated his First Amendment right to freedom of religion by prohibiting him from attending religious services (Third Cause of Action). In his complaint, and in the cause of action concerning religious freedom, Lombardo mentions only one Jewish service he was unable to attend.FN5 In opposition to this motion, Lombardo adds that in lieu of attending the service he asked to see a rabbi but that the rabbi never came.

> FN5. An appendix attached to his complaint, however, lists four services-one Jewish, two Protestant, and one for "Spiritual Development"-that Lombardo was allegedly prohibited from attending. To prevail on a free exercise claim, the plaintiff must "demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir.2002) (citation omitted). As a consequence, the complaint will be construed as asserting that the plaintiff is Jewish and that the defendants

interfered with his practice of his Jewish faith.

In the Second Circuit, to prevail on a free exercise claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006) (citation omitted).FN6 The First Amendment protects inmates' free exercise rights "even when the infringement results from the imposition of legitimate disciplinary measures." *McEachin v. McGuinnis,* 357 F.3d 197, 204 (2d Cir.2004); *see also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) (observing that "prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible"). Thus, defendants must "justify their restriction of [plaintiff's] free exercise rights" by reference to legitimate penological interests. *McEachin,* 357 F.3d at 204 (citation omitted).

> FN6. No party has suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to prisoners' free exercise claims. Accordingly, the free exercise analysis applied in the prison context will apply here.

Lombardo has pleaded a violation of his First Amendment rights with his allegation that Baxi prohibited him from attending Jewish services on August 18, 2006. Defendants also claim that defendants are entitled to qualified immunity on Lombardo's free exercise claim because they "could not reasonably have thought that barring Plaintiff from a single service could constitute an infringement of his Free Exercise right."

Under the doctrine of qualified immunity, a government official may be shielded from liability "if his conduct did not violate clearly established rights or if it would have been objectively reasonable for the official to believe his conduct did not violate plaintiff's rights." *Reuland v. Hynes,* 460 F.3d 409, 419 (2d Cir.2006) (citation omitted). In determining whether a defendant is entitled to qualified immunity, the relevant inquiry is whether the right that was allegedly violated was "clearly established at the time of the defendant's behavior." *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "The essence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

of the principle is that officers sued in a civil action for damages under 42 U.S.C. § 1983 have the same right to fair notice as do defendants charged with a criminal offense." *Pena v. DePrisco*, 432 F.3d 98, 115 (2d Cir.2005) (citation omitted). In assessing a qualified immunity claim, a court must consider:

> (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*7** *Id.* (citation omitted).

The right of an incarcerated person to observe his religion and to attend congregate religious services was well-established in this Circuit before August 2006. *See Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir.1993); *Young*, 866 F.2d at 570.[FN7] It was also well-established as of that time that the right is not abrogated when the incarcerated person is subject to disciplinary constraints, *see McEachin*, 357 F.3d at 204, but that restrictions may be imposed when they are "reasonably related to legitimate penological interests," *Young*, 866 F.2d at 570.

> FN7. Defendants rely on an unpublished Second Circuit summary order, dated March 29, 2004, for their contention that they "could not reasonably have thought that by barring Plaintiff from a single service could constitute an infringement of his Free Exercise right." Pursuant to the rules of the Second Circuit, citation to unpublished summary orders filed before January 1, 2007 is not permitted.2d Cir. R. 32.1. Regardless of what the order says, a summary, unpublished disposition cannot articulate the law of the Circuit with the clarity requisite for a qualified immunity defense.

The defendants are entitled to qualified immunity on Lombardo's free exercise claim. Relying solely on the allegations in the complaint and construing those allegations in the light most favorable to the plaintiff, it was objectively reasonable for the defendants to believe that the restriction on Lombardo's participation in a single co-ed religious service was reasonably related to legitimate penological interests. The service occurred just three days after Rebecca B. complained that Lombardo had touched her and had made obscene comments to her, and during that time Lombardo's treatment team was investigating those allegations. The claim based on the asserted violation of the Free Exercise Clause is dismissed. *See Young v. Goord*, No. 01 Civ. 0626(JG), 2005 WL 562756 (E.D.N.Y. Mar. 10, 2005), *aff'd*, 192 Fed. App'x 31, 33 (2d Cir.2006).

### III. Illegal Searches and Seizures

Lombardo contends in his Sixth and Twelfth Causes of Action that defendants Sadorra, Burton, and Brusinski violated his right to be free from searches and seizures "for harassment purposes" when they ordered or supervised searches of his quarters.[FN8] Lombardo was told that the search at issue in the Sixth Cause of Action was performed because "some unnamed person said that Plaintiff was in possession of matches," but suggests that the search was in retaliation for his complaints that staff members were eating the patients' Christmas cookies. As noted above, the search yielded no matches, but other contraband was discovered. As to the search at issue in the Twelfth Cause of Action, Lombardo observes that it was effected after a pat-frisk, conducted because of suspicions he was gambling, revealed no contraband on his person.

> FN8. Lombardo's Twelfth Cause of Action alleges that Brusinski violated Lombardo's rights "by approving 'shake-down' on Plaintiff after he was pat-frisked, with no contraband found." This cause of action thus challenges the "shake-down" search of Lombardo's quarters, and not the pat-frisk that preceded it.

As the defendants rightly observe, the Second Circuit has not articulated the level of privacy enjoyed by a civilly committed psychiatric patient such as Lombardo. *But see Buthy v. Commissioner of Office of Mental Health of New York State*, 818 F.2d 1046, 1051 (2d Cir.1987) (applying the levels of protection afforded pre-trial detainees under the Due Process Clause to persons confined due to an acquittal by reason of insanity or due to their

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

incompetence to stand trial). *Youngberg v. Romeo* teaches that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Romeo,* 457 U.S. at 321-22. "At the same time, this standard is lower than the compelling or substantial necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety." *Id.* at 322. Moreover, Romeo makes clear that courts must defer to the considered judgment of professionals in institutions to which persons are involuntarily committed. *Id.* at 323.

**\*8** In the convicted prisoner and pretrial detainee contexts, the Supreme Court has permitted searches of inmates' cells, finding that such a search gives rise to neither a Fourth Amendment nor Fourteenth Amendment claim. *See Block v. Rutherford,* 468 U.S. 576, 590 (1984); *Hudson,* 468 U.S. 517 at 530. The Supreme Court observed that "it would be literally impossible to accomplish the prison objectives" of preventing the introduction of contraband and illicit weapons, detecting escape plots, and maintaining a sanitary environment "if inmates retained a right of privacy in their cells." *Hudson,* 468 U.S. at 527; *see Willis v. Artuz,* 301 F.3d 65, 69 (2d Cir.2002). [FN9]

> **FN9.** A pretrial detainee may retain a limited Fourth Amendment right when a search is instigated by non-prison officials acting for non-institutional security reasons. *Willis,* 301 F.3d at 68. Since Lombardo does not assert that the searches were instituted at the behest of officials outside Mid-Hudson, this limited right need not be discussed further.

The same rationale obtains in the context of an involuntarily committed person. *Romeo* makes clear that involuntarily committed persons should be free of "conditions of confinement [that] are designed to punish." *Romeo,* 457 U.S. at 322. The *Romeo* rule is thus animated by a concern that individuals who have not been convicted of a crime not be punished as criminals. The *Block/Hudson* rule, on the other hand, is motivated by concerns about institutional security and health. The protections accorded to involuntarily detained individuals

under *Romeo* thus do not serve to undermine the *Block/Hudson* rationale that deprives institutionalized persons of their Fourth Amendment rights. As the Supreme Court has observed, "[i]t is difficult to see how the detainee's interest in privacy is infringed by the room-search rule. No one can rationally doubt that room searches represent an appropriate security measure ...." *Bell v. Wolfish,* 441 U.S. 520, 557 (1979); [FN10] *see also United States v. Willoughby,* 860 F.2d 15, 21 (2d Cir.1988). Accordingly, as an involuntarily detained person, Lombardo has no Fourth Amendment right against searches of his cell, and thus no claim under § 1983 for the alleged violations of his Fourth Amendment rights. His claims to this effect are therefore dismissed.

> **FN10.** In *Bell,* the Supreme Court assumed that a pretrial detainee had a diminished expectation of privacy after commitment to a custodial facility, and found that searches of these detainees' cells did not violate the Fourth Amendment. *Bell,* 441 U.S. at 557.

To the extent Lombardo argues that the first search was effected in retaliation for his complaint about the staff members, that claim also fails. "While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001); *see also Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003). The courts of this district are unanimous in holding that even retaliatory searches of a prisoner's cell do not give rise to a claim under § 1983. *See Salahuddin v. Mead,* 95 Civ. 8581(MBM), 2002 WL 1968329, at \*5 (S.D.N.Y. Aug. 26, 2002) (collecting cases). "Cell searches are so fundamental to the effective administration of persons and to the safety of prisoners and staff that the searches should not be second-guessed for motivation." *Id.* at \*3. For the reasons discussed above, involuntarily committed persons have no right to privacy in their cells. Accordingly, Lombardo cannot state a retaliation claim for a search of his cell.

IV. Right to Contact with Counsel

**\*9** Read broadly, Lombardo's Ninth Cause of Action

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

alleges that defendants violated his right "to confidential communications with attorneys" by refusing to allow him private telephone calls and by observing him as he placed his outgoing mail into envelopes. Lombardo's claim fails to the extent it is brought under the First and Fourteenth Amendments.

As the Second Circuit has observed, "[i]nterference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis,* 320 F.3d at 351.[FN11] Presumably the same holds true for legal communication by telephone and for the rights of inmates committed by reason of insanity. "To state a claim for denial of access to the courts-in this case due to interference with legal mail-a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim," *id.* (citation omitted); for instance, actions that led to the dismissal of an otherwise meritorious legal claim, *id.*

FN11. Lombardo predicates the Ninth Cause of Action in part on the Sixth Amendment, which applies only in criminal cases. Presumably, his Sixth Amendment claim concerns defendants' alleged interference with Lombardo's communication with his attorneys in connection with the underlying criminal case that resulted in his civil commitment. Defendants' treatment of this claim in their motion papers is cursory. In his opposition, Lombardo explains that he was committed to Mid-Hudson pursuant to New York Criminal Procedure Law. Liberally read, this argument suggests that his commitment proceedings and eventual exit proceedings from Mid-Hudson were criminal in nature, and that the Sixth Amendment therefore applies to him. Lombardo is therefore granted leave to replead his Ninth Cause of Action insofar as it raises a Sixth Amendment claim.

This claim fails for a number of reasons. First, Lombardo has failed to allege, as required by *Davis,* that defendants' actions "resulted in actual injury."[FN12] He has not alleged any way in which he was affected by defendants' mere observation of him sending mail, or

surveilling his outgoing telephone calls. Second, Lombardo has not alleged that defendants searched his mail, only that they observed him placing the mail into envelopes. Observation of the mail, standing alone, cannot impinge on Lombardo's access to counsel, "since the mail would not be read." *Wolff v. McDonnell,* 418 U.S. 539, 577 (1974). Third, per his request and the request of Mental Hygiene Legal Services, defendants agreed not to scrutinize any mail to Lombardo from the Mental Hygiene Legal Service or to listen to any legal calls.[FN13] Accordingly, Lombardo's Ninth Cause of Action fails to the extent it is predicated on the First and Fourteenth Amendments.

FN12. If Lombardo's failure to allege that the defendants hindered his pursuit of a meritorious legal claim were the sole deficiency, then Lombardo would be granted leave to replead, since the defendants did not move to dismiss his Ninth Cause of Action on this ground. As it is, the other grounds for dismissal are sufficient to support dismissal.

FN13. In an appendix to his complaint, Lombardo lists thirty-two telephone calls, identifying the staff member "who assisted [Lombardo] in making" the calls and the intended recipient. In his opposition to defendants' motion to dismiss, Lombardo identifies these calls for the first time as "legal telephone communications [that] were listened to on 32 occasions by members of Plaintiff's treatment team." Nowhere in his complaint does Lombardo allege that the staff members "listened to" these calls; he only claims that they "assisted [him] in making" them. Further, the calls were made to the Mental Health In-House Complaint Line, the Commission on Quality Care, the Joint Commission of Accreditors of Health Care Organizations, Mental Hygiene Legal Services, and a handful of unidentified individuals. Only Mental Hygiene Legal Services is identified as a legal services provider, and defendants agreed not to listen to any calls from this organization. Lombardo does not dispute this fact. Accordingly, the appendix does not support any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)

(Cite as: 2008 WL 2543573 (S.D.N.Y.))

plausible claim that Lombardo's counsel-related rights were violated by the defendants.

### V. Eighth Amendment

In his Second Cause of Action, Lombardo alleges that defendants Baxi, Chandrasekhara, and Brusinski violated his Eighth Amendment right to be free from cruel and unusual punishment by preventing him from attending certain activities, segregating him from other patients, preventing written communication with female patients, and denying him visits from his girlfriend. Further, in his Tenth Cause of Action, Lombardo claims that defendant Holanchok violated his Eighth Amendment rights by "attempting to coerce him," when he offered to end Lombardo's mail restrictions if Lombardo identified the source of the $600 confiscated from his outgoing mail. These claims fail as Eighth Amendment claims because that constitutional amendment does not apply to one who has been civilly committed. By its terms, the Eighth Amendment applies only to "punishment," and as "an insanity acquittee ... was not convicted, he may not be punished." *Jones v. United States,* 463 U.S. 354, 369 (1983); *see also Youngberg,* 457 U.S. at 324-25.

**\*10** Reading the complaint liberally, Lombardo's Second and Tenth Causes of Action fail to state any constitutional claims. For the most part, the injuries of which Lombardo complains have either been discussed and rejected in the preceding discussion or do not implicate any right protected by the Constitution. Only one claim requires further discussion: Lombardo asserts that he was denied visits from his girlfriend. This could be construed as raising a First Amendment claim. Assuming *arguendo* that Lombardo possessed a First Amendment right to freedom of association with his girlfriend, his claim fails. Lombardo acknowledges that his girlfriend brought him contraband caffeine, and that the restrictions on his visits with her were introduced as a result of these infractions. Lombardo does not argue that these restrictions were unreasonable, or that there was any impermissible reason for defendants' restrictions on his visits with his girlfriend. Further, Lombardo was permitted to receive other visitors, and to communicate with his girlfriend through other means, such as mail. *See Smith v. Coughlin,* 748 F.2d 783, 788 (2d Cir.1984).

### VI. State Law Claims

Lombardo alleges two violations of the New York Mental Hygiene Law. First, in his Fourth Cause of Action, he claims that Baxi, Chandrasekhara, and Brusinski violated his rights under the New York Mental Hygiene Law by denying him access to religious services. Second, the Eighth Cause of Action seeks to hold defendant "John Doe" liable for violating Lombardo's rights under 14 N.Y.C.R.R. § 527.11, which prescribes guidelines governing mental health patients' free communication with others within and outside the facility to which they are committed. In his "Addendum to Complaint," Lombardo identifies "John Doe" as Mildred Smith, a Mid-Hudson social worker. These claims fails. "The Mental Hygiene Law is a regulatory statute." *McWilliams v. Catholic Diocese of Rochester,* 536 N.Y.S.2d 285, 286 (4th Dep't 1988). "No private cause of action is authorized for violations of the Mental Hygiene Law." *Id.* [FN14]

> [FN14.] Lombardo is surely aware of this principle. In a previous lawsuit, his claims under the New York Mental Hygiene Law were dismissed on the same basis. *See Lombardo v. Stone,* No. 99 Civ. 4603(SAS), 2001 WL 940559, at *5 (S.D.N.Y. Aug. 20, 2001).

### CONCLUSION

The Court has considered Lombardo's other arguments and finds them to be without merit. Defendants' January 25, 2008 motion to dismiss is granted in part. Lombardo is granted leave to replead his Ninth Cause of Action under the Sixth Amendment A scheduling order accompanies this Opinion.

SO ORDERED.

S.D.N.Y.,2008.

Lombardo v. Holanchock
Not Reported in F.Supp.2d, 2008 WL 2543573 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Faris ABDUL-MATIYN, Plaintiff,
v.
Governor George PATAKI, Governor; Allen,
Correction Officer; Rowe, Correction Officer;
Valezquez, Correction Officer; Benbow, Correction
Officer; Johnson, Sullivan Correctional Facility Senior
Parole Officer; John Doe, 1, Sullivan Correctional
Facility Audiologist; John Doe 2, Sullivan Correctional
Facility Counselor; Walsh, Sullivan Correctional
Facility Superintendent; John Doe 3, Sullivan
Correctional Facility Psychiatrist; John Doe # 4, Cnypc
Psychiatrist; Elizabeth Farnum, Doctor; Debroize,
Doctor; Forshee, Doctor; Pete Hanmer, Cnypc Primary
Therapist; Tom Murphy; Jeff Nowicki; Sharon Barboza,
Director Cnypc Sotp Program; Sawyer, Director, Cnypc;
Cnypc Medical Staff; Michelle Payne, Former Cnypc
Program Rehabilitation Counselor; Steve Capolo; and
Linda Becker, Defendants.
No. 9:06-CV-1503 (DNH)(DRH).

April 8, 2008.
Faris Abdul-Matiyn, Brooklyn, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General
State of New York, Gerald J. Rock, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants Johnson, Walsh, Farnum, Debroize, Forshee,
Hanmer, Murphy, Nowicki, Barboza, Sawyer, CNYPC
Medical Staff, Capolo, and Becker.

Kloss, Stenger, Kroll & Lotempio, David W. Kloss, Esq.,
of Counsel, Buffalo, NY, for Defendants Allen, Rowe,
Valezquez, and Benbrow.

### DECISION and ORDER

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Faris Abdul-Matiyn, brought this civil
rights action pursuant to 42 U.S.C. § 1983. By a
voluminous Report-Recommendation dated February 19,
2008, the Honorable David R. Homer, United States
Magistrate Judge, addressed the numerous issues in this
matter with the recommendations that:

1. The motion of Walsh and Johnson to sever be
denied;

2. The motion of Walsh and Johnson to dismiss be
granted as to plaintiff's conspiracy claim against defendant
Johnson for failure to intervene, and denied in all other
respect;

3. The state defendants' motion to dismiss be granted
in all respects as to defendant Sawyer; granted in all
respects as to plaintiff's claim for denial of access to the
courts, and denied in all other respects;

4. The City defendants' motion to dismiss be denied
in all respects;

5. The motion of defendant CNYPC Medical Staff to
dismiss be granted; and

6. The complaint be dismissed without prejudice as to
defendants George Pataki, Michelle Payne, and John Does
I-IV.

No objections to the Report-Recommendation have
been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Homer, the
Report-Recommendation is accepted and adopted in its
entirety. See 28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that:

1. Defendant Walsh and Johnson's motion to sever is
DENIED;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

2. Defendant Walsh and Johnson's motion to dismiss is GRANTED with regard to plaintiff's conspiracy claim against defendant Johnson for failure to intervene, and DENIED in all other respects;

3. The state defendants' motion to dismiss is GRANTED in all respects with regard to defendant Sawyer, GRANTED in all respects with regard to plaintiff's claim for denial of access to the courts, and DENIED in all other respects;

4. The City defendants' motion to dismiss is DENIED in all respects;

5. The motion of defendant CNYPC Medical Staff to dismiss is GRANTED; and

6. The complaint is DISMISSED without prejudice with regard to defendants George Pataki, Michelle Payne, and John Does I-IV.

7. The Clerk is directed to enter judgment accordingly, and the remaining defendants are instructed to file and serve answers with regard to the remaining claims on or before April 29, 2008.

IT IS SO ORDERED.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Faris Abdul-Matiyn ("Abdul-Matiyn"), formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants,[FN2] twelve DOCS employees[FN3] ("State defendants"), four New York City Corrections Officers ("City defendants"), and the Central New York Psychiatric Center ("CNYPC") Medical Staff ("CNYPC defendants"), violated his constitutional rights under the First, Fourth, Eighth, and Fourteenth Amendments.

Compl. (Docket No. 1). Presently pending are a motion to sever defendants Walsh and Johnson pursuant to Fed.R.Civ.P. 21 or, in the alternative, to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) (Docket No. 17) and motions to dismiss from the State defendants (Docket Nos. 44, 47),[FN4] the City defendants (Docket No. 46), and defendant CNYPC Medical Staff defendants (Docket No. 55) pursuant to Fed.R.Civ.P. 12(b)(6). Abdul-Matiyn opposes all motions. Docket Nos. 45, 48, 62. For the following reasons, it is recommended that (1) the motion of Walsh and Johnson to sever be denied and their motion to dismiss be granted in part and denied in part, (2) the State defendants' motion be granted in part and denied in part, (3) the City defendants' motion be denied, and (4) the motion of the CNYPC Medical Staff be granted.

> FN2. Abdul-Matiyn initially named twenty-six defendants. Compl. By an order entered January 26, 2007, the Court *sua sponte* dismissed three of the defendants. Docket No. 8. Defendants Pataki and Payne have not been served or otherwise appeared in this action. Likewise, defendants John Does I-IV have neither been served nor further identified. More than 120 days have elapsed since the complaint was filed. Accordingly, it is recommended that the complaint be dismissed without prejudice as to these six defendants pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

> FN3. Two of the State defendants, Walsh and Johnson, are employed by Sullivan Correctional Facility and, while represented by the same attorney as the other State defendants, have filed separate motions.

> FN4. The State defendants initially moved to dismiss which was later discovered to contain an error in the electronic scanning of the documents. Docket No. 47. By an order dated May 29, 2007 (Docket No. 44, Pt. 1), that motion was stricken from the record and replaced by Docket No. 47. Docket No. 49.

**I. Background**

**\*2** The facts are presented in the light most favorable

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

to Abdul-Matiyn as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

Abdul-Matiyn "was released from Woodburn [Correctional Facility], after ... serv[ing] sixteen years and eight months ...." Compl. at 13. Abdul-Matiyn thereafter "attended [and completed] sex therapy, alternative[s] to violence, [and] psychological programs ...." *Id.* However, on May 5, 2005, Abdul-Matiyn was arrested and detained at Rikers Island due to a parole violation. *Id.*

Upon his arrival at Rikers Island, Abdul-Matiyn complained of "arthritis, back problems (pains), a history of heart problems, a history of blackouts ..," and kidney and bladder stones. *Id* . On July 6, 2005, Abdul-Matiyn requested a sick call because he was "having severe back pains, that were making it almost impossible for him to walk ... [and] a tightness in his chest and strong chest pains." *Id.* at 7. Abdul-Matiyn alleges that he was sent back to his cell, and despite his continued complaints, crippling pain, and pleas to go to the hospital, defendants Allen and Benbow ignored his requests. *Id.* at 7-8. Defendant Valezquez replaced Allen and "[Abdul-Matiyn] and the inmates informed [her] that [AbdulMatiyn] was having chest and back pains ... [so she] called the hospital and she was told to send [him] right down." *Id.* at 8. Benbow approached Valezquez to inquire where AbdulMatiyn was going and when Valezquez informed her that he was going to the hospital, Benbow allegedly referred to Abdul-Matiyn by a racial epithet and called the hospital, instructing them to put Abdul-Matiyn "on the burn". *Id.*

Defendant Rowe met Abdul-Matiyn upon his arrival at the hospital. *Id.* She informed him that he was "on the burn" and "[d]espite [Abdul-Matiyn's] persistent complaints of chest and back pains ..," Rowe did not let him see a doctor until over three and one-half hours later. *Id.* at 9. Abdul-Matiyn's chest pains had subsided, but he was still suffering from back pain and was prescribed methocarbamol. *Id.* Abdul-Matiyn contends that the physician informed him that due to the hospital's faulty equipment, the methocarbarnol was the only treatment available and that any persisting pain would have to be managed with Abdul-Matiyn's ability to use his mind to control the discomfort. *Id.*

Additionally, Abdul-Matiyn alleges that on another occasion where he was rushed to the clinic "due to severe pains [in his] chest, back and belly ..," he encountered Rowe, who stated that "they had something special in store for [Abdul-Matiyn]" and refused to provide Abdul-Matiyn with immediate medical treatment. *Id.* at 12. Abdul-Matiyn also contends that some of Rowe's saliva landed on his face and in his mouth while Rowe was speaking to him and attributed this exchange of bodily fluids to his contraction of Hepatitis B. *Id.* at 15.

**\*3** Abdul-Matiyn was supposed to be released from Rikers Island on May 5, 2006. *Id.* at 14. However, at the beginning of April, Abdul-Matiyn was summoned to meetings with the Sullivan Correctional Facility's mental health department. *Id.* at 16.[FN5] The mental health workers "stated that Albany told them to interview [Abdul-Matiyn] and to send Albany an evaluation;" however, despite Abdul-Matiyn's repeated requests, they would not tell him why Albany required an evaluation. *Id.* During the interview, Abdul-Matiyn was asked questions concerning his religion and alleged involvement with terrorists and terrorist organizations. *Id.* Additionally, Abdul-Matiyn contends that the mental health department was misconstruing prior conversations he had with them [FN6] about his religious beliefs, "distort[ing] and misinterpret[ing his statements] to have it appear that [he] was seeing and hearing things that were not there." *Id.*

> FN5. At some point Abdul-Matiyn was transferred to Sullivan Correctional Facility for housing, but the exact date is not reflected in the record.

> FN6. Abdul-Matiyn states that he sporadically suffered from depression which caused trouble sleeping. Compl. at 16. When this occurred, he would "go to mental health and speak with someone and [ ] get something to help him sleep." *Id.*

After the evaluation interview, Abdul-Matiyn was seen by defendant Johnson. *Id.* at 17. Johnson asked Abdul-Matiyn to complete additional paperwork, allegedly because AbdulMatiyn's initial paperwork had been "messed up." *Id.* Abdul-Matiyn "asked if anything came

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

up that would interfere with his release ...." and Johnson responded "no unless something else comes up unexpectedly ...." *Id.* Abdul-Matiyn continually asked correctional facility staff if there were new developments occurring in his case that would preclude his release; however, "[e]ach defendant expressed ... that they had no knowledge of anything that would prevent [him] from going home." *Id.*

On May 5, 2005, Abdul-Matiyn was met by Johnson and informed that he was "suppose[d] to have been examined by mental health the last two weeks before he was to be released [and] ... he had to be transferred to Marcy Psychiatric [Correctional Facility] to be evaluated." *Id.* at 18. Abdul-Matiyn alleges that he was told that his evaluation would be "three days to a week and no more than two weeks ...." *Id.* Abdul-Matiyn was then strip-searched, shackled, and transported to CNYPC. *Id.* Abdul-Matiyn later alleged that Walsh authored and signed an application for involuntary commitment and that this information was readily known by other defendants. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶¶ 11, 13-14.

Upon arrival at CNYPC, defendant Murphy allegedly told Abdul-Matiyn that he would "be [t]here a lot longer than [two weeks because he was] one of the filthy animals [defendants] have to clean off our streets." Compl. at 19. "All of [Abdul-Matiyn's] property was taken from him," including religious texts and other items. *Id.* Additionally, Murphy informed Abdul-Matiyn that he would "be [t]here for the rest of [his] life." *Id.* Abdul-Matiyn continually asked what authority granted defendants the ability to keep him confined against his will, but defendants did not give him an answer. *Id.*

**\*4** Additionally, Abdul-Matiyn underwent a psychological evaluation upon arrival. *Id.* According to the psychologist, "she didn't see anything mentally wrong with [Abdul-Matiyn] ... and that she could not give [him] any answers to his legal questions except that Governor Pataki instructed them to lock up everyone convicted of a sexual offense by any means possible, and keep them locked up forever." *Id.*

While Abdul-Matiyn resided at CNYPC, the CNYPC defendants, "especially ... Hanmer, .. Murphy, .. Nowicki

and ... Payne told [him] he had no constitutional rights ... to be allowed to practice his religion, have access to the courts or be told why he was [t]here at CNYPC." *Id.* at 20. Additionally, defendant Capolo allegedly refused Abdul-Matiyn's requests to pray, "tell[ing Abdul-Matiyn] that he was too busy to allow [Abdul-Matiyn] the opportunity to pray and [that he] would have to find another time after Capolo got off work to pray." *Id.* at 27. Abdul-Matiyn also contends that Payne "would taunt [him] everyday by making sarcastic statements about [Abdul-Matiyn] and his religion to groups of people whenever he was present." *Id.* Furthermore, although CNYPC provided kosher meals to Jewish residents and defendant Becker "told [Abdul-Matiyn] that they would consider obtaining a contract for halal meals <u>FN7</u> ...," none were purchased and Abdul-Matiyn was denied his special religious diet. *Id.* at 20.

> <u>FN7.</u> "Halal" foods are those prepared in accordance with Islamic religious law. *See, e.g.,* Cyril Glasse, *The Concise Encyclopedia of Islam* 133, 144, 148 (1989).

Abdul-Matiyn also contends that while he was at CNYPC, he was "forcefully strip searched, on a few occasions and threatened with the threat of being injected with drugs if he refused to be striped [sic] searched or ... participate in the programs [t]here at CNYPC, even if his refusal [wa]s due to his religion or if he w[as] physically ill." *Id.* at 23. AbdulMatiyn also alleges that Payne threatened him with the punishment of the "side room", where patients were allegedly "unmercifully beat, kick[ed] and stomp[ed] ...." *Id.* at 28. Moreover, Abdul-Matiyn contends that his "room ha[d] not been clean in over six months and the times [he] ha[d] tried to clean his room with a wet towel; he was threatened with punishment ...." *Id.* at 23. Abdul-Matiyn also complains that his confinement was discriminatory because "defendants ... came to the determination that they would imprison males convicted of sexual offenses ... [since] defendants are targeting only males convicted of sexual offenses and not females who commit the same or similar offenses." *Id.* at 25. This action followed.

**II. Discussion**

In his complaint, Abdul-Matiyn alleges that his First

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

Amendment rights were violated because the CNYPC defendants failed to provide him with halal meals, did not allow him to pray, and impeded his access to the courts. Abdul-Matiyn also claims that he was unlawfully strip-searched and shackled on multiple occasions. Additionally, Abdul-Matiyn asserts Eighth Amendment violations for deliberate indifference to a serious medical need [FN8] and, liberally construing Abdul-Matiyn's complaint, failure to protect. Moreover, AbdulMatiyn contends that his due process rights were violated by his civil confinement and the conspiracy between Walsh and Johnson to have him civilly confined, as well as claiming that his equal protection rights were violated by CNYPC's discriminatory procedures confining only male sex offenders. Walsh and Johnson move to sever and, in the alternative, dismiss based upon the failure to (1) abide by the pleading requirements, (2) allege the personal involvement of Walsh, and (3) state a claim with respect to Johnson. The State defendants move to dismiss based upon (1) Abdul-Matiyn's failure to comply with pleading requirements, (2) failure to allege the personal involvement of Sawyer, (3) the submission of a conclusory complaint with respect to the First and Fourteenth Amendment claims, and (4) the fact that verbal harassment alleged on the part of Capolo is not actionable under § 1983. The City defendants move to dismiss based upon the failure to (1) comply with pleading requirements, (2) allege personal involvement, (3) exhaust administrative remedies,[FN9] and (4) allege a serious medical need. The CNYPC defendants move to dismiss based upon Eleventh Amendment immunity.

FN8. Abdul-Matiyn asserts multiple claims of serious medical conditions including *inter alia* back and chest pain, hearing loss, bladder and kidney stones, Hepatitis B, and arthritis. Compl. at 5,11, 12-13, 14. Because only the City defendants asserted an argument controverting Abdul-Matiyn's serious medical need, only the ailments directly pertaining to their involvement with his treatment will be discussed. Docket No. 46. These claims primarily concern the complaints of Abdul-Matiyn's chest and back pain. Compl. at 7-9.

FN9. "[F]ailure to exhaust is an affirmative defense ...." *Jones v. Block,* 127 S.Ct. 910, 921

(2007); *see also Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006). Thus, the City defendants' assertion of this affirmative defense in a motion to dismiss is premature but may be revisited at the summary judgment stage. *See Jones,* 127 S.Ct. at 921-22 (holding that an inmate is not required to plead exhaustion in the complaint). Accordingly, the City defendants' motion on this ground should be denied.

**A. Legal Standard**

*5 Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the nonmovant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, "a 'complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Gilfus v. Adessa,* No. 5:04-CV-1368 (HGM/DEP), 2006 WL 2827132, at *3 (N.D.N.Y.2006) (citing *De Jesus v. Sears, Roebuck & Co.* 87 F.3d 65, 70 (2d Cir.1996) (internal quotations omitted)). Thus, dismissal is only warranted if it appears, beyond a reasonable doubt, that the non-moving party cannot prove a set of facts which would support his or her claim or entitle him or her to relief. *See Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999).

When, as here, a party seeks dismissal against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest..... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,.. or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

*se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted).

## B. Failure to Comply with Pleading Requirements

"Under the Federal Rules, a 'short and plain' complaint is sufficient as long as it puts the defendant on notice of the claims against it." *Phillips v. Girdich,* 408 F.3d 124, 127 (2d Cir.2005) (*quoting* Fed.R.Civ.P. 8(a)). Additionally, the Federal Rules state that "[a]ll averments of claim ... shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances...." Fed.R.Civ.P. 10(b). However, "[a]t base, the Rules command us never to exalt form over substance." *Phillips,* 408 F.3d at 128 (*citing* Fed.R.Civ.P. 8(f)).

The majority of defendants cite Abdul-Matiyn's failure to number his complaint in paragraphs as a basis for dismissal. However, the Court has been "willing to overlook harmless violations of Rule 10(b) ..." where the spirit of the rule, "to facilitate [ ] the clear presentations of the matters set forth, so that allegations might easily be referenced in subsequent pleadings," is not offended. *Id.* (citations and internal quotations omitted). Thus, "where the absence of numbering or succinct paragraphs does not interfere with one's ability to understand the claims or otherwise prejudice the adverse party, the pleading should be accepted." *Id.* (citations omitted).

**\*6** In this case, it is clear that all defendants were able to reference easily the allegations in the complaint as each set forth multiple reasons to dismiss the complaint other than the failure to comply with Rule 10(b). Moreover, defendants were not clearly prejudiced as each motion and memorandum of law is extensively researched, cogently written, and, when viewed together, refute most of the bases upon which Abdul-Matiyn asserts constitutional violations.

Therefore, the motions of Walsh and Johnson, the State defendants, and the City defendants on this ground should be denied.

## C. Personal Involvement

Certain defendants contend that Abdul-Matiyn has failed to establish their personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1)[T]he defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

## 1. Walsh

Walsh contends that "[o]ther than being named in the caption and identified as a party, [he] is never referred to in the complaint." Docket No. 17, Pt. 2 at 4. However, construing all of Abdul-Matiyn's submissions liberally, he alleges that "Walsh ... without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment .... " Docket No. 48 at ¶ 11. As discussed *infra* in subsection II(E)(2)(I), Abdul-Matiyn's involuntary civil confinement may constitute a due process violation. Thus, Walsh's alleged actions of authoring and signing the allegedly false report which served as the basis of Abdul-Matiyn's confinement may constitute direct participation in an alleged constitutional violation.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

Accordingly, Walsh's motion to dismiss on this ground should be denied.

### 2. Benbow, Allen, Rowe, and Valezquez

The City defendants contend that there are no allegations that they were personally involved in the alleged deliberate indifference to Abdul-Matiyn's medical treatment because they were not personally involved with providing his medical care. However, defendants need not physically administer the care to be subject to Eighth Amendment liability.

**\*7** As discussed *infra* in subsection II(E)(1), construing all facts in the light most favorable to Abdul-Matiyn, the City defendants exhibited deliberate indifference to his medical treatment. Although the City defendants were not responsible for the actual medical care, they were responsible for seeing that Abdul-Matiyn received adequate treatment once they were aware of his serious medical need. Crediting Abdul-Matiyn's allegations, each City defendant ignored this responsibility by denying Abdul-Matiyn with medical treatment or severely delaying it. Therefore, the complaint suffices to allege that each was directly involved in the alleged deliberate indifference.

Thus, City the City defendants' motion on this ground should be denied.

### 3. Sawyer

The State defendants argue that "[o]ther than being named in the caption and identified as a party, Sawyer is never referred to in the complaint." Docket No. 47, Pt. 2 at 4. Reading all of Abdul-Matiyn's submissions together, he alleges that "superiors [are] liable for their [employees'] actions ... and Sawyer is responsible for the training for those employed at CNYPC and liable for their actions and inactions." Docket No. 48 at ¶ 22. Abdul-Matiyn continues by alleging negligent hiring and retention and vicarious liability. *Id.* at ¶¶ 23-26.

Sawyer cannot be held liable solely because he held a supervisory position over other defendants. Abdul-Matiyn does not specifically contend that Sawyer was directly involved or had knowledge of the alleged constitutional violations; however, even when reading the complaint in the light most favorable to Abdul-Matiyn, any liberally construed allegations of direct involvement

and knowledge would still lack any factual basis. Additionally, although Abdul-Matiyn contends that there was negligent supervision, there is no fact asserted beyond his conclusory allegations that Sawyer created a hiring or retention policy which allowed constitutional violations to continue or was grossly negligent in managing the other named defendants.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### D. Severance

In the event of misjoinder of parties, "[a]ny claim against a party may be severed and proceed separately." Fed.R.Civ.P. 21. "While the decision whether to grant a severance motion is committed to the sound discretion of the trial court, the federal courts view severance as a procedural device to be employed only in exceptional circumstances." *Baergas v. City of New York,* No. 04-CV-2944 (BSJ/HBP), 2005 WL 2105550 at \*3 (S.D.N.Y. Sept. 01, 2005) (citations and internal quotations omitted). The factors considered "when determining whether severance is appropriate [are]:

(1) whether the claims arise out of the same transaction or occurrence, whether the claims present common questions of fact or law, (3) whether severance would serve judicial economy, (4) prejudice to the parties caused by severance, and (5) whether the claims involve different witnesses and evidence."

**\*8** *Id.* at \*3-4 (citations omitted).

In this case, it is clear that severance is not warranted. The actions of Walsh and Johnson are the basis of Abdul-Matiyn's due process claim. Liberally reading all submissions, Abdul-Matiyn alleges that Walsh, "without any medical support, wrote out an application, stating that [Abdul-Matiyn] was in need of involuntary commitment" and signed it, leading to Abdul-Matiyn's involuntary civil confinement, potentially in violation of the Fourteenth Amendment. Docket No. 45 at ¶¶ 6-7; Docket No. 48 at ¶ 11. Additionally, Abdul-Matiyn contends that Johnson participated in the conspiracy to involuntarily confine him "by concealing what was taking place, and giving [him]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

misleading information concerning the situation." *Id.* at ¶ 13. Thus, the subsequent claims of involuntary confinement asserted against the CNYPC defendants directly relate to, and intertwine with, the allegations against Walsh and Johnson. Additionally, the same set of facts relating to who signed the papers and ordered that he be confined would be determined in both cases. Among other things, this would result in defendants calling duplicate witnesses. Thus, severing the litigation would not serve the interests of judicial economy and may lead to inconsistent findings in liability and damages which would prejudice all defendants.

Therefore, Walsh and Johnson's motion to sever should be denied.

### E. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19 (1981).

#### 1. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This includes the provision of medical care and punishments involving "the unnecessary and wanton infliction of pain." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citations omitted). A prisoner advancing an Eighth Amendment claim for denial of medical care must allege and prove deliberate indifference to a serious medical need. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Hathaway,* 37 F.3d at 66. More than negligence is required "but less than conduct undertaken for the very purpose of causing harm." *Hathaway,* 37 F.3d at 66. The test for a § 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious medical need. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm. *Id.* "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan,* 511 U.S. 825, 844 (1994).

**\*9** " 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Because there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, 16 and (3) the existence of chronic and substantial pain ." *Brock v. Wright,* 315 F.3d 158, 162-63 (2d Cir.2003) (citing *Chance,* 143 F.3d at 702). The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case. *Smith,* 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs." *Chance,* 143 F.3d at 702. Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104, (1976). "Mere disagreement over proper treatment does not create a constitutional claim," as long as the treatment was adequate. *Id .* at 703. Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists ... are not adequate grounds for a § 1983 claim." *Magee v. Childs,* No. 04-CV1089 (GLS/RFT), 2006 WL 681223, at \*4 (N.D.N.Y. Feb. 27, 2006). Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness. *Hathaway v.. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Courts have held that "[s]evere back pain, especially if lasting an extended period of time, can amount to a 'serious medical need' under the Eighth Amendment." *Nelson v. Rodas,* No. 01-CV-7887 (RCC/AJP), 2002 WL 31075804, at \*14 (S.D.N.Y. Sept. 17, 2002). Courts have

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

also failed to recognize chest pains as a serious medical condition. *See McCoy v. Goord,* 255 F.Supp.2d 233, 260 (S.D.N.Y.2003) (holding that keeping plaintiff "waiting for twenty-five minutes and then sen[ding] him back to his cell without treating his chest pains does not amount to a constitutional deprivation.").

However, considering Abdul-Matiyn's claims together and reading all allegations in a light most favorable to him, it appears that he has alleged a serious medical condition. Abdul-Matiyn contends he had a history of back pain and that the back pain he was experiencing on July 6, 2005 was so severe that it was "making it almost impossible to walk ...." Compl. at 7. This pain began at 11:30 a.m. and was not addressed until after 3 p.m. *Id.* at 7-9. Additionally, the back pain was accompanied by severe chest pain. *Id.* at 7. This pain lasted far longer than that addressed in *McCoy.* Additionally, the combination "had [Abdul-Matiyn] twisted over in a bending position ... [causing him to] cry[ ]." *Id.* Crediting Abdul-Matiun's allegations, this combination of factors present a condition which a reasonable person or physician would deem worthy of treatment. Additionally, the pain appears to have been of sufficient severity. Thus, Abdul-Matiyn's chest and back pain constituted a serious medical condition.

**\*10** Construing the allegations in the light most favorable to Abdul-Matiyn also leads to the conclusion that the City defendants were deliberately indifferent to his need for medical treatment. Abdul-Matiyn alleges that Allen and Benbow refused to respond to his repeated requests to go to the clinic for his severe and crippling chest pains. Compl. at 7. Additionally, even though Valezquez called the clinic on Abdul-Matiyn's behalf, it is alleged that Valezquez stood idly by while Benbow told the clinic that Abdul-Matiyn was to be placed "on the burn." *Id.* at 8. Additionally, upon arrival at the clinic, Rowe refused to let Abdul-Matiyn see a physician for an extended period of time. Compl. at 9. If proven, these actions could constituted intentional delay and denial of medical services during a serious medical need.

Therefore, the City defendants' motion to dismiss on this ground should be denied.

## 2. Fourteenth Amendment

### I. Due Process

Abdul-Matiyn contends that the State defendants violated his due process rights when he was involuntarily, civilly confined at CNYPC without being given any justification from the State defendants. The State defendants contend that Abdul-Matiyn's claims are conclusory.

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). "Prisoners enjoy the right not to be deprived of life, liberty or property without due process of law, but their rights are to be balanced with, and often tempered by, the needs of their special institutional setting." *Malik v. Tanner,* 697 F. Supp 1294, 1301 (S.D.N.Y.1988) (citing *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974)). "Involuntary confinement, including civil commitment, constitutes a significant deprivation of liberty requiring due process." *See Fisk v. Letterman,* 401 F.Supp.2d 362, 374 (S.D.N.Y.2005) (citing *Addington v. Texas,* 441 U.S. 418, 425 (1979)). However, the Supreme Court has "permitt[ed] involuntary confinement based upon a determination that the person currently both suffers from a 'mental abnormality' or 'personality disorder' and is likely to pose a future danger to the public." *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997). "In the case of civil confinement, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for ... commit[ment] ... [and is in]tolera[nt of] the involuntary confinement of a nondangerous individual." *Mental Hygiene Legal Serv. v. Spitzer,* No. 07-CV-2935 (GEL), 2007 WL 4115936, at \*6 (S.D.N.Y. Nov. 16, 2007) (citations and internal quotations omitted).

In this case, viewing all facts in the light most favorable to Abdul-Matiyn, it appears that his due process rights were violated. Abdul-Matiyn continually inquired why he was being interviewed, if the results of those discussions would interfere with his release date, and, upon his arrival at CNYPC, under what authority and with what proof he was being detained. All of these unanswered inquiries directly reflect upon the due process, or lack thereof, afforded to Abdul-Matiyn.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

**\*11** Additionally, construing the allegations in the light most favorable to Abdul-Matiyn, he was not a danger to the community as he had undergone multiple courses during his release and devoted his time and energy to his religion and assisting those less fortunate in the community. Compl. at 13-14. Moreover, Abdul-Matiyn had no suicidal ideations or mental illness but was merely a devout and spiritual Muslim. *Id.* at 16. Therefore, AbdulMatiyn has alleged adequate facts to present a basis for recovery.

Thus, the State defendants' motion to dismiss on this ground should be denied.

### ii. Equal Protection[FN10]

FN10. Liberally construing Abdul-Matiyn's complaint, there is a second allegation of discrimination. Abdul-Matiyn claims that defendants did not target those convicted of homicide, a crime specifically mentioned in the Mental Hygiene laws, for confinement while they did target sex offenders, a crime allegedly "never considered by the framers ... as a mental illness ...." Compl. at 25. However, Abdul-Matiyn's conclusory allegations do not compare similarly situated individuals; thus, any such contention does not implicate Fourteenth Amendment protection.

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. 95-CV-1534, 1997 WL 151770, at \*3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.). "To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197 (1976).

In this case, Abdul-Matiyn alleges that male sex offenders were civilly confined in CNYPC while similarly situated female sex offenders were not. Compl. at 25. Construing all allegations in the light most favorable to Abdul-Matiyn, it appears that he has asserted a sex-based, discriminatory policy. The State defendants merely claim that Abdul-Matiyn has stated a conclusory allegation; however, at this stage these facts, without any proffer of substantial relation to an important government objective, are suffice to allege a potential basis for relief.

Therefore, the State defendants' motion to dismiss on this ground should be denied.

### 3. First Amendment
### I. Free Exercise of Religion

Abdul-Matiyn alleges that his First Amendment rights were violated when the State defendants failed to provide him with his religious meals and refused to let him pray. The State defendants contend that Abdul-Matiyn's claims are conclusory.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04-CV-57 (DNH), 2007 WL 3046703, at \*4 (N.D.N.Y. Oct. 17, 2007) (*citing Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (*citing Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns ...." *Johnson,* 2007 WL 3046703, at \* 4.

### a. Failure to Provide Halal Meals

**\*12** The Free Exercise Clause extends "into other aspects of prison life including, pertinently, that of an inmate's diet ...." *Id.* The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples ...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden [s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under ... *Turner* ....

  *Johnson,* 2007 WL 3046703 at * 4-5 (citations omitted).

In this case, Abdul-Matiyn has articulated a First Amendment violation as the State defendants did not provide him with his halal meals during his confinement in CNYPC. There is no dispute at this stage that Abdul-Matiyn held genuine religious beliefs. The State defendants at this stage assert only that Abdul-Matiyn's claim was conclusory. Therefore, the State defendants' motion must be denied because the allegations of the complaint suffice to state a claim.

Therefore, the State defendants' motion on this ground should be denied.

**b. Refusal to Allow Prayer**

"A determination of whether the refusal to permit attendance at a religious service [viooolates the First Amendment] hinges upon the balancing of an inmate's First Amendment free exercise right[ ] against institutional needs of ... operating prison facilities ...." *Johnson,* 2007 WL 3046703, at *4. "The governing standard is one of reasonableness, taking into account whether the particular regulation affecting some constitutional right asserted by a prisoner is reasonably related to legitimate penological interests." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (citations omitted).

In this case, Abdul-Matiyn appears to have asserted a First Amendment violation when the State defendants removed his religious texts and refused to permit him to pray. Compl. at 19. Abdul-Matiyn specifically references defendant Capolo, alleging that "he refuse[d] to allow [Abdul-Matiyn] to go and perform his prayers ...." *Id.* at 27. The State defendants contend that Capolo's oral refusals constituted nothing more than verbal harassment, which "alone, unaccompanied by an injury no natter how

inappropriate, unprofessional, or reprehensible .., does not constitute the violation of any federally protected right and therefore is not actionable under 42 U. S.C. § 1983." *Murray,* 2007 WL 956941, at *8.

However, the State defendants are incorrect in asserting that Capolo's alleged oral denials amounted only to verbal harassment and were insufficient to state a First Amendment violation. Capolo's alleged continuous refusals to provide Abdul-Matiyn with his religious texts or permit him time and space to pray were at least arguably unreasonable in light of the fact that at this stage, the State defendants have not proffered a legitimate penological interest which justified denial of the provision of a book and time for prayer. Thus, Abdul-Matiyn has alleged here a violation with a potential basis for relief.

**\*13** Therefore, the State defendants motion on this ground should be denied.

**ii. Access to Courts**

Abdul-Matiyn contends that while confined, he was denied access to a law library and was thus denied his First Amendment right of access to the courts. The State defendants assert that Abdul-Matiyn alleges only a conclusory claim here.

The Supreme Court has held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries ...." *Bounds v. Smith,* 430 U.S. 817, 828 (1977); *see also Lewis v. Casey,* 518 U.S. 343, 351 (1996). This right is not unlimited and "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis,* 518 U.S. at 531. "[I]n order to fulfill the actual injury requirement ... on a law library claim where there is a lack of access to the courts, the inmate must be pursuing [*inter alia* ] ... a civil rights claim pursuant to § 1983 to vindicate basic constitutional rights." *Linares v. Mahunik,* No. 05-CV-625 (GLS/RFT), 2006 WL 2595200, at *7 (N.D.N.Y. Sept. 11, 2006) (citations and internal quotations omitted). Thus, "to prove an actual injury, a plaintiff must show that a non-frivolous legal claim was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

frustrated or impeded due to the actions of prison officials." *Id.* (citations omitted).

In this case, Abdul-Matiyn enjoyed the right to a law library. Construing his allegations in the light most favorable to Abdul-Matiyn, this right was violated when the State defendants denied him access to one. Compl. at 20. However, Abdul-Matiyn does not allege that he suffered any injury due to this alleged deprivation. even when viewing all of Abdul-Matiyn's submissions together, he makes only that his lack of access to a law library precluded him from "drafting papers for court." Docket No. 48 at § 47. Additionally, Abdul-Matiyn claims that this preclusion from drafting papers provided defendants with their grounds for dismissal based on non-compliance with pleading requirements. *Id.*

However, this conclusory allegation is insufficient to provide a basis for relief. AbdulMatiyn alleges no case then pending which was adversely affected in any way. In this case, defendants' motions to dismiss based on the failure to comply with the pleading requirements were rejected. Moreover, Abdul-Matiyn gives no other indication of what drafts he intended to submit to the Court.

Therefore, the State defendants' motion to dismiss on this ground should be granted.

### 4. Conspiracy

Johnson assert that Abdul-Matiyn has failed to state a cause of action against him. Abdul-Matiyn contends that Johnson participated in the conspiracy to have him civilly detained and that he has a right "to be free from conspiracies to deprive him of his constitutional rights." Docket No. 48 at ¶¶ 13-14.

**\*14** "Section 1985 prohibits conspiracies to interfere with civil rights." *Davila v. Secure Pharmacy Plus,* 329 F.Supp.2d 311, 316 (D.Conn.2004). To state a claim for relief under § 1985(3), a plaintiff must show:

(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4)

whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828-29 (1983); *see also Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir.2007). "In addition, the conspiracy must be motivated by some class-based animus." *Iqbal,* 490 F.3d at 176 (citations omitted).

Here, Abdul-Matiyn alleges that Johnson joined with others to deprive Abdul-Matiyn of his rights. Liberally construing those allegations, the concert of actions by Johnson and others could support a claim of agreement among Johnson and other defendants and acts in furtherance of the conspiracy. This suffices to support a claim for conspiracy against Johnson and Johnson's motion on this ground should be denied.

However, liberally construing Abdul-Matiyn's claims, he has asserted an action for negligent failure to prevent the deprivation of his rights. If Johnson "ha[d] knowledge that any of the wrongs ... mentioned in section 1985 ... [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do ... [he] shall be liable to the party injured." 42 U.S.C. § 1986. However, "[a] claim under section 1986 ... lies only if there is a viable conspiracy claim under section 1985." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir.1994).

Therefore, Johnson's motion to dismiss on this ground should be granted in part and denied in part.

### F. Eleventh Amendment

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21 (1890)). Regardless of the nature of the relief

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2008 WL 974409 (N.D.N.Y.)

(Cite as: 2008 WL 974409 (N.D.N.Y.))

sought, in the absence of the State's consent, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100.

"[T]he Central New York Psychiatric Center[,] ... [as an institution, is an] arm[ ] of the state for Eleventh Amendment purposes and ... therefore, [is] absolutely immune from [P]laintiff's claims for monetary damages in this lawsuit." *Murray v. Pataki,* No. 03-CV-1263 (LEK/RFT), 2007 WL 956941, at *12 (N.D.N.Y. Mar. 29, 2007) (citations omitted). Therefore, the motion of defendant CNYPC Medical Staff on this ground should be granted.

### III. Conclusion

*15 For the reasons stated above, it is hereby **RECOMMENDED** that:

A. The motion of Walsh and Johnson to sever (Docket No. 17) be **DENIED;**

B. The motion of Walsh and Johnson to dismiss (Docket No. 17) be:

1. **GRANTED** as to Abdul-Matiyan's conspiracy claim against defendant Johnson for failure to intervene; and

2. **DENIED** in all other respects;

C. The State defendants' motion to dismiss (Docket Nos. 44, 47) be:

1. **GRANTED** in all respects as to defendant Sawyer;

2. **GRANTED** in all respects as to Abdul-Matiyan's claim for denial of access to the courts; and

3. **DENIED** in all other respects;

D. The City defendants motion to dismiss (Docket No. 46) be **DENIED** in all respects;

E. The motion of defendant CNYPC Medical Staff to dismiss (Docket No. 55) be **GRANTED;** and

F. The complaint be **DISMISSED** without prejudice as to defendants George Pataki, Michelle Payne, and John Does I-IV.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2008.

Abdul-Matiyn v. Pataki
Slip Copy, 2008 WL 974409 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Keith BUSH and Anthony Bennett, Plaintiffs,
v.
D.O.C. Commissioner Glen GOORD, Michael
Giambruno, Gerald Elmore, Tom Brunette, and Jeff
Weber, Defendants.
No. 03-CV-759S.

March 25, 2009.
West KeySummary**Constitutional Law 92** ⛛ 1426

92 Constitutional Law

92XIII Freedom of Religion and Conscience
92XIII(B) Particular Issues and Applications
92k1421 Prisons and Pretrial Detention
92k1426 k. Rehabilitation and Treatment
Programs. Most Cited Cases
**Mental Health 257A** ⛛ 465(3)

257A Mental Health

257AIV Disabilities and Privileges of Mentally
Disordered Persons
257AIV(E) Crimes
257Ak452 Sex Offenders
257Ak465 Disposition; Commitment
257Ak465(3) k. Treatment. Most Cited
Cases

A sex offender counseling and treatment program that
required a sex offender to admit responsibility for his
actions did not violate the sex offender's right to the free
exercise of religion. Although the sex offender's Wiccan
faith prevented him from admitting to guilt for his actions,
the program's acknowledgement of guilt requirement was
reasonably related to the department of
correction's legitimate penological interests. The program's goal was
to rehabilitate sex offenders, and without the sex offender

admitting to his guilt, officials would be unable to assist
the sex offender in the development of tools necessary to
self-regulate and to avoid future offensive behavior. Thus,
even though the sex offender would not gain certain
good-time-credits for failing to complete the program, the
offender's participation in the program was not mandatory
and did not violate his First Amendment rights. U.S.C.A.
Const.Amend. 1; 42 U.S.C.A. § 1983.

Scott Michael Lupiani, Scott M. Lupiani, Attorney at Law,
Buffalo, NY, for Plaintiffs.

David Joseph State, Peter B. Sullivan, New York State
Attorney General, Buffalo, NY, for Defendants.

**ORDER**

WILLIAM M. SKRETNY, District Judge.
*1 1. On October 9, 2003, Plaintiffs commenced this
civil rights action against Defendants under 42 U.S.C. §
1983. On October 9 and December 30, 2003, Plaintiffs
moved to proceed *in forma pauperis.* (Docket Nos. 2, 8.)
On May 27, 2004, this Court referred this matter to the
Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B).
(Docket No. 27.) On April 27, 2007, Defendants filed a
Motion for Summary Judgment. (Docket No. 119.)

2. On January 7, 2008, the Honorable Jeremiah J.
McCarthy, United States Magistrate Judge, filed a Report
and Recommendation, in which he recommended (1) that
Plaintiffs' Motions for Leave to Proceed *In Forma
Pauperis* be granted *nunc pro tunc,* and (2) that
Defendants' Motion for Summary Judgment be granted.
(Docket No. 135 .)

3. On April 29, 2008, this Court accepted in part and
recommitted in part Judge McCarthy's Report and
Recommendation. (Docket No. 139 .) This Court accepted
Judge McCarthy's recommendation to grant Plaintiffs'
Motions to Proceed *In Forma Pauperis,* but recommitted
Defendants' Motion for Summary Judgment for "further
factual development and discussion." (Docket No. 139, ¶
5.)

4. After additional discovery and receiving

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

supplemental briefing and oral argument, Judge McCarthy filed a Supplemental Report and Recommendation on February 23, 2009, in which he again recommends that Defendants' Motion for Summary Judgment be granted, and also recommends that Plaintiff Bush be terminated as a plaintiff because he is no longer incarcerated, which Plaintiffs do not oppose. (Docket No. 164.)

5. No objections to Judge McCarthy's Supplemental Report and Recommendation were received from either party within ten days of the date of its service, in accordance with 28 U.S.C. § 636(b)(1) (C) and Local Rule 72.3(a)(3). This Court has carefully reviewed the Supplemental Report and Recommendation and is now satisfied that the record is complete and fully supports Judge McCarthy's recommendation that Defendants' motion be granted. Accordingly, this Court will accept that recommendation and grant Defendants' motion.

IT HEREBY IS ORDERED, that this Court accepts Judge McCarthy's Supplemental Report and Recommendation (Docket No. 164) in its entirety, including the authorities cited and the reasons given therein.

FURTHER, that upon consent of Plaintiffs' counsel, the Clerk of the Court is directed to TERMINATE Plaintiff Keith Bush as a Plaintiff in this action.

FURTHER, that Defendants' Motion for Summary Judgment (Docket No. 119) is GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

### SUPPLEMENTAL REPORT AND RECOMMENDATION

JEREMIAH J. McCARTHY, United States Magistrate Judge.

This case was referred to me by Hon. William M. Skretny to hear and report in accordance with 28 U.S.C. 636(b)(1) (Dkt.# 118). Before me is defendants' motion for summary judgment (Dkt.# 119). Following oral argument and supplemental briefing, on January 7, 2008

I issued a Report and Recommendation in which I recommended that defendants' motion be granted (Dkt.# 135).

**\*2** Defendants filed objections to my Report and Recommendation (Dkt.# 136). By Decision and Order dated April 29, 2008 (Dkt.# 139), Judge Skretny accepted my recommendation that plaintiffs' *in forma pauperis* applications be granted (Dkt.# 139, ¶ 7), but stated that with respect to the summary judgment motion, "further factual development and discussion is necessary to appropriately weigh the relevant [*Turner* ] factors and reach a supportable legal conclusion." *Id.* at ¶ 5. Therefore, he returned the case to me for further proceedings and the issuance of a Supplemental Report and Recommendation. *Id.* at ¶ 7.

The parties thereafter conducted further discovery[FN1] and filed supplemental submissions. Oral argument was again held before me on February 13, 2009. Following oral argument, I requested defendants to clarify whether or not plaintiff Bennett lost previously earned good-time credits as a result of his failure to participate in the SOCP, and they did so (Dkt.162 and 163). For the following reasons, I again recommend that defendant's motion for summary judgment (Dkt.# 119) be GRANTED.

> FN1. The parties have conducted the depositions of plaintiff Bennett and defendants Tom Brunette and Jeffrey Weber. "Th[ese] depositions were the extent of the additional factual discovery conducted by the parties." Plaintiffs' Response (Dkt.# 154), p. 4.

### DISCUSSION AND ANALYSIS

**A. Status of Plaintiff Bush**

During oral argument on February 13, 2009, I inquired as to the status of plaintiff Bush. Plaintiffs' attorney stated that he would not oppose a motion to dismiss the complaint as to plaintiff Bush, as he is no longer incarcerated. Defendants then orally moved to dismiss the complaint, with prejudice, as to plaintiff Bush, and the motion was unopposed. Accordingly, I recommend that the complaint be dismissed as to plaintiff Bush.

**B. Does The SOCP's Acknowledgment of Responsibility Requirement Violate Plaintiffs' First**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

**Amendment Rights to Free Exercise of Religion?**[FN2]

> [FN2.] Because Judge Skretny remanded the case to me for a more complete factual discussion of the *Turner* factors, I have not expanded upon the other aspects of my initial Report and Recommendation, including whether plaintiffs' claims are subsumed by the class certified in *Donhauser v. Goord,* 01-CV-1535 (N.D.N.Y.) (settled October 2008). January 7, 2008 Report and Recommendation (Dkt.# 135), pp. 5-6.

"Prisoners retain their right to religious freedom even when incarcerated." *Ochoa v. Connell,* 2007 WL 3049889, *6 (N.D.N.Y.2007).* However, this right must be "balanced against the 'interests of prison officials charged with complex duties arising from administration of the penal system.' " *Id.* Therefore, a prison inmate retains only " 'those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system' ". *Shakur v. Selsky,* 391 F.3d 106, 113 (2d Cir.2004). "The governing standard is one of reasonableness.' " *Id.*

The parties agree that I "must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (*citing Turner v. Safley.* 482 U.S. 78, 90-91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

**\*3** Plaintiff Bennett "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin. supra.* 467 F.3d at 274-75.[FN3] Plaintiff Bennett has given conflicting accounts for why he did not participate in the SOCP. For example, in a June 6, 2003 Time Allowance Form he indicated that he "previously refused SOP ... due to concern over information regarding crime being disseminated to employees-security and other inmates." Declaration of

David State, Esq. (Dkt.# 149), Ex. B. He also explained during his deposition that "if I give a statement of guilt then this automatically destroys my chances of being exonerated of the case ... I asked her: what's more important? Me getting the treatment or me giving you a guilty plea?" August 29, 2008 Deposition Transcript of Anthony Bennett (Dkt. # 149), Ex. A, p. 17.

> [FN3.] This point was not addressed in my initial Report and Recommendation because it was not raised by defendants. Based upon the newly conducted discovery, defendants now raise this argument (Defendants' Memorandum of Law (Dkt.# 151), Point II), and plaintiffs do not challenge defendants' ability to raise this argument at this stage of the case. Plaintiffs' Response (Dkt.# 154), pp. 8-11. Therefore, I will address it.

However, at other points in his deposition, he indicated that his refusal to participate in the SOCP was because of the admission of guilt requirement, which would require him to violate his Wiccan faith: "When I presented myself before the court ... and I took an oath that my word is my bond and my bond is my life according to Wiccan.... [I]f you violate that, then you forfeit your life in this world and the next." *Id.* at pp. 29-30; *see also* p. 28.

Based upon the record before me, I cannot conclude, as a matter of law, that the SOCP's admission of guilt requirement does not substantially burden plaintiff Bennett's sincerely held religious beliefs. Therefore, I will consider each of the four *Turner* factors:

**1. "Whether the challenged regulation has a valid, rational connection to a legitimate governmental objective"**[FN4]

> [FN4.] Although plaintiff Bennett does not challenge the first and second *Turner* factors, I have analyzed them in light of the newly presented evidence, since Judge Skretny remanded the case to me for further factual development and analysis of all of the factors. Judge Skretny's April 25, 2008 Decision and Order (Dkt.# 139), ¶¶ 5-6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

"The first *Turner* 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Salahuddin, supra,* 467 F.3d at 274 (*citing O'Lone v. Estate of Shabazz,* 482 U.S. 342, 350, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Because "a court need not weigh each factor equally", this factor has been called the "controlling factor". *Mayfield v. Texas Department of Criminal Justice,* 529 F.3d 599, 607 (5th Cir.2008).

According to Edwin H. Elfeldt, the Guidance and Counseling Coordinator for DOCS, "the primary purpose of the [DOCS'] sex offender counseling program is to reduce the likelihood that convicted sex offenders and other inmates with histories of sexual offending behavior will reoffend, by helping them to gain control of the chain of behaviors that leads to sexual offending." Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 3. "The SOCTP is fully consistent with the standards, guidelines, and best practices in the field, which require participants in counseling to openly and honestly discuss the behavior that resulted in their incarceration and referral to SOCTP, demonstrate acceptance of responsibility for their conduct, and demonstrate an understanding of his or her sexual offending behavior and cycle of abuse. If an inmate lies or is untruthful, he will not benefit from the treatment." [FN5] *Id.* at ¶ 7.

> FN5. The SOCP was superseded by the Sex Offender Counseling and Treatment Program ("SOCTP") in November 2007. Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 1. However, at oral argument on February 13 the parties confirmed that the SOCTP also contains an admission of guilt requirement.

**\*4** Based upon Mr. Elfeldt's uncontested representations, I conclude that there is a rational connection between the SOCP, including its requirement that prisoners take responsibility for their crimes or face the loss of good time credits for non-participation, and DOCS' interest in rehabilitating prisoners. *See Donhauser v. Goord,* 314 F.Supp.2d, 119, 135 (N.D.N.Y.2004) ("there does exist a valid, rational connection between the SOCP, along with its requirements, including the threat

faced for non-participation, and the State's interest in requiring program participants to divulge their sexual histories as part of the larger interest in rehabilitating prisoners for safe return to society"). *See also Searcy v. Simmons,* 299 F.3d 1220, 1228 (10th Cir.2002) ( "Even were we to assume the admission of responsibility impinges upon Mr. Searcy's right to freely exercise his religious beliefs, we would agree with the district court that the requirement is 'reasonably related' to the [the government's] penological interests.").

**2. "Whether prisoners have alternative means of exercising the burdened right"**

Plaintiff Bennett is currently serving a sentence as a result of a conviction for a sexual offense in 1984. At his trial he denied, under oath, that he committed the crime. Plaintiff Bennett's August 29, 2008 Deposition Transcript (Dkt.# 149-2), pp. 28-30. He has been a practicing Wiccan since 1984, and according to him, "my word is my bond and my bond is my life according to Wiccan.... If you violate that, then you forfeit your life in this world and the next." *Id.* at p. 30.

Therefore, it is evident that plaintiff Bennett could not maintain his tenet against recanting his sworn testimony and, at the same time, abide by the SOCP's admission of guilt requirement. "Though it would not be conclusive, it would be some evidence that the regulations were unreasonable." *Overton v. Bazzetta,* 539 U.S. 126, 135, 123 S.Ct. 2162, 156 L.Ed.2d 162(2003).

**3. "The impact on guards, inmates, and prison resources of accommodating the right"**

**and**

**4. "The existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests"**

"The third factor and fourth factors are related: whether an accommodation would have a 'significant ripple effect' on the guards, other inmates, and prison resources and whether there is an alternative that fully accommodates the prisoner at *de minimis* cost to valid penological interests. 'This is not a 'least restrictive alternative' test, prison officials do not have to set up and

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint.' ... But if the inmate can point to an alternative that fully accommodates his rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship test." *Schnitzler v. Reisch,* 518 F.Supp.2d 1098, 1118 (D.S.D.2007).

**\*5** In remanding the case back to me of further proceedings, Judge Skretny noted that "it is unclear whether Plaintiffs voluntarily want to participate in the SOCP but believe that they cannot do so because of their religious convictions, or whether DOCS requires that the Plaintiffs participate in this particular program or face the loss of good-time credits. This distinction is important on at least the third and fourth Turner factors, particularly because it appears that programs similar to the SOCP exist that do not include the admission of guilt requirement (Plaintiffs, in fact, completed one)." Judge Skretny's April 25, 2008 Decision and Order (Dkt.# 139), ¶ 6.

According to Mr. Elfeldt, "allowing an inmate to complete the SOCTP without accepting responsibility for his behavior would wreak havoc with DOCS's rehabilitation goals. In other words, allowing Bennett to participate in the SOCTP without accepting responsibility for his behavior would give him credit for completion of a program where staff were prevented from exploring his assessed dynamic risks. If treatment staff cannot discuss with a participant his individual risks, they cannot assist that participant in the development of tools necessary to self-regulate and to avoid future offensive behavior." Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 14. Moreover, DOCS' "treatment staff are not trained to treat an offender who will not discuss his or her offending behavior." *Id* . Based upon this undisputed testimony, I conclude that accommodating plaintiff Bennett "would undermine the precept of the entire [program], that admission of responsibility and overcoming denial are integral to the rehabilitation of sex offenders." *Searcy, supra,* 299 F.3d at 1228.

"The court in *Turner* ... expressed concern for situations where an accommodation would have a 'ripple effect' throughout the prison, thereby possibly straining the facility's ability to cope with change." *Donhauser, supra,* 314 F.Supp.2d at 136. "Allowing one participant in the program to avoid discussion of his behavior could result in all other inmates doing the same which would prevent the entire group from receiving the benefits of program participation." Affidavit Edwin H. Elfeldt (Dkt.# 150), ¶ 15; *see also* ¶ 12 ("if the Department were to permit an offender to attend the SOCTP without engaging in such discussion, it would likely impair the ability of other inmates in the group to benefit from the program. I would expect that other inmates in the group would believe that they were being treated unfairly and this would make it much more difficult for those participants to engage in the very difficult process of discussing their behavior cycle").

Plaintiff Bennett argues that "the existence of other means of rehabilitating inmates was present prior to the current SOCP and those programs did not require an admission of guilt." Plaintiffs' Response (Dkt.154), p. 14. By "allowing ... previously acceptable religious based programs [such as this] as alternatives to the secular SOCP would accommodate those inmates with sincerely held religious beliefs that prevent those inmates from violating their sworn oath and relieving them of the threat of eternal punishment." *Id.* In 1989 plaintiff Bennett completed an Innovative Therapeutic Program ("ITP").[FN6] *See* Plaintiff Bennett's Deposition Transcript (Dkt.# 154-2), p. 12; Plaintiffs' Response (Dkt.# 126), Ex. A, ITP Manual. Other than the ITP, plaintiff Bennett concedes that he completed no sex offense counseling program. Plaintiff Bennett's Deposition Transcript (Dkt.# 154-2), pp. 14-15.

> [FN6]. It also appears to be referred as the "Islamic Therapeutic Program". Deposition of Thomas Brunette (Dkt.# 154-2), p. 77.

**\*6** However, the ITP is a religious based program, which is not sanctioned by DOCS. *See* Deposition of Thomas Brunette (Dkt.# 154-2), p. 78.[FN7] Although plaintiff Bennett received a certificate from DOCS for completing the ITP, DOCS "stopped giving out certificates at least 18 years ago.... We stopped doing that because the Department started developing their programs that were more staff run, more ... patented, consistent ... the sex offender program we now have is the result of

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

years of research". Deposition of Thomas Brunette (Dkt.# 154-2), p. 87.

> FN7. In fact, plaintiff Bennett made a similar argument regarding his referral to a DOCS' sanctioned substance abuse treatment and was advised by DOCS that the ITP did not satisfy his substance abuse treatment requirement. Declaration of David State, Esq. (Dkt.# 149), Ex. D.

It remains DOCS' responsibility to "assign[ ] each inmate to a program of treatment that is most likely to be useful in assisting the inmate to refrain from future violations of the law." Affidavit of Edwin H. Elfeldt (Dkt.# 150), 116. "The individual inmate's assigned Correction Counselor, evaluates each inmate to identify his or her assessed program needs." *Id.*

In this case, plaintiff Bennett was assigned to the SOCP. While he may have completed other non-sanctioned programs, these do not function as substitutes for the SOCP. The goal of the SOCP "is habilitative, and not punitive". *Id.* at ¶ 3. "The ultimate benefit of [SOCP] participation is enhancing the likelihood that the inmate will be able to lead a postsocial, law abiding life upon release from custody." *Id.* at ¶ 17.

While plaintiff Bennett may not agree with the necessity to complete the SOCP, "it is not the function of this court to micromanage the New York prison system or to second guess officials, including those regarding programming." *Sumpter v. Skiff,* 2008 WL 4518996, *12 (N.D.N.Y.2008).*

Alternatively, plaintiff Bennett argues that "the lost of earned good-time-credits and the inability to earn good-time-credits acts as a *de facto* compulsion towards participation." Plaintiffs' Response (Dkt.# 154), p. 5. Therefore, "if inmates could refuse to enter the program by making a voluntary and informed decision, and not one based on the fear that they may lose years of good-time-credits thereby extending their term of incarceration substantially, then there would be very little impact on guards, inmates, and prison resources." *Id.* at p. 14. In response, defendants argue that the SOCP is not

mandatory. Defendants' Memorandum of Law (Dkt.# 151), Point I; Defendants' Reply Memorandum of Law (Dkt.# 155), Point IV.

Although plaintiff Bennett's maximum sentence expires on July 14, 2013, by 2003 he had earned 9 years, 10 months and zero days of good-time credits, which gave him a conditional release date of September 14, 2003. Declaration of David State, Esq. (Dkt.# 163), ¶¶ 3 and 4, Ex. A. Based upon his impending conditional release date, the Time Allowance Committee began reviewing plaintiff Bennett's case in or about June 2003. *Id.* at ¶ 4. After reviewing the matter, the Time Allowance Committee recommended that all of plaintiff Bennett's previously earned good-time credits be withheld because he "needs to successfully complete S/O program and reapply to the committee" and "has a very poor disciplinary [*sic* ], with improvements noted, recently. Mr. Bennett should continue to work on this aspect of his incarceration." *Id.* at Ex. A. This recommendation was adopted by DOCS' Commissioner on July 1, 2003. *Id.*

**\*7** In addition to all of plaintiff Bennett's previously earned good-time credits being withheld, the parties agreed at the February 13, 2009 oral argument that he also lost the right to earn good-time credits going forward as a result of his failure to successfully complete the SOCP.

The SOCP Policy and Procedure Manual, effective October 2001 ("SOCP Manual"), provides that "an offender may chose to refuse participation in the.... Program." Affidavit of Edwin H. Elfeldt (Dkt.# 150), Ex. A, p. 15. "As a result, participation in the SOCP is voluntary." Affidavit of Edwin H. Elfeldt (Dkt.# 150), Ex. A, p. ¶¶ 4 and 16 ("The Department's sex offender programming is and has been a voluntary program").

According to the SOCP Manual, "an offender who refuses the Program should be made aware of the negative impact his/her decision may have on the Earned Eligibility process, NYS Board of Parole decisions, Time Allowance Committee decisions, the Board of Examiners of Sex Offenders assessment, and other DOCS programs he/she may wish to participate in, such as the Family Reunion Program.... An offender who refuses the ... Program may be given one second and final opportunity to participate,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

after one year from his/her initial refusal but not within one year of his/her Conditional Release Date or thereafter, unless specified by a Time Allowance Committee that *may withhold the earning of 'good time' until the offender successfully completes the ... Program.*" *Id* . (emphasis added).

Good behavior allowances "may be granted for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program, and *may be withheld, forfeited or canceled* in whole or in part for bad behavior, violation of institutional rules or *failure to perform properly in the duties or program assigned.*" N.Y. Correction Law § 803(1)(a) (emphasis added). "Good behavior allowances *are in the nature of a privilege* to be earned by the inmate and no inmate has the right to demand or to require that any good behavior allowance be granted to him." 7 N.Y.C.R.R. § 260.2 (emphasis added). *See also* N.Y. Correction Law § 804(3) ("No person shall have the right to demand or require the allowances authorized by this section ."); N.Y. Correction Law § 803(4) (same).

An inmate does not receive the good-time allowance until there is a final order of the commissioner. *See* 7 N.Y.C.R.R. § 262.1(d). However, "the grant of the good behavior allowance *shall be contingent* on the inmate's continued good behavior, efficient and willing performance of duties assigned, and progress and achievement in an assigned treatment program." *Id.* (emphasis added).

Although there is some contrary authority as to whether the loss of good time credits makes the SOCP a compulsory program,[FN8] I believe that it does not. The "granting or withholding of good time is a discretionary matter subject to the prisoner meeting and maintaining the requirements for eligibility. Thus, the inescapable conclusion is that ... the wholly discretionary good time allowance scheme does not 'create a legitimate expectancy' of obtaining an earlier release". *Edwards v. Ladlair,* 2008 WL 3156214, *4 (N.D.N.Y.2008) (habeas petition). Thus, "the right to a good time allowance is a discretionary privilege". *Id.* at *6; *see also* *Brooks v. DiFasi,* 1997 WL 436750, *4 (W.D.N.Y.1997) (Elfvin, J.) ("Under New York law and its prison regulations, there is

no right to good behavior allowances.... 'Good behavior allowances are in the nature of a privilege to be earned by the inmate' and there is no entitlement to them.").

> FN8. *See* Donhauser, supra, 314 F.Supp.2d at 134. ("In light of the severe nature of the loss of good time credits, the automatic imposition of such loss, and the casual connection between the imposition of such loss and plaintiff's invocation of his Fifth Amendment rights, the fact that participation in the SOCP was labeled 'recommended' or 'voluntary' is not dispositive of the issue of whether plaintiff truly had a choice in the matter. Such facts precipitate a finding that plaintiff was 'ordered,' not recommended, to participate in the program.").

**\*8** "It is beyond doubt, of course, that respondent would prefer not to choose between losing prison privileges and accepting responsibility for his past crimes. It is a choice, nonetheless, that does not amount to compulsion, and therefore one [the state] may require respondent to make." *McKune v. Lile,* 536 U.S. 24, 45, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002).[FN9] Therefore, I conclude that participation in the SOCP is voluntary, not mandatory.

> FN9. In my initial Report and Recommendation I did not reach the question of whether the SOCP infringed on plaintiffs' First Amendment rights because this was not argued by defendants who instead concentrated their arguments on whether the admission of guilt requirement was reasonably related to the DOCS' penological interests. However, because I have now found that the SOCP is not a compulsory program, I also find that plaintiffs' First Amendment claim fails on this basis alone without reaching the *Turner* factors: "Mr. Searcy is free to adhere to his religious proscription against lying. In doing so, however, he losses certain privileges he would have received had he complied fully with the requirements for the SATP. This does not present an infringement of Mr. Searcy's constitutional right to free exercise of religion. This is especially so because the requirement of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

admission of responsibility is generally applicable to all inmates in the SATP and is not pointed at any particular religion or religious belief." *Searcy, supra,* 299 F.3d at 1228.

However, even if participation in the SOCP *could be* considered mandatory, based upon my consideration of all of the *Turner* factors, including the first and "controlling" factor ( *Mayfield, supra,* 529 F.3d at 607), which weighs heavily in favor of defendants, I would find that the admission of guilt requirement is reasonably related to DOCS' penological interests.

Once defendants satisfy "the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct[,] 'the burden remains with the prisoner to show that these articulated concerns were irrational.' " *Salahuddin, supra,* 467 F.3d at 275. I conclude that defendants have satisfied their burden, whereas plaintiff Bennett has failed to meet his.

Accordingly, I conclude that the SOCP's "acknowledgment of guilt" requirement is reasonably related DOCS' legitimate penological interests, and recommend that plaintiff Bennett's First Amendment claim be dismissed. *See Schnitzler, supra,* 518 F.Supp.2d at 1104-1107 (holding that a sex offender treatment program, the completion of which was necessary to be eligible for non-discretionary parole, which required inmates to participate in sexually explicit group discussions did not violate the right to the free exercise of religion under the First Amendment).

**B. Are Defendants Entitled to Qualified Immunity?**

Even if the SOCP's acknowledgment of responsibility requirement violates plaintiffs' First Amendment rights to free exercise of religion, defendants argue that they are entitled to qualified immunity. Defendants' Memorandum of Law (Dkt.# 151), Point VI. Plaintiffs argue that this argument should be disregarded as it is not consistent with my order or the order of Judge Skretny, which limited the supplemental briefing to the applicability of the Turner factors. Plaintiffs' Response (Dkt.# 154), Point III.

Qualified immunity was argued by defendants in their initial motion for summary judgment. *See* Defendants' Memorandum of Law (Dkt.# 122), Point VI. However,

because I found that the SOCP did not violate plaintiffs' First Amendment rights, I concluded in my initial Report and Recommendation that "I need not reach defendants' qualified immunity arguments (Dkt. # 122, Point VI)." Report and Recommendation (Dkt.# 135), 9 n. 7. Although it was not addressed in my initial Report and Recommendation, I see no reason not to address it now as an alternative basis to recommend granting defendants' motion for summary judgment.[FN10]

> FN10. Because plaintiffs are not barred from raising objections to the Supplemental Report and Recommendation, I find that they are not prejudiced by my analysis of this issue herein. *See* Judge Skretny's April 25, 2008 Decision and Order (Dkt.# 139), p. 4.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565, 2009 WL 128768, *6 (2009). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**\*9** As evidenced by the absence of case law on the issue, it is not "clearly" established, either in the Second Circuit or elsewhere, that the admission of guilt requirement of the SOCP violates plaintiffs' rights to free exercise of religion. Other circuits have granted defendants summary judgment on the basis of qualified immunity for similar First Amendment challenges to inmate sexual offender treatment programs. *See Hydrick v. Hunter,* 500 F.3d 978, 992 (9th Cir.2007), *petition for certiorari filed,* 76 USLW 3410 (Jan 17, 2008) ("To the extent that the claim relies on a First Amendment right not to participate in treatment sessions, the Defendants have qualified immunity, because the law on this point is not clearly established."); *Aruanno v. Spagnuolo,* 292 Fed.Appx. 184, 187, 2008 WL 2746229, *2 (3d Cir.2008)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))

("even if we were to conclude that Aruanno had a right to refrain from disclosing his past sexual history and we have not so concluded, we could not hold that the right is clearly established under the First Amendment [right to refrain from speaking], and that it was one of which defendants should have been aware.").

Plaintiff Bennett concedes that *"this issue currently presented may be of first impression"*. Plaintiffs' Memorandum of Law (Dkt.# 126), p. 13 (emphasis added). However, he argues that it is well established that prison conditions do not give rise to a due process violation unless those conditions constitute a "atypical and significant hardship" as set forth in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). *Id.* While the plurality in *McKune, supra,* 536 U.S. at 37-38, applied the atypical and hardship standard to the plaintiff's Fifth Amendment challenge to an inmate sex offender treatment program, plaintiff Bennett is not asserting a due process or self-incrimination challenge to the SOCP's admission of guilt requirement.[FN11]

> FN11. Moreover, it is questionable whether the plurality's finding that compulsion under the Fifth Amendment should be measured by reference to *Sandin's* atypical and significant hardship standard (which Justice O'Connor disagreed with in her concurrence) can be considered the holding of the Supreme Court in *McKune, supra:* "Because Justice O'Connor based her conclusion on the narrower ground that KDOC's policy was not compulsion under the Fifth Amendment, we view her concurrence as the holding of the Court in *McKune,"* Searcy, *supra,* 299 F.3d at 1225.

Therefore, even if defendants *had* violated plaintiff Bennett's First Amendment rights, I would recommend that defendants' motion for summary judgment be granted to the extent that he seeks an award of damages, based on their entitlement to qualified immunity.[FN12]

> FN12. However, the qualified immunity defense would not bar plaintiff Bennett's claim for injunctive relief, since "qualified immunity is not a defense when such relief is sought". *African*

*Trade & Information Center. Inc. v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002).

**C. Defendants' Newly Raised Arguments**

Defendants raise additional arguments not previously raised before me, including that plaintiffs' claim is barred by the favorable termination rule of *Heck v. Humphrey.* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) and application of *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *See* Defendants' Memorandum of Law, Points IV and V. Plaintiffs object to my consideration of these arguments. Plaintiffs' Response (Dkt.# 154), Point III. Because these arguments were not previously raised by defendants in their initial motion or based on the newly conducted discovery, I will disregard them.

**CONCLUSION**

For these reasons, I again recommend that defendants' motion (Dkt.# 119) be GRANTED. Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**\*10** ORDERED, that this Supplemental Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Supplemental Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Supplemental Report and Recommendation in accordance with the above statute, Rule 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 790358 (W.D.N.Y.)

(Cite as: 2009 WL 790358 (W.D.N.Y.))


72.3(a)(3) of the Local Rules of Civil Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3). or with similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report and Recommendation), may result in the District Judges refusal to consider the objection.*

**SO ORDERED.**

W.D.N.Y.,2009.

Bush v. Goord
Slip Copy, 2009 WL 790358 (W.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

c

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Adrella E. WILSON, Plaintiff,
v.
LIMITED BRANDS, INC., et al., Defendants.
No. 08 CV 3431(LAP).

April 17, 2009.
West KeySummary**Administrative Law and
Procedure 15A** ⏝ **501**

15A Administrative Law and Procedure

15AIV Powers and Proceedings of Administrative
Agencies, Officers and Agents
15AIV(D) Hearings and Adjudications
15Ak501 k. Res Judicata. Most Cited Cases
Civil Rights 78 ⏝ 1711

78 Civil Rights

78V State and Local Remedies
78k1705 State or Local Administrative Agencies
and Proceedings
78k1711 k. Hearing, Determination, and Relief;
Costs and Fees. Most Cited Cases
Civil Rights 78 ⏝ 1712

78 Civil Rights

78V State and Local Remedies
78k1705 State or Local Administrative Agencies
and Proceedings
78k1712 k. Judicial Review and Enforcement of
Administrative Decisions. Most Cited Cases
Constitutional Law 92 ⏝ 4178

92 Constitutional Law

92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)7 Labor, Employment, and Public
Officials
92k4176 Regulation of Employment
92k4178 k. Employment Discrimination
Laws. Most Cited Cases
An Article 78 proceeding that affirmed the New York
State Division of Human Rights' (SDHR) determination
that there was no probable cause that an employer engaged
in unlawful discriminatory practices provided a former
employee with a full and fair opportunity to litigate her
claims, which she asserted in the instant federal action as
well. Thus, SDHR's determination of no probable cause
was entitled to preclusive effect because the SDHR's
procedure for investigating complaints, coupled with
judicial review, comported with due process. That the
employee might have been unaware of an administrative
appeal process was of no import. The employee's failure
to avail herself of the full range of available procedures
did not render those procedures inadequate under the Due
Process Clause. U.S.C.A. Const.Amend. 14; McKinney's
CPLR 7801 et seq.

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, District Judge.
**\*1** Defendants Victoria Secret Stores, L.L.C. and
Limited Brands, Inc. ("VSS" or "Defendants") move
pursuant to Rule 12(c) for judgment on the pleadings,
arguing that collateral estoppel precludes Plaintiff Adrella
E. Wilson from re-litigating claims she has already
litigated in the State Division of Human Rights ("SDHR")
and through an Article 78 proceeding in Bronx County.
For the reasons set out below, the motion is granted.
The Supreme Court has held that a federal court
"must give to a state-court judgment the same preclusive
effect as would be given that judgment under the law of
the State in which the judgment was rendered." *Migra v.
Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81, 104
S.Ct. 892, 79 L.Ed.2d 56 (1984).* In adherence to this rule,
the Court of Appeals has previously held that a "New
York state court affirmation of the [SDHR's] finding of no
probable cause would preclude federal litigation based on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

the same facts." *Yan Yam Koo v. Dep't of Bldgs. of the City of New York,* 218 Fed. Appx. 97, 98 (2007) (Summary Order), affirming *Yan Yam Koo v. NYC Dep't of Bldgs.,* No. 04 Civ. 9628, 2006 WL 963883 (S.D.N.Y. Apr. 12, 2006) (Summary Order). Therefore, a "judgment pursuant to Article 78 may preclude relitigation of issues already decided in that earlier judgment." *LaFleur v. Whitman,* 300 F.3d 256, 272 (2d Cir.2002).

New York law applies collateral estoppel "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *LaFleur,* 300 F.3d at 271. In *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), the Supreme Court held that an Article 78 proceeding that affirmed the SDHR's determination of no probable cause was entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comported with due process. 456 U.S. at 483-485. *See Hill v. Coca Cola Bottling Co. of New York,* 786 F.2d 550, 552 (2d Cir.1986) ("Since [plaintiff's] administrative proceeding before the state labor department was judicially confirmed in the Article 78 proceeding, we are required by *Kremer* to apply New York's law on collateral estoppel.").

Here, Plaintiff filed a Verified Complaint with the SDHR on April 25, 2005.[FN1] Following the SDHR finding of no probable cause on October 10, 2007 (Ex. I to the Amended Complaint ("Am.Compl.")), Plaintiff commenced an Article 78 proceeding seeking "to overturn [the] decision of the [SDHR] as well as investigate ministerial acts which delayed this case for 31 months." (Verified Petition, attached to the Article 78 Decision.) As noted in the Article 78 Decision, a hearing was held in that proceeding on May 19, 2008 at which both parties presented evidence.

FN1. The entire administrative record from the SDHR is attached to the June 27, 2008 Decision in *Wilson v. Victoria's Secret, et al* Supreme Court of the State of New York, County of Bronx, Index No. 34095707 (the "Article 78 Decision") which, in turn, is attached as Exhibit

A to Defendants' moving papers. The Court may consider these papers and the documents attached to the Amended Complaint herein on this motion. *See Stewart v. Transp. Workers Union of Greater New York, Local 100,* 561 F.Supp.2d 429, 435-36 (S.D.N.Y.2008) (noting that a district court may rely on matters of public record of which the court may take judicial notice in resolving a Rule 12(c) motion); *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006) (district court may rely on documents incorporated in a complaint on a Rule 12(c) motion).

On June 27, 2008, the State Court determined that "based upon the hearing held on May 19, 2008 and review of the file of the New York State Division of Human Rights the court finds that the determination of respondent of October 10, 2007 was not arbitrary or capricious." Accordingly, the State Court dismissed Plaintiff's Article 78 petition.

**\*2** The Amended Complaint was filed in this Court on July 25, 2008, and this motion followed.

*Same Issues Raised*

Plaintiff claims national origin discrimination in both the SDHR and in her Amended Complaint in this Court. Plaintiff admits that the claims raised in both fora were claims of national origin discrimination raised under Title VII:

Plaintiff "agrees that she filed a Verified Complaint against Victorias Secret [sic] ('VSS') with the New York State Division of Human Rights ('SDHR') ... and agrees that the charge was based on National Origin." *See* Pl. Opposition at 10.[FN2] The charge filed with the SDHR alleged a violation of both state law and Title VII. *See* Pl. Opposition, at 15; Amended Complaint, Exh. I. The SDHR determined that there was "no probable cause to believe that [VSS] has engaged in or is engaging in the unlawful discriminatory practice complained of." *See* Am. Compl., Exh. I.

FN2. Reference is to Plaintiff's Affirmation in Opposition to Motion dated February 11, 2009.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

Plaintiff "agrees that on December 5, 2007 an Article 78 [proceeding] was filed in the Bronx County New York State Supreme Court ... to overturn the decision of the SDHR." *See* Pl. Opposition at 15. That Court held that "the SDHR actions/determination was not arbitrary and capricious and dismissed the Article 78 petition." *Id.* at 17.

Finally, Plaintiff "agrees that an amended complaint was filed on July 25, 2008 in this [federal] court based on national origin discrimination in violation of Title VII." *Id.* at 19.

More specifically, a comparison of Plaintiff's pleadings in the Article 78 proceeding and in this action confirms that the two claims are based on precisely the same facts and circumstances. For example, in both fora, Plaintiff complains of:

Harassment by management by their cutting her hours and putting false write ups in her personnel files, *compare* letter of 1/3/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 9, p. 5, ll. 1-4.

Unfair or "un-American" working conditions, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) with Am. Compl., ¶ 2E, p. 2 l. 8.

Transfer of sales to favored associates, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 16.

Management's failure to inform her of late night cab reimbursement policy, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p.4, ll. 8-10.

Management's refusal to grant her time off to attend a funeral, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 1-2.

Retaliation for reporting sexual harassment, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 6-7, ll. 15-16.

Management's insulting remarks, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl ., ¶ 2E, p. 3, l. 9.

**\*3** Retaliation of the April 13, 2005 incident which led to her termination, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 8, l. 1.

The issues raised in the SDHR proceeding were, of course, necessarily decided by the State Court in the Article 78 Decision.

*Full Opportunity to Litigate Had*

A "full and fair opportunity to litigate" means that "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer,* 456 U.S. at 481. As noted above, the Supreme Court has clearly stated that an Article 78 proceeding that affirms the SDHR's determination of no probable cause is entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comport with due process. *Id.* at 483-485. Thus, the Article 78 proceeding here provided Plaintiff with a full and fair opportunity to litigate her claims. That she might have been unaware of the administrative appeal process, *see* Pl. Op. at 5-6, is of no import. Plaintiff's failure to avail herself of the full range of available procedures does not render those procedures inadequate under the Due Process Clause. *Kremer,* 456 U.S. at 485. ("The fact that Mr. Kremer failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy.")

*Plaintiff's Other Arguments Against Collateral Estoppel Without Merit*

To the extent that Plaintiff suggests that her naming VSS in her SDHR proceeding and Limited Brands in this action somehow avoids the application of collateral estoppel, she is mistaken. Identity of defendants is not required. *See, e.g., LaFleur,* 300 F.3d at 274 (holding that the proper inquiry with respect to collateral estoppel is *"not* whether the respondent-defendants were identical in both cases"); *Republic Gear Co. v. Borg-Wamer Corp.,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

381 F.2d 551, 555, n. 1 (2d Cir.1967) (explaining that "collateral estoppel may bar relitigation of an issue even against different defendants," provided that the issue in contention was necessary to the result reached in the prior proceeding); Yan Yam Koo, 218 Fed. Appx. at 99 (holding that the fact "[t]hat the plaintiff did not name the identical parties in the state and federal actions does not disturb our finding of [issue] preclusiveness").

In any event, the party defendants are sufficiently closely related to permit preclusion. Victoria's Secret Stores, L.L.C.-Plaintiff's actual employer (*see* Am. Compl. at ¶ 11E)-is a wholly-owned subsidiary of Limited Brands Store Operations, Inc., a Delaware corporation that is a wholly-owned subsidiary of Intimate Brands, Inc. Intimate Brands, Inc. is a Delaware corporation that is a wholly-owned subsidiary of LBI, which is also a publicly traded Delaware corporation.[FN3]

> **FN3.** The Court may take judicial notice of this fact, as this information is attached to the LBI Form 10K that is filed with the Securities and Exchange Commission. Accordingly, it is a matter of public record. *See Stewart,* 561 F.Supp.2d at 435-36.

Finally, to the extent that Plaintiff argues that she did not raise all her federal causes of action in her Article 78 proceeding, she is nevertheless barred from raising them now pursuant to the doctrine of *res judicata.*[FN4] Under New York law, the doctrine of *res judicata* bars a "later claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Because Plaintiff's claims indisputably arise from the same set of facts, *res judicata* applies to bar any legal theories she now raises that are different from those raised in the state court proceeding. *See Kremer,* 456 at 465 n. 3, 481 n. 22 (noting that *res judicata* has been taken to bar claims arising from the same transaction even if brought under different statutes; also noting that a " 'party cannot escape the requirements of full faith and credit and res judicata by asserting its own failure to raise matters clearly within the scope of a prior proceeding' " (quoting Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n, 455 U.S. 691, 710, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982))).

> **FN4.** Although Plaintiff named VSS as the defendant in the state court case and LBI in this case, the identity of the parties is nonetheless the same for purposes of determining *res judicata.* LBI has a sufficiently close relationship to VSS and both defendants were known to Plaintiff at the time she filed her first lawsuit. *See, e.g., Official Publ'ns, Inc. v. Kable News Co.,* 811 F.Supp. 143, 147 (S.D.N.Y.1993) (holding that the "doctrine of *res judiciata* also bars litigation of the same causes of action against defendants who were known to plaintiff at the time the first action was filed but were not named where the newly-added defendants have a sufficiently close relationship to the original defendant"); Alpert's Newspaper Delivery Inc. v. The New York Times Co., 876 F.2d 266, 270 (2d Cir.1989) (noting that in determining privity for *res judicata* purposes, the issue is one of substance rather than the names of the caption of the case). Because LBI is merely a holding company of which VSS is a wholly-owned subsidiary, and the defenses raised by VSS sufficiently represented LBI's interests, VSS and LBI are in privity for *res judicata* purposes. *See G & T Terminal Packaging Co. v. Consol. Rail Corp.,* 719 F.Supp. 153, 159 (S.D.N.Y.1989) (holding that "[s]ubsidiaries are in privity with their principal for res judiciata purposes when, as here, they sufficiently represent the principal's interests"). Additionally, the same counsel who represented VSS in the prior state court litigation represents LBI and VSS in the current litigation. *See Melwani v. Jain,* No. 02 Civ. 1224, 2004 WL 1900356, *2 (S.D.N.Y. Aug. 24, 2004) (stating that "the fact that the parties in the prior and current litigation had the same attorney is of singular significance in the privity analysis" (quotation marks omitted)).

*Conclusion*

**\*4** For the reasons set out above, Defendants' motion for judgment on the pleadings [dkt. no. 14] is granted.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

(Cite as: 2009 WL 1069165 (S.D.N.Y.))

 

 

     The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

     SO ORDERED.

S.D.N.Y.,2009.

Wilson v. Limited Brands, Inc.
Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.